DANIEL BLAU (Cal. Bar No. 305008)
Email: blaud@sec.gov
ALEC JOHNSON (Cal. Bar No. 270960)
Email: johnsonstu@sec.gov
PETER MOORES (Mass. Bar No. 658033)
Email: mooresp@sec.gov
ELIZABETH GOODY (N.Y. Bar No. 4687463)
Email: goodye@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission

David Hirsch, Chief (Crypto Assets and Cyber Unit)
Jorge Tenreiro, Deputy Chief (Crypto Assets and Cyber Unit)
100 F Street NE
Washington, DC 20549

Kathryn E. Zoladz, Acting Regional Director
Douglas M. Miller, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                    Plaintiff,<br><br>          vs.<br><br>PAYWARD, INC. and PAYWARD VENTURES, INC.,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT** |

    In support of its Complaint against Defendants Payward, Inc. ("Payward") and Payward Ventures, Inc. ("Payward Ventures"), which collectively do business as "Kraken," Plaintiff Securities and Exchange Commission ("SEC" or the "Commission") alleges as follows:

COMPLAINT                                    1

## I.    SUMMARY

1.    Since 2013, Kraken has operated an online trading platform through which its customers can buy and sell crypto assets, many of which form the basis of investment contracts covered under U.S. securities laws.  Without registering with the SEC in any capacity, Kraken has simultaneously acted as a broker, dealer, exchange, and clearing agency with respect to these crypto asset securities.  In doing so, Kraken has created risk for investors and taken in billions of dollars in fees and trading revenue from investors without adhering to or even recognizing the requirements of the U.S. securities laws that are designed to protect investors.

2.    Kraken's business practices, deficient internal controls, and inadequate recordkeeping present a range of additional risks that would also be prohibited for any properly registered securities intermediary.  For example, Kraken has at times held customer crypto assets valued at more than $33 billion, but it has commingled these crypto assets with its own, creating what its independent auditor had identified in its audit plan as "a significant risk of loss" to its customers.  Similarly, Kraken has held at times more than $5 billion worth of its customers' cash, and it also commingles some of its customers' cash with some of its own.  In fact, Kraken has at times paid operational expenses directly from bank accounts that hold customer cash.  In addition, during 2023, the independent auditor determined that issues related to Kraken's recordkeeping for customer custodial assets had resulted in material errors to Kraken's financial statements for 2020 and 2021.

3.    Congress enacted the Securities Exchange Act of 1934 (the "Exchange Act") in part to provide for the regulation of the national securities markets.  Congress charged the SEC with protecting investors, preserving fair and orderly markets, and facilitating capital formation.  The SEC carries out these statutorily mandated goals in part through a series of registration, disclosure, recordkeeping, inspection, and anti-conflict-of-interest regulations.  These regulations have generally led to the separation of key intermediaries in the securities markets—including the

COMPLAINT                                          2

separation of brokers and dealers from exchanges and clearing agencies—thereby protecting investors and their assets from the conflicts of interest and risks that can arise when these functions merge.  The SEC has also taken steps to protect investor assets when held by brokers or clearing agencies, including by issuing regulations that restrict the commingling of customer assets with those of the companies handling their investments.

4.    By operating a platform on which crypto assets are offered and sold as investment contracts, Kraken's operations place it squarely within the purview of U.S. securities laws.  Over seventy years ago, the Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), set forth the relevant test for determining whether an instrument is an investment contract subject to regulation under U.S. securities laws.  And in July 2017, the Commission issued a public report reminding members of the public that crypto assets may be considered investment contracts subject to securities laws if they satisfy *Howey*'s test.  The SEC has also enforced the relevant securities laws by bringing a range of enforcement actions based on the offer and sale of crypto assets as securities.  Nonetheless, Kraken has turned a blind eye to its legal responsibilities and engaged in its securities intermediary conduct without registering with the Commission, depriving investors of the disclosures and protections that registration entails.

5.    In failing to prevent known conflicts of interest and commingling its investors' assets with its own, Kraken demonstrates why registration and the investor protections that come with regulatory oversight are critical to the soundness of the United States capital markets.  Defendants have placed their own financial interests ahead of the legal obligations they owe to customers as securities intermediaries.  By engaging in the conduct set forth in this Complaint, Defendants have acted as an exchange, a broker, a dealer, and a clearing agency without registration in violation of Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)].  Unless Defendants are permanently restrained and enjoined, they will continue

to violate these statutes.

6. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

7. The Commission seeks a final judgment: (i) permanently enjoining Defendants from violating Sections 5, 15(a), and 17A of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)(1)]; (ii) ordering Defendants to disgorge their ill-gotten gains, on a joint and several basis, and to pay prejudgment interest thereon; (iii) permanently enjoining Defendants from acting as an unregistered exchange, broker, dealer, or clearing agency; and (iv) imposing civil money penalties on Defendants.

## II. JURISDICTION AND VENUE

8. The Court has jurisdiction over this action pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

9. Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of an exchange within or subject to the jurisdiction of the United States in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

10. Venue is proper in this district pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper because Defendants are headquartered in this district.

## III. DIVISIONAL ASSIGNMENT

11. Under Civil Local Rule 3-2(d), this case should be assigned to the San Francisco Division or the Oakland Division because a substantial part of the events or omissions that give rise to the claims alleged herein occurred in San Francisco County.

## IV. DEFENDANTS

12. Payward is a Delaware corporation founded in 2011, with an address in

San Francisco, CA.  Payward has a number of wholly owned subsidiaries headquartered throughout the world, including Payward Ventures, Inc.  Payward and most of its subsidiaries do business as Kraken.  Payward has never registered with the Commission in any capacity.

13.     Payward Ventures is a Delaware corporation founded in 2013, with an address in San Francisco, CA.  Payward Ventures has never registered with the Commission in any capacity.  On February 9, 2023, the SEC filed a settled action against Payward Ventures in connection with the unregistered offer and sale of Kraken's staking-as-a-service program.  *See SEC v. Payward Ventures, Inc.*, No. 3:23-cv-588 (N.D. Cal.).

## V.     **BACKGROUND**

14.     Kraken is subject to the laws and regulations governing the U.S. securities markets because many of the crypto assets bought and sold through its platform are offered, bought, and sold as investment contracts.  As discussed below, investment contracts are defined broadly under the law with a focus on an investor's reasonable expectations in acquiring an asset, rather than the form of the transaction itself.  Moreover, Kraken has long been on notice that its role in the offer and sale of crypto assets as investment contracts made it subject to U.S. securities laws.

### A.     **Statutory and Legal Framework Regarding the Scope of U.S. Securities Regulations**

15.     As the Supreme Court has recently reemphasized, the Exchange Act and the Securities Act of 1933 ("Securities Act") "form the backbone of American securities laws."  *Slack Tech., LLC v. Pirani*, 598 U.S. 759, 762 (2023).  Together, these acts provide for the regulation of various entities involved in the purchase and sale of securities and define "security" broadly to include a wide range of assets, including "investment contracts."  Securities Act § 2(a)(1) [15 U.S.C. § 77b(a)(1)]; Exchange Act § 3(a)(10) [15 U.S.C. § 78c(a)(10)].

16.     Investment contracts are instruments through which a person invests

money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  As the United States Supreme Court noted in *Howey*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  328 U.S. at 299.  Following Congress's intent, courts have found novel or unique investment vehicles to be investment contracts, including those involving orange groves, animal breeding programs, cattle embryos, mobile phones, enterprises that exist only on the internet, and crypto assets.

17.     To protect investors and fulfill the purposes of the Exchange Act, Congress imposed registration and disclosure obligations on certain defined participants in the national securities markets, including but not limited to broker-dealers, exchanges, and clearing agencies.  The Exchange Act empowers the SEC to write rules to, among other things, protect investors who use the services of those participants and provide for stability of the nation's securities markets.

**B.     Crypto Assets and Crypto Trading Platforms**

**1.     Crypto Assets**

18.     As used herein, the terms "crypto asset," "digital asset," or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

19.     A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks."  These systems typically rely on cryptographic techniques to secure recording of transactions.

20.     Some crypto assets are "native" to a particular blockchain, meaning that they are the blockchain's core asset that is integral to how the blockchain functions.  In contrast, other crypto assets may be non-native and are built on top of an existing

blockchain.

21.    Some crypto assets may provide a holder with certain pre-determined rights, coded into the software itself, such as the right to "burn" (or destroy) the asset in order to propose transactions on the asset's blockchain, or to interact with other portions of the blockchain's existing or yet-to-be-developed protocols and software.

22.    Crypto asset owners typically store key information about their crypto assets on a piece of hardware or software called a "crypto wallet." The primary purpose of a crypto wallet is to store the "public key" and the "private key" associated with a crypto asset so that the user can make transactions on the associated blockchain. The public key is colloquially known as the user's blockchain "address" and can be freely shared with others. The private key is analogous to a password and confers the ability to transfer a crypto asset. Therefore, whoever controls the private key controls the crypto asset associated with that key. Crypto wallets can reside on devices that are connected to the internet (sometimes called "hot wallets"), or on devices that are not connected to the internet (sometimes called "cold wallets" or "cold storage"). Although, all wallets are at risk of being compromised or "hacked," hot wallets are at greater risk because their internet connectivity makes them easier to access remotely.

23.    Crypto assets can be transferred directly on the relevant blockchain or through a third-party intermediary. The transfer of a crypto asset from one person to another that is verified and recorded on the relevant blockchain's publicly-available ledger is known as an "on-chain" transaction. The reliability of on-chain crypto asset transfers is one of the core functionalities of blockchain technology, as described in Section B.2 below.

24.    Crypto asset transactions that occur without being submitted to, verified, or recorded on a blockchain are known as "off-chain" transactions. For example, the transfer of crypto assets between two customers on the same centralized trading platform, such as Kraken's, is an off-chain transaction.

### 2. Consensus Mechanisms and Validation of Transactions on a Blockchain

25.    Blockchains typically employ a "consensus mechanism" that, among other things, aims to achieve agreement among users as to a data value or as to the state of the ledger.

26.    A consensus mechanism describes the particular protocol used by a blockchain to agree on, among other things, which ledger transactions are valid, when and how to update the blockchain, and whether to compensate certain participants for validating transactions and adding new blocks. There can be multiple compensation sources for consensus mechanisms under the terms of the blockchain protocol, including from fees charged to those transacting on the blockchain, or through the creation or "mining" of additional amounts of the blockchain's native crypto asset.

27.    "Proof of work" and "proof of stake" are two of the most prevalent consensus mechanisms used by blockchains. Proof of work, the mechanism used by the Bitcoin blockchain, involves a network of computers, known as "miners," expending computational effort to guess the value of a predetermined number. The first miner to successfully guess this number earns the right to update the blockchain with a block of transactions and is rewarded with the blockchain's native crypto asset. Proof of stake, the consensus mechanism currently used on the Ethereum blockchain, involves selecting "validators" from a network of crypto asset holders who have committed or "staked" a minimum number of crypto assets.

### 3. The Offer and Sale of Crypto Assets

28.    Persons have offered and sold crypto assets in capital-raising events in exchange for consideration, including but not limited to through so-called "initial coin offerings" or "ICOs," "crowdsales," or public "token sales." In some instances, the entities offering or selling the crypto assets may release a "whitepaper" or other marketing materials describing a project to which the asset relates, the terms of the offering, and any rights associated with the asset.

29.     Some issuers continue to sell the crypto assets after the initial offer and sale, including directly or indirectly by selling them on crypto asset trading platforms.

### 4.     Crypto Asset Trading Platforms

30.     Crypto asset trading platforms—like Kraken's—are marketplaces that offer a variety of services relating to crypto assets, often including brokerage, trading, custody, and settlement services.

31.     Crypto asset trading platform interfaces—like Kraken's—also look similar to traditional custodial securities brokerage platforms.  Whether web-, desktop-, or mobile-based, application programming interfaces (APIs), or other software, these crypto asset trading platform interfaces typically emulate those offered within the traditional securities markets: they show order books of the various assets available to trade and historical trading information like high and low prices, trading volumes, and capitalizations which serve in part to help investors recognize market opportunities.

32.     Crypto asset trading platforms allow their customers to deposit fiat (legal tender issued by a country) into bank accounts and crypto assets into crypto wallets controlled by the platform, and then to purchase and sell crypto assets for fiat or other crypto assets.  These transactions can be finalized on-chain, with the intermediary transferring the purchased crypto asset from the seller's account to the buyer's crypto wallet.  Or, if the purchaser has an account with the intermediary and customer assets are stored collectively in what is called an *omnibus* wallet, then the transactions can be finalized off-chain, with the platform recording the necessary debits and credits internally, without having to transfer crypto assets from one blockchain address to another.

33.     By possessing and controlling the fiat and crypto assets deposited and/or traded by their customers, crypto asset trading platforms function as central depositories.

34.     However, unlike in traditional securities markets, crypto asset trading

platforms (including that of Kraken) perform various other functions, in that they also typically solicit, accept, and handle customer orders for securities; allow for the interaction and intermediation of multiple bids and offers resulting in purchases and sales; act as an intermediary in making payments or deliveries, or both; and maintain a central securities depository for the settlement of securities transactions.

35.     By contrast, a registered national securities exchange submits information regarding executed trades to a registered clearing agency that takes responsibility for ensuring settlement finality and safekeeping of the assets being traded and, in doing so, protects investors' interests.  Thus, registered national securities exchanges typically do not assume possession or control of the underlying assets being traded.  Moreover, crypto asset trading platforms usually settle transactions by updating internal records with each investor's positions, a function typically carried out by clearing agencies and broker-dealers in compliant securities markets.

36.     Likewise, crypto asset trading platforms typically perform roles traditionally assigned to broker-dealers in compliant securities markets, such as effecting securities transactions on behalf of their customers, without the platforms following or even acknowledging the legal obligations and restrictions on activities that accompany status as a broker-dealer.

## C.     The SEC's "DAO Report"

37.     On July 25, 2017, the SEC issued the Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (the "DAO Report"), advising "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the offering of crypto assets at issue in the DAO Report were offerings of securities.

38.     The DAO Report also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate

pursuant to an exemption from such registration," and "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces." The DAO Report also found that the trading platforms at issue there "provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.

## VI.  FACTUAL ALLEGATIONS

### A.  Kraken's Operations

39.     In 2013, Kraken launched its "Kraken Trading Platform," which allows customers to buy and sell crypto assets through an online market. On its website, Kraken describes the Kraken Trading Platform as "one of the world's largest digital asset exchanges" and advertises that it has more than nine million retail and institutional customers located in over 190 countries.

40.     With the launch of the Kraken Trading Platform, Kraken also began providing services for customers to open accounts, deposit funds, enter orders, and trade crypto assets ("Kraken Services").

41.     Today, Kraken's Trading Platform resembles those found in the traditional securities industry with a matching engine, customer interface applications, a range of order types, and advanced trading tools. From its start in 2013 to the present (the "Relevant Period"), the Kraken Trading Platform and Kraken Services have evolved into an expansive online trading operation that lists more than 220 crypto assets and permits margin trading while offering securities trading services such as an over-the-counter trading desk ("OTC Desk"), "instant buy" features, and multiple applications and pathways for customers to interface with the Kraken Trading Platform and Kraken Services.

42.     Through the Kraken Trading Platform and Kraken Services, Kraken

facilitates transactions in crypto assets in multiple ways.  This includes: (1) allowing customers to submit orders for crypto assets and operating a system that attempts to match those orders; (2) opening and maintaining customer accounts and holding funds and crypto assets that have been transferred to or purchased through Kraken by customers; (3) operating "Instant Buy," where Kraken acts as the counterparty for a customer's request to buy or sell crypto assets; (4) operating the OTC Desk, which facilitates large crypto asset orders; (5) operating applications that allow customers to access their accounts and place and direct orders; and (6) offering margin lending for trading in crypto assets on the Kraken Trading Platform.

43.    In 2020 and 2021 together, Kraken earned more than $43 billion in revenue from trading-based transactions, including from fees charged to customers, sales of crypto assets to customers, and proprietary trading.

44.    The Kraken Trading Platform and Kraken Services are available to both retail and institutional customers, including to customers inside and outside the United States.

45.    The Kraken Trading Platform's servers are located in the United States, and are the means through which the platform operates a single set of order books and a matching engine.  Kraken does not segregate or segment the order books based on geography or local operating entity.

46.    Payward utilizes a single set of Terms of Service to cover the Kraken Trading Platform and Kraken Services.  According to Kraken's Terms of Service, the Kraken Trading Platform and Kraken Services are offered through "local operating entities," which are wholly owned subsidiaries of Payward.  For customers residing in the United States, the local operating entity is Payward Ventures.

47.    Despite the geographic designations referenced in the Terms of Service, Payward's operations are not geographically segregated, allowing U.S. customers to trade crypto assets regardless of where Kraken's operations occur.  Personnel of various local operating entities are cross-staffed according to product or service (not

by region) and report to Payward executive management.  For example, personnel of the Kraken Trading Platform and OTC Desk ultimately report to Payward's chief operating officer.  Payward's current and former chief executive officers participated in promotional videos and media interviews promoting the Kraken Trading Platform. Moreover, Payward's marketing materials to venture capital investors do not differentiate between Payward and these local operating entities.

48.    The crypto assets made available for trading on the Kraken Trading Platform and through the Kraken Services may be bought, sold, or exchanged for consideration, including U.S. dollars, other fiat currencies, or other crypto assets.

49.    Each unit of a particular crypto asset on the Kraken Trading Platform trades at the same price as another unit of that same crypto asset.

50.    These crypto assets are interchangeable (*e.g.*, any "FIL" crypto asset or fraction thereof is just like any other FIL crypto asset) on the Kraken Trading Platform.  Accordingly, to the extent the assets change in price on the Kraken Trading Platform, all tokens of the same asset increase or decrease in price in the same amounts and to the same extent, such that one token is equal in value to any other one token, on a *pro rata* basis.

51.    However, investors may buy or sell crypto assets through the Kraken Services at prices different than the contemporaneous price on the Kraken Trading Platform.  For example, Kraken may sell to an investor a crypto asset through its Instant Buy feature at a different price then the last executed trade or current offer on the Kraken Trading Platform.

52.    Nevertheless, the purchase of any particular unit of a crypto asset does not appear to give an investor any special rights not available to any other investor in that crypto asset, such as separately managed accounts, or different capital appreciation as to the value of that crypto asset.  This includes assets purchased on the Kraken Trading Platform and assets purchased through the Instant Buy feature.

53.    The crypto assets on the Kraken Trading Platform are available for sale

broadly to any person who creates an account with Kraken.  Kraken applications display information (like asset price changes) in a format highly similar to trading applications offered by registered broker-dealers in the traditional securities markets. Kraken makes these crypto assets available for trading without restricting transactions to those who might acquire or treat the asset as something other than as an investment.

54.     Kraken customers can access asset-specific webpages from the "Crypto Prices" page on Kraken's website.  There, customers can click on the name of a particular crypto asset and are redirected to a page where Kraken provides additional information about that crypto asset.  The information on each asset-specific page includes: (i) an "about" section describing the crypto asset; (ii) a "who created" section describing the team of people who created or launched the crypto asset and are developing the network for the crypto asset; (iii) a "how does it work" section that describes the protocol and blockchain for the crypto asset and any parameters or characteristics of the crypto asset; (iv) a roadmap section describing the anticipated development of the crypto network or project; (v) a section describing various analysts assessments about the future price of the crypto asset; (vi) historical information about the "price" of the asset including its "all-time high" price during the past year and the "price change" over the last 24 hours and the last year stated as a percentage return change; (vii) a link to another page about the crypto asset to "learn more about" it; (viii) links to purchase the crypto asset on the Kraken Trading Platform or through the Kraken Services and a description of the other crypto assets owned by owners of the particular crypto asset, and (ix) information specifically promoting a purchase of the asset as an investment into the asset's promoter's efforts to develop, create, grow, and/or maintain the asset's ecosystem in the hope that this will increase the asset's value.

55.     Because Kraken has not registered as a broker, dealer, national securities exchange, or clearing agency, there is no formal mechanism to ensure the accuracy or

1    consistency of the information Kraken selectively discloses about the crypto assets it

2    makes available for trading or about its own operations.

3        56.    Kraken does not restrict how many units of a crypto asset any given

4    investor may purchase.  Moreover, investors are not required to purchase quantities

5    tied to a purported non-investment "use" that may exist for the asset, if any.  To the

6    contrary, investors may purchase crypto assets in any amount and for any purpose.

7        57.    The crypto assets made available for trading on the Kraken Trading

8    Platform and through the Kraken Services are transferable and immediately eligible

9    for resale on the Kraken Trading Platform and through the Kraken Services (both

10   subject to settlement) without any apparent restrictions on resale (including as to the

11   prices or amounts of resale, or the identity of the new buyers).

12   **B.    Many of the Crypto Assets Available Through Kraken Are**
13   **        Securities**

14       58.    Throughout the Relevant Period, Kraken has made available for trading

15   many "crypto assets securities."  These crypto asset securities are investment

16   contracts represented by the underlying crypto asset.  In fact, Kraken currently makes

17   available for trading crypto assets that have been the subject of prior SEC

18   enforcement actions based upon their status as crypto asset securities, including

19   crypto assets trading under the symbols ADA, AXS, ALGO, ATOM, CHZ, COTI,

20   DASH, FIL, FLOW, ICP, MANA, MATIC, NEAR, OMG, SAND, and SOL, which

21   were alleged in one or more of the following actions against other unregistered

22   intermediaries:  *SEC v. Bittrex*, No. 2:23-cv-580 (W.D. Wash. filed April 17, 2023);

23   *SEC v. Binance Holdings Ltd.*, Civ. No. 23-1599 (D.D.C. filed June 5, 2023); *SEC v.*

24   *Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y. filed June 6, 2023).

25       59.    For purposes of prevailing on the Exchange Act claims set forth herein,

26   the SEC need only establish that Kraken has engaged in regulated activities relating

27   to a single crypto asset security during the Relevant Period.  Nevertheless, set forth

28   herein are details regarding a non-exhaustive list of 11 crypto asset securities

available on the Kraken Trading Platform and through the Kraken Services under the following trading symbols: ADA, ALGO, ATOM, FIL, FLOW, ICP, MANA, MATIC, NEAR, OMG, and SOL (the "Kraken-Traded Securities").

60.     Each of these Kraken-Traded Securities was offered and sold on the Kraken Trading Platform or through the Kraken Services during the Relevant Period.

61.     Each of the Kraken-Traded Securities was offered and sold as part of an investment contract.

62.     Based on the public statements of their respective issuers and promoters—at least some of which were rebroadcast by Kraken itself on the Kraken Trading Platform—a reasonable investor would have understood the offer and sale of each of the Kraken-Traded Securities as offers and sales of investment contracts. Specifically, purchasers of the Kraken-Traded Securities would reasonably have expected to profit from the efforts of these issuers and promoters to grow and maintain the technology platforms and blockchain ecosystems associated with these crypto assets because such growth or operations could in turn increase the price of the underlying crypto asset and/or provide increased value to holders of the Kraken-Traded Securities.

63.     Further, the economic reality of the offerings as presented by their respective issuers and promoters—and rebroadcast by Kraken itself—would have indicated to a reasonable investor that future profits through the increased value of the Kraken-Traded Securities would come through the efforts of these issuers and promoters.

64.     In light of the ongoing statements and efforts of these issuers and promoters, such as those set forth below, this expectation would have persisted whether the investor acquired the Kraken-Traded Securities from the issuer or from other investors.

65.     For example, FIL is the native crypto token of the Filecoin network, a self-described open-source data storage network that runs on a blockchain created by

Protocol Labs, Inc.  Protocol Labs conducted initial sales of FIL in 2017, saying the sales "raised the funding necessary to grow our team, to create the network, and build all the software tools needed to operate and use the network."  Underscoring the aligned financial incentives between the network and the FIL token, Protocol Labs publicly stated, "Filecoin success will reward the investment of supporters like you by simultaneously driving down the cost of storage and increasing the value of the Filecoin tokens that incentivize miners to provide storage."

66.    FIL has been available for purchase and sale on the Kraken Trading Platform and through the Kraken Services since October 2020.  And Kraken's own public statements about FIL have since reinforced the expectation of profits from an investment in FIL due to the managerial efforts of Protocol Labs.  As Kraken has stated on its website: "If the Filecoin network grows and more users trust it with their data, and more miners supply disk-space, then the amount of transactions requiring FIL should grow.  The price of FIL should rise since the amount of FIL available is limited."

67.    Section V.E of this Complaint provides further allegations specific to the 11 Kraken-Traded Securities, detailing the development of these crypto assets and the public statements and economic realities based upon which reasonable investors would have expected to profit from these crypto assets.

**C.    Kraken Was Required to Register with the Commission**

68.    Because the crypto assets available through the Kraken Trading Platform and the Kraken Services included crypto asset securities traded as investment contracts, Kraken was subject to U.S. securities laws.

69.    As previously noted, to fulfill the purposes of the Exchange Act, Congress imposed registration and disclosure obligations on certain defined participants in the national securities markets, including but not limited to brokers, dealers, exchanges, and clearing agencies.

70.    During the Relevant Period, Kraken acted as an exchange, broker,

dealer, and clearing agency with respect to crypto asset securities.

71.     Nonetheless, Kraken has never registered with the Commission as a national securities exchange, broker, dealer, or clearing agency.  Moreover, there is no exemption from registration with the Commission that would apply to Kraken.

### 1.     Kraken Failed to Register as a National Securities Exchange

#### a.     Registration of Exchanges

72.     In enacting registration provisions for national securities exchanges, Congress found in Section 2(3) of the Exchange Act [15 U.S.C. §78b(3)] that:

> Frequently the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation, resulting in sudden and unreasonable fluctuations in the prices of securities which (a) cause alternately unreasonable expansion and unreasonable contraction of the volume of credit available for trade, transportation, and industry in interstate commerce, (b) hinder the proper appraisal of the value of securities and thus prevent a fair calculation of taxes owing to the United States and to the several States by owners, buyers, and sellers of securities, and (c) prevent the fair valuation of collateral for bank loans and/or obstruct the effective operation of the national banking system and Federal Reserve System.

73.     Accordingly, Section 5 of the Exchange Act [15 U.S.C. § 78e] requires an organization, association, or group of persons that meets the definition of "exchange" under Section 3(a)(1) of the Exchange Act, unless otherwise exempt, to register with the Commission as a national securities exchange pursuant to Section 6 of the Exchange Act.

74.     Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(1)] defines "exchange" to mean "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange."

75.     Exchange Act Rule 3b-16(a) [17 C.F.R. § 240.3b-16(a)] further defines certain terms in the definition of "exchange" under Section 3(a)(1) of the Exchange Act, including "[a]n organization, association, or group of persons," as one that: "(1) [b]rings together the orders for securities of multiple buyers and sellers; and (2) [u]ses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade."

76.     Registration of a trading platform as an "exchange" under the Exchange Act is a bedrock Congressional requirement that permits the SEC to carry out its role overseeing the national securities markets.

77.     For example, registered exchanges must enact rules that, as required by Section 6 of the Exchange Act, are "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade … and, in general, to protect investors and the public interest."

78.     These rules are subject to review by the SEC under Section 19 of the Exchange Act [15 U.S.C. § 78s], both at the time of initial registration and subsequently whenever the exchange wishes to add, delete, or amend a rule.  This review process is designed to ensure that securities marketplaces operate in a manner consistent with the Exchange Act as their practices and procedures evolve over time and to protect investors and the integrity of securities markets that affect national commerce and the economy.

### b.     Kraken Operates an Unregistered Securities Exchange

79.     During the Relevant Period, Kraken used means and instrumentalities of interstate commerce to bring together the orders of multiple buyers and sellers of crypto asset securities, including the Kraken-Traded Securities.  Using a trading facility programmed with non-discretionary rules under which orders interact, Kraken connected these buyers and sellers to agree upon terms for trades in these securities. As a result, Kraken maintained and provided a marketplace for bringing together

buyers and sellers of securities.  Kraken was therefore required to register with the Commission as a national securities exchange or operate pursuant to an exemption to such registration but failed to do so.

80.     The Kraken Trading Platform makes available to its customers more than 220 crypto assets, including crypto asset securities, for trading.

81.     Kraken operates the Kraken Trading Platform through the use of a "trading engine" that matches customer orders based, in part, on price and time priority.

82.     Orders are stored in Kraken's central limit order book, a common functionality for many exchanges that tracks the price, size, time of submission, and other characteristics of each submitted order.  Kraken maintains a separate order book for each crypto asset trading pair.

83.     Kraken not only engaged in the conduct of a securities exchange, it described itself as one.  Kraken describes its operations, the Kraken Trading Platform, and the Kraken Services using terms from securities laws and the securities industry.  For example, Kraken calls its Trading Platform an "Exchange" or the "Kraken Exchange."

84.     According to a document prepared by Kraken's finance department in September 2022:

> [The] trading platform (the "Exchange" or "Kraken Exchange") allows institutional and retail investors (the 'customers') to purchase, sell or exchange [a crypto asset] for another [crypto asset] or fiat currency. Customers can initiate a limit order, market order, and certain other order types similar to those available on a traditional commodities or stock exchanges.  Kraken then fills those orders using an internally developed matching algorithm that allows multiple order transactions being matched amongst each other.

85.     Kraken further acted as an exchange by: (i) handling customer applications, order entries, and displaying order information; (ii) offering a variety of order types; (iii) charging fees per executed order; and (iv) matching the orders of buyers and sellers.

### i.   Customer Applications, Order Entry, and Display

86.   Kraken allows customers to enter orders to trade on the Kraken Trading Platform via Kraken's customer applications or an API.  An API is a software intermediary permitting two programs to communicate.

87.   Kraken itself also may enter orders into the Kraken Trading Platform as principal and be a counterparty to trades against customers.  Customers are not provided with any disclosures as to whether the counterparty to their trade on the Kraken Trading Platform is another Kraken customer or Kraken acting as principal, or any additional protections when Kraken is acting as principal.

88.   Through Kraken's customer applications or API, Kraken customers can place a variety of buy and sell orders for crypto assets, including crypto asset securities.  Through the Kraken Trading Platform, Kraken then matches the orders of buyers and sellers with each other.

89.   Kraken provides customers with a live feed of Kraken's order book— which shows bids and offers for each crypto asset available for trading on the platform—as well as a crypto asset's trading history on the Kraken Trading Platform. A customer may also view their own account information, including the customer's trade history, and the prices and sizes of its executed trades.

90.   Kraken has multiple customer applications, including web, mobile, and desktop applications.  Some are designed to be "beginner friendly," and others are designed for a "professional trading experience."

91.   The "professional" style applications offer features that mimic trading terminals offered or used by registered securities intermediaries.  For example, Kraken advertises its "Kraken Pro" application as "a one-stop destination for advanced crypto traders" that is "fully equipped with must-have advanced trading tools and features, addressing all your trading needs in one place," where traders can "identify trades with full-featured charting, technical indicators and compare up to 4 markets at once" as well as "monitor the action with live order books and streaming

trades."

92.     From 2017 until it was retired on September 30, 2023, Kraken offered an application named Cryptowatch which it described as a "premium trading terminal." Through Cryptowatch, Kraken provided "trading services for over 25 cryptocurrency exchanges," including the Kraken Trading Platform.  Cryptowatch, among other things, allowed Kraken customers to place orders on "multiple crypto exchanges from a single platform."  For example, Kraken customers who were also customers of one of those "exchanges" could place orders on that trading platform using the Cryptowatch application's automated connection.

93.     Kraken's website (www.Kraken.com) also functioned as a web-based application providing customers with an interface for trading crypto assets on the Kraken Trading Platform.  A tab or link on the Kraken website called "Markets" led customers to a page listing the current price for the hundreds of crypto assets available for trading on the Kraken Trading Platform, and also displayed the high and low price for each asset over the previous 24 hours, the percentage change in price during that same period, and the total value of all trading of that asset that occurred over that period.

94.     The crypto assets listed on the "Markets" page were listed by full name and trading symbol and displayed in descending order from largest to smallest based on the previous 24-hour trading volume.  The "Markets" page also displayed approximately five crypto assets under the category of "trending" for those assets that had the highest volume of trading over the previous 24 hours and those that had the highest percentage of gains or losses in value over that same period.

95.     Another tab or link on the Kraken Trading Platform website called "Trade" led visitors to a listing of the order book for the various crypto assets available for trade on the platform.  One side of the order book displays the current buy orders in descending order from highest bid price to lowest while the other side of the order book displays the sell orders in ascending order from lowest asking price

to the highest.

96.    The "Trade" page also displayed a "price chart" graph for the selected crypto asset which reflects the trading volume of the token over a selected period of time (i.e., 1 day, 5 days, 1 month, 3 months, 6 months, 1 year, 5 years) and a "depth chart" graph which displayed the current "mid-market price" (i.e., the middle point between the highest bid price and lowest asking price for a particular asset) and the "spread" (i.e., the difference between the highest bid and lowest asking price) for that asset.

### ii.    Order Types

97.    Kraken offers the ability for buyers and sellers to place multiple order types, including but not limited to, market (trade at the best available price in the order book), limit (trade at a specified price or better), stop loss (market order triggered at the stop price), take profit (market order entered when last traded price reaches a specified price), and settle position (closes a customer's margin position).

98.    Kraken requires customers, when submitting orders, to input various parameters, including those similar to parameters used in trading non-crypto securities: crypto asset trading symbol, size, price, and order type.  Customers may also place automated, algorithmic trades using Kraken's APIs.

99.    Kraken offers certain customers the ability to trade using margin on the Kraken Trading Platform.  Kraken extends margin credit (from its proprietary inventory) to these customers for buying and selling certain crypto assets, including crypto asset securities.  Kraken charges percentage-based fees for opening a leveraged position as well as for maintaining a leveraged position.

100.    Unless trading on margin, a Kraken customer must have an available balance of the relevant crypto asset or fiat currency in their account to cover the total value of the order plus any applicable fees.

101.    All orders are stored in Kraken's order book.

### iii.    Fees

102.   Similar to brokers and exchanges in the traditional securities markets, Kraken charges a fee or commission on each executed trade.

103.   Kraken's transaction-based fees vary depending on the trading pair, a user's 30-day trading volume, and other factors.

104.   Kraken's website states: "[T]rading fees are reduced according to the USD value of [the customer's] total volume traded by [a customer's] account over the previous 30 days."  Kraken's website states that Kraken "reward[s] user[s] who drive liquidity to Kraken" and "[t]he more you trade, the more you save."

105.   More specifically, Kraken uses a maker-taker fee schedule with volume incentives based on the customer's previous 30-day activity.  In a maker-taker model, an executed order that takes liquidity is charged a fee, while the resting order that makes liquidity (the order against which the taker order executes) is given a rebate, which is generally less than the amount of the taker fee, allowing the platform to keep the difference.

106.   Kraken's maker fee ranges from 0.00% to 0.16% of the principal amount traded, depending on the trader's 30-day volume.

107.   The taker fee ranges from 0.10% to 0.26% of the principal amount traded, depending on the trader's 30-day volume.  Kraken deducts the taker fee for each transaction from the customer's Kraken account.

### iv.    Order Matching

108.   The Kraken Trading Platform matches the orders of buyers and sellers pursuant to rules that Kraken has programmed into its matching engine.

109.   After a buyer or seller enters an order, Kraken's software performs certain checks, such as for erroneous order conditions, disruptive pricing, self-trading and other violations of Kraken policies, and ensures that the customer has sufficient funds (in the form of crypto assets, fiat currency, or margin) to settle any resulting transaction and pay applicable fees.

110.   If the order passes these checks, Kraken sends the order to its central limit order book where it is eligible to be matched and executed by the Kraken Trading Platform's automated matching engine (the "Kraken Matching Engine").

111.   Aside from periods of maintenance or outages, the Kraken Trading Platform is always open for trades, operating 24 hours a day, every day.

112.   The servers for the Kraken Matching Engine are located within the United States.

113.   If an order is not immediately executed upon entry, the Kraken Trading Platform will include the order in its order book for potential matching with one or more orders from other buyers or sellers.  The platform will then update the customer's account balance to reflect the open order.

114.   There is an order book for each crypto asset trading pair, *e.g.*, an order for trading U.S. Dollars to the crypto asset security called "Cardano" and represented by the trading symbol "ADA" may be referred to as the "ADA-USD" order book. The Kraken Matching Engine matches orders based on price-time priority within that order book.

115.   Kraken describes publicly on its website some of the "detailed trading rules for operating" the Kraken Trading Platform.  Kraken's website informs traders that: (i) orders placed on Kraken's order book are prioritized according to price; (ii) buy orders are prioritized in decreasing order of price with the highest bid placed at the top of the order book; (iii) sell orders are prioritized in increasing order of price with the lowest ask placed at the top of the order book; (iv) orders with same price are aggregated in the order book and are filled in a first in, first out manner; and (v) conditional orders are stored separately from the order book on a "not held" or reserved basis and are placed on the order book when an asset's price meets the pre-specified condition and price.

### v.   Direct Sales

116.   Kraken does not restrict issuers or promoters from publicly offering and

selling crypto assets, including each of the Kraken-Traded Securities, on the Kraken Trading Platform.  Nor does Kraken implement any policies or procedures to prevent issuers from offering and selling their crypto assets to the public on the Kraken Trading Platform.

117.   Multiple issuers sold their respective crypto assets on the Kraken Trading Platform through market makers.

118.   Kraken is aware that crypto asset issuers offer and sell their own holdings via the Kraken Trading Platform, in part because Kraken itself facilitated them doing so.

119.   For example, the issuer of ALGO (the native crypto asset to the Algorand blockchain) used a market maker ("Market Maker 1") to offer and sell ALGO, including on the Kraken Trading Platform.

120.   In April 2020, a representative of Market Maker 1 emailed Kraken representatives, stating in part, "As you know we are providing liquidity for a number of customers (token issuers), Algorand is the only one from our existing customers that is listed in Kraken and we would like to know if we can help you in any way with your due diligence with other [Market Maker 1] customers that would in my opinion be suited for Kraken."

121.   In response, a Kraken representative stated, in part, "I saw [Market Maker 1] and assumed straight market making-related discussions" and that another Kraken representative was "moving forward with all new asset reviews."  A call was arranged to "cover both new asset DD + MM discussions."

122.   In this context, "DD" is shorthand for "due diligence" and "MM" is shorthand for "market maker."

123.   In May 2020, the Kraken representative emailed the Market Maker 1 representative, stating in part, "I hope that you have been well since we spoke a few weeks ago.  As a quick follow-up, I wanted to provide some general benefits and liquidity guidelines that we look for in MM parents (attached).  It would also be great

1  to explore how Kraken and [Market Maker 1] can further collaborate going forward.

2  Do you have for a call early next week to discuss these?"

3      124.   Market Maker 1 also offered and sold ADA, FIL, FLOW, ICP, MATIC

4  and NEAR via the Kraken Trading Platform on behalf of their respective issuers.

5      125.   Other market makers offered and sold crypto assets via the Kraken

6  Trading Platform on behalf of their issuers.

7      126.   The issuers of the following Kraken-Traded Securities all sold their

8  respective crypto asset securities on the Kraken Trading Platform through market

9  makers during the Relevant Period:  ADA, ALGO, FIL, FLOW, ICP, MATIC, and

10  NEAR.

11      127.   Such sales were part of the respective issuer's offers and sales of their

12  crypto asset securities into the public trading markets.

13      128.   Kraken did not inquire or query whether a market maker was selling

14  crypto assets on behalf of an issuer.

15              **2.   Kraken Failed to Register as a Broker-Dealer**

16                  **a.   Registration of Broker-Dealers**

17      129.   Absent an applicable exemption or exception, Section 15(a) of the

18  Exchange Act [15 U.S.C. § 78o(a)] generally requires brokers and dealers to register

19  with the SEC, and a broker or dealer must also become a member of one or more

20  "self-regulatory organizations" ("SROs"), which in turn require members to adhere to

21  rules governing the activities of the SRO's members.

22      130.   Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines

23  "broker" generally as "any person engaged in the business of effecting transactions in

24  securities for the account of others."

25      131.   Section 3(a)(5) of the Exchange Act [15 U.S.C. § 78c(a)(5)] defines

26  "dealer" generally as "any person engaged in the business of buying and selling

27  securities for his own account, through a broker or otherwise."

28      132.   The regulatory regime applicable to broker-dealers is a cornerstone of

the federal securities laws and provides important safeguards to investors and market participants.  Registered broker-dealers are subject to comprehensive regulation and rules that include recordkeeping and reporting obligations, SEC and SRO examination, and general and specific requirements aimed at addressing conflicts of interest, among other things.  All of these rules and regulations are critical to the soundness of the national securities markets and to protecting investors in the public markets.

133.   To preserve the maintenance of fair and orderly markets, avoid conflicts of interests, and protect investors, Section 11(a) of the Exchange Act [15 U.S.C. § 78k(a)] prohibits broker-dealers from effecting transactions for their own accounts on exchanges where they are a member.

134.   Further, broker-dealers must abide by certain financial responsibility requirements under the Exchange Act.  For example, broker-dealers are required to make and maintain certain business records to assist the firm in accounting for its activities and to assist securities regulators in examining the firm's compliance with securities laws.  17 C.F.R. § 240.17a-3, 17a-4.  Broker-dealers are also prohibited under what is known as the "Customer Protection Rule" from using customer securities and cash to finance their own business.  17 C.F.R. § 240.15c3-3.  By segregating customer securities and cash from a firm's proprietary business activities, the rule increases the likelihood that customer assets will be readily available to be returned to customers if a broker-dealer fails.

### b.    Kraken Functions as a Broker

135.   During the Relevant Period, Kraken used, and continues to use, means and instrumentalities of interstate commerce to effect transactions in crypto asset securities for the accounts of others, and regularly participated in these securities transactions at key points in the chain of distribution.

136.   Kraken solicited, and continues to solicit, potential investors in crypto asset securities and hold itself out as selling crypto asset securities.

137.   As alleged above, Kraken provided, and continues to provide, a system for customers to enter orders in securities, to route and handle those customer orders, and to take compensation by charging customers fees for these services.

138.   Kraken handled, and continues to handle, customer funds and customers' crypto asset securities (which it commingled and treated as fungible with its own crypto assets) through Kraken-controlled accounts and crypto wallets.

139.   Kraken was therefore required to register with the Commission as a broker but did not do so.

   i.   **Kraken Views Itself as a Broker and Solicits Customers for Trading Crypto Asset Securities**

140.   In internal documents, Kraken calls itself a "broker" and states that its operations are similar to brokers in traditional markets.

141.   Internally, Kraken identifies itself as a broker in other ways.  For example, on a Kraken corporate organizational chart, Kraken labels Payward Ventures (along with other Kraken entities) as a client-facing "Broker Entity."

142.   In its internal policies, Kraken refers to Payward Ventures as a "Local Spot Broker" or the acronym "LSB."

143.   Kraken further refers to its customer accounts containing crypto assets or fiat as a customer's "brokerage account."

144.   Kraken regularly solicits customers to open accounts at Kraken to trade crypto assets, including the Kraken-Traded Securities, on the Kraken Trading Platform and through the Kraken Services, including through marketing and posts on its website, applications, and on social media.

145.   For example, Kraken has posted on X (formerly known as Twitter), with the handle "@KrakenFX" information about: crypto assets, including crypto asset securities, available to trade on the Kraken Trading Platform, including new assets or those newly available for margin trading; Kraken's promotions for customers; trading support notifications; enhanced trading features of the Kraken Trading Platform; links

to Kraken interviews and publications; and responses to specific posts by Kraken customers.

146.   Kraken regularly posts comments in the Kraken forum on Reddit, including referring customers to Kraken's support services and providing updates about the status of the Kraken Trading Platform.

147.   Kraken regularly posts to its blog (blog.kraken.com) promotional materials and information encouraging customers to trade crypto assets, including crypto asset securities, on the Kraken Trading Platform and through the Kraken Services.

148.   Through these various communication channels, Kraken provides instructions to potential customers on how to open a trading account.

149.   Through its website and applications, Kraken provides detailed information about the crypto assets, including the Kraken-Traded Securities, that trade on the Kraken Trading Platform and through the Kraken Services, including price charts and market statistics, price movements, volume, and information about how to trade those crypto assets.  For example, Kraken maintains a "Learn" webpage and online "Crypto Guides" that provide resources regarding crypto assets and trading crypto assets, as well as a "Prices" webpage that highlights top "Trending Cryptocurrencies" and crypto assets with the "Biggest Gains."

150.   Kraken also has marketed monetary incentives and promotions aimed at attracting more customers to the Kraken Trading Platform.  For example, in or around November 2019, Kraken launched the "Kraken Affiliate Program," which rewards existing Kraken customers who refer new customers to Kraken.  Under the Kraken Affiliate Program, existing Kraken customers receive "20% on the trading fees collected from clients you refer to us for the lifetime of the client with Kraken – up to $1,000 USD payout per referral."

### ii.   Kraken Controls Customer Assets

151.   In 2021, Kraken held more than $5 billion in customer fiat and more

than $33 billion in customer crypto assets.

152.   Kraken maintains its customers' crypto assets and funds in crypto wallets and bank accounts that it controls.

153.   To deposit crypto assets into a Kraken trading account, customers must transfer crypto assets from an existing crypto wallet to a Kraken-controlled crypto wallet.  Similarly, to deposit fiat currency into a Kraken trading account, customers must make a deposit to a Kraken-controlled bank account using a wire transfer, bank transfer, or other means.

154.   When a customer submits a request to withdraw funds or crypto assets, Kraken transfers them from a Kraken-controlled bank account or crypto wallet to the customer's designated account or crypto wallet.

155.   According to Kraken's terms of service, all digital assets held in a Kraken account are "custodial assets held by Payward for" the benefit of the customer.  Kraken disclaims any ownership or title to digital assets held in Kraken customer accounts.

156.   Kraken uses shared blockchain addresses called "omnibus accounts," which it controls, to hold crypto assets on behalf of customers.  Kraken holds the private keys for these addresses and maintains internal, or off-chain ledgers, to record individual customer holdings for their respective accounts.

157.   In documents provided to its auditor, Kraken stated "crypto assets are not separated by type of client, geography, margin vs. non-margin etc."

### iii.   Kraken Offers Trading on Margin

158.   During the Relevant Period, Kraken offered, and continues to offer, extensions of margin credit (from its proprietary inventory) to customers for buying and selling certain crypto assets, including crypto asset securities.

159.   Kraken advertises on its website that it offers "over 100 margin-enabled markets for you to buy (go 'long') or sell (go 'short') a growing number of cryptocurrencies with up to 5x leverage."

160.   If executed, margin transactions are executed on the Kraken Trading Platform using the Kraken Matching Engine.

161.   Kraken maintains physical or constructive custody of all crypto assets or fiat currency using margin for the duration of a customer's open margined position.

162.   Kraken charges additional fees for margin orders.

163.   Kraken charges percentage-based fees, based on the amount of margin credit extended, for opening a leveraged position as well as maintaining a leveraged position.

### c.   Kraken Functions as a Dealer

164.   During the Relevant Period, Kraken used means and instrumentalities of interstate commerce to effect transactions in crypto asset securities while engaged in the business of buying and selling securities for its own account.  Through the Kraken Services, such as Instant Buy and the OTC Desk, as well as its own proprietary trading, Kraken bought and sold crypto asset securities on multiple platforms, including the Kraken Trading Platform, as part of its regular business.  Kraken was therefore required to register with the Commission as a securities dealer but did not do so.

### i.   Instant Buy

165.   Kraken Instant Buy allows customers to "instantly" buy, sell, or "convert" crypto assets, including the Kraken-Traded Securities, with Kraken acting as the counterparty in all cases.

166.   Kraken's website states that the Instant Buy feature "allows you to convert between *any* crypto and cash assets."

167.   To use the service, a customer logs in to her account and click Buy, Sell, or Convert.  The customer would then be presented with a default asset and a price offered by Kraken to Buy, Sell, or Convert the asset.

168.   To change the asset, the customer opens a search field where she can scroll through a list of assets (shown with the asset's price) or type in the name of the

asset to Buy, Sell, or Convert.

169.   Kraken charges users of the Instant Buy feature a fee and in certain cases, a "spread."

170.   Kraken does not publish a general fee schedule or explain when or how a "spread" will be charged in addition to the fee.  Instead, Kraken displays the fees for the particular transaction.

171.   The customer must agree to the price for the asset offered by Instant Buy as well as the transaction fee, which Kraken assesses if the transaction is executed.

172.   The price quote Kraken provides to a customer in the Instant Buy feature is derived from Kraken's review of the pending orders on its order book on the Kraken Trading Platform.

173.   For example, if a customer wants to purchase 10 units of the Kraken-Traded Security Cardano (ADA) using Instant Buy, Kraken reviews the order book for ADA on the Kraken Trading Platform and presents a price quote valid for a specified period of time and the fees it would charge to complete the transaction.  If the customer accepts, Kraken then uses or leverages its own capital or crypto assets to acquire the 10 ADA on the Kraken Trading Platform, and then sells these 10 ADA to its customer and promptly settles the trade by ledger debits and credits.

### ii.    OTC Desk

174.    During the Relevant Period, Kraken offered the OTC Desk as a "premium service that allows traders to execute orders off the open Kraken exchange" for large orders of crypto assets, including the Kraken-Traded Securities, valued at $100,000 or more (although it may service smaller orders).

175.   Customers may send a request for a quote to the OTC Desk.  Kraken would typically respond with a quote at which it would be willing to trade with the customer.

176.   Kraken acts as principal to fill orders placed through the OTC Desk.

177.   To fill the orders placed with the OTC Desk, Kraken uses proprietary

assets, places orders (in its own account) on the Kraken Trading Platform, uses its own inventory, or places orders on third-party trading platforms.

178.   Customers interface with the OTC Desk through email or telephone, or by logging into their Kraken account and using the OTC Desk's online portal or an online chat function.

179.   On its website, Kraken states, "We do not charge you any fees for our [OTC Desk] service.  The bid or offer price we show is the 'all inclusive' price."

180.   Kraken's Terms of Service state that it may charge a mark-up or mark-down "between the price [Kraken] buys or sells an Asset in a transaction with you and the price it is able to obtain in subsequent transactions with third parties, and . . . such spread will not be reflected in the transaction fees you are charged at the time of your purchase or sale."

181.   Kraken's OTC Desk settles transactions in various ways depending on the manner it filled the customer's order.

182.   Kraken offered the OTC desk for orders of crypto assets, including Kraken-Traded Securities.

### iii.   Proprietary Trading

183.    During the Relevant Period, Kraken also engaged in proprietary trading of crypto assets, including crypto asset securities and Kraken-Traded Securities, for its own account separate from the Kraken Services.

184.   According to Kraken's financial statements, it stopped engaging in proprietary trading separate from the Kraken Services during the second quarter of 2020.

185.   From the beginning of 2020 until it stopped in the second quarter, Kraken generated approximately $47 million in revenue from the proprietary trading of crypto assets.

### 3. Kraken Failed to Register as a Clearing Agency
#### a. Registration of Clearing Agencies

186. Congress has determined that "[t]he prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors." 15 U.S.C. § 78q-1.

187. Section 17A(b) of the Exchange Act [15 U.S.C. § 78q-1(b)] accordingly generally makes it unlawful "for any clearing agency, unless registered in accordance with this subsection, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a clearing agency with respect to any security."

188. Section 3(a)(23)(A) of the Exchange Act [15 U.S.C. § 78c(a)(23)(A)] defines the term "clearing agency" as "any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities," as well as "any person … who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates."

189. Registered clearing agencies are subject to comprehensive regulation— including recordkeeping requirements and SEC examination—under the Exchange Act and the rules thereunder, providing important safeguards to investors and market

participants, and to the maintenance of fair competition.  Moreover, properly registered clearing agencies must enact a set of rules to govern their and their members' behavior, and these rules are subject to review by the SEC.

### b.   Kraken Functions as a Clearing Agency

190.   During the Relevant Period, Kraken's conduct in the settlement of crypto asset securities transactions and as a security depository with respect to crypto asset securities traded on the Kraken Trading Platform and through the Kraken Services, including Instant Buy and the OTC Desk, constitutes clearing agency activity. Kraken was therefore required to register with the Commission as a clearing agency but did not do so.

191.   Kraken has and continues to act as an intermediary in making payments and deliveries when facilitating the settlement of crypto asset securities transactions, including transactions in the Kraken-Traded Securities.

192.   After a customer order is matched, resulting in a trade (whether against another customer or Kraken itself), Kraken settles the trade through its internal ledger system by debiting and crediting the relevant balances of funds or crypto assets in the customer's (or customers') account(s).

193.   According to a Kraken internal document, its internal ledgers are "designed to function similarly to a 'stock record' account, like the one that is typically maintained by a broker-dealer that custodies its customers' holdings."

194.   In this way, all trades on Kraken's Trading Platform "occur 'off-chain' on the Kraken Exchange," meaning that they are recorded and settled on Kraken's internal ledgers without any crypto asset being transferred from one blockchain address to another (i.e., "on-chain").

195.   According to trading rules posted on Kraken's website, after matching buy and sell orders, "Kraken settles all filled orders immediately, by debiting and crediting the relevant balances of assets in both traders' accounts."

196.   Kraken's Terms of Service state that Kraken will use "commercially

reasonable efforts to settle trades" within two days of execution.

197.   Kraken has and continues to act as a security depository for crypto asset securities, including the Kraken-Traded Securities, that are traded on the Kraken Trading Platform and through the Kraken Services.

198.   Kraken holds these crypto assets in omnibus wallets for which Kraken holds the private keys, and Kraken provides a system for the central handling of securities whereby crypto asset securities are treated as fungible and ownership entitlements are transferred by bookkeeping entry without any on-chain transfers.

### D.   Kraken's Business Practices Create Heightened Risks for its Customers

199.   As an unregistered entity that nonetheless operates as a securities broker, dealer, exchange, and clearing agency, Kraken operates in ways that would not be permissible under the federal securities laws and regulations.

#### 1.   Kraken Fails to Separate the Competing Functions of Its Business

200.   In U.S. securities markets, the functions of "exchanges," "broker-dealers," and "clearing agencies" described above are typically carried out by separate legal entities that are independently registered and regulated by the SEC. Separation of these core functions aims to minimize conflicts between the interests of securities intermediaries and the investors they serve.  Registration and concomitant disclosure obligations allow the SEC to oversee the business of intermediaries and their relationship with investors, in order to, among other things, protect investors from manipulation, fraud, and other abuses.

201.   While providing the services of an exchange, broker, dealer, and clearing agency to its customers, Kraken does not separate these functions.

202.   Investors in securities markets do not interact directly with exchanges or clearing agencies but instead are customers of broker-dealers who effect transactions on investors' behalf.  Only broker-dealers (or natural persons associated with a

broker-dealer) may become members of a national securities exchange. In addition, broker-dealers who have customers must become members of the Financial Industry Regulatory Authority ("FINRA"), an SRO that imposes its own rules and oversight over broker-dealers, particularly as to protecting retail investors.

203. Kraken is not a member of FINRA.

204. Registered national securities exchanges and clearing agencies are also SROs, and therefore must submit all of their proposed rules and rule changes to the SEC for review.

205. Kraken does not submit its rules or proposed rules to the SEC for review.

206. As noted, the Exchange Act also subjects registered intermediaries to important record keeping and inspection requirements. For example, Section 17 of the Exchange Act [15 U.S.C. § 78q] requires registered national securities exchanges, broker-dealers, and clearing agencies to make and keep records as the SEC prescribes by rule, and subjects those records to reasonable periodic, special, or other examinations by representatives of the SEC.

207. Kraken does not submit itself to examinations by representatives of the SEC.

208. These provisions are designed to ensure that intermediaries follow the rules designed to protect investors and to promote fair and efficient operation of the securities markets, given their importance to the economic health of the nation. These provisions also seek to ensure, among other things, that investors' securities orders are handled fairly and transparently, that securities transactions result in settlement finality, and that investors' assets are protected and can be recovered if necessary.

209. In failing to comply with any SEC registration requirements, Kraken puts its customers' assets at a higher risk of loss than customers of registered securities intermediaries.

### 2.       Kraken Commingles Its Customers' Crypto Assets and Fiat with Its Own

210.   The U.S. securities laws protect customer assets by, among other things, ringfencing customer assets from corporate use.  Had it registered as a broker-dealer, Kraken would be required to appropriately account for and segregate customer cash and securities and would be subject to examination, inspection, and disclosure requirements aimed at detecting and preventing the failure to appropriately segregate customer assets.

211.   Kraken's Terms of Service stated that "custodial assets held by Payward [are] for [a customer's] benefit" and title is "not transferred to Payward."

212.   Nonetheless, Kraken's commingles customer crypto assets with its own.

213.   Commingling customer and proprietary assets creates a risk that, when customers request withdrawals of their assets, those assets might be encumbered (e.g., due to hypothecation, or liens or other interests being filed against such property to secure an obligation of Kraken) or gone completely.

214.   Concerning Kraken's custody of crypto assets, in its audit plan for 2022, Kraken's independent auditor stated: "There is a significant risk of loss of custodial (and proprietary) digital assets through theft/loss of public keys or improper controls over accounting for custodial digital assets that are comingled between customers and with the Company's proprietary digital assets."

215.   Kraken's Terms of Service also stated that "Payward makes no warranty" that customers' crypto assets "are held by [the customer] free and clear of any security interest or other lien or encumbrance by Payward or others, including but not limited to Payward's creditors."

216.   With respect to fiat, Kraken maintains bank accounts that are designated as custodial accounts for the purpose of holding customer fiat.

217.   Kraken maintains separate bank accounts that are designated as operational accounts for the purpose of holding corporate fiat.

218.   Yet, Kraken commingles corporate and customer fiat in some of these accounts.

219.   In its 2020 and 2021 financial statements, Kraken describes how it may commingle custodial funds with its own.  Kraken's financial statements state that "[a]mounts shown as Customer custodial funds are restricted to use based on the terms of service with our customers.  Such funds may be in separate accounts or commingled with cash that is unrestricted."  "Unrestricted" cash is Kraken's proprietary or corporate cash for which it has "unrestricted rights of withdrawal and use…."

220.   Kraken's independent auditor has observed that as of December 31, 2021, approximately $33.6 million of customer custodial fiat appeared to be in Kraken's operational bank accounts.  Kraken's independent auditor similarly observed that as of December 31, 2020, approximately $30.8 million of customer custodial fiat appeared to be in Kraken's operational accounts.

221.   Separately, Kraken treats some fiat in custodial accounts as its own – and not the customers' – supposedly because Kraken's customers owe Kraken fees arising from the customers' trading.  For example, Kraken has at times paid operational expenses using funds held in customer custodial accounts.  This is another example of improper commingling of funds that increases investor risk and in which registered securities intermediaries are prohibited from engaging.

222.   Kraken does not disclose to its customers that Kraken commingles customer and corporate fiat in either customer custodial accounts or Kraken's corporate operating accounts.

### 3.   Kraken's Internal Control Failures

223.   As part of the audit of Kraken's 2021 financial statements, Kraken's independent auditor identified multiple control deficiencies and informed Kraken's board of directors of a significant deficiency in the company's internal controls.

224.   In 2023, Kraken found errors relating to customer custodial cash and

crypto assets held for customers in 2020 and 2021.

225.   These errors were a result of Kraken's poor recordkeeping practices and failure to properly record margin transactions, underscoring the deficient internal controls at the company.

226.   In materials provided to its auditor, Kraken stated: "In August 2023, the Company self-identified the possibility of an error."  This error was largely based on Kraken's failure to establish a sub-ledger before offering its margin lending product.

227.   Kraken's auditor determined that these errors were material to the 2020 and 2021 financial statements of Payward and Payward Ventures.

## E.   Crypto Assets Securities Available Through Kraken

228.   As previously alleged in Section B, Kraken has made available for trading on its platform and through its services many crypto assets that are offered and sold as investment contracts and thus are securities.  Each of these crypto asset securities was offered and sold on the Kraken Trading Platform or through the Kraken Services during the Relevant Period.  Each of the crypto asset securities was sold as part of an investment contract, which as discussed involves an investment of money in a common enterprise from which the investor reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others.  Set forth below are details regarding certain previously identified Kraken-Traded Securities, 11 crypto asset securities which were available on the Kraken Trading Platform and through the Kraken Services.

### 1.   ADA

229.   "ADA" is the native token of the Cardano blockchain.  The Cardano blockchain was created in 2015 by an Ethereum co-founder, Charles Hoskinson, and an Ethereum operations manager, Jeremy Wood.  As described on Cardano's website, the Cardano blockchain protocol is built on its own proof-of-stake consensus protocol called Ouroboros, which is purportedly energy efficient.  Hoskinson and Wood created ADA and purported to limit the supply of ADA to 45 billion tokens.  From

2015 to 2017, Input Output Hong Kong ("IOHK"), a company founded by Hoskinson and Wood, conducted a token sale during which they sold approximately 25.9 billion ADA in exchange for bitcoin, at what equates to an average price of $0.0024 per token, raising approximately $62 million for Cardano.

230.   From the time of its offering and continuing through the Relevant Period, ADA was offered and sold as an investment contact and is therefore a security.

231.   The price of all ADA tokens goes up or down together.

232.   Today, three entities are responsible for Cardano: (1) the Cardano Foundation, a Swiss entity that is the legal custodian of the Cardano protocol and owner of its brand; (2) IOHK, an engineering company controlled by Hoskinson and Wood responsible for designing, building, and maintaining the Cardano blockchain; and (3) Emurgo, an entity with offices in New York and California that, according to its website, is "essentially the for-profit arm of Cardano," endeavoring "to advance the platform and drive adoption through commercial ventures."  As explained on the Cardano website, "IOHK develops the technology, the Cardano Foundation is responsible for supervising development and promoting Cardano, while Emurgo drives commercial adoptions."  These three entities collectively received 5.2 billion ADA following the initial mining of ADA, or approximately 16.7% of the initial token supply of 31.1 billion ADA.

233.   These three entities have used the proceeds from ADA sales to fund the development, marketing, business operations, and growth of the Cardano protocol. For example, investor funds were used to enact the Cardano Roadmap created by IOHK—specifically, to develop each of the Cardano development "eras" as shown in the following screenshot from the Cardano website:

234.    Kraken has made ADA available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services since approximately September 2018.

235.    The information publicly disseminated by Cardano, IOHK, and Emurgo would lead a reasonable investor, including those who purchased ADA since September 2018, to view ADA as an investment.  Specifically, investors would reasonably expect to profit from holding ADA based on the efforts of these groups to grow the Cardano platform because this growth would in turn increase the demand for and the value of ADA.

236.    In public statements on Twitter and other social media, as well as on their respective websites, including statements made while ADA was available to trade on the Kraken Trading Platform and through the Kraken Services, the Cardano Foundation, IOHK, and Emurgo have touted their expertise in developing blockchain networks and described the efforts they have made and will continue to make to develop the Cardano protocol and blockchain and attract users to the technology. These statements include:

(a)    an "ask me anything" video stream posted by Charles Hoskinson at IOHK in or about October 2018 in which he answered questions posed by the live public audience and in which he stated that he believes ADA will achieve his goal of a future market capitalization of $1 trillion;

(b)    a blog post by Charles Hoskinson at IOHK in or around January 2020 about how the decade from 2020 to 2029 will be the decade of Cardano and which stated, "[a]s we exit 2020 and throughout the next decade, incentives will be a

source of continuous research.  The better we get, the faster the feedback loop

becomes, the faster we can grow to achieve a billion users and become a truly global

social operating system that is beneficial to everyone.  With all that being said,

commercialization, technology, and incentives are the three things that will need to be

aligned for us to achieve that coveted number one spot.  We are building Cardano for

a reason…it is a commercial project and we want to see it grow";

       (c)     an announcement by IOHK in or around September 2021 about

the creation of smart contracts on the protocol, which supposedly would "pav[e] the

way" for additional demand for the blockchain protocol;

       (d)     a blog post by IOHK in or around November 2022 describing its

efforts to introduce "innovations, new functionality, and new features" to the

blockchain; and

       (e)     a blog post by IOHK on or around November 17, 2022, touting

ADA being "hosted on more than 30 cryptocurrency exchanges," and outlining

IOHK's plans to "improv[e] the underlying performance of the Cardano network to

better support growth and adoption of thousands of applications with high transaction

volumes" while giving specific examples of how this would be achieved.

237.  Public statements made by Kraken to investors about ADA and the

Cardano Platform reinforced investors' reasonable expectation of profits from an

investment in ADA due to the managerial efforts of Cardano, IOHK, and Emurgohas.

238.  For example, on its website, Kraken describes for investors Cardano's

history, team, and development.  Specifically, Kraken's website states that:

> A team of experts in the [crypto asset] and blockchain technology industries
> created Caradano (ADA), led by Jeremy Wood and Charles
> Hoskinson…Together, Wood and Hoskinson formed Input Output Hong
> Kong (IOHK), the research and development company behind Cardano….
> The Cardano Foundation is a non-profit organization based in Switzerland
> that oversees the development and adoption of Cardano.  It promotes the
> use and development of Cardano, provides education and resources, and
> governs the Cardano ecosystem . . . .  A for-profit investment arm called
> Emurgo provides support to prospective Cardano developers and promotes
> the business integration of Cardano's blockchain services.

1

## 2.   ALGO

2      239.   Algorand is a blockchain protocol founded by Silvio Micali. The

3  Algorand blockchain uses a consensus algorithm it calls "pure proof-of-stake," in

4  which each user's ability to influence the choice of a new block is proportional to its

5  stake (number of tokens) in the system.

6      240.   "ALGO" is the native token of the Algorand blockchain, and has a

7  maximum supply of 10 billion ALGO minted at the launch of the Algorand network.

8  Because ALGO is the native token of the Algorand blockchain, those utilizing the

9  Algorand blockchain need to hold (and potentially stake) certain amounts of ALGO.

10      241.   From the time of its offering and continuing through the Relevant

11  Period, ALGO was offered and sold as an investment contract and is therefore a

12  security.

13      242.   The price of all ALGO tokens goes up or down together.

14      243.   The Algorand Foundation Ltd. conducted an initial ALGO token sale on

15  or about June 19, 2019, selling 25 million tokens at $2.40 per ALGO, raising

16  approximately $60 million.  In advance of the token sale, the Algorand Foundation

17  promoted the token sale on Twitter and included a link to its website.

18      244.   The Algorand Foundation promoted the June 19, 2019, token sale in part

19  with a refund policy that allowed ALGO investors to return the ALGO to the

20  Algorand Foundation one year later at 90% of the original purchase price.  The

21  Algorand Foundation explained the economic rationale behind the refund policy by

22  noting its own belief in and commitment to the value of ALGO, stating: "We believe

23  in the underlying value of the Algorand blockchain, the Algo, and the potential of the

24  borderless economy.  Our goal is to invest in the growth, sustainability and

25  performance of that economy."

26      245.   In promoting the ALGO token sale, the Algorand Foundation tied the

27  potential growth of the Algorand blockchain to potential demand for the ALGO token

28  itself, and to its own commitment to preserving a price floor for ALGO.

246.   In or around August 2019, the Algorand Foundation publicly offered ALGO investors an early refund opportunity, and ALGO investors returned a total of approximately 20 million ALGO tokens to the Algorand Foundation in exchange for a refund that was 85% of the original purchase price.  In or around June 2020, ALGO investors who did not refund their ALGO tokens in August 2019 were publicly offered a second refund window. ALGO investors returned a total of approximately 5 million ALGO tokens for a refund that was 90% of the original purchase price.

247.   Through its rewards programs and incentive structures, the Algorand Foundation continued distributing tokens after the June 2019 token sale.  As of September 2022, approximately 6.9 billion ALGO were in circulation.

248.   Today, ALGO is available for buying, selling, and trading on crypto asset trading platforms in exchange for fiat currency or certain crypto assets, including bitcoin.  Kraken made ALGO available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services in January 2020.

249.   From the time of its offering and continuing through the Relevant Period, ALGO was offered and sold on the Kraken Trading Platform and through the Kraken Services as an investment contract and is therefore a security.

250.   Today, two entities are responsible for Algorand: (1) the Algorand Foundation, an organization purportedly focused on Algorand "protocol governance, token dynamics and supporting grassroots, open-source development on the Algorand ecosystem," which was incorporated in Singapore; and (2) Algorand, Inc., a company purportedly focused on "layer-1 development of the Algorand Protocol and enabling Enterprise adoption of Algorand blockchain technology."

251.   The Algorand Foundation and Algorand, Inc. purportedly collaborate on projects and initiatives for the Algorand community.

252.   Shortly before the June 19, 2019, ALGO token sale, Steven Kokinos, the CEO of Algorand, Inc., posted a publicly available article stating: "(a) We will be holding our founder's tokens for the long term and will not be selling them. (b) We

will use our founder's tokens to participate in consensus and assist in securing the network, though we will never represent more than 49% of the voting. (c) We will use our founder's tokens to support the ecosystem and encourage development."

253.   The Algorand Foundation purportedly owns 500 million ALGO tokens and the participation and governance rewards associated with those tokens.  Also, members of the Algorand Foundation's board of directors and its advisory committees receive ALGO as compensation.

254.   In addition to the tokens it owns, as of September 2022, the Algorand Foundation also controls over 3 billion ALGO tokens in wallets publicly identified as for "Community & Governance Rewards," "Ecosystem Support," and "Foundation Endowment," signaling to the public that the Algorand Foundation would use the ALGO tokens to support the ALGO economy or ecosystem as well as to reward itself and participants in this ecosystem.

255.   The information publicly disseminated by Algorand, Inc. and the Algorand Foundation would lead a reasonable investor, including those who purchased ALGO since January 2020, to view ALGO as an investment.  Specifically, investors would reasonably expect to profit from holding ALGO based on the efforts of these groups to grow the Algorand blockchain and the technologies associated with it because this growth would in turn increase the demand for and the value of ALGO.

256.   In public statements on Twitter, as well as on their respective websites, Algorand, Inc. and the Algorand Foundation promote the Algorand protocol.

257.   Until approximately May 14, 2022, the Algorand Foundation promoted that ALGO investors could receive participation rewards (purportedly a form of staking by delegation) by "participation in the Algorand ecosystem via holding Algo in an online wallet."

258.   As of approximately May 14, 2022, the Algorand Foundation publicly stated that it would replace the participation rewards that ALGO holders were entitled to receive with so-called governance rewards.  The Algorand Foundation described

"Governance" as a way for investors to make investment returns on their ALGO purchases—stating it is "a decentralized program which allows Algo holders to vote on the future of Algorand" and "the best way to earn rewards for holding Algo, with APY% of 10.02% - 14.05% seen in previous periods."

259.  The Algorand, Inc. and Algorand Foundation websites tout their teams' technical experience and expertise in the areas of cryptography and business development.  For example, Algorand, Inc.'s website states: "Blending technical mastery and professional stability, the Algorand team consists of internationally recognized researchers, mathematicians, cryptographers, and economists along with proven business leaders from global technology companies."

260.  In a March 2022 report, the Algorand Foundation publicly stated that it had started a new program to incentivize the "growth of the ecosystem, which is the fundamental need of a maturing blockchain.  The program includes a series of loans to help the growth of our DeFi network and to expand the institutional investments in the ecosystem . . . .  The Algorand Ecosystem team facilitates the development and growth of the ecosystem and developer pipeline including undiluted funding, technical onboarding and standardization conventions for ASAs, Wallets and AVM."

261.  Algorand, Inc. and the Algorand Foundation also take steps to incentivize third parties to participate in and attract users to the ALGO protocol.  For example, in or around February 2022, the Algorand Foundation announced a $10 million incentive for developers that could make the Algorand blockchain compatible with applications built on the Ethereum blockchain.

262.  Also in or around February 2022, the Algorand Foundation announced a section of its website called AlgoHub, "a virtual community designed to grow the pipeline of #Algorand developers."

263.  These statements led reasonable ALGO investors throughout the Relevant Period to expect that the demand for ALGO would likely increase based on Algorand, Inc.'s and Algorand Foundation's efforts to increase demand for the

Algorand technology, thereby resulting in a price increase for ALGO.

264.   Public statements made by Kraken to investors about ALGO and the Algorand blockchain reinforced investors' reasonable expectation of profits from an investment in ALGO due to the managerial efforts of Algorand, Inc. and the Algorand Foundation.

265.   For example, on its website, Kraken provides investors with analysis about the price of ALGO.  Specifically, Kraken's website states:

> Algorand is a new public blockchain, meaning its technology, while novel, has not yet seen much testing under real-world market conditions…. Investors may also see Algorand as a viable part of a cryptocurrency portfolio should they believe that proof-of-stake blockchains, which lower the cost of participating in a blockchain's operation, will ultimately prove more successful in the market.

### 3.   ATOM

266.   "ATOM" is the native crypto asset of the Cosmos Hub.  The Cosmos project was launched in 2017 by Jae Kwon and Ethan Buchman.  According to the Cosmos website (https://cosmos.network), Cosmos is an ecosystem of blockchains designed to scale and interoperate with each other, and the Cosmos team aims to "create an Internet of Blockchains" or "a network of blockchains able to communicate with each other in a decentralized way."

267.   Cosmos is built on a proof-of-stake consensus mechanism.

268.   The Cosmos Hub is a central blockchain that provides services to other blockchains connected to it, including "the largest interchain token exchange, shared security through interchain security, bridges to ethereum (ETH) and bitcoin (BTC), and secure custodianship of digital assets."  Cosmos described the Cosmos Hub as "the first hub among many hubs that [w]as launched within the Cosmos Network of sovereign blockchains."

269.   ATOM is described as "a license for the holder to vote, validate, or delegate to other validators" and "can also be used to pay for transaction fees to mitigate spam."

270.   In 2017, the Interchain Foundation (the "ICF"), a Swiss non-profit organization of which Buchman is President, sold ATOM by conducting what it termed the "Cosmos Fundraiser."  These so-called "donations" were to be used for the development of the Cosmos network.  Pursuant to this offering, participants received ATOM tokens in exchange for Bitcoin or Ethereum tokens.  The ICF offered ATOM at a value of $0.10 per token, with a 25 percent discount on that price for partnering "strategic funders" and a 15 percent discount for individual "Pre-Fundraisers."  By April 2017, ICF had raised approximately $17.3 million in BTC and ETH through its "fundraiser" by selling ATOM tokens.

271.   From the time of its offering and continuing through the Relevant Period, ATOM was offered and sold as an investment contract and therefore a security.

272.   The price of all ATOM tokens goes up or down together.

273.   At least four entities are currently or have been significantly involved in the development of Cosmos: (1) the ICF, which was created in 2017 by Kwon and Buchman and was formed "to support the development of Cosmos and the ecosystem that will contribute to the Cosmos Network"; (2) Interchain GmbH, LLC, a German limited liability company and subsidiary of ICF, which employs a team of approximately 35 software engineers and operations personnel working primarily on the Cosmos network; (3) All in Bits, Inc. d/b/a Tendermint (n/k/a Ignite, Inc.) ("Tendermint"), a Delaware corporation created by Kwon and headquartered in Berkley, California, with which the ICF contracted in 2017 "to develop the initial portion of the CESS [Cosmos Essential Software and Services]"; and (4) NewTendermint, Inc., a Delaware corporation of which Kwon is CEO and which supports and develops the Cosmos ecosystem.

274.   In February 2022, NewTendermint was spun off from All in Bits, Inc. (d/b/a Tendermint), which was rebranded to and became Ignite, Inc.  Ignite has focused on developing products and developing tools "to onboard the next wave of

developers and crypto enthusiasts to Cosmos."

275.   ATOM has been available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services since April 2019.

276.   The information publicly disseminated by ICF, Kwon, and Buchman would lead a reasonable investor, including those who purchased ATOM since April 2019, to view ATOM as an investment.  Specifically, ATOM holders would reasonably expect to profit from the efforts of these entities to grow the Cosmos protocol because this growth would in turn increase the demand for and value of ATOM.

277.   The ICF collected and pooled the $17.3 million raised from investors in the Cosmos Fundraiser.  In promoting the Cosmos Fundraiser, the ICF represented that the funds raised would be deployed to develop the Cosmos network.  For example, the March 31, 2017, "Cosmos Plan" posted on the Cosmos GitHub page provided that the raised funds would be used "to contract with entities"—including Tendermint—"and their agents for the development of the Cosmos Essential Software and Services (CESS) and to help foster a community around CESS."  The ICF later disclosed how they spent investor funds, posting "Projects Funded in 2018" to the ICF's public GitHub page.

278.   In the 2017 Cosmos Whitepaper and "Fundraiser Plan" (both of which were publicly available on the Cosmos website), Kwon and Buchman described the Cosmos Fundraiser and said that the 236 million ATOM tokens initially minted would be distributed as follows: 10% to the "Cosmos Network Foundation" (the ICF), 10% to All in Bits, Inc. (Tendermint), 5% to initial or "lead donors," and 75% to "the donors of the Cosmos Fundraiser" (investors).

279.   In public statements on the Cosmos and ICF websites, including statements made and available during the period when ATOM was available to trade on the Kraken Trading Platform, the ICF described its expertise in developing blockchain networks.  Further it detailed the efforts it and related entities, including

Interchain GmbH and Tendermint, were making to develop the Cosmos network and attract users to the technology.  For example:

    (a) Cosmos's website stated that "Cosmos is supported by the Interchain Foundation" and identifies Tendermint, Interchain GmbH, and 15 other "Cosmos core development teams."

    (b) The ICF website stated that it "funds, stewards, and responsibly advances the Cosmos ecosystem" and that its "core teams maintain the protocols and applications" in the "Cosmos tech stack" (including Cosmos Hub and Cosmos SDK).  Further, the site identified 35 "Team" members, including Cosmos Hub and Cosmos SDK project, strategy, and developer relations leads, and software and developer relations engineers," that "[w]e help support projects like the Cosmos Network." In describing the Team's "Engineering and Product" work, the site said "[w]e are primarily interested in general purpose technologies that expand the environment, capabilities, and security of the Cosmos ecosystem."

    (c) The "Projects Funded in 2018" post on the ICF's GitHub page (posted in 2019) identified grants, service agreements, and investments to develop the Cosmos network in 2018.

    (d) The ICF website has touted the "Builders Program," which "provides mentorship, structured support and access to a wide network of partners" and "is led by a team experienced in building the ecosystem's software and infrastructure."  The site has said the program "is made by builders for builders, linking together our team of entrepreneurs, software engineers and designers with years of experience in building and launching chains" and is a vehicle for ICF to "help teams navigate the ecosystem by giving access to our large network of investors, exchanges, custodians, auditors, development and design agencies, data providers

and infrastructure partners."

280.   Public statements made by Kraken to investors about ATOM and the Cosmos protocol reinforced investors' reasonable expectation of profits from an investment in ATOM due to the managerial efforts of ICF, Kwon, and Buchman.

281.   For example, on its website, Kraken describes for investors ICF's history, team, and development.  Kraken also provides a link to the Cosmos "roadmap" for investors to "stay connected on the current development status of Cosmos" and directs investors to the "Cosmos blog" for regular updates from the "Cosmos team."

### 4.   FIL

282.   "FIL" is the native crypto asset of the Filecoin network.  The Filecoin network is an open-source data storage network that runs on a blockchain created by Protocol Labs, Inc., which describes itself as a research, development, and deployment lab for network protocols.

283.   In or around July 2014, Protocol Labs and its founder and CEO, Juan Batiz-Benet ("Benet"), published a whitepaper entitled "Filecoin: A Cryptocurrency Operated File Storage Network," which Protocol Labs updated approximately three years later, setting forth a "path toward the construction of the Filecoin network."

284.   In 2017, Protocol Labs conducted a two-part token sale: first, an "Advisor Sale" for advisors of Protocol Labs and Filecoin; and second, a "Public Sale" for the broader community, supposedly limited to "accredited investors" (collectively "2017 FIL Sales").  In these sales, investors could use U.S. dollars and certain crypto assets to buy Filecoin.

285.   Protocol Labs ran the Advisor Sale from July 21 to July 24, 2017, and sold FIL to approximately 150 investors, which included individuals, institutional investors, trusts, and established syndicate investors.  These investors paid $.075 per FIL and were offered "vesting/discount choices of 1-3 years and 0-30% discount."

286.   In the August 2017 Public Sale, the FIL price was set based on a "public

sale price function," described as "price = max ($1, amountRaised / $40,000,000) USD/FIL" and increased thereafter based on the amount sold.  For the Public Sale, like the Advisor Sale, investors received discounted pricing for agreeing to longer vesting periods.

287.   From the time of its offering and continuing through the Relevant Period, FIL was offered and sold as an investment contract and therefore a security.

288.   The price of all FIL tokens goes up or down together.

289.   In connection with the 2017 FIL Sales, which were effected pursuant to Simple Agreement for Future Tokens (SAFTs), Protocol Labs filed forms with the SEC claiming an exemption from registration for the offerings of FIL pursuant to SAFTs.

290.   Protocol Labs reported that they raised more than $205 million for the development of Filecoin in the 2017 FIL Sales and that the value of FIL increased in the days following the close of the sale based on the fluctuation in value of certain invested crypto assets.

291.   Protocol Labs pooled investment proceeds from the token sales to fund the development and growth of the Filecoin network.

292.   On October 15, 2020, Protocol Labs launched the mainnet, a publicly accessible version of the Filecoin network, and FIL began being minted and distributed.  There was a stated maximum circulating supply of 2,000,000,000 FIL, meaning that no more than 2 billion FIL will ever be created, with issuance aligning with network growth.

293.   FIL has been available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services since October 2020.

294.   Since the October 2020 launch, Protocol Labs has continued to use funds from the sale of FIL to develop, expand, and promote the Filecoin network.

295.   The information Protocol Labs has publicly disseminated, including after the initial FIL sales, would lead a reasonable investor, including those who have

purchased FIL since October 2020, to view FIL as an investment. Specifically, FIL holders would reasonably expect to profit from Protocol Lab's efforts to grow its protocol because this growth would in turn increase the demand for and value of FIL.

296.   The Protocol Labs Filecoin Team posted about the sale: "The Filecoin Sale was a critical milestone in the lifetime of the project. It raised the funding necessary to grow our team, to create the network, and build all the software tools needed to operate and use the network." They further stated, "Filecoin success will reward the investment of supporters like you by simultaneously driving down the cost of storage and increasing the value of the Filecoin tokens that incentivize miners to provide storage. We're thrilled by your widespread, enthusiastic interest and look forward to staying engaged and including you in our success."

297.   In addition, Benet and the Filecoin team released a document titled, "Filecoin Token Sale Economics," that provided information about the 2017 FIL Sales and the Filecoin network, stating:

> Protocol Labs requires significant funding to develop, launch, and grow the Filecoin network. We must develop all the software required: the mining software, the client software, user interfaces and apps, network infrastructure and monitoring, software that third-party wallets and exchanges need to support Filecoin, integrations with other data storage software, tooling for web application and dapps to use Filecoin, and much more. We must deploy the network, facilitate its growth to large scale, market to and onboard miners and clients, bring key partners into the eco system, and much more.

298.   That document also stated that FIL was to be distributed to groups "critical to the network's creation, development, growth, and maintenance" with an allocation that tied Protocol Labs' profits to those of FIL holders:

(a) 70% to Filecoin Miners – "For providing data storage service, maintaining the blockchain, distributing data, running contracts, and more."

(b) 15% to Protocol Labs – "For research, engineering, deployment, business development, marketing, distribution, and more."

(c) 10% to investors – "For funding network development, business development, partnerships, support, and more."

(d) 5% to Filecoin Foundation – "For long-term network governance, partner support, academic grants, public works, community building, etc."

299.   The "Filecoin Token Sale Economics" document further explained: "We have structured the token sale to reward a large group of people that can help us build the [Filecoin] network, by selling Filecoin at what we think is a much lower price than it will be worth some day (caveat: as with any risky investment of course we cannot make guarantees or predictions)."

300.   As described in a July 2017 blog post, the Advisor Sale in particular was intended, in part, to secure "long-term commitment to and alignment with the Filecoin network" and "to reward their contributions so far and/or future potential with the capability to invest early."

301.   The "Filecoin Token Sale Economics" and another document made available to investors ahead of the 2017 FIL Sales, the Filecoin Primer, stated that Filecoin purchasers would be able to sell the token on crypto asset trading platforms in the future.

302.   The Filecoin Primer also touted "Large Scale Value Creation," explaining that the Filecoin Network: "will create value in a number of ways, and the total impact of the network can be tremendous.  Growth of the network will drive demand for the token. The more value created by the Filecoin Network, the more things people and organizations spend Filecoin on, and the greater the value and worth of the token."

303.   Similarly, a Confidential Private Placement Offering Memorandum ("PPM") in connection with the 2017 FIL Sales stated: "A significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to buildout a decentralized storage network, powered by a blockchain and the Filecoin protocol token."

304.   Moreover, both before and after the 2017 FIL Sales, Protocols Labs consistently touted its expertise and ability, and led the work to develop the Filecoin

network for launch.  In an August 2, 2017 Q&A, Benet stated: "Over the last few years, Protocol Labs has proved to the world that we know how to deploy capital to create valuable projects, valuable technology, and valuable software. . . .  We know how to deploy capital effectively.  We have great plans for the Filecoin network and its surrounding ecosystem, at many levels of funding.  We plan to deploy 100s of millions of dollars over the next few years to make Filecoin the world's best storage network, not just the best decentralized storage network."

305.   Benet also addressed the funding needs, pricing, and economics of FIL in that August 2017 Q&A, stating: "Since we think and are working for Filecoin to be worth a lot more in the future, then we naturally want to sell it at the highest price the market will bear.  Subject to reason, if we can sell it higher, then we should."

306.   Benet also explained publicly that Filecoin needed funding in order to be able to compete: "Our (collective) competition is the massive, centralized cloud storage companies.  We are talking about the tech titans – AWS, Google Cloud, and Microsoft Azure – the three biggest companies in the world have cloud businesses with BILLIONS of dollars in revenues, not just funding.  In order to put up this fight, we will need significant resources.  Yes, resources in the hundreds of millions will empower us to develop Filecoin as fast as we can, as well as the dozens of other tools and services required to make Filecoin a service and ecosystem remotely close to competitive with the centralized counterparts."

307.   The economic structure of FIL distribution and public statements about that structure further invited investors to view FIL as an investment in Protocol Labs' and the Filecoin Foundation's efforts.  These factors would lead reasonable investors to conclude that FIL investors' interests were aligned with those of FIL's developers.  Specifically, the tokens allocated to Protocol Labs and Filecoin Foundation were to vest over a six-year period beginning after the network launch.  As stated in the "Filecoin Token Sale Economics" document, Protocol Labs and the Filecoin Foundation "aim[ed] to make Filecoin massively valuable in the long-term, and we

want to attract investors similarly interested in long-term value creation and growth"
and "[v]esting creates long-term alignment" because "Protocol Labs and the Filecoin
Foundation are deeply committed for the long-term, and 6-year vesting boldly proves
that to all other network participants."

308.   Filecoin has also implemented a process to "burn" (i.e., destroy) FIL
tokens, thereby reducing the FIL supply.  As with the "burn" mechanisms of other
crypto asset securities, this marketed burning of FIL as part of the Filecoin's
economic features has led investors reasonably to view their purchase of FIL as
having the potential for profit.

309.   Following the release of the protocol in October 2020, Protocol Labs
continued to be heavily involved in the development and promotion of the Filecoin
network and its pursuit of success.

310.   In late 2021, Raul Kripalani, a Protocol Labs researcher, introduced the
"Filecoin Virtual Machine" ("FVM"), described as a "core pillar in the next evolution
of the decentralized storage ecosystem."  On November 6, 2022, Kripalani tweeted,
"These were amazing weeks for the #FVM + team. Momentum and expectation are
through the roof. 100s of teams building on the Wallaby testnet.  Many promising
@Filecoin apps to launch on mainnet the minute FEVM kicks in.  Pumped to be
building the future of $FIL with these rockstars!"  The Protocol Labs Twitter account
has posted updates regarding FVM, including through April 2023.

311.   The Protocol Labs team has continued to release "roadmaps" or "master
plans," available online and through recorded video presentations, that showcase
future development plans for the Filecoin network.  For example, in September 2022,
Benet delivered the keynote address at FIL-Singapore, which "gathered builders from
around the world to build, share experiences, and hear from other community
members on what's next for the network."  In his address, Benet presented "The
Filecoin Masterplan," which included building the world's largest decentralized
storage network.

312.   In a February 3, 2023, Protocol Labs blog post addressing the impact of the "crypto winter" economic downturn, Benet touted the Filecoin team's supposed successes to date in growing the Filecoin ecosystem, "[w]e've achieved a tremendous amount in the past several years - from Filecoin launch; to scaling IPFS to millions of users; building one of the fastest growing developer ecosystems; supporting 300+ companies across the network; growing movements like SBS and FTC; launching testnets for FVM, Saturn, SpaceNet, and Bacalhau just last quarter; and much more."

313.   Public statements made by Kraken about FIL and the Filecoin network reinforced investors' reasonable expectation of profits from an investment in FIL due to the managerial efforts of Protocol Labs.

314.   For example, on its website, Kraken provides investors with analysis of the price of FIL.  Further, Kraken's website states:

> Should Filecoin be able to successfully offer decentralized storage service that can't be easily tampered with by corporations or governments, it could also gain more users, especially if centralized services begin to lose the trust of their customers.  Like Bitcoin, the total amount of FIL that will ever be created is also limited, in this case, to 2 billion tokens.  If the Filecoin network grows and more users trust it with their data, and more miners supply disk-space, then the amount of transactions requiring FIL should grow. The price of FIL should rise since the amount of FIL available is limited.

### 5.   FLOW

315.   FLOW is the native token for the Flow blockchain, which was launched in 2020 by Dapper Labs, an entity incorporated in Canada.  Flow was purportedly designed as "the foundation for a new generation of games, applications, and the digital assets that power them."

316.   The Flow website boasts that the Flow proof-of-stake blockchain is designed in a manner that makes it different, faster, and more efficient than other blockchain networks due to its "multi-node architecture," which separates the functions traditionally performed by one validator (collection, consensus, execution, and verification) across multiple validator nodes.

317.   Between 2019 and 2020, Dapper Labs raised approximately $24.6

million in "pre-launch" funding in two purportedly private fundraising rounds, including from venture capital firms, in return for convertible notes that were expected to convert to FLOW tokens.  The FLOW tokens were subject to 24-month lock-up periods during which they could not be transferred, sold, or used in transactions.

318.   Subsequently, Dapper Labs held another token sale consisting of two phases, which raised approximately $19 million.  Additionally, Dapper Labs conducted other sales of FLOW for which it filed forms with the SEC claiming that the sales were exempt from registration under Rule 506(b) of Regulation D, including one on September 12, 2019 covering sales to 31 investors in the total amount of approximately $11.2 million, and two others on December 9 and 15, 2021, each for sales to a single investor in the amount of approximately $6.47 million and $23 million, respectively.

319.   From the time of its offering and continuing through the Relevant Period, FLOW was offered and sold as an investment contract and therefore a security.

320.   The price of all FLOW tokens goes up or down together.

321.   Since approximately January 2021, FLOW has been available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services.

322.   According to the FAQ page on the Flow website: "[FLOW] is the exclusive token for staking, delegating, paying transaction fees, and paying storage fees.  It is also the primary token used for buying, selling, and trading assets and experiences on Flow."  Approximately 1.25 billion FLOW tokens were initially created, and as of May 2023, approximately 72% of all FLOW is in circulation.

323.   Given that FLOW tokens are required in order to interact with the Flow blockchain, the demand for and the value of the FLOW token would increase as a result of the efforts by Dapper Labs and the Flow development team to develop the

Flow blockchain network and increase demand for its features.  The increase in value of FLOW would inure to all FLOW holders—investors and the Dapper Labs/Flow development team alike.  Dapper Labs and the Flow development team have promoted this dynamic through the publicly available information they have disseminated.

324.   The information publicly disseminated by Dapper Labs and the Flow development team would lead a reasonable investor, including those who purchased FLOW since January 2021, to view FLOW as an investment.  Specifically, FLOW holders would reasonably expect to profit from the efforts of these groups to grow the Flow protocol because this growth would in turn increase the demand for and the value of FLOW.

325.   For example, Flow's website stated that of the total FLOW supply, Dapper Labs and the Flow development team collectively received 38%; pre-launch backers and participants in the 2020 token sale received 30%; and 32% was set aside for "ecosystem development" and remains under the control of Flow's management. This last group of tokens, according to the website, are used to "bootstrap adoption and reward early participants in the network."

326.   Below is a graph depicting the initial or "Genesis Block" token distribution of FLOW:



327.  This stated distribution of FLOW tied the fortunes of FLOW holders to each other and to the fortunes of the Flow development team.

328.  Flow's website further highlights its development team and its ability to grow and develop the Flow blockchain and the value of the FLOW token.  For example, it states that Flow was "[d]eveloped by the team behind some of the most successful crypto applications on the Ethereum network" and "Flow has been developed and brought to market by one of the most innovative and interdisciplinary teams in the world."

329.  Indeed, according to the Flow website, since the launch of the Flow blockchain in or around December 2020, due to Dapper Labs' and others' efforts, "Flow's ecosystem has grown from a small group of enthusiasts to a global community of over 10,000 developers, over 17 million user accounts, and over 2 million monthly active wallets."

330.  In addition, in its announcement of the Flow blockchain in or around

September 2019, Dapper Labs highlighted its involvement with other successful crypto projects and funding support it had received from various investors.  And, at a 2022 town hall, Dapper Labs and the Flow development team explained planned development activities for 2023, including continued development to support the consumer-scale adoption of blockchain technology.

331.   Further, the Flow website describes the FLOW token as a "low-inflation" asset—meaning that the only new tokens that would purportedly be issued would be distributed to stakers of the token so that FLOW investors' holdings would not be diluted.

332.   Public statements made by Kraken to investors about FLOW and the Flow protocol reinforced investors' reasonable expectation of profits from an investment in FLOW due to the managerial efforts of Dapper Labs and the Flow development team.

333.   For example, on its website, Kraken describes FLOW's history, team, and development.  Specifically, Kraken's website states that "[w]ith Flow, the team…is seeking to create a new platform that allows these types of applications to attract a larger number of mainstream users.  For more regular updates from the Flow team, you can bookmark the Flow blog, which includes tips and tutorials on the network and its evolving technology."

334.   Kraken's website also provides investors with analysis about the price of FLOW.  Further, Kraken's website states that, "[i]nvestors may also seek to add FLOW to their portfolio should they believe in the future of blockchain platforms focused on game development and collectables."

**6.    ICP**

335.   "ICP," previously called "DNF" and rebranded as ICP in 2021, is the native token of the "Internet Computer Protocol," a blockchain-based protocol, conceived in 2016 by Swiss not-for-profit DFINITY Foundation ("DFINITY"), which has offices in Palo Alto and San Francisco.

336.   DFINITY describes the Internet Computer Protocol as a set of protocols that allow independent data centers around the world to band together and offer a decentralized alternative to the current centralized internet cloud providers and ICP as the token designed to interact with these systems, including to provide for processing power, data storage, and network bandwidth.

337.   In an April 8, 2017, Medium post, DFINITY's founder, Dominic Williams, referred to the Internet Computer Protocol as an "intelligent decentralized cloud."  At a 2020 Blockchain conference, he further touted the protocol as a more efficient replacement for big tech cloud services, servers, databases, firewalls, VPNs, and other services.

338.   Between 2017 and 2018, DFINITY engaged in three funding rounds: (1) a "Seed" round in 2017; (2) a "Strategic" round in early 2018; and (3) a "Presale" round in late 2018.  In these rounds, DFINITY raised the equivalent of approximately $170 million by selling rights to receive future ICP tokens, which did not yet exist.

339.   According to a post released by DFINITY on its website on or about May 10, 2021, when the network launched, the rights to "access" the ICP received in the seed round funds were staggered from 0 to 90-plus days.  On or about November 19, 2022, Williams tweeted that purchasers in the initial Seed fundraiser "made out like bandits" when they purchased ICP for $0.03.

340.   ICP tokens first became available on multiple crypto asset trading platforms on or about May 10, 2021, when the network launched.  At launch, DFINITY minted a total of 469 million ICP tokens.

341.   From the time of its offering and continuing through the Relevant Period, ICP was offered and sold as an investment contract and therefore a security.

342.   The price of all ICP tokens goes up or down together.

343.   Since approximately March 2022, ICP has been available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services.

344.   The information publicly disseminated by DFINITY and its founder

would lead a reasonable investor, including those who purchased ICP since March 2022, to view ICP as an investment.  Specifically, ICP holders would reasonably expect to profit from the efforts of these entities to grow the Internet Computer Protocol because this growth would in turn increase the demand for and the value of ICP.

345.   For example, DFINITY stated publicly that it would use the proceeds from ICP sales to fund development, marketing, business operations, and growth and promotion of the Internet Computer Protocol, and thus demand for its ICP token.  In fact, DFINITY distributed approximately 24% of the ICP tokens issued in the public launch to support the Internet Computer platform and to pay staking rewards through the Internet Computer ecosystem.  Another 18% of ICP tokens were distributed to compensate the DFINITY team members, aligning their financial fortunes with those of ICP investors.

346.   Moreover, in an April 4, 2018 Medium post leading up to the 2018 funding rounds, Williams touted: "DFINITY has received inbound interest from hundreds of private accredited entities such as hedge funds."  Indeed, a number of venture capital firms invested in ICP.

347.   Furthermore, from ICP's inception through today, DFINITY has publicly stated that its key developers, including Williams, have been and continue to be heavily involved in Internet Computer Protocol and have promoted their dedication to grow the network and increase the value of ICP.

348.   For example:

- On June 27, 2020 Williams tweeted: "[t]he Internet Computer proj is propelled by extraordinary investments in R&D. DFINITY has assembled one of the strongest science & engineering teams in tech, across several research centers worldwide. This team has been relentlessly pushing blockchain ambition to new levels."

- On December 19, 2021, Williams tweeted: "[t]here's nothing we can do

COMPLAINT                                                65

to control the price, but we feel the pain same as everyone else. There has been a lot of market manipulation by bad people but we remain focused on taking #ICP to the #1 spot."

- On January 25, 2023, Williams tweeted: "[w]hen I look at [crypto asset pricing services], I don't look at the $ price, I look position. $ICP needs to be in the top 3, and I will work tirelessly to help get it there."

349.    A month after it was launched for public trading, ICP's price reached an intraday high of $700.  One month later, the price of ICP had plummeted to $72 and Williams began making public statements indicating the price of ICP would increase again.  For example, on June 10, 2021, Williams tweeted, "Major [venture capital] firms … hv [sic] long-term strategies & generally don't panic dump.  Their focus is on moonshots because that's what generates their primary returns.  We all need to keep our focus on horizon.  Watch what happens in +6/9 months."  And, on September 3, 2021, Williams tweeted, "ICP seed investors' 2000X gains; crypto's largest research org; most advanced blockchain; ferocious growth."

350.    In an ICP whitepaper released in January 2022, DFINITY promotes that it burns ICP tokens as a mechanism to support the price of ICP by reducing their total supply.  On January 20, 2023, Williams tweeted, "$ICP will eventually become deflationary"—meaning its supply will be reduced over time.  On its website, DFINITY posts a Dashboard that calculates the ongoing cycle burn rate, reflecting the number of ICP tokens burned.  As with other crypto asset securities set forth herein, this marketed burning of ICP as part of the system's "deflationary" mechanism has led investors reasonably to view their purchase of ICP as having the potential for profit by limiting the supply of tokens available.

351.    Public statements made by Kraken about ICP and the Internet Computer Protocol reinforced investors' reasonable expectation of profits from an investment in ICP due to the managerial efforts of DFINITY.

352.    For example, on its website, Kraken describes for investors DFINITY's

history, team, and the development of the Internet Computer Protocol.  Further, Kraken provides investors with analysis about the price of ICP.  Specifically, Kraken's website states: "Investors may find Internet Computer attractive based on its goal of creating a blockchain platform for faster transaction settlement time and with theoretically infinite capacity."  Kraken website further states: "ICP's goal of building a modern internet with the ability to host any scale of application, from DeFi and smart contract applications to tokenized internet services and websites, may also be of interest to those who want to add ICP to their portfolio."

### 7.   MANA

353.   "MANA" is the digital token minted by Decentraland.  Decentraland is a virtual reality platform that began development in June 2015 but was not made available to the public until its launch in February 2020.  Decentraland was launched through an entity named Metaverse Holdings by a team of core individual developers: Ariel Meilich, Esteban Ordano, Manual Araoz, and Yemel Jardi.  Decentraland operates on the Ethereum blockchain.  According to Decentraland's website, www.decentraland.org, Decentraland is a three-dimensional virtual reality platform, where users can create, experience, and monetize their content and applications.

354.   According to Decentraland's website, MANA serves as the crypto asset involved in all transactions in the Decentraland virtual reality ecosystem.  On August 18, 2017, Decentraland held an initial coin offering in which MANA tokens were exchanged for ETH tokens, raising approximately $24.1 million.  Currently, there is a total supply of approximately 2.19 billion MANA tokens.

355.   Decentraland offered early contributors to the Decentraland ecosystem a discounted price when purchasing MANA.

356.   From the time of its offering and continuing through the Relevant Period, MANA was offered and sold as an investment contract and therefore a security.

357.   The price of all MANA tokens goes up or down together.

358.   MANA has been available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services since December 2020.

359.   The information Decentraland publicly disseminated would lead a reasonable investor, including those who have purchased MANA since August 2020, to view MANA as an investment.  Specifically, MANA holders would reasonably expect to profit from Decentraland's efforts to grow the Decentraland protocol because this growth would in turn increase the demand for and value of MANA.

360.   Investor proceeds raised during the MANA ICO were pooled to fund the marketing, business expenses, and completion of the Decentraland platform.  For instance, on July 5, 2017—a few weeks before the MANA ICO—Jardi published a blog post detailing Decentraland's intended use of revenue from the token sale as follows:



361.   The blog post further explained that the "top priority" for use of the revenue was to develop a virtual world and that even after Decentraland was created, "the development budget will focus on the continued improvement of the end-user experience within the world."

362.   Indeed, Meilich explained in a separate blog post that after the ICO, Decentraland would implement a "Continuous Token Model," where it would increase the MANA supply by 8 percent in the first year, followed by a lower rate in subsequent years, to allow Decentraland to "regularly expand while accommodating

new users … The proceeds of the tokens sold by [the Continuous Token Model] will finance Decentraland over the long haul, perpetually aligning it with the prosperity of the network."

363.   In April 2020, the Decentraland Team announced the creation of the Decentraland Foundation (the "Foundation"), which today holds the intellectual property rights over and makes available the products and services, including virtual environment and tools, offered on the Decentraland platform.  Meilich publicly stated that the distribution of the initial supply of MANA tokens issued at the time of the ICO would be as follows: 20 percent to the founding team, advisors, and early contributors; 20 percent to the Foundation; 40 percent to be available for purchase by the public; and 20 percent reserved to "incentivize early users, developers, and partners who want to build within Decentraland."

364.   As Meilich explained in his public blog post, "To incentivize value creation within Decentraland, extra tokens will be allocated to the [development team], organization, and a reserve to accelerate Community and Partner engagement."

365.   For example, Decentraland publicly issued a whitepaper ("Decentraland Whitepaper") describing the architecture that would be built in the virtual reality platform and steps that would be taken to support Decentraland's growth.  It further made clear that the development of the platform was only beginning, and listed a number of "Challenges" that would need to be addressed in the development process in order for the platform to succeed.

366.   Decentraland has continued to invest efforts in new developments and tools for the platform.  According to Melich, even after the ICO, Decentraland was still "preparing a land allocation policy to ensure fair distribution, as well as a method for groups to purchase larger contiguous plots of land."  Since the ICO, Decentraland has developed tools for purported use on its platform (e.g., the "Marketplace" and "Builder" tools).  In a public blog post published on March 19, 2018, the Decentraland team described the marketplace tool as the "first … in what will be a

series of tools."

367.   Additionally, the Decentraland Whitepaper explained how the Foundation would "Foster the Network" in that it will "hold contests to create art, games, applications, and experiences, with prizes contingent on meeting a set of milestones.  At the same time, new users will be assigned allowances, allowing them to participate in the economy immediately."  The Decentraland Whitepaper further claimed, "These financial incentives will help bootstrap the utility value of the network until it independently attracts users and developers."

368.   The Decentraland Whitepaper and website have also marketed that the protocol "burns" (or destroys) MANA tokens when used within the Decentraland ecosystem.

369.   Public statements made by Kraken about MANA and the Decentraland Foundation reinforced investors' reasonable expectation of profits from an investment in MANA due to the managerial efforts of Decentraland.

370.   For example, on its website, Kraken describes for investors MANA's history, team, and development.  Further, Kraken provides investors with analysis about the price of MANA.  Specifically, Kraken's website states: "When LAND is auctioned, the MANA tokens used to purchase the parcels are burned, or removed from circulation, making the supply of MANA deflationary.  This could put pressure on the token value as the platform grows with new users."  "Investors may seek to add MANA to their portfolio should they believe in the future of virtual reality and its ability to connect users all over the world."

### 8.   MATIC

371.   "MATIC" is the native token of the Polygon blockchain.  Polygon, originally called the Matic Network and rebranded as Polygon in 2021, is a blockchain platform created in 2017 in Mumbai, India by, among others, Jaynti Kanani, Sandeep Nailwal, and Anurag Arjun.  Since its creation, Polygon's founders have remained actively involved with Polygon through "Polygon Labs" ("Polygon"),

an entity they also founded for "the development and growth of Polygon."

372.    According to the Polygon website, https://polygon.technology/, the Polygon network is an Ethereum scaling platform that enables developers to build scalable user-friendly dApps with low transaction fees, purportedly by hosting "sidechains" that run alongside the Ethereum blockchain, and allows users to process transactions and initiate the transfer of assets and technology development on Polygon's supposedly less congested sidechain network.

373.    Polygon issued a fixed supply of 10 billion MATIC tokens. MATIC holders can earn additional MATIC for staking their MATIC on the Polygon platform and becoming a validator, from delegating their MATIC to other validators in return for a portion of the fees collected from validating transactions, or from staking their MATIC with other third parties, such as crypto asset platforms that offer staking services.

374.    According to the initial whitepaper for MATIC, "Matic Tokens [we]re expected to provide the economic incentives … of the Matic Network [now Polygon] … [W]ithout the Matic Token, there would be no incentive for users to expend resources to participate in activities or provide services for the benefit of the entire ecosystem on the Matic Network."

375.    In or around 2018, Polygon sold approximately 4 percent of the total supply of MATIC in two early rounds of sales raising $165,000 at a price of $0.00079 USD per 1 MATIC and $450,000 at a price of $0.00263 USD per 1 MATIC.  In April 2019, Polygon sold another 19% of the total supply of MATIC to the public through a so-called "initial exchange offering" (or "IEO"—essentially, an initial offer and sale of a crypto asset security on a crypto trading platform) on the Binance.com crypto asset trading platform at a price of $0.00263 USD per 1 MATIC, raising an additional $5 million to fund development of the network.

376.    From the time of its offering and continuing through the Relevant Period, MATIC was offered and sold as an investment contract and therefore a

security.

377.   The price of all MATIC tokens goes up or down together.

378.   MATIC has been available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services since May 2021.

379.   The information Polygon publicly disseminated would lead a reasonable investor, including those who purchased MATIC since May 2021, to view MATIC as an investment.  Specifically, MATIC holders would reasonably expect to profit from Polygon's efforts to grow the Polygon protocol because this growth would in turn increase the demand for and the value of MATIC.

380.   For example, Polygon stated publicly, including in the whitepaper, that it would pool investment proceeds through its private and public fundraising to develop and grow its business.

381.   Following the IEO, moreover, Polygon engaged in additional MATIC sales, stating publicly that it was doing so in order to raise the funds needed to support the growth of its network.  On February 7, 2022, Polygon reported on its blog that it raised about $450 million through a purportedly private sale of its native MATIC token in a funding round to several prominent venture capital firms.  Polygon reported, "[w]ith this warchest, the core team can secure Polygon's lead in paving the way for mass adoption of Web3 applications, a race that we believe will result in Ethereum prevailing over alternative blockchains."

382.   Polygon has also reported fundraising from other marquee and celebrity investors.

383.   Polygon also stated that it would reserve roughly 67% of MATIC to support the Polygon ecosystem, the Foundation, and network operations. Another 20% of MATIC was further reserved to compensate the Polygon team members and advisors, aligning their fortunes with investors' with respect to MATIC.

384.   In addition, the Polygon blog provides frequent updates on network growth and developments at Polygon, including weekly statistics on active wallets

and transactions per day, as well as financial metrics such as revenue per day and total network revenue.

385.   Polygon has also routinely announced when crypto asset trading platforms have made MATIC available for trading, such as the Kraken Trading Platform and through the Kraken Services in or around May 2021.

386.   Polygon has explicitly encouraged MATIC purchasers to view MATIC as an investment in other ways.  For example, in a February 5, 2021 tweet, 14 months after MATIC's single biggest price drop, Nailwal compared the token to a prize fighter that came back from defeat to become a champion:



387.   Also, on November 3, 2022, Nailwal stated on Twitter: "I will not rest till @0xPolygon gets its well-deserved 'Top 3' spot alongside BTC & ETH. No other project comes even close."  In a May 24, 2022 "Fireside Chat" with CNBC posted on YouTube, Bejelic described part of "what's different about Polygon" as: "[w]e are as a team very, very committed, we have a very hands on approach with all the projects out there, we are working around the clock on adoption and that is why we are currently the most adopted scaling infrastructure platform."  Currently, the founders of Polygon continue to promote the platform through various social media.  For example, on February 21, 2023, Nailwal tweeted, and Kanani retweeted, "Polygon has grown exponentially.  To continue on this path of stupendous growth we have crystallized our strategy for the next 5 yrs to drive mass adoption of web3 by scaling Ethereum.  Our treasury remains healthy with a balance of over $250 million and over 1.9 billion MATIC."

388.   Since January 2022, Polygon has also marketed that it "burns" MATIC tokens accumulated as fees, indicating that the total supply of MATIC would decrease.  For example, in January 2022, Polygon emphatically announced a protocol upgrade that enabled burning in a blog post titled, "Burn, MATIC, Burn!"  As Polygon explained in another blog post on its website around the same time, "Polygon's MATIC has a fixed supply of 10 billion, so any reduction in the number of available tokens will have a deflationary effect."  As of March 28, 2023, Polygon had burned approximately 9.6 million MATIC tokens. This marketed burning of MATIC as part of the Polygon's network's "deflationary effect" has led investors reasonably to view their purchase of MATIC as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of MATIC.

389.   Public statements made by Kraken about MATIC and the Polygon Network reinforced investors' reasonable expectation of profits from an investment in MATIC due to the managerial efforts of Polygon.

390.   For example, on its website, Kraken provides investors with analysis about the price of MATIC.  Specifically, Kraken website states:

> "The crypto price of MATIC is subject to various factors. These include market demand and supply, cryptocurrency news, bull and bear markets, technological advancements, and adoption of the Polygon network . . . Positive news, such as new partnerships or regulatory developments, could lead to an increase in demand and, consequently, the price of MATIC. Technological advancements within the Polygon network could also affect the MATIC coin price, as a more efficient network could attract more users…these improvements could result in increased demand and trading volume."

### 9.   NEAR

391.   "NEAR" is the native token of the NEAR blockchain protocol, a proof-of-stake blockchain conceived in 2018 by Delaware corporation Near, Inc. ("Near") and its founders Alexander Skidanov and Illia Polosukhin.  According to the NEAR whitepaper, the NEAR protocol uses a technology dubbed "Nightshade" that allows the volume of transactions on the network to grow indefinitely without hurting its

performance, measured in speed and transaction fees.

392.    In 2019, Skidanov and Polosukhin founded the NEAR Foundation, a non-profit organization under Swiss law that claims to be "responsible for contracting protocol maintainers, funding ecosystem development, and shepherding core governance of the NEAR protocol."

393.    From Q3 2017 to Q1 2020, Near raised approximately $34.1 million through the offer and sale of notes that were convertible into then-nonexistent NEAR tokens.  In July 2019, Near filed forms with the SEC claiming its offer and sales of convertible notes was exempt from registration and stating that Near "intended to use the proceeds [of the sales] for the development of the Near protocol."  In August 2020, Near held an additional sale of approximately 120 million NEAR tokens.  In January 2022, the NEAR Foundation raised an additional $150 million through a purportedly "private" sale of NEAR tokens to venture capital investors.

394.    From the time of its offering and continuing through the Relevant Period, NEAR was offered and sold as an investment contract and therefore a security.

395.    The price of all NEAR tokens goes up or down together.

396.    Although U.S. investors purportedly were prohibited from participating in the early seed funding rounds or NEAR's initial minting, NEAR has been available for purchase and sale in the United States since at least October 2020, including since June 2022 on the Kraken Trading Platform and through the Kraken Services.

397.     The information publicly disseminated by Near, the NEAR Foundation, and their common founders would lead a reasonable investor, including those who purchased NEAR since June 2022, to view NEAR as an investment.  Specifically, NEAR holders would reasonably expect to profit from the efforts of these groups to grow the protocol because this growth would in turn increase the demand for and the value of NEAR.

398.    Approximately 35.7% of the one billion NEAR tokens initially minted

were transferred to early investors that held convertible notes. Of the remaining initial supply of NEAR tokens, 14% were allocated to the "Core Contributors," 11.7% to "Early Ecosystem" developers, 10.0% to the NEAR "Foundation Endowment," 17.2% to "Community Grants and Programs," and 11.4% to "Operations Grants." Accordingly, the financial incentives and fortunes of Near's core team members and those of early developers (who collectively owned approximately 25.7% of the initial supply of NEAR) were aligned with those of other NEAR investors (who owned approximately 35.7% of the initial NEAR supply).

399.   For example, Near stated in its SEC filings that it would pool investment proceeds from the sale of notes convertible into NEAR tokens to develop the NEAR protocol and grow Near's business and, as recently as January of 2022, that it further pooled proceeds from the sale of $150,000 in NEAR tokens that month for the same purposes.

400.   And, as the NEAR Foundation publicly touted, it did in fact use its allocation of NEAR tokens to support the development of the NEAR protocol and ecosystem. For example, in October 2021, the NEAR Foundation announced "$800 million in funding initiatives targeted at accelerating growth" of the NEAR ecosystem. Subsequently, in a "transparency report" blog post on the Near website, the NEAR Foundation stated that it had "deployed $540M in fiat and tokens during [the last quarter of 2021 and the first two quarters of 2022]" to support "NEAR ecosystem projects" and launch "regional hubs" around the world, among other efforts to help grow the ecosystem.

401.   NEAR's founders remain actively involved with the NEAR protocol today through the NEAR Foundation. In fact, Polosukhin sat on the NEAR Foundation Council (its governing group) until March 2023 and has served as its Chair for the past two years.

402.   In a post on one of the NEAR Foundation's blogs discussing the role of the NEAR ecosystem in funding projects to continue growing the NEAR protocol,

1  Polosukhin likened the NEAR ecosystem to a venture capitalist picking an

2  investment strategy and likened the NEAR community to investors in the NEAR

3  ecosystem:



9      403.   Similarly, as an indicator of investor demand, Near has touted its high-

10  profile venture capital partners.  For example, until March 2023, Near's website

11  stated that NEAR is "[b]acked by the best," followed by the logos of 10 venture

12  capital firms and the following quotation from one of those firms' partners: "NEAR

13  is poised to be a leading smart contract blockchain platform, combining first-rate

14  technology with a fast-growing developer ecosystem.  We are excited to support

15  NEAR as we ramp up our investments in the digital asset space."

16      404.   Near has also marketed the feature of the NEAR protocol that

17  automatically burns 70% of all NEAR tokens accumulated as fees.  Accordingly, the

18  greater the number of transactions that occur on the NEAR protocol, the greater the

19  number of NEAR tokens that are burned, reducing their total supply.  As with other

20  crypto asset securities set forth herein, marketing that NEAR tokens are being burned

21  is designed to lead holders of surviving NEAR tokens to expect the potential for

22  profit due to the reduction in their supply.

23      405.   Public statements made by Kraken to investors about NEAR and the

24  NEAR Protocol reinforced the reasonable expectation of profits from an investment

25  in NEAR due to the managerial efforts of the NEAR Foundation.

26      406.   For example, on its website, Kraken describes for investors NEAR's

27  history, team, and development.  Further, Kraken provides investors with analysus

28  about the price of NEAR.  Specifically, Kraken's website states: "NEAR Protocol

increases its token supply by 5% each year, with 90% of these newly released tokens going to validators.  The remainder goes to the blockchain's treasury to support platform development."  "Investors may wish to buy NEAR and add it to their portfolio should they believe in the future of sharding as a way to scale blockchain technology and wish to have a stake in the future development of the NEAR ecosystem."

### 10. OMG

407.   The so-called OMG Network, previously known as OmiseGO, was founded in 2017.  In or around December 2020, Genesis Block Ventures ("GBV"), a Hong Kong-based venture capital firm, acquired the OMG Network.  In or around February 2021, the OMG Network partnered with another entity to develop the so-called Boba Network.  In or around August 2021, the OMG Network changed its name to the "OMG Foundation" and the following year became the "BOBA Foundation."

408.   The OMG token was issued by the OMG Network as a "proof-of-stake" token on the OMG Network.  The OMG Network held an ICO on or about June 24, 2017, raising approximately $25 million through the sale of OMG tokens to the public in exchange for ether.  The OMG Network issued a maximum supply of approximately 140.2 million OMG tokens, and sold approximately 65.1% of this supply to the public in the ICO.

409.   Today, OMG tokens are available for buying, selling, and trading on several crypto asset trading platforms in exchange for fiat currency (namely U.S. Dollars) or certain crypto assets.  Kraken made OMG available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services in October 2019, and it remains available.

410.   From the time of its offering and continuing through the Relevant Period, OMG was offered and sold as an investment contract and is therefore a security.

411.   The price of all OMG tokens goes up or down together.

412.   The OMG Network pools the proceeds from OMG token sales to fund the development, marketing, business operations, and growth of the OMG Network, as reflected in OMG's "Crowdfunding Whitepaper," which used the following chart to explain how funds raised during the ICO would be used to develop the network:



413.   Specifically, the OMG whitepaper explained that the "[m]ajority of the funds raised will go towards the development of open source software.  Overall fund usage will be split approximately 2:1 ratio between network and end-user application development."  The whitepaper also detailed how the "budget" would be used, which included items such as "[c]onstruct and roll-out blockchain, including full node client," and "[c]onstruct and roll-out decentralized custody of funds."

414.   The stated distribution of the OMG tokens tied the fortunes of the OMG token holders together and to the fortunes of the promoters.  For instance, the OMG tokens were allocated as follows: 65.1% for purchase by the public; 20% for "future costs and uses including use for network validation as part of the development and execution of the project" as a "reserve"; 9.9% for OMG "team members and key contributors who worked to develop the ideas, supporting structures and actual implementation of the OmiseGO Project"; and 5% for an airdrop to ether token holders to "encourage incentive alignment with the Ethereum mainnet."  Even after the ICO, and through changes in management, the promoters of OMG continued to

tout the connected fortunes of OMG token holders and the promoters.

415.   The information publicly disseminated by OMG's promoters would lead a reasonable investor, including those who purchased OMG since October 2019, to view OMG as an investment.  Specifically, OMG holders would reasonably expect to profit from the promoters' efforts to grow the OMG Network because this growth would in turn increase the demand for and the value of OMG.

416.   For example, the whitepaper touted the experience of the parent holding company (Omise Holdings Pts. Ltd.), the OMG Network team, and advisors that would contribute to building a successful blockchain network—the usage of which would derive value to the OMG token holders.  The whitepaper stated that "[o]ur technical team is led by experienced professionals who have track records in high growth technology startups" and that they had the "best setup to implement this project" given the parent holding company's "established track record in building a fast-growing fintech startup in the payments and value-transfer landscape."

417.   Further, materials available at the time of the ICO indicated that the development of the platform by the OMG Network team could lead to profits for OMG token holders.  For instance, the whitepaper provided that "[a]t the OmiseGo Network layer, token holders will be eligible to earn transaction fees for interchange payments and decentralized exchange. Activity 'on-chain' will pay transaction fees to token holders for validating the network."

418.   Moreover, the OmiseGo website at the time of the ICO indicated that OMG token holders could anticipate receiving a share of the fee revenue generated on the platform, and a document purporting to establish the terms under which users purchased OMG during the ICO clarified that potential for profit was linked to efforts of the OMG Network team ("[W]hile the individuals and entities . . . assigned to [create the network] will make reasonable efforts to develop and complete OmiseGO, it is possible that such development may fail and User's OMG may become useless and/or valueless due to technical, commercial, regulatory or any other reasons").

419.   Even after the OMG Network released a beta version of its platform in mid-2020 (which did not exist at the time of the ICO), the OMG Network team continued to emphasize their commitment to developing the network.  For instance, in or around June 2020 (more than seven months years after OMG was listed on the Kraken Trading Platform), the OMG Network team expressed an intended focus on future marketing for the platform: "We've always followed the mantra that our work will speak for itself in the market place and we've gone very light on the marketing—focusing instead on top-notch engineering and solid business development."  In or around October 2020, the OMG Network's CEO wrote that for the remainder of 2020 the OMG Network "team remains focused on onboarding our CeFi partners to build out the Layer-2 value transfer use-case and improve the protocol and UX" and that the "goal is to get OMG Network technology embedded into a network of merchants and enterprises, so it becomes the go-to protocol for value transfer."

420.   Similarly, while the management of the OMG Network continued to change hands, the new teams still stated publicly that they would focus on making efforts to achieve growth for OMG.  For example, at the time of the acquisition by GBV in or around December 2020, the OMG Network stated, "Today, @genesisblockhk acquires OMG Network.  We'll work together to grow our ecosystem and accelerate the adoption of OMG Network as the value transfer layer for #Ethereum!"  And in November 2021, the new team touted, "OMG was trading around $3-4 when the current team took over. Fair to say quite a bit of value has been created since then between OMG and BOBA."

421.   Upon acquisition of the OMG Network in December 2020, GBV promised to continue to "promote the accelerated growth of OMG Network, and further enhance the adoption of OMG blockchain in Asia and beyond."

422.   These statements led reasonable OMG investors to expect that the demand for OMG would likely increase based on the OMG Network's efforts to increase demand for its technology, thereby potentially resulting in a price increase

1   for OMG.

2   423.   Public statements made by Kraken about OMG and the OMG Network

3   reinforced investors' reasonable expectation of profits from an investment in OMG

4   due to the managerial efforts of Omise and the OMG Network team.

5   424.   For example, on its website, Kraken describes for investors OMG's

6   history, team, and development, noting the "OMG Network is developed by Omise

7   Go Pte Ltd., a subsidiary of Omise, a Thailand-based payments processor founded in

8   2013.  Previously known as Omisego, Omise rebranded to OMG Network on June

9   1st, 2020."

10   425.   Kraken further provides investors with analysis about the price of OMG.

11   Specifically, Kraken's website states: "Should Omise bridge the gap between

12   centralized and decentralized financial networks with OMG Network, the OMG

13   cryptocurrency could be of interest to long-term traders as well."

14   **11.   SOL**

15   426.   "SOL" is the native token of the Solana blockchain. The Solana

16   blockchain was created by Solana Labs, Inc. ("Solana Labs"), a Delaware corporation

17   headquartered in San Francisco that was founded in 2018 by Anatoly Yakovenko

18   ("Yakovenko") and Raj Gokal (Solana Labs' current CEO and COO, respectively).

19   According to Solana's website, www.solana.com, the Solana blockchain is a network

20   upon which decentralized apps ("dApps") can be built, and is comprised of a platform

21   that aims to improve blockchain scalability and achieve high transaction speeds by

22   using a combination of consensus mechanisms.

23   427.   According to Solana's website, SOL may be "staked" on the Solana

24   blockchain to earn rewards, and a certain infinitesimal amount of SOL must be

25   "burned" to propose a transaction on the Solana blockchain, a common function for

26   native tokens on blockchains that constitutes a method for cryptographically

27   distributed ledgers to avoid a potential bad actor from "spamming" a blockchain by

28   overwhelming it with an infinite number of proposed transactions.

COMPLAINT                                         82

428.   Between May 2018 and early March 2020, Solana Labs filed with the SEC multiple forms claiming that its offers and sales of securities—what Solana described in those forms as the "sale and issuance of rights to receive Solana Labs, Inc. tokens in the future via a [SAFT]"—were exempt from registration under Rule 506(c) of Regulation D under the Securities Act.  Through these offers and sales of securities, Solana sold approximately 177 million SOL, raising over $23 million.

429.   Later in March 2020, Solana Labs conducted additional SOL sales on the CoinList trading platform (www.coinlist.co) in a "Dutch auction" (wherein investors place bids and the entire offering occurs at the price with the highest number of bidders).  During this offering, Solana Labs sold approximately 8 million SOL, at an average price of $0.22 per SOL, raising approximately $1.76 million.  In August 2021, Solana Labs completed another, purportedly private sale of SOL, raising over $314 million from investors, each of whom paid for SOL with fiat currency and was required to sign a purchase agreement.

430.   Beginning in February 2020, Solana Labs took steps to make SOL available for trading on crypto asset trading platforms.  For example, in a September 17, 2020, Twitter post, Solana Labs stated: "The Solana community in the United States has been eagerly awaiting the chance to trade SOL on a U.S. exchange, and now that day has come. SOL/USDT, SOL/USD, and SOL/BTC pairs are all open for trading on @ftx_us."  In another Twitter post later the same day, Solana Labs stated: "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL within one day."

431.   From the time of its offering and continuing through the Relevant Period, SOL was offered and sold as an investment contract and therefore a security.

432.   The price of all SOL tokens goes up or down together.

433.   SOL has been available for buying, selling, and trading on the Kraken Trading Platform and through the Kraken Services since approximately June 2021.

434.   The information Solana Labs publicly disseminated would lead a

reasonable investor, including those who purchased SOL since June 2021, to view SOL as an investment.   Specifically, SOL holders would reasonably expect to profit from Solana Labs' efforts to grow the Solana protocol because this growth would in turn increase the demand for and the value of SOL.

435.   Solana Labs stated publicly that it would pool the proceeds from its private and public SOL sales in omnibus crypto asset wallets that it controlled, and that it would use those proceeds to fund the development, operations, and marketing efforts with respect to the Solana blockchain in order to attract more users to that blockchain (potentially increasing the demand for, and therefore the value of, SOL itself, given the need for those who wish to interact with the Solana blockchain to tender SOL).  For example, in connection with the 2021 private sale of SOL, Solana Labs stated publicly that it would use investor funds to: (i) hire engineers and support staff to help grow Solana's developer ecosystem; (ii) "accelerate the deployment of market-ready applications focused on onboarding the next billion users into crypto"; (iii) "launch an incubation studio to accelerate the development of decentralized applications and Platforms building on Solana"; and (iv) develop a "venture investing arm" and "trading desk dedicated to the Solana ecosystem."

436.   As Solana Labs stated publicly, of the 500 million SOL tokens initially minted, 12.5% were allocated to Solana Labs' founders, including Yakovenko and Gokal, and another 12.5% were allocated to the Solana Foundation, a non-profit organization headquartered in Zug, Switzerland "dedicated to the decentralization, growth, and security of the Solana network."  In fact, on April 8, 2020, Solana Labs transferred 167 million SOL tokens to the Solana Foundation, and in its public announcement of the Solana Foundation's formation, Solana Labs stated that "[t]he Foundation's initial focus is expanding and developing the ecosystem of the Solana protocol."

437.   Solana Labs' two original founders have worked for the Solana Foundation. Gokal currently serves as a member of the Solana Foundation Council.

And Yakovenko was a member and President of the Solana Foundation Council from its founding until December 2021, when he stepped down to focus on his work at Solana Labs.

438.    In public statements on its website and social media pages, including statements made and available during the period when SOL was available to trade on the Kraken Trading Platform and through the Kraken Services, Solana specified its expertise in developing blockchain networks and described the efforts Solana and its founders had made and would continue to make to develop the Solana blockchain protocol and attract users to the technology, which, again, required those utilizing the technology to demand some amount of SOL.

439.    Solana Labs undertook other promotional efforts to increase participation in its network and thus demand for SOL, including with: (a) a Solana podcast of which there have been at least 90 episodes since July 2019, with interviews of key Solana Labs management and other key personnel, including Yakovenko; (b) a YouTube channel with over 37,000 subscribers; and (c) dedicated Telegram, Twitter, Reddit, Solana Forums, Discord, GitHub, Meetup, and Weibo channels, with links to each available on Solana's website.

440.    These promotional statements that Solana Labs made in these fora with respect to SOL and Solana Labs' efforts to increase demand and value for SOL included, for example:

- A July 28, 2019 post on Solana Labs' Medium blog in which Yakovenko stated that "Solana … supports upwards of 50,000 TPS" (transactions per second) "making it the most performant blockchain and the world's first web-scale decentralized network" and that the "Solana team— comprised of pioneering technologists from [several high-profile technology companies]—has focused on building the tech required for Solana to function with these groundbreaking performance standards";

- Solana's website statement that "Solana is engineered for widespread,

mainstream use by being energy efficient, lightning fast, and extremely inexpensive" and that "[m]any of the core Solana builders, like co-founder Anatoly Yakovenko, have a background in building cell phone networks," which "means that they are singularly focused on building for scalability (the ability to grow) and efficiency (the ability to get the most information across with the least amount of resources)";

- An April 14, 2021 post on gemini.com in which Yakovenko touted the Solana network's ability to "support a theoretical peak capacity of 65,000 transactions per second, currently" ("around 10,000 times faster than Bitcoin, 4,000 times faster than Ethereum, and 35 times faster than Ripple—even around 2.5 times faster than Visa") and projecting that such speed would "doubl[e] in capacity every two years with improvements in hardware and bandwidth"; and

- A December 23, 2022 post on Solana's website marketing various "upgrades" that Solana and its engineers would undertake, including "turbine optimizations" introduced by the "core engineering team," which Yakovenko described as the "coolest piece of technology that we built that nobody knows about."

441. Further, Solana Labs markets that it "burns" (or destroys) SOL tokens as part of a "deflationary model." As Yakovenko explained in an April 14, 2021 article entitled "Solana (SOL): Scaling Crypto to the Masses" posted on gemini.com, "Solana transaction fees are paid in SOL and burnt (or permanently destroyed) as a deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price." As explained on the Solana website, since the Solana network was launched, the "Total Current Supply" of SOL "has been reduced by the burning of transaction fees and a planned token reduction event." This marketed burning of SOL as part of the Solana network's "deflationary mechanism" has led investors reasonably to view their purchase of SOL as having the potential for profit to the

extent there is a built-in mechanism to decrease the supply and therefore increase the price of SOL.

442.   Public statements made by Kraken about SOL and the Solana Protocol reinforced investors' reasonable expectation of profits from an investment in SOL due to the managerial efforts of Solana Labs.

443.   For example, on its website, Kraken describes for investors SOL's history, team, and development.  Further, Kraken provides investors with analysis about the price of SOL.  Specifically, Kraken's website states: "Solana's comparatively large market cap demonstrates the wider crypto community's belief in the future of the Solana ecosystem."

444.   Kraken went on to explain: "Crypto market participants that see a long-term prospect in the Solana blockchain may choose to dollar cost average (DCA) in SOL tokens.  For those not interested in timing the market or finding the perfect time to buy, dollar cost averaging may be the most effective strategy for accumulating SOL."

445.   Further, Kraken stated on its site: "By setting up a recurring buy of SOL, you can accumulate SOL regularly over time.  Those that believe in the potential of the Solana blockchain over the long term may choose to simply set up a recurring buy of SOL tokens on a regular basis rather than making a large, one-time purchase of SOL all at once."

# FIRST CLAIM FOR RELIEF

## Violations of Exchange Act Section 5

## (Payward and Payward Ventures)

446.   The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 445.

447.   By engaging in the acts and conduct described in this Complaint, Payward and Payward Ventures, directly or indirectly, made and continues to make use of the mails and the means and instrumentalities of interstate commerce for the

purpose of using any facility of trading platforms that constitute exchanges within or subject to the jurisdiction of the United States, in order to effect transactions in a security, or to report any such transaction, without registering as national securities exchange under Exchange Act Section 6 [15 U.S.C. § 78f], and without being exempted from such registration.

448.   By reason of the conduct described above, each of Payward and Payward Ventures, directly or indirectly, violated, are violating, and, unless enjoined, will continue to violate Exchange Act Section 5 [15 U.S.C. § 78e].

## SECOND CLAIM FOR RELIEF

### Violations of Exchange Act Section 15(a)

### (Payward and Payward Ventures)

449.   The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 445.

450.   By engaging in the acts and conduct described in this Complaint, Payward and Payward Ventures, persons other than a natural person under the Exchange Act, are each a broker and dealer and each made and continues to make use of the mails and the means and instrumentalities of interstate commerce to effect transactions in, or to induce or attempt to induce the purchase or sale of, securities, without registering as a broker or dealer in accordance with Exchange Act Section 15 [15 U.S.C. § 78o], and without being exempted from such registration.

451.   By reason of the conduct described above, each of Payward and Payward Ventures, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

## THIRD CLAIM FOR RELIEF

### Violations of Exchange Act Section 17A

### (Payward and Payward Ventures)

452.   The Commission realleges and incorporates by reference here the allegations in paragraphs 1 through 445.

453.   By engaging in the acts and conduct described in this Complaint, Payward and Payward Ventures, directly or indirectly, each made and continues to make use of the mails and the means and instrumentalities of interstate commerce to perform the functions of a clearing agency with respect to securities, without registering in accordance to Section 17A(b) [15 U.S.C. § 78q-1(b)] of the Exchange Act and without being exempted from registration.

454.   By reason of the conduct described above, each of Payward and Payward Ventures, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 17A [15 U.S.C. § 78q-1].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

### **I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

### **II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, Sections 5, 15(a), or 17A of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), 78q-1(b)].

### **III.**

Prohibiting, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], Defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from using means or instrumentalities of interstate commerce to: (i) act as an

unregistered exchange with respect to any securities, including any crypto asset securities; (ii) act as unregistered broker or dealer with respect to any securities, including any crypto asset securities; or (iii) act as an unregistered clearing agency with respect to any securities, including any crypto asset securities.

## IV.

Order Defendants to disgorge all ill-gotten gains, together with prejudgment interest thereon.

## V.

Order Defendants to pay civil penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VI.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VII.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  November 20, 2023

*/s/ Daniel Blau*
Daniel Blau
Alec Johnson
Peter Moores
Elizabeth Goody
Attorneys for Plaintiff
Securities and Exchange Commission