MATTHEW C. SOLOMON (appearing *pro hac vice*)
msolomon@cgsh.com
RAHUL MUKHI (SBN 350718)
rmukhi@cgsh.com
JENNIFER KENNEDY PARK (SBN 344888)
jkpark@cgsh.com
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Avenue
Washington, DC 20037
Telephone: (202) 974-1680

BRIAN KLEIN (SBN 258486)
bklein@waymakerlaw.com
ASHLEY MARTABANO (SBN 236357)
amartabano@waymakerlaw.com
WAYMAKER LLP
515 S. Flower Street, Suite 3500
Los Angeles, CA 90071
Telephone: (424) 652-7814

*Attorneys for Defendants Payward, Inc.*
*and Payward Ventures, Inc.*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PAYWARD, INC.; PAYWARD VENTURES, INC.,<br><br>Defendants. | Case No. 3:23-cv-06003-WHO<br><br>Judge: Hon. William H. Orrick<br>Hearing Date: June 12, 2024<br>Time: 2:00 p.m.<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS** |

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on June 12, 2024, or at such other date as may be agreed upon or ordered, at the Courtroom of the Honorable William H. Orrick, Defendants Payward, Inc. and Payward Ventures, Inc. (together, "Kraken" or the "Company") will move the Court, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss with prejudice the Securities and Exchange Commission's ("SEC") Complaint (ECF No. 1) (the "Complaint"). This motion to dismiss ("Motion") is based on this notice of motion, the accompanying memorandum of points and authorities, the Declaration of Matthew C. Solomon ("Solomon Decl.") and accompanying exhibits, the arguments of counsel, and all other matters properly considered by the Court. This Motion is brought on the grounds that the Complaint fails to state a claim against Kraken upon which relief can be granted.

**REQUESTED RELIEF**

Kraken requests that the Court grant the Motion and dismiss the Complaint with prejudice.

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED ........................................................................1

PRELIMINARY STATEMENT ..........................................................................................1

BACKGROUND ..................................................................................................................4

    A.    History of Digital Assets and the SEC's Shifting Positions .................................4

    B.    Trading on Kraken's Platform ...............................................................................6

    C.    Kraken's Congressional Testimony and the SEC's Decision to Bring Charges .................8

    D.    The SEC's Claims .................................................................................................8

LEGAL STANDARD ..........................................................................................................9

ARGUMENT .......................................................................................................................9

I.    THE COMPLAINT DOES NOT PLEAD SECURITIES TRANSACTIONS ON KRAKEN'S PLATFORM ......................................................................................10

    A.    The SEC never alleges the contract that an "investment contract" requires. .....................10

    B.    An "investment contract" must include post-sale obligations running from issuer to purchaser, which are not alleged. .....................14

    C.    The SEC cannot otherwise satisfy any *Howey* element....................................16

        1.    There is no "investment of money."..........................................................16

        2.    There is no "common enterprise."..............................................................17

        3.    There is no "reasonable expectation of profits" from the efforts of others. ....................19

    D.    The SEC's counterarguments are unavailing....................................................22

        1.    The SEC cannot substitute the necessary relationship between issuer and Kraken customer with transactions that did not occur on Kraken. ...............................................22

        2.    An amorphous "ecosystem" is not a "common enterprise" and does not satisfy *Howey*'s other requirements. ....................................................23

        3.    The presence of market makers does not cure the SEC's failure to show any necessary linkage between issuer and Kraken user. ....................................................26

    E.    The SEC's digital asset cases are distinguishable and inconsistent with the law in this Circuit. ....................................................26

II.    THE MAJOR QUESTIONS DOCTRINE REQUIRES DISMISSAL......................................28

CONCLUSION ..................................................................................................................30

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**Federal Cases**

4

*Alabama Ass'n of Realtors v. HHS,*

5
    141 S. Ct. 2485 (2021) ...................................................................................................28

6

*Ashcroft v. Iqbal,*

7
    556 U.S. 662 (2009) ........................................................................................................9

8

*Bell Atlantic Corp. v. Twombly,*

9
    550 U.S. 544 (2007) ........................................................................................................9

10

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ..............................................................................................28-30

11

12

*Bobrowski v. Red Door Grp.,*
    2011 WL 3555712 (D. Ariz. Aug. 11, 2011) ............................................................17

13

14

*Bobrowski v. Red Door Grp.,*
    2011 WL 3875424 (D. Ariz. Aug. 31, 2011) ............................................................18

15

16

*Brodt v. Bache & Co.,*
    595 F.2d 459 (9th Cir. 1978).....................................................................................18-19

17

18

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.,*
    608 F.2d 1297 (9th Cir. 1979).................................................................................*passim*

19

*FDA v. Brown & Williamson Tobacco Corp.,*

20
    529 U.S. 120 (2000) ......................................................................................................29

21

*Friel v. Dapper Labs, Inc.,*
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) .......................................................................27

22

23

*Groff v. DeJoy,*
    600 U.S. 447 (2023) ......................................................................................................10

24

*Happy Investment Group v. Lakeworld Properties, Inc.,*

25
    396 F. Supp. 175 (N.D. Cal. 1975)..........................................................................14-15

26

*Harman v. Harper,*

27
    1990 WL 121073 (9th Cir. Aug. 21, 1990) ...............................................................15

28

*Hart v. Pulte Homes of Michigan Corp.*,
    735 F.2d 1001 (6th Cir. 1984) ...................................................................................17

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) ..............................................................................*passim*

*In re United Energy Corp.*,
    944 F.2d 589 (9th Cir. 1991) ....................................................................................13

*Inline Utilities, LLC v. Schreiber*,
    2020 WL 4464463 (S.D. Cal. Aug. 4, 2020).......................................................13, 16-17

*Jacobo v. Doe*,
    2022 WL 2052637 (E.D. Cal. June 7, 2022) ................................................................25

*Kleiman v. Wright*,
    2018 WL 6812914 (S.D. Fla. Dec. 27, 2018)..................................................................4

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985) ..................................................................................................15

*Marini v. Adamo*,
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ........................................................................18

*Mordaunt v. Incomco*,
    686 F.2d 815 (9th Cir. 1982) .................................................................................18-19

*National Ass'n of Mfrs. v. Dep't of Def.*,
    583 U.S. 109 (2018) ..................................................................................................11

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ..................................................................................20, 23

*Risley v. Univ. Navigation Inc.*
    2023 WL 5609200 (S.D.N.Y. Aug. 29, 2023) ..............................................................29

*Rodriguez v. Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993) .............................................................................14-15, 20-21

*Salameh v. Tarsadia Hotel*,
    726 F.3d 1124 (9th Cir. 2013) ........................................................................13, 17, 23

*SEC v. Belmont-Reid*,
    794 F.2d 1388 (9th Cir. 1986) ...............................................................................19-20

*SEC v. C. M. Joiner Leasing Corp.*,
  320 U.S. 344 (1943) .................................................................................................. 13

*SEC v. Commodity Options Int'l, Inc.*,
  553 F.2d 628 (9th Cir. 1977) ..................................................................................... 20

*SEC v. Edwards*
  540 U.S. 389 (2004) ............................................................................................. 10,12

*SEC v. Energy Grp. of Am., Inc.*,
  459 F. Supp. 1234 (S.D.N.Y. 1978) .......................................................................... 19

*SEC v. Kik Interactive Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) ....................................................................... 27

*SEC v. Lauer*,
  52 F.3d 667 (7th Cir. 1995) ....................................................................................... 16

*SEC v. R.G. Reynolds Enters.*,
  952 F.2d 1125 (9th Cir. 1991) ................................................................................... 13

*SEC v. Ripple Labs, Inc.*,
  2023 WL 4507900 (S.D.N.Y. July 13, 2023) ..................................................... *passim*

*SEC v. Rubera*,
  350 F.3d 1084 (9th Cir. 2003) ................................................................. 9, 13, 16-17

*SEC. v. Telegram Grp. Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ....................................................................... 27

*SEC v. Terraform Labs Pte. Ltd.*,
  2023 WL 4858299 (S.D.N.Y. July 31, 2023) ............................................................ 27

*SEC v. United Benefit Life Insurance Co.*,
  387 U.S. 202 (1967) ................................................................................................... 11

*SEC v. Variable Annuity Life Insurance Co.*,
  359 U.S. 65 (1959) ..................................................................................................... 11

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ............................................................................................ *passim*

*Sprewell v. Golden State Warriors*,
  266 F.3d 979 (9th Cir. 2001) ....................................................................................... 9

*Teed v. Chen*,
   2022 WL 16839496 (N.D. Cal. Nov. 9, 2022) ................................................................17-18

*United States v. Harmon*,
   474 F. Supp. 3d 76 (D.D.C. 2020) ..................................................................................... 25

*Wals v. Fox Hills Dev. Corp.*,
   24 F.3d 1016 (7th Cir. 1994) .............................................................................................. 16

*Warfield v. Alaniz*,
   569 F.3d 1015 (9th Cir. 2009) ................................................................................ 13, 16, 21

*West Virginia v. EPA*,
   597 U.S. 697 (2022) ......................................................................................................28-30

*Williams v. Taylor*,
   529 U.S. 362 (2000) ........................................................................................................... 10

**State Cases**

*Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*,
   240 N.W. 827 (Wis. 1932) .................................................................................................. 12

*Creasy Corp. v. Enz Bros. Co.*,
   187 N.W. 666 (Wis. 1922) .................................................................................................. 12

*Dobal v. Guardian Fin. Corp.*,
   251 Ill. App. 220 (1929) ..................................................................................................... 12

*Lewis v. Creasey Corp.*,
   248 S.W. 1046 (Ky. Ct. App. 1923) .................................................................................. 12

*McCormick v. Shively*,
   267 Ill. App. 99 (1932) ....................................................................................................... 12

*State v. Heath*,
   153 S.E. 855 (N.C. 1930) .................................................................................................... 12

*State v. Robbins*,
   240 N.W. 456 (Minn. 1932) ................................................................................................ 12

*Stevens v. Liberty Packing Corp.*,
   161 A. 193 (N.J. 1932) ........................................................................................................ 12

**Docketed Cases**

*CFTC v. Zhao*,
    No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023) ............................................................. 5

*SEC v. Binance Holdings Ltd.*,
    No. 23-1599 (ABJ) (D.D.C. filed June 5, 2023) .................................................... 6

*SEC v. Coinbase, Inc.*,
    No. 23-cv-4738 (KPF) (S.D.N.Y. filed June 6, 2023) ..........................................6-7

*SEC v. Ripple Labs, Inc.*,
    No. 20-CV-10832 (AT) (SN) (S.D.N.Y. June 13, 2023) ...................................... 22

**Federal Rules & Statutes**

15 U.S.C § 78 ....................................................................................................................9,16

Federal Rule of Civil Procedure 12(b)(6)...................................................................... 1

**Legislative Materials**

Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. (2023)..............................4

Crypto-Currency Act of 2020, H.R. 6154, 116th Cong. (2020) .......................................4

Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022) .....................4

Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022) ...............4

Eliminate Barriers to Innovation Act of 2021, H.R. 1602, 117th Cong. (2021) ...........................4

Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong.
    (2023) ...............................................................................................................28

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail
    Investors Collide,Part III*, 117th Cong., 12 (May 6, 2021) .................................5, 29

Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023) ......4, 28

*The Future of Digital Assets: Measuring the Regulatory Gaps in the Digital Assets
    Markets*, 118th Cong. (May 10, 2023). ................................................................5, 8

The Token Taxonomy Act of 2021, H.R. 1628, 117th Cong. (2021) .................................4

U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019, H.R. 923,
116th Cong. (2019) ................................................................................................4

**Other Authorities**

Alec Liu, *What Satoshi Said: Understanding Bitcoin Through the Lens of Its Enigmatic
Creator*, Vice (Jan. 16, 2014) ...........................................................................25

*Bitcoin Price*, Kraken ...............................................................................................22

*Black's Law Dictionary* (3d ed. 1933) .....................................................................12

Brief for the SEC, *SEC v. Edwards*, No. 02-1196 (U.S. June 26, 2003),
2003 WL 21498455 ...............................................................................10, 11, 16

Brief for the SEC at 9, *SEC v. Howey*, No. 843 (U.S. April 17, 1946),
1946 WL 50582 ................................................................................................11

*CFTC Approves Two Proposals and a DCO Application* (Dec. 18, 2023) ..................26

*Ethereum Price*, Kraken ............................................................................................22

Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke
Conference* (Jan. 20, 2023) ............................................................................5, 29

Letter from Vanessa Countryman, Secretary of the SEC Letter to Paul Grewal, Chief Legal
Officer, Coinbase Global Inc. (Dec. 15, 2023) ...................................................4

Press Release, White House, FACT SHEET: White House Releases First-Ever
Comprehensive Framework for Responsible Development of Digital Assets (Sept. 16,
2022) ...................................................................................................................6

SEC, Fiscal Year 2023 Congressional Budget Justification Annual Performance Plan (Mar.
24, 2022) .............................................................................................................6

SEC, *Mission* .............................................................................................................5

SEC, Order Granting Accelerated Approval of Proposed Rule Changes to List and Trade
Bitcoin-Based Commodity-Based Trust Shares and Trust Units, Release No. 34-99306
(Jan. 10, 2024) ..................................................................................................26

*Webster's New International Dictionary* (2d ed. 1937) ............................................12

William Hinman, Dir., SEC Div. of Corp. Fin., *Digital Asset Transactions: When Howey
Met Gary (Plastic)* (June 14, 2018) ...............................................................4, 23

1

**STATEMENT OF ISSUES TO BE DECIDED**

2      1.      Whether the SEC's claims under the Securities Exchange Act of 1934 (the "Exchange

3  Act") should be dismissed under Rule 12(b)(6) because the SEC fails to plausibly allege that digital

4  assets were investment contracts when traded on Kraken, a longstanding U.S.-based platform for

5  trading such assets.

6      2.      Whether the SEC's claims should be dismissed pursuant to the major questions

7  doctrine because the agency is asserting newfound authority over a significant portion of the

8  economy without clear congressional authorization.

9

**PRELIMINARY STATEMENT**

10      The SEC fails to plausibly allege that any digital asset was a security when traded on Kraken,

11  specifically, a kind of security called an "investment contract."  An investment contract is not simply

12  an investment.  Diamonds can be an investment.  A classic car can be an investment.  Comic books,

13  baseball cards, or Star Wars memorabilia can be investments.  As the Exchange Act makes clear, an

14  "investment contract" requires a contract.  In every Supreme Court and Ninth Circuit decision finding

15  an "investment contract," there is a contract.

16      The term "investment contract" predates the federal securities laws, originating in the state

17  "blue sky" laws.  In 1946, the Supreme Court in *Howey* drew from these laws to provide the test for

18  when a contract is an "investment contract."  There must be "a contract, transaction or scheme

19  whereby a person invests his money in a common enterprise and is led to expect profits solely from

20  the efforts of the promoter or a third party."  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946).

21  Secondary market trading of digital assets on Kraken meets none of these requirements.

22      Supreme Court precedent instructs that an investment "contract, transaction, or scheme" must

23  include a contract or a series of contracts for the issuer to provide post-sale value to the buyer.  While

24  a "contract" is a single instrument, a "transaction or scheme" may involve more than one contract

25  that must logically be read together.  This requirement is how the Supreme Court gave meaning to

26  the statutory language and the state securities laws that grounded *Howey*:  There must be both an

27  "investment" and at least one "contract."  Mere investment will not do.  Since 1946, the Supreme

28

---

Court and Ninth Circuit have found dispositive the presence (or absence) of contracts and post-sale obligations.

Securities—whether stocks, bonds, or "investment contracts"—reflect a relationship between issuer and buyer.  In exchange for the buyer's money, the issuer obligates itself to provide value to the buyer by working to generate a post-sale return on her investment.  This commitment from issuer to buyer differentiates investing in a business (a security) from buying its products or assets (not a security).  Absent these requirements, the SEC and private plaintiffs could "securitize" any simple asset sale with an alleged speculative purpose like comic books and baseball cards.  The securities laws have never given the SEC and private plaintiffs such vast authority.

The SEC does not allege that digital asset issuers entered into contracts with or undertook post-sale obligations to Kraken's customers.  In fact, the SEC alleges no relationship at all between the 11 issuers and Kraken's customers.  The disconnect between issuers and Kraken customers not only forecloses the existence of any investment "contract, transaction, or scheme," but it also defeats the remaining *Howey* requirements:  Kraken customers did not invest money in an enterprise.  Kraken customers participated in no common enterprise with issuers.  And Kraken customers could not reasonably expect profits from the efforts of issuers.

The SEC appears to offer three implausible theories for bridging the gap between its allegations and *Howey*'s requirements.  The first theory posits that issuers and primary purchasers formed investment contracts in primary offerings of digital asset tokens years ago, and that those investment contracts somehow "persisted" when the tokens traded in the secondary market on Kraken between unrelated parties.  This novel theory fails because the SEC never alleges that post-sale rights or obligations that may have been created in the primary offerings were conveyed in secondary transactions of tokens on Kraken.  Nor could they because the digital asset transfers without any rights or obligations attached.  This cannot form an investment contract.

The SEC advances a second theory in the Complaint:  The digital asset itself is the investment contract.  The Complaint calls them "crypto asset securities," a term of the SEC's own recent creation.  But courts have repeatedly said that the underlying digital assets are not themselves investment contracts.  And the SEC itself conceded in a case against another secondary trading

platform that digital assets are "just computer code."  The SEC also admitted that there are no "continuing promises from the issuer or developer to the token holder [or] post-sale obligations on the issuer or developer."  Computer code without any promises or obligations cannot possibly form an investment contract.

The SEC has in cases against other platforms advanced yet a third theory:  The digital asset is essentially a share in a collective "ecosystem."  This includes the issuers, users, and app developers that build network functionality.  As the SEC tells it, this "ecosystem" theory means that digital assets are sold as investment contracts on Kraken without any contractual or post-sale obligations.  If that were the case, the SEC could regulate any commodity or asset associated with an "ecosystem"—from diamonds to sneakers to trading cards to digital assets such as Bitcoin, which the SEC acknowledges is not a security.  "Ecosystems," where even the SEC admits no contracts or post-sale obligations exist, cannot possibly form an investment contract.

The SEC asks this Court to endorse one of its three unprecedented paths to find an investment contract.  These theories fail because they contravene the plain language of the Exchange Act, distort *Howey*, and ignore the economic realities of the transactions on Kraken.  The SEC recently decided that it wants to claim regulatory authority over digital asset trading platforms. It conjured up new untenable legal theories as the means to justify this end.  But the SEC cannot expand its own jurisdiction; only Congress can.

Indeed, Congress continues to debate which regulator should have jurisdiction over which parts of the multi-trillion dollar digital asset market.  Such major questions are for Congress to expressly delegate to an executive agency, not for the agency to seize for itself.  On May 10, 2023, Kraken testified to this effect before the U.S. Congress.  It testified that the current laws do not adequately cover the digital asset industry.  It testified that Congress could put in place rules that would better protect consumers and investors.  It testified that in any new secondary market framework, the SEC may have to cede jurisdiction to the CFTC.  The very next day, the SEC called Kraken to say it was going to sue, and this Complaint followed.

The Court should dismiss the Complaint with prejudice.

1

## BACKGROUND[1]

2

### A.    History of Digital Assets[2] and the SEC's Shifting Positions

3

Bitcoin was introduced in 2008.[3]  Since then, Congress has considered several proposed

4

regulatory frameworks for digital assets and platforms.[4]  Many proposals would grant authority to

5

agencies other than the SEC.[5]  At the same time, the SEC has refused to create its own regulatory

6

framework.[6]

7

The SEC offered no public guidance suggesting digital asset transactions could be investment

8

contracts until July 2017, when it issued the "DAO Report."  *See* Compl. ¶ 37.  In June 2018, the

9

SEC's Director of Corporation Finance said that transactions in Bitcoin and Ether are *not* securities

10

transactions.[7]  The Commodity Futures Trading Commission ("CFTC") maintains that Bitcoin,

11

12

13
[1] Kraken's statement of the facts is drawn from the Complaint and documents that the Court may
14
take judicial notice of on a motion to dismiss.  Kraken accepts the Complaint's allegations only for purposes of this Motion.

15
[2] "Digital asset," as defined in the Complaint, is "an asset issued and/or transferred using blockchain
16
or distributed ledger technology."  Compl. ¶ 18.  The Complaint uses the terms "crypto asset," "digital asset," and "token" interchangeably.  *Id.*

17
[3] *See Kleiman v. Wright*, 2018 WL 6812914, at *1 (S.D. Fla. Dec. 27, 2018).

18
[4] *See, e.g.*, Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023),
19
https://tinyurl.com/3yx8f5hm; Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. (2023), https://tinyurl.com/yc2nmpsx; Digital Commodity Exchange Act of 2022, H.R. 7614, 117th
20
Cong. (2022), https://tinyurl.com/45cnjwyd; Digital Commodities Consumer Protection Act of 2022, S. 4760, 117th Cong. (2022), https://tinyurl.com/bdd7r5p3; The Token Taxonomy Act of 2021, H.R.
21
1628, 117th Cong. (2021), https://tinyurl.com/bezac866; Eliminate Barriers to Innovation Act of 2021, H.R. 1602, 117th Cong. (2021), https://tinyurl.com/2mx3mt8m; Crypto-Currency Act of 2020,
22
H.R. 6154, 116th Cong. (2020), https://tinyurl.com/589kheax; U.S. Virtual Currency Market and Regulatory      Competitiveness      Act      of      2019,      H.R.      923,      116th      Cong.      (2019),
23
https://tinyurl.com/3hscvaj2.

24
[5] *See id.*

25
[6] Just two months ago, the SEC denied a petition for rulemaking that would establish specific rules
26
for trading digital assets.  *See* Letter from Vanessa Countryman, Secretary of the SEC to Paul Grewal, Chief Legal Officer, Coinbase Global, Inc. (Dec. 15, 2023), http://tinyurl.com/3u6csfdf.

27
[7] William Hinman, Dir., SEC Div. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary
28
(Plastic)* (June 14, 2018), https://tinyurl.com/9k6hbh3m (emphasis added) ("Director Hinman Speech").

Ether, and other digital assets are commodities, not securities, and regulates them as such.[8]  In 2022, a senior CFTC official testified to Congress that "[d]igital assets have been broadly determined by the CFTC and federal courts to be commodities under the [Commodities Exchange Act]."[9]

Consistent with this, SEC Chair Gary Gensler gave sworn testimony to Congress the prior year that "the exchanges trading in these crypto assets do not have a regulatory framework [] at the SEC."  He further stated that "it is only Congress that could really address" this lack of a framework.[10]  Other SEC Commissioners and members of Congress agreed:  The SEC's jurisdiction does not reach transactions where only the digital asset passes between buyer and seller.[11]  In 2021, the SEC also authorized the initial public offering of the digital asset trading platform Coinbase.[12]  Presumably the SEC would not have allowed retail investors to buy public shares in a business engaged in illegal securities trading.[13]

But then in June 2023, the SEC reversed course—charging Coinbase and another digital asset trading platform, Binance, with unlawfully operating as unregistered securities exchanges, broker-

---

[8] *See, e.g.*, *CFTC v. Zhao*, No. 23-cv-01887 (N.D. Ill. Mar. 27, 2023), ECF No. 1 ¶ 24 (alleging Bitcoin, Ether, and Litecoin are commodities).

[9] *The Future of Digital Asset Regulation*, Hearing before the U.S. House Committee on Agriculture, 117th Cong. 10 (June 23, 2022) (Dir., CFTC Div. of Market Oversight, Vincent McGonable), http://tinyurl.com/5a9dvba3.

[10] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. 12 (May 6, 2021), http://tinyurl.com/3u2cynya.

[11] *See, e.g.*, Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://tinyurl.com/47cypbvt. ("[I]f we seriously grappled with the legal analysis and our statutory authority, . . . we would have to admit that we likely need . . . more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us.  And Congress might decide to give that authority to someone else."); *The Future of Digital Assets: Measuring the Regulatory Gaps in the Digital Asset Markets*, 118th Cong. 4 (May 10, 2023) (Rep. French Hill) (R-AR), http://tinyurl.com/4xmupbxr ("But right now, there is not a workable framework in place for digital asset issuers and intermediaries to be regulated effectively by the SEC or the CFTC.").

[12] Coinbase Global, Inc., Notice of Effectiveness (Apr. 1, 2021), https://tinyurl.com/bde7p3wk.

[13] *See* Compl. ¶ 3; *accord* SEC, *Mission*, http://tinyurl.com/ycxm3p4m ("We protect investors by vigorously enforcing the federal securities laws").

dealers, and clearing agencies, alleging they were trading "crypto asset securities."[14]   Kraken was left out of this initial volley of lawsuits.  The SEC did not threaten charges against Kraken until May 11, 2023, exactly one day after it heard Kraken testify to Congress in favor of limiting the SEC's jurisdiction over digital assets.  On November 20, 2023, with dismissal motions pending in the Southern District of New York and the District of Columbia, the SEC filed this Complaint in a third jurisdiction making the same registration claims.

There was no legislative, regulatory, or factual change in circumstances that gave the SEC authority that its Chair previously stated it lacked.  Congress has debated how digital assets and platforms should be regulated, but proposals are still pending in both the House and Senate.  Kraken's platform has been operating openly since 2013 in substantially the same form as it does today.  *See* Compl. ¶ 1.  Nevertheless, after its Chair unequivocally testified that "exchanges trading in these crypto assets do not have a regulatory framework [] at the SEC," the agency now asserts that it *always* had such jurisdiction.  This is supposedly because secondary market platforms like Kraken facilitate trading of "investment contracts."

## B. Trading on Kraken's Platform

Kraken is one of many participants in the digital asset industry in the United States, which has been valued at $2-$3 trillion.[15]   Approximately 40 million Americans have purchased digital assets.[16]   Since launching in 2013, Kraken's platform has become one of the world's largest secondary market trading platforms, with more than nine million customers in over 190 countries. Compl. ¶ 39.  Kraken customers buy and sell more than 220 digital assets in exchange for other digital assets, U.S. dollars, or other currencies.  *Id.* ¶¶ 41, 48.

Trading on Kraken's primary platform—referred to as the "Kraken Trading Platform" in the

---

[14] *See SEC v. Coinbase, Inc. et al.*, No. 23-cv-4738 (KPF) (S.D.N.Y. filed June 6, 2023), ECF No. 1; *SEC v. Binance Holdings Ltd. et al.*, No. 23-cv-01599 (ABJ) (D.D.C. filed June 5, 2023), ECF No. 1.

[15] SEC, *Fiscal Year 2023 Congressional Budget Justification Annual Performance Plan* 4 (Mar. 28, 2022), http://tinyurl.com/33bnjkna; *Press Release, White House, FACT SHEET: White House Releases First-Ever Comprehensive Framework for Responsible Development of Digital Assets* (Sept. 16, 2022), http://tinyurl.com/22mas2hc.

[16] Press Release, White House, *supra* note 15.

Complaint—is blind bid/ask.  *See id.* ¶¶ 81-82, 108-110, 115.  Buyers and sellers do not know each other's identities, do not communicate with each other, and do not have contractual privity.  *See id.* ¶¶ 108-110; *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *11 (S.D.N.Y. July 13, 2023) (sales on digital asset trading platforms, including Kraken, "were blind bid/ask transactions"); *cf. SEC v. Coinbase Inc. et al.*, No. 23-cv-4738 (KPF) (S.D.N.Y. June 6, 2023), ECF No. 1 ¶ 97 ("[N]either the buyer nor the seller knows the identity of the counterparty to the trade[s]" on platforms where orders are matched via a "matching engine.").  Kraken matches "buyers and sellers pursuant to rules that Kraken has programmed into its matching engine."  Compl. ¶ 108.

In addition to its main blind bid/ask platform, Kraken's "Instant Buy" feature allows customers to instantly "buy, sell, or 'convert'" digital assets, "with Kraken acting as the counterparty."  *Id.* ¶ 165.  Customers placing large orders can use Kraken's over-the-counter ("OTC") desk, with "Kraken act[ing] as principal to fill [the] orders."  *Id.* ¶¶ 174-76.

The SEC alleges that a "non-exhaustive list" of 11 digital assets available on Kraken were traded "as" investment contracts.  *Id.* ¶¶ 59, 68.  These digital assets are used for applications of decentralized computing technologies, colloquially known as blockchains, that provide a broad range of services—from censor-resistant data storage like Filecoin, *id.* ¶ 282, to online games and apps like FLOW, *id.* ¶ 315.  Kraken does not issue these 11 digital assets, or any digital assets at all.  Kraken is not alleged to have any contractual relationship with the issuers.  All 11 digital assets were initially sold and put into use by consumers months or even years before they were listed on Kraken.[17]

---

[17] *See* Compl. ¶¶ 229, 234 (ADA was available for purchase or sale since at least 2015 but not sold on Kraken until 2018); ¶¶ 243, 248 (ALGO was available for purchase or sale since at least June 2019 but not sold on Kraken until January 2020); ¶¶ 270, 275 (ATOM was available for purchase or sale since at least 2017 but not sold on Kraken until April 2019); ¶¶ 284, 293 (FIL was available for purchase or sale since at least 2017 but not sold on Kraken until October 2020); ¶¶ 317, 321 (FLOW was available for purchase or sale since at least 2019 but not sold on Kraken until January 2021); ¶¶ 338, 343 (ICP was available for purchase or sale since at least 2017-2018 but not sold on Kraken until March 2022); ¶¶ 354, 358 (MANA was available for purchase or sale since at least August 2017 but not sold on Kraken until December 2020); ¶¶ 375, 378 (MATIC was available for purchase or sale since at least 2018 but not sold on Kraken until May 2021); ¶¶ 393, 396 (NEAR was available for purchase and sale since at least October 2020 but not sold on Kraken until June 2022); ¶¶ 408-09 (OMG was available for purchase or sale since at least June 2017 but not sold on Kraken until October 2019); ¶¶ 428-29, 433 (SOL was available for purchase or sale since at least 2018-2020 but not sold on Kraken until June 2021).

The SEC does not allege that Kraken customers bought digital assets directly from issuers. It does allege that issuers sold on Kraken's platform "through market makers." *Id.* ¶ 126. The Complaint mischaracterizes these sales with the conclusory label "Direct Sales." *See id.* ¶¶ 116-28. Despite this self-serving defined term, the Complaint does not allege that issuers sell directly to Kraken's customers. *See id.* Similarly, the Complaint does not allege that market makers (or anyone else) sent proceeds from sales on Kraken back to any issuer. *See id.*

## C.      Kraken's Congressional Testimony and the SEC's Decision to Bring Charges

Because of regulatory uncertainty, Kraken has consistently advocated for clarity. Kraken testified at a May 10, 2023 hearing before the House Financial Services Committee and the House Agriculture Committee. Members of Congress from both parties criticized the SEC for sowing uncertainty.[18] In its testimony, Kraken criticized the SEC's regulation-by-enforcement approach and applauded Congress's ongoing work to legislate a regulatory system for digital asset markets. Kraken testified: "In the United States . . . we face significant regulatory gaps. Those gaps are so stark that they have spawned a seemingly unending docket of both private and public litigation. This litigation has not protected consumers. This litigation will not protect consumers either. Congress can fill these gaps with clear mandates."[19] Kraken further advocated for Congress to "draw[] clear jurisdictional lines for SEC and CFTC oversight."[20] The day after Kraken testified, SEC Staff notified Kraken that they intended to bring the current claims.

## D.      The SEC's Claims

The SEC does not allege fraud. The SEC does not allege consumer harm. The SEC's sole claims are that Kraken has somehow operated in plain sight for almost a decade as an unregistered

---

[18] *The Future of Digital Assets: Measuring the Regulatory Gaps in the Digital Asset Markets*, 118th Cong. 34 (May 10, 2023) (Rep. Steil) (R-WI), http://tinyurl.com/4xmupbxr ("We don't know what Chairman Gensler's plans are, and there are not clear rules in front of us. And regulation by enforcement doesn't work."); *id.* at 48 (Rep. Torres) (D-NY) ("Myth: There is no need at all for the SEC to provide regulatory clarity and guidance, and calls for clarity and guidance are nothing more than a pretext for evading lawful compliance. Fact: . . . The SEC should consider issuing a request for comment regarding areas where additional guidance is needed related to the application of Federal securities laws to crypto assets.").

[19] *Id.* at 12.

[20] *Id.*

1   securities exchange, broker-dealer, and clearing agency, in violation of the Exchange Act.  *See* 15

2   U.S.C. §§ 78e, 78o, 78q-1.  All these claims rest on the SEC's flawed premise that certain digital

3   assets were "traded as investment contracts" on Kraken's platform.  *See, e.g.*, Compl. ¶ 68.

4                                          **LEGAL STANDARD**

5        The SEC has the burden to plead "sufficient factual matter, accepted as true, to state a claim

6   to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  To

7   do so, the SEC must allege sufficient facts to show "more than a sheer possibility that a defendant

8   has acted unlawfully."  *Id*.  "Labels and conclusions" or a "formulaic recitation of the elements of a

9   cause of action" are insufficient.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  While

10  a court must credit a plaintiff's well-pleaded allegations, it need not "accept as true allegations that

11  are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *Sprewell v.*

12  *Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

13                                            **ARGUMENT**

14       The SEC does not have the authority to regulate all speculative investments.  Instead, the

15  Exchange Act limits the SEC's jurisdiction to transactions in "securities," which the statute defines

16  to include "investment contracts."  15 U.S.C § 78c(a)(10).  An "investment contract" is "a contract,

17  transaction or scheme whereby a person invests his money in a common enterprise and is led to

18  expect profits solely from the efforts of the promoter or a third party."  *Howey*, 328 U.S. at 298-99.

19  In *SEC v. Rubera*, the Ninth Circuit stated that it had "distilled Howey's definition into a three-part

20  test requiring (1) an investment of money (2) in a common enterprise (3) with an expectation of

21  profits produced by the efforts of others."  350 F.3d 1084, 1090 (9th Cir. 2003) (cleaned up).  In

22  doing so, it presupposed the existence of a "contract, transaction or scheme."  *Id*. (citing *Howey*, 328

23  U.S. at 298-99); *see also De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300

24  (9th Cir. 1979) ("Under the test announced by the Supreme Court in [*Howey*], an investment contract

25  is *an agreement* that calls for an investment of money in a common enterprise with an expectation

26  of profits solely from the efforts of others.") (emphasis added).

27       The SEC fails to allege any of the following requirements under *Howey*:  (1) at least one

28  contract, as required to form an "investment contract" under the Exchange Act; (2) post-sale

obligations owed by issuers of digital assets to customers on Kraken; (3) an investment of money by Kraken's customers in an enterprise; (4) participation in a common enterprise between Kraken's customers and the issuers; or (5) reasonable expectation of profits by Kraken's customers based on the efforts of issuers.  Each of these failures provides an independent basis to dismiss the Complaint with prejudice.

## I.     THE COMPLAINT DOES NOT PLEAD SECURITIES TRANSACTIONS ON KRAKEN'S PLATFORM.

As the SEC has conceded, digital assets are not themselves "investment contracts."  *See, e.g.*, *Ripple*, 2023 WL 4507900, at *8 (a digital asset "is not in and of itself" an investment contract under *Howey*); Solomon Decl., Ex. A, Coinbase Tr. 18:15-19:2 (SEC: "[A]t the end of the day, these 12 or 13 tokens, they are just computer code.").  The statutory text of the Exchange Act, *Howey*, and over 75 years of precedent applying *Howey* establish that investment contracts require one or more contracts.  And the "contract, transaction, or scheme" must include the issuer undertaking a post-sale obligation to deliver future value to the purchaser.  The SEC fails to plead either.[21]

### A.     The SEC never alleges the contract that an "investment contract" requires.

For a "contract, transaction, or scheme" to constitute an "investment contract," there must be a contract or series of contracts.  "Statutory interpretation must begin with, and ultimately heed, what a statute actually says."  *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (cleaned up).  "We are considering investment *contracts*."  *SEC v. Edwards*, 540 U.S. 389, 397 (2004) (emphasis in original).  Both words in "investment contract" must be given meaning.  *See Williams v. Taylor*, 529 U.S. 362, 404 (2000) (courts "must give effect, if possible, to every clause and word of a statute") (cleaned up); Brief for the SEC at *17, *SEC v. Edwards*, No. 02-1196 (U.S. June 26, 2003), 2003 WL 21498455 ("SEC *Edwards* Br.") ("The first word in ['investment contract'] means the investing of money or capital in some species of property for income or profit . . . The second word in ['investment contract'] means an agreement between two or more persons to do or forbear something.") (cleaned

---

[21] The arguments below apply to Kraken's trading platform—where trades are anonymously made between Kraken's customers on both sides of the transaction—as well as the Instant Buy/OTC platforms, where trades are made between a Kraken customer, on one side, and Kraken, on the other.

1    up).  Until its recent crypto cases, the SEC readily accepted that an "investment contract" needs a

2    "contract."

3         For example, in *Edwards*, the SEC told the Supreme Court: "the very term

4    'investment contract' makes clear that instruments of that name include those in which a return—

5    whether labeled income or profit—is promised in a contract." *Id*.  Earlier, the SEC advanced to the

6    *Howey* Court the common-sense proposition that an "investment contract" is a species of "contract."

7    *See* Brief for the SEC at *9, *SEC v. Howey,* No. 843 (U.S. April 17, 1946), 1946 WL 50582 (an

8    "investment contract" includes "any contractual arrangement for the investment of money in an

9    enterprise with the expectation of deriving profit through the efforts of the promoters").  Even now,

10   the SEC seems to implicitly recognize that a "scheme" under *Howey* must be read in accordance with

11   the statutory text to include one or more contracts.  *See* Solomon Decl., Ex. A, Coinbase Tr. 90:2-7

12   (court observing that SEC did not present a "scheme" argument in response to similar arguments by

13   Coinbase).

14        The statute's plain language of "investment contract" requires a "contract."   That alone

15   defeats the Complaint, because it alleges no contract.  "Because the plain language of [the statute] is

16   unambiguous, our inquiry begins with the statutory text, and ends there as well." *Nat'l Ass'n of Mfrs.*

17   *v. Dep't of Def.*, 583 U.S. 109, 127-28 (2018) (rejecting government's "atextual" reading of

18   precedent that was "unmoored from the statutory text").

19        Supreme Court precedent addressing "contract[s], transaction[s], or scheme[s]" is likewise

20   grounded in contractual obligations.  In *Howey* itself, an investment contract "scheme" existed only

21   where purchasers were offered "something more than fee simple interests in land [and] something

22   different from a farm or orchard coupled with management services."  328 U.S. at 299-300.  They

23   were offered—through "land sales *contracts*, warranty deeds and service *contracts*"—"an

24   opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed

25   and partly owned by respondents."  *Id*. (emphasis added).  Subsequent cases have all involved

26   contracts.  *See, e.g.*, *SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 71 (1959) ("annuity

27   contracts" promised holders a "pro rata share" of returns from a "portfolio of equity interests"); *SEC*

28   *v. United Benefit Life Ins. Co.*, 387 U.S. 202, 204-05, 210-12 (1967) (similar annuity contracts);

1  *Edwards,* 540 U.S. at 391, 395 (payphone sale-and-leaseback contracts promised investors a fixed

2  return).

3  　　This makes sense.  Just as Congress was not drafting on a blank slate when including

4  "investment contract" in the definition of "security," neither was the *Howey* Court in interpreting the

5  statutory term.  The Supreme Court drew the definition of "investment contract" from pre-1933 state

6  "blue sky" laws.  *Howey*, 328 U.S. at 298 (by including "investment contract" in the definition of

7  "security," "Congress was using a term the meaning of which had been crystallized by this prior

8  judicial interpretation" applying states' blue sky laws).  The blue sky cases required a contract.  *See,*

9  *e.g.*, *Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*, 240 N.W. 827, 828-29 (Wis. 1932); *Dobal v.*

10  *Guardian Fin. Corp.*, 251 Ill. App. 220, 224 (1929); *see also, e.g.*, *State v. Heath*, 153 S.E. 855, 857

11  (N.C. 1930) ("The term [investment contract] is not defined in the act, but it implies the apprehension

12  of an investment as well as of a contract.").[22]  Indeed, since the earliest days of the Exchange Act,

13  courts have consistently looked to see whether at least one contract is present.  Where a single

14  contract failed to satisfy all the *Howey* elements, courts considered whether an arrangement of

15  multiple contracts did (*i.e.*, a "transaction" or "scheme").[23]  *See, e.g.*, *Stevens v. Liberty Packing*

16  *Corp.*, 161 A. 193, 193-95 (N.J. 1932) (considering "absentee ownership agreement" and "buy back

17  contract" together as part of "twofold" "scheme").[24]  Courts might similarly examine whether an

18  ―――――――――――――――

19  [22] *See also, e.g.*, *McCormick v. Shively*, 267 Ill. App. 99, 102 (1932) (statutory phrase "investment

20  contract" "clearly contemplates" only "contracts" with certain characteristics); *Lewis v. Creasey*

    *Corp.*, 248 S.W. 1046, 1049 (Ky. Ct. App. 1923) (no investment contract where contract granting

21  buyer the right to purchase groceries at a discount imposed no post-sale obligations on the seller);

    *Creasy Corp. v. Enz Bros. Co.*, 187 N.W. 666, 667 (Wis. 1922) (same with respect to other

22  merchandise).

23  [23] Dictionary definitions of the word "scheme" at the time of *Howey* confirm this reading.  At the

    time of *Howey*, "scheme" meant a formal business arrangement.  *See, e.g.*, *Black's Law Dictionary*

24  1584 (3d ed. 1933) ("[A] scheme is a document containing provisions for regulating the management

    or distribution of property rights, or for making an arrangement between two persons having

25  conflicting rights."); *Webster's New International Dictionary* 2234 (2d ed. 1937) ("A plan or

    program of something to be done; an enterprise; a project; as, a business scheme; an irrigation

26  scheme.").

27  [24] *See also, e.g.*, *State v. Robbins*, 240 N.W. 456, 457 (Minn. 1932) ("Considering the two contracts

    together, they constitute a sale of an interest in a profit-sharing scheme or venture, and are a

28  security").

implied contract existed.  *See SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 349 (1943) ("The terms of the offering . . . either by itself or when read in connection with the agreement to drill as consideration for the original leases, might be taken to embody *an implied agreement* to complete the wells.") (emphasis added).  But neither the state courts interpreting the blue sky laws nor the Supreme Court interpreting the federal securities laws has ever abandoned the requirement for a contract.

The Ninth Circuit has likewise treated the existence of one or more contracts as an irreducible requirement for an investment contract, whether alleged as a "transaction" or "scheme."  *See, e.g.*, *Warfield v. Alaniz*, 569 F.3d 1015, 1018, 1020-24 (9th Cir. 2009) (investment contract where defendant sold "charitable gift annuity contracts"); *Hocking v. Dubois*, 885 F.2d 1449, 1458-59 (9th Cir. 1989) (en banc) (rental pool agreement and series of other contracts "were part of one scheme or transaction," or in other words, they "were sold as a package"); *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-33 (9th Cir. 2013) (no investment contract where "two contracts" were not "offered as a package," meaning they were not "part and parcel of one scheme"); *SEC v. R.G. Reynolds Enters.,* 952 F.2d 1125, 1129-31, 1134 (9th Cir. 1991) (two contracts together formed an investment contract because "it would defy common sense to read" them "separately"); *In re United Energy Corp.*, 944 F.2d 589, 596 n.8 (9th Cir. 1991) ("Thus, an 'investment contract' can consist, as it does here, of two or more contracts which together constitute an 'investment' or 'scheme.'").[25]

An investment contract must include at least one contract.  But the SEC does not meet this requirement.  It does not allege any contract between the 11 issuers and Kraken purchasers.  That alone requires dismissal.

---

[25] *Compare Rubera*, 350 F.3d at 1087, 1093 (finding investment contract where investors purchased pay phones from promoter and simultaneously entered into service contracts requiring promoter to "manage and maintain the telephone" and to distribute monthly payments), *with Inline Utilities, LLC v. Schreiber*, 2020 WL 4464463, at *3 (S.D. Cal. Aug. 4, 2020) (payment in exchange for portion of defendants' share of revenue stream was not investment contract when the complaint "does not even allege the existence of a contract").

1

**B.      An "investment contract" must include post-sale obligations running from**
2
**issuer to purchaser, which are not alleged.**

3        While necessary, a contract is not sufficient to establish an "investment contract."  Assets are

4   routinely bought and sold through sale contracts that are not investment contracts.  *See, e.g.*,

5   *Rodriguez v. Banco Cent. Corp*., 990 F.2d 7, 10 (1st Cir. 1993) ("A simple sale of land, whether for

6   investment or use, is not a 'security'").  Rather, under binding precedent, an "investment contract"

7   must impose post-sale obligations on the issuer.  In other words, the issuer and the purchaser must

8   enter into a "contract" that is in the nature of an "investment" in the issuer.  The very essence of a

9   security is that an investor hands over money to the issuer in exchange for the issuer's ongoing (*i.e.*,

10  post-sale) obligations to deliver future value to the investor.  Without post-sale obligations (even in

11  the presence of a contract), there is just a simple agreement for an asset sale, not an investment in an

12  issuer's enterprise.

13       The Ninth Circuit's decision in *De Luz* illustrates this point and controls here.  In that case,

14  plaintiffs alleged that land sale contracts accompanied by promotional materials were investment

15  contracts.  608 F.2d at 1300-01.  The Ninth Circuit disagreed because no post-sale obligations ran

16  from issuer to purchaser.  *Id.*  Even promotional statements outside the contracts—like those the SEC

17  relies on here, *see infra* Section I.C.3—did not turn contracts to transfer title into investment contracts

18  because they lacked post-sale obligations:

19           De Luz asserts that Kaiser's marketing material promoted Rancho California as
             a passive investment which would appreciate in value as a result of Kaiser's
20           development of common facilities.  Additionally, there is evidence in the record
             that Kaiser represented that it would facilitate the resale of investor's parcels,
21           minimizing the efforts required by the investor.

22           On the other hand, it is undisputed that the land sale contracts *obligate* Kaiser
             to do no more than transfer title.  There is no reference *in the contracts to an*
23           *obligation* on the part of Kaiser to develop any land.   At most, Kaiser
             represented in its promotional materials that it would develop part of the
24           retained land in this huge tract, but no timetable for the development was set.

25
        *Id*. (emphasis added).  Similarly, in *Happy Investment Group v. Lakeworld Properties, Inc.*,
26
    "promises of the general nature made by defendants" were insufficient to form an investment contract
27
    where there were no contracts imposing "actual commitments to perform specific services."  396 F.
28

Supp. 175, 179-81 (N.D. Cal. 1975); *see also Harman v. Harper*, 1990 WL 121073, at *5 (9th Cir. 1990) (joint venture agreement in property transaction was not an investment contract where the promoter was "not obligated by the terms of the [agreement] to effectuate [property] improvements"; even notes and equity interests were not investment contracts where issuer "made no promises to develop or otherwise manage the properties"); *Rodriguez*, 990 F.2d at 11 (land sale contract was not an "investment contract" where "the evidence did not show that the promoter or any other obligated person or entity was promising the buyers to build or provide anything" after the land sale).

Here too, the SEC does not allege that the 11 issuers were obligated to do anything for Kraken customers. Nor are there allegations that Kraken customers who sold the digital assets undertook any such obligations to the buyers. *Cf.* Solomon Decl., Ex. A, Coinbase Tr. 52:20-53:12 (SEC acknowledging that complaint against Coinbase does not allege "continuing promises from the issuer or developer to the token holder [or] post-sale obligations on the issuer or developer" when traded in the secondary market).

The SEC seems to rely on allegations that the 11 issuers *initially* offered and sold their digital assets in primary sales not involving Kraken or its customers. But the SEC must plausibly allege that transactions on Kraken conveyed post-sale rights or obligations. Certain types of securities, such as equity, have contractual rights that travel with the instrument. A purchaser of stock—whether in the primary or secondary market—may get both "the right to receive dividends" and "voting rights in proportion to the number of shares owned." *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985). By contrast, the SEC never alleges that a secondary market purchaser of a digital asset on Kraken received any post-sale rights (because they did not). This requires dismissal. *See Hocking*, 885 F.2d at 1456, 1462 (no "per se" rule in the Ninth Circuit that investment contract in primary sales is also an investment contract in secondary sales because *Howey* requires an "examination of the economic reality of each transaction").

All the instruments included in the Exchange Act's definition of a security reflect an investment of capital in an issuer's business and a promised return from the enterprise's financial performance. This is as true for "investment contracts" as for the 27 other instruments included in the Exchange Act's definition of a security, such as stocks and bonds. *See* 15 U.S.C. § 78c(a)(10).

While "investment contracts" are "unconventional instruments," they must have "the essential properties of a debt or equity security." *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994) (Posner, C.J.) ("A share of stock, for example, is an undivided interest in an enterprise, entitling the owner to a pro rata share in the enterprise's profits . . . ."); *SEC v. Lauer*, 52 F.3d 667, 670 (7th Cir. 1995) (Posner, C.J.) ("an investment contract," while "not a conventional security like a bond or a share of common stock," has "the essential properties of a conventional security"); *see also* SEC *Edwards* Br. at *20 (arguing that "'investment contract' embodies the essential attributes" of securities, including "debt [or] equity participation") (cleaned up).

In *Howey*, the orange was not the investment contract. The investment contract was the contractual obligation to continue to develop the orange groves and provide investors with the pro rata profits of that enterprise. Here, the only things that trade on Kraken are the digital assets themselves (the "oranges")—not any post-sale obligations to provide future value to the purchaser (the "investment contract"). Digital asset transactions on Kraken are sales of *Howey* oranges; they are not sales of *Howey* "investment contracts."

**C.      The SEC cannot otherwise satisfy any *Howey* element.**

The absence of any alleged contract and post-sale obligation is not just fatal to the existence of an investment "contract, transaction, or scheme." These same pleading defects also cause the SEC to flunk the remaining *Howey* elements: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Warfield*, 569 F.3d at 1020.

*1.      There is no "investment of money."*

In the Ninth Circuit, the "investment of money" prong "requires that the investor commit his assets *to [an] enterprise*." *Rubera*, 350 F.3d at 1090 (cleaned up) (emphasis added) (prong satisfied when "investors in the telephone investment program turned over substantial amounts of money to" the corporation that issued the program). Where buyers are "several steps removed from an investment in any actual contract or enterprise," this prong is not satisfied. *Inline Utilities*, 2020 WL 4464463, at *3-4 (dismissing complaint). Kraken customers were not only "several steps removed" from the issuers, the Complaint does not allege even a single interaction between them. *See id.* at *3. A Kraken purchaser sent his "assets" to an anonymous third party, not to the issuer, and therefore

1   not to an "enterprise."  *See Rubera*, 350 F.3d at 1090.  And the anonymous third party was free to do

2   what he wished with the consideration he received for selling his digital assets.  The SEC never

3   alleges that third-party sellers remitted "assets" to the issuers, or that issuers otherwise received any

4   money from customers' trading.  *See Ripple*, 2023 WL 4507900, at *13 (no "investment of money"

5   when "Ripple never received the payments from these [digital asset] distributions").

6                    *2.       There is no "common enterprise."*

7           Without any connection between the issuers and Kraken customers, the SEC likewise cannot

8   demonstrate a common enterprise, either based on horizontal commonality or strict vertical

9   commonality.  *See Hocking*, 885 F.2d at 1459 ("The Ninth Circuit accepts either traditional

10  horizontal commonality or . . . a strict version of vertical commonality.").

11          Horizontal commonality:  To show horizontal commonality, the SEC must plausibly allege

12  "a pooling of funds among investors."  *Hart v. Pulte Homes of Mich. Corp.*, 735 F.2d 1001, 1003

13  (6th Cir. 1984).  The Complaint generally alleges that some issuers pooled some funds at some point

14  in time, or that issuers pooled funds raised in *primary offerings* that occurred long before the tokens

15  traded on Kraken.  *See* Compl. ¶¶ 277, 291, 360, 380, 393, 399, 412, 435; *supra* n. 17.  But to survive

16  a motion to dismiss, the SEC must plausibly allege that Kraken customer funds—not some earlier or

17  different funds—were pooled by issuers.  *See Salameh*, 726 F.3d at 1131 ("Plaintiffs' allegations are

18  not sufficient to show that a security was sold *when the condominiums were transferred*" on the

19  secondary market) (emphasis added).  It does not, which requires dismissal.  *See Teed v. Chen*, 2022

20  WL 16839496, at *12 (N.D. Cal. Nov. 9, 2022) (horizontal commonality not sufficiently pleaded

21  when parties did not allegedly "pool[] their investments together" but rather kept their Bitcoin in

22  "separate wallet[s]").[26]

23          Horizontal commonality also involves "two or more investors who . . . split the net profits

24  and losses in accordance with their pro rata investments."  *Teed*, 2022 WL 16839496, at *12 (quoting

25

26  [26] *See also Bobrowski v. Red Door Grp.*, 2011 WL 3555712, at *2 (D. Ariz. Aug. 11, 2011) ("Plaintiff
    did not purchase an undivided share in the total rentals or sales of all the units . . . .  Plaintiff owned
27  the individual units, and could make profits or sustain losses independent of the fortunes of other
    purchasers.").
28

*Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir. 1988) (panel decision)).  The SEC has not alleged the issuers were obligated to or ever did distribute *anything* to digital asset purchasers on Kraken, let alone a pro rata split of profits.  *See Bobrowski v. Red Door Grp., Inc.*, 2011 WL 3875424, at *1 (D. Ariz. Aug. 31, 2011) (no horizontal commonality where "neither the express contractual terms nor economic reality provided plaintiff a pro rata share of the enterprise's profits").

<u>Strict vertical commonality</u>:  To show strict vertical commonality, the SEC must adequately allege that the "fortunes of the investor[s] are interwoven with" the "success of" the issuers.  *Brodt v. Bache & Co.*, 595 F.2d 459, 460-61 (9th Cir. 1978).  This element requires a "one-to-one relationship between the investors" and the issuers "such that there is an interdependence of *both profits and losses* of the investment."  *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011) (cleaned up); *see also Mordaunt v. Incomco*, 686 F.2d 815, 817 (9th Cir. 1982) (strict vertical commonality exists only when there is a "direct relation between the success or failure of the promoter and that of his investors").  The Complaint alleges no relationship, let alone a one-to-one relationship, between any issuer and purchaser on Kraken.  Similarly, there are no plausible allegations that the success of the *issuer's enterprise* was "interwoven" or directly correlated with the profits or losses of the buyer, as the Ninth Circuit requires.  *See Brodt*, 595 F.2d at 460-61.  That issuers and purchasers allegedly owned the same tokens (*e.g.*, Compl. ¶ 398) at most shows a common *interest* in the token's value, not a common *enterprise*.  *See Marini*, 812 F. Supp. 2d at 257 ("[T]he Court disagrees with plaintiffs that [defendants'] ownership of the same types of coins necessarily links their fortunes together for purposes of the strict vertical commonality analysis.").  Even if issuers were wildly successful from selling non-token products (*e.g.*, Compl. ¶ 310) but token prices declined due to market forces, token purchasers could be wiped out.[27]  *See Brodt*, 595 F.2d at 461 (no strict vertical commonality where brokerage house "could reap large commissions for itself and be characterized as successful, while the individual accounts could be wiped out").  Likewise, an issuer's business could fail, but the network and token could still exist and move with the broader

---

[27] *See* Compl. ¶ 390 (relying on statement on Kraken's website that price of token is subject to "market demand and supply" and "cryptocurrency news"); Solomon Decl., Ex. B, Binance Tr. 87:10-16 (SEC acknowledging that "[m]arket forces" may affect token value).

digital asset market.  *Cf. SEC v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1241 (S.D.N.Y. 1978) ("Thus, if the customer sells the lease not to EGA, but on the market, he or she is not at all dependent upon EGA for his or her profits.").[28]

> 3.    There is no "reasonable expectation of profits" from the efforts of others.

Finally, there can be no "reasonable expectation of profits" by Kraken customers based on the efforts of issuers where Kraken customers lack any contractual undertaking or relationship with the issuers or their businesses.

People purchase many investments that are not securities——from commodities such as oil or diamonds, to collectibles such as art, baseball cards, or valuable watches.  Markets facilitate buying all these assets, including for speculative gain.  Yet these have never been considered securities because purchasers do not have a reasonable expectation of profits based on the efforts of others. *See, e.g., Ripple*, 2023 WL 4507900, at *12 ("[A] speculative motive on the part of the purchaser or seller does not evidence the existence of an 'investment contract' . . .  Anyone who buys or sells, for example, a horse or an automobile hopes to realize a profitable 'investment.'") (cleaned up).

*SEC v. Belmont-Reid* illustrates the critical distinction between investing *in* a business (which can satisfy the "efforts of others" prong) versus purchasing a business's output (which cannot).  794 F.2d 1388 (9th Cir. 1986).  In *Belmont-Reid*, a natural resources developer "rais[ed] capital by selling its gold directly to investors." *Id*. at 1389.  The developer had not yet extracted the gold and planned to use the capital raised to do so. *Id*.  The company pre-sold gold to purchasers (before its extraction) under "prepayment plans." *Id*.  The SEC argued that the contractual arrangement with the pre-payment purchasers constituted an investment contract. *Id*.  Analyzing the "efforts of others" prong, the court observed that since the purchasers were pre-paying for the gold it was "easy to assert that the failure or success of the enterprise in which the prepayment purchaser was engaged depended significantly on the managerial efforts of [the developer] and for that reason the third requirement of

---

[28] The SEC cannot allege a direct relation between Kraken's success and the success of buyers on Kraken's secondary market platform.  Kraken simply collects a transaction fee for every secondary market purchase, regardless of the ultimate outcome of that trade for the buyer or the success of the digital asset's "ecosystem." *See Mordaunt*, 686 F.2d at 817 (finding no strict vertical commonality where defendant earned commissions even where plaintiffs' trades lost money).

the *Howey* test is met." *Id*. at 1391.  But the court went on to reject this superficial argument.  Instead, the Ninth Circuit reasoned that one could "speculat[e] in the world gold market" "by buying a share in a company mining gold."  *Id*.  "However, that is not what was done."  *Id*.  The profits that the purchasers expected thus derived from "the anticipated increase in the world price of gold," not from any increase in the value of the seller's business from the efforts of others.  *Id*.; *see also Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (per curium) (no investment contract where value of silver purchased from a silver dealer "depended upon the fluctuations of the silver market, not the managerial efforts of [the sellers]").

That is on point here.  Kraken customers buy digital assets from other Kraken customers.  The SEC never alleges that these assets give them any expected claim on an issuer's business, income, or profits.  One could "speculat[e] in the [digital asset]" "by buying a share in a [digital asset] company."  *Belmont-Reid*, 794 F.2d at 1391.  "However, that is not what was done" on Kraken.  *Id*.; *see SEC v. Commodity Options Int'l, Inc.*, 553 F.2d 628, 632 (9th Cir. 1977) (explaining that commodity futures contracts "are investments to be sure," but the investment "is not in an enterprise but is in the underlying commodity," which does not form an investment contract); *Rodriguez*, 990 F.2d at 11 ("[W]hat was purchased in this case was not a share of a business enterprise and so not a security.").

The *Ripple* case further underscores why the SEC's allegations are insufficient to plead a reasonable expectation of profits from the efforts of the issuers.  2023 WL 4507900, at *5.  Ripple, an alleged digital asset issuer, sold XRP tokens on trading platforms (including Kraken).  *Id*. at *2; Defendants' Statement of Undisputed Material Facts ¶¶ 299, 309, *SEC v. Ripple*, 20-CV-10832 (AT) (SN) (June 13, 2023), ECF No. 826.  The Court held that the SEC could not show a "reasonable expectation of profits" based on the efforts of the alleged issuer because of the same lack of issuer-buyer connection reflected here:  (1) buyers "did not know who was selling" the token; (2) buyers "could not have known if their payments of money went to Ripple"; (3) "Ripple did not make any promises or offers" to the buyers "because Ripple did not know who was buying" the token; (4) the sales "were not made pursuant to contracts"; and (5) buyers did not expect profit "from Ripple's efforts [] as opposed to other factors, such as general cryptocurrency market trends."  *Ripple*, 2023

WL 4507900, at *11-12.  These factors compel the same outcome here.[29]

The SEC tries to end-run the absence of any purchaser-issuer relationship creating a reasonable expectation of profits based on the efforts of the issuer.  It attempts to do so by alleging that the issuers made ongoing public statements advertising their tokens and improvements of the underlying technology platforms, which Kraken customers allegedly relied on for an expectation of profits based on their efforts.  *See, e.g.*, Compl. ¶¶ 62-64.  But advertising or promotional statements cannot create a reasonable expectation of profits based on the efforts of others without a contractual obligation by the issuer.

In *De Luz*, the plaintiff alleged that the defendant's "marketing material promoted" a property "as a passive investment which would appreciate in value as a result of [defendant's] development of common facilities."  608 F.2d at 1300.  The Ninth Circuit held that the promotional statements were insufficient to create an investment contract because there was "no reference in the contracts to an obligation."  *Id*. at 1301.  So too here.  Notwithstanding any alleged ongoing promotional statements by the digital asset issuers to develop "common" platform improvements, there are no contracts alleged at all, much less a "reference in [any] contracts to an obligation."  *Id*. at 1300-01. Promotional statements are not a substitute for the contractual obligations required for an investment contract.  *See Rodriguez*, 990 F.2d at 11 (even "strong and repeated suggestions [by promoters] that the surrounding area would develop into a thriving residential community" did not convert land sale contracts into investment contracts given absence of post-sale obligations by the promoter "to build or provide anything"); *cf. Warfield*, 569 F.3d at 1021-23 (promotional statements considered when made in connection with annuity contracts that promised ongoing payments and charitable contributions on behalf of purchasers).

That some issuer statements were allegedly "rebroadcast" by Kraken does not rescue the

---

[29] The SEC alleges that Instant Buy and OTC transactions involving digital assets were also investment contracts apparently for the same reasons as when they were sold on Kraken's blind bid/ask platform.  Compl. ¶ 228.  The SEC's claims fail for the same reasons as above.  The only relevant difference between trading on Kraken's blind bid/ask platform and its Instant Buy and OTC desks are that, for the latter, Kraken users trade with Kraken itself (as counterparty or principal), rather than other Kraken users.  Compl. ¶¶ 165, 174-76.

Complaint. *See, e.g.*, Compl. ¶¶ 63, 424-25.  None of these statements create a contractual obligation by the issuer (nor could they).  And Kraken's website includes similar statements about Bitcoin and Ether, which the SEC does not contend are securities.[30]  Unsurprisingly, the SEC conceded in *Coinbase* that its *Howey* arguments do not turn on similar "rebroadcasting" allegations.  *See* Solomon Decl., Ex. A, Coinbase Tr. 20:12-18 (SEC:  "[W]hether or not Coinbase is rebroadcasting [the promotional statement], that doesn't change the calculus of what these issuers and these ecosystems are.").

> **D.     The SEC's counterarguments are unavailing.**

The SEC pleads no relationship between issuers and purchasers or buyers and sellers on Kraken, let alone contracts, post-sale obligations, and investments into the issuer's businesses as required by the Exchange Act and case law.  It likely will assert that these *Howey* requirements can be substituted by transactions that did not even occur on Kraken, the existence of some nebulous "ecosystem," or trading by "market makers."  All three arguments fail.

> > *1.     The SEC cannot substitute the necessary relationship between issuer and Kraken customer with transactions that did not occur on Kraken.*

The SEC suggests that *secondary* sales on Kraken were investment contracts because the issuers' *primary* sales were investment contracts.  *See, e.g.*, Compl. ¶ 410 ("From the time of its [initial] offering and continuing through the Relevant Period, OMG was offered and sold as an investment contract and is therefore a security.").  The Complaint has pages of allegations about issuers' primary sales and statements made in connection with those sales.  But for each of the 11 alleged digital assets, the issuer's primary sales occurred months or years before its digital asset was listed on Kraken.  *See supra* n. 17.  Issuers' primary sales would only be relevant if transactions on Kraken's secondary market somehow inherited whatever agreements may have existed between the issuers and primary purchasers.

But again, unlike stocks, for example, rights are not alleged to travel with the digital assets sold on Kraken.  In *Hocking*, the Ninth Circuit rejected the argument that investment contracts in

---

[30] *Bitcoin Price*, Kraken, http://tinyurl.com/359jk835; *Ethereum Price*, Kraken, http://tinyurl.com/yuw23wz4.

primary sales were necessarily investment contracts in secondary sales, holding that "*each case requires an analysis of how the [asset] was promoted to the investor, including any representations made to the investor, and the nature of the investment and the collateral agreements.*"  885 F.2d at 1462 (emphasis added); *see also Salameh*, 726 F.3d at 1131 ("Plaintiffs' allegations are not sufficient to show that a security was sold *when the condominiums were transferred*.") (emphasis added); *Noa*, 638 F.2d at 79 ("*Once the purchase of silver bars was made*, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of Key Futures.") (emphasis added).  Nothing is alleged to pass from seller to buyer on Kraken other than ownership of the underlying tokens.

The SEC's own officials accept the view that a digital asset sale is not an investment contract simply because it may once have been offered as such.  In 2018, the SEC's former Director of Corporation Finance acknowledged this regarding Ether.  He said that "*putting aside the fundraising that accompanied the creation of Ether*, based on [] the present state of Ether . . . *current offers and sales* of Ether are not securities transactions."  Director Hinman Speech (emphasis added).  That is because "the analysis of whether something is a security is not static and *does not strictly inhere to the instrument*."  *Id.* (emphasis added).  Applying *Howey* to secondary market transactions requires "putting aside" earlier primary offerings and considering the realities of the relevant trades on Kraken.  Because the SEC never alleges that contractual obligations passed with Kraken's secondary market transactions, digital assets were not "traded as investment contracts" on Kraken's platform.

An orange itself can never be an "investment contract" no matter how it is traded.  The same is true of computer code.  Such things can be the subject of an "investment contract," where there are the requisite contractual obligations.  But the SEC has not alleged any digital assets were traded with any such obligations on Kraken.  That is fatal.

> 2. *An amorphous "ecosystem" is not a "common enterprise" and does not satisfy Howey's other requirements.*

The SEC has argued in other cases that the digital asset itself "represent[s]" the investment contract because Kraken customers are investing in an amorphous "ecosystem."  *See* Compl. ¶ 58; Solomon Decl., Ex. B, Binance Tr. 90:9-18, 92:14-93:18.  As the value of the overall ecosystem

increases, so does the value of the token, according to the SEC.  *See* Solomon Decl., Ex. A, Coinbase Tr. 19:3-19, 21:17-22:5.  But the Complaint here fails to coherently plead any "ecosystem" that would be a cognizable "enterprise" within the meaning of *Howey*.  *See, e.g.*, Compl. ¶ 62 (referencing, but not defining, "blockchain ecosystems associated with these crypto assets").  If the SEC argues the "ecosystem" is the issuer, its theory fails because it does not plausibly allege Kraken customers invested in the issuers.  If the "ecosystem" is a blockchain or network on which the tokens run, that would be akin to saying that purchasing gasoline reflects an investment in the engine it powers, and would not reflect investment in an "enterprise" as *Howey* requires.  If the "ecosystem" is the entire market of participants—from developers building applications to blockchain users— who may hope to see the value of a given token increase, then everyone in the United States could be part of countless "ecosystems" in commodities or collectibles.

At bottom then, the SEC's "ecosystem" theory, if it continues to propound it, is a dressed-up version of its allegation that the digital asset itself *is* the investment contract.  But this is a position that the SEC itself has disclaimed elsewhere, recognizing that is foreclosed by precedent.  *See supra* at 10.

In any event, the SEC's "ecosystem" theory has no grounding in *Howey*.  Nor does it have any limiting principle.  An endless variety of collectibles and commodities could theoretically have an associated "ecosystem," where a large asset holder is making ongoing promotional statements and taking steps that could increase the value of assets held by others.  De Beers has historically controlled a large percentage of the world's diamond supply, and has an interest in promoting the diamond "ecosystem."  It also sells diamond rings to the general public.  And it makes promotional statements that its "diamonds are forever."  Purchasers may hope to gain from De Beers' diamond "ecosystem."  They could do so by buying shares in De Beers.  Or, they could speculate on the diamonds and jewelry that De Beers sells in the hope they increase in value.  Indeed, based on De Beers' public statements and promotional efforts, they may rely on their reasonable expectations that De Beers will take steps to increase the value of diamonds generally or their rings in particular.  They may even rely on De Beers' technical and managerial expertise in managing the supply of diamonds on the market.  These individuals may then resell their diamonds or rings.  Those resale purchasers

may also have the same expectations based on De Beers' ongoing statements and efforts. No one says that sales or resales of De Beers' diamonds and jewelry are investment contracts. But applying the SEC's "ecosystem" theory, they would be.

And the SEC's theory has even broader implications. Under the Securities Act, private plaintiffs could bring claims targeting vast swaths of the U.S. economy with unregistered securities class actions—trading cards, gold, sneakers, Beanie Babies, Rolexes, vintage cars, art, and more.

While the SEC invites the Court to adopt a principle without any limit, Kraken does not. If an asset is coupled with at least one contract with post-sale obligations to provide future value, there can be an investment contract. If those easily ascertainable requirements are absent, there cannot be. This is a straightforward test for courts to apply (as they have been doing for more than 75 years). *Howey* is a flexible test, but the SEC would take it past its breaking point. Assessing whether a particular "ecosystem" is sufficiently associated with an asset to dispense with the contract and post-sale requirements could never be administered in a principled way, as the SEC itself has demonstrated.

The folly of the SEC's "ecosystem" theory is laid bare by its disparate treatment of Bitcoin and Ether. The "ecosystem" theory certainly captures the "ecosystems" of each of these tokens. *See United States v. Harmon*, 474 F. Supp. 3d 76, 89 (D.D.C. 2020) (citing articles describing the Bitcoin "ecosystem"). The creator of Bitcoin, for example, promoted the token, publicly announcing that: "As the number of users grows, the value per coin increases. It has the potential for a positive feedback loop; as users increase, the value goes up."[31] The Ethereum Foundation has done the same with Ether. *See Jacobo v. Doe*, 2022 WL 2052637, at *1 (E.D. Cal. June 7, 2022) (describing the Ethereum Foundation as "a well-known organization that supports the Ethereum cryptocurrency platform and related technologies"). Moreover, the CFTC has approved trading commodity derivatives of these assets.[32] And the SEC itself has approved listing and trading of Bitcoin ETFs.[33]

---

[31] Alec Liu, *What Satoshi Said: Understanding Bitcoin Through the Lens of Its Enigmatic Creator*, Vice (Jan. 16, 2014), http://tinyurl.com/46kffsbw.

[32] *See, e.g.*, Commodity Futures Trading Commission, *CFTC Approves Two Proposals and a DCO Application* (Dec. 18, 2023), http://tinyurl.com/5262yud3.

[33] *See, e.g.*, SEC, Order Granting Accelerated Approval of Proposed Rule Changes to List and Trade

The SEC cannot explain why its "ecosystem" theory should cover the 11 digital assets alleged in the Complaint but not the ones it already conceded are not securities.

3.     *The presence of market makers does not cure the SEC's failure to show any necessary linkage between issuer and Kraken user.*

Finally, the SEC alleges that "[m]ultiple issuers sold their respective crypto assets on the Kraken Trading Platform through market makers."   Compl. ¶ 117.   Despite this conclusory allegation, the SEC never actually alleges how issuers raised funds "through" market makers on Kraken.   There is no allegation that market makers sent the proceeds of their sales back to the issuer. *See id*. ¶¶ 116-28.   Nor does the SEC allege that issuers had any other interest in the market maker sales on Kraken.   *See id*.   More fundamentally, that market makers sold digital assets on Kraken does nothing to change the absence of the required post-sale obligations from issuers to Kraken's customers.   The Complaint makes no such allegations with respect to market maker sales on Kraken or otherwise.   Indeed, to the extent other Kraken users traded with any such market makers, they would have no way of knowing that fact or that the market maker might have some connection to the issuer (a connection the SEC never defines).   The Complaint resorts to misleadingly calling the market maker transactions "Direct Sales," despite no factual allegations to support that conclusory label.   This just underscores that the SEC knows it has not, and cannot, satisfy *Howey* for secondary sales on Kraken.

**E.     The SEC's digital asset cases are distinguishable and inconsistent with the law in this Circuit.**

The SEC has in related cases  relied on decisions involving certain digital asset issuers outside of the Ninth Circuit to support its position.   *See, e.g.*, Solomon Decl., Ex. A, Coinbase Tr. 49:24-50:16; Ex. B, Binance MTD Tr. 94:6-13, 123:3-124:6 (citing *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299 (S.D.N.Y. July 31, 2023); *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020); and *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020)).   They do not.   Each of these cases involved a primary offering and claims against the issuer, not claims against a

_____

Bitcoin-Based Commodity-Based Trust Shares and Trust Units, Release No. 34-99306 (Jan. 10, 2024), http://tinyurl.com/2p98h2kc.

secondary market trading platform.

In *Terraform*, the court noted that "a formal common-law contract between transacting parties" is not needed "for an 'investment contract' to exist." 2023 WL 4858299, at *11. Citing no prior precedent, the court then said that investment contracts can be found "wherever the 'contracting' parties agree – that is, 'scheme' – that the contractee will make an investment of money in the contractor's profit-seeking endeavor." *Id*. *Terraform*'s interpretation of "scheme" under *Howey* finds no support in the Exchange Act or Ninth Circuit case law. *See supra* Section I.A. Regardless, on Kraken, the buyer and issuer are not alleged to be "contracting parties" who "agree" to anything, much less "agree" to "make an investment in the contractor's profit-seeking endeavor." *Terraform*, 2023 WL 4858299, at *11.

In *Kik*, the issuer conducted an initial integrated private and public offering, through which tokens were sold for future delivery weeks later. 492 F. Supp. 3d at 174-75. But the Complaint does not allege any initial public offering occurred on Kraken, or any other kind of plausibly alleged direct issuer sales. The court in *Kik* also said that "an ongoing contractual *obligation* is not a necessary requirement for a finding of a common enterprise." *Id*. at 178 (emphasis added). This conclusion is incompatible with Ninth Circuit case law. *See supra* Section I.B.

Finally, *Telegram* involved a "series of contracts and understandings" between the issuer and initial purchasers. 448 F. Supp. 3d at 359. The SEC does not allege anything similar here. In sum, no prior cases against digital asset issuers supports the SEC's novel allegations here against a secondary trading platform like Kraken.[34]

---

[34] The SEC may also seek to rely on *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422 (S.D.N.Y. 2023). But in that out-of-circuit case, the only "marketplace" on which secondary sales of NFTs could occur was created and controlled by the issuer, which was critical to the district court's determination that those sales were plausibly alleged to be investment contracts. *Id*. at 447-50. Here, Kraken's trading platform is not controlled by any issuer.

## II.     THE MAJOR QUESTIONS DOCTRINE REQUIRES DISMISSAL.

The SEC's efforts to regulate secondary digital asset markets should be rejected under the major questions doctrine.  Under this doctrine, courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies."  *W. Va. v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up).   When an agency asserts "extraordinary" power, it "must point to clear congressional authorization for the power it claims."  *Id*.  And when an agency "'claim[s] to discover in a long-extant statute an unheralded power' representing a 'transformative expansion in [its] regulatory authority,'" courts apply heightened skepticism.  *Id*. at 724 (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

Here, the SEC's attempt to expand its authority presents a major question.  The Exchange Act is ninety years old.  The SEC now espouses new theories that would give it authority over any commodity that may increase in value—authority Congress has not given it and the SEC rightly disclaimed earlier.

This is a question of great economic and political significance.  The regulation of the digital asset industry and the platforms on which these assets trade implicates trillions of dollars.  *See supra* at 6.  Plainly, a "significant portion of the American economy" would be impacted.  *Biden v. Neb.*, 143 S. Ct. 2355, 2373-74 (2023) (major question existed when "between $469 billion and $519 billion" at issue); *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489-90 (2021) (major question existed when approximately $50 billion at issue).  But importantly, the SEC's recent decision that it can regulate assets associated with an "ecosystem" would have far broader impact—sweeping in multiple industries, including the broader commodities and collectibles markets.  *See supra* Section I.D.2.  The SEC may deny that intent today, but it cannot avoid that ultimate import of its unprecedented theory.

This is not an area where Congress has been sitting on its hands.  Congress is actively debating the appropriate regulatory framework.  *See Neb.*, 143 S. Ct. at 2373 ("The Secretary's assertion of administrative authority has conveniently enabled him to enact a program that Congress has chosen not to enact itself.") (cleaned up); *see, e.g.*, Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023), https://tinyurl.com/3yx8f5hm; Financial Innovation

and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023), https://tinyurl.com/yc38dmjn. Since 2019, Congress has considered over 20 proposals on these issues. And it is not at all clear that Congress wishes the SEC to have the power it now asserts. Indeed, many of those bills would grant authority to agencies other than the SEC. *See supra* at 4; *Risley v. Univ. Navigation Inc.*, 2023 WL 5609200, at *3 (S.D.N.Y. Aug. 29, 2023) ("Congress and the courts have yet to make a definitive determination as to whether [digital assets] constitute securities, commodities, or something else."). This case accordingly has vast "political significance." *Neb.*, 143 S. Ct. at 2373. The major questions doctrine is intended precisely to prevent an agency from bypassing such "earnest and profound debate" by commandeering for itself the very powers that are being debated. *W. Va.*, 597 U.S. at 732 (rejecting agency interpretation of statute that "allowed it to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself").

The doctrine applies with special force when, as here, an agency claims authority it previously acknowledged it lacks. *See, e.g., Neb.*, 143 S. Ct. at 2364 (applying doctrine when Department of Education had earlier disclaimed "statutory authority to provide blanket or mass cancellation" of student loans); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (2000) (similar). In 2021, Chair Gensler told Congress that "right now the exchanges trading in these crypto assets do not have a regulatory framework [] at the SEC," and "it is only Congress that could really address" this lack of a framework.[35] At least one other SEC commissioner recently agreed, stating that "if we seriously grappled with the legal analysis and our statutory authority, . . . we would have to admit that we likely need . . . more clearly delineated, statutory authority to regulate certain crypto tokens and to require crypto trading platforms to register with us. And Congress might decide to give that authority to someone else."[36]

Accordingly, the SEC "must point to clear congressional authorization" to exert this

---

[35] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, 117th Cong. 12 (May 6, 2021), http://tinyurl.com/3u2cynya.

[36] Hester M. Peirce, Comm'r, SEC, *Outdated: Remarks Before the Digital Assets at Duke Conference* (Jan. 20, 2023), https://tinyurl.com/47cypbvt.

1  authority.  *W. Va.*, 597 U.S. at 723.  There is none.  Chair Gensler recognized that two years ago.

2  Another SEC Commissioner recognized that last year.  The CFTC recognizes that currently, claiming

3  for itself authority to regulate the two largest digital assets as commodities.  And Congress recognizes

4  that; otherwise there would be no need to debate various bills deciding who should have authority

5  over digital assets and platforms.  *See supra* at 4-6.  The SEC's "novel" construction of the Exchange

6  Act is sufficiently "extraordinary" to require dismissal under the major questions doctrine.  *See Neb.*,

7  143 S. Ct. at 2369-70.

8  **CONCLUSION**

9        For the foregoing reasons, the Court should dismiss the Complaint in its entirety with

10  prejudice.

12   DATED: February 22, 2024

13                                         Respectfully Submitted,

14                                         */s/ Matthew C. Solomon*
                                           MATTHEW C. SOLOMON (appearing *pro*
15                                         *hac vice*)
                                           msolomon@cgsh.com
16                                         RAHUL MUKHI (SBN 350718)
                                           rmukhi@cgsh.com
17                                         JENNIFER KENNEDY PARK (SBN
                                           344888)
18                                         jkpark@cgsh.com
                                           CLEARY GOTTLIEB STEEN &
19                                         HAMILTON LLP
                                           2112 Pennsylvania Avenue
20                                         Washington, DC 20037
                                           Telephone:  (202) 974-1680
21
                                           BRIAN KLEIN (SBN 258486)
22                                         bklein@waymakerlaw.com
                                           ASHLEY MARTABANO (SBN 236357)
23                                         amartabano@waymakerlaw.com
                                           WAYMAKER LLP
24                                         515 S. Flower Street, Suite 3500
                                           Los Angeles, CA 90071
25                                         Telephone:  (424) 652-7814

26                                         *Attorneys for Defendants Payward Inc. and*
                                           *Payward Ventures, Inc.*