**EXHIBIT A**

Jaime Bartlett, SBN 251825
jbartlett@sidley.com
David Goldenberg, SBN 347955
dgoldenberg@sidley.com
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
Telephone: +1 415 772 1200
Facsimile: +1 415 772 7400

Lilya Tessler (*pro hac vice* admission pending)
ltessler@sidley.com
SIDLEY AUSTIN LLP
2021 McKinney Avenue, Suite 2000
Dallas, TX 75201
Telephone: +1 214 981 3300
Facsimile: +1 214 981 3400

*Attorneys for Amicus Curiae The Chamber of Digital Commerce*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| Securities and Exchange Commission,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>Payward, Inc. et al,<br><br>　　　　　Defendants. | Case No. 3:23-cv-06003-WHO<br><br>**BRIEF OF AMICUS CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Honorable William H. Orrick |

# TABLE OF CONTENTS

I. INTEREST OF AMICUS .................................................................................................. 1

II. INTRODUCTION .............................................................................................................. 2

III. ARGUMENT....................................................................................................................... 3

    a. **The SEC Wrongly Conflates the Subject of an Investment Contract with the Investment Contract Itself** ................................................................................... 3

    b. **SEC's Regulation-By-Enforcement Poses Separation of Powers and Due Process Concerns** ................................................................................................................. 6

        i. **Major Questions Doctrine**................................................................................ 7

        ii. **Due Process and Fair Notice** ........................................................................... 9

IV. CONCLUSION ................................................................................................................. 11

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alabama Ass'n of Realtors v. HHS,*
    141 S. Ct. 2485 (2021) ................................................................................................................ 8

*Balt. Gas & Elec. Co. v. FERC,*
    954 F.3d 279 (D.C. Cir. 2020) .................................................................................................. 11

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ............................................................................................................ 7, 8

*Cmty. Television of S. Cal. v. Gottfried,*
    459 U.S. 498 (1983) .................................................................................................................. 11

*Commodity Futures Trading Comm'n v. Ooki DAO,*
    No. 3:22-CV-05416-WHO, 2023 WL 5321527 (N.D. Cal. June 8, 2023) ................................ 6

*Cont'l Mktg. Corp. v. SEC,*
    387 F.2d 466 (10th Cir. 1967) .................................................................................................... 3

*F.C.C. v. Fox Television Stations, Inc.,*
    567 U.S. 239 (2012) .................................................................................................................... 9

*FDA v. Brown & Williamson Tobacco Corp.*
    529 U.S. 120 (2000) ............................................................................................................... 7, 8

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) .................................................................................................................... 9

*Hocking v. Dubois,*
    885 F.2d 1449 (9th Cir. 1989) .................................................................................................... 3

*Nat'l Fed'n of Indep. Business v. OSHA,*
    142 S. Ct. 661 (2022) .............................................................................................................. 7, 8

*Noa v. Key Futures, Inc.,*
    638 F.2d 77 (9th Cir. 1980) ........................................................................................................ 5

*SEC v. Belmont Reid & Co.,*
    794 F.2d 1388 (9th Cir. 1986) .................................................................................................... 5

*SEC v. Binance Holdings Ltd.,*
    Case No. 1:23-cv-01599-ABJ-ZMF (D.D.C. filed Oct. 19, 2023), Dkt. No. 159 ................. 1, 2

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) .................................................................................................................. 11

*SEC v. Coinbase Inc.*,
   Case No. 1:23-cv-04738-KPF (S.D.N.Y. filed Aug. 11, 2023), Dkt. No. 55 .................... 1, 2, 9

*SEC v. Edwards*,
   540 U.S. 389 (2004) ................................................................................................................ 3, 5

*SEC v. Glen-Arden Commodities, Inc.*,
   368 F. Supp. 1386 (E.D.N.Y. 1974) ............................................................................................ 3

*SEC v. Ripple Labs, Inc.*,
   2023 WL 4507900 (S.D.N.Y. July 13, 2023) ......................................................................... 4, 6

*SEC v. Ripple Labs, Inc.*,
   Case No. 1:20-cv-10832 (S.D.N.Y. filed Dec. 20, 2020), Dkt. No. 4 ................................ 2, 4, 6

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ......................................................................................... 4

*SEC v. Terraform Labs Pte. Ltd.*,
   Case No. 1:23-cv-01346 (S.D.N.Y filed Feb. 16, 2023) Dkt. No. 1 ....................................... 2, 4

*SEC v. Terraform Labs Pte. Ltd.*,
   No. 23-CV-1346 (JSR), 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ...................................... 4

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ........................................................................................................ 3, 4, 5, 8

*United Hous. Found., Inc. v. Forman*,
   421 U.S. 837 (1975) .................................................................................................................... 5

*Util. Air Reg. Group v. EPA*,
   573 U.S. 302 (2014) ................................................................................................................ 7, 8

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ............................................................................................................ 7, 8

**Statutes**

7 U.S.C. § (c)(2)(D)(ii)(II) ............................................................................................................... 6

15 U.S.C. § 77b(a)(1) ...................................................................................................................... 3

15 U.S.C. § 78c(a)(10) .................................................................................................................... 3

**Other Authorities**

*Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3,
   2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-
   digital-assets ................................................................................................................................ 5

Government Accountability Office, *Securities and Exchange Commission- Applicability of the Congressional Review Act to Staff Accounting Bulletin No. 121*, B-334540 (Oct. 21, 2023) (https://www.gao.gov/products/b-334540) ..........................10

Jesse Hamilton, *Robinhood Joins Coinbase in Saying It Tried to 'Come In and Register' Like SEC Wanted*...................................................................................................10

K33 Research, *The Emerging Crypto Industry 4* (2023), perma.cc/3WDU-6LGN ........................7

LILYA TESSLER, BROKER-DEALER REGULATION § 53: 2.2 (PLI Plus, 2d ed,, 2023) https://plus.pli.edu/Details/Details?fq=id%3A(32789-CH53)..................................................10

Lucas Schweiger, *81 of the Top 100 Public Companies Are Using Blockchain Technology* ...............................................................................................................................7

Thomas Franck, *One in Five Adults Has Invested In, Traded or Used Cryptocurrency, NBC News Poll Shows*, CNBC (March 31, 2022), perma.cc/V6XU-TAAW............................7

I.      INTEREST OF AMICUS

Founded in 2014, The Chamber of Digital Commerce ("The Chamber") is the world's largest digital asset and blockchain trade association. The Chamber represents more than 200 diverse members of the blockchain industry globally, including digital asset exchanges, leading banks and investment firms, startups, and other digital asset economy participants. The Chamber's leadership team and Board of Advisors includes policy and legal experts, industry pioneers, and former regulators, including two former Chairs and a Commissioner of the U.S. Commodity Futures Trading Commission ("CFTC"), and a former Commissioner of the U.S. Securities and Exchange Commission ("SEC"). Guided by the principle of promoting industry compliance with applicable law, The Chamber seeks to foster a legal and regulatory environment in which digital asset users can enjoy regulatory certainty as they apply blockchain technologies to an array of commercial, technological, and social purposes. An important aspect of that mission is representing the interests of its members, including regularly filing briefs as *amicus curiae* in novel cases that implicate issues of importance to the blockchain community.

Pursuant to its mission, The Chamber also sponsors several compliance-focused initiatives, in addition to advocating for regulatory clarity. These include the Blockchain Alliance, which since 2015 has combatted criminal uses of blockchain technology, providing technical assistance and information-sharing resources. This initiative serves over 100 governmental and commercial entities, including the SEC. The Chamber also encourages industry compliance with federal securities law through initiatives like the Token Alliance, a network of 400+ thought leaders and technologists that has developed numerous tools and resources for industry and policymakers as they engage with the blockchain and digital asset community.

The Chamber has an interest in this case because it has long called for the SEC to work cooperatively with the blockchain community to develop rules of the road that provide companies with fair notice of what the law requires and how they can comply. This matter, and the SEC's regulation-through-enforcement, poses a threat to the potential for sustained growth and success of the trillion-dollar blockchain community, the millions of people who participate in crypto markets, and the hundreds of crypto companies like Kraken that have attempted in good faith to comply with

federal and state law as they innovate in a transformative industry.

## II.     INTRODUCTION

Blockchain[3] is a revolutionary computing technology with the power to transform how people and businesses interact. Innovators throughout the United States have harnessed this new technology for a wide variety of use cases, including logistics, automation, digital identity verification, file storage, and commercial transactions. While it is a helpful shorthand to refer to the "crypto industry," blockchain technology applications span beyond any single industry or sector of the U.S. economy. Digital asset exchanges, like Kraken, help people and businesses to use this technology every day.

Despite the technology being in its infancy, the number of individuals and companies actively engaged with blockchain and digital assets is significant. The U.S. digital asset industry was projected to generate approximately $18 billion in revenue in 2023. And research indicates that over one fifth of U.S. residents have used digital assets. Furthermore, many of the largest public companies are utilizing blockchain. Digital asset exchanges, like Kraken, provide a gateway for individuals and businesses to use and interact with blockchain by enabling them to buy, sell, and trade digital assets that are necessary to interact with many blockchains.

The SEC's insistence here and in other similar cases[4] to expand the scope of the securities laws to regulate all digital asset transactions as securities transactions is wrong as a matter of law and a threat to the adoption and advancement of blockchain technology. Contrary to the SEC's interpretation, digital assets are not inherently "investment contracts." Certainly, digital assets, along with oranges, whisky, and a host of other assets, can be the *subject* of an investment contract. But the fact that digital assets operate using the blockchain as a backbone and can fluctuate in value does not make them a security. Moreover, the SEC's view that digital assets are themselves securities is a

---

[3] Blockchain technology is a distributed, decentralized, and immutable digital ledger that is used to record transactions across a network of computers. It allows multiple parties to reach consensus on the state of a shared digital history without the need for a central authority.

[4] *See, e.g.*, Complaint, *SEC v. Coinbase Inc.*, Case No. 1:23-cv-04738-KPF (S.D.N.Y. filed Jun. 6, 2023) , Dkt. No. 1; Complaint, *SEC v. Binance Holdngs. Ltd.*, Case No. 1:23-cv-01599-ABJ-ZMF (D.D.C. filed Jun. 5, 2023), Dkt. No. 1; Complaint, *SEC v. Terraform Labs Pte. Ltd.*, Case No. 1:23-cv-01346 (S.D.N.Y filed Feb. 16, 2023) Dkt. No. 1; Complaint, *SEC v. Ripple Labs, Inc.*, Case No. 1:20-cv-10832 (S.D.N.Y. filed Dec. 20, 2020), Dkt. No. 4.

major question that Congress has not clearly delegated to the SEC. In fact, Congress has been actively working to legislate this very issue. The SEC's interpretation would have enormous implications for the trillion-dollar digital asset space as it stands and could fundamentally impede development in the U.S. economy. This is precisely the kind of regulatory action for which the Supreme Court requires clear Congressional intent before concluding that Congress intended to delegate such authority.

Not only is the SEC's interpretation wrong as a matter of law, it implicates substantial constitutional issues of fair notice and due process. Rather than leverage the traditional tools of regulatory rulemaking, the SEC has relied on individual enforcement actions to communicate its interpretation of the law. Users and uses of blockchain technology, however, are sufficiently diverse and complicated that fact-specific enforcement actions cannot provide the general clarity necessary for market participants to know what is and is not permissible.

### III. ARGUMENT

#### a. The SEC Wrongly Conflates the Subject of an Investment Contract with the Investment Contract Itself

Digital assets are nothing more than lines of computer code. Such code unlocks functionality on particular blockchain networks. But digital assets are certainly not securities. Foundational to the SEC's complaint is its allegation that the digital assets at issue constitute investment contracts—in other words, securities pursuant to 15 U.S.C. §§ 78c(a)(10) and 77b(a)(1). *See* Dkt. No. 1 at 15 ("These crypto asset securities are investment contracts represented by the underlying crypto asset."). As the Supreme Court has explained, an investment contract involves a "contract, transaction, or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946). But courts are clear that the subject of an investment contract is not necessarily itself a security. This is true whether the subject of an investment contract is a physical asset, or an intangible one, such as a digital asset.[5] For example, a farmer and investor can enter into

---

[5] *See SEC v. Glen-Arden Commodities, Inc.*, 368 F. Supp. 1386 (E.D.N.Y. 1974), *aff'd sub nom. Glen-Arden Commodities*, 493 F.2d 1027 (whisky casks); *SEC v. Edwards*, 540 U.S. 389 (2004) (payphones); *Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989), *cert. denied*, 494 U.S. 1078

an investment contract where the farmer will grow and distribute oranges. The oranges themselves, however, are merely the subject of the investment contract and do not "represent" the investment contract between the farmer and investor or become securities when sold.

Other courts considering this issue have recognized that digital tokens are not inherently securities. "[A] digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract." *SEC v. Ripple Labs, Inc.*, 2023 WL 4507900, at *8 (S.D.N.Y. July 13, 2023); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020) ("The Court rejects Telegram's characterization of the purported security in this case. While helpful as a shorthand reference, the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence. . . . *Howey* requires an examination of the entirety of the parties' understandings and expectations."). In other words, whether a *transaction or scheme* is an "investment contract" must be assessed on a transaction-by-transaction basis. And the presence of an asset that may have been the subject of an investment contract at one time does not necessarily make downstream transactions in that asset securities transactions.

The reasoning underlying the recent decision in *Terraform* comports with the findings in *Ripple* and *Telegram*. *See SEC v. Terraform Labs Pte. Ltd.*, No. 23-CV-1346 (JSR), 2023 WL 8944860, at *14 (S.D.N.Y. Dec. 28, 2023). While the court in *Terraform* stated that the sales of the digital assets in that case constituted investment contracts, it did so only after considering and accounting for the overall alleged scheme, i.e., after examining the entirety of the parties' understandings and expectations. Importantly, the court cited as part of the basis for its holding "specific, repeated statements that would lead a reasonable investor in LUNA to expect a profit based on defendants' efforts to further develop the Terraform blockchain." *Id.* Although the court used language suggesting that the digital tokens themselves are securities, the analysis and even the court's summary of its own findings make clear that, as in *Ripple* and *Telegram*, it is the *scheme* underlying the specific alleged sales at issue, rather than the simple existence of the underlying digital asset that

---

(1990) (condominiums); *Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967) (beavers); *see also* William Hinman, SEC Dir., Div. of Corp. Fin., SEC, Digital Asset Transactions: *When Howey Met Gary (Plastic)*, Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018) ("[I]nvestment contracts can be made out of virtually any asset (including virtual assets).").

constitute the investment contract. *See, e.g., id.* at *15 ("[D]efendants cannot meaningfully dispute that they led holders of MIR to expect profit from a common enterprise based on Terraform's efforts to develop, maintain, and grow the Mirror Protocol.").

In conflating the *subject* of an investment contract with an investment contract itself, the SEC incorrectly seeks to divorce the prongs of the *Howey* test from each other. *Howey* requires that an investment be made *in* a common enterprise. It is not enough to find merely that some outlay of funds has been made while also, separately, alleging the plausible existence of some common enterprise or that the purchaser expects some financial gain.

First, the mere fact that units of a particular digital asset necessarily exist on a common blockchain database is insufficient to constitute a common enterprise for purposes of *Howey*. With respect to digital assets, SEC staff early on declared its divergence from the federal courts interpreting *Howey* on this point. "In order to satisfy the 'common enterprise' aspect of the *Howey* test, federal courts require that there be either 'horizontal commonality' or 'vertical commonality.' The Commission, on the other hand, does not require vertical or horizontal commonality per se, nor does it view a 'common enterprise' as a distinct element of the term 'investment contract.'" *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (citations omitted)). The SEC cannot now make the conclusory statement that a blockchain is itself a common enterprise, or the corollary that digital assets represent shares in a purported common enterprise, such that a purchase of a digital asset in a downstream transaction somehow equates to an investment *in* a common enterprise as is required by *Howey*.

Nor is the fact that the value of a digital asset may increase due to market forces or because purchasers' desire to consume the asset – sufficient to establish an investment contract under *Howey* and its progeny. *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980); see also *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir. 1986). Crucially, for secondary transactions, "profits" under *Howey* require more than just capital appreciation or gain. The Supreme Court's decisions in *Edwards* and *Forman* makes clear: profits for purposes of *Howey* includes "capital appreciation *resulting from the development of the initial investment.*" *United Hous. Found., Inc. v.*

*Forman*, 421 U.S. 837, 852 (1975) (emphasis added); *SEC v. Edwards*, 540 U.S. 389, 395 (2004). In a secondary transaction, the proceeds of a sale are simply not an investment used or developed as part of any enterprise, and any subsequent increase in the value of the asset cannot be attributed to the purported enterprise's use of those proceeds. As the court in *Ripple* recognized, in the context of primary transactions, "[R]ecipients of the Other Distributions [including distributions to employees as compensation and to third parties as part of Ripple's Xpring initiative] did not pay money or 'some tangible and definable consideration' to Ripple. To the contrary, Ripple paid XRP to these employees and companies. And, as a factual matter, there is no evidence that 'Ripple funded its projects by transferring XRP to third parties and then having them sell the XRP,' SEC Mem. at 31, because Ripple never received the payments from these XRP distributions. . . . In any event, the SEC does not develop the argument that these secondary market sales were offers or sales of investment contracts, particularly where the payment of money for these XRP sales never traced back to Ripple, and the Court cannot make such a finding." *Ripple Labs*, 2023 WL 4507900, at *13.

While this Court has not directly considered the issue, its holdings in another digital asset-related case reflects the same view. In *Ooki DAO*, this Court found that the digital asset transactions at issue were "retail commodity transactions," the definition of which excludes, among other things, "any security," *see* 7 U.S.C. § (c)(2)(D)(ii)(II). *Commodity Futures Trading Comm'n v. Ooki DAO*, No. 3:22-CV-05416-WHO, 2023 WL 5321527, at *6 (N.D. Cal. June 8, 2023) ("There are also no facts suggesting that the transactions involved securities or contracts of sale (as opposed to, as alleged in the complaint, the establishment of leveraged positions on anticipated price differences between commodities), or that any other exceptions outlined in § 2(c)(2)(D)(ii) apply, and the amici (and CFTC) do not contend otherwise.").

### b. SEC's Regulation-By-Enforcement Actions Pose Separation of Powers and Due Process Concerns

The development of blockchain technology and use of digital assets is undergoing rapid innovation, iteration, and evolution. Like the development of any technology, but especially one marked by such dynamism, clear regulation is necessary for industry participants to understand what they can and cannot do as the industry grows. Regulating through enforcement, rather than through

6
BRIEF OF AMICUS CURIAE IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,
CASE NO. 3:23-cv-06003-WHO

the statutorily required notice and public comment process, poses grave concerns about the viability of the industry and raises serious constitutional questions.

          i.  Major Questions Doctrine

As the Supreme Court has recently reinforced, when considering whether Congress has delegated authority to an agency, courts must determine whether a case is "extraordinary" and embodying "economic and political significance," which counsels hesitation before concluding that Congress intended to delegate authority without "clear congressional authorization." *West Virginia v. EPA*, 142 S. Ct. 2587, 2608, 2614 (2022) (quoting *Util. Air Reg. Group v. EPA*, 573 U.S. 302, 324 (2014)).

Because the blockchain community is widespread in the United States and has extraordinary economic significance, the SEC's categorical designation of digital assets as securities should be considered under the major questions doctrine. Per the SEC's Complaint, Kraken alone "earned more than $43 billion in revenue" in 2020 and 2021. Dkt. No. 1 at 12. And this case has ramifications well beyond just Kraken's business. The United States is by far the world leader in digital asset jobs, calling itself home to 30% of the global digital asset workforce of 190,000 people. *See* K33 Research, *The Emerging Crypto Industry 4* (2023), perma.cc/3WDU-6LGN. *Compare with Nat'l Fed'n of Indep. Business v. OSHA*, 142 S. Ct. 661, 666 (2022) (staying OSHA vaccination mandate that might cause "hundreds of thousands of employees to leave their jobs"). Furthermore, digital asset use is widespread. Some estimates show that as many as 21% of U.S. residents—approximately 70 million people—have used digital assets in some way. *See* Thomas Franck, *One in Five Adults Has Invested In, Traded or Used Cryptocurrency, NBC News Poll Shows*, CNBC (March 31, 2022), perma.cc/V6XU-TAAW. *Compare with Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023) (staying student loan forgiveness plan affecting 43 million borrowers). Many of the largest public companies use blockchain technology. *See* Lucas Schweiger, *81 of the Top 100 Public Companies Are Using Blockchain Technology*, Blockdata (Oct. 6, 2022), perma.cc/9H4F-T6GN. Overall, the U.S. digital asset industry is projected to generate approximately $18 billion in revenue in 2023, on top of a global market cap greater than $1 trillion. *See Cryptocurrencies – United States*, Statista, perma.cc/YK3U-XG24 (last visited July 29, 2023). By comparison, the production value of

tobacco crops in 2000, the year the Court struck down the FDA's attempt to regulate the tobacco industry absent congressional authorization in *FDA v. Brown & Williamson Tobacco Corp.* 529 U.S. 120, 159 (2000), was $2 billion ($3.54 billion in today's dollars). USDA, Crop Production Historical Track Records 264 (2023), perma.cc/9ZR2-GWB2.

While the Supreme Court has not established a formal test for whether a case implicates sufficient "economic significance," it has found that regulation implicating far fewer amounts constituted major questions. In *Alabama Ass'n of Realtors v. HHS*, the Court found that "$50 billion in emergency rental assistance" was "a reasonable proxy for the [challenged policy's] economic impact," and that this was enough to trigger major-questions scrutiny. 141 S. Ct. 2485, 2489 (2021). In *Biden v. Nebraska*, the Court explained that if $50 billion in rental assistance was enough to "trigger[] analysis under the major questions doctrine," student-loan cancellation amounting to "ten times" that impact necessarily qualified as well. 143 S. Ct. at 2373.

Nor need a case involve government spending to qualify as economically significant for purposes of the major questions doctrine. What matters is the government's effort to "exercise control over 'a significant portion of the American economy.'" *Id.* (quoting *Util. Air Reg. Group*, 573 U.S. at 324). In *Nat'l Fed'n of Indep. Business v. OSHA*, the Court found that regulatory requirements imposing "billions of dollars in unrecoverable compliance costs" and possibly causing "hundreds of thousands of employees . . . to leave their jobs" was a major question. 142 S. Ct. at 664-666. *See also Util. Air Reg. Group*, 573 U.S. at 322 (measure would lead to "permitting costs of $147 billion" and "caus[e] construction projects to grind to a halt nationwide"). The economic toll need not even be described in dollars. In *West Virginia v. EPA*, rather than quantify the economic stakes, the Court simply noted that the government had arrogated to itself the power to "substantially restructure the American energy market." 142 S. Ct. at 2610. And in *FDA v. Brown & Williamson Tobacco Corp.*, the Court observed that "FDA has now asserted jurisdiction to regulate an industry constituting a significant portion of the American economy." 529 U.S. at 159.

Accepting the SEC's position would result in substantial impact to the blockchain space with far-reaching and unpredictable disruptive effects. The SEC's application of *Howey* and shifting interpretations of securities laws revealed to the industry through *post hoc* enforcement actions

jeopardizes the health of blockchain technology, driving these United States-led businesses offshore. In addition to subjecting current market participants to unknowable and potentially existential risk, the SEC's position impacts emerging companies, research groups, non-profits, and enthusiasts who cannot afford the expensive burden of operating in an undefined regulatory regime. Such a dramatic, new application of regulatory power will also inevitably cause entire organizations to abandon blockchain technology altogether or shift operations out of the United States to avoid the burden the SEC seeks to impose.

Congress has recognized the importance of blockchain technology and is actively working to determine the scope of the SEC's authority and ameliorate the potential economic impact that results from the SEC's current approach. Members of Congress have introduced dozens of bills relating to digital asset regulation, some of which would expressly decline to give the SEC the authority it seeks, and Senator Cynthia Lummis has even submitted an amicus brief highlighting Congressional activity as a reason to question the SEC's claims of broad authority in similar litigation. *See* Brief of Amicus Curiae, Senator Cynthia Lummis, *SEC v. Coinbase Inc.*, Case No. 1:23-cv-04738-KPF (S.D.N.Y., filed Aug. 11, 2023), Dkt. No. 53, pp. 5–7 (listing major pieces of legislation introduced, including the Responsible Financial Innovation Act (RFIA), S. 2281, 118th Cong. (2023); The Financial Innovation and Technology for the 21st Century Act (FIT21), H.R. 4763, 118th Cong. (2023); and the Digital Commodities Consumer Protection Act of 2022 (DCCPA), S. 4760, 117th Cong. (2022)). Rather than following Congress's lead in determining the scope of the SEC's jurisdiction over this widespread industry, the SEC is pushing forward with its regulation-by-enforcement agenda.

        ii.   Due Process and Fair Notice

Even if this Court determines that the SEC's regulation of digital assets-as-securities is not a major question, the Court should find that the SEC's regulation-by-enforcement of the blockchain and digital asset companies fails to provide fair notice and does not comport with due process.

The SEC's regulation-by-enforcement approach does not provide fair notice to the industry of what the SEC purports to regulate or how. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or

required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Of course, an otherwise impermissibly vague statute may be given sufficient interpretation by courts and regulators to provide fair notice. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972). To date, the SEC has chosen to pursue individual enforcement actions reflecting its determination that digital assets constitute securities. In such a diverse industry, however, it is impossible to divine generally applicable interpretive guidance from individual enforcement actions because of the individualized and inherently complex nature of each digital asset and variety of ways they are used.

Digital asset exchanges typically support hundreds of digital assets, and the SEC's interpretation of the securities laws provides no limiting principle to determine whether these assets are offered as securities or commodities. Moreover, despite encouraging existing participants to simply register with the SEC, in practice, the SEC has made it all but impossible to do so. *See generally Cryptoasset Trading Platforms Cannot Register as Securities Exchanges*, Committee on Capital Markets Regulation (June 6, 2023), perma.cc/87X8-NQEM (explaining "why the SEC's own policies in fact make it impossible for crypto asset trading platforms" to "register[] and operat[e] in compliance with the regulatory framework for securities exchanges"). Companies attempting to register either as digital asset issuers, exchanges, or broker dealers have explained that they "couldn't get the [SEC] to guide [them] into crypto compliance" and that the SEC pulled the plug on their efforts. *See* Jesse Hamilton, *Robinhood Joins Coinbase in Saying It Tried to 'Come In and Register' Like SEC Wanted*, Yahoo! Finance (June 7, 2023), perma.cc/JZ4N-N3SW. Part of the issue is that exchanges simply function differently from companies dealing with actual securities. Digital asset exchanges combine numerous technological components unique to digital assets to serve the needs of their users. For example, digital asset exchanges often have different "wallets" to handle digital assets.[6] Similarly, digital asset exchanges have databases specific to digital assets and user interfaces designed for the various digital assets the exchange handles.

The SEC should, instead, leverage the traditional tools of administrative rulemaking to

---

[6] *See* LILYA TESSLER, BROKER-DEALER REGULATION § 53: 2.2 (PLI Plus, 2d ed,, 2023) https://plus.pli.edu/Details/Details?fq=id%3A(32789-CH53).

provide clear, formal guidance for the blockchain and digital asset companies to implement.[7] Administrative rulemaking vindicates and codifies the due process right by "incorporat[ing]" through the Administrative Procedure Act, "basic principles of fair notice and equal treatment" into agency action. *Balt. Gas & Elec. Co. v. FERC*, 954 F.3d 279, 286 (D.C. Cir. 2020). Accordingly, it is a long-established principle of administrative law that "rulemaking is generally a 'better, fairer, and more effective' method of implementing a new industry-wide policy." *Cmty. Television of S. Cal. v. Gottfried*, 459 U.S. 498, 511 (1983). *See also SEC v. Chenery Corp.*, 332 U.S. 194, 202 (1947) (The SEC's "function of filling in the interstices of the Act should be performed, as much as possible, through this quasi-legislative promulgation of rules to be applied in the future").

Traditional administrative rulemaking would allow market participants to weigh in and help craft clear, reasonable guidance and procedures. Forward-looking guidance would also mean that digital asset exchanges, to the extent that they fall within the bounds of the regulation, could comply with the regulation proactively rather than operating with unknowable and existential legal liability.

### IV.   CONCLUSION

For the foregoing reasons, the court should grant Kraken's motion to dismiss.

Dated: February 27, 2024

Respectfully submitted,

 /s/ *Jaime Bartlett*
Jaime Bartlett
Lilya Tessler (*pro hac vice* admission pending)
David Goldenberg
SIDLEY AUSTIN LLP
Attorneys for *amicus curiae*
The Chamber of Digital Commerce

---

[7] The Government Accountability Office has previously found that the SEC engaged in unlawful rulemaking in connection with the SEC's Staff Accounting Bulletin No. 121. *See* Government Accountability Office, Securities and Exchange Commission—Applicability of the Congressional Review Act to Staff Accounting Bulletin No. 121, B-334540 (Oct. 21, 2023) (https://www.gao.gov/products/b-334540).