1   CHRIS LAND (Wyo. Bar #7-6006)
    UNITED STATES SENATE
2   Office of United States Senator Cynthia M. Lummis
    127A Russell Senate Office Building
3   Washington, D.C. 20510

4
    (202) 224-3424
5   chris_land@lummis.senate.gov

6   *Counsel for Amicus Curiae*

7

8               **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFONIA**
9                 **SAN FRANCISCO DIVISION**

10

11   SECURITIES AND EXCHANGE COMMISSION,

12                    Plaintiff,

13          v.                                    Case No. 3:23-cv-06003-WHO

14   PAYWARD, INC. & PAYWARD VENTURES,
     INC.
15

16                    Defendants.

17

18

19              **[PROPOSED] *AMICUS CURIAE* BRIEF OF**
         **UNITED STATES SENATOR CYNTHIA M. LUMMIS**
20        **IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

21

22

23

24

25

26

27

28

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

1

2

## <u>TABLE OF CONTENTS</u>

3

TABLE OF AUTHORITIES ...........................................................................................................II

INTERESTS OF *AMICUS CURIAE* ...........................................................................................1

PRELIMINARY STATEMENT ....................................................................................................2

ARGUMENT...................................................................................................................................2

I.      The SEC's Enforcement Stance In This Action Runs Counter To Ongoing
Legislative Efforts. ...........................................................................................................3

II.     The SEC's Attempt to Treat Crypto Assets, Themselves, As Securities Improperly
Expands the Statutory Definition of "Securities" And Violates The Separation Of
Powers.................................................................................................................................7

CONCLUSION.............................................................................................................................13

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

2

3

**CASES**

4

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
    141 S. Ct. 2485 (2021)........................................................................................................8

5

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023)..............................................................................................9, 12, 13

6

7

*In re Coinbase, Inc.*,
    No. 23-1779 (3d Cir. Jun. 20, 2023)................................................................................12

8

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)..................................................................................................... 4, 7

9

10

*Nat'l Pork Producers Council v. Ross*,
    143 S. Ct. 1142 (2023)......................................................................................................7

11

*Util. Air Regul. Grp. v. Env't Prot. Agency*,
    573 U.S. 302 (2014)..........................................................................................................7

12

13

*W. Virginia v. Env't Prot. Agency*,
    142 S. Ct. 2587 (2022)...........................................................................................7, 8, 12, 13

14

**STATUTES**

15

16

Securities Act of 1933, 15 U.S.C. § 77a *et seq.*..............................................................................2

17

Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*...........................................................2

18

**OTHER AUTHORITIES**

19

Andrew Perrin, *16% of Americans Say They Have Ever Invested In, Traded or Used
    Cryptocurrency,* Pew Resch. Ctr. (Nov. 11, 2021)........................................................9

20

21

Blockchain Regulatory Certainty Act, H.R.1747, 118th Cong. (2023)..........................................4

22

Clarity for Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. (2023) ........................4, 5

23

*Coincidence or Coordinated? The Administration's Attack on the Digital Asset
    Ecosystem Before the H. Subcomm. on Digital Assets, Fin. Tech. and Inclusion of
    the H. Comm. on Fin. Serv.*, 118th Cong. (2023)  ......................................................3

24

25

Commission Regulation 2023/1114, art. 6, 2023 O.J. (L150/40) 1...............................................6

26

Crypto-Currency Act of 2020, H.R. 6154, 116th Cong. (2020).....................................................4

27

28

*Crypto Crash: Why Financial System Safeguards are Needed for Digital Assets Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 118th Cong. (2023)............................3

*Crypto Crash: Why the FTX Bubble Burst and the Harm to Consumers Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 117th Cong. (2022)...............................3

Crypto Exchange Disclosure Act, H. R. 9421, 117th Cong. (2022)................................4

Derek Saul, *Crypto Market Crosses $1 Trillion For First Time In Months As Bitcoin Recovers From FTX-Driven Crash,* Forbes (Jan. 16, 2023)....................................9

*Digital Assets and the Future of Finance: Examining the Benefits and Risks of a U.S. Central Bank Digital Currency Before the H. Comm. on Fin. Serv.*, 117th Cong. (2022) (May 26, 2022)............................................................3

*Digital Assets and the Future of Finance: The President's Working Group on Financial Markets' Report on Stablecoins Before the H. Comm. on Fin. Serv.*, 117th Cong. (2022) ...........................................................................3

Digital Commodities Consumer Protection Act of 2022, H.R.8730, 117th Cong. (2022)...................................................................................................4

Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022) .................4

Eliminate Barriers to Innovation Act of 2021, H.R. 1602, 117th Cong. (2021) .............4

*Examining Regulatory Frameworks for Digital Currencies and Blockchain Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 116th Cong. (2019) (statement of Rebecca N. Nelson, Specialist in Int'l Trade and Fin.), ...........................................6

Exec. Order No. 14067, 87 F.R. 14143 (2022)............................................................6, 8

FINMA, *Developments in FinTech* ...............................................................................6

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III Before the H. Comm. on Fin. Serv.*, 117th Cong. (2021) (statement of Gary Gensler, Chairman, Sec. and Exch. Comm'n) .........................9, 10

H. Comm. on Agric. and H. Comm. on Fin. Serv., *Why is Action Needed on Digital Assets Market Structure Legislation?* (July 20, 2023)...............................................4, 6

*Investigating the Collapse of FTX, Part I Before the H. Comm. on Fin. Serv.*, 117th Cong. (2022) .............................................................................................3

Joanna Ossinger, *Crypto World Hits $3 Trillion Market Cap as Ether, Bitcoin Gain,* Bloomberg (Nov. 8, 2021)............................................................................9

Julie Tsirkin, *Sen. Cynthia Lummis: Crypto Regulation Bill Could Prevent Another FTX-style Crisis,* NBC News (July 19, 2023) ...........................................................4

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

Kara McKenna Rollins, *Have the SEC's Delay Tactics Made Its Petition for Rulemaking Process Vulnerable to Challenge?  A Look at In re Coinbase Inc. and SEC's Nullification of 5 U.S.C. § 553(e) by Inaction,* Yale J. on Reg.: Notice & Comment Blog (May 3, 2023).......................................................................................12

Letter from Chairman Gensler to Sen. Warren (Aug. 5, 2021) .......................................3

Letter from Rep. Patrick McHenry to Chairwoman Maxine Waters (Jan. 24, 2022).....................3

Lewis Cohen *et al., The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022) ..................................................11

Michael P. Regan, *Laser Eyes Aglow on the US Presidential Campaign Trail,* Bloomberg, (Aug. 1, 2023)...........................................................................................9

Office of Senator Lummis, *What's New in Lummis-Gillibrand 2023* ...............................3

Press Release, Sen. Kirsten Gillibrand, Lummis, Gillibrand Reintroduce Comprehensive Legislation to Create Regulatory Framework for Crypto Assets (Jul. 12, 2023)......................................................................................................3

Press Release, Warren Davidson, Davidson Reintroduces Token Taxonomy Act (Mar. 9, 2021) .........................................................................................................4

*Protecting Investors and Savers: Understanding Scams and Risks in Crypto and Securities Markets Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 117th Cong. (2022) ........................................................................................................3

*Putting the 'Stable' in 'Stablecoins:' How Legislation Will Help Stablecoins Achieve Their Promise Before the H. Subcomm. on Digital Assets, Fin. Tech. and Inclusion of the H. Comm. on Fin. Serv.*, 118th Cong. (2023) .....................................3

Nikhilesh De, *SEC Chair Gensler Suggests Lummis-Gillibrand Bill May "Undermine" Market Protections*, Coindesk (Jun. 14, 2022)...................................3

Responsible Self-Regulation Act of 2022, S. 5286, 117th Cong. (2022) .......................4

Securities Clarity Act, H.R. 3572, 118th Cong. (2023)..................................................4

Securities Clarity Act, H.R. 4451, 117th Cong. (2021)..................................................4

Sen. Kirsten Gillibrand, *To Maintain America as the Financial Capital of the World, the Federal Government Needs to Encourage Innovation in the Digital Assets Markets and Protect Consumers Through Thoughtful Regulation. Here's How*, Medium (June 7, 2023)..........................................................................................6

Special Measures to Fight Modern Threats Act, H.R. 7128 and S. 3876, 117th Cong. (2022)...........................................................................................................4

Subcomm. on Digital Assets, Fin. Tech. and Inclusion (118th Congress)......................4

The Central Bank Digital Currency Study Act of 2021, H.R. 2211, 117th Cong. (2021)................................................................................................................4

The Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023) ...........................................................................................4, 5

*The Future of Digital Assets: Identifying the Regulatory Gaps in Digital Asset Market Structure Before the H. Comm. on Fin. Serv. & H. Comm. on Agric. Joint Subcomm.*, 118th Cong. (2023) .................................................................3

*The Future of Digital Assets: Measuring the Regulatory Gaps in the Digital Asset Markets Before the Joint Subcomm. of the H. Comm. on Fin. Serv. and the H. Comm. on Agric.*, 118th Cong. (2023)..........................................................3

*The Future of Digital Assets: Providing Clarity for Digital Asset Spot Markets: Hearing Before the H. Comm. on Agric.*, 118th Cong. (2023)..................................3

*The Future of Digital Assets: Providing Clarity for the Digital Asset Ecosystem Before the H. Comm. on Fin. Serv.*, 118th Cong. (2023) ...........................................3

*The Promises and Perils of Central Bank Digital Currencies Before the H. Comm. on Fin. Serv.*, 117th Cong. (2021) .....................................................................6

Token Taxonomy Act, H.R. 1628, 117th Cong. (2021) .....................................................4

*Understanding Stablecoins' Role in Payments and the Need for Legislation Before the H. Subcomm. On Digital Assets, Fin. Tech. and Inclusion of the H. Comm. on Fin. Serv.*, 118th Cong. (2023) ...............................................................3

*Understanding the Role of Digital Assets in Illicit Finance Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 117th Cong. (2022)..................................................3

U.S. Dep't of Commerce, *Responsible Advancement of U.S. Competitiveness in Digital Assets* (Sept. 2022) ...........................................................................9

U.S. Dep't of Justice, *The Report of the Attorney General Pursuant to Section 8(b)(iv) of Executive Order 14067: How to Strengthen International Law Enforcement Cooperation for Detecting, Investigating, And Prosecuting Criminal Activity Related to Digital Assets* (June 6, 2022)........................................6

U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019, H.R. 923, 116th Cong. (2019)...........................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

v

1

2

### INTERESTS OF *AMICUS CURIAE*

3

4

*Amicus curiae*, United States Senator Cynthia M. Lummis of Wyoming, is among the

principal crypto asset policy leaders in Congress and is a member of the Senate Committee on

5

Banking, Housing and Urban Affairs, which has jurisdiction over crypto assets and the U.S.

6

Securities and Exchange Commission (SEC).

7

Senator Lummis, alongside Senator Kirsten Gillibrand of New York, reintroduced the

8

bipartisan Lummis-Gillibrand Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023),

9

which is the most comprehensive, detailed crypto asset legislation introduced in Congress.  *Amicus*

10

seeks to draw the Court's attention to the numerous, bipartisan legislative efforts of Congress with

respect to crypto assets.

11

*Amicus* also has a special interest in upholding the Constitution's separation of powers by

12

ensuring that federal agencies do not exceed the authority conferred upon them or encroach upon

13

Congress's ongoing legislative efforts.  *Amicus* believes that the SEC's approach to enforcement in

14

this case and in the crypto asset industry more broadly contravenes that separation of powers.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PRELIMINARY STATEMENT**

2      The SEC brings this enforcement action against Payward ("Kraken") in the midst of debates

3  in the halls of Congress and around the world about how crypto assets should be regulated.  The

4  Constitution empowers the Congress—not the SEC—to legislate in such an area of profound

5  economic and political significance.

6      Congress and the SEC share a desire to protect investors and orderly markets.  Crypto asset

7  related concerns, however, are not confined to the securities markets, and the SEC is not their sole

8  protector.  Although the SEC seeks broad authority over crypto asset markets, most legislative

9  proposals in Congress would instead grant much of that authority to other agencies.  Unsatisfied, the

10 SEC seeks to circumvent the political process to commandeer that authority for itself.  To do so, the

11 SEC relies on a novel interpretation of two words—"investment contract"—nested in the definition

12 of "security" set forth 90 years ago in the Securities Act of 1933 and the Securities Exchange Act of

13 1934 (Exchange Act) (collectively, the Acts).  When Congress created the SEC to regulate

14 securities markets, it did not grant the SEC power to reimagine the definition of "securities" to

15 expand the agency's sphere of influence into other asset classes, or to encroach on other agencies

16 and regulatory schemes.  The SEC's attempt to shoehorn an entire new class of assets into the

17 existing definition of a "security," and thereby add to the definition enumerated by Congress,

18 exceeds the SEC's authority, encroaches on Congress's lawmaking, and contravenes the separation

19 of powers.

20     The SEC cannot legislate by enforcement.

21

**ARGUMENT**

22     This is no run-of-the-mill enforcement case.  Through this case the SEC seeks primary

23 influence over economic, political, and legal questions under active consideration by Congress and

24 multiple agencies.

25     *Amicus* submits this brief to highlight: (i) the important questions implicated here, which are

26 properly before Congress right now; and (ii) the fundamental separation-of-powers principles that

27

28

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

1  weigh strongly in favor of deferring to Congress rather than adopting the SEC's novel and

2  expansive view of its own authority.

3

4  **I.     THE SEC'S ENFORCEMENT STANCE IN THIS ACTION RUNS COUNTER TO ONGOING LEGISLATIVE EFFORTS.**

5       Crypto asset regulation is a Congressional priority and momentum currently exists toward

6  the passage of a balanced framework that promotes responsible innovation and protects consumers.[1]

7  Both the House and Senate are actively considering how the United States should classify and

8  regulate this emerging class of crypto assets, as reflected in numerous hearings.[2]  In so doing,

9  Congress is weighing views of the SEC among myriad other equally important perspectives.[3]

10

11  [1] *See, e.g.*, Press Release, Kirsten Gillibrand, Lummis, Gillibrand Reintroduce Comprehensive Legislation To Create Regulatory Framework For Crypto Assets, (July 12, 2023), https://tinyurl.com/35vfxjkp ("[Senator Lummis and I] will make passing this bipartisan legislation a priority in this Congress."); Letter from Rep. Patrick McHenry to

12  Chairwoman Maxine Waters (Jan. 24, 2022), https://tinyurl.com/2aed92n9 ("I believe it is critical that we thoroughly review the current environment and prioritize the issues [around digital assets] that must be addressed.").

13  [2] Since January 2022, the Senate Committee on Banking, Housing and Urban Affairs and the House

14  Committee on Financial Services have held multiple hearings solely dedicated to examining the role of digital assets in the U.S. economy and potential legislation to address their regulation.  *See, e.g., Crypto Crash: Why Financial System Safeguards are Needed for Digital Assets Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 118th Cong. (2023);

15  *Crypto Crash: Why the FTX Bubble Burst and the Harm to Consumers Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 117th Cong. (2022); *Investigating the Collapse of FTX, Part I Before the H. Comm. on Fin. Serv.*, 117th

16  Cong. (2022); *Protecting Investors and Savers: Understanding Scams and Risks in Crypto and Securities Markets Before the S. Comm. on Banking, Hous., and Urb. Aff.*, 117th Cong. (2022); *The Future of Digital Assets: Providing*

17  *Clarity for the Digital Asset Ecosystem Before the H. Comm. on Fin. Serv.*, 118th Cong. (2023); *Putting the 'Stable' in 'Stablecoins:' How Legislation Will Help Stablecoins Achieve Their Promise Before the H. Subcomm. on Digital Assets,*

18  *Fin. Tech. and Inclusion of the H. Comm. on Fin. Serv.*, 118th Cong. (2023); *The Future of Digital Assets: Measuring the Regulatory Gaps in the Digital Asset Markets Before the H. Comm. On Fin. Serv. & H. Comm. on Agric. Joint*

19  *Subcomm.*, 118th Cong. (2023)); *The Future of Digital Assets: Identifying the Regulatory Gaps in Digital Asset Market Structure Before the H. Comm. on Fin. Serv. & H. Comm. on Agric. Joint Subcomm.*, 118th Cong. (2023);

20  *Understanding Stablecoins' Role in Payments and the Need for Legislation Before the H. Subcomm. On Digital Assets, Fin. Tech. and Inclusion of the H. Comm. on Fin. Serv.*, 118th Cong. (2023); *Coincidence or Coordinated? The*

21  *Administration's Attack on the Digital Asset Ecosystem Before the H. Subcomm. on Digital Assets, Fin. Tech. and Inclusion of the H. Comm. on Fin. Serv.*, 118th Cong. (2023); *Digital Assets and the Future of Finance: Examining the*

22  *Benefits and Risks of a U.S. Central Bank Digital Currency Before the H. Comm. on Fin. Serv.,* 117th Cong. (2022) (May 26, 2022); *Understanding the Role of Digital Assets in Illicit Finance Before the S. Comm. on Banking, Hous.,*

23  *and Urb. Aff.*, 117th Cong. (2022); *Digital Assets and the Future of Finance: The President's Working Group on Financial Markets' Report on Stablecoins Before the H. Comm. on Fin. Serv.*, 117th Cong. (2022).

24  [3] The SEC provided early feedback on the RFIA, *see* Office of Senator Cynthia Lummis, What's New in *Lummis-Gillibrand 2023*, https://tinyurl.com/56598c67, and Chair Gensler publicly commented on the proposal, *see* Nikhilesh De,

25  *SEC Chair Gensler Suggests Lummis-Gillbrand Bill May "Undermine" Market Protections*, Coindesk (Jun. 14, 2022), https://tinyurl.com/2nm99cyt. *See also* Letter from Chairman Gensler to Sen. Warren, (Aug. 5, 2021),

26  https://tinyurl.com/4ym4fbu6 (responding to a request for information concerning the sufficiency of existing SEC authority by stating that "we need additional authorities to prevent transactions, products, and platforms from falling

27  between regulatory cracks" and that "Regulators would benefit from additional plenary authority to write rules for and attach guardrails to crypto trading and lending."); *see also, e.g.*, *The Future of Digital Assets: Providing Clarity for Digital*

28

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

1    Through these efforts, it is clear that existing law is inadequate to the task of addressing crypto

2    assets.[4]

3         The SEC's assertion of authority in this case is out of step with active legislative efforts.

4    Congress has introduced various bills to address the role of various federal agencies in the

5    regulation of crypto assets.[5]  The House has also established a subcommittee dedicated specifically

6    to crypto regulation.[6]  While some pending bills may be different, the SEC's expansive, novel

7    interpretation of its own authority is inconsistent with most of the pending bills.[7]  For example:

8         1.    On July 12, 2023, *amicus* Senator Lummis and Senator Kirsten Gillibrand introduced

9    the Responsible Financial Innovation Act (RFIA), S. 2281, 118th Cong. (2023).  This bipartisan bill

10   takes comprehensive steps to regulate the industry and impose consumer protections, and carefully

11   delineates the roles of the SEC and the U.S. Commodity Futures Trading Commission (CFTC).  It

---

*Asset Spot Markets: Hearing Before the H. Comm. On Agric*., 118th Cong. (2023) (statement of Rostin Benham, Chairman, Commodity Futures Trading Comm'n), https://tinyurl.com/47w447p5 (highlighting "the need for Congressional action to address the lack of federal regulation over the digital commodity market.").

[4] *See* Julie Tsirkin, *Sen. Cynthia Lummis: Crypto Regulation Bill Could Prevent Another FTX-Style Crisis*, NBC News (July 19, 2023), https://tinyurl.com/k44cjcah (Senator Lummis: "Companies like Kraken and Coinbase have gone to the SEC and asked them to be clear and lay out the regulatory requirements that the SEC believes should apply to them. And they're frustrated because they feel like they were trying to comply, but instead some of them got enforcement actions slapped on them"); H. Comm. on Agric. and H. Comm. on Fin. Serv., *Why is Action Needed on Digital Assets Market Structure Legislation?*  (July 20, 2023) https://tinyurl.com/34v9hypz ("Until there is a consistent, clear framework in place, market participants, consumers, and investors will continue to seek regulatory clarity given the requirements that stem from the classification of a particular digital asset"); Press Release, Warren Davidson, Davidson Reintroduces Token Taxonomy Act (Mar. 9, 2021), https://tinyurl.com/45df3rup (stating "a patchwork of laws and regulations creates confusion and even hostility to various blockchain businesses.").

[5] *See, e.g*., Responsible Financial Innovation Act, S. 2281, 118th Cong. (2023); Clarity for the Payment Stablecoins Act of 2023, H.R. 4766, 118th Cong. (2023); The Financial Innovation and Technology for the 21st Century Act, H.R. 4763, 118th Cong. (2023); Securities Clarity Act, H.R. 3572, 118th Cong. (2023); Blockchain Regulatory Certainty Act, H.R.1747, 118th Cong. (2023).  At least 50 measures relating to cryptocurrency, blockchain, and central bank digital currency were introduced during the 117th Congress.  *See e.g*., Responsible Self-Regulation Act of 2022, S. 5286, 117th Cong. (2022); Crypto Exchange Disclosure Act, H.R. 9421, 117th Cong. (2022); Digital Commodities Consumer Protection Act of 2022, H.R. 8730, 117th Cong. (2022); Special Measures to Fight Modern Threats Act, H.R. 7128 and S. 3876, 117th Cong. (2022); Digital Asset Market Structure and Investor Protection Act, S. 5030 117th Cong. (2022); ; Digital Trading Clarity Act of 2022, S. 5030, 117th Cong. (2022) ; Digital Commodity Exchange Act of 2022, H.R. 7614, 117th Cong. (2022); Securities Clarity Act, H.R. 4451, 117th Cong. (2021); The Central Bank Digital Currency Study Act of 2021, H.R. 2211, 117th Cong. (2021); Token Taxonomy Act, H.R. 1628, 117th Cong. (2021); Eliminate Barriers to Innovation Act of 2021, H.R. 1602, 117th Cong. (2021); U.S. Virtual Currency Market and Regulatory Competitiveness Act of 2019, H.R. 923, 116th Cong. (2019); Crypto-Currency Act of 2020, H.R. 6154, 116th Cong. (2020).

[6] *See* Subcomm. on Digital Assets, Fin. Tech. and Inclusion (118th Congress), https://tinyurl.com/mr3ut7yw.

[7] *Cf. Food & Drug Admin. v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 144 (2000) (noting that it is telling when Congress has "considered and rejected" bills authorizing or endorsing something akin to the agency's proposed course of action).

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

recognizes that many initial sales of tokens may be investment contract transactions subject to SEC

oversight, but also recognizes that the underlying crypto assets themselves are typically

commodities and thus requires crypto asset exchanges to register with the CFTC.  The legislation

also grants the SEC significant new disclosure authority over crypto assets.  The bill also

appropriates $1.4 billion in additional funding over the next five years to the CFTC, SEC, the U.S.

Department of the Treasury, and other agencies.

2.       On July 10, 2023, Representative Glenn Thompson, Chair of the House Committee

on Agriculture, and Representative French Hill introduced The Financial Innovation and

Technology for the 21st Century Act (FIT21), H.R. 4763, 118th Cong. (2023).  Two weeks later,

bipartisan majorities of both the House Committee on Financial Services and the House Committee

on Agriculture voted to advance FIT21 to the House floor for consideration.  FIT21 provides the

CFTC with primary jurisdiction over crypto assets and clarifies the circumstances under which such

assets would fall under SEC's jurisdiction.  It would also establish a digital commodity exchange

framework that would serve as a vehicle for important consumer protections.

3.       On August 3, 2022, Senators Debbie Stabenow and John Boozman introduced the

Digital Commodities Consumer Protection Act of 2022 (DCCPA), S. 4760, 117th Cong. (2022).

The DCCPA grants exclusive authority to the CFTC over activities involving digital commodities

while excluding securities and stablecoins backed by the full-faith and credit of the United States.  It

creates a new registration regime for all "digital commodity platforms" under the Commodity

Exchange Act, 7 U.S.C. § 1a *et seq.*, and designates a set of "core principles" that platforms must

follow to provide important safeguards.[8]

Each of these bills recognizes that the crypto industry does not fit entirely within existing

securities laws and transcends the current statutory powers of the SEC.  The multitude of interests at

stake require a holistic approach beyond the scope of a single agency, including approaches taken

---

[8] On July 27, 2023, the House Financial Services Committee advanced out of committee by a bipartisan vote the Clarity for Payment Stablecoins Act of 2023, introduced by Chairman Patrick McHenry, which recognizes several regulatory paths for approving and regulating stablecoin issuers while ensuring protections for consumers.  H.R. 4766, 118th Cong. (2023).

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

1   around the world.  Congress is attuned to these important considerations.[9]  And, in its investigative

2   and fact-gathering functions, Congress has heard testimony from numerous experts on these

3   issues.[10]

4        Meanwhile, the SEC's treatment of virtually all crypto assets as securities, and subjecting

5   them to all the requirements of existing securities laws, is inconsistent with the approaches being

6   taken in other jurisdictions.  For example, Swiss regulations distinguish between three separate

7   categories of tokens (payment tokens, utility tokens, and asset tokens),[11] many of which the SEC

8   would sweep into its broad definition of crypto asset securities.  The European Parliament,

9   meanwhile, has passed its Markets in Crypto Assets Regulation that introduces a disclosure regime

10  for crypto asset issuers similar to securities regulation, but adapted to the distinct features of digital

11  assets and without need to classify the tokens as securities, much in the vein of the Lummis-

12  Gillibrand legislation's "ancillary asset" approach.[12]

13

14

15  [9] *See* Sen. Kirsten Gillibrand, *To Maintain America as the Financial Capital of the World, the Federal
16  Government Needs to Encourage Innovation in the Digital Assets Markets and Protect Consumers Through Thoughtful
    Regulation. Here's How*, Medium (June 7, 2023), https://tinyurl.com/4bvnvbwx (recognizing that without "a clear and
17  defined regulatory framework to guide their businesses practices, digital asset companies could be compelled to take their
    operations overseas"); H. Comm. on Agric. and H. Comm. on Fin. Serv., *Why is Action Needed on Digital Assets Market
18  Structure Legislation?* (July 20, 2023), https://tinyurl.com/34v9hypz (cautioning that "entrepreneurs are warning against
    doing business in the United States because of a lack of structure and are advocating for digital asset companies to move
    offshore" underscoring "the need for Congress to act").

19      On these points, Congress is not alone.  In March 2022, the White House issued an Executive Order recognizing
20  that the "growing development and adoption of digital assets and related innovations . . . necessitate an evolution and
    alignment of the United States Government approach to digital assets."  Exec. Order No. 14067, 87 F.R. 14143 (2022),
21  https://tinyurl.com/mttbeenp (calling for a coordinated interagency process to evaluate and report on a variety of
    government interests and policy considerations, including concerns for consumer protection and market stability with the
    United States' "interest in ensuring that it remains at the forefront of responsible development and design of digital assets
22  and the technology that underpins new forms of payments and capital flows in the international financial system").

23  [10] *See, e.g.*, *Examining Regulatory Frameworks for Digital Currencies and Blockchain Before the S. Comm. on
    Banking, Hous., and Urb. Aff.,* 116th Cong. (2019) (statement of Rebecca N. Nelson, Specialist in Int'l Trade and Fin.),
24  https://tinyurl.com/3nxm3xd2; *The Promises and Perils of Central Bank Digital Currencies Before the H. Comm. on Fin.
    Serv.*, 117th Cong. (2021), https://tinyurl.com/techr67c; *accord* U.S. Dep't of Justice, *The Report of the Attorney General
    Pursuant to Section 8(b)(iv) of Executive Order 14067: How To Strengthen International Law Enforcement Cooperation
25  For Detecting, Investigating, And Prosecuting Criminal Activity Related To Digital Assets*, (June 6, 2022),
    https://www.justice.gov/ag/page/file/1510931/download (recognizing that "[d]ifferences in the substantive treatment or
26  regulation of digital assets across legal systems . . . may complicate the ability or willingness of foreign partners to assist
    in U.S. investigations").

27  [11] FINMA, Developments in FinTech, https://tinyurl.com/4p7uu8b6 (last visited Aug. 11, 2023).

28  [12] Commission Regulation 2023/1114, art. 6, 2023 O.J. (L150/40) ¶ 1, https://tinyurl.com/2p9yps9s.

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

1
2
3
4
5
6
7
8
9
10

The SEC is not suited to the task of crafting a holistic regulatory framework for crypto assets, particularly through a judicial enforcement action (where neither the SEC nor this Court is positioned to grapple with the unintended consequences of the SEC's current enforcement stance, and the policy implications of its novel legal position).  Such policymaking is precisely the role the Constitution assigns to Congress.  Where a balancing of economic factors and trade-offs must occur, the People's elected representatives are "entitled to weigh the relevant 'political and economic' costs and benefits for themselves . . . ."  *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142, 1160 (2023).  The SEC should not "displace the cost benefit analyses inherent in democratically adopted legislation," *id.*, with its own enforcement agenda premised on tenuous authority.

11
12

**II.     THE SEC'S ATTEMPT TO TREAT CRYPTO ASSETS, THEMSELVES, AS SECURITIES IMPROPERLY EXPANDS THE STATUTORY DEFINITION OF "SECURITIES" AND VIOLATES THE SEPARATION OF POWERS.**

13
14
15
16
17
18

As Congress advances legislation governing crypto assets, this Court should reject the SEC's novel effort to expand its own reach by reading into the term "investment contract" a lurking power to import a new asset class into the definition of a security.  "Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line."  *W. Virginia v. Env't Prot. Agency*, 142 S. Ct. 2587, 2609 (2022) (internal quotation marks and citation omitted).

19
20
21
22
23
24
25
26

Whether dubbed "the major questions doctrine" or basic preservation of the separation of powers, Congress has not conferred on the SEC wholesale regulatory power over this industry, and accepting the SEC's theory encroaches on Congress's legislative role.  This agency action should therefore be treated with skepticism.  *Util. Air Regul. Grp. v. Env't Prot. Agency*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy," courts have long "greet[ed] its announcement with a measure of skepticism.") (quoting *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 123 (2000)).

27
28

1    Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of

2  vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,

3  141 S. Ct. 2485, 2489 (2021) (internal quotation marks omitted).  Under the "major questions

4  doctrine," courts are "reluctant to read into ambiguous statutory text the delegation claimed to be

5  lurking there" in "extraordinary cases . . . in which the history and the breadth of the authority that

6  the agency has asserted, and the economic and political significance of that assertion, provide a

7  reason to hesitate before concluding that Congress meant to confer such authority."  *West Virginia*,

8  142 S. Ct. at 2608–09 (internal quotation marks and citations omitted).  In such cases "separation of

9  powers principles and a practical understanding of legislative intent" require an agency to point to

10  "clear congressional authorization for the power it claims."  *Id.* at 2609 (internal quotation marks

11  and citation omitted).

12    Both pillars of the major questions doctrine favor judicial caution here: (1) there is vast

13  economic and political significance to the SEC's assertion of authority to define crypto assets as

14  securities, and (2) Congress did not speak clearly to confer such power on the SEC.

15    On the first pillar, regulation of crypto assets is a matter of great economic and political

16  significance.  It is the subject of dozens of recent Congressional hearings and legislative proposals.

17  *See* Section I, *supra*.  An Executive Order calling for a wide-ranging interagency response

18  recognizes the "profound implications" for interests such as financial stability and national

19  security.[13]  A multiplicity of reports from numerous corners of the government and private sector

20

21

22

23

24

25    [13] Exec. Order No. 14067, 87 F.R. 14143 (2022), https://tinyurl.com/mttbeenp (calling for a broad interagency

26  response in recognition of the "dramatic growth in markets for digital assets, with profound implications for the protection of consumers, investors, and businesses, including data privacy and security; financial stability and systemic risk; crime;

27  national security; the ability to exercise human rights; financial inclusion and equity; and energy demand and climate change.").

28

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

8

1    are focused on the issue.[14]  And regulation of the crypto industry is a platform issue for those

2    running for public office.[15]  Few economic issues command more political attention today.

3           By the numbers, crypto assets alone have been valued between $1 trillion and $3 trillion,

4    which accounts for just one aspect of a broad and growing marketplace including scores of private

5    and public companies, like Kraken, and their employees that the SEC seeks to pull into its

6    regulatory orbit along with the assets themselves.  And in a report published in November 2021, the

7    Pew Research Center estimated that 16% of Americans had invested in, traded, or used

8    cryptocurrency.[16]  The Supreme Court recently held that the Secretary of Education's effort to

9    release borrowers from their obligations to repay $430 billion in student loans was a matter of

10   "economic and political significance" which merited judicial hesitation "before concluding that

11   Congress meant to confer such authority."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2372 (2023)

12   (internal quotation marks and citations omitted).  If $430 billion in student loans is a matter of

13   "economic and political significance" meriting judicial hesitation, so too is a multitrillion-dollar

14   industry in which 16% of Americans participate.

15          The largest financial institutions in the world have recognized that regulating crypto asset

16   markets will impact every quarter of finance. The CEO of Blackrock, the world's largest asset

17   manager (with over $9 trillion under management), has said crypto assets will be "the next

18   generation for markets."[17]  Moreover, the CEO of JP Morgan Chase (largest U.S. bank with over $3

19

20          [14] *See supra* notes 4 & 9.  *See also* U.S. Dep't of Com., *Responsible Advancement of U.S. Competitiveness In Digital
21   Assets*, (Sept. 2022), https://tinyurl.com/2p9htyp7 (noting that digital assets present "tangible risks to the soundness and
     stability of the US financial system and, if unaddressed, could affect the United States' position in the global financial
     system").

22          [15] *See* Michel P. Regan, *Laser Eyes Aglow on the US Presidential Campaign Trail*, Bloomberg, (Aug. 1, 2023),
23   https://tinyurl.com/25umpypt.

             [16] *See* Joanna Ossinger, *Crypto World Hits $3 Trillion Market Cap as Ether, Bitcoin Gain*, Bloomberg (Nov. 8,
24   2021); Derek Saul, *Crypto Market Crosses $1 Trillion For First Time in Months As Bitcoin Recovers From FTX-Driven
     Crash*, Forbes (Jan. 16, 2023); *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail
25   Investors Collide, Part III Before the H. Comm. on Fin. Serv*., 117th Cong. (2021) (statement of Gary Gensler, Chairman,
     Sec. and Exch. Comm'n), https://tinyurl.com/mtrnkbn2; Andrew Perrin, *16% of Americans Say They Have Ever Invested
26   In, Traded or Used Cryptocurrency,* Pew Resch. Ctr. (Nov. 11, 2021), https://tinyurl.com/2p9fnjys.

             [17] *See, e.g.,* David G.W. Birch, *Larry Fink Says Tokens are "The Next Generation for Markets,"* FORBES, Mar.
27   1, 2023, https://www.forbes.com/sites/davidbirch/2023/03/01/larry-fink-says-tokens-are-the-next-generation-for-
     markets/?sh=f1f59687bb1b.

28   ***PROPOSED AMICUS BRIEF***
     ***CASE NO. 3:23-CV-6003-WHO***

1    trillion in assets), has also said that his bank should be "scared" of the fintech competitors and that

2    "decentralized finance and blockchain are real."[18]

3    And the SEC's position sweeps further still.  If the SEC has the power to graft its view of an

4    investment transaction onto non-security financial assets themselves, the same reasoning could

5    apply to other asset classes for which a secondary market develops.  On the second pillar, nowhere

6    do the securities laws clearly grant the SEC authority over crypto assets.  Nor do the Acts grant

7    authority to add to the enumerated definition of "securities" set forth by Congress.  To be clear:

8    Congress has reserved for itself—not the SEC—the fundamental task of determining what type of

9    assets fall within the SEC's purview, and Congress is the appropriate body to set forth a framework

10   for regulating crypto assets.[19]  Congress may decide to grant that authority to the SEC, in whole or

11   in part, but that is a decision Congress must make and that the SEC cannot prematurely usurp for

12   itself.

13   The SEC's assertion of power over crypto asset secondary markets—which it reaches by

14   treating crypto assets themselves as securities—is a novel departure from the existing definition of a

15   "security" established by Congress.  As the SEC Chair acknowledged not long ago, "it is only

16   Congress that could really address it" because "[r]ight now, there is not a market regulator around

17   these crypto exchanges."[20]

18   The SEC continues to depart from its prior, well-established position to bring this

19   enforcement action against Kraken.  It does so by labelling crypto assets themselves as securities.

20   *See, e.g.*, ECF 1, Complaint ¶¶ 1, 228-445.  To do so, the SEC relies on the *Howey* test, to assert

21   that the crypto assets are (or can be treated as) investment contracts.  *Id.* at ¶¶ 4, 16.

22

23   [18] *See, e.g., Chairman & CEO Letter to Shareholders*, JP MORGAN CHASE, https://reports.jpmorganchase.com/investor-relations/2021/ar-ceo-letters.htm (last visited Feb. 27, 2024); Luisa Beltran,

24   *JP Morgan CEO Jamie Dimon Warned About the Threat for Fintechs 2 Years Ago, Some 80 Deals Later, Here's How their Acquisition Strategy is Unfolding*, YAHOO FINANCE, Apr. 25, 2023, https://finance.yahoo.com/news/jpmorgan-ceo-jamie-dimon-warned-100000173.html.

25   [19] Even if Congress ultimately selects a bill that confers on the SEC broad powers over the crypto industry, it is

26   by virtue of Congress conferring that power on the SEC—not the SEC assumption of that power onto itself—that the SEC would have authority to act.

27   [20] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III: Hearing Before the H. Comm. on Fin. Serv.,* 117th Cong. (2021) (statement of Chairman Gary Gensler, Securities

28   and Exchange Commission), https://tinyurl.com/mtrnkbn2.

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

1    This is an unprecedented use of the *Howey* test, which has not been broadly accepted to

2  capture assets that do not confer or create a recognizable legal interest in a business entity, like debt,

3  equity or a liquidation preference, even as part of a broader "contract, transaction, scheme" that is

4  itself an investment contract.  As early as 2022, leading practitioners published scholarship

5  concluding that the SEC's novel attempt to use *Howey* to construe that a non-security asset itself is

6  an "investment contract" (even when traded in secondary markets where the purchaser has no legal

7  relationship to any person or entity that was initially allocated the asset) was unprecedented in the

8  decades-long history of *Howey*. *See* Lewis Cohen *et al.*, *The Ineluctable Modality of Securities*

9  *Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022), https://tinyurl.com/y6sfurf6.

10  Specifically, having reviewed 266 *Howey* cases over the last seven decades, which constitutes all

11  relevant federal appellate and Supreme Court *Howey* cases, the authors concluded that:

> The one critical quality that can be found across each of the enumerated categories is
> the presence of a *legal relationship* volitionally established by an identifiable legal
> entity that acts as the issuer of the security and the various other parties who . . . are
> owners of that security.[21]

15  The SEC's novel interpretation would also create the first class of issuer-independent

16  securities—*i.e.* securities that do not carry any legal relationship to any identifiable issuer capable

17  of complying with the Federal securities laws, *id.*—a concept that Congress has not sanctioned.

19    Prior to filing its Complaint, this position was known to the SEC, who favorably cited the

20  works underlying the Cohen article in their briefing for *SEC v. Ripple Labs, et al.*[22] The article's

21  core conclusion rejecting the SEC's "embodiment theory" (*i.e.,* that a crypto asset somehow

22  "embodies" or "represents" an "ecosystem") was subsequently recognized by Judge Torres of the

23  Southern District of New York in her summary judgement order in *Ripple Labs*, where the Court

24  stated:

---

[21] *See Ineluctable Modality*, at 63 (emphasis in original).

[22] *See SEC v. Ripple Labs Inc.*, No. 1:20-cv-10832, Reply Memorandum of Law in Support of Motion for Summary Judgment against all Defendants, ECF 730, at 28 (December 2, 2022) (where SEC cited the amicus brief filed by Paradigm Operations LP in the case and characterized it as follows: "noting that application of *Howey* to XRP transactions is 'not new'").

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

XRP, as a digital token, is not in and of itself a "contract, transaction[,] or scheme" that *embodies* the *Howey* requirements of an investment contract. Rather, the Court examines the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP. *See Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.").[23]

Nevertheless, the SEC continues to assert this unsubstantiated and, ultimately, unworkable theory to bring this action against Kraken. The SEC's departure from longstanding interpretations of the term "investment contract" and from definition of "security" as legislated by Congress is precisely the sort of "transformative expansion" of the SEC's "regulatory authority" that triggers judicial skepticism as set forth in *West Virginia*. 142 S. Ct. at 2610 (internal quotation marks and citation omitted). Allowing the SEC to expand the definition of a "security" would encroach on Congress's role and "effect a fundamental revision of the" Exchange Act, "changing it from one sort of scheme of regulation into an entirely different kind." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (internal quotation marks, citations, and alterations omitted). The SEC is improperly "seizing the power of the Legislature" by asserting authority over all crypto assets. *Id.*

There is a reason the Constitution favors legislation over agency enforcement actions. A statutory framework balances competing interests and provides both fair warning of obligations and a meaningful opportunity for compliance. Relying on enforcement actions, by contrast, gives little forewarning and scares away good actors in the process.[24] "[W]hen it comes to the Nation's policy, the Constitution gives Congress the reins." *Nebraska*, 143 S. Ct. at 2381 (Barrett, J., concurring).

\*      \*      \*

---

[23] *SEC v. Ripple Labs Inc., et al.*, 2023 U.S. Dist. LEXIS 120486, at \*24 (S.D.N.Y. 2023) (emphasis added).

[24] Even setting aside the fact that Congress did not clearly grant the SEC authorization to regulate secondary crypto markets, the SEC has been criticized for jumping to enforcement while reneging its role to set forth clear regulation. *See* Kara McKenna Rollins, *Have the SEC's Delay Tactics Made Its Petition for Rulemaking Process Vulnerable to Challenge? A Look at In re Coinbase Inc. and SEC's Nullification of 5 U.S.C. § 553(e) by Inaction*, Yale J. on Reg.: Notice & Comment Blog (May 3, 2023) (explaining that the SEC has received five petitions for rulemaking in the last five years seeking clarity on the cryptoeconomy, and the SEC has neglected to act on all five); *accord In re Coinbase, Inc.*, No. 23-1779 (3d Cir. Jun. 20, 2023) (retaining jurisdiction over mandamus petition seeking rulemaking).

***PROPOSED AMICUS BRIEF***
***CASE NO. 3:23-CV-6003-WHO***

1

2

3

"Because the Constitution vests Congress with '[a]ll legislative Powers,' Art. I, § 1, a reasonable interpreter would expect it to make the big-time policy calls itself, rather than pawning them off to another branch." *Nebraska*, 143 S. Ct. at 2380 (Barrett, J., concurring).

4

5

6

7

8

9

10

As the Supreme Court explained, courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *West Virginia*, 142 S. Ct. at 2609 (internal quotation marks omitted).  Under the SEC's approach, the agency would jump ahead of Congress.  *Amicus* asks this Court to resist the siren song of a regulatory agency seeking to expand its authority (under the auspices of investor protection) at the expense of the separation of powers. *Id.* ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.") (internal quotation marks, citation, and alteration omitted).

11

## CONCLUSION

12

13

14

15

For the reasons discussed above, this Court should decline the SEC's novel effort to regulate crypto asset secondary markets on the theory that crypto assets are securities, and defer to Congress to enact a proper regulatory scheme.

Kraken's Motion to Dismiss (ECF 25) should be granted.

16

17

Dated:  February XX, 2024

18

19

20

21

22

23

24

25

26

27

Respectfully submitted,

UNITED STATES SENATOR
CYNTHIA M. LUMMIS

By:  /s/ *Chris Land*

CHRIS LAND (Wyo. Bar #7-6006)
UNITED STATES SENATE
Office of United States Senator Cynthia M. Lummis
127A Russell Senate Office Building
Washington, DC 20510

Tel: (202) 224-3424
chris_land@lummis.senate.gov

*Counsel for Amicus Curiae*

28

*PROPOSED AMICUS BRIEF*
*CASE NO. 3:23-CV-6003-WHO*

13

1

## **CERTIFICATE OF SERVICE**

2

The undersigned hereby certifies that a copy of the foregoing document was filed on February

3

XX, 2024, with the Clerk of the Court by using the CM/ECF system, which will effect electronic

4

service on all parties and attorneys registered to receive notifications via the CM/ECF system.

5

Dated:  February XX, 2024                                            By: ____/s/ *Chris Land*

6
                                                                                              Chris Land

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28