# EXHIBIT A

**ORRICK, HERRINGTON & SUTCLIFFE LLP**
STEPHEN A. CAZARES (SBN 201864)          DANIEL S. KIM (SBN 254679)
scazares@orrick.com                                        dan.kim@orrick.com
The Orrick Building                                         631 Wilshire Boulevard
405 Howard Street                                          Suite 2-C
San Francisco, California 94105-2669          Santa Monica, California 90401
Telephone: (415) 773-5700                            Telephone: (310) 633-2803
Facsimile: (415) 773-5759

**KIRK & INGRAM, LLP**
MICHAEL W. INGRAM (SBN 310119)       DAVID E. KIRK (*pro hac vice* filed)
mingram@kirkingram.com                            dkirk@kirkingram.com
100 Wilshire Blvd., Suite 700                        43 West 43rd St., Suite 279
Santa Monica, California 90401                      New York, New York 10036
Telephone: (310) 487-0270                            Tel: (212) 859-3504

Attorneys for *Amicus Curiae*
INVESTOR CHOICE ADVOCATES NETWORK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | CASE NO. 3:23-cv-06003-WHO |
| Plaintiff, | **BRIEF FOR AMICUS CURIAE INVESTOR CHOICE ADVOCATES NETWORK IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| vs. | |
| PAYWARD, INC. and PAYWARD VENTURES, INC., | Date:     June 12, 2024 |
| Defendants. | Time:     2:00 p.m. |
| | Judge:    Hon. William H. Orrick |

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

I.    A WELL-SETTLED MEANING OF "INVESTMENT CONTRACT" BASED ON STATE BLUE SKY LAWS INFORMED THE FEDERAL DEFINITION AND REQUIRED A CONTRACTUAL UNDERTAKING TO DELIVER FUTURE VALUE. ................................................. 2

II.    ABSENT A CONTRACTUAL RELATIONSHIP, STATEMENTS ABOUT A DIGITAL ASSET CANNOT TRANSFORM IT INTO AN INVESTMENT CONTRACT. ...................................................................................................... 5

    A.    Investors cannot reasonably expect a profit based on public statements unaccompanied by a contractual relationship. .................................... 6

    B.    The SEC's position would lead to unpredictable applications of the securities laws and chill important commercial speech about assets. ............................................................................. 9

III.    A DIGITAL ASSET'S INHERENT CHARACTERISTICS CANNOT TRANSFORM IT INTO AN INVESTMENT CONTRACT. ................................... 11

    A.    A digital asset's scarcity or depleting supply does not transform it into an investment contract. ........................................... 11

    B.    The ability to generate yield cannot transform a digital asset into an investment contract. ...................................................... 12

CONCLUSION ............................................................................................................. 15

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) .................................................................................................. 9, 11

*Am. Meat Inst. v. U.S. Dep't of Agric.*,
760 F.3d 18 (D.C. Cir. 2014) ........................................................................................ 10

*Bobrowski v. Red Door Grp.*,
2011 WL 3555712 (D. Ariz. Aug. 11, 2011) ................................................................ 13

*Boykin v. K12, Inc.*,
54 F.4th 175 (4th Cir. 2022) ........................................................................................... 8

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ....................................................................................... 8

*Chamber of Commerce of the United States of America v. SEC*,
412 F.3d 133 (D.C. Cir. 2005) ....................................................................................... 14

*Counterman v. Colorado*,
600 U.S. 66 (2023) ......................................................................................................... 10

*Ibanez v. Florida Department of Business and Professional Regulation*
512 U.S. 136, 146 (1994) ............................................................................................... 10

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) .......................................................................................... 8

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
608 F.2d 1297 (9th Cir. 1979) .......................................................................................... 7

*Detroit Gen. Ret. Sys. v. Medtronic, Inc.*,
621 F.3d 800 (8th Cir. 2010) ............................................................................................ 8

*Harman v. Harper*,
914 F.2d 262, 1990 WL 121073 (9th Cir. 1990) (unpublished opinion) ........................... 7

*Ibanez v. Fla. Dep't of Bus. & Pro. Regul., Bd. of Acct.*,
512 U.S. 136 (1994) ........................................................................................................ 10

*Key Equity Invs., Inc. v. Sel-Leb Mktg. Inc.*,
246 F. App'x 780 (3d Cir. 2007) ...................................................................................... 8

*Kong v. Fluidigm Corp.*,
2023 WL 2134394 (9th Cir. Feb. 21, 2023) ..................................................................... 8

*Lehman Bros. Commercial Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
179 F. Supp. 2d 159 (S.D.N.Y. 2001) .............................................................................. 12

*Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*,
   39 F.4th 1092 (9th Cir. 2022) ................................................................................................. 8

*Marsh Grp. v. Prime Retail, Inc.*,
   46 F. App'x 140 (4th Cir. 2002) ........................................................................................... 8, 9

*Noa v. Key Futures, Inc.*,
   638 F.2d 77 (9th Cir. 1980) ................................................................................................. 12

*Raab v. Gen. Physics Corp.*,
   4 F.3d 286 (4th Cir. 1993) .................................................................................................... 8

*Revak v. SEC Realty Corp.*,
   18 F.3d 81 (2d Cir. 1994) .................................................................................................... 13

*Rodriguez v. Banco Cent. Corp.*,
   990 F.2d 7 (1st Cir. 1993) ..................................................................................................... 7

*Sakkal v. Anaplan Inc.*,
   557 F. Supp. 3d 988 (N.D. Cal. 2021) .................................................................................. 8

*SEC v. Belmont Reid & Co.*,
   794 F.2d 1388 (9th Cir. 1986) ............................................................................................. 12

*SEC v. Everest Mgmt. Corp.*,
   475 F.2d 1236 (2d Cir. 1972) ............................................................................................... 14

*SEC v. OwnZones Media Network, Inc.*,
   2020 WL 13311398 (C.D. Cal. Sept. 17, 2020) .................................................................... 9

*SEC v. Ripple Labs, Inc.*,
   2021 WL 4555352 (S.D.N.Y. Oct. 4, 2021) ........................................................................ 14

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946) ...................................................................................................... *passim*

*Simon Schuster v. Crime Victims Bd.*,
   502 U.S. 105 (1991) .............................................................................................................. 10

*Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*,
   531 U.S. 159 (2001) .............................................................................................................. 11

*In re Stratasys Ltd. S'holder Sec. Litig.*,
   864 F.3d 879 (8th Cir. 2017) ................................................................................................ 8

*Suna v. Bailey Corp.*,
   107 F.3d 64 (1st Cir. 1997) ................................................................................................... 8

*Svets v. Osborne Precious Metals Co.*,
   1992 WL 281413 (N.D. Cal. June 8, 1992) .......................................................................... 12

**California Cases**

*People v. Clark*,
  215 Cal. App. 2d 734 (Cal. Dist. Ct. App. 1963).................................................................. 3

*People v. Steele*,
  2 Cal. App. 2d 370 (Cal. Dist. Ct. App. 1934)............................................................... 5, 6

*People v. White*,
  12 P.2d 1078 (Cal. Dist. Ct. App. 1932)........................................................................ 4

**Other State Cases**

*Hanneman v. Gratz*,
  211 N.W. 961 (Minn. 1927)........................................................................................... 5

*Kerst v. Nelson*,
  213 N.W. 904 (Minn. 1927)........................................................................................... 4

*Lewis v. Creasey Corp.*,
  248 S.W. 1046 (Ky. 1923)............................................................................................. 5

*McCormick v. Shively*,
  267 Ill. App. 99 (1932).................................................................................................. 5

*Prohaska v. Hemmer-Miller Dev. Co.*,
  256 Ill. App. 331 (1930)................................................................................................ 4

*State v. Bushard*,
  205 N.W. 370 (Minn. 1925)........................................................................................... 4

*State v. Gopher Tire & Rubber Co.*,
  177 N.W. 937 (Minn. 1920)........................................................................................... 4

*State v. Heath*,
  153 S.E. 855 (N.C. 1930)............................................................................................... 4

*State v. Ogden*,
  191 N.W. 916 (Minn. 1923)........................................................................................... 4

**Statutes**

Securities Act of 1933 ........................................................................................... 1, 2, 5

Securities and Exchange Act of 1934 .................................................................. 1, 2, 5

Cal. Stat., ch. 353 § 2(b) (1913) ................................................................................... 3

Minn. Laws ch. 429 § 3 (1917) ..................................................................................... 3

**Other Authorities**

U.S. Const. amend. I. ............................................................................................ 10, 11

Lex Fridman Interview of Elon Musk, at 15:15 (April 12, 2019), *available at*
  https://www.youtube.com/watch?v=dEv99vxKjVI&t=15m15s..................................................... 7

SEC Commissioner: Investors Have the Right to Make Their Own Decisions
  Without Regulators Standing in the Way, *available at*
  https://www.cnn.com/2021/10/11/perspectives/sec-commissioner-investors-
  regulators/index.html ............................................................................................. 14

Susan G. Flanagan, *The Common Enterprise Element of the Howey Test*,
  18 Pac. L. J. 1141, 1147-48 (1987) ................................................................... 4

Jonathan R. Macey & Geoffrey P. Miller,
  *Origin of the Blue Sky Laws*, 70 Tex. L. Rev. 347, 352 (1991) (Macey & Miller) ................. 3

Phillip Tocker, Note, *The Texas Blue Sky Law*,
  11 Tex. L. Rev. 102, 102 (1932) ........................................................................ 3

Brief of Securities Law Scholars as *Amici Curiae* in Support of Coinbase's Motion
  to Judgment on the Pleadings, *SEC v. Coinbase, Inc. et al.*,
  No. 23-cv-4738 (KPF) (S.D.N.Y. filed August 11, 2023), ECF No. 59 .................................. 2

**CORPORATE DISCLOSURE STATEMENT**

*Amicus curiae* Investor Choice Advocates Network ("ICAN") is a nonprofit, public interest organization.  ICAN has no parent corporation, and no publicly held company has a 10% or greater ownership interest in ICAN.

**STATEMENT OF INTEREST**

ICAN is a nonprofit organization that advocates for expanding access to markets for underrepresented investors and entrepreneurs who do not share the same access and market power as those with more assets and resources.

As an organization speaking on behalf of underrepresented market participants, ICAN has a significant interest in encouraging clarity in the Securities and Exchange Commission's ("SEC") application of the federal securities laws to asset markets and ensuring that the SEC's power to regulate securities does not improperly hamper the ability of individuals and organizations to transact.  The SEC's ambiguous and expansive interpretation and application of the Securities Act of 1933, as amended ("Securities Act") and the Securities Exchange Act of 1934, as amended ("Exchange Act") to digital assets has far-reaching negative impacts on the opportunities available to investors.

The interests of ICAN differ from those of the parties.  ICAN is a nonprofit organization advocating for the protection and maximization of investor choice—a perspective not represented by the positions of either defendant (a for-profit cryptocurrency exchange) or the SEC (a federal regulatory agency).[1]

**INTRODUCTION**

The SEC brings this cryptocurrency enforcement action and others like it under the premise that certain digital assets constitute "investment contracts" subject to the federal securities laws. The SEC's basis for that premise is flawed.  The term "investment contract" carries a specific meaning deriving from cases testing states' "blue sky" securities laws, which predated and

---

[1] No party's counsel authored this brief in whole or in part, and no party, party's counsel, or any person other than amicus, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

BRIEF FOR AMICUS CURIAE ICAN IN
SUPPORT OF DEFENDANTS' MOTION
TO DISMISS – 3:23-CV-06003-WHO

1   informed the use of that term in the Securities Act and the Exchange Act.  That meaning requires

2   investment contracts to entail ongoing contractual obligations to share profits in an enterprise.  *See*

3   *infra* Part I.

4          The Court should consider the historical context of the term "investment contract" and

5   reject the SEC's attempt to assert the existence of an investment contract based on creators' and

6   developers' statements about the assets they create.  Allowing mere statements about an asset to

7   transform that asset into an investment contract would lead to absurd results, and investors can

8   have no reasonable expectation of a profit when they have no contractual expectation at all.  *See*

9   *infra* Part II.A.  To find otherwise would discourage innovators from speaking about their

10  innovations, chilling important commercial speech and leaving consumers and investors with less

11  information about their preferred assets.  That result is at odds with the SEC's own mission and

12  renders implausible their interpretation of "investment contract."  *See infra* Part II.B.

13         Equally unavailing is the SEC's attempt to allege investment contracts based on digital

14  assets' deflationary mechanisms and natural forces of supply and demand, which do not involve

15  managerial efforts by a third party.  *See infra* Part III.A.  Nor can an investment contract derive

16  from a digital asset's ability to generate yield through its own characteristics and its owner's

17  efforts, as once again, third-party managerial efforts are missing.  *See infra* Part III.B.

18                                         **ARGUMENT**

19  **I.    A WELL-SETTLED MEANING OF "INVESTMENT CONTRACT" BASED ON**
        **STATE BLUE SKY LAWS INFORMED THE FEDERAL DEFINITION AND**
20      **REQUIRED A CONTRACTUAL UNDERTAKING TO DELIVER FUTURE**
        **VALUE.[2]**
21

22         As Kraken notes in its Motion, the term "investment contract" predates use of the term as

23  part of the statutory definition of "security" in both the Securities Act and Exchange Act.

24  (Motion 12:3-17).  Because neither statute defines "investment contract," the Supreme Court in

25  *Howey* turned to a well-established body of state "blue sky" jurisprudence to inform the Court's

26  ───────────────

27  [2] ICAN's blue sky law analysis draws in part upon analysis contained in the Brief of Securities
    Law Scholars as *Amici Curiae* in Support of Coinbase's Motion to Judgment on the Pleadings,
    filed in *SEC v. Coinbase, Inc. et al.*, No. 23-cv-4738 (KPF) (S.D.N.Y. filed August 11, 2023),
28  ECF No. 59.

1  determination of which arrangements constituted "investment contracts" and which did not.  *SEC*

2  *v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946).  A recurring bedrock component of state court

3  "blue sky" decisions leading up to *Howey* was the presence of a contractual undertaking to deliver

4  future value.

5      The 1800s witnessed a boom of investment opportunities in the American economy and a

6  corresponding boom in investment instruments—everything from blue-chip stocks to more

7  questionable offerings made in-person, in periodicals, or by mail.  Jonathan R. Macey & Geoffrey

8  P. Miller, *Origin of the Blue Sky Laws*, 70 Tex. L. Rev. 347, 352 (1991) (Macey & Miller).  At

9  the turn of the 20th century, state legislatures began enacting laws that sought to address

10  "dishonest promoters who would sell shares 'in the bright blue sky itself.'"  Phillip Tocker, Note,

11  *The Texas Blue Sky Law*, 11 Tex. L. Rev. 102, 102 (1932).

12      Early state regulatory efforts such as Kansas's 1911 securities act, credited as the first

13  blue-sky law, did not endeavor to define "security."  That act instead opted to simply prohibit

14  companies from selling "any stock, bonds, or other securities of any kind or character" without

15  first registering them.  Macey & Miller 361 (citing 1911 Kan. Sess. Law 210); *see also* 1913 Cal.

16  Stat., ch. 353, § 2(b) (quoted in *People v. Clark*, 215 Cal. App. 2d 734, 747 (1963) (including

17  traditional instruments like "stock, stock certificate[s], bonds, and other evidences of

18  indebtedness" as "securities").

19      As the variety of investment types proliferated, states responded with more sophisticated

20  statutes and began including the term "investment contract" in their securities laws to capture

21  schemes that included contractual promises to convey future profits but that did not squarely fit as

22  a traditional "stock" or "bond."  Minn. Laws 1917, ch. 429 § 3, as amended by Minn. Laws 1919,

23  ch. 105, 257 (including "stocks, bonds, investment contracts, or other securities") (quoted in

24  *Gutterson v. Pearson*, 189 N.W. 458, 483-84 (Minn. 1922)).  As the Supreme Court noted in

25  *Howey*, states' statutory expansion of enumerated instruments to include "investment contract"

26  was meant to capture investments beyond formal stocks or bonds that included a *contractual* right

27  to future profits.  *Howey*, 328 U.S. at 298 & n.4.

28

1  As an early adopter of the statutory term "investment contract," Minnesota's interpretation

2  carried weight in the *Howey* Court's survey of the fundamental aspects of investments considered

3  "investment contracts."  *Howey*, 328 U.S. at 298 & n.4.  In the leading Minnesota case, *State v.*

4  *Gopher Tire & Rubber Co.*, 177 N.W. 937 (Minn. 1920), a tire dealer sold investors certificates in

5  its business pursuant to which investors agreed to promote the tire dealer's goods in exchange for

6  a contractual right to receive a percentage of the dealer's profits.  *Id*. at 937-38.  The Minnesota

7  Supreme Court found this to be an "investment contract" principally because investors obtained

8  the contractual right to share in the tire dealer's profits.  *Id*.  Later Minnesota cases similarly

9  found "investment contracts" existed where investors obtained a contractual right to a portion of

10  profits of the counterparty's business operation.  *State v. Bushard*, 205 N.W. 370 (Minn. 1925)

11  (bus driver investor received "operator's agreement" promising a wage plus the right to share in

12  the bus company's profits); *Kerst v. Nelson*, 213 N.W. 904, 905-06 (Minn. 1927) (purchase of

13  vineyard plus a contractual right to proceeds from resulting grape sales); *State v. Ogden*, 191

14  N.W. 916, 917 (Minn. 1923) (holding "statement and purchase" for units in oil venture was

15  investment contract because "unit holders were to participate in profits in proportion to their

16  holdings").  Thus, the Minnesota blue sky jurisprudence that informed *Howey* defined

17  "investment contracts" as those arrangements in which the investor received a contractual

18  promise of a share of future profits in the seller's commercial enterprise.

19  The *Gopher Tire* standard spread, leading other states to "adopt[] [its] definition of

20  investment contract."  Susan G. Flanagan, *The Common Enterprise Element of the Howey Test*,

21  18 Pac. L. J. 1141, 1147-48 (1987).  *See also Howey*, 328 U.S. at 298 (noting that the *Gopher*

22  *Tire* standard was "uniformly applied by state courts to a variety of situations").  *See, e.g.*, *People*

23  *v. White*, 12 P.2d 1078, 1081 (Cal. Dist. Ct. App. 1932) (contractual right to receive "a specified

24  sum on a specified date as principal and earnings") (cited by *Howey*, 328 U.S. at 298 n.4); *State v.*

25  *Heath*, 153 S.E. 855, 857 (N.C. 1930) (the term "investment contract" "implies the apprehension

26  of an investment as well as of a contract") (cited by *Howey*, 328 U.S. at 298 n.4); *Prohaska v.*

27  *Hemmer-Miller Dev. Co.*, 256 Ill. App. 331, 338-39 (1930) (a "written agreement" afforded a

28

- 4 -

1    contractual right to offset land purchase price with profits from crops harvested on land) (cited by

2    *Howey*, 328 U.S. at 298 n.4).

3          As other states adopted this standard, the *absence* of a contractual right to profits in the

4    seller's enterprise often resulted in courts excluding the arrangement from the definition of

5    "security."  *People v. Steele*, 2 Cal. App. 2d 370, 374 (Cal. Dist. Ct. App. 1934) (no "investment

6    contract" in lease of gold mine under which investor "could not expect any return from his money

7    on account of anything done by others"); *Lewis v. Creasey Corp.*, 248 S.W. 1046, 1047 (Ky.

8    1923) (no "investment contract" where wholesaler offered local stores an arrangement in which

9    the stores would pay $300 in exchange for the right to buy goods at a certain price); *McCormick*

10   *v. Shively*, 267 Ill. App. 99 (1932) (no "investment contract" in installment sale of land where

11   seller retained an interest in crops grown on the land); *Hanneman v. Gratz*, 211 N.W. 961 (Minn.

12   1927) (no "investment contract" in arrangement involving sale of a trust holding oil leases to a

13   group of investors holding proportionate stake in the trust with no obligation by the seller to

14   return proceeds to investors based on profits).  The key missing piece in these cases was a post-

15   sale contractual obligation of the seller to share future profits.

16         Thus, when Congress passed the Securities Act and the Exchange Act and defined

17   "security" to include "investment contract," state courts had developed a consistent interpretation

18   of that term:  an arrangement contractually entitling the investor to a portion of the future income

19   or profits derived from the seller's enterprise.  As the Supreme Court in *Howey* explained,

20   Congress "attach[ed] that meaning to the term" when using it in the statutes.  *See* 328 U.S. at 298.

21   **II.    ABSENT A CONTRACTUAL RELATIONSHIP, STATEMENTS ABOUT A
22           DIGITAL ASSET CANNOT TRANSFORM IT INTO AN INVESTMENT
         CONTRACT.**

23         With the historical context for the definition of "investment contract" in mind, the SEC's

24   complaint in this action attempts to drastically expand its meaning to encompass assets whose

25   values may increase based on their creators' statements and actions, even when unaccompanied

26   by any contractual relationship.  This interpretation should be rejected as an improper extension

27   of the definition of "investment contract" that would risk chilling important commercial speech.

28

A.      **Investors cannot reasonably expect a profit based on public statements unaccompanied by a contractual relationship.**

The SEC posits that at least 11 cryptoassets traded on the Kraken platform constitute investment contracts based in large part on "the public statements of their respective issuers and promoters" and the premise that purchasers "would reasonably have expected to profit from the efforts of these issuers and promoters to grow and maintain the technology platforms and blockchain ecosystems associated with these crypto assets."  Compl. ¶¶ 58-62.  For each of the 11 assets, the SEC alleges:

> The information publicly disseminated by [the developers] would lead a reasonable investor … to view [the token] as an investment.  Specifically, [token holders] would reasonably expect to profit from holding [the token] based on the efforts of [the developers] to grow [the blockchain technologies] because this growth would in turn increase the demand for and the value of [the token].

*See* Compl. ¶¶ 235, 255, 276, 295, 324, 344, 359, 379, 397, 415, 434.

In contending that this information made these assets into investment contracts, the SEC relies on statements about, for example:  developers' beliefs about the future growth of a network in size and value (Compl. ¶ 236), team credentials (Compl. ¶¶ 279, 328), past technological and network growth achievements (Compl. ¶¶ 312, 329, 440), development plans (Compl. ¶¶ 304, 361, 366-67, 403), and risks (Compl. ¶ 418).  This is the sort of information that ordinary investors may well find useful, whether for a digital asset or any other type of asset.  And it may be helpful to investors in assessing an asset's value, taken with as many grains of salt as they wish.  But it is not—and should not be—the standard for establishing an investment contract, which requires a contractual obligation.  In the words of a pre-*Howey* California blue sky case interpreting the meaning of an investment contract, "[w]hile a 'security' … may contemplate that a profit will accrue from the money invested, the expectation of such a result cannot, of itself, determine that an instrument is a 'security.'"  *Steele*, 2 Cal. App. 2d at 374.

This distinction is clear in cases involving real estate.  The Ninth Circuit found no investment contract even where "[defendant's] marketing material promoted [the property] as a

- 6 -

1    passive investment which would appreciate in value as a result of [defendant's] development of

2    common facilities."  *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300

3    (9th Cir. 1979).  In rejecting an investment contract theory, the Court observed that "[t]here is no

4    reference in the [land sale] contracts to an obligation on the part of [defendant] to develop any

5    land."  *Id.* at 1301.  *See also Harman v. Harper*, 914 F.2d 262, 1990 WL 121073, at *5 (9th Cir.

6    1990) (unpublished opinion) (no investment contract where defendant "made no promises to

7    develop or otherwise manage the properties"); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10,

8    11 (1st Cir. 1993) (rejecting investment contract theory despite "strong and repeated suggestions

9    that the surrounding area would develop into a thriving community" because nobody "was

10   *promising* the buyers to build or provide anything") (emphasis added).

11        The same result follows with other non-digital assets.  Consider electric vehicles.  If a

12   manufacturer describes its vehicles' efficiency, upcoming features, and plans to grow a network

13   of charging stations—a burgeoning "ecosystem" that will improve the vehicles' usability and

14   increase their resale value—that would not turn their cars into investment contracts.  Indeed, Elon

15   Musk once stated in an interview that, in light of plans to develop self-driving functionality, "if

16   you buy a Tesla today, I believe you are buying an appreciating asset, not a depreciating asset."[3]

17   The SEC's logic would make Tesla *vehicles*—as opposed to Tesla equity—investment contracts.

18   That would be an absurd outcome.  Cars are not securities, even if their creator speaks about their

19   features, development plans, and potential for appreciation.

20        The same could be said about artists who speak publicly about their paintings and plans

21   for future collections, creators of collectibles who may speak about their efforts to make their

22   "ecosystems" more popular, or investors who tout the price potential of assets like gold, real

23   estate, or Bitcoin.  Purchasers of land, cars, modern art, Beanie Babies, Pokémon cards, gold, or

24   Bitcoin are all entitled to hear those statements, and they may hope based on those statements that

25   those assets may increase in value.  But the statements do not transform those assets into

26   investment contracts.  Applying that label without any contractual arrangement to deliver future

27

28   [3] Lex Fridman Interview of Elon Musk, at 15:15 (April 12, 2019), *available at*
     https://www.youtube.com/watch?v=dEv99vxKjVI&t=15m15s.

BRIEF FOR AMICUS CURIAE ICAN IN
SUPPORT OF DEFENDANTS' MOTION
TO DISMISS  –  3:23-CV-06003-WHO

profits would force investors who wish to purchase such speculative assets into an investment contract regime that they never agreed to.

Put another way, these statements cannot transform a product into an investment contract absent a contractual commitment, because investors could not *reasonably expect* a profit if they have no contractual expectation at all. Hoping that an asset's price will go up is a far cry from an expectation grounded in a contractual obligation. The related arena of securities fraud provides guidance here. In that jurisprudence, the Ninth Circuit has made clear that "investors do not rely on vague statements of optimism." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010); *see also Sakkal v. Anaplan Inc.*, 557 F. Supp. 3d 988, 996 (N.D. Cal. 2021) (rejecting claims because "no reasonable investor would rely on such statements") (quoting *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019)); *Detroit Gen. Ret. Sys. v. Medtronic, Inc.*, 621 F.3d 800, 807-08 (8th Cir. 2010) ("No reasonable investor would rely on these statements….") (quoting *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 547 (8th Cir. 1997)); *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 145 (4th Cir. 2002) (same); *Suna v. Bailey Corp.*, 107 F.3d 64, 72 (1st Cir. 1997) (same).[4]

Nor can investors reasonably rely on statements regarding future plans, which are actionable only if the investor could "reasonably rely on [the] statement as a *guarantee* of some

---

[4] *See, e.g., Kong v. Fluidigm Corp.*, 2023 WL 2134394, at *2 (9th Cir. Feb. 21, 2023) (rejecting statements that "mass cytometry adoption is robust" and "the mass cytometry franchise has grown extremely strongly" as "puffery"); *Macomb Cnty. Employees' Ret. Sys. v. Align Tech., Inc.*, 39 F.4th 1092, 1099 (9th Cir. 2022) (rejecting descriptions of "a great growth market" and "huge market opportunity" as puffery); *Boykin v. K12, Inc.*, 54 F.4th 175, 183 (4th Cir. 2022) ("reasonable investors could not have relied upon" statements about "technological 'core competency,'" "expertise," and "flexibility"); *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (11th Cir. 2019) (finding "proclamations that [company] was devoting 'substantial resources' to its problems, with 'improved results'" were "quintessential puffery"); *In re Stratasys Ltd. S'holder Sec. Litig.*, 864 F.3d 879, 882 (8th Cir. 2017) (holding that "no reasonable investor would rely" upon statements that products had "unmatched speed, reliability, quality and connectivity"); *Key Equity Invs., Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 785-86 (3d Cir. 2007) (rejecting "optimistic statements that [company] was . . . 'slated to begin to generate strong revenue and earnings growth in 2002'"); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (rejecting as puffery statements regarding "expected annual growth rate of 10% to 30% over the next several years" and that company was "poised to carry the growth and success of 1991 well into the future").

BRIEF FOR AMICUS CURIAE ICAN IN
SUPPORT OF DEFENDANTS' MOTION
TO DISMISS  –  3:23-CV-06003-WHO

1   concrete fact or outcome." *SEC v. OwnZones Media Network, Inc.*, 2020 WL 13311398, at *5

2   (C.D. Cal. Sept. 17, 2020) (quoting *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS*

3   *AG*, 752 F.3d 173, 185 (2d Cir. 2014) (emphasis added). Thus, "projections of future

4   performance not worded as guarantees are generally not actionable under the federal securities

5   laws." *Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 145 (4th Cir. 2002) (quoting *Krim v.*

6   *BancTexas Group, Inc.*, 989 F.2d 1435, 1446 (5th Cir. 1993)).

7          These principles apply to the *Howey* test by analogy. Even investors in securities that

8   unquestionably entail an ongoing legal relationship with an issuer cannot reasonably rely on

9   public statements of optimism, puffery, or future expectations that fall short of a guarantee. It

10  follows that owners of digital assets cannot have reasonable expectations of profit based on the

11  statements of persons from whom they have no contractual expectation at all.[5]

12         **B.      The SEC's position would lead to unpredictable applications of the securities
13                   laws and chill important commercial speech about assets.**

14         The SEC's position that investment contracts can be conjured out of non-contractual

15  statements by an asset's creator threatens to chill useful commercial speech and "deprive

16  consumers of accurate information about their chosen products." *44 Liquormart, Inc. v. Rhode*

17  *Island*, 517 U.S. 484, 503 (1996). If the SEC's position is accepted, product developers risk

18  turning their products into investment contracts simply by making statements that, in the SEC's

19  view, could lead hypothetical purchasers to "reasonably expect" a profit. That position would

20  give the SEC unfettered discretion to selectively apply and enforce the securities laws wherever it

21  decides such statements may cause an expectation—for instance, in industries that it does not

22  favor, such as digital assets.

23         An advantage of requiring an investment contract to entail a contractual obligation is that

24  it offers certainty. If product creators do not contractually undertake to generate profits for

25  investors, their products will not be subjected to the federal securities laws. Without that

26  ───────────────────

[5] Of course, consumer protection laws, commodities regulations, common law fraud claims, and
27  other legal frameworks exist to protect purchasers affected by deceptive statements made about
    assets, whether digital or otherwise. Shoehorning the federal securities laws into asset classes
28  that they do not fit may unduly displace the proper use of more appropriate regimes.

1   contractual bright line, creators of digital assets—and other assets—may opt to silence themselves

2   out of fear that merely talking about the assets they create will subject those creations to the

3   federal securities laws and their attendant registration and disclosure requirements.  Exposing all

4   creators to that regime would be "so burdensome that it essentially operates as a restriction on

5   constitutionally protected speech."  *See Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 27

6   (D.C. Cir. 2014).

7        *Ibanez v. Florida Department of Business and Professional Regulation* is instructive.  In

8   that case, the Supreme Court held that the detailed disclosures required by a regulatory regime

9   "effectively rule[d] out" the use of a professional designation on a business card or letterhead,

10  because it would require pages of attached disclosures.  *Ibanez v. Fla. Dep't of Bus. & Pro.*

11  *Regul., Bd. of Acct.*, 512 U.S. 136, 146 (1994).  The Court concluded that such a regime ran afoul

12  of the First Amendment by rendering the commercial speech at issue impracticable.  *See id.*

13       The SEC's stance here poses a similar concern.  It would thrust developers' products (in

14  contrast to their business enterprises) into the purview of the federal securities laws because of

15  public statements unattended by any contractual promise.  Applying a burdensome and otherwise

16  inapplicable regulatory regime as a consequence of such statements would, in the words of

17  *Ibanez*, "effectively rule out" commercial discourse about digital assets, because it would leave

18  creators and developers "unsure about the side of a line on which [their] speech falls."  *See*

19  *Counterman v. Colorado*, 600 U.S. 66, 6-7 (2023).  Creators may prefer saying nothing at all over

20  risking having their statements parroted back to them in an SEC complaint.  Those fears will

21  "effectively drive certain ideas or viewpoints from the marketplace."  *Simon Schuster v. Crime*

22  *Victims Bd.*, 502 U.S. 105, 116 (1991).  One alarming example is the SEC's labelling of a digital

23  asset-themed podcast, YouTube channel, and social media pages as "promotional efforts to

24  increase participation in its network and thus demand for [the asset]."  Compl. ¶ 439.  Using the

25  creation of informational forums as the basis for an investment contract will discourage

26  information sharing and undercut public participation in dialogue about these technologies.

27

28

"[T]he free flow of commercial information is indispensable." *44 Liquormart*, 517 U.S. at 497. Silencing creators with the threat of an ever-broadening securities regime would cut off that flow, an outcome that falls far short of the "constitutional protection for the dissemination of accurate and nonmisleading commercial messages" guaranteed by the First Amendment. *Id.* at 496. It would also be an outcome directly contrary to the SEC's interest in disclosure, ultimately leaving investors and consumers with less information about the assets they purchase. That helps no one. An interpretation of "investment contract" that risks such a drastic chilling effect on commercial speech is not plausible, even at the motion to dismiss stage. The Court should not construe its statutory meaning in the manner endorsed by the SEC here, as doing so "would raise serious constitutional problems." *See Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Engineers*, 531 U.S. 159, 173 (2001).

## III.   A DIGITAL ASSET'S INHERENT CHARACTERISTICS CANNOT TRANSFORM IT INTO AN INVESTMENT CONTRACT.

### A.   A digital asset's scarcity or depleting supply does not transform it into an investment contract.

In contending that certain digital assets constitute investment contracts, the SEC relies on allegations that the assets have a "deflationary" supply, such that the quantity in existence will decrease as it is "burned" or destroyed over time. *See* Compl. ¶¶ 308, 350, 368, 388, 404, 441 (asserting that deflationary or burning mechanics "led investors reasonably to view their purchase . . . as having the potential for profit"). Boiled down, these allegations are simple: Certain digital assets are programmed to be consumed or destroyed over time, decreasing their supply. As the available supply of such an asset decreases and it becomes scarcer, its price may rise.

These allegations are a red herring, as they merely describe supply rules and market forces. Deflationary mechanisms are rules programmed into a digital asset's computer code that govern how its supply operates. The SEC acknowledges as much, explaining that "the right to 'burn' (or destroy) the asset in order to propose transactions on the asset's blockchain" is a "pre-determined right[], coded into the software itself." Compl. ¶ 21. As such, it is an intrinsic part of the asset itself, and it operates automatically, not through managerial efforts.

1    A digital asset's scarcity or depleting supply is no different from that of analogous

2    physical assets.  For instance, the world's oil supply is a natural resource that depletes through

3    use—a natural "deflationary mechanism."  Oil investors may hope to profit as reserves are

4    depleted.  The same can be said for other natural and manmade assets, such as precious metals,

5    rare wines, or scarce seats at popular concerts.  None of these are securities, even if some

6    individuals purchase them with the hope that decreases in supply will lead to increases in price.

7    As to the SEC's contention that a decrease in supply may lead to an increase in price, that

8    is nothing more than a description of the market forces of supply and demand, which do not give

9    rise to an investment contract.  *See SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391 (9th Cir.

10    1986) (no investment contract where profits depended on "fluctuations of the gold market, not the

11    managerial efforts of [others]"); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79-80 (9th Cir. 1980) (no

12    investment contract where profitability turned on fluctuations of silver market); *Svets v. Osborne*

13    *Precious Metals Co.*, 1992 WL 281413, at *2 (N.D. Cal. June 8, 1992) (no investment contract

14    where "once the plaintiffs made their investment, their profits depended upon the fluctuations of

15    the market, not the managerial effort of defendants"); *Lehman Bros. Commercial Corp. v.*

16    *Minmetals Int'l Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159, 164 (S.D.N.Y. 2001) (no

17    investment contract where profits "would result in large part from market movements, not from

18    capital appreciation due to [promoter's] efforts").  Accordingly, the SEC's contentions regarding

19    the decreasing supplies or "burning" functions of certain digital assets do not aid them in pleading

20    the existence of an investment contract.

21    **B.    The ability to generate yield cannot transform a digital asset into an**
      **investment contract.**

22

23    The SEC also contends that various digital assets are investment contracts in part because

24    they can generate additional digital assets by being "staked."  *See* Compl. ¶¶ 239, 258, 331, 373,

25    427.  These allegations appear to suggest that a digital asset may constitute an investment contract

26    because its computer code can generate digital asset "rewards."  That contention is another red

27    herring.

28

Many natural and manmade non-security assets are inherently able to generate some form of yield.  Orange trees generate a yield of oranges, and solar panels generate a yield of electricity.  Real estate generates rental income.  Owners may make use of those assets to generate yields and may expect to profit as a result.  But those profits are inherent features of the assets themselves, combined with the *owner's* efforts—not the efforts of a third party.

In *Howey*, for instance, it was not the ability of citrus trees to bear fruit that gave rise to an investment contract, but rather the professional development and cultivation services provided through contracts attached to the purchases of the groves.  *See Howey*, 328 U.S. at 299-300.  The orange trees themselves, even while generating "rewards" in the form of oranges, were not securities.  Absent an agreement to professionally cultivate such "rewards," an asset's mere ability to generate them does not give rise to an investment contract.  *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 88 (2d Cir. 1994) (no investment contract for condominium units that could generate profits for their owners); *Bobrowski v. Red Door Grp.*, 2011 WL 3555712, at *2 (D. Ariz. Aug. 11, 2011) (similar).  And the mere fact that owners *could* outsource efforts to a third party cannot make the asset into an investment contract.  Otherwise, anyone who sold a citrus grove in fee simple would be selling a security, since the owner might choose to hand off its cultivation to someone else.  That outcome would distort *Howey* beyond recognition.

Digital assets that generate yields are no different.  A digital asset can be programmed so that owners or stakers of the asset can use them to receive "rewards," as the SEC alleges.  That yield could be in the form of additional quantities of that digital asset, or of another.  Just as a condominium owner can generate their own yield by renting out their condominium units, owners of digital assets can use staking functions to generate yield.  If they do so using their own digital assets, without relying on the managerial efforts of another person, the resulting rewards cannot form the basis for an investment contract.

\*     \*     \*

Investors in the United States have the right to use their capital as they see fit.  When they choose to invest in assets without entering into any contractual agreement to receive future profits

BRIEF FOR AMICUS CURIAE ICAN IN
SUPPORT OF DEFENDANTS' MOTION
TO DISMISS  –  3:23-CV-06003-WHO

1  in an enterprise, they should not be forced into the inapplicable regulatory framework of the

2  investment contract.

3        The Court's rulings on this motion and in this litigation will have far-reaching impacts

4  extending beyond the parties here.  They will affect the wider digital asset market and its

5  participants, including creators and investors.  Absent from the Complaint is any suggestion that

6  the owners of these assets have requested the remedies sought by the SEC.  Instead, this case

7  appears designed to expand the SEC's jurisdiction through piecemeal litigation rather than

8  through rulemaking or by seeking statutory authority from Congress.  In litigation, as opposed to

9  rulemaking, the SEC actively excludes investors—those the SEC is charged with protecting—

10  from participating in the process.  *See, e.g.*, *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240

11  (2d Cir. 1972) (upholding order granting SEC's opposition to investors' motion to intervene);

12  *SEC v. Ripple Labs, Inc.*, 2021 WL 4555352, at *1 (S.D.N.Y. Oct. 4, 2021) (denying investors'

13  motion to intervene that was opposed by SEC).

14        As current SEC Commissioner Hester Peirce said in addressing the importance of investor

15  choice and the role of regulators:  "Investor protection means enforcing antifraud and disclosure

16  rules, but it also means protecting an investor's right to make investment decisions for herself, to

17  take risks and to use the latest technology to trade and invest.  As in other areas of life, people

18  want to be able to make choices about their finances, even if others might question those choices

19  or choose differently for themselves."  Equally important, she added that "regulators have a role

20  to play, but that role should always be carried out with humility and a realization that investors

21  have a right to make their own decisions."[6]  Here, the SEC's expansive view of investment

22  contracts risks depriving United States residents of the ability to purchase their choice of assets,

23  because the SEC disfavors them.  That restraint on choice harms buyers.  *See Chamber of*

24  *Commerce of the United States of America v. SEC*, 412 F.3d 133, 144 (D.C. Cir. 2005) (loss of

25  opportunity to purchase mutual fund shares constituted a legally cognizable injury).  The Court

26

27  [6] SEC Commissioner: Investors Have the Right to Make Their Own Decisions Without
Regulators Standing in the Way, *available at* https://www.cnn.com/2021/10/11/perspectives/sec-
28  commissioner-investors-regulators/index.html.

BRIEF FOR AMICUS CURIAE ICAN IN
SUPPORT OF DEFENDANTS' MOTION
TO DISMISS  –  3:23-CV-06003-WHO

1   should consider that harm in evaluating whether the SEC has plausibly alleged that the securities

2   laws apply.

3                                          **CONCLUSION**

4          For the foregoing reasons, the Court should grant defendants' Motion to Dismiss.

5

6   Dated:  February 28, 2024               Respectfully submitted,

7

8   **KIRK & INGRAM, LLP**                  **ORRICK, HERRINGTON & SUTCLIFFE LLP**

9   Michael W. Ingram (SBN 310119)          By:  ___*/s/ Stephen A. Cazares*_____
    mingram@kirkingram.com                  Stephen A. Cazares (SBN 201864)
10  100 Wilshire Blvd., Suite 700           scazares@orrick.com
    Santa Monica, California 90401          The Orrick Building
11  Tel: (310) 487-0270                     405 Howard Street
                                            San Francisco, California 94105-2669
12  David E. Kirk (*pro hac vice* filed)    Telephone: (415) 773-5700
    dkirk@kirkingram.com                    Facsimile:  (415) 773-5759
13  43 West 43rd St., Suite 279
    New York, New York 10036                Daniel S. Kim (SBN 254679)
14  Tel: (212) 859-3504                     dan.kim@orrick.com
                                            631 Wilshire Boulevard, Suite 2-C
15                                          Santa Monica, California 90401
                                            Telephone: (310) 633-2803
16

17                                          *Attorneys for Amicus Curiae*
                                            INVESTOR CHOICE ADVOCATES NETWORK
18

19

20

21

22

23

24

25

26

27

28

BRIEF FOR AMICUS CURIAE ICAN IN
SUPPORT OF DEFENDANTS' MOTION
TO DISMISS  –  3:23-CV-06003-WHO