CLEMENT & MURPHY, PLLC
Paul D. Clement *(pro hac vice)*
Erin E. Murphy *(pro hac vice)*
C. Harker Rhodes IV *(pro hac vice)*
Nicholas M. Gallagher* *(pro hac vice)*
706 Duke Street
Alexandria, VA 22314
Telephone: 202-742-8900
paul.clement@clementmurphy.com

* Supervised by principals of the firm who are
members of the Virginia Bar

KIBLER FOWLER & CAVE LLP
John D. Fowler (SBN 271827)
jfowler@kfc.law
Kevin Cammiso (SBN 316540)
kcammiso@kfc.law
11100 Santa Monica Blvd., Suite 360
Los Angeles, California 90025
Telephone:      (310) 409-0400
Facsimile:      (310) 409-0401

*Attorneys for Amici Curiae Blockchain
Association and DeFi Education Fund*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> PAYWARD, INC., ET AL., <br><br> Defendants. | CASE NO. 3:23-CV-06003-WHO <br><br> **DECLARATION OF PAUL D. CLEMENT IN SUPPORT OF ADMINISTRATIVE MOTION BY THE BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND FOR LEAVE TO FILE AMICUS BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Judge:    Hon. William H. Orrick |

## <u>DECLARATION OF PAUL D. CLEMENT</u>

I, Paul D. Clement, hereby declare:

1.      I am a partner with Clement & Murphy PLLC, counsel for *amici curiae* Blockchain Association and DeFi Education Fund in this action. The following facts are within my personal knowledge and, if called as a witness herein, I can and will competently testify thereto.

2.      This declaration is made pursuant to Local Rule 7-11 and in support of the Administrative Motion by the Blockchain Association and DeFi Education Fund for Leave to File Amicus Brief in Support of Defendants' Motion to Dismiss.

3.      On February 28, 2024, Blockchain Association and DeFi Education Fund, through counsel, sought stipulation from the parties to the filing of their proposed amicus brief. Defendants consented to the filing of the proposed amicus brief.  The SEC took no position on the filing of the proposed amicus brief, but reserved the right to object upon review of the brief.

4.      Attached as Exhibit A is a copy of the Blockchain Association and DeFi Education Fund's proposed amicus brief.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 29th day of February, 2024.


                                        <u>s/Paul D. Clement</u>
                                        Paul D. Clement

# EXHIBIT A

CLEMENT & MURPHY, PLLC
Paul D. Clement *(pro hac vice)*
Erin E. Murphy *(pro hac vice)*
C. Harker Rhodes IV *(pro hac vice)*
Nicholas M. Gallagher* *(pro hac vice)*
706 Duke Street
Alexandria, VA 22314
Telephone: 202-742-8900
paul.clement@clementmurphy.com

* Supervised by principals of the firm who are
members of the Virginia Bar

KIBLER FOWLER & CAVE LLP
John D. Fowler (SBN 271827)
jfowler@kfc.law
Kevin Cammiso (SBN 316540)
kcammiso@kfc.law
11100 Santa Monica Blvd., Suite 360
Los Angeles, California 90025
Telephone:     (310) 409-0400
Facsimile:     (310) 409-0401

*Attorneys for Amici Curiae Blockchain
Association and DeFi Education Fund*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> PAYWARD, INC., ET AL., <br><br> Defendants. | CASE NO. 3:23-CV-06003-WHO <br><br> **BRIEF FOR *AMICI CURIAE* BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** <br><br> Judge:    Hon. William H. Orrick |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................ii

INTEREST OF *AMICI CURIAE* ..............................................................................................1

INTRODUCTION .......................................................................................................................1

ARGUMENT ..............................................................................................................................3

I.      Digital Assets Are Not Inherently Securities........................................................................3

II.     The SEC's Various Grounds For Trying To Categorize Practically All Digital Assets As Securities Are Wrong .........................................................................................5

       A.     Digital Assets Typically Are Not Themselves Investment Contracts.....................6

       B.     Digital Assets Do Not Become Investment Contracts Whenever a Buyer Believes They Will Increase in Value Due to Their Creators' Efforts....................8

       C.     Digital Assets Do Not Become Investment Contracts Whenever They Are Part of a Digital "Ecosystem" ...........................................................................11

       D.     The SEC's Conflicting Theories Leave Industry Participants Without Any Fair Notice of the Asserted Scope of Its Regulatory Authority............................14

CONCLUSION ..........................................................................................................................17

BRIEF FOR AMICI CURIAE BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
608 F.2d 1297 (9th Cir. 1979) ................................................................................10

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ............................................................................................14

*SEC v. Ripple Labs, Inc.*,
2023 WL 4507900 (S.D.N.Y. July 13, 2023) ..........................................................6, 7

*SEC v. Telegram Grp. Inc.*,
448 F.Supp.3d 352, 358 (S.D.N.Y. 2020) ................................................................13

*SEC v. Terraform Labs Pte. Ltd.*,
2023 WL 4858299 (S.D.N.Y. July 31, 2023) ..........................................................6, 7

*SEC v. W.J. Howey Co.*,
328 U.S. 293 (1946) ....................................................................................*passim*

*State v. Gopher Tire & Rubber Co.*,
177 N.W. 937 (Minn. 1920) .................................................................................4

**Statutes**

7 U.S.C. §1a(9) ........................................................................................................4

15 U.S.C. §77b(a)(1) ...........................................................................................1, 3

15 U.S.C. §78c(a)(10) ..........................................................................................1, 3

15 U.S.C. §78u(g) ................................................................................................16

**Other Authorities**

*Am. Diamond Co.*, SEC No-Action Letter, 1977 WL 10907
(Aug. 15, 1977) ..................................................................................................6

Br. for the SEC, *SEC v. W.J. Howey Co.*, No. 843, 1946 WL 50582 (U.S. Apr. 17,
1946)...................................................................................................................7

Complaint, *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599
(D.D.C. filed June 5, 2023) .....................................................................5, 6, 8, 16

Complaint, *SEC v. Coinbase, Inc.*, No. 23-cv-4738
(S.D.N.Y. filed June 6, 2023) ................................................................5, 6, 8, 16

Complaint, *SEC v. Wahi*, No. 22-cv-1009
(W.D. Wash. filed July 21, 2022) ...........................................................................16

BRIEF FOR AMICI CURIAE BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS

*Cryptocurrencies: Oversight of New Assets in the Digital Age, Hr'g Before the U.S.*
    *H. Comm. on Agric.*, 115th Cong. (2018) ................................................. 13

*Future Sys. Inc.*, SEC No-Action Letter, 1973 WL 9653 (June 8, 1973) ....................................... 7

*Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail*
    *Investors Collide, Part III: Hearing Before the*
    *H. Comm. on Fin. Servs.*, 117th Cong. (2021) ....................................... 14

GAO, GAO-23-105346, *Blockchain in Finance: Legislative and Regulatory*
    *Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets* (June
    2022)........................................................................................................... 17

William Hinman, Director, SEC Div. of Corp. Fin., *Digital Asset Transactions:*
    *When Howey Met Gary (Plastic)*, Remarks at Yahoo Finance All Markets
    Summit: Crypto (June 14, 2018), http://tinyurl.com/58c42rds ................................ 13

Linda Jeng, *Crypto Migration: European and Asian Regulators Welcome Crypto*
    *Innovation While U.S. Cracks Down*, Forbes (Apr. 7, 2023),
    https://tinyurl.com/47hr5eee ................................................................ 17

Letter from Jake Chervinsky, Head of Policy, Blockchain Association, and Miller
    Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman,
    Secretary, SEC (June 13, 2022), https://tinyurl.com/5d96p4bx ....................... 17

Letter from Vanessa Countryman, Secretary, SEC, to Paul Grewal, Chief Legal
    Officer, Coinbase Global, Inc. (Dec. 15, 2023), *available at*
    http://tinyurl.com/4ezj2wa2 ................................................................ 15

Shalini Nagarajan, *Dogecoin's Creator Sold All His Coins 6 Years Ago After*
    *Getting Laid Off*, Bus. Insider (Feb. 12, 2021), http://tinyurl.com/37t3kbj8 ....................... 13

Hester Peirce, SEC Comm'r, *Kraken Down: Statement on* SEC v. Payward
    Ventures, Inc., et al. (Feb. 9, 2023), https://tinyurl.com/2mwnuppr ........................ 15

Hester Peirce, SEC Comm'r, *Overdue: Statement of Dissent on LBRY* (Oct. 27,
    2023), http://tinyurl.com/42wp6ptz.......................................................... 16

Hester M. Peirce and Mark T. Uyeda, SEC Comm'rs, *Statement Regarding Denial*
    *of Petition for Rulemaking* (Dec. 15, 2023), http://tinyurl.com/5cy5ux3w ........................... 15

Caroline D. Pham, CFTC Comm'r, *Statement on* SEC v. Wahi
    (July 21, 2022), http://tinyurl.com/ytny6a9w.......................................... 15

*Pokémon Trading Card Game*, Pokémon, http://tinyurl.com/4xcra4rn (last visited
    Feb. 29, 2024)........................................................................................ 13

Marco Quiroz-Gutierrez, *FTX Is Bankrupt and SBF Was on Trial, So Why Are*
    *People Still Buying FTT Tokens?*, Fortune Crypto
    (Nov. 3, 2023), http://tinyurl.com/3efyys2d.................................................. 13

SEC, *Further Definition of "As a Part of a Regular Business" in the Definition of
Dealer and Government Securities Dealer in Connection with Certain Liquidity
Providers*, Release No. 34-99477 (Feb. 6, 2024), http://tinyurl.com/xx4r5mt6 ....................15

SEC Opp. to Mot. for J. on the Pleadings, *SEC v. Coinbase, Inc.*,
No. 23-cv-4738 (S.D.N.Y. filed Oct. 3, 2023) ...........................................................8

SEC Opp. to Mot. to Dismiss, *SEC v. Binance Holdings Ltd.*,
No. 23-cv-1599 (D.D.C. filed Nov. 7, 2023)............................................8, 11, 12

*Supercharger*, Tesla, http://tinyurl.com/2fntfuj2 (last visited Feb. 29, 2024)..............................13

Transcript, *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599
(D.D.C. filed Jan. 26, 2024) ...........................................................................6

Transcript, *SEC v. Coinbase, Inc.*, No. 23-cv-4738
(S.D.N.Y. filed Jan. 22, 2024), Dkt.101 ................................................6, 10, 11, 12

*Welcome to Ethereum*, Ethereum Foundation, ethereum.org
(last visited Feb. 29, 2024) ............................................................................12

BRIEF FOR AMICI CURIAE BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS

### INTEREST OF *AMICI CURIAE*[1]

The Blockchain Association ("BA") is a nonprofit membership organization dedicated to promoting a pro-innovation policy environment for the digital asset economy.  BA endeavors to achieve regulatory clarity and to educate policymakers, regulators, courts, and the public about how blockchain technology can pave the way for a more secure, competitive, and consumer-friendly digital marketplace.  BA represents over 100 member companies reflecting the wide range of the dynamic blockchain industry, including software developers, infrastructure providers, exchanges, custodians, investors, and others supporting the public blockchain ecosystem.

The DeFi Education Fund ("DEF") is a nonpartisan research and advocacy group working to explain the benefits of decentralized finance to policymakers around the globe, achieve regulatory clarity for the future of the global digital economy, and help realize the transformative potential of decentralized finance.  DEF advocates for the interests of decentralized finance users, participants, and software developers working to create new decentralized finance products using blockchain technology.  Among other things, DEF educates the public about decentralized finance through op-eds, podcasts, and print media; meets with members of Congress to discuss decentralized finance and attendant issues; and submits public comments on proposed rulemakings that impact decentralized finance.

As organizations with a wide breadth of knowledge and background relating to the digital asset industry, BA and DEF respectfully submit this brief to provide the Court with their and the industry's perspective on the important issues raised in this case, and to urge the Court to reject the SEC's ongoing efforts to exceed its statutory authority by claiming regulatory jurisdiction over practically all digital assets.

### INTRODUCTION

This suit represents yet another attempt by the SEC to sweep practically all digital assets within its regulatory purview on the theory that those assets purportedly represent "investment contract[s]" under the federal securities laws.  15 U.S.C. §§77b(a)(1), 78c(a)(10).  That theory is

---

[1] Counsel for *amici* certify that no counsel for a party authored this brief in whole or in part, and no person other than *amici* made any monetary contribution to its preparation or submission.

1   meritless.  As the statutory text, history, and governing precedent confirm, an "investment contract"

2   requires an ongoing relationship between the parties, in the form of a continuing obligation on the

3   part of the seller or promoter to manage a common enterprise for the buyer's benefit.  The digital

4   assets at issue here, by contrast, are just assets—not investment contracts.  Like books, wheat,

5   baseball cards, automobiles, or any of the other millions of assets that Americans buy and sell every

6   day, digital assets do not involve any kind of ongoing obligation on the part of their seller or

7   developer to manage any common enterprise for the buyer's benefit.

8       The SEC's constantly shifting arguments to the contrary are deeply flawed.  While the SEC

9   has sometimes suggested that digital assets are somehow themselves "investment contracts," it has

10   elsewhere acknowledged that this argument cannot be right.  And to the extent the SEC has tried to

11   argue that a digital asset becomes a security whenever a buyer believes that asset will rise in value

12   based on its creator's or seller's efforts, or whenever its creator or seller makes any statement to that

13   effect, that position is untenable.  If the SEC's authority truly extended that far, it would give the

14   agency jurisdiction over any of a wide range of assets that speculators may buy in the expectation

15   that their value will increase based on their manufacturers' efforts to limit supply and/or increase

16   demand—which perhaps explains why the SEC itself has recently retreated from that sweeping

17   theory.

18       Finally, to the extent the SEC tries to argue that digital assets are different because each

19   digital asset is tied to a particular "ecosystem" (a term that the SEC does not define), and so its value

20   necessarily grows or declines in tandem with the success of that "ecosystem" as a whole, that

21   argument fails both as a matter of fact and as a matter of law.  Contrary to what the SEC has

22   suggested, the value of a digital asset is *not* necessarily tied to the success of its creator or others; in

23   fact, a digital asset can continue to have value long after the entity that created it has relinquished

24   control over the development of that asset, and even after that entity no longer exists.  In any event,

25   countless assets have values that are tied to a broader "ecosystem," from Barbies to baseball cards

26   to electric cars.  That does not mean that anyone who buys one of those assets is purchasing a

27   security.  Nor does the mere fact that an asset and its producer may both grow in value at the same

28   time through the producer's efforts turn the asset into a security.  As with the SEC's other theories,

its "ecosystem" theory would radically expand SEC jurisdiction in a way that has neither any basis in the statute nor any meaningful limiting principle—which may be why the SEC has chosen to pursue it through ad hoc enforcement actions rather than subjecting it to the crucible of notice-and-comment rulemaking.

In short, none of the SEC's ever-evolving approaches can justify its ongoing efforts to expand its regulatory jurisdiction far beyond the bounds Congress imposed in the federal securities laws.  Congress is currently in the midst of deciding for itself which federal regulators should have jurisdiction over which parts of the digital assets market, and the SEC cannot preempt that congressional decision by seizing additional authority for itself, especially when it cannot even develop a coherent doctrine to justify its power grab.  The SEC's constantly shifting theories would be bad enough if it were just a private litigant; coming from a regulatory agency tasked with ensuring that industry participants and the public at large understand what the law requires, the SEC's lack of clear guidance and its disregard for the limits of its statutory authority are inexcusable.  And by advancing its oft-changing theories through ad hoc enforcement actions rather than setting out a fixed (and judicially reviewable) position through notice-and-comment rulemaking, the SEC has left the digital assets industry in a state of utter regulatory confusion, with countless law-abiding industry participants facing an imminent risk of SEC enforcement litigation just for failing to comply with the agency's exaggerated and mercurial understanding of its own authority.  This Court should end that state of affairs and reject the SEC's untenable attempt to expand its jurisdiction to reach practically all digital assets.

**ARGUMENT**

**I.      Digital Assets Are Not Inherently Securities.**

The Securities Act and the Exchange Act authorize the SEC to regulate transactions involving any "security," a term statutorily defined by a list of over fifty various categories of financial instruments, such as a "note," "stock," "bond," "debenture," etc.  15 U.S.C. §77b(a)(1); *see id.* §78c(a)(10).  While that list is extensive, it does not purport to include anything and everything one might obtain as an "investment" in the colloquial sense, or even everything traded on markets.  For instance, it does not include commodities—i.e., things

BRIEF FOR AMICI CURIAE BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

like gold, wheat, sugar, or oil—even though they are traded by sophisticated parties on markets all throughout the country.  *Cf.* 7 U.S.C. §1a(9) (defining "commodity").  Instead, the common feature among the instruments included in the statutory definition of "security" is not that people may purchase them hoping to turn a profit, but that those instruments (unlike commodities) all involve some sort of ongoing relationship between the purchaser and the issuer or seller.  Broadly speaking, the purchaser agrees to invest its capital into a common enterprise, and the issuer or seller agrees in return to manage the enterprise's affairs to benefit its investors and share any profits with them.  *See, e.g.*, *SEC v. W.J. Howey Co.*, 328 U.S. 293, 297-300 (1946).

The SEC does not contend that the digital assets at issue in this case are notes, stocks, bonds, or any of the other instruments that one might normally think of as a security.  Instead, the SEC relies on just one term in the statutory definition of "security," claiming that the digital assets at issue here—and practically all other digital assets—fall within the SEC's jurisdiction because they represent "investment contracts."  *See, e.g.*, Dkt.1 ("Complaint") ¶¶1, 4, 14-16, 58, 61-62.

That claim contravenes the statutory text, history, precedent, and common sense.  As its plain meaning suggests, the term "investment contract" requires an ongoing investment relationship between the parties, in the form of a continuing contractual undertaking on the part of the seller or a third party to manage a common enterprise for the buyer's benefit and share any profits.  That understanding is reflected in the numerous state "blue sky" laws that used the term before Congress enacted the Securities and Exchange Acts, and in the state-court cases interpreting them.  *See, e.g.*, *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920) (certificates providing "the right to share in the profits of the corporation" were investment contracts).  That same understanding continues in the Supreme Court's seminal decision in *Howey*, which explains that an investment contract requires "a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'"  328 U.S. at 298 (quoting *Gopher Tire*, 177 N.W. at 938); *see also id.* at 298-99 ("investment contract" means "a contract, transaction[,] or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party").

Under that settled understanding, the digital assets at issue here are just assets, not investment contracts. When those assets are sold and purchased, they do not involve any kind of ongoing obligation on the part of the seller or any third party to manage any common enterprise for the buyer's benefit and resulting profits; the buyer acquires title to the digital asset and nothing more. Any subsequent increase (or decrease) in the value of that asset is the result of market forces like supply and demand. The fact that the asset buyer may expect the value of its asset to increase due to marketing or other efforts by its creator, or that the creator has declared that it intends to engage in such efforts, does not convert a simple asset sale into an investment in a common enterprise in which the seller or creator has ongoing obligations to the buyer.

To be sure, it is *possible* to create a digital asset that would involve such ongoing obligations and so would qualify as an investment contract (or some other form of security). For instance, a business could create a digital asset that represents a traditional share of stock in that business and carries with it a contractual right to a share of the business's profits. But digital assets of that nature are exceedingly rare, and the SEC does not assert that any of the assets at issue here fall into that rare class (nor does it allege any facts that would support such an assertion). Instead, the SEC's allegations here—as in similar recent SEC enforcement actions—describe only typical digital assets that do not carry with them any continuing obligation on the part of their creators, sellers, or any third parties toward their buyers or anyone else. *See, e.g.*, Complaint ¶¶58-67, 228-445; *cf.* Complaint ¶¶127-305, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y. filed June 6, 2023), Dkt.1 ("Coinbase Complaint"); Complaint ¶¶364-509, *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599 (D.D.C. filed June 5, 2023), Dkt.1 ("Binance Complaint"). The SEC thus asserts jurisdiction here only on the theory that practically all digital asset transactions represent investment contracts. Because that theory fails as a matter of law and fact, the digital assets at issue here are just assets, not securities, and they therefore fall outside the SEC's jurisdiction.

## II.    The SEC's Various Grounds For Trying To Categorize Practically All Digital Assets As Securities Are Wrong.

Despite the absence of any clear statutory authority to regulate digital asset transactions, the SEC has now filed multiple enforcement actions against digital asset industry participants, putting

1    forward a variety of different theories (sometimes even within the same case) in its ongoing efforts

2    to come up with some justification for claiming that digital asset transactions are securities

3    transactions subject to SEC oversight.  None of those various theories is persuasive.

4        **A.    Digital Assets Typically Are Not Themselves Investment Contracts.**

5        At times, the SEC has suggested that it believes that digital assets are *themselves* investment

6    contracts (making them what the SEC newly calls "crypto asset securities").  *See, e.g.*, Complaint

7    ¶4 (noting that the SEC has asserted that crypto assets "may be considered investment contracts"

8    and that the SEC has brought enforcement actions "based on the offer and sale of crypto assets as

9    securities"); *id.* ¶14 (alleging "the offer and sale of crypto assets as investment contracts"); *id.* ¶58

10   ("[C]rypto asset securities are investment contracts represented by the underlying crypto asset.");

11   *id.* ¶62 (alleging that sales of the digital assets here were "offers and sales of investment contracts");

12   *id.* ¶228 (alleging Kraken has made available for trading "many crypto assets that are offered and

13   sold as investment contracts and thus are securities"); *see also, e.g.*, Coinbase Complaint ¶¶1, 6,

14   102, 114 (similar); Binance Complaint ¶¶352, 362 (similar).  That position, however, has been

15   correctly rejected by multiple courts—and even the SEC itself has recently retreated from that view.

16   *See, e.g.*, *SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *12 (S.D.N.Y. July 31, 2023)

17   (digital assets "if taken by themselves, might not qualify as investment contracts"); *SEC v. Ripple*

18   *Labs, Inc.*, 2023 WL 4507900, at *7-8 (S.D.N.Y. July 13, 2023) ("XRP, as a digital token, is not in

19   and of itself … an investment contract."); Transcript at 100, *SEC v. Binance Holdings Ltd.*, No. 23-

20   cv-1599 (D.D.C. filed Jan. 26, 2024), Dkt.212 (SEC clarifying it was "not alleging that the token

21   itself is a crypto asset security"); Transcript at 21, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y.

22   filed Jan. 22, 2024), Dkt.101 ("Coinbase Tr.") ("[SEC]:  The token itself is not the security.  THE

23   COURT:  I understand that.  Right.").

24       That is for good reason.  As the SEC itself has long recognized, commodities and other assets

25   are not themselves investment contracts.  To be sure, virtually any asset can be a *component* of an

26   investment contract—but only if its sale is accompanied by post-sale obligations to the buyer.  *See,*

27   *e.g.*, *Am. Diamond Co.*, SEC No-Action Letter, 1977 WL 10907, at *4-5 (Aug. 15, 1977) (taking no

28   action where seller intended to advertise "diamonds as an investment" but had no obligation to

provide further services); *Future Sys. Inc.*, SEC No-Action Letter, 1973 WL 9653, at *3 (June 8, 1973) (taking no action on sales of silver where seller stored the silver for the buyer but otherwise "would have no relationship with the purchaser after the initial sale"). As *Howey* explained, without that "opportunity … to share in the profits of a large citrus fruit enterprise managed and partly owned by" the seller, the sale of an asset like an orange grove remans just "an ordinary real estate sale"—even if the purchaser may expect the land to prove profitable. *Howey*, 328 U.S. at 298-99. Indeed, even the SEC's proffered definition of an "investment contract" in *Howey* required an ongoing "contractual arrangement." Br. for the SEC, *SEC v. W.J. Howey Co.*, No. 843, 1946 WL 50582, at *9 (U.S. Apr. 17, 1946) (describing the "definition of an 'investment contract' … as including any *contractual arrangement* for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters" (emphasis added)). But in all events, even when an asset is a *component* of an investment contract, that does not make the asset itself an "investment contract," such that all future transactions involving that asset would be investment contracts too.

That settled understanding dooms any claim that all digital assets themselves constitute "investment contracts." Just like diamonds or silver, digital assets by themselves are simply assets; they are not contracts of any kind, let alone investment contracts. *See Terraform*, 2023 WL 4858299, at *12; *Ripple*, 2023 WL 4507900, at *7-8. And because digital assets by themselves typically are not securities, there is no viable argument that secondary sales of such assets—which generally involve no accompanying promises by the asset's seller and no new investment in the asset's creator—are securities transactions simply because they involve digital assets. Notably, many digital assets companies *do* issue actual securities, in the form of shares in the companies themselves, that *do* represent actual investments in those companies—and that are entirely distinct from the digital assets those companies create or trade, just as a share in a gold-mining company is distinct from the actual gold that company mines. In short, there is no support for any claim that virtually all digital assets inherently constitute investment contracts and so are subject to the SEC's regulatory power, which likely explains why the agency appears to have now disavowed that theory.

BRIEF FOR AMICI CURIAE BLOCKCHAIN ASSOCIATION AND DEFI EDUCATION FUND IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS

*See supra* p.6.  This Court should likewise reject any attempt by the SEC to now claim in this case that the digital assets here are somehow themselves investment contracts.

> **B.** **Digital Assets Do Not Become Investment Contracts Whenever a Buyer Believes They Will Increase in Value Due to Their Creators' Efforts.**

At other times, the SEC has suggested that even if digital assets are not investment contracts themselves, transactions in those assets become investment contracts whenever a buyer believes the value of the asset will rise in value due to its creator's or seller's efforts, or whenever its creator or seller makes public statements indicating that they intend to devote future efforts to increasing its value.  *See, e.g.*, Complaint ¶62 (alleging that transactions in the digital assets here were investment contracts because their purchasers "would reasonably have expected to profit from the efforts of [their] issuers and promoters"); *id.* ¶63 (alleging that statements by the assets' "issuers and promoters … would have indicated to a reasonable investor that future profits through the increased value of the [assets] would come through the efforts of these issuers and promoters"); *see also, e.g., id.* ¶¶66, 228, 235, 237, 255; Coinbase Complaint ¶¶18, 126, 133, 145 (similar); Binance Complaint ¶¶370, 382, 389 (similar); SEC Opp. to Mot. for J. on the Pleadings at 1, *SEC v. Coinbase, Inc.*, No. 23-cv-4738 (S.D.N.Y. filed Oct. 3, 2023), Dkt.69 ("Coinbase Opp.") (asserting that creators of digital assets "invited" buyers "reasonably to expect the value of their [assets] to increase based on the issuer's broadly-disseminated plan to develop and maintain the asset's value"); SEC Opp. to Mot. to Dismiss at 3, *SEC v. Binance Holdings Ltd.*, No. 23-cv-1599 (D.D.C. filed Nov. 7, 2023), Dkt.172 ("Binance Opp.") (asserting that digital asset buyers "were offered the opportunity to participate—via the potential appreciation of the value of the crypto assets—in the promoters' efforts to develop and grow the issuers' blockchain-based business").  That position is likewise untenable, and would render the SEC's jurisdiction over commercial transactions effectively limitless.

To begin, that theory sorely misreads the Supreme Court's decision in *Howey*.  To be sure, *Howey* described an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298-99; *see id.* at 298 ("investment contract" means "a

contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment'" and has been used to encompass "a variety of situations where individuals were led to invest money in a common enterprise with the expectation that they would earn a profit solely through the efforts of the promoter or of some one other than themselves"). But *Howey* made clear that a mere *expectation* of profits from the efforts of another is not alone sufficient to create the requisite "contract, transaction or scheme." *See id.* at 299 (explaining that the sale of "a farm or orchard coupled with management services" would not alone be an investment contract). The transaction must involve a "common enterprise"—that is, an ongoing relationship between the parties in a "profit-seeking business venture" in which "the promoters manage, control[,] and operate the enterprise" for the benefit of investors who "provide the capital and share in the earnings and profits." *Id.* at 300. Absent that kind of continuing relationship between the parties—with ongoing *obligations* on the part of the promoter or seller to increase value and share profits—an investment contract cannot arise, regardless of whether the buyer expects to profit from the promoter's or seller's future efforts or whether the promoter or seller has declared any intent to engage in such efforts.

Any other interpretation would effectively erase any limits on the SEC's jurisdiction over commercial transactions, giving it authority over all kinds of assets that speculators may buy in the expectation that their producers will devote effort to increasing their value. Someone might well decide to buy a rare Barbie based on statements by Mattel that it intends to restrict the supply of that particular doll and drive demand through a major advertising campaign, or buy a limited-run pair of Nike sneakers based on statements by the company that it intends to increase the value of that model by signing a well-known athlete to promote them, or buy gold based on statements by the World Gold Council about its planned efforts to promote gold as a store of value. In each of those cases (and countless others like them), the buyer might well have reasonable expectations that its asset will increase in value as a result of the seller's or a third party's efforts, based on representations about future plans to drive the value of those products. But those expectations do not convert Barbies, sneakers, or gold into securities, or subject those asset purchases to the registration and disclosure requirements of the Securities and Exchange Acts. As long as there is no continuing

1    relationship or ongoing obligation on the seller's part to manage a common enterprise for the buyer's

2    benefit and share resulting profits, the mere fact that the buyer expects an asset to increase in value

3    based on the seller's or a third party's future efforts does not create SEC jurisdiction.

4         In fact, the SEC has apparently recognized that problem with its position, as it has recently

5    elsewhere conceded that an asset transaction does *not* become an investment contract just because

6    the buyer expects the asset to increase in value based on another's efforts.  *See, e.g.*, Coinbase Tr.49-

7    50 (SEC disavowing the position that "any asset purchased with an expectation that its value will

8    go up based on the entrepreneurial or managerial efforts of others is an investment contract"); *id.* at

9    55-56 (SEC recognizing that "just buying an item, and … hoping that it appreciates … is not a

10   securities transaction").  But that is all that the SEC's allegations here plausibly show:  that at least

11   some buyers might have purchased digital assets in the expectation that their value would rise based

12   on the expected development and marketing efforts of their producers, just as at least some buyers

13   purchase Barbies, sneakers, or other assets in the expectation that their respective producers will

14   likewise work to increase the value of those assets.  *See, e.g.*, Complaint ¶¶62, 63, 66, 228, 235,

15   237, 255; *cf.* Coinbase Tr.56 (SEC recognizing that "if you buy a baseball card, for example, you're

16   not buying into the baseball card player enterprise").  That is not enough to turn the purchase of a

17   digital asset (or any other asset) into an investment contract.

18        Nor does it help the SEC to allege that the creators of the digital assets at issue made "public

19   statements … describ[ing] the efforts they have made and will continue to make" to develop those

20   assets and "attract users to the technology."  Complaint ¶236; *see, e.g., id.* ¶¶263, 279, 307.  For one

21   thing, the SEC conflates utility and price, treating statements about intended future efforts to expand

22   the usefulness of a particular digital asset as if they were promises that the asset's price would

23   increase.  *See, e.g., id.* ¶¶236, 263, 279, 307. In any event, as the Ninth Circuit has recognized,

24   promotional statements about an asset seller's future intentions simply do not give rise to the kind

25   of ongoing obligation on the seller's part that would be necessary for an asset sale to become an

26   investment contract.  *See De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300-

27   01 (9th Cir. 1979) (seller's representations in promotional materials about its intended future

28   development efforts did not convert sales of land into investment contracts).  That does not mean

10

that buyers of digital assets (or other assets) have no legal protection against unscrupulous sellers; if an asset seller made statements about its intended future efforts that the seller knew were false and that were intended to induce reliance, the buyer may well have a valid fraud claim.  But for digital assets as for other assets, the mere fact that an asset seller has advertised its intent to work hard to increase the value of its product does not convert every purchase of that product into a securities transaction.  This Court should reject any attempt by the SEC to argue to the contrary. *See, e.g.*, Complaint ¶¶62-63.

> **C.      Digital Assets Do Not Become Investment Contracts Whenever They Are Part of a Digital "Ecosystem".**

Presumably recognizing these problems, the SEC has recently tried a new theory: that digital assets are different from other assets because each digital asset is tied to a particular "ecosystem," and so the asset's value necessarily grows or declines in tandem with the efforts of the asset's creator to develop that "ecosystem."  *See, e.g.*, Complaint ¶62; Binance Opp.18 (asserting that the value of a digital asset is "dependent on the success of the enterprise" because digital asset value is "tied … to the token ecosystem"); Coinbase Tr.19 (SEC: "[T]hat network or ecosystem, that is what drives the value of the token because the token as code is linked to that ecosystem. It is tied to it. It cannot be separated from it. As the value of that network or platform or ecosystem increases, so does the value of the token."); *id.* at 57 (SEC: "[W]hat is the enterprise? It's the network. It's the ecosystem. You are buying into that ecosystem with your token. … The token would be worthless without the ecosystem[.]").  That latest effort to justify the SEC's overreach is not only in tension with its previous recognition that a robust and decentralized ecosystem makes a digital asset *less* like a security, *see infra* p.13, but both factually and legally wrong in any event.  The fact that an asset can be described as part of a broader "ecosystem" does not turn buying that asset into an investment in a common enterprise with its creator, let alone an investment contract subject to the federal securities laws.

As an initial matter, the SEC has never clearly defined what it thinks an "ecosystem" is, and it apparently misunderstands how industry participants would use that term.  The SEC appears to believe that each digital asset has a group of developers and entities that work together with a

Case No. 3:23-CV-06003-WHO

common goal of developing that asset and increasing its price.  That belief is mistaken.  Contrary to what the SEC suggests, the ongoing development of a blockchain does not usually rest solely in the hands of a single creator or developer.  Instead, a blockchain "ecosystem" often involves a number of independent actors or groups of actors with no control over each other and who might not even communicate with each other, each of which plays a different role in the maintenance and expansion of the blockchain as a whole.

For instance, a blockchain ecosystem may include individual developers who work on the code for a blockchain protocol early in the project and then are no longer involved, or other developers who join later to fix specific bugs and then never have any other involvement; it may include foundations that did not develop the underlying protocol but are established later to maintain it; it may include labs that are focused on designing future developments or improvements; and it may include any combination of other independent persons or entities, each playing a different role in the perpetuation of the ecosystem as a whole.  *See, e.g.*, *Welcome to Ethereum*, Ethereum Foundation, ethereum.org (last visited Feb. 29, 2024) (describing Ethereum as a "community-run technology").  These entities usually do not have formal or informal obligations to each other; they instead operate as wholly separate units.  Given the wide range of actors that may be involved in developing a single blockchain, the SEC's apparent belief that the value of any digital asset is necessarily closely tied to the ongoing efforts of the digital asset's original creator is plainly incorrect.  More important, the involvement of these numerous independent actors demonstrates that the purchase of a digital asset is neither an investment in a common enterprise, nor premised on a reasonable expectation of profit from the efforts of the digital asset's creator.

Indeed, despite what the SEC has suggested, the value of a digital asset (unlike a security) is *not* necessarily tied to the economic success or even the continued existence of the person or entity that created it.  *Contra* Binance Opp.18; Coinbase Tr.19, 57.  Digital assets can continue to have value even if their creators are no longer putting any effort at all into developing an "ecosystem"— indeed, even if their creators are defunct.  For example, the DOGE token continues to retain value and trade at high volumes even though its creator has publicly walked away from the token, *see* Shalini Nagarajan, *Dogecoin's Creator Sold All His Coins 6 Years Ago After Getting Laid Off*, Bus.

Insider (Feb. 12, 2021), http://tinyurl.com/37t3kbj8, as does the FTT token even though FTX is in bankruptcy proceedings and no "ecosystem" for the token will ever exist again, *see* Marco Quiroz-Gutierrez, *FTX Is Bankrupt and SBF Was on Trial, So Why Are People Still Buying FTT Tokens?*, Fortune Crypto (Nov. 3, 2023), http://tinyurl.com/3efyys2d. Indeed, even the SEC appears to agree that transactions in two of the most popular digital assets—Bitcoin and Ether—are *not* investment contracts because there is no single entity on whose managerial efforts a buyer could even theoretically be said to rely when purchasing those assets. *See, e.g.*, *SEC v. Telegram Grp. Inc.*, 448 F.Supp.3d 352, 358 (S.D.N.Y. 2020) (recognizing that a digital asset "utilized by members of a decentralized community" and "administered by this community of users … is not likely to be deemed a security"); *Cryptocurrencies: Oversight of New Assets in the Digital Age, Hr'g Before the U.S. H. Comm. on Agric.*, 115th Cong. 28 (2018) (statement of Gary Gensler); William Hinman, Director, SEC Div. of Corp. Fin., *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at Yahoo Finance All Markets Summit: Crypto (June 14, 2018), http://tinyurl.com/58c4rds.

Once again, the SEC's theory proves far too much. Countless assets have values that are tied in some way to a broader "ecosystem" and to the efforts of their producers (or others) to expand and improve that "ecosystem." The value of a Tesla electric car, for instance, is unquestionably tied to a certain extent to Tesla's efforts to continue expanding its network of "Supercharger" charging stations that allow drivers to quickly recharge their Tesla automobiles. *See Supercharger*, Tesla, http://tinyurl.com/2fntfuj2 (last visited Feb. 29, 2024). The value of a Pokémon card is likewise tied to at least some extent to The Pokémon Company's efforts to develop and expand its network of customers who play that popular trading card game, *see Pokémon Trading Card Game*, Pokémon, http://tinyurl.com/4xcra4rn (last visited Feb. 29, 2024), as well as service providers who create venues for trading cards, vendors who sell branded merchandise, fan groups who create a secondary market, and countless others. But the fact that those assets exist only in the context of a broader ecosystem that drives their value—and at least for Pokémon cards, would be worthless without that broader ecosystem—does not mean that everyone who buys a Tesla or a Pokémon card is buying a security, much less that those assets must be registered with the SEC. Put simply, the mere existence

of a broader ecosystem that affects an asset's value does not convert the purchase of that asset into an investment in a common enterprise with its creators and all others involved in the asset's "ecosystem."

So too for the SEC's suggestion that digital assets reflect a common enterprise because both the buyers of a digital asset and its creator will profit if the creator is successful in developing the asset. *See, e.g.*, Complaint ¶¶49-50, 65, 254, 307.  As explained, the value of a digital asset is not necessarily tied to the success of its creator, and a digital asset (unlike a security) may retain value even if its creator becomes defunct. *See supra* pp.12-13.  But even if digital assets were strictly correlated with the value of their producers, the mere fact that an asset and its producer may both grow in value at the same time through the producer's efforts does not thereby turn that asset into a security or its purchase into an investment in a common enterprise (particularly when that purchase involves no ongoing contractual obligation on the producer's part).  The market price of diamonds and the market value of De Beers may often move in tandem—and may be influenced by De Beers' own marketing efforts—but that does not mean that a person who buys a diamond from De Beers is somehow joining a common enterprise with that company.  In short, as with the SEC's other theories, its ecosystem theory has no basis in the "economic reality" that the securities laws are intended to reflect, *Howey*, 328 U.S at 298, and would expand the SEC's regulatory dominion far beyond the limited class of transactions that Congress has actually authorized the agency to regulate.

### D.   The SEC's Conflicting Theories Leave Industry Participants Without Any Fair Notice of the Asserted Scope of Its Regulatory Authority.

The SEC's various—and sometimes contradictory—theories not only are wrong, but also underscore the SEC's failure to give industry participants fair notice of what activities it believes fall within its jurisdiction and require registration under the federal securities laws.  *See, e.g.*, *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III: Hearing Before the H. Comm. on Fin. Servs.*, 117th Cong. 12 (2021) (statement of Gary Gensler, SEC Chair) (acknowledging that "right now the exchanges trading in these crypto assets do not have a regulatory framework … at the SEC" and "only Congress … could really address it"); *cf. Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (courts assessing fair notice may consider "the

interpretation of the statute given by those charged with enforcing it"). In keeping with its apparent commitment to deliberate regulatory ambiguity, the SEC has refused to propose for public comment any regulations setting forth its view on what purportedly brings a digital asset within its regulatory domain—and in fact explicitly denied a recent petition for rulemaking imploring the agency to do so, despite numerous requests to the same effect from other industry participants over the years. *See* Letter from Vanessa Countryman, Secretary, SEC, to Paul Grewal, Chief Legal Officer, Coinbase Global, Inc. (Dec. 15, 2023), *available at* http://tinyurl.com/4ezj2wa2. *But see* Hester M. Peirce and Mark T. Uyeda, SEC Comm'rs, *Statement Regarding Denial of Petition for Rulemaking* (Dec. 15, 2023), http://tinyurl.com/5cy5ux3w (dissenting from denial of petition because "addressing these important issues is a core part of being a responsible regulator"). The SEC has even gone so far as to proceed with finalizing *other* regulations that specifically implicate what the SEC calls "crypto asset securities"—all without providing any guidance on what that term actually means. *See* SEC, *Further Definition of "As a Part of a Regular Business" in the Definition of Dealer and Government Securities Dealer in Connection with Certain Liquidity Providers*, Release No. 34-99477 (Feb. 6, 2024), http://tinyurl.com/xx4r5mt6.

Instead, the SEC has continued to sue industry participant after participant based on confused and contradictory theories of what makes a digital asset a security—an approach that, as one SEC Commissioner observed (in regard to another SEC case against Kraken, no less) "does not cut it" when it comes to providing fair notice of what the law requires. Hester Peirce, SEC Comm'r, *Kraken Down*: *Statement on* SEC v. Payward Ventures, Inc., et al. (Feb. 9, 2023), https://tinyurl.com/2mwnuppr; *see id.* (recognizing that "[u]sing enforcement actions to tell people what the law is in an emerging industry" is not a "fair way of regulating"); Caroline D. Pham, CFTC Comm'r, *Statement on* SEC v. Wahi (July 21, 2022), http://tinyurl.com/ytny6a9w (emphasizing that digital asset regulation should be "addressed through a transparent process that engages the public to develop appropriate policy with expert input—through notice-and-comment rulemaking," because "[r]egulatory clarity comes from being out in the open, not in the dark").

Making matters worse, throughout the past two years, the SEC has adopted a new enforcement strategy: regulation by enforcement against third parties. As in this case, the SEC has

chosen not to sue the actual creators of the digital assets at issue, forcing other parties to litigate (and courts to adjudicate) the issue of whether those assets are securities in the absence of an entity that may have the most relevant information and whose interests may be most significantly affected. *See, e.g.*, Complaint ¶¶228-445 (alleging that certain tokens are securities but not naming their creators as defendants); Coinbase Complaint ¶¶114-305 (same); Binance Complaint ¶¶364-509 (same); Complaint ¶¶95-206, *SEC v. Wahi*, No. 22-cv-1009 (W.D. Wash. filed July 21, 2022), Dkt.1 (same).   This leaves the third-party creators suffering real harm without any means by which to defend themselves, as private parties are not permitted to intervene in SEC enforcement proceedings without the SEC's consent.   *See* 15 U.S.C. §78u(g) (SEC enforcement actions seeking equitable relief shall not be "consolidated or coordinated" with private actions absent SEC consent).   And it leaves the industry as a whole with no guidance on the governing legal standards except for the (sometimes inconsistent) judicial decisions that have been issued in the particular enforcement actions that the SEC has chosen to bring, which necessarily address only the (sometimes unusual) facts presented in those particular cases and so cannot provide a uniform nationwide regulatory framework.   Meanwhile, the problems with the SEC's approach are only compounded by its continued insistence that digital asset industry participants must register even though it still has not provided any procedures for them to do so.   *See, e.g.*, Hester Peirce, SEC Comm'r, *Overdue: Statement of Dissent on LBRY* (Oct. 27, 2023), http://tinyurl.com/42wp6ptz ("There is no path for a company like LBRY to come in and register[.]").

The SEC's ongoing refusal to issue clear regulations setting forth its position on which digital assets fall within its regulatory jurisdiction, and the ever-shifting welter of confused theories it has invoked to try to justify its ad hoc enforcement actions against digital asset industry participants, have had serious negative effects on the American digital assets industry.   Digital assets companies in the United States face a constant threat of unpredictable SEC enforcement actions, casting a pall over the entire industry and discouraging new entities from entering the field.   Those risks to new industry participants, moreover, are further exacerbated by the SEC's strategy of bringing enforcement actions against entities other than asset creators and excluding those creators from litigation that can have a substantial impact on their businesses.   The agency has thus

16

compounded the burden on market participants—entrepreneurs, investors, and developers—and left them without any way of conclusively determining whether or not their activity will be subject to SEC regulation.  As a result, the agency's regulatory overreach has started to threaten the United States' competitive advantage in the development of innovative blockchain technologies, and has already driven some digital assets companies to other jurisdictions where the rules are clearer.  *See, e.g.*, Letter from Jake Chervinsky, Head of Policy, Blockchain Association, and Miller Whitehouse-Levine, Policy Director, DEF, to Vanessa A. Countryman, Secretary, SEC (June 13, 2022), https://tinyurl.com/5d96p4bx; GAO, GAO-23-105346, *Blockchain in Finance: Legislative and Regulatory Actions Are Needed to Ensure Comprehensive Oversight of Crypto Assets* (June 2022); *see also* Linda Jeng, *Crypto Migration: European and Asian Regulators Welcome Crypto Innovation While U.S. Cracks Down*, Forbes (Apr. 7, 2023), https://tinyurl.com/47hr5eee.  Those practical effects of the SEC's unsustainable approach provide all the more reason for this Court to reject the SEC's attempt to sweep practically all digital assets and digital assets transactions under its regulatory jurisdiction and to confirm that the vast majority of digital assets do not represent securities subject to SEC oversight under the federal securities laws.

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion to dismiss.

Dated:  February 29, 2024                          CLEMENT & MURPHY, PLLC

By:     /s/ Paul D. Clement
        Paul D. Clement *(pro hac vice)*
        Erin E. Murphy *(pro hac vice)*
        C. Harker Rhodes IV *(pro hac vice)*
        Nicholas M. Gallagher* *(pro hac vice)*
        Attorneys for *Amici Curiae* Blockchain
        Association and DeFi Education Fund