# EXHIBIT A

Drew C. Ensign (SBN 243956)
**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC**
2575 East Camelback Rd, Ste 860
Phoenix, AZ 85016
602-388-1262 (P)
densign@holtzmanvogel.com

*Counsel for the State of Montana*

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>          Plaintiff,<br><br>PAYWARD, INC.; PAYWARD VENTURES, INC.,<br><br>          Defendants. | Case No.: 3:23-cv-06003-WHO<br><br>**BRIEF OF AMICUS CURIAE STATE OF MONTANA SUPPORTED BY SEVEN OTHER STATES IN SUPPORT OF NEITHER PARTY**<br><br>Honorable William H. Orrick III |

## INTEREST OF AMICUS CURIAE

The State of Montana, supported by seven additional States whose support is noted below after the signature block, submits this amicus brief pursuant to the court's order dated January 18, 2024. This amicus is in support of neither party because the State of Montana takes no position as to the conduct or business practices of Payward, Inc. and Payward Ventures, Inc. (collectively, "Payward"), but it opposes the Securities and Exchange Commission's ("SEC") regulation of crypto assets absent an investment contract because Congress has not delegated this authority to the SEC.[1]

States have a strong interest in preventing the potential preemption of consumer protection and other state laws by the SEC's attempt to regulate crypto assets as securities. *See, e.g.*, Gary Gensler, SEC Chair, *Statement on the Approval of SpotBitcoin Exchange-Traded Products* (Jan. 10, 2024) (stating that the "vast majority of crypto assets are investment contracts and thus subject to the federal securities laws.").[2] The SEC's exercise of this undelegated authority puts consumers at risk by potentially preempting state statutes better tailored to the specific risks of non-securities products. Some state laws are *more* protective of consumers than the federal securities laws.

The SEC has described crypto assets as shares in a collective "ecosystem." Mtn. to Dismiss, Dkt. 25 at 23-25 (citing SEC statements in Coinbase and Binance oral arguments). The States have been at the forefront of using their enforcement authority to protect consumers in the area of technology ecosystems. *See, e.g., Utah v. Google LLC,* No. 3:21-cv-05227JD (N.D. Cal.) (action challenging anticompetitive practices in the Google play store); *Texas v. Google LLC,* No. 4:20-cv-00957-SDJ (E.D. Tex) (action challenging anticompetitive practices in the ad tech industry). The States are committed to protecting consumers in diverse technology ecosystems and have a significant interest in the potential preemption of state laws that would impact those efforts.

## ARGUMENT

**The SEC's Enforcement Action Exceeds its Delegated Powers.**

The SEC filed its complaint against Payward, a secondary market platform, alleging violations of the Exchange Act. *See* Compl., Dkt. 1 ¶¶ 447, 450, 453. The SEC's enforcement action is based

---

[1] "Crypto asset" refers to "an asset issued and/or transferred using blockchain or distributed ledger technology." *See* Mtn. to Dismiss, Dkt. 25 at 4 n.2.
[2] *Available at* https://www.sec.gov/news/statement/gensler-statement-spot-bitcoin-011023.

on the premise that "many of the crypto assets" bought and sold through Payward are "investment contracts" subject to the laws and regulations governing the U.S. securities market. *Id.* ¶ 14. But crypto assets are not automatically securities. The SEC's overly broad interpretation of investment contract means that the SEC is exceeding its authority by attempting to regulate non-securities.

### A. State-law cases inform the definition of "investment contract."

The Securities Act of 1933 and the Exchange Act of 1934 define "security" based on an enumerated list including "investment contract," among other "instrument[s] commonly known as a 'security.'" 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). The Supreme Court set forth a test for determining whether an instrument qualifies as an investment contract in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298-301 (1946). *Howey* established a three-part test requiring: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (quoting *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003)). The third prong of this test requires both an "expectation of profit" and that "expected profits are the product of the efforts of a person other than the investor." *Id*.

The Supreme Court held that Congress, in adopting this test, incorporated the "common" and "uniformly applied" understanding of "investment contract," which had been "crystallized" through state cases. *Howey*, 328 U.S. at 298; *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004). As the Court noted, the term was "common in many state 'blue sky' laws in existence prior to the adoption of the federal statute and, although the term was also undefined by the state laws, it had been broadly construed by state courts so as to afford the *investing public* a full measure of protection." *Howey*, 328 U.S. at 298 (emphasis added). Widely adopted in over 33 states, blue sky laws addressed "speculative schemes having no more basis than so many feet of blue sky" such as shares in "nonexistent gold mines." *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920). But these laws were not designed as general-purpose consumer protection laws.

One such blue sky law included a registration requirement that applied to "stocks, bonds, investment contracts, or other securities." Minn. Laws 1917, ch. 429 § 3, as amended by Minn. Laws 1919, ch. 105, 257. In a leading case, *Gopher Tire*, the Minnesota Supreme Court found certificates to be "investment contracts" where the certificates were "contracts" that "induce[d]" an "investment"

by "promis[ing] a share in defendant's profits," which the investor received in exchange for that investment. 177 N.W. at 938. The court interpreted "investment contract" to involve an "investment" as that term was "commonly used and understood": "placing of capital or laying out of money in a way intended to secure income or *profit from its employment*." *Id.* (emphasis added).

Applying a similar analysis to *Gopher Tire*, Kentucky's highest court held in *Lewis v. Creasey Corp.* that an offer by a grocery wholesaler to local stores to pay $300 for the right to buy groceries for only five percent above cost was not a "contract" within the meaning of the securities law. 248 S.W. 1046, 1049 (Ky. 1923). The court reasoned that the wholesaler had not "promised" to give the participants in the deal any part of his future profits. *Id*. As with *Gopher Tire*, the court's analysis was driven by the fundamental conclusion that the legislature acted to cover the essential attributes of a security, and not enact a general-purpose consumer protection law. *Id.* at 1048. Blue sky laws protected investors expecting profits from a business or enterprise—they were not designed to protect consumers who purchased an asset anticipating that it would increase in value.

Because the Supreme Court in *Howey* interpreted "investment contract" to encompass the meaning of that term as "crystallized" by the blue-sky law cases, the limitations recognized in those cases should inform the interpretation here. 328 U.S. at 298. "Investment contracts" under the Securities Act and the Exchange Act are not meant to serve as general consumer protection statutes covering all asset purchases. *See Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018-19 (7th Cir. 1994) ("The statutory language … suggests that the term 'investment contract' has the limited purpose of identifying unconventional instruments that have the essential properties of a debt or equity security."). The SEC's interpretation, however, ignores these limitations and seeks to apply "investment contract" to assets that do not meet the *Howey* definition.

**B.     The SEC wrongly expands the definition of "investment contract" in this enforcement action to any asset that could increase in value.**

The SEC's theory functions as a regulatory power grab through an expansive interpretation of "investment contract" that would encompass many non-securities transactions. *Howey*'s three-part test requires: "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." *Warfield*, 569 F.3d at 1020.

The test for "investment contract" is not met, without more, for crypto assets sold on a secondary market platform for multiple reasons. To begin, there is no contract or series of contracts for the issuer of the crypto asset to provide post-sale value to the buyer of such asset. As the Motion to Dismiss explains, the SEC has not alleged any contractual relationship between the 11 issuers and the persons who buy the crypto assets on the secondary market platform. Dkt. 25 at 1. The SEC also has not alleged that crypto asset buyers using Payward's platform had an expectation in the income, profits, or assets of any business. Instead, the SEC alleges that crypto purchasers had an expectation of increased "demand for and value of" their crypto assets based on the "managerial efforts" of the blockchain networks with which the crypto assets are associated. *See, e.g.,* Compl. ¶¶ 235, 237.

In other words, the SEC's theory is that purchasers who bought crypto assets on the Payward exchange expected that the value of those crypto assets would increase because the blockchain networks would continue to develop and "attract users to the technology." Compl. ¶ 236. But there is simply no continuing obligation by the issuers alleged here. The SEC is thus asking courts to find an "investment contract" under *Howey* in the absence of either a common enterprise or any contract with continuing obligations. *Cf. Milnarik v. M-S Commodities, Inc.*, 457 F.2d 274, 276 (7th Cir. 1972) ("Judicial analyses of the question whether particular investment contracts are 'securities' within the statutory definition have repeatedly stressed the significance of finding a common enterprise."). Instead, SEC's theory is based merely on the *voluntary maintenance* of the blockchain networks and purchasers' hopes that the value of the crypto assets they purchased on the secondary market will increase. *See, e.g.*, *Noa v. Key Futures, Inc.*, 638 F.2d 77, 79 (9th Cir. 1980) (finding agreement to sell silver bars were not "investment contracts" because after the sale "the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of Key Futures").

Such an expansive view would turn ordinary baseball card collectors into securities investors and third-party sellers of baseball cards into securities exchanges. A baseball card collector purchases cards in the hope that such cards will increase in value. The value of her card collection is dependent— like the blockchain networks attracting new users—on the viability of the card market and the card issuer's ability to attract new collectors. But the card collector has no continuing contractual relationship with either the card issuer or the seller of the card, and certainly no expectation of sharing

1   the card issuer's profits. Consumer protection laws apply, but securities laws do not.

2   *Lewis v. Creasey Corp.*, discussed above, is also instructive. There, a grocery wholesaler
3   permitted local stores to pay $300 for the right to buy groceries for only five percent above cost. 248
4   S.W. at 1049. The local stores depended on the wholesaler for inventory and thus would expect their
5   own profits to turn on the wholesaler's sound managerial efforts. But that did not create an investment
6   contract. As Kentucky's highest court explained, "[i]n one sense of the word every contract is an
7   investment by the parties thereto." *Lewis*, 248 S.W. at 1049. But an "investment contract" for
8   purposes of blue sky laws, and consequently the Exchange and Securities Act, does not encompass
9   all contracts. *Lewis*, 248 S.W. at 1049. The wholesaler's offer was not an "investment contract"
10  because he had not "promised" to give the local stores any part of his future profits. *Id*. Similarly,
11  even if the crypto purchasers depend on the sound management of the blockchain networks for the
12  increased value of their crypto assets, the purchasers do not expect a share of the *blockchain networks'*
13  profits. Instead, they are simply the holders of an asset; therefore, purchase of the crypto assets on the
14  secondary market platform are not investment contracts.

15  There are multiple reasons why someone might purchase an asset with hopes that its value or
16  market price will go up in the future. This could include rarity (like art or any other collector's item),
17  network effects (which are common in technology), or economies of scale causing prices for services
18  associated with the good to go down. But this does not turn the purchase of such an asset into an
19  investment contract. The SEC's expansive interpretation of "investment contract" would mean that
20  Congress somehow intended the SEC to function as a general-purpose consumer protection regulator
21  for any crypto asset where purchasers hope the value will increase. That simply is not the case, and
22  this over-reach will become increasingly problematic as the crypto-asset economy expands.

23  **C.    The SEC's overly broad interpretation of "investment contract" and claimed**
24  **authority over crypto assets squarely implicates the major questions doctrine.**

25  The who and what of regulating crypto assets is the subject of fierce debate.[3] And without a
26  clear answer from Congress, the SEC has appointed itself crypto regulator. When a federal

---

[3] Soumen Datta, *SEC v. CFTC: Inside the Battle for Control of the Crypto Landscape*, BSC News (May 16, 2023), *available at*, https://www.bsc.news/post/sec-vs-cftc-inside-the-battle-for-control-of-the-crypto-landscape.

administrative agency attempts to exercise new authority over an area of great economic or political significance, it requires "clear congressional authorization." *See W. Va. v. EPA*, 142 S. Ct. 2587, 2608-09 (2022). Under the major questions doctrine, courts "presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (internal quotations omitted). The doctrine protects important constitutional principles including "self-government, equality, fair notice, federalism, and the separation of powers." *Id*. at 2621 (Gorsuch, J., concurring). Here, the major questions doctrine forecloses the SEC's expansive view of its authority to regulate crypto assets in the absence of congressional legislation.

*First*, the SEC's regulation of crypto assets is economically and politically significant. The crypto asset industry has grown by some estimates to a total value of almost $2 trillion dollars, and the total estimated value of Bitcoin alone is over $1 trillion.[4] Moreover, one in five Americans has invested in, traded, or used cryptocurrency.[5] The SEC claims that Payward unlawfully failed to register as an exchange, broker, dealer, or clearing house based on the agency's interpretation that crypto assets qualify as securities. *See* Compl. ¶¶ 446-454. If permitted to regulate based on the SEC's expansive view of "investment contract," the SEC's reach would extend broadly across the industry and result in significant economic effects given the regulatory costs to industry participants. The SEC's claim of authority is also politically significant. Congress has considered dozens of legislative proposals about cryptocurrency, including whether crypto assets should be treated as securities regulated by the SEC or commodities regulated by the Commodity Futures Trading Commission.[6]

*Second*, regulation of crypto assets departs from the SEC's historical regulation. In applying the major questions doctrine, courts look at an agency's history of regulation and the implications of the power it is claiming for itself. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,

---

[4] *See* Shayak Majumder, *Cryptocurrency Price Today: Cryptocurrency Price Today: Bitcoin Remains Stable, Ethereum Slowly Approaches $3,000*, ABP News Live (Feb. 23, 2024), *available at* https://news.abplive.com/business/crypto/crypto-price-today-february-23-check-global-market-cap-bitcoin-btc-ethereum-doge-solana-litecoin-axl-imx-live-tv-1666696; *Bitcoin Market Cap*, available at https://ycharts.com/indicators/bitcoin_market_cap (last visited Feb. 22, 2024).

[5] Thomas Franck, *One in 5 Adults Has Invested In, Traded or Used Cryptocurrency*, NBC News Poll Shows, NBC News (March 31, 2022), *available at* https://www.nbcnews.com/tech/tech-news/one-five-adults-invested-traded-used-cryptocurrency-nbc-news-poll-show-rcna22380.

[6] *See* Jason Brett, *Congress Creates a Storm of Crypto Legislation*, Forbes (Aug. 3, 2023), https://www.forbes.com/sites/jasonbrett/2023/08/03/congress-creates-a-storm-of-crypto-legislation/?sh=5d477f093aa4.

141 S. Ct. 2485, 2489 (2021). The enforcement action in this suit contradicts SEC Chair Gary Gensler's testimony in 2021 regarding crypto asset regulation: "exchanges trading in these crypto assets do not have a regulatory framework either at the SEC, or our sister agency, the Commodity Futures Trading Commission."[7] And, as described above, expanding "investment contract" to purchases of assets without a contract for the issuer of the crypto asset to provide post-sale value to the buyer of such asset departs from historical practice. *See* Dkt. 25 at 10-11 (citing Brief for the SEC at *17, *SEC v. Edwards*, No. 02-1196 (U.S. June 26, 2003), 2003 WL 21498455 ("The second word in [investment contract] means an agreement between two or more persons to do or forbear something.") (cleaned up); Brief for the SEC at *9, *SEC v. Howey*, No. 843 (U.S. April 17, 1946), 1946 WL 50582 (an "investment contract" includes "any contractual arrangement for the investment of money in an enterprise with the expectation of deriving profit through the efforts of the promoters")). Under the major questions doctrine, the SEC has failed to show clear congressional authorization to regulate crypto assets absent an "investment contract."

### D. The federalism canon shuts down the SEC's expansive view of "investment contract" because it potentially preempts important state laws.

Like the major questions doctrine, the federalism canon also forecloses the SEC's interpretation of "investment contract" because it would upend the traditional division of powers between the States and the federal government. Courts do not assume that Congress exercises lightly its "extraordinary power" to preempt state law. *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). Instead, "if Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so *unmistakably clear* in the language of the statute." *Id.* (emphasis added) (cleaned up). The SEC's interpretation here would preempt areas of law traditionally regulated by states such as consumer protection. The court should reject the SEC's expansive view of "investment contract" under the federalism canon.

---

[7] *Game Stopped? Who Wins and Loses When Short Sellers, Social Media, and Retail Investors Collide, Part III*, Hr'g Before the U.S. H. Fin. Servs. Comm., 117th Cong. 12 (May 6, 2021) (statement of SEC Chair Gary Gensler), https://tinyurl.com/mtrnkbn2; *see also* Dkt. 25 at 5 n.11 (citing Hester M. Peirce, Comm'r, SEC, Outdated: Remarks Before the Digital Assets at Duke Conference (Jan. 20, 2023), https://tinyurl.com/47cypbvt ("[I]f we seriously grappled with the legal analysis and our statutory authority, . . . we would have to admit that we likely need . . . more clearly delineated, statutory authority . . . to require crypto trading platforms to register with us.")).

### 1. *The SEC's position could preempt important state consumer protection laws.*

The SEC's actions seek to radically expand its authority into areas of traditional state regulation and other fields of law such as general consumer protection, which could preempt state laws that are *more* protective of consumers than the securities laws. The National Securities Markets Improvement Act of 1996 ("NSMIA") preempts states from applying their own registration and qualification requirements to securities offerings and transactions in NSMIA-covered "securit[ies]." This includes security offerings by issuers traded on national securities exchanges. 15 U.S.C. § 77r(a). The definition of "sale" and "offer," *see* 15 U.S.C. § 77b(a)(3), can include secondary market transactions as well. *S.E.C. v. Ripple Labs, Inc.*, No. 20 CIV. 10832 (AT), 2023 WL 4507900, at *11 n.16 (S.D.N.Y. July 13, 2023) (collecting authorities). The NSMIA's language is broad, providing that states may not "directly or indirectly prohibit, limit, or impose conditions, based on the merits of such offering or issuer, upon the offer or sale of any [covered] security. . . ." 15 U.S.C. § 77r(a)(3).

The NSMIA contains an exception to preemption, but it is limited to states enforcing their laws related to "fraud or deceit." 15 U.S.C. § 77r(c)(1)(A). Many state regulations are far more nuanced than these two categories, or they are expressly designed to provide substantive oversight and protections for consumers. As of 2018, thirty-eight states and the District of Columbia had prohibitions against "unfair" acts and practices in their consumer protection laws.[8] For example, the Montana Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mont. Code § 30-14-103. These are important protections for consumers that do not require conduct to be deceptive to be actionable. The SEC's treatment of crypto assets as securities absent an investment contract could potentially preempt important state law protections for consumers related to crypto assets that the securities laws do not provide.

The Ninth Circuit *Myers v. Merrill Lynch & Co.* case illustrates the potential preemptive effect. 249 F.3d 1087 (9th Cir. 2001). In *Myers*, the court affirmed dismissal of the plaintiff's state law claims challenging "penalty bids" and similar restrictions imposed by brokers to discourage

---

[8] *See, e.g.*, National Consumer Law Center, *Consumer Protection in the States: A 50-State Evaluation of Unfair and Deceptive Practices Laws* (March 2018), *available at* https://filearchive.nclc.org/udap/udap-report.pdf.

potential purchasers of stock in public offerings from quickly reselling their shares to turn a quick profit. *Id*. at 1088. The Ninth Circuit adopted the district court's reasoning that the plaintiff's claims under California's unfair and deceptive acts and practices law were preempted by federal regulation of securities transactions. *Id.* The district court reasoned that although the NSMIA provided an exception from preemption for state claims involving fraud or deceit, "the SEC has exercised its congressionally delegated rulemaking authority to craft a regulatory scheme, i.e., Regulation M, to deal with these practices and protect investors from fraudulent or misleading conduct associated with the use of penalty bids." *Myers v. Merrill Lynch & Co*., No. C-98-3532 WHO, 1999 WL 696082, at *9-10 (N.D. Cal. Aug. 23, 1999), *aff'd*, 249 F.3d 1087.

*Myers* demonstrates the potential preemptive effect of federal securities law on state laws that may be *more protective* of consumers and are passed through democratic processes that are closer and more accountable to the people of the various states.[9] It was undisputed in *Myers* that the purchased shares were "securities" under federal law where Congress had made a policy decision to delegate authority to an unelected regulatory body to preempt state law. But for crypto assets without an investment contract, Congress has made no such decision. Erroneously characterizing these crypto assets as securities therefore potentially leads to preemption that Congress never approved.

### 2. Several state laws regulating crypto assets could also be preempted.

The SEC's attempted preemption of crypto assets also stymies state legislative experimentation in this area. Courts have "long recognized the role of the States as laboratories for devising solutions to difficult legal problems." *Oregon v. Ice*, 555 U.S. 160, 171 (2009). But federalism—and its byproduct of legislative variation from the state laboratories of democracy—is defeated when federal agencies act without authority to preempt state legislation. States have already acted to regulate crypto assets and will presumably continue to legislate as new issues present themselves. The SEC's regulation of crypto assets absent an investment contract unlawfully deprives the States of their police power and limits legal innovation and tailoring in this emerging area.

---

[9] Treating crypto assets as securities would also force private claimants into the framework of Rule 10b-5, which requires several elements before a plaintiff can prevail. For example, a plaintiff must allege a false or misleading statement or omission by the defendant of a material fact in connection with the purchase or sale of a security; scienter; reliance; and causation of economic loss. *In re Alphabet, Inc. Sec. Litig.,* 1 F.4th 687, 699 (9th Cir. 2021).

Many states have implemented statutory and regulatory regimes that treat crypto assets as money transmitters. Some states have directly defined money transmitters to include virtual currencies. *See* Ala. Code §§ 8-7A-2, 8-7A-5 (license required for money transmission, including receiving "virtual or fiat currencies"); Conn. Gen. Stat. § 36a-600(c) (companies transmitting virtual currency face extra scrutiny based on "undue risk of financial loss to consumers, considering the applicant's proposed business"); Florida Stat. § 560.204 (money transmitters); Ga. Code § 7-1-680(30) ("virtual currency" is "a digital representation of monetary value," bringing virtual currencies within licensing and regulatory regime for money transmission); *see also United States v. Harmon*, 474 F. Supp. 3d 76, 89 (D.D.C. 2020) (Bitcoin—and by definition other crypto assets—are "money" for purposes of the D.C. Money Transmitters Act); *State v. Espinoza*, 264 So. 3d 1055, 1064 (Fla. Dist. Ct. App. 2019) (virtual currencies fall within the money services businesses).

Money transmitters are generally required to register and show minimum net worth, sufficient security, and subject themselves to examinations by state regulators.[10] State regulatory schemes prohibit, for example, "gross negligence in any transaction by a money services business, regardless of reliance thereon by, or damage to, a customer"; "[f]ailure to maintain, preserve, keep available for examination, and produce all books, accounts, files, or other documents required by this chapter"; and "[i]nsolvency." Fla. Stat. § 560.114(1)(b), (e), (i). Further, "most licensed money transmitters are examined annually by either multi-state teams or individual states to ensure licensees operate in a safe and sound manner, and in adherence to state and [FinCEN] laws and regulations."[11] These examples of state regulations are commonsense but absent in securities regulation, which does not serve the same purpose. These carefully crafted state regimes are at risk of being preempted.

## CONCLUSION

For the foregoing reasons, the court should reject categorizing crypto assets as securities absent an investment contract. The SEC's exercise of this undelegated authority puts state consumers at risk by preempting state statutes better tailored to the specific risks of non-securities products.

---

[10] *See* Cong. Research Serv., *Telegraphs, Steamships, and Virtual Currency: An Analysis of Money Transmitter Regulation* at 3 (Aug. 20, 2020), https://crsreports.congress.gov/product/pdf/R/R46486.
[11] Conference of State Bank Supervisors & Money Transmitter Regulators Ass'n, *The State of State Money Services Business Regulation & Supervision* at 9 (2016), https://www.csbs.org/sites/default/files/2017-11/State%20of%20State%20MSB%20Regulation%20and%20Supervision%202.pdf.

| | |
|---|---|
| Dated: February 29, 2024 | Respectfully submitted, |
| | AUSTIN KNUDSEN<br>*Montana Attorney General* |
| | By: /s/ Drew C. Ensign<br>Drew C. Ensign (SBN 243956)<br>**HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK PLLC**<br>2575 East Camelback Rd, Ste 860<br>Phoenix, AZ 85016<br>602-388-1262<br>densign@holtzmanvogel.com |
| | *Counsel for the State of Montana* |

ALSO SUPPORTED BY:

TIM GRIFFIN
ARKANSAS ATTORNEY GENERAL

BRENNA BIRD
IOWA ATTORNEY GENERAL

LYNN FITCH
MISSISSIPPI ATTORNEY GENERAL

MIKE HILGERS
NEBRASKA ATTORNEY GENERAL

DAVE YOST
OHIO ATTORNEY GENERAL

MARTY JACKLEY
SOUTH DAKOTA ATTORNEY GENERAL

KEN PAXTON
TEXAS ATTORNEY GENERAL