BENJAMIN J. TOLMAN, State Bar No. 301942
TORRES & TOLMAN, PROFESSIONAL CORPORATION
201 Spear Street, Suite 1175
San Francisco, CA 94105
Telephone: (415) 212-7748
Email: btolman@torrestolman.com

Lewis Rinaudo Cohen, *pro hac vice* (pending)
Gregory Strong, *pro hac vice* (forthcoming)
Amil Sumaiya Malik. *pro hac vice* (pending)
COHENWILSON LLP
331 Park Avenue South
New York, NY 10010
Tel: (212) 984-6845
lewis.cohen@dlxlaw.com
greg.strong@dlxlaw.com
amil.malik@dlxlaw.com

Attorneys for Amicus Curiae Paradigm Operations LP

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>PAYWARD, INC. and PAYWARD VENTURES, INC.,<br><br>Defendants. | Case No. 3:23-cv-06003-WHO<br><br>**BRIEF FOR *AMICUS CURIAE* PARADIGM OPERATIONS LP**<br><br>Judge:   Hon. William H. Orrick |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………..…………………………….........ii

INTERESTS OF AMICUS CURIAE…………………………………..…………………………1

SUMMARY OF ARGUMENT…………………………………..………………………………....1

ARGUMENT ………………………………..………………………………...…………………3

   I.   THE TOKENS, TAKEN ALONE, ARE NOT ANY TYPE OF SECURITY, INCLUDING INVESTMENT CONTRACTS. …………………………………………..3

   II.   THE COMPLAINT ALLEGES THAT THE TOKENS "REPRESENT" INVESTMENT CONTRACTS—A NOVEL THEORY UNSUPPORTED BY EXISTING HOWEY CASE LAW OR THE FACTS ALLEGED IN THE COMPLAINT. ……………………………………………..........................................4

   III.   EVEN IF IT WERE POSSIBLE FOR THE TOKENS TO "REPRESENT" AN INVESTMENT SCHEME, THE COMPLAINT DOES NOT ADEQUATELY ALLEGE THE EXISTENCE OF A "COMMON ENTERPRISE" BETWEEN PURCHASERS OF THE TOKENS ON THE DEFENDANTS' MARKETPLACE AND AN IDENTIFIABLE THIRD PARTY. ……………………………….....................................................7

   IV.   THE SEC FAILS TO CORRECTLY APPLY NINTH CIRCUIT LAW ON INVESTMENT CONTRACTS TO THE SPECIFIC TRANSACTIONS OF TOKENS ON THE DEFENDANTS' PLATFORM. ………………………….....................................9

CONCLUSION…………………………………..……………………………….........................11

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Hocking v. Dubois*, 839 F.2d 560 (9th Cir. 1988), *modified on reh'g en banc*, 885 F.2d 1449 (9th Cir. 1989)……………………………………………………………………………………….14

*Hocking v. Dubois,* 885 F.2d 1449 (9th Cir.1989) (*en banc*)……………………………... 5, 13, 14

*SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020)…………………………………...4

*SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022) ……………………………..4, 5

*SEC v. Telegram Grp., Inc. et al.,* 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ………………………3, 4

*S.E.C. v. W.J. Howey Co.,* 328 U.S. 293 (1946) …………………….....................*passim*

**STATUTES**

15 U.S.C. § 77a *et seq*…………………………………………………………..……………….3

15 U.S.C § 78a *et seq*……………………………………………………………….....................3

15 U.S.C. §78c(a)(10) …………………………………………………………..……………1

**OTHER AUTHORITIES**

Nina Bambysheva & Leigh Cuen, *How the Bitcoin Ecosystem Works*, Forbes (Mar. 9, 2023)…..8

Lewis Cohen *et al.*, *The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities* (Nov. 10, 2022) ………………………………..…………………………….2, 9

Allison Harbin, *Pricing and Valuation in the Art Market*, ArtRow (Nov. 7, 2023)…………....8

Juliet den Oudendammer, *The Art Ecosystem, and Why Some Artists Are More Successful Than Others*, Art Represent.com (Dec. 7, 2015) ………………………..……………………8

## INTERESTS OF AMICUS CURIAE

Paradigm Operations LP ("Paradigm") is an American investment firm that invests in crypto assets and related technologies at the frontier of innovation. Issues placed before this Court would adversely impact the ability of the projects Paradigm backs to develop and engage lawfully with these valuable technologies in the United States. Paradigm seeks leave to participate as an amicus in this case because it is concerned that the misapplication of the *Howey* test to secondary transactions involving crypto assets as formulated in the Complaint[1] by the Securities and Exchange Commission (the "SEC" or the "Commission") exceeds the Commission's authority under current law and, if adopted, would have sweeping and unintended effects on Paradigm and many others who seek to utilize new technology.[2]

## SUMMARY OF ARGUMENT

The SEC's Complaint seeks to assert jurisdiction over the marketplace platform operated by the Defendants (collectively, "Kraken") for alleged violations of the Securities Exchange Act of 1934, as amended (the "Exchange Act").[3] Kraken's marketplace platform allows users to purchase and sell crypto assets, including the eleven crypto assets identified in the Complaint (collectively, the "Tokens"). The Complaint advances the novel theory that because Tokens that may have initially been offered and sold in fundraising transactions that met the definition of "investment contract," then the Tokens themselves necessarily also are investment contract transactions when they are subsequently purchased or sold on the Defendants' platform by third party users.[4] This

---

[1] *SEC v. Payward, Inc. and Payward Ventures, Inc.*, No. 3:23-cv-06003, Complaint (N.D. Cal. Nov. 20, 2023) (the "Complaint").

[2] Neither Paradigm nor the funds which it advises owns any interest in the Defendants.

[3] 15 U.S.C. §78c(a)(10).

[4] An "investment contract" is a type of security included in the definition of that term in the Exchange Act. The current understanding of the term "investment contract" was set forth by the Supreme Court in *S.E.C. v. W.J. Howey Co*., 328 U.S. 293 (1946) ("*Howey*"). The Complaint is not consistent on this point, however, and refers to the trading on the Defendants' platform of "investment contracts *represented by* the underlying crypto asset" (Complaint ¶ 58) and still elsewhere refers to the eleven Tokens by name, stating that each was "offered and sold *as part of* an investment contract" (Complaint ¶ 61).

misreading of *Howey* is inconsistent with almost 80 years of appellate jurisprudence on the question of what constitutes an "investment contract."[5]

The SEC's own theory regarding the manner in which *Howey* applies to secondary market transactions in crypto assets has varied significantly over time, resulting in operators of digital asset markets, like the Defendants, finding themselves being charged with strict liability offenses, even though they believed they were complying with the law.

Despite the SEC's shifts in its position, the law is quite clear. Like other assets that are not securities, the Tokens may be sold in connection with a contract, transaction, or scheme that constitutes an investment contract. To determine whether a specific transaction meets the definition of investment contract, the transaction must be analyzed individually to ensure that it meets each of the four elements set out in *Howey*.[6] The summary judgment order entered in *SEC v. Ripple Labs, et al.*[7] correctly applied this analysis, which is also consistent with the approach taken in *Hocking v. Dubois*, the most applicable Ninth Circuit precedent.[8] However, the Complaint fails to allege that *specific transactions* in the Tokens by users of Kraken's marketplace constituted the required "contracts, transactions or schemes" under *Howey*, and thus it must be dismissed.

---

[5] For a complete discussion and analysis of the appellate jurisprudence on this topic through the date of publication, *see* Lewis Cohen, Greg Strong, Freeman Lewin and Sarah Chen*, "The Ineluctable Modality of Securities Law: Why Fungible Crypto Assets Are Not Securities"* (November 10, 2022), available at https://ssrn.com/abstract=4282385 ("Ineluctable Modality").

[6] *See Howey*, 328 U.S. 293, 298–99 (finding that for a transaction or scheme to be an "investment contract" — and thus, a security — it must have four elements: (1) an investment of money (2) in a common enterprise (3) with a reasonable expectation of profits (4) from the efforts of others). The question of whether all four of these elements are present in a purported investment scheme is known as the "*Howey* test."

[7] *See SEC v. Ripple Labs Inc.*, No. 1:20-cv-10832, Order on Motion for Summary Judgment, ECF No. 874 (S.D.N.Y. July 13, 2023).

[8] *Hocking v. Dubois*, 885 F.2d 1449 (9th Cir. 1989) (*en banc*) ("*Hocking II*"), *cert. denied* 494 U.S. 1078 (1990).

# ARGUMENT

## I. THE TOKENS, TAKEN ALONE, ARE NOT ANY TYPE OF SECURITY, INCLUDING INVESTMENT CONTRACTS.

Most crypto assets, including the Tokens, in and of themselves do not intrinsically have the characteristics of any type of "security" as defined in the Securities Act of 1933, as amended (the "Securities Act," together with the Exchange Act, the "Securities Acts") or the Exchange Act. 15 U.S.C. § 77a *et seq.*; 15 U.S.C § 78a *et seq*. While the SEC's position has been inconsistent over time, the Commission recently conceded this in its action against Coinbase in the Southern District of New York.[9] That is, the Tokens, examined on their own, do not purport to convey an interest in any person or entity, or to represent any legal agreement, and thus would not otherwise be considered securities.

Crypto assets themselves are best understood as "controllable electronic records."[10] These "records" are simply alphanumeric sequences associated with a unique "address" in a code-based ledger maintained and updated by a network of computer nodes, known as "validators." As the court in *SEC v. Telegram Grp. Inc. et al*. correctly characterized, the "Gram" token, which was the crypto asset at issue in the case, is "little more than alphanumeric cryptographic sequence" and was not the security in the case. *SEC v. Telegram Grp. Inc. and Ton Issuer Inc.*, 2020 WL 1430035 (S.D.N.Y. Mar. 24, 2020). Similar to Grams, the Tokens available on the Defendants' platform by themselves are not investment contracts or any other type of "security."

---

[9] *See SEC v. Coinbase, Inc.*, No. 1:23-cv-04738, Transcript of Proceedings at 19, Hearing Held on Jan. 17, 2024, before Hon. Katherine Polk Failla, U.S. District Judge (S.D.N.Y. June 6, 2023), where an attorney for the SEC gave this explanation of the Commission's position as to the status of crypto assets as securities:

> So [the crypto asset itself] is just computer code. And the computer code is linked on a blockchain because a bunch of letters and numbers that live on that blockchain. But the key here is that these letters and numbers from this code go with that blockchain and its surrounding network or ecosystem, you'll see sometimes the cases use. It's that network or ecosystem, that is what drives the value of the token because the token as code is linked to that ecosystem. It is tied to it. It cannot be separated from it.

[10] A term defined in Article 12 to the Uniform Commercial Code, which is in the process of being adopted by states. *See* Uniform Law Commission, 2022 Amendments to the Uniform Commercial Code, available at https://www.uniformlaws.org/committees/community-home?communitykey=1457c422-ddb7-40b0-8c76-39a1991651ac.

-3-

**II.   THE COMPLAINT ALLEGES THAT THE TOKENS "REPRESENT" INVESTMENT CONTRACTS—A NOVEL THEORY UNSUPPORTED BY EXISTING *HOWEY* CASE LAW OR THE FACTS ALLEGED IN THE COMPLAINT.**

It is not disputed that a crypto asset could be sold as the "object" of a fundraising transaction that meets the four prongs of the *Howey* test, thus potentially causing the transaction to be considered a type of "securities" offering. Some fundraising transactions involving crypto assets, such as those conducted in connection with so-called "initial coin offerings," have been found to be offerings of securities.[11] In such cases, the SEC was seeking to enforce against an entity that failed to register a fundraising sale under Section 5 of the Securities Act. Here, the SEC attempts to apply the concept of "investment contract" to *secondary* sales of crypto assets on the Defendant's platform—even though the transactions are not alleged to involve a fundraising and are simply undertaken between two independent market participants with no alleged relation to the creator of the Token or each other.

There is a critical difference between applying the *Howey* test to fundraising transactions, and the way the SEC seeks to apply it in the Complaint against Kraken, a third-party marketplace provider. In the former situation, it may be possible to hold a fundraising party responsible based on the specific "facts and circumstances" surrounding its own fundraising, as well as the potential consequences of such arrangements. In the latter situation, however, because crypto assets do not in any legally cognizable way "embody" or "represent" an investment contract, third parties, including Paradigm and companies into which it has invested, have no means of determining with certainty what statements of others are sufficient to transform transactions in a crypto asset that, considered on its own, is not itself a security, into securities transactions.

However, despite the historical application of *Howey*, the Complaint has not alleged that there is a legal instrument setting forth the "terms" applicable to the Tokens that a prospective purchaser or other market participant could examine to determine whether they were engaging in a

---

[11] *See, e.g.*, *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211 (D.N.H. 2022); *SEC v. Terraform Labs et al.*, 1:23-cv-01346-JSR, (S.D.N.Y. Dec. 28, 2023)*; SEC v. Kik Interactive Inc.*, 2020 WL 5819770 (S.D.N.Y. Sept. 30, 2020); *SEC v. Telegram Grp. Inc. and Ton Issuer Inc.*, 2020 WL 1430035 (S.D.N.Y. Mar. 24, 2020).

securities transaction. The Complaint also does not allege that secondary transactions by users on Kraken's platform meet the four prongs of *Howey*.

Instead, for each Token, the Complaint only recites that the Token was "offered and sold *as* an investment contract" and then follows with the conclusory statement, "and *is* therefore a security."[12] However, this phraseology obscures a critical distinction: any non-security asset (*e.g.,* whiskey, pelt animals, earthworms) may be sold *as part of* an investment contract transaction, but this does not turn an asset into a security.

As one example, with respect to the crypto asset known as ADA, the allegations in the Complaint refer to statements on websites, a video stream from 2018, a blog post from 2020, an "announcement" made in 2021, and several blog posts from 2022, which the SEC alleges the ADA token "represents." Based on these statements alone, the Complaint asserts that "a reasonable investor would have understood the offer and sale of each of the Kraken-Traded Securities as offers and sales of investment contracts."[13] But the Complaint makes no allegations that purchasers or sellers were aware of these statements, that the tokens themselves are contracts, that the statements constitute a contract, or that any post-sale obligations exist.

The idea that a crypto asset (nothing more than an alphanumeric sequence controlling a number recorded in a ledger maintained by a network of node operators) *embodies* an investment contract was recently rejected in the Southern District of New York and other courts.[14] In *SEC v.*

---

[12] Complaint at ¶ 230.
[13] Complaint at ¶ 62.
[14] This specific issue was addressed by the District Court for the District of New Hampshire in the remedies order (the "LBRY Remedies Order") issued in a case involving fundraising sales of crypto assets, *SEC v. LBRY, Inc.; see* Memorandum and Order, *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211 (D.N.H. July 11, 2023), ECF No. 109. In a prior ruling on cross motions for summary judgment in the case, Judge Barbadoro concluded that the defendant, LBRY, Inc., had sold the crypto asset at issue, referred to as LBC, "as a security." However, at a hearing on remedies, Judge Barbadoro clarified that the fact that he had found that LBC had been sold "as a security" in the summary judgment order did not necessarily mean that LBC itself was a security. Rather, Judge Barbadoro noted that the question of whether any particular secondary sale of LBC was required to be registered under Section 5 of the Securities Act had not been litigated in the case and therefore could not be decided based on the finding that the fundraising sales of LBC tokens were conducted *as* investment contract transactions – a position directly inconsistent with the SEC's assertion here that because a crypto asset is initially sold as a security in a fundraising sale, that asset therefore "is a security." *See SEC v. LBRY, Inc.*, No. 1:21-cv-00260, Transcript of Proceedings for Motions Hearing held on January 30, 2023, before Hon. Paul J. Barbadoro, U.S. District Judge (D.N.H. March 13, 2023).

-5-

*Ripple Labs, Inc. et al.*, the Court, referring to XRP, another crypto asset with characteristics similar to the Tokens wrote:

> XRP, as a digital token, is not in and of itself a "contract, transaction[,] or scheme" that embodies the *Howey* requirements of an investment contract. Rather, the Court examines the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP. *See Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.").[15]

The SEC's own statements regarding how the *Howey* test is properly applied to crypto assets have been a moving target. For example, the very first line of the SEC's first amended complaint in *Ripple Labs* in 2021 reads: "From at least 2013 through the present, Defendants sold over 14.6 billion units of a digital asset security called 'XRP.'"[16] There is no suggestion in that complaint that the XRP crypto asset is a commodity-type asset that "represents" an ongoing investment scheme.[17]

But, later, in 2023, the SEC brought very similar enforcement actions against four separate crypto asset marketplaces: Bittrex,[18] Binance,[19] Coinbase,[20] and Kraken, seemingly asserting that the crypto assets themselves are securities.

The SEC's inconsistent application of the *Howey* test to crypto assets over time has significantly exacerbated the difficulty for market participants participating in secondary transactions involving crypto assets, including Paradigm and the companies into which it invests, to rely on guidance that changes without warning.

---

[15] *SEC v. Ripple Labs Inc.*, No. 1:20-cv-10832, Order on Motion for Summary Judgment, ECF No. 874 (S.D.N.Y. July 13, 2023) at 15.
[16] *SEC v. Ripple Labs, Inc. et al.*, No. 1:20-cv-10832, Amended Complaint, ECF No. 46 (S.D.N.Y. Feb. 18, 2021).
[17] As discussed in Section II below, most recently, the SEC has argued that even though a given asset is not a security, it is part of an undefined and vaguely explained "ecosystem" that is what purportedly constitutes the security – a dramatic change from their prior position.
[18] *See SEC v. Bittrex, Inc., et al.*, No. 2:23-cv-00580 (W.D. Wash. filed April 17, 2023).
[19] *See SEC v. Binance Holdings Ltd. et al.*, No. 1:23-cv-01599 (D.D.C. filed June 5, 2023*).*
[20] *See SEC v. Coinbase, Inc*, No. 1:23-cv-04738 (S.D.N.Y. filed June 6, 2023).

**III.  EVEN IF IT WERE POSSIBLE FOR THE TOKENS TO "REPRESENT" AN INVESTMENT SCHEME, THE COMPLAINT DOES NOT ADEQUATELY ALLEGE THE EXISTENCE OF A "COMMON ENTERPRISE" BETWEEN PURCHASERS OF THE TOKENS ON THE DEFENDANTS' MARKETPLACE AND AN IDENTIFIABLE THIRD PARTY.**

While *Howey* requires the finding of a "common enterprise" for each investment contract, at no point does the Complaint attempt to describe the "common enterprise" of each Token.[21] This alone should be a sufficient basis on which to dismiss the Complaint.

It may be implied from statements made by SEC counsel in recent litigation that the Commission's current theory is that the common enterprise in each transaction "represented" by a Token is that Token's "ecosystem." This novel reliance on an undefined and amorphous concept of a Token's "ecosystem," however, does not satisfy the common enterprise requirements of the Ninth Circuit and is not supported by prior *Howey* jurisprudence.[22] Moreover, it cannot be applied consistently and in a non-arbitrary manner. For example, in an attempt to distinguish between crypto assets which the SEC asserted were reliant on an "ecosystem" (and therefore, assuming that the other *Howey* prongs were met, were securities), and other assets that the Commission does not appear to believe "represent" securities, counsel for the SEC has argued that Bitcoin is unlike virtually all other crypto assets (and all other commonly traded collectables and other non-securities) in that Bitcoin can be differentiated by its lack of an "ecosystem." During an exchange between the Court and counsel for the SEC in a hearing on a motion for judgment on the pleadings in *SEC v. Coinbase, Inc.*,[23] an SEC counsel asserted that the common enterprise element in *Howey* is met for certain crypto assets as follows:

> What is the enterprise? It's the network. It's the ecosystem. You are buying into that ecosystem with your token. The token is the key that gets you into this ecosystem. Without the token, you can't get in. The token would be worthless without the ecosystem; it depends on it. And so when you have this collectible, you're not buying into the collectible. You're not buying into the enterprise because there's nothing around it.[24]

---

[21] As discussed further in Section III, even though Ninth Circuit law applies the investment contract analysis on a transaction-by-transaction basis, for this discussion we assume the SEC's position that the token itself is the investment contract.
[22] *Hocking II*.
[23] *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738, Transcript of Proceedings at 57-58, Hearing Held on Jan. 17, 2024, before Hon. Katherine Polk Failla, U.S. District Judge (S.D.N.Y.).
[24] *Id.* at 57-58.

-7-
BRIEF FOR *AMICUS CURIAE* PARADIGM OPERATIONS LP
CASE NO.: 3:23-CV-06003-WHO

In contrast, when speaking of Bitcoin, which the Commission appears to have accepted does not represent an investment scheme, SEC counsel argued:

> I think the way to look at that is, again, to come back to your Honor's question about the ecosystem, there's no ecosystem behind it. And I think that's the easiest way to look at it. Because the way we view these 13 particular tokens is that you are buying the token and the totality of the inducements. If nobody is inducing anything, then you can't be buying that in a sense. And I think you see in instances like Bitcoin, it lacks that centralized function.

However, as argued by attorneys for Coinbase at that hearing, this distinction is wholly without merit. It is clear from even a cursory review of publicly available information that Bitcoin does indeed have a vibrant "ecosystem" – something recognized in print articles in major publications.[25] Yet, the Commission has not articulated – even when asked to by a Court – why Bitcoin's "ecosystem" is insufficient to qualify as an "ecosystem" that establishes a common enterprise, when "ecosystems" of other crypto assets do.

Moreover, we need not look only to crypto assets to recognize that there are many other traded non-security assets whose value is wholly or substantially dependent on an "ecosystem" of participants. For example, many artworks derive their present value from the ecosystem surrounding them, including the presence of museums, galleries, auction houses, publications, valuation services, specialized insurers, and collectors.[26] The saleable value of a particular piece of art, much like that of the Tokens, depends on the engagement of multiple parties within this ecosystem, even if the actions of the artist herself may have an outsized impact on that value. Whether or not a crypto asset may be classified as a security based on whether the Commission believes it has an "ecosystem" is akin to the Commission being able to decree whether a particular piece of artwork has a network of supporters and service providers that constitute an "ecosystem" and when it does not.

---

[25] *See, e.g.,* Nina Bambysheva & Leigh Cuen, *How the Bitcoin Ecosystem Works*, Forbes (Mar. 9, 2023), available at https://www.forbes.com/sites/digital-assets/article/how-the-bitcoin-ecosystem-works/?sh=11437f8a6352.

[26] *See e.g.,* Allison Harbin, *Pricing and Valuation in the Art Market*, ArtRow, November 7, 2023, available at https://artrow.com/how-pricing-and-valuation-work-on-the-art-market/ (noting that, at the core of the art market is an "intricate dance" between pricing and valuation, driven by "a complex ecosystem" including factors such as artist reputation, provenance, aesthetics, and market demand); *see also* Juliet den Oudendammer, *The Art Ecosystem, and Why Some Artists Are More Successful Than Others*, Art Represent.com, December 7, 2015,
available at https://www.artrepresent.com/blog/the-art-ecosystem.

Additionally, if these "ecosystem" participants were to be stripped away, the artwork would still have "consumptive" value – one could look at it.  However, like a numbered Georgia O'Keefe print unlabeled and abandoned on a small Pacific island, without that ecosystem the asset would have little or no discernable *economic* value to island residents unfamiliar with the artist.  Likewise, even without whatever the Commission may believe is the "ecosystem" around a given crypto asset, as long as that asset has been deployed to a functional blockchain network, the asset can be used *consumptively* to make payments, store information, or access services.  Ecosystems contribute to the *economic* value of assets in numerous non-security markets without rendering these assets securities under current law.

### IV. THE SEC FAILS TO CORRECTLY APPLY NINTH CIRCUIT LAW ON INVESTMENT CONTRACT TO THE SPECIFIC TRANSACTIONS OF TOKENS ON THE DEFENDANTS' PLATFORM.

Current law in the Ninth Circuit rejects the concept that purchases and sales of the Tokens on the Kraken marketplace are inherently or "*automatically*" investment contract transactions based solely on information that may have been available to the purchasers but not provided to the purchasers by the purported promoters of the relevant investment contract transactions.  To the contrary, under current law in the Ninth Circuit, all four *Howey* factors must be established *at the time each transaction took place*.  This principle is illustrated clearly in *Hocking v. Dubois*,[27] where the full Ninth Circuit analyzed a transaction under *Howey* that did not directly involve as a party the entity that would purportedly be the "issuer" of the alleged investment scheme (a real estate developer).[28]

In that case, Hocking, an individual investor looking for an income-producing property, purchased a rentable condominium unit from the unit's original purchasers in a secondary transaction based on, among other things, information about the unit developer's rental scheme provided to him by his broker, Dubois, a third party.  When the real estate deal went sour, Hocking sued his broker, alleging that the secondary sale was an investment contract transaction subject to the antifraud provisions of the Exchange Act in which the broker was alleged to have made

---

[27] *Hocking II*.
[28] For a more detailed discussion of *Hocking II*, *see Ineluctable Modality* at 58 – 61.

misrepresentations. The District Court found that Hocking's transaction did not constitute an investment contract.[29] However, a panel of the Ninth Circuit reversed, finding that an "offering of a condominium with [a rental pool agreement] automatically makes the [transaction an investment contract].'"[30] The full Ninth Circuit reheard the case *en banc* and reversed the panel's decision, holding that the existence of the rental pool agreement did not *automatically* cause the arrangement to become an investment contract transaction. The *en banc* Court reasoned:

> We agree with defendants and *amici* that the three-judge panel may have written too broadly its conclusion that so long as a rental pool 'option' exists, all secondary market sales necessarily involve a security. Such a *per se* rule would be ill-suited to the examination of the economic reality of *each transaction* required by *Howey*.

*Hocking II*, 885 F.2d at 1462 (emphasis added). Critically, the *en banc* majority in *Hocking II* did not assume that, merely because the purchase of the condominium and the rental pool agreement directly from the developer would have constituted an investment contract transaction, the purchase of those same items in a transaction with a secondary seller through the broker should *automatically* be treated as an investment contract transaction as well.[31] Rather, the Court explained the *Howey* test must be applied to the specific facts and circumstances surrounding Hocking's (secondary market) purchase of the condominium and the rental purchase agreement before them. Following *Hocking II*, this Court should dismiss the Complaint for its failure to plead allegations that user transactions involving the Tokens on the Kraken marketplace met the definition of "investment contracts" at the time and in the context in which they took place.

This same point was more recently emphasized in the Southern District of New York in *Ripple Labs*. In that case, which involved primary sales of XRP, another crypto asset, the Court held that "programmatic sales" of the asset on a blind bid basis on a marketplace could not automatically be investment contract transactions due merely to the existence of materials that may have promoted investment interest since "Ripple did not make any promises or offers because Ripple did not know who was buying the XRP, and the purchasers did not know who was selling

---

[29] *See Hocking v. Dubois*, 839 F.2d 560, 562 (9th Cir. 1988) ("*Hocking*") (describing trial court opinion), *modified on reh'g en banc*, 885 F.2d 1449 (9th Cir. 1989).
[30] *Id*. at 565.
[31] *See id*. at 1456.

it."[32]  Likewise, in the instant case, it is not sufficient for the Complaint to allege the existence of ephemeral and informal materials that a given buyer or seller on the Kraken marketplace may not even have been aware of.

## CONCLUSION

The SEC's theory that the Tokens "*form the basis of* investment contracts" is not the law as it stands today, and it would be a deeply problematic change to the law without a Congressional mandate, making it nearly impossible for Paradigm and the companies in which it invests to determine when and how they may properly engage in secondary transactions in the Tokens or other crypto assets.  The specific violations alleged by the SEC in the Complaint are each strict liability offenses, which the Defendants, and other similarly situated market participants, should not be held liable for, given the lack of support of the SEC's inconsistent theory under current law.

The SEC's Complaint should be dismissed for failure to state a claim based on existing Supreme Court and Ninth Circuit precedents.[33]

Dated:  February 29, 2024

TORRES & TOLMAN,
PROFESSIONAL CORPORATION

By:   /s/ Benjamin J. Tolman
         Benjamin J. Tolman

COHENWILSON LLP
Lewis Rinaudo Cohen, *pro hac vice* (pending)
Gregory Strong, *pro hac vice* (forthcoming)
Amil Sumaiya Malik. *pro hac vice* (pending)

*Attorneys for amicus curiae Paradigm Operations LP*

---

[32] *SEC v. Ripple Labs, Inc. et al*., No. 1:20-cv-10832, Order on Motion for Summary Judgment, ECF No. 874 at 24 (S.D.N.Y. July 13, 2023).
[33] *SEC v. Payward, Inc., Payward Ventures, Inc.*, No. 3:23-cv-06003, Defendants Notice of Motion and Motion to Dismiss, ECF No. 25 (N.D. Cal. Feb. 22, 2024).