1  DANIEL BLAU (Cal. Bar No. 305008)
   Email: blaud@sec.gov
2  ALEC JOHNSON (Cal. Bar No. 270960)
   Email: johnsonstu@sec.gov
3  PETER BRYAN MOORES (Mass. Bar No. 658033)
   Email: mooresp@sec.gov
4  ELIZABETH GOODY (N.Y. Bar No. 4687463)
   Email: goodye@sec.gov
5
   Attorneys for Plaintiff
6  Securities and Exchange Commission

7  Jorge Tenreiro, Deputy Chief (Crypto Assets and Cyber Unit)
   100 Pearl Street, Suite 20-100
8  New York, New York

9  Katharine E. Zoladz, Regional Director
   Douglas M. Miller, Regional Trial Counsel
10 444 S. Flower Street, Suite 900
   Los Angeles, California 90071
11 Telephone: (323) 965-3998
   Facsimile: (213) 443-1904

12
                    **UNITED STATES DISTRICT COURT**
13
                    **NORTHERN DISTRICT OF CALIFORNIA**
14
                         **San Francisco Division**
15

16

17 SECURITIES AND EXCHANGE              Case No. 3:23-cv-06003-WHO
   COMMISSION,
18                                      **PLAINTIFF SECURITIES AND**
                Plaintiff,              **EXCHANGE COMMISSION'S**
19                                      **OPPOSITION TO DEFENDANTS' MOTION**
        vs.                             **TO DISMISS**
20
   PAYWARD, INC. and PAYWARD            Date:      June 12, 2024
21 VENTURES, INC.,                      Time:      2:00 p.m.
                                        Ctrm:      2, 17th Floor
22              Defendants.             Judge:     The Hon. William H. Orrick

23

24

25

26

27

28

1

## **TABLE OF CONTENTS**

2  INTRODUCTION ............................................................................................................. 1

3  STATEMENT OF ISSUES TO BE DECIDED ............................................................. 2

4  STATEMENT OF RELEVANT FACTS ....................................................................... 2

5      A.    Regulatory Framework ............................................................................ 3

6      B.    The SEC's "DAO Report" ..................................................................... 4

7      C.    Kraken's Operations .............................................................................. 4

8  LEGAL STANDARD .................................................................................................... 5

9  ARGUMENT .................................................................................................................. 6

10      A.    Neither the *Howey* Test Nor Anything Else in the Federal Securities Laws Requires a Written Agreement to Create an "Investment Contract." ................... 7

11

12      B.    Investment Contracts Do Not Require Contractual Post-Sale Obligations. ........ 11

    C.    Mere Resale Does Not Change an Investment Contract's Character. ................. 12

13

14      D.    The Kraken-Traded Securities Satisfy the *Howey* Test. ..................................... 16

        1.    Investment of Money ................................................................. 17

15

16          2.    Common Enterprise .................................................................. 18

                a.    Vertical Commonality ................................................ 18

17

18                  b.    Horizontal Commonality .......................................... 20

19          3.    Expectation of Profits from Efforts of Others .......................... 22

20      E.    There Is No Basis to Bar the SEC from Fulfilling its Congressional Mandate to Enforce U.S. Securities Laws. ...................................................................... 27

21          1.    The Major Questions Doctrine Is Not Concerned with Agency Enforcement of Congressional Enactments. ............................. 27

22

23          2.    The Circumstances Warranting Application of the Major Questions Doctrine Are Absent Here. ...................................................... 29

24  CONCLUSION ............................................................................................................... 30

25

26

27

28

1

## TABLE OF AUTHORITIES

2

## CASES

3

*Alabama Assn. of Realtors v. HHS*,
    594 U.S. 758 (2021) ............................................................................................................ 29

4

5

*Aldrich v. McCullock Properties, Inc.*,
    627 F.2d 1036 (10th Cir. 1980) ........................................................................................ 12

6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................................. 5

7

8

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ............................................................................ 20

9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .............................................................................................................. 5

10

11

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ................................................................................................ 27, 30

12

*Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*,
    240 N.W. 827 (Wis. 1932) ................................................................................................ 10

13

14

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ................................................................................................................ 28

15

*Caldwell v. Caldwell*,
    2006 WL 618511 (N.D. Cal. Mar. 13, 2006) .................................................................. 7

16

17

*Chamberlin v. Advanced Equities, Inc.*,
    2002 WL 34419450 (W.D. Wash. Jan. 17, 2002) ........................................................ 27

18

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
    608 F.2d 1297 (9th Cir. 1979) .................................................................................. 12, 26

19

20

*Diskin v. Lomasney & Co.*,
    452 F.2d 871 (2d Cir. 1971) ............................................................................................ 10

21

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................................................................... 27

22

23

*Friel v. Dapper Labs, Inc.*,
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) .................................................................... 23, 25

24

*FTC v. Kochava Inc.*,
    671 F. Supp. 3d 1161 (D. Idaho 2023) .......................................................................... 28

25

26

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    756 F.2d 230 (2d Cir. 1985) ............................................................................................ 10

27

*Golden v. Garafalo*,
    678 F.2d 1139 (2d Cir. 1982) ............................................................................................ 9

28

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..................................................................................................... 10

*Hocking v. Dubois*,
    839 F.2d 560 (9th Cir. 1988) ..................................................................................... 20

*Hocking v. Dubois*,
    885 F.2d 1449 (9th Cir. 1989) .............................................................................. passim

*Landreth Timber Co. v. Landreth*,
    471 U.S. 681 (1985)....................................................................................................... 9

*Mace Neufeld Prods., Inc. v. Orion Pictures Corp.*,
    860 F.2d 944 (9th Cir. 1988) ..................................................................................... 14

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982)................................................................................................ 3, 14

*NFIB v. OSHA*,
    595 U.S. 109 (2022)..................................................................................................... 27

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ....................................................................................... 24

*Patterson v. Jump Trading LLC*,
    -- F. Supp. 3d --, 2024 WL 49055 (N.D. Cal. Jan. 4, 2024) .......................... 8, 15, 19, 23

*Pino v. Cardone Capital, LLC*,
    55 F.4th 1253 (9th Cir. 2022) ...................................................................... 11, 13, 26

*Reves v. Ernst & Young*,
    494 U.S. 56 (1990)......................................................................................................... 2

*Rodriguez v. Banco Cent.*,
    990 F.2d 7 (1st Cir. 1993) .......................................................................................... 12

*Salameh v. Tarsadia Hotel*,
    726 F.3d 1124 (9th Cir. 2013) .............................................................................. 6, 21

*SEC v. Blockvest, LLC*,
    2019 WL 625163 (C.D. Cal. Feb. 14, 2019)................................................................. 8

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943)................................................................................................ 9, 11

*SEC v. Cap. Gains Rsch. Bureau, Inc.*,
    375 U.S. 180 (1963)..................................................................................................... 28

*SEC v. Coinbase, Inc.*,
    2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024)........................................................passim

*SEC v. Dalius*,
    2023 WL 3988425 (C.D. Cal. May 24, 2023) ............................................................. 20

*SEC v. Edwards*,
    540 U.S. 389 (2004)........................................................................................... 6, 22, 28

*SEC v. Glenn W. Turner Enters.*,
  474 F.2d 476 (9th Cir. 1973) ................................................................. 10, 22

*SEC v. Hui-Feng*,
  935 F.3d 721 (9th Cir. 2019) ....................................................................... 22

*SEC v. Kik Interactive, Inc.*,
  492 F. Supp. 3d 169 (S.D.N.Y. 2020) ...................................................... 12, 20

*SEC v. LBRY, Inc.*,
  639 F. Supp. 3d 211 (D.N.H. 2022)................................................ 8, 14, 15, 23

*SEC v. NAC Found.*,
  512 F. Supp. 3d 988 (N.D. Cal. 2021) ........................................................ 8, 19

*SEC v. R.G. Reynolds Enters., Inc.*,
  952 F.2d 1125 (9th Cir. 1991) ...................................................................... 18

*SEC v. Ripple Labs, Inc.*,
  -- F. Supp. 3d --, 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ................... 12, 25

*SEC v. Ripple Labs, Inc.*,
  2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) ..................................................... 25

*SEC v. Rubera*,
  350 F.3d 1084 (9th Cir. 2003) ................................................................. passim

*SEC v. SG Ltd.*,
  265 F.3d 42 (1st Cir. 2001) .............................................................................. 8

*SEC v. Telegram Group, Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) ....................................................... 19, 21

*SEC v. Terraform Labs Pte., Ltd.*,
  -- F. Supp. 3d --, 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ................... passim

*SEC v. Terraform Labs, Pte. Ltd.*,
  -- F. Supp. 3d --, 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ........................ 8

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ................................................................................ passim

*SEC v. Wahi*,
  2024 WL 896148 (W.D. Wash. Mar. 1, 2024) ......................................... 15, 17, 19

*Smith v. Gross*,
  604 F.2d 639 (9th Cir. 1979) .......................................................................... 12

*Tcherepnin v. Knight*,
  389 U.S. 332 (1967)......................................................................................... 7

*United Hous. Found., Inc. v. Forman*,
  421 U.S. 837 (1975)..................................................................................... 3, 13

*United States v. Freeman*,
  -- F. Supp. 3d --, 2023 WL 5391417 (D.N.H. Aug. 22, 2023) .......................... 28

*Usher v. City of Los Angeles*,
    828 F.2d 556 (9th Cir. 1987) ............................................................................. 6

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ......................................................................................... 27

*Warfield v. Alaniz*,
    569 F.3d 1015 (9th Cir. 2009) ...................................................................... passim

*West Virginia v. EPA*,
    597 U.S. 697 (2022) .................................................................................. 27, 29

*Wildes v. BitConnect Int.'l PLC*,
    25 F.4th 1341 (11th Cir. 2022) ....................................................................... 26

**FEDERAL STATUTES**

**Securities Act of 1933**

Section 2(a)(1)
    [15 U.S.C. § 77b(a)(1)] ............................................................................ 3, 7, 13

Section 18(a)
    [15 U.S.C. § 77r(a)] ......................................................................................... 27

Section 18(b)
    [15 U.S.C. § 77r(b)] ......................................................................................... 27

Section 18(c)
    [15 U.S.C. § 77r(c)] ......................................................................................... 27

**Securities Exchange Act of 1934**

Section 2
    [15 U.S.C. § 78b] ............................................................................................. 13

Section 2(3)
    [15 U.S.C. § 78b(3)] ......................................................................................... 13

Section 3(a)(10)
    [15 U.S.C. § 78c(a)(10)] ........................................................................... 3, 7, 13

Section 13
    [15 U.S.C. § 78m] ............................................................................................ 13

Section 15
    [15 U.S.C. § 78o] ........................................................................................ 4, 13

Section 17A
    [15 U.S.C. § 78q-1] ..................................................................................... 4, 13

Section 21(a)
    [15 U.S.C. § 78u(a)] .......................................................................................... 4

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(6).................................................................................................. 5

**OTHER AUTHORITIES**

*First Annual Report of the Securities and Exchange Commission,*
*Fiscal Year Ended June 30, 1935* (1935)................................................................... 3

*SEC v. Coinbase, Inc.*,
ECF No. 77, No. 1:23-cv-04738-KPF (S.D.N.Y. October 10, 2023).................................... 27

*SEC v. Edwards*,
No. 02-1196, 2003 WL 21498455 (U.S. June 26, 2003) ...................................... 9

*SEC v. W.J. Howey Co.*,
No. 843, 1946 WL 50582 (U.S. Apr. 17, 1946) ...................................... 9

Plaintiff Securities and Exchange Commission ("SEC") respectfully submits this brief in opposition to the Motion to Dismiss ("Motion") filed by Defendants Payward, Inc. and Payward Ventures, Inc. (collectively "Kraken").

## INTRODUCTION

Crypto assets are not the first technological innovation to interest securities markets. The Securities Act of 1933 ("Securities Act") and Securities Exchange Act of 1934 ("Exchange Act") have provided critical protections for investors financing such innovations from the ticker tape era through the internet age. Kraken does not contest in its Motion that it functions as an exchange, broker, dealer, or clearing agency, nor does it contest that it has failed to register with the SEC in any of these capacities. But emboldened by the rapid rise of crypto asset trading, Kraken asks this Court to ignore Supreme Court precedent and hold that Kraken's activities do not involve "securities," so that it may continue to evade investor protections mandated by these long-standing U.S. securities laws.

The Supreme Court's decision in *SEC v. W.J. Howey Co*. compels a contrary conclusion. 328 U.S. 293 (1946). The *Howey* Court defined an "investment contract" under the Securities Act and Exchange Act to mean "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." *Id*. at 298-99. Through application in scores of cases, the Ninth Circuit has "distilled *Howey*'s definition into a three-part test requiring '(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others.'" *Warfield v. Alaniz*, 569 F.3d 1015, 1020 (9th Cir. 2009) (quoting *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003)). The SEC's Complaint alleges in detail how these three factors are satisfied for 11 different crypto asset securities traded on Kraken's platform, triggering the requirement for Kraken to register with the SEC. (Compl. ¶¶ 228-445.)

Kraken nonetheless argues that there are two additional requirements for an investment contract beyond those stated by the Supreme Court in *Howey*: a written contract between the issuer and buyer and the inclusion of post-sale obligations in that contract. (Motion at 9-10.) No court has ever adopted Kraken's perversion of *Howey*. Several have expressly rejected encumbering *Howey*

with these additional requirements, which would drastically narrow a class of previously regulated investments. Indeed, the Supreme Court stated that Congress "enacted a definition of 'security' sufficiently broad to encompass virtually any instrument that might be sold as an investment." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990). In a recent similar enforcement action against an unregistered crypto asset trading platform, the court in *SEC v. Coinbase, Inc.* squarely rejected the <u>exact</u> same arguments Kraken makes here, finding that "the 'crypto' nomenclature may be of recent vintage, but the challenged transactions fall comfortably within the framework that courts have used to identify securities for nearly eighty years." 2024 WL 1304037, at *1 (S.D.N.Y. Mar. 27, 2024). This Court should find the same here and reject Kraken's invitation to be the first to subvert *Howey*'s clear test.

Kraken's assertion of the "major questions" doctrine is similarly inapposite. The SEC was created by Congress to enforce the Securities Act and Exchange Act, including the requirement that securities intermediaries register with the SEC. In applying the *Howey* test in its determination that Kraken must register, the SEC is simply following its Congressional mandate. To argue that the SEC is assuming new powers in doing so here suggests that new technologies are beyond the scope of traditional securities law. They are not. Congress does not need to enact bespoke laws for each new technology that emerges.

Kraken's Motion should therefore be denied, and this case should proceed.

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether the Complaint plausibly alleges that investment contracts were traded on Kraken's crypto asset trading platform.

2.     Whether this Court should apply the major questions doctrine to bar this SEC enforcement action where the SEC seeks to follow long-standing Supreme Court precedent in fulfilling its Congressional mandate to administer and enforce U.S. securities laws.

## STATEMENT OF RELEVANT FACTS

Since 2013, Kraken has operated an online trading platform through which its customers can buy and sell crypto assets. (Compl. ¶ 1.) Kraken's Motion concedes this and does not contest that it simultaneously acts as a broker, dealer, exchange, and clearing agency with respect to the sale of

these crypto assets.  (Motion at 6.)  Further, Kraken does not contest that it has failed to register with the SEC in any capacity.  The Complaint's well-pled allegations further show that many of the transactions in these crypto assets form the basis of investment contracts covered under U.S. securities laws.

### A.    Regulatory Framework

In the wake of the 1929 stock market crash, Congress passed the Securities Act and Exchange Act to stabilize the U.S. securities market through a range of provisions related to, among other things, the offer and sale of securities.  Specifically, the Exchange Act was "adopted to restore investors' confidence in the financial markets," *Marine Bank v. Weaver*, 455 U.S. 551, 555 (1982), and regulates securities exchanges, brokers, dealers, clearing agencies, and other intermediaries.  Both the Securities Act and the Exchange Act broadly define "security" to include a wide range of assets, and both include the identical term "investment contracts."  Securities Act § 2(a)(1) [15 U.S.C. § 77b(a)(1)]; Exchange Act § 3(a)(10) [15 U.S.C. § 78c(a)(10)].

Congress emphasized in the Exchange Act the "national public interest" in the registration and regulation of participants in the securities markets, to "insure the maintenance of fair and honest markets." *Id.* § 78b.  With respect to exchanges, Congress found that "[f]requently the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation." *Id.* at § 78b(3).  To that end, "[t]he fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.'" *Reves*, 494 U.S. at 60 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975)).  Accordingly, entities that meet the definition of "exchange" must register with the SEC, provide certain disclosures, and permit the SEC to carry out its congressionally mandated oversight role over registered exchanges.  In fact, immediately following passage of the Exchange Act, the SEC investigated entities potentially acting as securities exchanges, leading certain entities to choose to register with the SEC and others to cease trading in securities or discontinue operations altogether.  *See First Annual Report of the Securities and Exchange Commission, Fiscal Year Ended June 30, 1935* (1935), at 11-13, *available at* www.sec.gov/about annual_report/1935.pdf.

The regulatory regime applicable to brokers, dealers, and clearing agencies serves the same purpose.  Registered brokers, dealers, and clearing agencies are subject to comprehensive regulation that includes recordkeeping and reporting obligations, SEC examination, and other requirements aimed at protecting investors.  15 U.S.C. §§ 78o, 78q-1.

## B.   The SEC's "DAO Report"

In July 2017, the SEC issued the Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (the "DAO Report"), in which the SEC explained that certain crypto asset securities are subject to U.S. securities laws.  The DAO Report specifically advised "those who would use . . . distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws." (Compl. ¶ 37.)  The DAO Report also stated that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption," even "with respect to products and platforms involving emerging technologies and new investor interfaces."  (*Id*. ¶ 38.)  The DAO Report further stated that the trading platforms at issue "provided users with an electronic system that matched orders from multiple parties to buy and sell [the crypto asset securities at issue] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.  (*Id*.)

## C.   Kraken's Operations

The "Kraken Trading Platform" allows customers to buy and sell crypto assets through an online market.  On its website, Kraken describes the Kraken Trading Platform as "one of the world's largest digital asset *exchanges*" (emphasis added) and advertises that it has more than nine million retail and institutional customers located in over 190 countries.  (*Id*. ¶ 39.)  With the launch of the Kraken Trading Platform, Kraken also began providing services for customers to open accounts, deposit funds, enter orders, and trade crypto assets ("Kraken Services").  (*Id*. ¶ 40.)  From its start in 2013 to the present, the Kraken Trading Platform and Kraken Services have evolved into an expansive online trading operation that lists more than 220 crypto assets and permits margin trading in addition to offering other trading services such as an over-the-counter trading desk, "instant buy" features, and multiple applications and pathways for customers to interface with the

Kraken Trading Platform and Kraken Services.  (*Id*. ¶¶ 40-41.)

Among the crypto assets on its platform, Kraken has made available for trading many crypto asset securities.  In fact, Kraken currently makes available for trading several crypto assets that have been the subject of prior SEC enforcement actions based upon their status as crypto asset securities, including crypto assets trading under the symbols ADA, AXS, ALGO, ATOM, CHZ, COTI, DASH, FIL, FLOW, ICP, MANA, MATIC, NEAR, OMG, SAND, and SOL, which were alleged in one or more of the following actions against other unregistered intermediaries: *SEC v. Bittrex*, No. 2:23-cv-580 (W.D. Wash. filed Apr. 17, 2023); *SEC v. Binance Holdings Ltd*., Civ. No. 23-1599 (D.D.C. filed June 5, 2023); *SEC v. Coinbase, Inc*., No. 23-cv-4738 (S.D.N.Y. filed June 6, 2023).

The Complaint discusses in detail 11 crypto asset securities that Kraken made available through its trading platform or related services ("Kraken-Traded Securities").  (Compl. ¶¶ 228-445.) Based on the public statements of their respective issuers and promoters—at least some of which were rebroadcast by Kraken itself on the Kraken Trading Platform—the offer and sale of each of the Kraken-Traded Securities are offers and sales of investment contracts and, therefore, securities.

Despite their obligation to register with the SEC, an obligation highlighted in the DAO Report and through other actions, Kraken chose not to register.  Meanwhile, Kraken earned more than $43 billion in revenue in 2020 and 2021 alone from trading-based transactions, including fees charged to customers, sales of crypto assets to customers, and its own proprietary trading.  (*Id*. ¶¶ 42-43.)  During this time, each of the Kraken-Traded Securities detailed in the Complaint was available on the Kraken Trading Platform.

## **LEGAL STANDARD**

To withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff alleges facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher*

1    *v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

2    <u>**ARGUMENT**</u>

3        Kraken has failed to comply with a host of regulatory requirements specific to its role as an

4    exchange, broker, dealer, and clearing agency.  In doing so, Kraken has created risk for its

5    customers and the markets and taken in billions of dollars in fees and trading revenue without

6    adhering to the long-standing requirements of U.S. securities laws designed to protect investors and

7    the integrity of the U.S. securities markets.  (Compl. ¶ 1.)

8        Kraken nevertheless seeks to continue to evade regulation by suggesting that none of the

9    crypto assets on its platform were traded as securities.  Its Motion is premised on the incorrect

10   assertion that an investment contract under *Howey* requires the existence of a written contract

11   enforceable under state law between issuer and buyer containing post-sale obligations.  (Motion at

12   9-16.)  No court has ever taken this position.  In fact, Kraken cannot cite a single case from the

13   more than 1,470 federal court opinions that cite *Howey* (including several by the Supreme Court

14   reaffirming *Howey* and more than 270 opinions within the Ninth Circuit alone) where a court has

15   adopted Kraken's proposed additional requirements.  This is unsurprising, as Kraken's argument

16   plainly contravenes the flexible approach adopted by Congress and the Supreme Court.  *See SEC v.*

17   *Edwards*, 540 U.S. 389, 393 (2004) ("This definition [of investment contract] 'embodies a flexible

18   rather than a static principle, one that is capable of adaptation to meet countless and variable

19   schemes devised by those who seek the use of the money of others on the promises of profits.'"

20   (quoting *Howey*, 328 U.S. at 299)).  The Court should reject Kraken's attempt to distort *Howey* by

21   inserting new, formalistic requirements into a test that requires substance be elevated over form.

22   *See Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1130 (9th Cir. 2013) ("[S]ubstance governs, not

23   name or label or form."); *Warfield*, 569 F.3d at 1020 ("In applying the *Howey* test, we are mindful

24   of the remedial purpose of the Securities Acts, as well as the Supreme Court's repeated rejection of

25   a narrow and literal reading of the definition of securities.").

26       Kraken further argues that investment contracts cannot exist once the crypto assets trade on

27   a secondary market, due to the supposedly increased separation between the issuer and buyer.

28   (Motion at 16-22.)  But this assertion cannot be squared with the text of the Securities Act and the

Exchange Act—which both define "security" identically to include "investment contracts" and suggest no distinction whatsoever based on the manner of sale or location of the transactions.  *See* Securities Act § 2(a)(1) [15 U.S.C. § 77b(a)(1)]; Exchange Act § 3(a)(10) [15 U.S.C. § 78c(a)(10)]. The argument is another attempt to impose a formulaic analysis on the *Howey* test that the Supreme Court itself rejected.  "[I]n searching for the meaning and scope of the word 'security' in [either] Act, form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).   As detailed below, the allegations in the Complaint show how each of the three parts of the *Howey* test are satisfied with respect to transactions in each of the Kraken-Traded Securities.  The fact that these investment contracts were resold on Kraken's platform does not change their character and transform them into non-securities.

Finally, Kraken contends that the SEC should be barred from pursuing this enforcement action under the major questions doctrine.  But this argument ignores the statutes and caselaw underlying this action and should likewise be rejected.[1]

### A.    Neither the *Howey* Test Nor Anything Else in the Federal Securities Laws Requires a Written Agreement to Create an "Investment Contract."

The *Howey* Court held that an "investment contract" under U.S. securities law is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  328 U.S. at 298-99.  In applying this holding across hundreds of cases, Ninth Circuit precedent is consistent and clear: *Howey* is "a three-part test requiring '(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others.'"  *Warfield*, 569 F.3d at 1020 (quoting *Rubera*, 350 F.3d at 1090).  Nowhere within *Howey* or the subsequent cases applying its holding is there a requirement of a written contract between the issuer of a security and the buyer. In fact, the Ninth Circuit has explicitly rejected such a formalistic reading of *Howey*: "In defining

---

[1] Kraken improperly seeks judicial notice of 28 documents from outside the Complaint.  ECF 27. Kraken's request is deficient because, among other things, it fails to attach copies of the proposed webpages.  *See, e.g., Caldwell v. Caldwell*, 2006 WL 618511, at *4 (N.D. Cal. Mar. 13, 2006) (denying the request for judicial notice where the parties did not supply the Court with copies of the website).  Regardless, even if they were proper subjects of judicial notice, the documents are irrelevant to the determination of Kraken's motion and do not alter the analysis in any way.

1  the term investment contract, *Howey* itself uses the terms 'contract, transaction, or scheme,' 328

2  U.S. at 298-99, leaving open the possibility that the security not be formed of one neat, tidy

3  certificate, but a general 'scheme' of profit seeking activities." *Hocking v. Dubois*, 885 F.2d 1449,

4  1457 (9th Cir. 1989).

5       Moreover, multiple district courts within the Ninth Circuit have specifically found crypto

6  assets were properly alleged to be part of investment contracts in cases where there was no

7  underlying written contract.  In *Patterson v. Jump Trading LLC*, plaintiffs alleged that the defendant

8  violated the securities laws with respect to crypto asset securities issued by Terraform, collectively

9  called "Terra Tokens" by the plaintiffs.  -- F. Supp. 3d --, 2024 WL 49055 (N.D. Cal. Jan. 4, 2024).

10 The complaint alleged that plaintiffs bought the Terra Tokens with money and crypto assets on

11 trading platforms "'like Binance US and Kraken.'"  *Id.* at *11.  The court found that plaintiffs had

12 sufficiently pled that Terra Tokens were offered and sold as investment contracts even though there

13 was no written agreement with post-sale obligations between the buyers on the trading platforms

14 and the issuer.  *Id.* at *11-12; *see also SEC v. Terraform Labs, Pte. Ltd*., -- F. Supp. 3d --, 2023 WL

15 8944860, at *13-15 (S.D.N.Y. Dec. 28, 2023) (holding the same Terraform-issued crypto assets

16 constituted securities as a matter of law and rejecting adding additional requirements to *Howey* test).

17      Similarly, in *SEC v. NAC Foundation*, the SEC alleged the defendants promoted "ABTC"

18 tokens with a "white paper" posted to a defendant's website and through press releases, social

19 media posts, and other on-line content.  512 F. Supp. 3d 988, 992 (N.D. Cal. 2021).  The court held

20 that the SEC sufficiently pled that ABTC tokens were offered and sold as investment contracts even

21 though the SEC never alleged any written contract.  *Id.* at 995-97; *see also SEC v. Blockvest, LLC*,

22 2019 WL 625163 (C.D. Cal. Feb. 14, 2019) (finding defendants offered crypto asset security based

23 on whitepaper and website promotional statements in absence of a written contract); *SEC v. SG

24 Ltd.*, 265 F.3d 42, 49-55 (1st Cir. 2001) (investment contract based solely on representations on

25 promoter's website); *SEC v. LBRY, Inc.*, 639 F. Supp. 3d 211, 214-221 (D.N.H. 2022) (finding

26 LBRY publicly offered and sold crypto asset security LBC as an investment contract to the public

27 without written contracts through "various digital asset trading platforms").

28      Left without caselaw to rely on, Kraken contends that the "plain language of 'investment

contract' requires a 'contract.'" (Motion at 11.)  But Kraken's argument ignores the larger structure and text of the securities laws.  Each of the terms chosen by Congress were imbued with meaning. Some "standardized" terms, like bonds and stocks, have "well-settled meaning."  *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943).  For other types of securities, Congress used descriptions to invoke an investment concept, like the phrase "investment contract."  *Id.*; *Howey*, 328 U.S. at 297 ("This definition also includes 'securities' of a more variable character, designated by such descriptive terms as . . . 'investment contract.'").  Like the other descriptive phrases within the definition of security, the phrase "investment contract" simply labels the instrument or concept Congress was describing.  The words <u>themselves</u> do not delimit the security type because "the reach of the Act does not stop with the obvious and commonplace.  Novel, uncommon, or irregular devices, whatever they appear to be, are also reached . . . ."  *Joiner*, 320 U.S. at 351; *see also Golden v. Garafalo*, 678 F.2d 1139, 1143 (2d Cir. 1982) (explaining "investment contract" is meant as a "catch-all phrase").  As a result, *Howey* provides the fulsome definition of investment contract. All that is required to be an "investment contract" is set forth in *Howey*—nothing more.

Congress, moreover, used the same term—"investment contract"—to define "security" regardless of whether someone "sell[s]" or "offer[s] to sell" the instrument, 15 U.S.C. § 77e(a), (c), or whether they "effect any transaction" utilizing the facility of an "exchange."  *Id.* § 78e.  There is nothing in the statutory language that suggests the nature of the instrument changes based on the medium of the transaction.  To the contrary, "the definitions of 'security' in [the Securities Act and the Exchange Act] are virtually identical and [are] treated as such."  *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 687 n.1 (1985).[2]

More generally, Kraken's re-imagining of the Securities Act and Exchange Act would thwart Congress's broader purpose behind the statutes.  Because "[t]he Acts were designed to protect the American public from speculative or fraudulent schemes of promoters … Congress

---

[2] Kraken also attempts to mischaracterize statements made by the SEC or SEC staff.  (Motion at 10-11.)  Contrary to Kraken's claims, the SEC's briefs in *Edwards* and *Howey* show the SEC argued that investment contracts *can include* contractual arrangements with certain characteristics, not that contractual arrangements are required.  *See* Brief for SEC, *SEC v. Edwards*, No. 02-1196, 2003 WL 21498455, at *17 (U.S. June 26, 2003); *see also* Brief for SEC, *SEC v. W.J. Howey Co.*, 843, 1946 WL 50582, at *9 (U.S. Apr. 17, 1946).

defined the term 'security' broadly, and the Supreme Court in turn has construed the definition liberally." *SEC v. Glenn W. Turner Enters.*, 474 F.2d 476, 481 (9th Cir. 1973). Imposing a legal formalism, like a written contract, prevents the Acts from realizing Congress's goal of "encompassing virtually any instrument that might be sold as an investment." *Rubera*, 350 F.3d 1084, 1089-90 (9th Cir. 2003); *see also Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 756 F.2d 230, 240-41 (2d Cir. 1985) (investment contract based on "implicit promise" and marketing materials stating defendants would maintain secondary market for resale).[3]

As a result, the courts that have directly addressed the very argument Kraken makes here— the supposed "contract" requirement—have explicitly rejected it. These courts have explained that "the Supreme Court made clear in *Howey* that Congress did not intend [investment contract] to apply only where transacting parties had drawn up a technically valid written or oral contract under state law." *SEC v. Terraform Labs Pte., Ltd.*, -- F. Supp. 3d --, 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023) (hereafter *Terraform I*); *see also Coinbase*, 2024 WL 1304037, at *19 (citing *Terraform I*). The analysis in *Coinbase* on a motion for judgment on the pleadings is on all fours with the present case. In *Coinbase*, like here, the SEC alleged that Coinbase had operated an unregistered exchange of crypto asset securities and operated as an unregistered broker and clearing agency. 2024 WL 1304037, at *11-12. The SEC alleged Coinbase made available for trading certain crypto assets that are offered and sold as investment contracts, including seven (ADA, FIL, FLOW, ICP, NEAR, MATIC, and SOL) that are specifically alleged in the Complaint here. *Compare id.* at *6 *with* Compl. ¶ 59. The *Coinbase* allegations about those seven crypto asset securities are nearly identical to the allegations in the Kraken Complaint. *Compare SEC v. Coinbase, Inc.*, No. 23-Civ-4738 (KPF), ECF No. 1 (S.D.N.Y. June 6, 2023) ("Coinbase complaint") ¶¶ 127-189, 230-269 (attached as Ex. 1 to Declaration of Peter Moores) with Compl. ¶¶

---

[3] The "Blue Sky" state cases Kraken cites also do not expressly require a written contract because the issue was not before them. *See, e.g., Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*, 240 N.W. 827, 828-29 (Wis. 1932) (finding a securities contract based upon the terms of the investment). Further, courts have long rejected similar attempts to subordinate the federal securities laws to restrictive state law contract principles. *See, e.g., Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971) (the definition of "offer" under the Securities Act "goes well beyond the common law" (citation omitted)); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983) (finding references to common law "unavailing").

229-238, 282-352, 371-406, 426-445.  In a carefully reasoned decision that surveilled the applicable precedent, Judge Failla concluded that: (1) "there need not be a formal contract between transacting parties for an investment contract to exist under *Howey*"; (2) when conducting the *Howey* analysis, "courts are not to consider the crypto-asset in isolation" but must consider the full circumstances surrounding their sale and distribution; and (3) in assessing these circumstances, courts should review what the "offeror invites investors to reasonably understand and expect" by examining "how, and to whom, issuers or promoters market the crypto-asset."  *Coinbase*, 2024 WL 1304037, at *19-20.  In reaching this conclusion, the court rejected the same reinterpretation of the *Howey* test offered by Kraken here.  *Id.* at *24 (*e.g.*, rejecting defendants' "Blue Sky" case argument).

**B.    Investment Contracts Do Not Require Contractual Post-Sale Obligations.**

Beyond its unsupported written contract requirement, Kraken also seeks to add yet another requirement: a fifth prong that the written contract in question contain post-sale obligations on the issuer of the security.  (Motion at 14-16.)  This argument fails for all the reasons stated above: Kraken cannot cite a single case <u>requiring</u> a contract, much less one with post-sale obligations.  To the contrary, all indications from the text, structure, and purpose of the securities laws, as well as decades of cases applying *Howey*, indicate that Kraken's proposed fifth prong is wrong.

But Kraken's argument on post-sale obligations warrants further discussion because it highlights the contrast between *Howey*'s broad interpretation of "investment contract" and Kraken's strained and restrictive construction.  Far from limiting a *Howey* analysis to the terms of a written contract, the Ninth Circuit has instructed courts to examine "the promotional materials associated with an instrument or transaction in determining whether an investment contract is present." *Warfield*, 569 F.3d at 1021 (noting *Edwards* and *Forman* relied upon non-contractual promises and statements to apply *Howey*).  Indeed, "[i]n attempting to determine whether a scheme involves a security, the inquiry is not limited to the contract or other written instrument."  *Hocking*, 885 F.2d at 1457; *see also Joiner*, 320 U.S. at 352-53 (the test is "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect"); *Pino v. Cardone Capital, LLC*, 55 F.4th 1253, 1260 (9th Cir. 2022) (interpreting Section 12 of the Securities Act, "To conclude that [defendant's] social media communications fall

outside the Act's protections would be at odds with Congress's remedial goals.").

To adequately conduct the *Howey* analysis, a court must examine the economic reality of a transaction and understand what a purchaser was led to believe. "'Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case.'" *Hocking*, 885 F.2d at 1457 (quoting *Aldrich v. McCullock Properties, Inc.*, 627 F.2d 1036, 1039-40 (10th Cir. 1980)). Contractual promises may evidence a buyer's reasonable expectations. But that is different from saying they are <u>required</u>. *See Smith v. Gross*, 604 F.2d 639, 641-43 (9th Cir. 1979) (finding investment contract from sale of earth worms based on promotional newsletter and oral assurances); *see also SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178 (S.D.N.Y. 2020) ("[A]n ongoing contractual obligation is not a necessary requirement for a finding of a common enterprise."). In *Coinbase*, the court noted that "since *Howey*, no court has adopted a contractual undertaking requirement" and concluded that such a "formalistic" requirement "cannot be fairly read into the *Howey* test." 2024 WL 1304037, at *24-25 (distinguishing *De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297 (9th Cir. 1979) and *Rodriguez v. Banco Cent.*, 990 F.2d 7 (1st Cir. 1993), cited by Kraken (Motion at 14-15), as "poor comparators" with facts inherently different from the "sale of fungible assets with no inherent value, to a potentially unlimited number of public buyers"). Even a case Kraken heavily relies on, *SEC v. Ripple Labs, Inc.*, rejected this ongoing contractual obligation requirement. -- F. Supp. 3d --, 2023 WL 4507900, at *6 (S.D.N.Y. July 13, 2023) (requiring post-sale obligations "would call for the Court to read beyond the plain words of *Howey*").

This Court should view Kraken's proposed additional requirements to the *Howey* test for what they are—a formalistic attempt to narrow and evade the securities laws—and reject them.

## C.   Mere Resale Does Not Change an Investment Contract's Character.

Kraken further seeks to limit the reach of an "investment contract" by arguing that *Howey*'s first two prongs— (1) an investment of money (2) in a common enterprise—cannot be satisfied unless an investor's money goes directly to the <u>issuer</u>. (Motion at 16-19). Kraken is effectively

proposing a *sixth Howey* prong: privity between an issuer and an investor.  Under this theory, the resale of an investment contract—including on a crypto asset trading platform like Kraken's—would categorically be excluded from the reach of the federal securities laws.  This extreme position is wrong and should be rejected out of hand.

As noted above, while the Securities Act largely focuses on the offers and sales of a security, the Exchange Act regulates parties involved in the secondary market for securities (including exchanges, brokers, dealers, and clearing agencies) and requires, among other things, ongoing disclosure for the benefit of investors and the marketplace.  15 U.S.C. §§ 78b(3), 78m, 78o, 78q-1.  The same Congress included the same term—"investment contract"—in the definition of "security" set forth in both Acts.  15 U.S.C. §§ 77b(a)(1), 78c(a)(10).  Nowhere did Congress draw a distinction between "investment contracts" traded on exchanges and those sold by the issuer.  Nor do the statutes suggest that an "investment contract" offered and sold in an initial offering under the Securities Act ceases to be a "security" under the Exchange Act when it is traded in the secondary market.  Kraken can cite to nothing at all that suggests that the term "investment contract" is construed differently simply because an issuer may sell it to an investor or one investor may resell it to another.  Instead, Congress "sought to define the term 'security'" to include "the many types of instruments that in our commercial world fall within the ordinary concept of a security."  *Forman*, 421 U.S. at 865 (internal quotes and citation omitted).

By limiting investment contracts to private contractual sales made directly with the issuer, Kraken is essentially arguing for the removal of investment contracts from Exchange Act coverage, blocking any investor protections that would apply if an investment contract was resold on the secondary market.  This position plainly contradicts Congress's stated purpose in adopting the Exchange Act of ensuring "the maintenance of fair and honest markets."  15 U.S.C. § 78b; *cf. Pino*, 55 F.4th at 1259 (denying "contractual privity" required to make an offer).

Because of this contradiction, *Coinbase* unequivocally rejected the defendants' argument that transactions in crypto assets on the secondary market were categorically excluded from constituting investment contracts.  2024 WL 1304037, at *23.  The court noted that, by design, the profitability of a crypto asset enterprise relied, in part, "on the success of the token in the resale

market and on capital contributions from both institutional investors and retail purchasers," and as a result, issuers encouraged investors trading in the secondary market to buy their crypto assets. *Id.* Ultimately, "the applicability of the federal securities laws should not be—and indeed, as to more traditional securities, is not—limited to primary market transactions." *Id.*

Moreover, Kraken's position turns the guidance given by the Supreme Court on its head, as the Court has found that a transaction failed the *Howey* test in part because it was "not designed to be traded publicly." *Marine Bank v. Weaver*, 455 U.S. 551, 559-60 (1982). *See also Mace Neufeld Prods., Inc. v. Orion Pictures Corp.*, 860 F.2d 944, 946-47 (9th Cir. 1988) (finding no investment contract where agreement "was unique, private, and never intended to be publicly traded"). The very factor—public trading—that these courts have found help give a transaction its character as a security cannot also be what strips an investment contract of its character as a security.

To support its argument, Kraken cites *Hockin*g for the proposition that every resale of an investment contract must go through the three prongs of the *Howey* test. (Motion at 22-23.) The implication is that each transaction on the Kraken-Trading Platform must be reevaluated each time there is a sale to determine whether that specific transaction involves the offer and sale of an investment contract, as if the character of the investment contract inherently changes upon resale. However, *Hocking* does not support Kraken's position. First, courts routinely apply the *Howey* test to an entire offering, even though the offering may include thousands of transactions grouped together due to their uniform nature. *See, e.g.*, *LBRY*, 639 F.Supp.3d at 215 (finding offering of investment contracts involving different types of sales involving millions of LBC spread out over multi-year period). Second, the *Hocking* court's observation was made with respect to the resale of a real estate asset that was <u>not</u> already part of a security to determine if upon resale, it became part of an investment contract. 885 F.2d at 1462. Third, *Hocking* involved specific representations made in an "isolated resale[]" to a unique buyer of a unique, non-fungible asset, and did not involve a public market or exchange. *Id.* Here, the applicable offering statements and promises made by the promoters of the Kraken-Traded Securities were made broadly and universally to all members of the public with respect to fungible and functionally indistinguishable assets, and the economic reality and investment package issuers offered investors and what investors resold on Kraken's

1  platform remained the same.  Accordingly, the analysis does not turn on whether the investor

2  bought the Kraken-Traded Securities "directly from an issuer, or, instead," on Kraken's platform or

3  through its services.  *See Coinbase*, 2024 WL 1304037, at \*23; *see also Terraform I*, 2023 WL

4  4858299, at \*15 (rejecting proposed privity requirement to *Howey* and finding "[t]hat [whether] a

5  purchaser bought the coins directly from the defendants or, instead, in a secondary re-sale

6  transaction has no impact on whether a reasonable individual would objectively view the

7  defendants' actions and statements as evincing a promise of profits based on their efforts").

8       Under similar circumstances, courts have found investment contracts involving crypto assets

9  remained securities, even after being traded on the secondary market.  In *SEC v. Wahi*, 2024 WL

10 896148 (W.D. Wash. Mar. 1, 2024), the court found on a motion for a default judgment that the

11 defendant had traded crypto asset securities on insider information in violation of the securities

12 laws.  *Id.* at \*1.  The *Wahi* court concluded that the transactions in crypto assets were investment

13 contracts even though the defendant traded the crypto assets "on the secondary market."  *Id.* at 6.

14 Taking the allegations in the complaint as true, the court reasoned:

15       The promotional statements and managerial promises set forth in the [first amended
16       complaint] apply equally to tokens that an investor may have bought from the issuer
         directly or from another investor, including on a crypto asset trading platform.  Each
17       issuer continued to make such representation regarding the profitability of their
         tokens even as the tokens were traded on secondary markets.

18 *Id.*  Finding there was no material change to the "investment package" resold on the public market,

19 the *Wahi* court concluded that there was no difference under *Howey* between tokens purchased

20 directly from the issuer and those resold on the trading platform.

21      Similarly, in *Terraform I*, the court found that due to the defendants' "public campaign,"

22 "secondary-market purchasers had every bit as good a reason to believe that the defendants would

23 take their capital contributions and use it to generate profits on their behalf." 2023 WL 4858299, at

24 \*15.  In *LBRY*, the court concluded, based upon LBRY's public statements and the economic reality

25 of the transaction, that LBRY offered and sold its crypto asset LBC as investment contracts,

26 including to purchasers who bought "44.1 million LBC through various digital asset trading

27 platforms."  639 F.Supp.3d at 215.  In *Jump Trading*, the court found plaintiffs adequately pled that

28 retail investors purchased investment contracts on crypto asset trading platforms "like Binance US

1   and Kraken." 2024 WL 49055, at *11-12.

2   Under Kraken's theory, issuers could sell crypto asset securities to underwriters who then

3   immediately dump them onto public markets without the protections of the securities laws because,

4   according to Kraken, the former securities no longer qualify as investment contracts once offered by

5   the underwriters. This is not—and cannot be—the law. The economic reality of an investment

6   contract does not simply vanish as soon as it is offered on Kraken's platform, and issuers cannot

7   "launder" their securities through the public markets to wash them of their character as securities.

8       **D.**    **The Kraken-Traded Securities Satisfy the *Howey* Test.**

9   Stripped of Kraken's erroneous proposed additions, the *Howey* test for an investment

10   contract covered under U.S. securities law remains a three-part analysis: "(1) an investment of

11   money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of

12   others." *Warfield*, 569 F.3d at 1020. For purposes of prevailing on the Exchange Act claims set

13   forth in its Complaint, the SEC need only establish that Kraken has engaged in regulated activities

14   relating to a single investment contract. Nevertheless, the Complaint alleges facts sufficient to

15   show that a non-exhaustive list of 11 different crypto asset securities were traded as investment

16   contracts through Kraken's platform or its services.

17   Kraken, however, attempts to distort the *Howey* analysis of the crypto asset securities

18   alleged in the SEC's Complaint. The Complaint alleges that investment contracts were offered and

19   sold when issuers originally offered and sold crypto assets as a package along with representations,

20   promises, and details that dictated the economic reality of the offerings. As alleged, this occurred

21   both through sales by the issuers themselves on Kraken's platforms and before the crypto asset

22   securities were resold on Kraken's platform. Under the second scenario, the Complaint alleges that

23   crypto assets securities remained investment contracts throughout the period when they were traded

24   through Kraken. In such a case, the physical separation or lack of privity between the issuer and the

25   resale buyer is not relevant because what the investing public was led to believe and the economic

26   reality of the original offering remain unchanged. This is especially true where, as here, Kraken

27   repeats promoters' claims on its own website while itself re-selling crypto asset securities to its

28   customers. Contrary to Kraken's arguments, an investment contract's character does not change

merely because it changes hands.

### 1.   Investment of Money

The first prong of Howey requires an investment of money that would subject the investor to a potential "financial loss." *Warfield*, 569 F.3d at 1021 (quoting *Rubera*, 350 F.3d at 1090).  For each Kraken-Traded Security, the Complaint alleges investors committed cash or other consideration, such as other crypto assets, in exchange for the Kraken-Traded Security.  (Compl. ¶¶ 229, 243, 270, 284-86, 290, 317-18, 338, 354, 375, 381, 393, 408, 428-29.)  For example, the Complaint alleges that the promoters of the FLOW network sold the network's native crypto asset, FLOW, to investors in multiple investment rounds for millions of dollars.  (*Id.* ¶¶ 315, 317-18.)  The Complaint also alleges that investors using the Kraken Trading Platform and Kraken Services paid for Kraken-Traded Securities using fiat or other crypto assets.  (*Id.* ¶¶ 32, 48, 60.)  These allegations are sufficient to plead the "investment of money."  *See, e.g.*, *Wahi*, 2024 WL 896148, at *5-6 (finding "investment of money" where issuers sold crypto assets in exchange for cash and financial consideration and where buyer on secondary market "paid for the tokens he purchased").

Kraken's Motion does not contest that the initial offering of the Kraken-Traded Securities involved an investment of money that satisfies *Howey*.  (Motion at 16-17.)  Instead, they merely reassert their incorrect argument that what would otherwise be an investment contract stops being one upon resale in a secondary market.  On this false premise, Kraken argues that the Complaint fails to allege the money invested by Kraken customers went to the issuers of the Kraken-Traded Securities.  Kraken's argument is wrong both factually and legally.  As to the facts, the Complaint alleges that the issuer of FLOW offered and sold FLOW from its own holdings on the Kraken Trading Platform using market maker agents.  (Compl. ¶¶ 117-18, 124, 126.)  The Complaint makes similar allegations about six other Kraken-Traded Securities.  (*Id.* ¶¶ 124, 126.)  Regardless, Kraken is also wrong in its legal assertion that "the investment of money" must go directly to the issuer.  Indeed, the focus of *Howey*'s first prong is whether the investor committed or risked her assets, not where those assets went.  In *Hocking*, the plaintiff bought a condo (the asset component of the investment contract) from a third-party seller.  885 F.2d at 1452-53.  Plaintiff's payments were to the condo sellers, not the issuers of the putative investment contract: the developer and management

company.  That Hocking's money did not go to the "issuers" was not relevant.  Sitting *en banc*, the *Hocking* panel found that "there can be no serious argument that Hocking did not invest money" if the condo was part of a package including a rental agreement.  *Id.* at 1459.  Likewise, when investors spend money to acquire crypto assets that are offered as part of an investment contract, it is not relevant whether investors' money goes to the issuer or a third party.

### 2.    Common Enterprise

In the Ninth Circuit, a "common enterprise" exists where the investment scheme involves either "strict vertical commonality" or "horizontal commonality."  *Hocking*, 885 F.2d at 1459; *see also id.* at 1455.  The Complaint's allegations about the Kraken-Traded Securities satisfy both strict vertical and horizontal commonality.

#### a.    Vertical Commonality

"[V]ertical commonality may be established by showing that the fortunes of the investors are linked with those of the promoters."  *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130 (9th Cir. 1991) (cleaned up).  The Complaint alleges vertical commonality by alleging that the fortunes of promoters and investors are both linked to the value of the respective Kraken-Traded Security.  (Compl. ¶¶ 231-32, 242, 246, 252-54. 272, 278, 288, 298, 307, 320, 325-26, 342, 345, 357, 363, 377, 383, 387, 395, 398, 411, 414, 432, 436.)  The promoters retained significant amounts of Kraken-Traded Securities for their future benefit.  If the price of the Kraken-Traded Security rose, then the promoters would benefit alongside investors.  If the price of the Kraken-Traded Security fell, then the promoters would suffer losses, again, alongside investors.

For example, the Complaint alleges that the promoters of the Algorand network publicly retained ownership and/or control over billions of ALGO tokens.  (*Id.* ¶¶ 240, 253-54.)  The Complaint alleges that ALGO was integral to the function of the Algorand blockchain and that the price for all ALGO goes up or down together. (*Id.* ¶¶ 20, 240, 242.)  The Complaint alleges that promoters stated that they would hold ALGO for the long term; believed in the value of ALGO; were committed to preserving a price floor for ALGO; and that their goal was to invest in the "growth, sustainability and performance" of the blockchain economy.  (*Id.* ¶¶ 244-45, 252.)  The Complaint alleges that the promoters remained responsible for the Algorand network.  (*Id.* ¶¶ 250-

51.)  Thus, the fortunes of the promoters of the Algorand network and investors were inexorably tied together and linked.  *See NAC Found.,* 512 F. Supp.3d at 996 (finding SEC sufficiently alleged strict vertical commonality where promoters "retained a healthy share of . . . tokens for their personal and corporate coffers"); *Jump Trading*, 2024 WL 49055, at *11 (denying motion to dismiss where complaint alleged promoters held "significant amount" of crypto asset LUNA and pooled proceeds to develop Terraform blockchain "ecosystem"); *SEC v. Telegram Group, Inc.*, 448 F. Supp. 3d 352, 370–71 (S.D.N.Y. 2020) (finding that "strict vertical commonality" existed because the issuer's "fortunes are directly tied to the fortunes of the [investors]").

Kraken acknowledges that the promoters and investors of the Kraken-Traded Securities share in the profits and losses from the rise and fall of the market prices of the crypto assets. Nonetheless, Kraken contends the Complaint is deficient because it does not allege a "one-to-one" relationship between promoters and investors.  But such a relationship is not required by *Howey* or Ninth Circuit precedent, and this argument ignores the economic reality of these investments. When the price of ALGO rises 5%, the Algorand promoters profit 5% <u>and</u> investors profit 5% <u>with respect to their ALGO holdings</u>.  If ALGO purchasers are ever "wiped out" as Kraken postulates, then the Algorand promoters would suffer the exact same financial harm, only magnified because the promoters own billions more ALGO.  They share in the profits and losses in a perfect one-to-one ratio.  Whenever profits or losses flow from the same source for both the promoter and investors, their fortunes are interwoven.[4]  *See Wahi*, 2024 WL 896148, at *5 (finding vertical commonality where the complaint alleged that the promoters "retained substantial tokens for their management teams, specifically to align the financial fortunes of management and token-holders"). This is entirely different than the broker-customer relationships cited by Kraken in its Motion where the source of profits for the broker (commissions) differs entirely from the source of profits for customers (stock or commodity appreciation).  (Motion at 18.)

---

[4] Contrary to Kraken's argument, whether a promoter has a separate project or enterprise is not relevant to the *Howey* analysis because there are infinite ways in which a promoter can separately generate revenue or profit.  In *Howey* itself, the record reflects that the issuers of the investment contracts had separate business pursuits, including managing other groves.  328 U.S. at 294-95.  In fact, the issuers were corporations that operated a tourism business and presumably had losses or profits separate and apart from their financial interest in the ventures at issue in *Howey*.

1

### b.   Horizontal Commonality

2      "Horizontal commonality describes the relationship shared by two or more investors who

3 pool their investments together and split the net profits and losses in accordance with their pro rata

4 investments." *Hocking v. Dubois*, 839 F.2d 560, 566 (9th Cir. 1988), *aff'd in relevant part*, 885

5 F.2d at 1459 (en banc).  The *Coinbase* court found horizontal commonality satisfied where "token

6 issuers, developers, and promoters frequently represented that proceeds from crypto-asset sales

7 would be pooled to further develop the tokens' ecosystems and promised that these improvements

8 would benefit all token holders by increasing the value of the tokens themselves."  2024 WL

9 1304037, at *21; *see also SEC v. Dalius*, 2023 WL 3988425, at *8 (C.D. Cal. May 24, 2023)

10 ("Generally, pooling [for horizontal commonality] occurs when the funds received by the promoter

11 through an offering are, essentially, reinvested by the promoter into the business, and such

12 reinvestment increases the value of the instrument offered." (cleaned up)).

13      The Complaint pleads horizontal commonality by alleging the promoters of the Kraken-

14 Traded Securities pooled the funds raised from their offerings to use for developing their respective

15 networks.  (Compl. ¶¶ 233, 250-54, 261, 270, 277, 279, 291, 294, 297-99, 306, 325-27, 330, 345,

16 360-61, 363-64, 380-81, 383, 393, 398-400, 412-14, 435-36.)  For example, the Complaint alleges

17 the promoters of the Cardano network raised $62 million between 2015 and 2017 from its offering

18 and used the proceeds from offering Cardano's crypto asset security, ADA, to "fund the

19 development, marketing, business operations, and growth of the Cardano protocol."  (*Id.* ¶¶ 229,

20 233).  The Complaint alleges that shortly after Kraken made ADA available on Kraken's platform, a

21 Cardano founder stated that he believed ADA will achieve his goal of a future market capitalization

22 of $1 trillion.  (*Id.* ¶¶ 229, 234, 236).  Based on these allegations, the Complaint sufficiently pleads

23 that Cardano's promoters pooled the proceeds from sales to develop the Cardano network to

24 achieve the promoter's goal of driving up the price of ADA, which would benefit investors and the

25 promoters in accordance with their *pro rata* holdings of ADA.  *See Kik*, 492 F. Supp. 3d at 178-79

26 (finding common enterprise where defendant pooled proceeds to fund operations, including the

27 "construction of the digital ecosystem it promoted"); *see also Balestra v. ATBCOIN LLC*, 380 F.

28 Supp. 3d 340, 354 (S.D.N.Y. 2019) (purchasers were not entitled to a pro rata share of profits but

1    "such a formalized profit-sharing mechanism is not required for a finding of horizontal

2    commonality").  Accordingly, *Coinbase* found that the SEC plausibly alleged horizontal

3    commonality specifically with respect to SOL and FIL on virtual identical allegations to those

4    alleged in the Complaint against Kraken.  2024 WL 1304037, at *21; *compare* Moores Decl. Ex. 1

5    ¶¶ 133-34, 172-179 *with* Compl. ¶¶ 294-302, 434-35.

6         Kraken acknowledges that the Complaint alleges promoters pooled investors funds to

7    develop their networks.  (Motion at 17.)  But Kraken argues that the Complaint fails to allege

8    horizontal commonality because it lacks allegations that promoters pooled funds from Kraken's

9    customers, not just funds from before Kraken listed the security.  *Id.*  Again, Kraken is wrong both

10   factually and legally.  For example, the Complaint alleges that the Cardano promoters retained 5.2

11   billion ADA, offered and sold ADA to investors through Kraken's platform, and used the proceeds

12   from ADA sales to fund the development of the Cardano network.  (Compl. ¶¶ 124, 126, 232-33.)

13   Thus the Complaint does allege that promoters pooled funds from Kraken customers.  In fact, the

14   Complaint makes similar allegations related to promoters of multiple Kraken-Traded Securities,

15   including ALGO, FIL, FLOW, ICP, MATIC, and NEAR.  (Compl. ¶¶ 124, 126, 243, 250-51, 290-

16   91, 294, 297, 317-18, 325, 328-30, 338, 345, 375, 380, 393, 399.)

17        As previously discussed, Kraken is also wrong in its legal assertion that the investment of

18   money must go directly to the issuer to establish horizontal commonality.  This requirement would

19   eliminate the possibility of an "investment contract" being involved in a resale, especially in public

20   markets, which is the very focus of the Exchange Act.  As the Ninth Circuit stated in *Salameh*,

21   "[w]hat matters is the economic reality of the transaction."  726 F.3d at 1130.  The economic reality

22   of Kraken-Traded Securities is that new investors replace resellers within the common enterprise on

23   the same terms, such that no new pooling of resale proceeds are required under *Howey*.  *See*

24   *Telegram*, 448 F. Supp. 3d at 369 ("The plain economic reality is that, post-launch, the [crypto

25   assets] themselves continue to represent the Initial Purchasers' pooled funds.").  Kraken has no case

26   support for its pooling argument, which is just as invented as its other proposed requirements.[5]

27   _____

28   [5] Kraken's reliance upon *Salameh* is misplaced.  (Motion at 17, claiming erroneously that *Salameh*

### 3.   Expectation of Profits from Efforts of Others

In the Ninth Circuit, the third prong of the *Howey* test requires that the investor be led to expect profits produced by the efforts of others. *Rubera*, 350 F.3d at 1090-91.  The third prong involves two distinct concepts: (a) "whether a transaction involves any expectation of profit;" and (b) "whether expected profits are the product of the efforts of a person other than the investors." *Warfield*, 569 F.3d at 1020.  "Profits" can take various forms of financial return, including "the increased value of the investment."  *Edwards*, 540 U.S. at 394. *See also SEC v. Hui-Feng*, 935 F.3d 721, 730-31 (9th Cir. 2019) (holding that expectation of profits prong is met even where an investor enters a transaction primarily for a purpose other than to invest, where the promoter also marketed investment potential).  The Ninth Circuit has rejected a strict interpretation of the "efforts of others" component "in favor of a more flexible focus 'whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Rubera*, 350 F.3d at 1091-92 (quoting *Glenn W. Turner Enters.*, 474 F.2d at 482).  Further, the court's inquiry is an objective one into "the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" *Warfield*, 569 F.3d at 1021 (quoting *Howey*, 328 U.S. at 298-99).  As noted above, a proper inquiry covers all the issuer's promotional materials, representations, and the economic reality of the transaction.  *Id.*

The Complaint alleges that a purchaser of any of the Kraken-Traded Securities were led to expect profits from the potential increased value of the crypto asset resulting from the efforts of the promoters or managers of the associated crypto asset network.  For example, the Complaint alleges that the issuers of Filecoin (ticker: FIL) represented to prospective purchasers that the price of FIL would increase based upon their work in developing the Filecoin network.  (Compl. ¶¶ 282-314.)  "Growth of the network will drive demand for the token.  The more value created by the Filecoin Network, the more things people and organizations spend Filecoin on, and the greater the value of worth of the token." (*Id.* ¶ 302.)  The Complaint also alleges that the promoters of the Filecoin

---

relates to resales on a secondary market.)  The plaintiffs in *Salameh* purchased condominiums from the developer.  726 F.3d at 1128.  There are no alleged resales.  *Salameh* does not address horizontal commonality, nor does it suggest that once an investment contract has been formed the proceeds from a resale of the investment contract must be pooled by the reseller.

network created a reasonable expectation of profits based upon how they structured the FIL offering with discounts, vesting schedules, and in such a way as to reward purchasers "by selling Filecoin at what we think is a much lower price than it will be worth some day (caveat: as with any risky investment of course we cannot make guarantees or predictions)."  (*Id.* ¶¶ 299, 307.)  Filecoin's promoters also wanted to demonstrate their "long-term alignment" with purchasers "similarly interested in long-term value creation and growth" by retaining tokens (*id.* ¶ 307), furthering investors' expectation of profits.  Finally, the Complaint alleges that the promoters promised investors that they would be able to sell their FIL on public crypto platforms in the future (*id.* ¶ 301), and that FIL promoters programmed into their network a "burn" mechanism to decrease supply and increase its price.  (*Id.* ¶ 308.)

These allegations about Filecoin are functionally identical to numerous crypto asset securities cases in which courts have found investment contracts.  *See, e.g.*, *Jump Trading*, 2024 WL 49055, at *12 (defendants publicly promoted that crypto asset would increase in value from increased blockchain usage resulting from their development efforts); *LBRY*, 639 F. Supp. 3d at 219-20 (LBRY's retention of hundreds of millions of LBC "would lead purchasers of LBC to expect that they too would profit . . . as a result of LBRY's assiduous efforts"); *Friel v. Dapper Labs, Inc.*, 657 F. Supp. 3d 422, 446-47 (S.D.N.Y. 2023) (finding security alleged where, without promoter's continued maintenance of the blockchain, the crypto asset would have no value).

For the other Kraken-Traded Securities, the Complaint similarly alleges that the promoters structured the offerings like securities offerings in ways that led investors to believe the promoters would work hard to attempt to raise the price of the crypto asset security.  (Compl. ¶¶ 232, 235-38, 244-45, 250-65, 273-74, 276-81, 295-307, 311-12, 322-34, 344-52, 359-70, 374, 379-90, 392-93, 397-406, 412-25, 430, 434-45.)  The Complaint further alleges that promoters informed purchasers of what they had done, what they planned to do, and how their efforts would impact the value of crypto asset, through numerous public statements in whitepapers, marketing materials, offering documents, websites, social media posts, and oral assurances.  (*Id.*)  *Cf. Coinbase*, 2024 WL 1304037, at *22 (complaint satisfied *Howey*'s third prong by alleging issuers "repeatedly encouraged investors to purchase tokens by advertising the ways in which their technical and

1  entrepreneurial efforts would be used to improve the value of the asset, and continued to do so long

2  after the tokens were made available for trading on the secondary market"). Notably, the court in

3  *Coinbase* expressly found nearly identical allegations about the crypto assets SOL, MATIC, and

4  FLOW satisfied *Howey*'s third prong. 2024 WL 1304037, at *22; *compare* Moores Decl. Ex. 1

5  ¶¶ 139-40, 154, 160, 243 to Compl. ¶¶ 330, 387, 381, 440-41.

6       Kraken does not contest that the Complaint adequately alleges that purchasers were buying

7  the Kraken-Traded Securities expecting to make money from the appreciation in the price of the

8  crypto asset. In fact, Kraken and *amici* liken the Kraken-Traded Securities to gold, silver, or

9  collectibles that investors buy as investments to profit from their appreciation in value. (Motion at

10  19-20.) Instead, Kraken challenges the "efforts of others" component of the Complaint's

11  allegations, arguing that a purchaser could not reasonably form the belief that any rise in price could

12  be attributed to the managerial efforts of promoters without a "contractual undertaking or

13  relationship with the issuers or their business." (Motion at 19.)

14       Investments in Kraken-Traded Securities, however, are not like the purchases of gold or

15  silver discussed in *Belmont-Reid, Noa*, or similar cases that Kraken cites. (Motion at 19-20.) In

16  those cases, the courts found that the seller was powerless relative to the established global markets

17  for gold or silver and that no reasonable purchaser would conclude that the profits from the rise in

18  commodity prices would be due to the putative issuer's managerial efforts. *See, e.g., Noa v. Key*

19  *Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980) (viewing national silver market as independent of

20  promoter's activities). In stark contrast, the Complaint here alleges that the promoters <u>created</u> the

21  protocols, the blockchains, the software, the applications, and the crypto assets—the entire

22  network—and continued to work diligently to grow their networks or "ecosystems." As alleged, the

23  resale markets for the Kraken-Traded Securities <u>depended</u> upon the promoter's activities and

24  network. Kraken's slippery slope argument about collectibles similarly fails because trading cards

25  or valuable watches typically lack the promoter's representations, promises, and economic realities

26  that would cause a reasonable buyer to expect an appreciation in value of their collectibles in a

27  global marketplace based upon the promoter's managerial efforts. Unlike the value of diamonds or

28  vintage cars, the value of a crypto asset vanishes (as does the crypto asset itself) if the networks they

are intrinsically tied to disappear.  *See Coinbase*, 2024 WL 1304037, at *25 (distinguishing commodities and collectibles from a crypto asset which is necessarily intermingled with its digital network without which it would not exist); *Friel*, 657 F. Supp. 3d. at 439 (finding collectibles lack "critical causal connection" existing between crypto asset issuer and value of crypto asset).  But if an offering of valuable watches did meet the *Howey* test, then the asset would join whiskey casks, chinchillas, earth worms, and payphones as assets underlying investment contracts.

Further, the economic reality of the Kraken-Traded Securities demonstrates why this court should not follow the limited holding in *SEC v. Ripple* cited by Kraken.  First, the *Ripple* court expressly limited its decision to the specific facts of the case as presented at summary judgment, including but not limited to differing promotional materials and contractual terms at issue in different types of sales in that case.  *SEC v. Ripple Labs, Inc.*, 2023 WL 6445969, at *3-4 (S.D.N.Y. Oct. 3, 2023) (explaining that the court's summary judgment order "did not hold that offers and sales on digital asset exchange cannot create a reasonable expectation of profits based on the efforts of others").  Second, the court also declined to rule on secondary market trading, which the court regarded as something different and distinct from Ripple's own sales on crypto asset trading platforms.  *Ripple*, 2023 WL 4507900, at *11 n.16.  Third, without support, the *Ripple* opinion creates subclasses of "objective" purchasers and treats public crypto asset market participants differently, which belies the precept of U.S. securities laws that material information disclosed publicly by issuers is relevant and understood by public markets.

On that last point, no court has followed *Ripple*.  Judge Rakoff in *Terraform I* explicitly rejected it: "*Howey* makes no such distinction between purchasers . . . .  That a purchaser bought the coins directly from the defendants or, instead, in a secondary resale transaction has no impact on whether a reasonable individual would objectively view the defendants' actions and statements as evincing a promise of profits based on their efforts."  *Terraform I*, 2023 WL 4858299, at *15.  Similarly, in *Coinbase* the court concluded that "there is little logic to the distinction Defendants attempt to draw between the reasonable expectations of investors who buy directly from an issuer and those who buy on the secondary market."  2024 WL 1304037, at *23 ("An investor selecting an investment opportunity in either setting is attracted by the promises and offers made by issuers to

the investing public.").  The same is true in the Ninth Circuit, which recognizes that under the

Securities Act solicitations need not be direct or personal and that "nothing in the Act indicates that

mass communications, directed to multiple potential purchasers at once, fall outside the Act's

protections."  *Pino*, 55 F.4th at 1258; *see also Wildes v. BitConnect Int.'l PLC*, 25 F.4th 1341, 1345

(11th Cir. 2022) (Securities Act makes no "distinction between individually targeted sales efforts

and broadly disseminated pitches.")

Along the same line, Kraken argues that a purchaser of a Kraken-Traded Security could not

reasonably believe that any rise in price could be attributed to the promoters' efforts without a

"contractual undertaking or relationship with the issuers or their business," (Motion at 19), and

downplays the content of the "advertising or promotional statements" detailed in the Complaint,

claiming they are too vague.  (Motion at 21, citing *De Luz*, 608 F.2d at 1300.)  This argument also

flies in the face of economic reality as it simply ignores that expectations of profit are precisely the

conclusion that the assets' promoters invited investors to draw.  Moreover, Kraken never engages

with the specific allegations in the Complaint, which unlike those in *De Luz*, are very specific.  In

contrast to the limited representation of the developer in *De Luz* to develop a fraction of the land at

some indeterminate time, *id.* at 1301, the Complaint's allegations detail specific promises and

representations promoters made to induce purchasers to purchase the Kraken-Traded Securities.[6]

Using Filecoin again as an example, the Complaint alleges the FIL promoters made a drum-beat of

comprehensive promises about what they were going to do for FIL holders:

> We must develop all the software required: the mining software, client software, user
> interfaces and apps, network infrastructure and monitoring, software that third-party
> wallets and exchanges need to support Filecoin, integrations with other data storage
> software, tooling for web application and dapps to use Filecoin, and much more.  We
> must deploy the network, facilitate its growth to large scale, market to and onboard
> miners and clients, bring key partners into the eco system, and much more.

(Compl. ¶ 297.)  Moreover, the FIL promoters have also continued to release "roadmaps" and

"master plans" that update the progress the promoters have made and showcase future plans for the

---

[6] *De Luz* also directly undermines Kraken's argument because the court looked to the developer's
extra-contractual statements and promises in its analysis and did not require that such promises be
legally enforceable or contractual.  *De Luz*, 608 F.2d at 1300-01.

Filecoin Network.  (*Id.* ¶ 311.)  The promoters were not vaguely saying they may build someday some network possibly related to the crypto asset.

**E.      There Is No Basis to Bar the SEC from Fulfilling its Congressional Mandate to Enforce U.S. Securities Laws.[7]**

**1.      The Major Questions Doctrine Is Not Concerned with Agency Enforcement of Congressional Enactments.**

Kraken misunderstands the major questions doctrine's purpose and reach.  Rooted in "both separation of powers principles and a practical understanding of legislative intent," *West Virginia v. EPA*, 597 U.S. 697, 723 (2022), the doctrine is focused on preventing "the Executive seizing the power of the Legislature," *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023).  It thus constrains agencies' "regulatory assertions" of "highly consequential power beyond what Congress could reasonably be understood to have granted," *West Virginia*, 597 U.S. at 722, 724 (cleaned up), such as the adoption of an entirely new "regulatory scheme," *id.* at 2616, or the enactment of a new regulatory "program," *Nebraska*, 143 S. Ct. at 2369.[8]

---

[7] *Amici* also raises the prospect that, if the Kraken-Traded Securities are investment contracts subject to the federal securities laws, then state efforts to regulate such securities will be preempted. *See* Br. of Amicus Curiae State of Mont. (ECF No. 51-1) at 7-10.  Their fears of preemption, however, are misguided.  First, preemption under the National Securities Markets Improvement Act ("NSMIA") is limited.  15 U.S.C. § 77r(a).  Second, preemption applies only to "covered securit[ies]," which crypto asset securities are not.  *Id.*; 15 U.S.C. § 77r(b) (defining covered securities); *see also* Moores Decl., Ex. 2 (Br. of Amicus Curiae N. Am. Sec. Adm'rs Ass'n, Inc. in Support of the SEC at 7-8, *SEC v. Coinbase, Inc.*, No. 1:23-cv-04738-KPF (S.D.N.Y. October 10, 2023), ECF No. 77 (listing actions brought by state securities administrators involving crypto asset securities and supporting the SEC's application of *Howey*)).  In fact, adopting Kraken's unprecedentedly narrow view of the definition of investment contracts would impinge upon a state's ability to enforce state securities laws.  *Id.*  Third, even if crypto asset securities were subject to NSMIA, states would still be free to continue to police "fraud or deceit" or "unlawful conduct" in connection with such securities.  15 U.S.C. § 77r(c); *see Chamberlin v. Advanced Equities, Inc.*, 2002 WL 34419450, at *3 (W.D. Wash. Jan. 17, 2002) ("Congress did not intend NSMIA to interfere with states' ability to protect their citizens from fraud, or to implement greater protections from fraudulent activity than the federal law provides.").  Finally, even if the present facts changed and preemption did apply with respect to a specific crypto asset security listed on a registered national securities exchange, that is the type of conduct Congress has decided warrants a uniform national regulatory approach and preemption.

[8] Cases that *West Virginia* and *Nebraska* identify as relevant precedent similarly involved the exercise of regulatory authority.  *See NFIB v. OSHA*, 595 U.S. 109 (2022) (staying OSHA's "vaccine mandate"); *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) (rejecting EPA's greenhouse-gas regulations); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) (rejecting FDA's tobacco regulations).

Filing an enforcement action pursuant to the Executive's power to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, is fundamentally different.  "A lawsuit is the ultimate remedy for a breach of the law, and it is to the President, and not to the Congress, that the Constitution entrusts" the "'take Care'" "responsibility."  *Buckley v. Valeo*, 424 U.S. 1, 138 (1976) (*per curiam*) (citation omitted).  Given this distinction, courts have refused to extend the major questions doctrine to the SEC's "exercise[e of] its Congressionally bestowed enforcement authority."  *Coinbase*, 2024 WL 1304037, at *15.  *See also FTC v. Kochava Inc*., 671 F. Supp. 3d 1161, 1180 (D. Idaho 2023) (holding major questions doctrine "inapplicable" because "the FTC is not flexing its regulatory muscles—it is merely asking a court to interpret and apply a statute enacted by Congress"); *United States v. Freeman*, -- F. Supp. 3d --, 2023 WL 5391417, at *8-12 (D.N.H. Aug. 22, 2023) (rejecting major questions doctrine in enforcement action).  As Judge Rakoff reasoned, "[d]efendants cannot wield a doctrine intended to be applied in exceptional circumstances as a tool to disrupt the routine work that Congress expected the SEC … to perform." *Terraform I*, 2023 WL 4858299, at *9; *Coinbase*, 2024 WL 1304037, at *15 ("Using enforcement actions to address crypto-assets is simply the latest chapter in a long history of giving meaning to the securities laws through iterative application to new situations.").

Kraken and *amici* point to proposed legislation addressing the regulation of crypto assets, but the claim that the SEC cannot enforce existing statutes in light of proposed legislation finds no support in the Supreme Court's major questions doctrine cases or elsewhere.  Congress created the SEC to administer and enforce the securities laws, which were designed to "eliminate. . . abuses [that] contributed to the stock market crash of 1929 and the depression of the 1930's," by adopting a "philosophy of full disclosure" to "achieve a high standard of business ethics in the securities industry."  *SEC v. Cap. Gains Rsch. Bureau, Inc*., 375 U.S. 180, 186 (1963).  Since its inception, the SEC has exercised this authority with respect to a wide variety of securities.  *See, e.g., Edwards*, 540 U.S. 389 (payphone sale-and-leasebacks); *Joiner*, 320 U.S. 344 (oil and gas leases).  "Until the law changes, the SEC must enforce, and the judiciary must interpret, the law as it is."  *Coinbase*, 2024 WL 1304037, at *15.

### 2.   The Circumstances Warranting Application of the Major Questions Doctrine Are Absent Here.

The major questions doctrine's rationale—to constrain "agencies' assert[ions] of highly consequential power beyond what Congress could reasonably be understood to have granted" (*West Virginia*, 597 U.S. at 724)—is also not implicated here.

First, this civil enforcement action lacks the vast economic or political significance that the Supreme Court has pointed to when invoking the major questions doctrine.  In *Alabama Assn. of Realtors v. HHS*, for example, the Court emphasized that the challenged CDC eviction moratorium would govern 80 percent of the country and impose an estimated $50 billion cost.  594 U.S. 758, 764 (2021).  And in *West Virginia*, the Court described the EPA rule at issue as one that would have "force[d] a nationwide transition away from the use of coal to generate electricity," allowing the agency "to adopt a regulatory program that Congress had conspicuously and repeatedly declined to enact itself."  597 U.S. at 724, 735 (cleaned up).

Here, the SEC is not exercising authority over the entire "digital asset industry" (Motion at 28); rather, it seeks to force Kraken to comply with the federal securities laws.  Even so, the scope of the entire "industry" "falls far short of being a portion of the American economy bearing vast economic and political significance." *Terraform I*, 2023 WL 4858299, at *8 (cleaned up).  "[I]t would ignore reality to place the crypto-currency industry and the American energy and tobacco industries—the subjects of *West Virginia* and *Brown & Williamson*, respectively—on the same plane of importance." *Id.*; *see also Coinbase*, 2024 WL 1304037, at *14.  Additionally, crypto asset securities are but a subset of the securities over which the SEC exercises enforcement authority.  It makes little sense to question the SEC's enforcement authority based on the current size of the "digital asset industry" when Congress has undisputedly granted the SEC enforcement authority over the much larger securities industry.  *See Coinbase*, 2024 WL 1304037, at *14.

Second, in sharp contrast to the Supreme Court's major questions cases, it is simply not the case that this enforcement action exceeds the authority Congress granted the SEC.  In *West Virginia*, the Court observed that the EPA had "located that newfound power in the vague language in an ancillary provision" of the Clean Air Act which "was designed to function as a gap filler and had

rarely been used in the preceding decades." 597 U.S. at 724 (cleaned up). The Court found "little reason to think" that Congress had, by means of that "previously little-used backwater" provision, "implicitly tasked [the EPA], and it alone, with balancing the many vital considerations of national policy implicated in deciding how Americans will get their energy." *Id*. at 729-30. Similarly, in *Nebraska*, the Court found it unlikely that, by giving the Secretary of Education discretion to modify or waive statutory student loan provisions, Congress authorized him to "create[] a novel and fundamentally different loan forgiveness program" that would "release 43 million borrowers from their obligations to repay $430 billion in student loans." 143 S. Ct. at 2369, 2372. The Court thus concluded that "the basic and consequential tradeoffs inherent in a mass debt cancellation program are ones that Congress would likely have intended for itself." *Id.* at 2375 (cleaned up).

This case presents far different circumstances. The SEC did not file this action pursuant to a "previously little-used backwater" provision, *West Virginia*, 597 U.S. at 730, or some "humdrum reporting requirement," *Nebraska*, 143 S. Ct. at 2371. Rather, the SEC filed this action pursuant to the same authority, exercised since its establishment, to enforce the federal securities laws with respect to any instrument that is a "security." Enforcing those laws here thus does not represent the exercise of a "newfound power," *West Virginia*, 597 U.S. at 724; it is the exact type of enforcement action that Congress authorized the SEC to bring. Such "clear congressional authorization," *Nebraska*, 143 S. Ct. at 2375 (cleaned up), would satisfy the major questions doctrine even if it were applicable.

## <u>CONCLUSION</u>

For the reasons set forth above, the SEC respectfully requests that the Court deny Defendants' Motion.

Dated: April 9, 2024                          Respectfully submitted,

                                             */s/ Peter Bryan Moores*
                                             _____
                                             Daniel O. Blau
                                             Alec Johnson
                                             Peter Bryan Moores
                                             Elizabeth Goody
                                             Counsel for Plaintiff
                                             Securities and Exchange Commission

1

## **PROOF OF SERVICE**

2

I am over the age of 18 years and not a party to this action.  My business address is:

3

U.S. SECURITIES AND EXCHANGE COMMISSION,
33 Arch Street, 24th Floor, Boston, MA 02110

4

Telephone No. 617-573-8900.

5

On April 9, 2024, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

6

on all the parties to this action addressed as stated on the attached service list:

7

☐   **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's

8

practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

9

☐   **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I

10

personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

11

☐   **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly

12

maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

13

☐   **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the

14

addressee as stated on the attached service list.

15

☐   **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility

16

regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

17

☐   **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

18

☒   **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF

19

system, which effects electronic service on counsel who are registered with the CM/ECF system.

20

☐   **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

21

22

I declare under penalty of perjury that the foregoing is true and correct.

23

Date:  April 9, 2024                                */s/ Peter Bryan Moores*

24

Peter Bryan Moores

25

26

27

28

*SEC v. Payward, Inc.; Payward Ventures, Inc.*
**United States District Court—Northern District of California**
**Case No. 3:23-cv-06003-WHO**

## SERVICE LIST

Matthew C. Solomon, Esq.
Rahul Mukhi, Esq.
Jennifer K. Park, Esq.
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
Email:  msolomon@cgsh.com
Email:  rmukhi@cgsh.com
Email:  jkpark@cgsh.com
*Attorney for Defendants Payward, Inc. and Payward Ventures, Inc.*

Brian Klein, Esq.
Ashley Martabano, Esq.
Waymaker LLP
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Email;  bklein@waymakerlaw.com
Email:  amartabano@waymakerlaw.com
*Counsel for Defendants Payward, Inc. and Payward Ventures, Inc.*