**EXHIBIT A**

1

2  Matthew D. Zinn (Bar #214587)
Shute, Mihaly & Weinberger
3  396 Hayes Street
San Francisco, CA 94102-4421
4  415-552-7272
5  zinn@smwlaw.com

6  Robin Thurston*
Orlando Economos
7  Sarah Goetz*
8  Democracy Forward Foundation
P.O. Box 34553
9  Washington, DC 20043
202-788-6052
10  rthurston@democracyforward.org
11  oeconomos@democracyforward.org
sgoetz@democracyforward.org
12  *Counsel for Amici Curiae*
13  *Motion for admission pro hac vice pending*

14              **UNITED STATES DISTRICT COURT**

15     **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

16

17

18  SECURITIES AND EXCHANGE            Case No. 3: 23-cv-06003-WHO
COMMISSION,
19                                      **BRIEF OF AMICI CURIAE**
20                         *Plaintiff,*  **ADMINISTRATIVE LAW**
**SCHOLARS IN SUPPORT OF**
21              v.                       **PLAINTIFF'S OPPOSITION TO**
**DEFENDANTS' MOTION TO**
22  PAYWARD, INC. and PAYWARD          **DISMISS**
VENTURES, INC.,
23                                      Honorable William H. Orrick
24                         *Defendants.*
25

26

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ....................................................................................................... 1

ARGUMENT ............................................................................................................ 3

I.   The Legal Foundations of the Major Questions Doctrine Limit its
     Application. ..................................................................................................... 3

     A. The major questions doctrine is triggered only in "extraordinary"
        cases involving "major" claims of authority. ............................................ 3

     B. The major questions doctrine is intended to vindicate Congressional
        intent and preserve the separation of powers. ........................................ 4

II.  The Major Questions Doctrine Is Inapplicable to This Lawsuit. ....................... 5

     A. The SEC's enforcement action is neither "extraordinary" nor
        "economically significant." ...................................................................... 6

     B. The major questions doctrine does not apply to displace or limit
        binding judicial standards like the *Howey* test because judicial
        review reinforces the separation of powers. ............................................ 11

     C. The major questions doctrine leads to absurd results here because the
        SEC and private litigants share litigation authority. ............................... 13

CONCLUSION ......................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama Ass'n of Realtors v. HHS.*,
   594 U.S. 758 (2021) ............................................................................... 6, 10

*Biden v. Nebraska*,
   143 S. Ct. 2355 (2023) ...................................... 5, 6, 7, 8, 10, 12, 14, 16

*Cont'l Mktg. Corp. v. SEC*,
   387 F.2d 466 (10th Cir. 1967) .............................................................. 9, 11

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ......................................................... 7, 8, 10, 12, 17

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ............................................................................... 7, 10

*King v. Burwell*,
   576 U.S. 473 (2015) ............................................................................... 7, 12

*Marbury v. Madison*,
   5 U.S. 137 (1803) .......................................................................................... 16

*MCI Telecomms. Corp. v. AT&T Co.*,
   512 U.S. 218 (1994) ..................................................................... 6, 10, 12, 17

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA (NFIB v. OSHA)*,
   595 U.S. 109 (2022) ....................................................................................... 18

*SEC v. Brigadoon Scotch Distribs., Ltd.*,
   388 F. Supp. 1288 (S.D.N.Y. 1975) ...................................................... 4, 9

*SEC v. Coinbase*,
   23 Civ. 4738 (KPF), 2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ....... 9, 11, 13, 14, 16

*SEC v. Edwards*,
   540 U.S. 389 (2004) ............................................................................... 9, 11

*SEC v. R.G. Reynolds Enters., Inc.*,
   952 F.2d 1125 (9th Cir. 1991) ..................................................................... 11

ii

*SEC v. Terraform Labs Pte. Ltd.*,
  23-cv-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ............................ 4, 12

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) .................................................................... 4, 5, 9, 11, 15, 16

*SEC v. Wickham*,
  12 F. Supp. 245 (D. Minn. 1935) ............................................................. 11

*Slack Techs. v. Pirani, LLC*,
  598 U.S. 759 (2023) ........................................................................... 16

*State v. Gopher Tire & Rubber Co.*,
  177 N.W. 937 (Minn. 1920) .................................................................... 15

*TransUnion LLC v. Ramirez*,
  594 U.S. 412 (2021) ........................................................................... 14

*United States v. Texas*,
  599 U.S. 670 (2023) ........................................................................... 14

*Utah v. Walsh*,
  No. 2:23-CV-016-Z, 2023 WL 6205926 (N.D. Tex. Sept. 21, 2023) ........................ 11

*Util. Air Regul. Grp. v. EPA (UARG)*,
  573 U.S. 302 (2014) ................................................................. 6, 7, 8, 15, 17

*West Virginia v. EPA*,
  597 U.S. 697 (2022) .................................................. 4, 6, 7, 8, 10, 11, 15, 17, 18

**Constitutional Provisions**

U.S. Const., art. II, § 1, cl. 1; § 3 ............................................................ 14

**Statutes**

15 U.S.C. § 77l .................................................................................. 5

15 U.S.C. § 77t .................................................................................. 5

15 U.S.C. §§ 77l, 77k, 78t-1, 78r ............................................................... 17

15 U.S.C. §78c(a)(10) ............................................................................ 4

**Other Authorities**

*Apple Inc. Common Stock*, NASDAQ (last visited Apr. 3, 2024)
  https://www.nasdaq.com/market-activity/stocks/aapl ..................................................... 13

Kristin E. Hickman & Richard J. Pierce, Jr.,
  *Administrative Law Treatise* (6th ed. 2019) .................................................. 10

Press Release, White House, FACT SHEET: White House Releases First-Ever
  Comprehensive Framework for Responsible Development of Digital Assets (Sept. 16,
  2022), http://tinyurl.com/22mas2hc. .............................................................. 13

SEC, *About the SEC* (last visited Apr. 6, 2024),
  https://www.sec.gov/strategic-plan/about ..................................................... 13

Todd Phillips & Beau J. Baumann, *The Major Questions Doctrine's Domain*,
  89 Brooklyn L. Rev. (forthcoming 2024),
  https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4504304 .................................. 6, 8

**INTRODUCTION**

For nearly a century, the Securities and Exchange Commission ("SEC") has regulated the national securities markets. Since its inception, it has carried out its mission to protect investors, preserve fair and orderly markets, and facilitate capital formation with respect to both run-of-the-mill securities instruments and novel ones. From its early days of enforcing the Securities Act's requirements against units of a citrus grove development, *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), or portfolios of rare coins, *SEC v. Brigadoon Scotch Distribs., Ltd.*, 388 F. Supp. 1288 (S.D.N.Y. 1975), to the modern specter of crypto assets, the "flexible" and "adapt[able]" nature of the securities laws enables the SEC to respond to industry innovations, *Howey*, 328 U.S. at 299.

This enforcement action against defendants Payward, Inc. and Payward Ventures, Inc. ("Kraken") is the latest such application of the SEC's authority to regulate "investment contracts" to new factual circumstances. 15 U.S.C. §78c(a)(10). The relative novelty of the investment asset does not make the SEC's use of its longstanding authority "unheralded" or "transformative," such as would trigger the major questions doctrine. *See West Virginia v. EPA*, 597 U.S. 697, 700 (2022). The SEC has been exercising this authority against the latest investment crazes for decades. Nor does this enforcement action implicate the kind of economic or political significance the Supreme Court has held is required to trigger the doctrine. It is simply a continuation of the SEC's gradual process of clarifying the application of the securities laws through incremental enforcement actions—a process it has applied to address potential new securities since its creation in 1934.

The major questions doctrine has never been applied to preclude a civil enforcement action brought by an agency, as Kraken would have here, but only to invalidate legislative agency actions. Individual enforcement actions are fact-specific, do not bind other parties, and provide the regulated entity a chance to contest the government's theory of liability; they are necessarily more limited in their reach than industry-wide regulation. While regulations are legislative—arguably at times implicating the separation of powers—civil

1

enforcement actions are within the core of Article II authority. Indeed, through an action to enforce the Securities Act in novel circumstances, the SEC is asking this Court to say what the law is, not "arrogating [that power] to itself." *Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023). As other courts have found, the major questions doctrine is irrelevant to SEC enforcement actions involving crypto assets.

*First*, the SEC is proceeding through case-by-case adjudication rather than a broadly applicable rule, bringing a specific complaint in federal court against a particular party alleged to have violated the Exchange Act. The SEC does not purport to reinterpret the Exchange Act or the *Howey* standard, but is merely attempting to vindicate its best reading of its regulatory authority as it has done for nearly a century. *Second*, the Court should not apply the major questions doctrine because the Supreme Court has never applied the major questions doctrine to displace an existing standard, and doing so here would unravel the longstanding *Howey* standard. When the Supreme Court interpreted "investment contract" in 1946, it already "had been crystallized by . . . prior judicial interpretation." *Howey*, 328 U.S. at 298. Applying the major questions doctrine here would override the plain language of the statute and its longstanding interpretation—the opposite of the doctrine's core motivations. *See infra* Part I.B. *Third*, application of the major questions doctrine to the SEC's authority to vindicate the securities laws would introduce absurd discrepancies between the ability of the SEC to bring claims against crypto companies and that of private litigants to do the same. *Compare* 15 U.S.C. § 77l *with id*. § 77t.

Amici take no position on the proper application of *Howey*. But application of the major questions doctrine in a case like this one would conflict with governing Supreme Court precedent on the doctrine's scope. *See generally* Todd Phillips & Beau J. Baumann, *The Major Questions Doctrine's Domain*, 89 Brooklyn L. Rev. (forthcoming 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4504304 (arguing that courts should not apply the major questions doctrine beyond legislative rules that carry the force of law). Therefore, in resolving Kraken's motion to dismiss, the Court should not apply the major

questions doctrine.

## ARGUMENT

### I. THE LEGAL FOUNDATIONS OF THE MAJOR QUESTIONS DOCTRINE LIMIT ITS APPLICATION.

#### A. The major questions doctrine is triggered only in "extraordinary" cases involving "major" claims of authority.

The major questions doctrine implements a presumption that Congress does not delegate extraordinary powers that transform an agency's authority without speaking clearly. *West Virginia*, 597 U.S. at 723–24. It applies when an agency undertakes extraordinary action—action "novel and fundamentally different" from the authority it has exercised before. *Nebraska*, 143 S. Ct. at 2369. In *West Virginia*, the Court recast the doctrine as a substantive canon rooted in "separation of powers principles and a practical understanding of legislative intent." 597 U.S. at 723.

The major questions doctrine has two triggers, neither of which is sufficient on its own. First, agency action must be "extraordinary," meaning it is "unheralded" and "transformative." *West Virginia*, 597 U.S. at 724 (quoting *Util. Air Regul. Grp. v. EPA (UARG)*, 573 U.S. 302, 324 (2014)). An agency action is unheralded when it lacks meaningful regulatory precedent. *See, e.g.*, *Alabama Ass'n of Realtors v. HHS.*, 594 U.S. 758, 765 (2021) (concluding that the COVID-19 eviction moratorium was "unprecedented" because the relevant statutory authority had never yielded any regulation "approach[ing] the size or scope of the eviction moratorium"). Agency action is "transformative" if the promulgated rule would radically alter a broader regulatory scheme, *see generally MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 229–30 (1994) (action at issue implicated a major question because it would have waived an essential and mandatory requirement essential to Congress's design); *Nebraska*, 143 S. Ct. at 2369 (loan forgiveness program "abolished [prior forgiveness programs] and supplanted them with a new regime entirely"); or else greatly expand the agency's jurisdiction, *see FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (statute did not grant the FDA

3

jurisdiction over the tobacco industry).

Second, an agency action must be *major*, meaning that the action implicates a "question of deep economic and political significance." *West Virginia*, 597 U.S. at 752 (Gorsuch, J., concurring) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)). Economic significance exists when agencies seek to regulate "a significant portion of the American economy," *Brown & Williamson*, 529 U.S. at 123, and when they require "billions of dollars in spending" by private persons or entities, *Burwell*, 576 U.S. at 485; *see also West Virginia*, 597 U.S. at 724 (finding the Clean Power Plan major because it would empower the EPA to "substantially restructure the American energy market"); *UARG*, 573 U.S. at 324 (rejecting a rule in part as it would have expanded the agency's regulatory authority over many never-regulated sources of greenhouse gas emissions); *Nebraska*, 143 S. Ct. at 2373 (finding major student-loan forgiveness worth about $500 billion). Political significance may exist when an agency action touches on a politically contentious issue. *See Gonzales v. Oregon*, 546 U.S. 243, 267 (2006) (physician-assisted suicide, a hotly contested political issue); *see also Brown & Williamson*, 512 U.S. at 148–49 (exploring Congress's repeated decisions over a 35-year period not to grant the FDA authority to regulate tobacco products). The Court has never suggested that the mere existence of political disagreement with an agency's decisionmaking triggers the major questions doctrine on its own.

Once the major questions doctrine's dual triggers are both pulled, an agency's legal interpretation fails unless the agency can point to "clear" statutory authorization that Congress permitted the agency action. *West Virginia*, 597 U.S. at 723.

### B. The major questions doctrine is intended to vindicate Congressional intent and preserve the separation of powers.

The major questions doctrine assumes that Congress does not delegate extraordinary powers without speaking clearly. *See id.* ("Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices.") (cleaned up); *Brown & Williamson*, 529 U.S. at 160 ("[W]e are confident that Congress could not have

4

1   intended to delegate a decision of such economic and political significance to an agency in
2   so cryptic a fashion."). So in the rare case in which an agency claims such extraordinary
3   authority, the doctrine requires Congress to have clearly authorized the power at issue. *See*
4   *West Virginia*, 597 U.S. at 723 (quoting *UARG*, 573 U.S. at 324) ("[I]n certain
5   extraordinary cases . . . [t]he agency . . . must point to 'clear congressional authorization'
6   for the power it claims."). This rationale for the major questions doctrine elevates
7   congressional intent as a critical component of the doctrine's applicability. It also suggests
8   that, where evidence flips this presumption about how Congress "speaks" in statutes, the
9   major questions doctrine may not apply.

10   A second rationale focuses on "separation of powers principles." *Id*. The major
11   questions doctrine is preoccupied with stopping executive aggrandizement at the expense
12   of the legislature. *See Nebraska*, 143 S. Ct. at 2373. As a result, the major questions
13   doctrine is often implicated when an agency "conveniently" seizes on an untested and
14   ancillary provision to "enact a program that Congress has chosen not to enact itself." *Id.*
15   (citing *West Virginia*, 597 U.S. at 731).

16   **II.   THE MAJOR QUESTIONS DOCTRINE IS INAPPLICABLE TO THIS ACTION.**

17   There is simply nothing "major" about this enforcement action—it is one
18   incremental step in a gradual process of case-by-case enforcement, consistent with the
19   SEC's longstanding practice. *See* Phillips & Baumann, *supra* page 3, (manuscript at 64)
20   (identifying various enforcement actions brought by the SEC, including one filed the year
21   after the agency's creation). Contrary to Kraken's assertions, *see Defs.' Notice of Mot. and*
22   *Mot. to Dismiss* (hereinafter "MTD"), ECF No. 25, at 28, the SEC is proceeding down a
23   mundane path by bringing an enforcement action against a single firm under precedent that
24   is almost a century old.

25   The SEC's authority to enforce the Exchange Act has long required it to bring
26   actions in response to new financial arrangements. Crypto is only the latest in a long line
27   of investment fads requiring the SEC's attention—from rare coins, *see Brigadoon Scotch*

28

*Distrib., Ltd.*, 388 F. Supp. 1288, to live beavers, *see Cont'l Mktg. Corp. v. SEC*, 387 F.2d 466 (10th Cir. 1967). The SEC is merely executing its Article II law-enforcement function of bringing cases against those it alleges to have violated the securities laws, and asking this Court to execute its Article III responsibility to apply the law to a novel fact pattern in turn. *See SEC v. Coinbase*, 23 Civ. 4738 (KPF), 2024 WL 1304037 at *15 (S.D.N.Y. Mar. 27, 2024) ("Using enforcement actions to address crypto-assets is simply the latest chapter in a long history of giving meaning to the securities laws through iterative application to new situations."). This case-by-case approach to statutory interpretation eliminates many of the concerns that animate the major questions doctrine.

### A. The SEC's enforcement action is neither "extraordinary" nor "economically significant."

The major questions doctrine is inapplicable here because the SEC is merely applying existing law to a single firm in an enforcement proceeding. The application of the securities laws has, for nearly eight decades, been determined by whether the thing to be regulated is an "investment contract" as interpreted in *SEC v. W.J. Howey Co.*—that is, whether there is some "scheme whereby a person invests his money in a common enterprise and is led to expect profits" through the efforts of another. 328 U.S. at 299. This is "*the test* for whether a particular scheme is an investment contract." *SEC v. Edwards*, 540 U.S. 389, 393 (2004) (emphasis added).

The application of the *Howey* test to crypto assets does not warrant the invocation of the major questions doctrine. Given the foundations of the doctrine discussed in Part I.B, *supra*, it can reasonably be applied only to agency actions that are legislative in character—i.e., actions that alter rights and bind the regulated entities[1]—and operate on a

---

[1] *See* Kristin E. Hickman & Richard J. Pierce, Jr., *Administrative Law Treatise* 410–11 (6th ed. 2019) (discussing "legislative rules" that "have the same force and effect as statutes"). The only Supreme Court case applying the major questions doctrine to anything but a straightforwardly "legislative" rule, order, or standard is *Gonzales v. Oregon*, 546 U.S. 243 (2006). Even there, while the Attorney General's declaration that suicide was not a "legitimate medical practice" was styled as an interpretive rule, *id.* at 249, it purported to carry the force of law and therefore was essentially legislative in character, *see id.* at 268.

national or industry-wide scale. *See, e.g.*, *Brown & Williamson*, 529 U.S. at 159 (legislative rule attempting to regulate the entire tobacco industry); *Alabama Ass'n of Realtors*, 594 U.S. at 764 (nationwide eviction moratorium curtailing property rights); *Nebraska*, 143 S. Ct. at 2369, 2372–76 (federal program cancelling $400 billion of student debt). This feature of the doctrine derives from the major questions doctrine's two rationales. The theory about how Congress "speaks" in statutes is most relevant when agencies act with nationwide and legislative power that mirrors Congress's own policy prerogatives. *See MCI*, 512 U.S. at 231 ("It is highly unlikely that Congress would leave the determination of whether an industry will be entirely, or event substantially, rate-regulated to agency discretion[.]"). Similarly, legislative rules and their ilk are the type of agency action most likely to raise the separation-of-powers issues that animate the major questions doctrine. *See, e.g.*, *West Virginia*, 597 U.S. at 724 (determining that a legislative rule triggered the major questions doctrine because it would allow an agency to "substantially restructure the American energy market"). In this case, the SEC has not issued a rule altering Kraken's rights or obligations. To the contrary, the SEC is engaged in straightforward law enforcement under existing precedent.

     ***Extraordinary.*** There is nothing *extraordinary* about this enforcement action. The *West Virginia* Court gauged the "extraordinary" nature of an agency action by assessing whether it was "unheralded" or "transformative," *West Virginia*, 597 U.S. at 724, in light of "the history and the breadth of the authority that the agency has asserted," *id.* at 721 (cleaned up). Reviewing prior cases, the Court noted that some indicators that an agency might be acting in such a manner include regulating outside of its traditional sphere of expertise, seeking to draw new classes of entities into its regulatory orbit, meaningfully diverging from its regulatory antecedents, and adopting a legal interpretation that upends the broader statutory scheme. *Id.* at 721–23 (listing cases). Courts have applied this analysis to find that the major questions doctrine is not triggered where "the reasonableness of [the agency's] interpretation is supported" by "the "history and breadth of authority" it has

1  asserted. *Utah v. Walsh*, No. 2:23-CV-016-Z, 2023 WL 6205926, at *4, *4 n.3 (N.D. Tex.
2  Sept. 21, 2023) (citing *West Virginia*, 597 U.S. at 721).

3      For nearly a century the SEC has enforced the *Howey* standard against newly
4  popular types of assets to carry out its mission "to regulate investments, in whatever form
5  they are made and by whatever name they are called." *Edwards*, 540 U.S. at 393
6  (quotations omitted). The SEC has a storied history of proceeding through enforcement
7  actions before Article III courts to "develop the law by accretion" under the *Howey*
8  standard. *Coinbase*, 2024 WL 1304037 at *15. The SEC did so first in the 1935 case *SEC
9  v. Wickham*, one year after the agency was created. 12 F. Supp. 245 (D. Minn. 1935)
10  (holding that the contract at issue was a security). In *Howey*, the SEC did the same thing.
11  *See Howey*, 328 U.S. at 295. More recently, the SEC has asked courts to determine whether
12  contracts for various assets qualify as securities, including the refining and sale of gold,
13  *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125 (9th Cir. 1991) or investment in a
14  scheme to raise, sell, and deliver live beavers, *Cont'l Mktg. Corp.*, 387 F.2d at 466. Unlike
15  prior cases in which the Court held that the agencies' interpretations of statutes would result
16  in the statutes' fundamental revision, such as *MCI*, 512 U.S. at 231, and *Brown &
17  Williamson*, 529 U.S. at 137–39, a legal finding by this Court that sales of certain crypto
18  assets are investment contracts would merely result in those sales having to comply with
19  existing rules on the sale of securities—like countless new products before them.
20  Regulating "crypto-assets based on [a] determination that certain of certain of such assets
21  are securities hardly amounts to a 'transformative expansion in [SEC's] regulatory
22  authority.'" *SEC v. Terraform Labs Pte. Ltd.*, 23-cv-1346 (JSR), 2023 WL 4858299, at *8
23  (S.D.N.Y. July 31, 2023) (citation omitted). The agency is simply proceeding through case-
24  by-case adjudication in partnership with the federal judiciary, as it has for a century.

25      The same conclusion is reached by focusing on the major questions doctrine's
26  approach to how Congress "speaks" in statutes. The doctrine proceeds on the theory that
27  Congress does not empower the executive to engage in nationwide, major, and
28

BRIEF OF AMICI CURIAE ADMINISTRATIVE LAW SCHOLARS IN SUPPORT OF PLAINTIFF
CASE NO. 3:23-CV-06003-WHO

extraordinary *lawmaking* through underdetermined text. *See Brown & Williamson*, 529 U.S. at 160. Here, the "decision" or "authority" the SEC claims is to enforce the securities laws against perceived securities under *Howey*; not new authority to regulate non-securities.

**_Significance._** Second, the SEC's enforcement action is not "a decision of such economic and political significance,", *Brown & Williamson*, 529 U.S. at 160, because it is merely pursuing a single firm for violating extant law. Actions are only economically significant where they directly affect an entire industry, require citizens nationwide to pay for some service, or involve the expenditure of so much taxpayer money that the agency threatens Congress's control over the purse. *See id.* at 159; *Nebraska*, 143 S. Ct. at 2372–73 ("[T]he Secretary of Education claims the authority, on his own, to release 43 million borrowers from their obligations to repay $430 billion in student loans. . . . Practically every student borrower benefits, regardless of circumstances."); *King*, 576 U.S. at 485 ("The tax credits are among the Act's key reforms, involving billions of dollars in spending each year and affecting the price of health insurance for millions of people.").

Even if the crypto industry as a whole were considered to be "significant," the same cannot be said of the particular transactions the SEC here claims qualify as "investment contracts." Accordingly, rather than resort to the facts at issue in this case, Kraken asserts economic significance by claiming the SEC's suit "implicates trillions of dollars" by attempting "[t]he regulation of the digital asset industry and the platforms on which these assets trade." MTD at 28. As an initial matter, the market capitalization of *domestic* crypto *securities* is a small fraction of the $2-3 trillion *global* estimate of crypto *assets* (which includes not only securities but commodities and other assets) that Kraken cites.[2] Indeed,

---

[2] Amici note that Kraken appears to represent that "the digital asset industry in the United States, has been valued at $2-$3 trillion." MTD at 6. But the White House Fact Sheet Kraken cites for that proposition says only that "digital assets . . . reached a market capitalization of $3 trillion globally last November." Press Release, White House, FACT SHEET: White House Releases First-Ever Comprehensive Framework for Responsible Development of Digital Assets (Sept. 16, 2022), http://tinyurl.com/22mas2hc.

1  "the securities industries over which Congress has expressly given the SEC enforcement
2  authority are even broader than the markets for cryptocurrencies, and implicate larger
3  portions of the American economy." *Coinbase*, 2024 WL 1304037 at *14. The SEC is
4  responsible for regulating "$118 trillion in U.S. equity markets, $2.8 trillion in exchange-
5  traded equity options, and $237 trillion in the fixed income markets," along with the
6  financial disclosures of public companies whose aggregate market capitalization exceeds
7  $51 trillion.[3] By contrast, the total global value of crypto assets is closer to that of Apple
8  Inc., a single U.S. company, valued at roughly $2.6 trillion.[4]

9      Kraken argues that this case is politically significant because Congress is
10 considering legislation to further regulate crypto assets. *See* MTD at 28. But Congress has
11 legislated, and it has granted the SEC jurisdiction to bring suits alleging that certain assets
12 are securities and to press its theories of what constitutes an investment contract in federal
13 court. In any event, congressional deliberation does not turn routine enforcement into a
14 major question of policy. *See Coinbase*, 2024 WL 1304037 at *15 ("Nor does
15 Congressional consideration of new legislation implicating cryptocurrency, on its own,
16 alter the SEC's mandate to enforce existing law.").

17     Kraken's invocation of the major questions doctrine ignores the doctrine's core
18 concern: separation of powers. The SEC is not "arrogating to itself power belonging to
19 another" branch, *Nebraska*, 143 S. Ct. at 2373; it is acting in the core of its Article II power.
20 Enforcement actions by executive agencies are outside the major questions doctrine's
21 domain because they are paradigmatic Article II activity: law enforcement in Article III
22 courts. *See United States v. Texas*, 599 U.S. 670, 678 (2023) (quoting U.S. Const., art. II,
23 § 1, cl. 1; § 3; *TransUnion LLC v. Ramirez*, 594 U.S. 412, 429 (2021)) ("Article II of the
24 Constitution assigns the 'executive Power' to the President and provides that the President
25 'shall take Care that the Laws be faithfully executed.' Under Article II, the Executive

26

27 [3] *See* SEC, *About the SEC* (last visited Apr. 6, 2024) https://www.sec.gov/strategic-plan/about.
   [4] *Apple Inc. Common Stock*, NASDAQ (last visited Apr. 3, 2024)
28 https://www.nasdaq.com/market-activity/stocks/aapl.

Branch possesses authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'"). And the executive-enforcement paradigm differs materially from legislative rules in that it polices past conduct, rather than prospectively restraining regulated entities. Moreover, to vindicate its reading of the law, the SEC must persuade federal judges with every complaint it files.

It is irrelevant that these enforcement actions will collectively have some precedential effect for the broader crypto-assets industry if Kraken appeals their case and that appeal produces a published judicial opinion. By definition, courts are tasked with applying the law to new facts and conduct. All the alleged separation-of-powers concerns raised by Kraken are imagined, as this case is about the most straightforward of executive tasks: case-by-case law enforcement.

**B. The major questions doctrine does not apply to displace or limit binding judicial standards like the *Howey* test because judicial review reinforces the separation of powers.**

Kraken quietly requests that this Court do something far more extraordinary than the SEC's action—indeed, something that no court has done. In asking this Court to apply the major questions doctrine, Kraken would have the definition of "investment contract" turn on whether application of the securities laws in a given case implicates a major question, rather than the substantive meaning of the term. Yet as discussed above, *supra* Part II.A, interpretation of the term "investment contract" has for decades been controlled by the *Howey* standard—a standard which itself incorporated state judicial precedent going back a century. *See Howey*, 328 U.S. at 298 (citing *State v. Gopher Tire & Rubber Co.*, 177 N.W. 937, 938 (Minn. 1920). If this Court were to accept Kraken's request and use the major questions doctrine to decide whether particular assets are investment contracts, it would displace or narrow *Howey*, a result that flies in the face of the doctrine's motivations regarding legislative intent.

A straightforward application of the major questions doctrine's triggers—which requires an action to be both "extraordinary" and "major"—places preexisting judicial

precedents, such as *Howey*, beyond its reach. An agency action is extraordinary when an agency attempts to transform the reach or character of statutory text, *see West Virginia*, 597 U.S. at 724 (quoting *UARG*, 573 U.S. at 324), or exceeds its own past interpretation or implementation, *id.* at 723–24. Here, the agency's action is subject to a long-standing judicial test that has been used for decades to interpret the statute and determine whether the agency may regulate a given contract, consistent with the agency's own practice of seeking elucidation of the securities laws from the judiciary through enforcement. If the SEC is stretching the meaning of securities laws beyond what they can maintain—as Kraken alleges is the case, *see* MTD at 29–30—its enforcement actions will not survive judicial application of *Howey*. That is a question for this Court to decide under existing precedent—not a reason to upend decades of it.

There are also good reasons to think that the major questions doctrine should not displace *Howey* based on the doctrine's preoccupation with how Congress "speaks" in statutes. Congress has operated with *Howey* in the background for nearly eight decades, never once enacting new legislation to rebut it. Congress's decision to adopt to *Howey*'s open-endedness provides additional justification for not applying the major questions doctrine here. As the Supreme Court recently remarked in *Slack Techs. v. Pirani, LLC*, "Congress remains free to revise the securities laws at any time . . . . [The judiciary's] only function lies in discerning and applying the law as we find it." 598 U.S. 759, 770 (2023). *See also Coinbase*, 2024 WL 1304037 at *15 ("Until the law changes, the SEC must enforce, and the judiciary must interpret, the law as it is.").

Finally, applying the major questions doctrine to eviscerate judicial precedent is inconsistent with the judiciary's Article III duty to "say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The *Howey* Court gave the securities laws their best meaning. Nothing in that Court's opinion suggests that the term "investment contract" is underdetermined; to the contrary, it makes clear that the term was already understood. *See Howey*, 328 U.S. at 298 ("Congress was using a term the meaning of which had been

crystalized by [] prior judicial interpretation."). Using the major questions doctrine to overturn *Howey* would suggest that the doctrine can overwhelm clear and durable judicial precedent, a result that would reek of "dice-loading" concerns. *See Nebraska*, 143 S. Ct. at 2378 (warning against a "version of the major questions doctrine [that] 'loads the dice'" against agency action).

Here, Kraken rejects the assertion that the crypto assets at issue are securities by alluding to their status as commodities, *see* MTD at 19 (comparing crypto assets to "commodities such as oil or diamonds, to collectibles such as art, baseball cards, or valuable watches") and alleging that term "investment contract" requires "post-sale obligations" on the part of the seller. MTD at 14. If the crypto assets here are commodities (and amici take no position on whether they are), then the securities laws themselves should result in the SEC lacking jurisdiction over these assets. But the fact that Kraken arguably has plausible defenses under the securities laws provides no reason to resort to the major questions doctrine's heavy artillery, which the Supreme Court has made clear is reserved for "extraordinary" cases. *See West Virginia*, 597 U.S. at 721.

### C. The major questions doctrine leads to absurd results here because the SEC and private litigants share litigation authority.

Investors who have faced losses by the purchase of unregistered securities or by other enumerated violations of the securities laws may bring suit to recover for those damages. *See* 15 U.S.C. §§ 77*l*, 77k, 78t-1, 78r. Using these laws, class-action lawsuits may be filed on the grounds that purchased crypto assets are unregistered securities and the issuers, therefore, owe plaintiffs money damages. In these cases, litigants must first convince courts that the assets purchased are securities through application of the *Howey* test.

It would be nonsensical to apply the major questions doctrine—which presupposes an evaluation of the "history and the breadth of the authority that [the agency] has asserted," *Brown & Williamson*, 529 U. S. at 160—to private actions where the SEC has not asserted authority. There is no "claim of 'unheralded' regulatory power over 'a significant portion

of the American economy,'" *West Virginia*, 597 U.S. at 722 (quoting *UARG*, 573 U.S. at 310); no effort by the "agency to make a 'radical or fundamental change' to a statutory scheme," *id*. at 723 (*quoting MCI,* 512 U.S. at 229); and no agency "claim[ of] the power to resolve a matter of great 'political significance,'" *id*. at 743 (Gorsuch, J., concurring) (*quoting Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., OSHA (NFIB v. OSHA)*, 595 U.S. 109, 117 (2022)), because there is no agency claim to legislative power *at all*. The application of *Howey* is all that should matter.

If courts were to apply *Howey* in a case brought by a class action against the issuer of one crypto asset and hold that they are securities subject to the securities laws, but apply the major questions doctrine to a case brought by the SEC against that same issuer and hold that the securities laws do not apply notwithstanding the *Howey* test, those opinions would collide. There would effectively be two bodies of law depending on who brought the case at issue. On top of the absurdity that comes with deciding the same case differently, the principle of collateral estoppel would be impossible to apply. This absurdity confirms the incompatibility of the major questions doctrine with enforcement actions asking courts to interpret statutes.

## CONCLUSION

Application of the major questions doctrine here would betray the doctrine's motivations, displace judicial interpretation of legislative text, and produce absurdity. For the foregoing reasons and those put forth by the SEC, the Court should not apply the major questions doctrine here.

1   Respectfully submitted,

2

3   DATED:  April 16, 2024          DEMOCRACY FORWARD FOUNDATION

4                                   By:         */s/ Orlando Economos*

5                                     ORLANDO ECONOMOS

6                                  Attorney for Amici Curiae Administrative Law

7                                  Scholars

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28