1  MATTHEW C. SOLOMON (appearing *pro hac vice*)
   msolomon@cgsh.com
2  RAHUL MUKHI (SBN 350718)
   rmukhi@cgsh.com
3  JENNIFER KENNEDY PARK (SBN 344888)
   jkpark@cgsh.com
4  CLEARY GOTTLIEB STEEN & HAMILTON LLP
   2112 Pennsylvania Avenue
5  Washington, DC 20037
   Telephone:  (202) 974-1680
6
   BRIAN KLEIN (SBN 258486)
7  bklein@waymakerlaw.com
   ASHLEY MARTABANO (SBN 236357)
8  amartabano@waymakerlaw.com
   WAYMAKER LLP
9  515 S. Flower Street, Suite 3500
   Los Angeles, CA 90071
10 Telephone:  (424) 652-7814

11 *Attorneys for Defendants Payward, Inc.*
   *and Payward Ventures, Inc*
12

13             **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
14

15 SECURITIES AND EXCHANGE          Case No. 3:23-cv-06003-WHO
   COMMISSION,
16                                  Judge: Hon. William H. Orrick
                                    Hearing Date: June 12, 2024
17          Plaintiff,              Time: 2:00 p.m.

18              v.
                                    **REPLY MEMORANDUM OF LAW IN**
19 PAYWARD, INC.; and               **SUPPORT OF DEFENDANTS' MOTION**
   PAYWARD VENTURES, INC.,          **TO DISMISS**
20
            Defendants.
21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

PRELIMINARY STATEMENT.................................................................................. 1

ARGUMENT .......................................................................................................... 2

    I.    "INVESTMENT CONTRACTS" REQUIRE CONTRACTS WITH POST-SALE
        OBLIGATIONS. ...................................................................................... 2

    II.    THE SEC FAILS TO  PLAUSIBLY ALLEGE THAT THE SECONDARY MARKET
        TRANSACTIONS ON KRAKEN WERE INVESTMENT CONTRACTS...................7

    III.   THE SEC FAILS TO SATISFY ANY *HOWEY* ELEMENT........................................ 9

      A.    Investment of Money........................................................................ 9

      B.    Common Enterprise......................................................................... 10

      C.    Expectation of Profits from Efforts of Others........................................... 13

    IV.   THE MAJOR QUESTIONS DOCTRINE REQUIRES DISMISSAL. ........................... 15

CONCLUSION ..................................................................................................... 15

1

## **TABLE OF AUTHORITIES**

2

3

4
**Federal Cases**                                                                   **Page(s)**

5
*Apple Inc. v. Allan & Assoc. Ltd.*,
6
    445 F. Supp. 3d 42 (N.D. Cal. 2020)...................................................................... 10

7
*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ...........................................................11-13

8
*Bargetto v. Walgreen Co.*,
9
    2022 WL 18539360 (N.D. Cal. Dec. 19, 2022)...................................................... 2

10
*Brodt v. Bache & Co.*,
11
    595 F.2d 459 (9th Cir. 1978) ................................................................................ 12

12
*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
13
    608 F.2d 1297 (9th Cir. 1979).................................................................... 5, 7, 14

14
*Friel v. Dapper Labs, Inc.*,
15
    657 F. Supp. 3d 422 (S.D.N.Y. 2023) ................................................................. 13

16
*Golden v. Garafalo*,
17
    678 F.2d 1139 (2d Cir. 1982)................................................................................. 4

18
*Groff v. DeJoy*,
    600 U.S. 447 (2023).............................................................................................. 3

19
*Happy Inv. Grp. v. Lakeworld Properties, Inc.*,
20
    396 F. Supp. 175 (N.D. Cal. 1975)...................................................................... 14

21
*Hector v. Wiens*,
22
    533 F.2d 429 (9th Cir. 1976) ............................................................................... 10

23
*Hocking v. Dubois*,
24
    885 F.2d 1449 (9th Cir. 1989)....................................................................... *passim*

25
*Marine Bank v. Weaver*,
26
    455 U.S. 551 (1982)............................................................................................... 7

27
*Merck & Co. v. HHS*,
    962 F.3d 531 (D.C. Cir. 2020) ............................................................................ 15

28

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ................................................................................................. 13

*Patterson v. Jump Trading LLC*,
    2024 WL 49055 (N.D. Cal. Jan. 4, 2024) ............................................................................ 9

*Pino v. Cardone Cap., LLC*,
    55 F.4th 1253 (9th Cir. 2022) ....................................................................................... 14-15

*Rodriguez v. Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993) ................................................................................................... 13

*Salameh v. Tarsadia Hotel*,
    726 F.3d 1124 (9th Cir. 2013) ...................................................................................... 5-6, 8

*SEC v. Belmont Reid*,
    794 F.2d 1388 (9th Cir. 1986) ............................................................................................ 13

*SEC v. Blockvest, LLC*,
    2019 WL 625163 (S.D. Cal. Feb. 14, 2019) ....................................................................... 3

*SEC v. C. M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ..................................................................................................... 3, 5-7

*SEC v. Coinbase, Inc.*,
    2024 WL 1304037 (S.D.N.Y. Mar. 27, 2024) ......................................................... 6-7, 9, 11

*SEC v. Dalius*,
    2023 WL 3988425 (C.D. Cal. May 24, 2023) ................................................................... 11

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020) .............................................................................. 11

*SEC v. LBRY, Inc.*,
    2023 WL 4459290 (D.N.H. July 11, 2023) ........................................................................ 9

*SEC v. NAC Foundation, LLC*,
    512 F. Supp. 3d 988 (N.D. Cal. 2021) ......................................................................... 3, 12

*SEC v. Ripple Labs, Inc.*,
    2023 WL 6445969 (S.D.N.Y. Oct. 3, 2023) ..................................................................... 14

*SEC v. Ripple Labs, Inc.*,
    682 F. Supp. 3d 308 (S.D.N.Y. 2023) ................................................................... 6, 10, 14

*SEC v. Rubera*,
   350 F.3d 1084 (9th Cir. 2003)............................................................................4, 10

*SEC v. SG Ltd.*,
   265 F.3d 42 (1st Cir. 2001)...........................................................................................3

*SEC v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) .......................................................................12

*SEC v. Terraform Labs Pte. Ltd.*,
   2023 WL 4858299 (S.D.N.Y. July 31, 2023)..........................................................3, 14

*SEC v. W.J. Howey Co.*,
   328 U.S. 293 (1946)..................................................................................................4-6

*SEC v. Wahi*,
   2024 WL 896148 (W.D. Wash. Mar. 1, 2024)..............................................................9

*Smith v. Gross*,
   604 F.2d 639 (9th Cir. 1979) .......................................................................................6

*Teed v. Chen*,
   2022 WL 16839496 (N.D. Cal. Nov. 9, 2022)............................................................11

*United States v. Carman*,
   577 F.2d 556 (9th Cir. 1978) .....................................................................................13

*Wals v. Fox Hills Dev. Corp.*,
   24 F.3d 1016 (7th Cir. 1994) ........................................................................................8

*Warfield v. Alaniz*,
   569 F.3d 1015 (9th Cir. 2009).............................................................................5-6, 10

*West Virginia v. EPA*,
   597 U.S. 697 (2022).....................................................................................................15

*Wildes v. BitConnect Int'l PLC*,
   25 F.4th 1341 (11th Cir. 2022) .............................................................................14-15

**State Cases**

*Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*,
   240 N.W. 827 (Wis. 1932)............................................................................................4

**Other Authorities**

Brief for the SEC, *SEC v. W.J. Howey Co.*, No. 843 (U.S. April 17, 1946)
    1946 WL 50582 ................................................................................................................5

**PRELIMINARY STATEMENT**

To meet its pleading burden, the SEC must plausibly allege that Kraken acted as an unregistered exchange, broker-dealer, and clearing agent with respect to securities—here, "investment contracts." But the SEC has not identified any investment contracts that were (or could be) traded, brokered, or settled on Kraken. The SEC admits—and uniform precedent holds—that digital assets are not themselves investment contracts. But digital assets are all that are alleged to be traded, brokered, or settled on Kraken.

Recognizing this fundamental flaw, the SEC's Opposition attempts to collapse primary offerings conducted off Kraken with secondary sales on Kraken. The SEC's theory is foreclosed by longstanding Ninth Circuit precedent, which requires the Court to analyze the "economic reality of *each transaction*." *Hocking v. Dubois*, 885 F.2d 1449, 1462 (9th Cir. 1989) (en banc) (emphasis added). The transactions alleged to have occurred on Kraken are blind bid/ask secondary market sales of digital assets (governed by the 1934 Exchange Act), unaccompanied by any contractual terms or other obligations that may have existed at the initial offering (governed by the 1933 Securities Act). By the SEC's own admission, these transactions took place months or years apart, between different parties, and on different terms. Under the SEC's theory, whenever a digital asset was sold pursuant to an investment contract in the past, the investment contract follows the asset in perpetuity. The SEC makes this argument even though none of the potential contractual rights or obligations that could establish an investment contract in the first place are transferred in the secondary sale.

When pressed to identify the securities in question, the SEC points to things that Kraken does not and could not trade, broker, or settle. Instead of identifying an investment *contract*, the SEC asks the Court to accept an "investment *concept*" as sufficient. Instead of identifying an enterprise, the SEC asks the Court to accept an "ecosystem." But Kraken does not trade, broker, or settle "concepts" or "ecosystems." The SEC never plainly alleges that what actually is traded, brokered, and settled on Kraken is itself an investment contract. This failure spotlights the fundamental problem with the SEC's case. The only things that are alleged to be traded, brokered, or settled on Kraken are digital assets—which are not investment contracts.

It is precisely because of the need to make a principled distinction between "investment contracts" (regulated by the SEC) and all other "investment concepts" (not regulated by the SEC) that no Supreme Court or Ninth Circuit case has ever found an investment contract without a contract in the 90 years since the passage of the Exchange Act.  Several State Attorneys General agree that a contract is a requirement for an investment contract.  They also agree that the SEC's position is contrary to the state blue sky cases relied on by *Howey* itself.  And it follows that the SEC cannot satisfy *Howey's* additional requirements that there be investments of money *in* a common enterprise with a reasonable expectation of profits based on the efforts of others.

The SEC's argument could transform the sale of any digital asset (or any commodity) into an investment contract whenever the agency wishes it so—simply by claiming there is promotion of some surrounding "ecosystem."  This would gut *Howey* by significantly expanding the SEC's jurisdiction to a host of investment activities that were never delegated to the agency.  Such a significant reordering of the U.S.'s financial regulatory structure should be debated in Congress, not in the courts.  The SEC's assertion that it can regulate all "investment concepts" and "ecosystems" is the type of agency power grab that the Supreme Court has held runs afoul of the major questions doctrine.[1]

## ARGUMENT

## I.   "INVESTMENT CONTRACTS" REQUIRE CONTRACTS WITH POST-SALE OBLIGATIONS.

Investment contracts require a contract with post-sale obligations. Mot. at 10-16.  The SEC makes no attempt to distinguish the four Supreme Court and six Ninth Circuit cases cited for this proposition in Kraken's Motion.  *See id.*  The SEC's Opposition notes that there are over 1,470 federal cases citing *Howey* but it identifies *no* Supreme Court or Ninth Circuit decision finding an investment contract absent a contract and post-sale obligations.  *See* Opp. at 6.  The SEC instead asks

---

[1] The SEC does not challenge the accuracy of the sources subject to Kraken's judicial notice request (ECF No. 27), but instead incorrectly argues that Kraken was required to attach copies of the webpages.  *See, e.g.*, *Bargetto v. Walgreen Co.*, 2022 WL 18539360, at *2 (N.D. Cal. Dec. 19, 2022) (taking judicial notice of linked webpage).  To address any conceivable issue, Kraken attaches copies of the documents subject to its request to the Reply Declaration of Matthew C. Solomon.

the Court to ignore the plain language of the statute and the facts of binding precedent, while swinging at strawmen that do not reflect Kraken's arguments.

Throughout its brief, the SEC tries to refute an argument that Kraken never made: that "*Howey* requires the existence of a **written** contract enforceable under state law."  Opp. at 6 (emphasis added); *see also id.* at 1, 6-8, 10-11.  Based on that premise, the SEC argues that Kraken seeks to inject "new, formalistic requirements" into *Howey*.  Opp. at 6-7.  The word "written" appears nowhere in Kraken's Motion; nor did Kraken otherwise suggest a written contract was required.  *See, e.g.*, Mot. at 12-13 (discussing implied contracts, citing to *SEC v. C. M. Joiner Leasing Corp.*, 320 U.S. 344, 349 (1943)).  Rather, Kraken's argument is that an "investment contract" must involve at least one contract—whether written, oral, express, or implied.

The SEC's cases only further support Kraken's position.  *See* Opp. at 8, 10-11.  Some addressed an initial coin offering ("ICO"), which "is a fundraising event where an entity offers participants a unique digital 'coin' or 'token' or 'digital asset' in exchange for consideration." *SEC v. Blockvest, LLC*, 2019 WL 625163, at *2 (S.D. Cal. Feb. 14, 2019).  Critically, the "token may entitle its holders to certain rights related to a venture underlying the ICO," *i.e.,* there is a contractual right present. *Id.; see also SEC v. NAC Foundation, LLC*, 512 F. Supp. 3d 988, 992 (N.D. Cal. 2021). The SEC's other cases likewise involved contractual rights and obligations.  *See SEC v. Terraform Labs Pte. Ltd.*, 2023 WL 4858299, at *11 (S.D.N.Y. July 31, 2023) (sales of tokens involved "'contracting' parties"); *SEC v. SG Ltd.*, 265 F.3d 42, 45, 51 (1st Cir. 2001) (promoter promised a "flat 10% guaranteed return" on investments, and "pledged to allocate an indeterminate portion of the profits" to "a special reserve fund").

The SEC next argues that the plain meaning of the term "investment contract" can be disregarded because the "words <u>themselves</u>"—*i.e.*, the statutory language of the Exchange Act—"do not delimit the security type."  *See* Opp. at 9 (emphasis in original).  This assertion contravenes a fundamental principle of statutory interpretation: it "*must* begin with, and ultimately heed, what a statute actually says."  *Groff v. DeJoy*, 600 U.S. 447, 468-72 (2023) (cleaned up) (emphasis added) (relying on the text of Title VII rather than prior interpretation of case law inconsistent with the statutory text); *see also* Mot. at 10-11.

The SEC also argues that Congress intended "investment contract" to encompass any "investment concept." *See* Opp. at 9. The SEC's atextual position effectively concedes that its claims fail under the statutory language. Its argument is also unmoored from *Howey* itself and its statutory underpinnings.[2] The blue sky laws that gave meaning to "investment contract" uniformly included a contract, not simply an "investment concept." Mot. at 12. The SEC does not dispute this. *See* Opp. at 10 n.3 (arguing only that blue sky cases did not "require a *written* contract") (emphasis added). The one blue sky case it cites involved a contract. *See Brownie Oil Co. of Wis. v. R.R. Comm'n of Wis.*, 240 N.W. 827, 828-29 (Wis. 1932) ("We think the contract which evidences the investor's right to this return should be treated as a security…."). To save its Complaint, the SEC disregards blue sky precedent as "subordinate," *see* Opp. at 10 n.3, contrary to binding precedent that requires interpreting "investment contract" consistent with that body of law. *See SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946) (holding that Congress incorporated the "common" and "uniformly applied" understanding of "investment contract" that had been "crystallized" through the state blue sky cases); *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) ("The Supreme Court in *Howey* held that, for purposes of the Securities Acts, the term 'investment contract' *retains the same meaning* it possessed under predating state 'blue sky' laws.") (emphasis added). Eight State Attorneys General agree that the SEC's theory "ignores the[] limitations" recognized in the blue sky cases and would harm consumers by "preempt[ing] state laws that are *more* protective of consumers than the securities laws." Amicus Br. of Eight State Attorneys General, ECF No. 51-1 at 3, 8.[3]

---

[2] The SEC claims that "'investment contract' is meant as a 'catch-all phrase.'" Opp. at 9 (quoting *Golden v. Garafalo*, 678 F.2d 1139, 1143 (2d Cir. 1982)). *Golden*, which used "catch-all phrase" in dicta and without citing any authority, does not support the SEC's attempt to expand the meaning of "investment contract" beyond the statutory text.

[3] It is therefore the SEC's position, not Kraken's, that would "thwart Congress's" intent. *See* Opp. at 9. The SEC suggests that a "general 'scheme' of profit seeking activities," absent a contract and post-sale obligations, can constitute an investment contract. Opp. at 8 (quoting *Hocking*, 885 F.2d at 1457). But Kraken demonstrated that courts use the terms "scheme" and "transaction" to mean an arrangement that includes one or more contracts. Mot. at 11-13 (citing Supreme Court, Ninth Circuit, and blue sky decisions, and dictionary definitions of "scheme"). The SEC makes no other attempt to refute Kraken's argument and does not cite a single Supreme Court or Ninth Circuit case finding an investment contract based on a "transaction" or "scheme" that did not involve a contract and post-sale obligation.

The SEC brushes aside controlling law finding investment contracts only where there are contractual post-sale obligations by pointing out that courts consider promotional materials. *See* Opp. at 11-12. But in the absence of a contract and post-sale obligations, promotional statements and other extra-contractual representations alone are insufficient to create an investment contract. *See De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300-01 (9th Cir. 1979) (no investment contract where, despite developer's "marketing material" promoting property "as a passive investment" and representation "that it would facilitate the resale of investor's parcels," there was "no reference in the contracts to an obligation on the part of [the seller] to develop any land"); *see also* Mot. at 14-15 (collecting cases). Thus, the Ninth Circuit examines promotional materials in the context of the "[c]haracterization of the inducement" of "the contract or other written instrument." *Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131 (9th Cir. 2013) (quoting *Hocking*, 885 F.2d at 1457); *see also Warfield v. Alaniz*, 569 F.3d 1015, 1024 (9th Cir. 2009) (finding an investment contract based on "consideration of the Foundation's promotional literature, as well as the annuity contracts themselves").

The SEC cannot explain away the Ninth Circuit precedent where promotional statements alone have never created an investment contract. Instead, the SEC suggests *De Luz* does not control because real estate, unlike digital assets, has "inherent value." *See* Opp. at 12. The real estate cases—*De Luz*, *Rodriguez*, *Harman*, and *Happy Investment Group*—did not turn on whether the asset at issue had purported "inherent value." This makes sense because the Supreme Court rejected the SEC's "inherent value" argument in *Howey*: it is "immaterial . . . whether there is a sale of property with or without intrinsic value." 328 U.S. at 301; *see also Joiner*, 320 U.S. at 352 ("The courts have not been guided by the nature of the assets [associated with] a particular document or offering."); Br. for the SEC at *12, 30-31, *SEC v. W.J. Howey Co.*, No. 843 (U.S. Apr. 17, 1946), 1946 WL 50582 ("SEC *Howey* Br.") (arguing that whether an "interest has 'specific value,' independent of the success of the enterprise as a whole" is a "test[] which [is] unwarranted by the statute," including because it would be "administratively unworkable"). The Ninth Circuit has thus indicated that the

1    "same principle[s] appl[y] . . . whether a real-estate transaction" is at issue or not. *Salameh*, 726 F.3d

2    at 1130.[4]

3         The SEC's remaining cases do not support its claim that post-sale obligations are not required

4    here. *See* Opp. at 12. In *Smith v. Gross*, there was an "agreement" for the worm seller to repurchase

5    the purchasers' worm production at a set price—*i.e.*, a contract with a post-sale obligation. 604 F.2d

6    639, 641-42 (9th Cir. 1979). While the *Ripple* court held that post-sale obligations are not required

7    in every case, it only found investment contracts to exist where there *were* contracts and post-sale

8    obligations. *SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308, 323-28 (S.D.N.Y. 2023). And *Ripple*'s

9    holding that blind bid/ask sales on trading platforms (including Kraken) were not investment

10   contracts was based on the absence of any post-sale obligation: "Ripple did not make any promises

11   or offers" to purchasers over platforms "because Ripple did not know who was buying" the token,

12   and "purchasers did not know who was selling" the token. *Id*. at 329. The SEC concedes that it does

13   not allege any post-sale obligations running to the buyers in blind bid/ask trades on Kraken, so *Ripple*

14   supports dismissal.

15        Judge Failla's holding in *Coinbase* that a "contractual undertaking" requirement "cannot be

16   fairly read into the *Howey* test" rests on flawed reasoning that cannot be squared with Ninth Circuit

17   precedent. *SEC v. Coinbase, Inc.*, 2024 WL 1304037, at *24 (S.D.N.Y. Mar. 27, 2024):

18   - Judge Failla's suggestion that the post-sale obligations in *Howey* were "purely incidental" is
       erroneous under *Howey* itself. *See id.* It was the "transfer of rights in land" that was "purely
19     incidental." *Howey*, 328 U.S. at 300. The associated contracts that obligated the defendants
       to maintain and harvest the orange grove after the sale were not just incidental, they were a
20     *core part* of the investment contract offered to investors. *See, e.g.*, *Warfield*, 569 F.3d at
       1020 ("In *Howey*, the Supreme Court found an 'investment contract' present where promoters
21     sold acreage with fruit trees on it as well as 'service contracts' to cultivate and market the
       crops, with an allocation of the net profits going to the purchaser.").
22
23   - Judge Failla relied on *Joiner* for the point that "the ability to compel managerial efforts was
       a state-law concern." *Coinbase*, 2024 WL 1304037, at *24. But Kraken does not argue that
24     post-sale obligations must be enforceable under state law. And in *Joiner*, the Supreme Court
       found an investment contract because the purchasers' payments to the promoter for oil leases
25     were "contingent upon" the promoter's post-sale undertaking to drill an exploratory well.

26   _____

27   [4] The SEC's own allegations contradict the argument that the digital assets here lack inherent value.
     *See, e.g.*, Compl. ¶¶ 282 (uses of FIL for data storage), 315 (uses of FLOW in online games); *see*
28   *also* Amicus Br. of Blockchain Ass'n, ECF No. 50-1 at 12-13.

320 U.S. at 349.  As the Court explained, "the undertaking to drill a well runs through the whole transaction as the thread on which everybody's beads were strung."  *Id.* at 348.

- Judge Failla also cast aside *De Luz* and the blue sky cases that make clear that an investment contract must involve a contract and post-sale obligations.  *Coinbase*, 2024 WL 1304037, at *24.  As described above, this is inconsistent with Supreme Court and Ninth Circuit precedent.

## II.   THE SEC FAILS TO  PLAUSIBLY ALLEGE THAT THE SECONDARY MARKET TRANSACTIONS ON KRAKEN WERE INVESTMENT CONTRACTS.

The SEC does not plausibly allege that digital asset sales *on Kraken* were investment contracts based on the alleged facts of *those* sales.[5]  The SEC instead tries to argue that the features of the *secondary* sales on Kraken that are actually at issue in this case are irrelevant, as long as the issuers' *primary* sales—which all occurred months or years before their digital assets were listed on Kraken—constituted investment contracts.  *See* Opp. at 12-16.  Throughout its brief, the SEC asks the Court to find the presence of an investment contract without analyzing the alleged features of the actual transactions on Kraken.

But under Ninth Circuit precedent such as *Hocking*, the Court must examine the transactions actually at issue to determine whether *Howey*'s requirements are met.  Mot. at 22-23; *see also Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.").  Congress itself recognized that it is critical to distinguish between the two distinct phases of securities trading by passing two acts, the Securities Act and the Exchange Act, that address initial offers and secondary trading, respectively.  The SEC distorts Kraken's argument by claiming that it would "categorically" exclude secondary sales, resales, and public offerings "from the reach of the federal securities laws."  *See* Opp. at 13-14.  That is wrong.  Kraken's

---

[5] Throughout its brief, the SEC makes the disingenuous suggestion that Kraken could easily just register with the SEC.  This is not true because the current regime for registration is incompatible with the SEC's conception of securities based on investment "concepts" and "ecosystems."  Kraken and other digital asset platforms have attempted to work with the SEC to develop an actual, workable registration regime.  *See* Mot. at 4 n.6.  The SEC's position that firms can simply register online under the current regime is "patently false," as one Congressperson put it.  Reply Solomon Decl. Ex. G, May 10, 2023 Congressional Hr'g at 48 (Rep. Ritchie Torres) (D-NY).

argument applies only to secondary sales that lack a contract and post-sale obligations as required by *Howey*.  Mot. at 22-23.

Earlier transactions of a different character, involving different parties (issuers' primary offerings), may form investment contracts, while later transactions (secondary sales on Kraken not involving an issuer) do not.  In *Hocking*, had the plaintiff "purchased the condominium and the rental pool directly from the developer and an affiliated rental pool operator," *i.e.*, a primary offering, he "would have purchased a security." *Hocking*, 885 F.2d at 1456.  However, Hocking "purchased in the secondary market" from a reseller.  *Id*.  Sitting en banc, the Ninth Circuit held that the *Howey* test must be applied to *that* secondary transaction, expressly rejecting the panel's "per se rule" that all secondary sales were investment contracts because the "rental pool 'option' exist[ed]" already from the primary offers to the original purchasers.  *Id*. at 1462; *see also Salameh*, 726 F.3d at 1132 (no investment contract because the "economic reality" was that "these two transactions were distinct," where they "were executed with different entities" and were separated by a "large time gap").[6]

This distinction makes sense.  Investment contracts must have "the essential properties of a debt or equity security." *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1018 (7th Cir. 1994).  Stocks and bonds are securities when sold in the secondary market not simply because they were securities when initially offered, but because contractual rights travel with the instruments.  *See* Mot. at 15.  The same is not necessarily true for investment contracts, which is why *Howey* requires an "examination of the economic reality of *each* transaction," including when it is an "isolated resale[]." *Hocking*, 885 F.2d at 1462 (emphasis added).

*Hocking* and the other Ninth Circuit cases cited by Kraken control here, not the district court cases cited by the SEC.  The SEC posits that "courts routinely apply the *Howey* test to an entire

---

[6] The SEC makes two unsuccessful attempts to distinguish *Hocking* on its facts, without explaining why either matters.  As to the first, it is immaterial whether the "real estate asset [] was" initially "part of a security," Opp. at 14, because the court focused on what was offered to the secondary purchaser regardless of what features "exist[ed]" from the primary offering.  *Hocking*, 885 F.2d at 1462.  As to the second, the SEC offers no case law to support its suggestion that statements made directly to a "unique buyer" should be given less weight than statements made to the public.  *See* Opp. at 14.

1    offering," including secondary sales, but cites only one case, *LBRY*, where the court expressly *did*

2    *not* consider secondary sales. *See* Opp. at 14. There, the court noted that "whether the registration

3    requirement applies to secondary market offerings of" a digital asset "has *not* been litigated in this

4    case." *SEC v. LBRY, Inc.*, 2023 WL 4459290, at *3 (D.N.H. July 11, 2023) (emphasis added). The

5    SEC also cites two Southern District of New York decisions to argue that it makes no difference

6    whether a digital asset was sold directly by an issuer in a primary offering, or resold by an unrelated

7    third party in an anonymous transaction on Kraken. *See* Opp. at 15. Neither case cited *Hocking*, and

8    their holdings conflict with the Ninth Circuit precedent discussed above. Finally, the SEC's reliance

9    on *SEC v. Wahi* and *Patterson v. Jump Trading LLC* is misplaced. *Wahi* is a default judgment where

10   the SEC had no adversary. 2024 WL 896148 (W.D. Wash. Mar. 1, 2024). *Patterson* involved sales

11   by the issuer itself, and the court otherwise did not examine each transaction independently as

12   required. 2024 WL 49055, at *11 (N.D. Cal. Jan. 4, 2024), *appeal pending*, No. 24-670 (9th Cir.).

13        Until recently, the SEC itself recognized that secondary sales must be treated differently than

14   primary offerings. *See* Mot. at 5, 23 (citing testimony by Chair Gensler and speech by Director

15   Hinman). And in prior cases involving primary sales, the SEC has steadfastly avoided roping in

16   secondary sales. For instance, the *LBRY* court's acknowledgement came after the SEC urged it not

17   to reach the very issue of post-ICO secondary sales. Hr'g Tr. at 24:23-36:8, *LBRY*, No. 1:21-cv-260-

18   PB (Jan. 30, 2023), ECF No. 105 (SEC representing to the court it was "not seeking in th[at] action

19   to regulate secondary sales"). These efforts would have been unnecessary if there was no distinction

20   between primary and secondary sales.

21   **III.**     **THE SEC FAILS TO SATISFY ANY *HOWEY* ELEMENT.**

22        The absence of any alleged contract or post-sale obligation also results in the SEC's inability

23   to otherwise satisfy any of *Howey*'s elements.

24        **A.**      **Investment of Money**

25        The SEC fails to allege that any purchasers of the relevant digital assets on Kraken committed

26   their assets "to an enterprise." Mot. at 16-17.[7] The SEC has no good answer to this pleading failure.

27

28   [7] Judge Failla did not address this prong with respect to trades on Coinbase's platform. *See Coinbase*, 2024 WL 1304037, at *20.

Selectively quoting from *Warfield* and *Rubera*, it first argues that mere risk of "financial loss" is sufficient. *See* Opp. at 17. But the SEC's brief omits the first part of the relevant sentence: "The investment of money prong of the *Howey* test *requires that the investor commit his assets to the enterprise* in such a manner as to subject himself to financial loss." *Warfield*, 569 F.3d at 1021 (emphasis added) (cleaned up); *Rubera*, 350 F.3d at 1090 (same, quoting *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976)). *Hocking* does not help the SEC. The defendants in *Hocking* did not challenge whether the plaintiff's assets were committed to the relevant enterprise. In dicta, the Ninth Circuit stated that this prong would be satisfied if the purchaser invested in the entire "package"—committing his assets to the enterprise which included the condo and rental agreements offered by the sellers, developer, and management company—not simply because the purchaser risked his assets. *See* 885 F.2d at 1459.

The alleged involvement of market makers does not solve this pleading failure. The Complaint alleges that certain issuers sold their digital assets on Kraken "through market makers." Compl. ¶ 126. But it never alleges that those market makers sent the proceeds of their sales back to the enterprise. *See Ripple*, 682 F. Supp. 3d at 330 (no "investment of money" when "Ripple never received the payments" from sales by third parties). The SEC in its Opposition tellingly abandons the Complaint's misleading characterization of the market maker sales as "Direct Sales," now only describing the market makers as "agents" of the issuers. *See* Opp. at 17. The Complaint does not allege the market makers to be agents of the issuers, and it "may not be amended by the [SEC's] brief[] in opposition to a motion to dismiss." *Apple Inc. v. Allan & Assoc. Ltd.*, 445 F. Supp. 3d 42, 59 (N.D. Cal. 2020). [8]

**B.   Common Enterprise**

A common enterprise presupposes the existence of at least *some* relationship between the issuer and purchasers. *See* Mot. at 17-18; Amicus Br. of Blockchain Ass'n, ECF No. 50-1 at 8-9. The SEC argues that a token's "digital ecosystem" can instead substitute for the requisite common enterprise. *See* Opp. at 20-21. This goes well beyond any conception of a "common enterprise"

---

[8] The SEC concedes that it has not alleged the involvement of market makers as to four of the relevant digital assets. *See* Opp. at 17.

under *Howey* or its progeny.  *See* Mot. at 23-26.  Kraken customers do not transact in "ecosystems."  And Kraken certainly does not act as an exchange, broker-dealer, or clearing agent for "ecosystems."  Nor are the tokens shares in an "ecosystem."  They are assets and nothing more.

Kraken does not dispute that digital assets, like "valuable watches . . . whiskey casks, chinchillas, earth worms, [or] payphones," can be the subject of an investment contract when *Howey*'s requirements are met, including investment in a common enterprise.  Opp. at 25.  But neither the Exchange Act nor binding precedent allow the Court to find that investment in an asset constitutes an investment contract simply because the SEC alleges the existence of an "ecosystem."[9]

***Horizontal commonality***.  The SEC mischaracterizes a series of allegations in its Complaint to argue it adequately pled the requisite pooling of Kraken customer funds.  *See* Opp. at 21.  Some of the cited paragraphs allege that funds from primary offerings not involving Kraken customers were pooled.  *See, e.g.*, Compl. ¶¶ 290-91, 380, 399 (describing pooling of funds from initial offerings).  Others describe generic statements that the issuers would use some proceeds at some point to fund development efforts.  *See, e.g., id.* ¶¶ 294, 297, 345.  None of these allegations suggest Kraken customer funds were pooled.  Regardless, allegations that some undifferentiated proceeds were used to fund development efforts are not enough to show asset pooling.  *See Teed v. Chen*, 2022 WL 16839496, at *12 (N.D. Cal. Nov. 9, 2022) (horizontal commonality not sufficiently pleaded when parties did not allegedly "pool[] their investments together" but rather kept their Bitcoin in "separate wallet[s]").  Pooling is not satisfied even under the SEC's own authority because it does not allege that Kraken customer funds were "received by the promoter" and therefore cannot show such funds were "reinvested by the promoter into the business."  Opp. at 20 (citing *SEC v. Dalius*, 2023 WL 3988425, at *8 (C.D. Cal. May 24, 2023)).[10]

---

[9] The non-precedential decision in *Coinbase* extracted a novel definition of "ecosystem" from a law review article and other secondary sources that the SEC did not rely on there or here, as well as a single paragraph in the SEC's complaint that did not advance any definition or even the outer bounds of this term.  *See* 2024 WL 1304037, at *3 n.4 (stating that "the SEC uses the term 'ecosystem' in its narrower sense," citing Compl. ¶ 134); ECF No. 60-1, Moores Decl. Ex. 1, at ¶ 134 (describing single set of statements by one issuer).

[10] *Kik* and *Balestra* are distinguishable because they involved ICOs, which are primary offerings that involve pooling of funds.  *See SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 174, 178 (S.D.N.Y.

According to the SEC, it does not matter that Kraken customer funds were not pooled as long as *some other peoples' funds* were once pooled at *some prior point in time*. *See* Opp. at 20-21. This is supposedly because "new investors replace resellers within the common enterprise on the same terms." Opp. at 21. But the SEC does not allege facts supporting this purported "replacement," nor has any court interpreting *Howey* adopted this "replacement" theory. Moreover, the SEC does not and cannot allege that any contractual rights running from issuer to buyer in the initial offerings continued to run from buyer to seller in secondary transactions on Kraken. The consideration exchanged for a digital asset on Kraken is—under no plausible reading—"pooled" with others' funds.

**Vertical commonality**. The SEC does not contest that strict vertical commonality requires plausible allegations that the "fortunes of the investor[s] are interwoven with" the "success of" the issuers. *Brodt v. Bache & Co.*, 595 F.2d 459, 460-61 (9th Cir. 1978). But it cannot show how the fortunes of Kraken customers are "interwoven" with the fortunes of the issuers when there is no alleged transaction or relationship between them. *See id.* The cases it cites, unlike here, involved purchasers committing their assets to an ongoing enterprise. *See* Opp. at 19; *see, e.g.*, *NAC Found.*, 512 F. Supp. 3d at 996 ("[R]etail U.S. investors exchanged capital for ABTC tokens" in ICO, and "ICO proceeds would fund the development of the AML BitCoin ecosystem, and each ABTC token could (eventually) be redeemed for an AML BitCoin."); *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 371 (S.D.N.Y. 2020) ("Telegram's fortunes are directly tied to the fortunes of the Initial Purchasers, which will rise and fall with the success or failure of the TON Blockchain.").

The SEC says that the "interwoven" requirement can be satisfied as long as the issuer and purchaser have an interest in the same asset. *See* Opp. at 19 ("Whenever profits or losses flow from the same source for both the promoter and investors, their fortunes are interwoven."). In the Ninth Circuit, more is required. *See, e.g.*, *Brodt*, 595 F.2d at 461 (no strict vertical commonality when "the success or failure of Bache as a brokerage house does not correlate with individual investor profit or loss"). Otherwise, the *strict* vertical commonality requirement would be reduced to a lax common

2020); *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019).

interest requirement, satisfied whenever a promoter and buyer own the same commodity and both hope it increases in value. That is not the law. *See Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980) (no investment contract even though promoter and purchaser both owned silver and would be affected equally by market fluctuations).[11]

## C.   Expectation of Profits from Efforts of Others

The SEC asserts that the Court should adopt a diluted form of the third *Howey* prong, where it is enough to allege that investors expect a third party to expend efforts to increase the value of an asset they both own. *See* Opp. at 22. That is not the law in the Ninth Circuit.

*First*, binding precedent distinguishes between investing in a business (*e.g.*, equity in a gold mining company or a digital asset issuer) and buying the output of a business (*e.g.*, gold or a digital asset). *See SEC v. Belmont Reid*, 794 F.2d 1388 (9th Cir. 1986); *Noa*, 638 F.2d at 79; Mot. at 19-20. The SEC does not and cannot allege that Kraken purchasers bought anything more than a digital asset—the output of a business—and not "a share of a business enterprise," as required for a reasonable expectation of profits under *Howey*. *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 11 (1st Cir. 1993). The SEC says that, unlike commodities, "the resale markets for the Kraken-Traded Securities <u>depended</u> upon the promoter's activities and network." Opp. at 24 (emphasis in original). But it points to no supporting allegations in the Complaint. Indeed, in the case of Bitcoin, the world's most valuable, used, and traded digital asset, there is no active issuer promoting the network yet the resale market remains.[12]

---

[11] The SEC is also wrong that "whether a promoter has a separate project or enterprise" is irrelevant. Opp. at 19 n.4. For example, in *United States v. Carman*, the Ninth Circuit found investment in a common enterprise because the investor's "avoidance of loss . . . was clearly dependent upon the sound management and continued solvency of" the promoter. 577 F.2d 556, 563 (9th Cir. 1978).

[12] *Balestra*, relied on by *Coinbase*, involved an ICO through which the issuer offered tokens where the blockchain had not yet been launched. 380 F. Supp. 3d at 347. In that context, the court explained that "without the promised ATB Blockchain, there was essentially no 'market' for ATB [tokens]." *Id.* at 357. Similarly, in *Friel v. Dapper Labs, Inc.*, the NFTs "[could not] be sold or traded outside of the Marketplace," which was controlled by the issuer, and that the issuer's terms of use stated that the NFTs "have no intrinsic or inherent value outside the Flow Blockchain." 657 F. Supp. 3d 422, 439 (S.D.N.Y. 2023). There are no such allegations here.

*Second*, the SEC argues that alleged promotional statements by digital asset issuers created a reasonable expectation of profits to prospective purchasers. But in the Ninth Circuit, promotional statements alone are insufficient without a "reference in the contracts to an obligation," which the SEC concedes is absent here. *De Luz*, 608 F.2d at 1301; *see also Happy Inv. Grp. v. Lakeworld Properties, Inc.*, 396 F. Supp. 175, 180-81 (N.D. Cal. 1975) ("promises of the general nature made by defendants" were insufficient to form an investment contract where there were no contracts imposing "actual commitments to perform specific services"); *see also* Amicus Br. of Eight State Attorneys General, ECF No. 51-1 at 4-5. The SEC relies on a factual distinction—that *De Luz* involved a "limited representation" unlike the "very specific" statements in the Complaint—without addressing the underlying legal principle that promotional statements without a contractual obligation are not enough. *See* Opp. at 26.

Finally, the SEC argues that *Ripple* wrongly held that purchasers on digital asset trading platforms, including Kraken, had no reasonable expectation of profits. Opp. at 25.[13] The *Ripple* court properly held that the "economic reality" showed that the "expectation of profits" element was not satisfied because, among other things, there was no relationship between the alleged issuer and purchasers on digital asset platforms. *Ripple*, 682 F. Supp. 3d at 328-30. That *Ripple* was decided on summary judgment does not help the SEC because it fails to plead facts that would meet the legal standard *Ripple* laid out for sales on digital asset platforms. *See* Mot. at 20-21. The SEC seeks to distinguish *Ripple* on the basis that it involved sales by an alleged issuer to purchasers on digital asset platforms and therefore did not need to address secondary sales by third parties. But the court's conclusion—that sales on digital asset platforms by an alleged issuer did not give rise to an expectation of profits—applies with even greater force here where the issuer is not even a party to the trade.[14]

---

[13] *Ripple* did not, as the SEC claims, improperly "create[] subclasses of 'objective' purchasers." *See* Opp. at 25. Rather, the court examined, as required, specific transactions in their specific contexts. *Terraform* purported to disagree with *Ripple*, but performed the same type of transaction-specific analysis. *See* 2023 WL 4858299, at *12-15; *see also SEC v. Ripple Labs, Inc.*, 2023 WL 6445969, at *5 (S.D.N.Y. Oct. 3, 2023) (finding "that the SEC misstates the [*Ripple*] holding," which "does not conflict with the *Terraform* court's reasoning").

[14] *Ripple* is not inconsistent with *Pino* and *Wildes*. *See* Opp. at 26. Both of those cases addressed

1

**IV.    THE MAJOR QUESTIONS DOCTRINE REQUIRES DISMISSAL.**

2          The SEC says that the major questions doctrine does not apply because the Complaint brings

3    an enforcement action only against Kraken.  *See* Opp. at 29.  Putting aside that it has also brought

4    parallel actions against other U.S.-based trading platforms, the implications of its theory in this

5    case—that digital asset sales can be investment contracts absent any contract and post-sale

6    obligation—would affect the entire multi-trillion dollar digital asset industry.  *See* Amicus Br. of

7    Sen. Lummis, ECF No. 41-1 at 7-12.  The SEC's theory also sweeps in sales of countless collectibles

8    and commodities.  *See id.* at 10; *see also Merck & Co. v. HHS*, 962 F.3d 531, 540-41 (D.C. Cir.

9    2020) ("[T]he breadth of the Secretary's asserted authority is measured not only by the specific

10   application at issue, but also by the implications of the authority claimed.").  Therefore, the major

11   questions doctrine applies and "clear congressional authorization" is required. *West Virginia v. EPA*,

12   597 U.S. 697, 723 (2022).

13          Congress granted the SEC jurisdiction over securities; it did not grant the SEC plenary

14   authority over investments that it now claims.  The SEC's assertion that it has "clear congressional

15   authorization" based on the text of the Exchange Act is ironic because it also argues that it is not

16   bound by the "words <u>themselves</u>" in that statute.  *See* Opp. at 9, 29-30.  The SEC cannot have it both

17   ways.  And the SEC simply ignores Chair Gensler's prior acknowledgment that there was no clear

18   authorization when he asked Congress for *new* statutory authority to regulate digital asset trading

19   platforms, reinforcing similar statements by other SEC Commissioners and actions by the CFTC and

20   Congress.  Mot. at 29-30.

**CONCLUSION**

22          Kraken's Motion should be granted and the claims should be dismissed with prejudice.

23

24

25

26   ─────────────────────
     whether the "statutory seller" requirement under Section 12 of the Securities Act was satisfied based
27   on alleged "solicitations."  *Pino v. Cardone Cap., LLC*, 55 F.4th 1253, 1257-60 (9th Cir. 2022);
     *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1345-46 (11th Cir. 2022).  They have no applicability
28   to the SEC's Exchange Act claims, which have no "statutory seller" requirement.

1   DATED: May 9, 2024

2

3                                                   Respectfully Submitted,

                                                    */s/ Matthew C. Solomon*
4                                                   Matthew C. Solomon (*pro hac vice*)
                                                    **CLEARY GOTTLIEB STEEN &**
5                                                   **HAMILTON LLP**
                                                    2112 Pennsylvania Avenue, NW
6                                                   Washington, DC 20037
                                                    Telephone: (202) 974-1680
7                                                   msolomon@cgsh.com

8                                                   Jennifer Kennedy Park (SBN 34488)
                                                    **CLEARY GOTTLIEB STEEN &**
9                                                   **HAMILTON LLP**
                                                    1841 Page Mill Rd., Suite 250
10                                                  Palo Alto, CA 94304
                                                    Telephone: (650) 815-4130
11                                                  jkpark@cgsh.com

12                                                  Rahul Mukhi (SBN 350718)
                                                    **CLEARY GOTTLIEB STEEN &**
13                                                  **HAMILTON LLP**
                                                    One Liberty Plaza
14                                                  New York, NY 10006
                                                    Telephone: (212) 225-2912
15                                                  rmukhi@cgsh.com

16                                                  Brian Klein (SBN 258486)
                                                    Ashley Martabano (SBN 236357)
17                                                  **WAYMAKER LLP**
                                                    515 S. Flower Street, Suite 3500
18                                                  Los Angeles, CA 90071
                                                    Telephone: (214) 740-8614
19                                                  bklein@waymakerlaw.com
                                                    amartabano@waymakerlaw.com
20
                                                    *Attorneys for Defendants Payward Inc. and*
21                                                  *Payward Ventures, Inc.*

22

23

24

25

26

27

28