# EXHIBIT D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>    100 F Street, N.E.<br>    Washington, DC 20549,<br><br>             **Plaintiff,**<br><br>          **v.**<br><br>**BINANCE HOLDINGS LIMITED,<br>BAM TRADING SERVICES INC.,<br>BAM MANAGEMENT US HOLDINGS<br>INC., AND CHANGPENG ZHAO,**<br><br>             **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **Civil Action No. 1:23-cv-01599**<br>)<br>)<br>)<br>)<br>)   **Jury Trial Demanded**<br>)<br>)<br>) |

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission"), for its Complaint against Defendants Binance Holdings Limited ("Binance"), BAM Trading Services Inc. ("BAM Trading"), BAM Management US Holdings Inc. ("BAM Management"), and Changpeng Zhao ("Zhao"), alleges as follows:

## SUMMARY

1.     This case arises from Defendants' blatant disregard of the federal securities laws and the investor and market protections these laws provide. In so doing, Defendants have enriched themselves by billions of U.S. dollars while placing investors' assets at significant risk.

2.     Defendants have unlawfully solicited U.S. investors to buy, sell, and trade crypto asset securities through unregistered trading platforms available online at Binance.com ("Binance.com Platform") and Binance.US ("Binance.US Platform") (collectively, "Binance Platforms"). Defendants have engaged in multiple unregistered offers and sales of crypto asset securities and other investment schemes. And Defendants BAM Trading and BAM Management

defrauded equity, retail, and institutional investors about purported surveillance and controls over manipulative trading on the Binance.US Platform, which were in fact virtually non-existent.

3.      First, Binance and BAM Trading, under Zhao's leadership and control, have unlawfully offered three essential securities market functions—exchange, broker-dealer, and clearing agency—on the Binance Platforms without registering with the SEC.  Acutely aware that U.S. law requires registration for these functions, Defendants nevertheless chose not to register, so they could evade the critical regulatory oversight designed to protect investors and markets.

4.      Second, Binance and BAM Trading have unlawfully engaged in unregistered offers and sales of crypto asset securities, including Binance's own crypto assets called "BNB" and "BUSD," as well as Binance's profit-generating programs called "BNB Vault" and "Simple Earn," and a so-called "staking" investment scheme available on the Binance.US Platform.  In so doing, they have deprived investors of material information, including the risks and trends that affect the enterprise and an investment in these securities.

5.      Third, BAM Trading and BAM Management have made misrepresentations to investors about controls they claimed to have implemented on the Binance.US Platform, while raising approximately $200 million from private investors in BAM Management and attracting billions of dollars in trading volume from investors (including retail and institutional investors) seeking to transact on the Binance.US Platform.

6.      Starting in or around 2018, determined to escape the registration requirements of the federal securities laws, Defendants—under Zhao's control—designed and implemented a multi-step plan to surreptitiously evade U.S. laws.  As Binance's Chief Compliance Officer ("Binance CCO") admitted, "we do not want [Binance].com to be regulated ever."

7.      As one part of this plan to evade United States regulatory oversight over Zhao, Binance, and the Binance.com Platform, Zhao and Binance created BAM Management and BAM Trading in the United States and claimed publicly that these entities independently controlled the operation of the Binance.US Platform.  Behind the scenes, however, Zhao and Binance were intimately involved in directing BAM Trading's U.S. business operations and providing and maintaining the crypto asset services of the Binance.US Platform.  BAM Trading employees referred to Zhao's and Binance's control of BAM Trading's operations as "shackles" that often prevented BAM Trading employees from understanding and freely conducting the business of running and operating the Binance.US Platform—so much so that, by November 2020, BAM Trading's then-CEO told Binance's CFO that her "entire team feels like [it had] been duped into being a puppet."

8.      As a second part of Zhao's and Binance's plan to shield themselves from U.S. regulation, they consistently claimed to the public that the Binance.com Platform did not serve U.S. persons, while simultaneously concealing their efforts to ensure that the most valuable U.S. customers continued trading on the platform.  When the Binance.US Platform launched in 2019, Binance announced that it was implementing controls to block U.S. customers from the Binance.com Platform.  In reality, Binance did the opposite.  Zhao directed Binance to assist certain high-value U.S. customers in circumventing those controls and to do so surreptitiously because—as Zhao himself acknowledged—Binance did not want to "be held accountable" for these actions.  As the Binance CCO explained, "[o]n the surface we cannot be seen to have US users[,] but in reality, we should get them through other creative means."  Indeed, Zhao's stated "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us."

9.      Defendants' purposeful efforts to evade U.S. regulatory oversight while simultaneously providing securities-related services to U.S. customers put the safety of billions of dollars of U.S. investor capital at risk and at Binance's and Zhao's mercy.  Lacking regulatory oversight, Defendants were free to and did transfer investors' crypto and fiat assets as Defendants pleased, at times commingling and diverting them in ways that properly registered brokers, dealers, exchanges, and clearing agencies would not have been able to do.  For example, through accounts owned and controlled by Zhao and Binance, billions of U.S. dollars of customer funds from both Binance Platforms were commingled in an account held by a Zhao-controlled entity (called Merit Peak Limited), which funds were subsequently transferred to a third party apparently in connection with the purchase and sale of crypto assets.

10.      Moreover, Defendants understood the importance to crypto asset investors of implementing trading surveillance and controls over crypto trading platforms.  Zhao himself stated in 2019 that "CREDIBILITY is the most important asset for any exchange!  If an exchange fakes their volumes, would you trust them with your funds?"

11.      Defendants BAM Trading and BAM Management touted the surveillance and controls supposedly in place to prevent manipulative trading on the Binance.US Platform.

12.      But Defendants failed to implement on the Binance.US Platform the trade surveillance or manipulative trading controls BAM Trading and BAM Management touted to investors.  Thus, Defendants failed to satisfy basic requirements of registered exchanges—to have rules designed to prevent fraudulent and manipulative acts and the capacity to carry out that purpose.  The supposed controls were virtually non-existent, and those that did exist did not monitor for or protect against "wash trading" or self-dealing, which was occurring on the Binance.US Platform.  Most notably, from at least September 2019 until June 2022, Sigma Chain

AG ("Sigma Chain"), a trading firm owned and controlled by Zhao, engaged in wash trading that artificially inflated the trading volume of crypto asset securities on the Binance.US Platform.

13.     Congress enacted the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") in part to provide for the regulation of the offer and sale of securities and the national securities markets through registration and attendant disclosure, recordkeeping, inspection, and conflict-of-interest mitigation requirements. Binance and BAM Trading—both under Zhao's control—have engaged and continue to engage in unregistered offers and sales of crypto asset securities, effecting unregistered crypto asset securities transactions on the Binance Platforms, combining core securities market functions while purposefully evading registration, and operating while impaired by obvious conflicts of interest. In doing so, they have dodged the disclosure and other requirements that Congress and the SEC have constructed over the course of decades to protect our capital markets and investors and thereby have violated—and continue to violate—the law.

## VIOLATIONS

14.     By engaging in the conduct set forth in this Complaint, Binance and BAM Trading engaged in, and are currently engaging in, the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

15.     By engaging in the conduct set forth in this Complaint, Binance acted as an exchange, broker and dealer, and clearing agency for the Binance.com Platform without registering in any such capacities, in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)]. Similarly, with respect to the Binance.US Platform, Binance acted together with BAM Trading as an exchange, BAM Trading acted as a broker, and Binance and BAM Trading each acted as a clearing agency, without registering in

any such capacities, in violation of Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)]. As a control person over Binance and BAM Trading under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)], Zhao has also violated Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)] for Binance and BAM Trading's violations with respect to both Binance Platforms.

16.     By engaging in the conduct set forth in this Complaint, BAM Trading and BAM Management have further obtained money or property by means of materially false and misleading statements and engaged in transactions, practices, and courses of business that operated as a fraud or deceit upon purchasers in the offer and sale of securities in violation of Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)(2) and 77q(a)(3)].

17.     Unless Defendants are permanently restrained and enjoined, there is a reasonable likelihood that they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object in violation of the federal securities laws.

## NATURE OF THE PROCEEDING AND RELIEF SOUGHT

18.     The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d) and 27(a) of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa(a)].

19.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from committing further violations of the federal securities laws they are alleged to have violated; (b) ordering Defendants to disgorge their ill-gotten gains with prejudgment interest; (c) permanently enjoining Defendants and any entity controlled by them from, directly or indirectly, using the means or instrumentalities of interstate commerce to: (i) participate in the

issuance, purchase, offer, or sale of any security, including any crypto asset security, in any

unregistered transaction; (ii) act as an unregistered exchange with respect to any securities,

including any crypto asset securities; (iii) act as an unregistered broker or dealer with respect to

any securities, including any crypto asset securities; and (iv) act as an unregistered clearing

agency with respect to any securities, including any crypto asset securities; (d) imposing civil

money penalties on Defendants; and (e) ordering equitable relief that may be appropriate or

necessary for the benefit of investors.

## <u>JURISDICTION AND VENUE</u>

20.     This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and

22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d) and 27(a)

of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa(a)].

21.     Defendants, directly or indirectly, have made use of the means or instruments of

transportation or communication in interstate commerce or of the mails, including Defendants'

regular use of the Internet and the U.S. banking system, in connection with the transactions, acts,

practices, and courses of business alleged in this Complaint.

22.     Venue is proper in the District of Columbia pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

Among other acts, Defendants failed to register with the SEC in this District as an exchange,

broker-dealer, or clearing agency as required under the Exchange Act.  In addition, they failed to

register with the SEC in this District the offer and sale of securities, and they conducted

unregistered offers and sales of securities to residents of, or persons located in, this District.

23.     Defendants also transacted business in this District.  At least before September

2019, Binance (as controlled by Zhao) made the Binance.com Platform available for trading to

7

customers in this District.  Further, BAM Management and BAM Trading (also under Zhao's and Binance's control) obtained District of Columbia business licenses and transacted business in this District, including through the operation and availability of the Binance.US Platform, which was accessed by individuals in the District, and through personnel (such as one of its CEOs) in this District, who provided services to and engaged in business with all Defendants.

24.     Defendants' violations of the federal securities laws alleged in this Complaint occurred within the United States and had a foreseeable substantial effect within the United States.  Binance and Zhao actively solicited U.S. investors to trade on the Binance Platforms. Binance and Zhao, for example, regularly solicited U.S. investors via their social media and other internet postings to trade on both of the Binance Platforms.  Zhao also directed other Binance employees to actively solicit and take other steps to retain U.S. investors on the Binance.com Platform, even after Binance publicly announced in June 2019 that it would no longer serve U.S. investors.  By then, Binance estimated that it had over 1.47 million U.S.-based investors on the Binance.com Platform, and it continued to maintain a substantial U.S. customer base for several years thereafter.  In addition, Binance has employees located in the United States, and residents of this District invested in schemes Binance offered and sold as securities including BUSD and the Simple Earn program.

25.     Moreover, until at least the end of 2022, Binance, at Zhao's direction, maintained custody and control of the crypto assets deposited, held, traded, and/or accrued by customers on the Binance.US Platform.

## DEFENDANTS

26.     The Binance Platforms were founded and are maintained and operated by an opaque web of corporate entities, including those identified below, all of which are beneficially

owned and controlled by Zhao, Binance's Chief Executive Officer ("CEO") and, at least through March 2022, the Chairman of BAM Trading's and BAM Management's Boards of Directors.

27.     **Binance,** d/b/a Binance.com, is a Cayman Islands limited liability company founded and owned by Zhao.  Since at least July 2017, it has operated the Binance.com Platform, an international crypto asset trading platform.  The Binance.com Platform markets itself as being available to customers in more than 100 countries.  It currently offers trading in over 350 crypto assets and makes available various other investment opportunities involving crypto assets, including crypto asset securities.  Binance operates through a number of subordinate or affiliated entities, in multiple jurisdictions, all tied to Zhao as the beneficial owner.  Zhao has been publicly dismissive of "traditional mentalities" about corporate formalities and their attendant regulatory requirements.  He has refused to identify the headquarters of Binance, claiming, "Wherever I sit is the Binance office.  Wherever I meet somebody is going to be the Binance office."  According to Zhao, the concept of a formal corporate entity with a headquarters and its own bank account is unnecessary: "All of those things doesn't have to exist for blockchain companies."  Notably, however, billions of dollars from the platforms flowed through dozens of Binance and Zhao-owned U.S.-based bank accounts.  Neither Binance nor any of its subsidiaries or affiliated entities have ever been registered with the SEC in any capacity.

28.     **BAM Management** is a Delaware corporation and the parent of BAM Trading and other affiliated entities.  When the Binance.US Platform launched in 2019, BAM Management was wholly owned by BAM Management Company Limited, a Cayman Islands company, which in turn was wholly owned by CPZ Holdings Limited, a British Virgin Islands company that was owned and controlled by Zhao.  Presently, Zhao continues to own 81 percent

of BAM Management.  Neither BAM Management nor any of its subsidiaries or affiliated

entities (including BAM Trading) has ever been registered with the SEC in any capacity.

29.     **BAM Trading**, d/b/a Binance.US, is a Delaware corporation with a principal

place of business in Miami, Florida.  It is wholly owned by BAM Management.  BAM Trading

holds 43 money transmitter licenses with U.S. jurisdictions, including this District.

30.     **Zhao, widely known as "CZ,"** is a Canadian citizen who resides outside of the

United States, is Binance's founder, beneficial owner, and CEO, and was Chairman of BAM

Trading's and BAM Management's Boards of Directors at least until approximately March 2022.

Zhao also owns several entities that have regularly traded on the Binance Platforms.  Between

October 2022 and January 2023, Zhao personally received $62.5 million from one of the Binance

bank accounts.  Zhao has never been associated with any entity registered with the SEC.

## CERTAIN OTHER ENTITIES

31.     **Trust Company A** is a New York limited purpose trust company.  Beginning in

September 2019, pursuant to a "Stablecoin as a Service" agreement with a Binance affiliate,

Trust Company A issued in partnership with Binance the crypto asset "BUSD," which was

approved by and under the supervision of the New York Department of Financial Services

("NYDFS").  BUSD is a Binance-branded U.S. Dollar denominated crypto asset on the

Ethereum blockchain.  In December 2019, BAM Trading entered into a partnership with Trust

Company A, whereby Trust Company A provided certain services with respect to BUSD

purchases and sales on the Binance.US Platform.  Effective February 21, 2023, Trust Company

A ceased issuing new BUSD pursuant to an NYDFS order.

32.     **Trust Company B** is a Nevada-based trust company.  In or around July 2019, BAM Trading entered into an agreement with Trust Company B to provide certain services to customers purchasing crypto assets on the Binance.US Platform with U.S. dollars.

33.     **Sigma Chain** is a crypto asset trading firm incorporated in Switzerland.  Zhao is Sigma Chain's beneficial owner, and several Binance employees conducted its operations. Among others, Binance's back office manager ("Binance Back Office Manager") was Sigma Chain's President at the same time she also had signatory authority over BAM Trading's bank accounts.  Sigma Chain was an active trader on both Binance Platforms, and described itself as "the main market maker for Binance.com."  Upon the Binance.US Platform's launch, Zhao directed that Sigma Chain be one of its first market makers.  Further, since the Binance.US Platform began offering over-the-counter ("OTC") trading and its Convert Trading and One Click Buy Sell ("OCBS") Services to customers, Sigma Chain has served as one of the counterparties to Binance.US Platform customers, including, at times, serving as the only counterparty.

34.     **Merit Peak Limited ("Merit Peak")** is a crypto asset trading firm incorporated in the British Virgin Islands.  Zhao is Merit Peak's beneficial owner, and several Binance employees conducted its operations.  It has described itself as "a proprietary firm trading with our owner's [Zhao's] self-made wealth from the digital asset business."  Merit Peak was an OTC trading service provider on the Binance.com Platform and was one of the earliest market makers on the Binance.US Platform.  Through Merit Peak, Zhao has also directed over $16 million to BAM Management to fund the Binance.US Platform's operations.

35.     Below is a high-level graphical representation of a certain limited number of relationships and entities relevant to the allegations herein.



## BACKGROUND

### I.    STATUTORY AND LEGAL FRAMEWORK

36.    As the Supreme Court recently reemphasized, the Securities Act and the Exchange Act are the "backbone of American securities laws."

37.    The Securities Act and the Exchange Act define "security" to include a wide range of assets including "investment contracts." Investment contracts are instruments through which a person invests money in a common enterprise and reasonably expects profits or returns derived from the entrepreneurial or managerial efforts of others. As the United States Supreme Court noted in *SEC v. W.J. Howey Co.*, Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and

variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. 293, 299 (1946). Courts have found a variety of novel or unique investment vehicles to be investment contracts, including those involving orange groves, animal breeding programs, cattle embryos, mobile phones, enterprises that exist only on the Internet, and crypto assets (which crypto asset market participants at times also label "cryptocurrencies").

### A. The Securities Act's Registration and Disclosure Requirements

38. Congress enacted the Securities Act to regulate the offer and sale of securities. Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)] require those that directly or indirectly offer and sell securities to register those offers and sales with the SEC.

39. Registration statements provide the investing public with material, sufficient, and accurate information to make informed investment decisions, including financial and managerial information about the issuer, how the issuer will use offering proceeds, and the risks and trends that affect the enterprise and an investment in its securities.

### B. The Exchange Act's Registration and Other Requirements

40. To fulfill the purposes of the Exchange Act, Congress imposed registration and disclosure obligations on certain defined participants in the national securities markets, including but not limited to broker-dealers, exchanges, and clearing agencies. It also empowered the SEC to write rules to protect investors who use the services of those intermediaries.

41. In the Exchange Act, Congress explained that such oversight is essential to the proper functioning of the national securities markets and the national economy:

> [T]ransactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are effected with a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related

> thereto … [to] perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions.

15 U.S.C. § 78b.

42.     Congress also determined that "[t]he prompt and accurate clearance and settlement of securities transactions, including the transfer of record ownership and the safeguarding of securities and funds related thereto, are necessary for the protection of investors and persons facilitating transactions by and acting on behalf of investors."  15 U.S.C. § 78q-1.

*i.     Registration of Exchanges*

43.     In enacting registration provisions for national securities exchanges, Congress found in Section 2(3) of the Exchange Act [15 U.S.C. §78b(3)] that:

> Frequently the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation, resulting in sudden and unreasonable fluctuations in the prices of securities which (a) cause alternately unreasonable expansion and unreasonable contraction of the volume of credit available for trade, transportation, and industry in interstate commerce, (b) hinder the proper appraisal of the value of securities and thus prevent a fair calculation of taxes owing to the United States and to the several States by owners, buyers, and sellers of securities, and (c) prevent the fair valuation of collateral for bank loans and/or obstruct the effective operation of the national banking system.

44.      Accordingly, Section 5 of the Exchange Act [15 U.S.C. § 78e] requires an organization, association, or group of persons that meets the definition of "exchange" under Section 3(a)(1) of the Exchange Act, unless otherwise exempt, to register with the Commission as a national securities exchange pursuant to Section 6 of the Exchange Act.

45. Section 3(a)(1) of the Exchange Act [15 U.S.C. § 78c(a)(1)] defines "exchange" to mean "any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a market place or facilities for bringing together purchasers and sellers of securities or for otherwise performing with respect to securities the functions commonly performed by a stock exchange as that term is generally understood, and includes the market place and the market facilities maintained by such exchange."

46. Exchange Act Rule 3b-16(a) [17 C.F.R. § 240.3b-16(a)] further defines certain terms in the definition of "exchange" under Section 3(a)(1) of the Exchange Act, including "[a]n organization, association, or group of persons," as one that: "(1) [b]rings together the orders for securities of multiple buyers and sellers; and (2) [u]ses established, non-discretionary methods (whether by providing a trading facility or by setting rules) under which such orders interact with each other, and the buyers and sellers entering such orders agree to the terms of a trade."

47. Registration of a trading platform as an "exchange" under the Exchange Act is a bedrock Congressional requirement that permits the SEC to carry out its role of oversight over the national securities markets.

48. For example, properly registered exchanges must enact rules to govern their and their members' behavior. Under Section 6 of the Exchange, the rules, among other things, must be "designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade … and, in general, to protect investors and the public interest."

49. These rules are subject to review by the SEC under Section 19 of the Exchange Act [15 U.S.C. § 78s], including before an exchange can be registered and begin operating. This review process is designed to ensure that securities marketplaces operate in a manner consistent with the Exchange Act as its practices and procedures evolve over time, in part to protect

investors and the integrity of securities markets that affect national commerce and the economy.

### ii. Registration of Broker-Dealers

50.     Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)] generally requires brokers and dealers to register with the SEC, and a broker or dealer must also become a member of one or more "self-regulatory organizations" ("SROs"), which in turn require members to adhere to rules governing members' activities.

51.     Section 3(a)(4) of the Exchange Act [15 U.S.C. § 78c(a)(4)] defines "broker" generally as "any person engaged in the business of effecting transactions in securities for the account of others." Section 3(a)(5) of the Exchange Act [15 U.S.C. § 78c(a)(5)] defines "dealer" generally as "any person engaged in the business of buying and selling securities for his own account, through a broker or otherwise."

52.     The regulatory regime applicable to broker-dealers is a cornerstone of the federal securities laws and provides important safeguards to investors and market participants. Registered broker-dealers are subject to comprehensive regulation and rules that include recordkeeping and reporting obligations, SEC and SRO examination, and general and specific requirements aimed at addressing certain conflicts of interest, among other things. All of these rules and regulations are critical to the soundness of the national securities markets and to protecting investors in the public markets who interact with broker-dealers.

53.     To preserve the fair and orderly markets, avoid conflicts of interests, and protect investors, Section 11(a) of the Exchange Act [15 U.S.C. § 78k(a)] prohibits broker-dealers that are members of exchanges from effecting transactions on that exchange for their accounts.

### iii. Registration of Clearing Agencies

54.     Section 17A(b) of the Exchange Act [15 U.S.C. § 78q-1(b)] generally makes it

unlawful "for any clearing agency, unless registered in accordance with this subsection, directly or indirectly, to make use of the mails or any means or instrumentality of interstate commerce to perform the functions of a clearing agency with respect to any security."

55.     Section 3(a)(23)(A) of the Exchange Act [15 U.S.C. § 78c(a)(23)(A)] defines the term "clearing agency" as "any person who acts as an intermediary in making payments or deliveries or both in connection with transactions in securities or who provides facilities for comparison of data respecting the terms of settlement of securities transactions, to reduce the number of settlements of securities transactions, or for the allocation of securities settlement responsibilities," as well as "any person … who (i) acts as a custodian of securities in connection with a system for the central handling of securities whereby all securities of a particular class or series of any issuer deposited within the system are treated as fungible and may be transferred, loaned, or pledged by bookkeeping entry without physical delivery of securities certificates, or (ii) otherwise permits or facilitates the settlement of securities transactions or the hypothecation or lending of securities without physical delivery of securities certificates."

56.     Registered clearing agencies are subject to comprehensive regulation under the Exchange Act and the rules thereunder, providing important safeguards to investors and market participants, and to the maintenance of fair competition.  These regulations and rules include recordkeeping obligations and require SEC examination.  Moreover, clearing agencies properly registered under the Exchange Act must enact a set of rules to govern their and their members' behavior, and these rules are subject to review by the SEC.

**C.      Registration of Exchanges, Broker-Dealers, and Clearing Agencies Is Essential to the Proper Functioning of the U.S. Securities Markets and to the Protection of Investors**

57.     In U.S. securities markets, the functions described above are typically carried out

17

by separate legal entities that are independently registered and regulated by the SEC. Separation

of these core functions aims to minimize conflicts between the interests of securities

intermediaries and the investors they serve. Registration and concomitant disclosure obligations

allow the SEC to oversee the business of intermediaries and their relationships with investors and

to thereby protect investors from manipulation, fraud, and other abuses.

58.    Investors in securities markets do not interact directly with exchanges or clearing

agencies but instead are customers of broker-dealers that effect transactions on investors' behalf.

Only broker-dealers (or natural persons associated with a broker-dealer) may become members

of a national securities exchange. In addition, broker-dealers that have customers must become

members of the Financial Industry Regulatory Authority ("FINRA"), an SRO that imposes its

own rules and oversight over broker-dealers, particularly as to protecting retail investors.

59.    Registered national securities exchanges and clearing agencies are also SROs and

therefore must submit all of their proposed rules and rules changes to the SEC for review.

60.    As noted, the Exchange Act also subjects registered intermediaries to important

record-keeping and inspection requirements. For example, Section 17 of the Exchange Act [15

U.S.C. § 78q] requires registered national securities exchanges, broker-dealers, and clearing

agencies to make and keep records as the SEC prescribes by rule and subjects those records to

reasonable periodic, special, or other examinations by representatives of the SEC.

61.    These provisions are designed to ensure that intermediaries follow the rules that

protect investors and promote the fair and efficient operation of the securities markets. These

provisions also seek to ensure, among other things, that investors' securities orders are handled

fairly and transparently, that securities transactions result in settlement finality, and that

investors' assets are protected and can be recovered if necessary.

II.     **BACKGROUND ON CRYPTO ASSETS AND CRYPTO TRADING PLATFORMS**

A.      **Crypto Assets**

62.     As used herein, the terms "crypto asset," "digital asset," or "token" generally refer to an asset issued and/or transferred using blockchain or distributed ledger technology, including assets referred to colloquially as "cryptocurrencies," "virtual currencies," and digital "coins."

63.     A blockchain or distributed ledger is a database spread across a network of computers that records transactions in theoretically unchangeable, digitally recorded data packages, referred to as "blocks." These systems typically rely on cryptographic techniques to secure recording of transactions.

64.     Some crypto assets may be "native tokens" to a particular blockchain—meaning that they are represented on their own blockchain—though other crypto assets may also be represented on that same blockchain.

65.     Crypto asset owners typically store the software providing them control over their crypto assets on a piece of hardware or software called a "crypto wallet." Crypto wallets offer a method to store and manage critical information about crypto assets, *i.e.*, cryptographic information necessary to identify and transfer those assets. The primary purpose of a crypto wallet is to store the "public key" and the "private key" associated with a crypto asset so that the user can make transactions on the associated blockchain. The public key is colloquially known as the user's blockchain "address" and can be freely shared with others. The private key is analogous to a password and confers the ability to transfer a crypto asset. Whoever controls the private key controls the crypto asset associated with that key. Crypto wallets can reside on devices that are connected to the internet (sometimes called a "hot wallet"), or on devices that are not connected to the internet (sometimes called a "cold wallet" or "cold storage"). All

19

wallets are at risk of being compromised or "hacked," but internet connectivity makes hot wallets easier to access and therefore puts them at greater risk from certain hacks.

### B. Consensus Mechanisms and Validation of Transactions on a Blockchain

66. Blockchains typically employ a "consensus" mechanism that, among other things, aims to achieve agreement among users to a data value or on the state of the ledger.

67. A consensus mechanism describes the particular protocol used by a blockchain to agree on, among other things, which ledger transactions are valid, when and how to update the blockchain, and potentially to compensate certain participants for validating transactions and adding new blocks. There can be multiple sources for compensation under the terms of the blockchain protocol, including from fees charged to those transacting on the blockchain, or through the creation or "minting" of additional amounts of the blockchain's native crypto asset.

68. "Proof of work" and "proof of stake" are the two major consensus mechanisms used by blockchains. Proof of work, the mechanism used by the Bitcoin blockchain, involves computers, known as "validator nodes," attempting to "mine" a "block" of transactions, in part by solving a complex mathematical problem. The first miner to successfully solve the problem earns the right to update the blockchain and is rewarded with the blockchain's native crypto asset. Proof of stake, the consensus mechanism currently used by the Ethereum blockchain, involves the blockchain protocol selecting block validators from crypto asset holders who have committed or "staked" a minimum number of crypto assets as part of the validation process.

### C. The Offer and Sale of Crypto Assets

69. Persons have offered and sold crypto assets in capital-raising events in exchange for consideration, including but not limited to through so-called "initial coin offerings" or "ICOs," "crowdsales," or public "token sales." In some instances, the entities offering or selling

the crypto assets may release a "whitepaper" or other marketing materials describing a project to which the asset relates, the terms of the offering, and any rights associated with the asset.

70.    Some issuers continue to sell the crypto assets after the initial offer and sale, including by directly or indirectly by selling it on crypto asset trading platforms.

### D.    Crypto Asset Trading Platforms

71.    Crypto asset trading platforms—like the Binance Platforms, which are described in more detail below—are marketplaces that generally offer a variety of services relating to crypto assets, often including brokerage, trading, and settlement services.

72.    Crypto asset trading platforms allow their customers to purchase and sell crypto assets for fiat currency (legal tender issued by a country) or for other crypto assets.  "Off-chain" transactions are tracked in the internal recordkeeping mechanisms of the platform but do not involve transferring crypto assets from one wallet to another, while "on-chain" transactions are those involving the transfer of a crypto asset from one blockchain address to another.

73.    Crypto asset trading platforms typically possess and control the crypto assets deposited and/or traded by their customers and thus function as a central depository.  The customers' entitlements are then typically tracked and maintained on the crypto asset trading platform's internal ledgers.  Consistent with their failures to register with the SEC in any capacity and follow rules applicable to registered intermediaries, the Binance Platforms did not segregate a customer's crypto assets from other customers' or the firm's assets.

74.    The graphic user interfaces employed by crypto asset trading platforms—such as on websites, mobile apps, or other software—typically emulate and function like traditional securities trading screens: They show order books of the various assets available to trade and historical trading information like high and low prices, trading volumes, and capitalizations.

75.     However, unlike in traditional securities markets, crypto asset trading platforms (including the Binance Platforms) typically solicit, accept, and handle customer orders for securities; allow for the interaction and intermediation of multiple bids and offers resulting in purchases and sales; act as an intermediary in making payments or deliveries, or both; and maintain a central securities depository for the settlement of securities transactions.

76.     By contrast, a registered national securities exchange submits information regarding executed trades to a registered clearing agency that takes responsibility for ensuring settlement finality and safekeeping of the assets being traded and, in doing so, protects investors' interests.  Thus, registered national securities exchanges typically do not assume possession or control of the underlying assets being traded.  Moreover, crypto asset trading platforms usually settle transactions by updating internal records with each investor's positions, a function typically carried out by clearing agencies in compliant securities markets.

77.     Likewise, crypto asset trading platforms typically perform roles traditionally assigned to broker-dealers in regulatory compliant securities markets, without following or even recognizing the legal obligations and restrictions on activities that accompany status as a broker-dealer.  For example, unregistered and non-compliant crypto asset trading platforms often do not adequately disclose that they have the ability and financial incentive to trade crypto asset securities against their own customers on the platform, putting customers on the losing side of each trade.

### E.     The DAO Report

78.     On July 25, 2017, the SEC issued the *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO* (the "DAO Report"), advising "those who would use … distributed ledger or blockchain-enabled means for capital raising[] to take appropriate steps to ensure compliance with the U.S. federal securities laws," and finding that the

offerings of certain crypto assets identified therein were offerings of securities.

79.     The DAO Report also advised that "any entity or person engaging in the activities of an exchange must register as a national securities exchange or operate pursuant to an exemption from such registration" and "stress[ed] the obligation to comply with the registration provisions of the federal securities laws with respect to products and platforms involving emerging technologies and new investor interfaces."  The DAO Report also found that the trading platforms at issue therein "provided users with an electronic system that matched orders from multiple parties to buy and sell [certain crypto asset securities] for execution based on non-discretionary methods" and therefore "appear to have satisfied the criteria" for being an exchange under the Exchange Act.

## FACTS

### III.     UNDER ZHAO'S CONTROL, BINANCE PROVIDED EXCHANGE, BROKER-DEALER, AND CLEARING AGENCY SERVICES TO U.S. INVESTORS THROUGH THE BINANCE.COM PLATFORM.

80.     In 2017, Binance, controlled by Zhao, launched the Binance.com Platform to provide services to crypto asset investors.  To finance its start-up costs, Zhao and Binance created a new crypto asset security called "Binance Coin," also known as "BNB."

81.     From approximately June 26 to July 3, 2017, Zhao and Binance conducted a so-called ICO of BNB that raised approximately $15 million from investors globally, including U.S. investors, by selling 100 million BNB tokens at an average price of $0.15 per token.  As of May 14, 2023, BNB traded as high as $314.70.

82.     From inception, as set forth in greater detail in Section VII.A below, BNB was offered and sold as a security because Binance touted an investment in BNB as an investment in Binance's efforts to create a successful crypto asset trading platform centered around BNB.  For

example, to promote the BNB ICO, Binance published a "Binance Exchange" whitepaper (the "Binance Whitepaper") announcing Binance's ambition to build "a world-class crypto exchange, powering the future of crypto finance," in which BNB would play an integral role as a so-called "exchange token"—*i.e.,* a crypto asset associated by its issuer with a crypto asset trading platform that the issuer markets as an investment in the success of the platform itself.

83.     Central to the Binance Whitepaper's proposal was the "Binance Exchange Matching Engine" that would match crypto asset buy and sell orders and be "capable of sustaining 1,400,000 orders/second, making Binance one of the fastest exchanges in the market."

84.     In July 2017, shortly after completion of the BNB ICO, Zhao and Binance launched the Binance.com Platform.

85.     Since Binance's inception, Zhao has been Binance's CEO and its ultimate decision maker.  All Binance employees directly or indirectly report to him.  He had and continues to have the ability to exercise control—and does in fact exercise such control—over all aspects of Binance's business, including its operation of the Binance.com Platform, and he directs and oversees the platform's various functions and services.

86.     From the time it launched the Binance.com Platform, Binance, under Zhao's control, has acted as an exchange, clearing agency, and broker-dealer in crypto asset securities without registering in those capacities.

**A.**     **The Binance.com Platform Provides a Marketplace and Facilities for Trading Crypto Asset Securities.**

     *i.*     *Display and Order Book*

87.     Customers can access and create accounts on the Binance.com Platform via the Binance.com website, a Binance mobile phone application, or a Binance-created application programming interface ("API").

88.     The Binance.com Platform displays customer account information, including account balances, and open orders, order history, and trade history with respect to crypto assets available on the platform.  The platform also displays open crypto asset orders on the order book and provides real-time data of bid and ask prices, trading volume, and the times that the orders were submitted.  Additionally, the Binance.com Platform displays information about executed trades (*i.e.*, price, quantity, and time historical data for such trades).

*ii.        Order Matching and Trading Rules*

89.     The Binance.com Platform offers "spot" (immediate) market trading through an order-matching functionality similar to that of a traditional securities exchange.

90.     According to Binance, when an investor places an order on the Binance.com Platform, the order enters Binance's internal automated matching engine, called "MatchBox," which matches buy-and-sell orders based on programmed, non-discretionary rules that govern how orders will interact.  When separate customers' buy and sell orders have prices that overlap, MatchBox executes the trade and removes the orders from the order book.  Orders that do not execute immediately are typically ranked and displayed in price-time priority, meaning that orders placed earlier in time are prioritized for any given price.

91.     MatchBox does not indicate to one party the identity of the other party to a trade.  Upon execution of a trade, other functionality in the Binance.com Platform settles the trade.

*iii.       Binance OTC*

92.     Since at least January 2019, Binance has operated additional functionality that it refers to as "Binance OTC."  As advertised and described by Binance, Binance OTC allows customers to transact directly with Binance, where Binance is the counterparty trading in its own account.  Binance quotes prices directly to Binance OTC customers, acts as the principal on each

25

trade, and profits from the spread between their bid and ask quotations.

93.     In marketing Binance OTC, Binance has touted "a number of advantages to trading with us," including "Fast Settlement" and a "Simple Process - The trading discussion happens on chat, and a trade can be confirmed in as quickly as 1-2 minutes from the time you reach out to us for a price.  Once we agree on a price, we fully take care of the settlement process by moving the coins you're selling out of your Binance account and the coins you're buying in … you don't need to send coins anywhere."

94.     Since the launch of the Binance.com Platform, Binance provided OTC trading services through Merit Peak—a Zhou-owned entity—serving as the counterparty to customers on the Binance.com Platform, and Merit Peak also provided market making services on the Binance.US Platform.

### B.     Binance Holds and Controls Customers' Funds and Crypto Assets.

95.     To utilize any of the functionalities on the Binance.com Platform, investors must create and fund accounts with Binance.  Customers must have sufficient assets in their accounts to cover the value of any trading order, plus applicable fees.  Once customers have funded their Binance accounts, they can buy, sell, transfer, and store crypto assets on the platform.

96.      Customers can establish and fund Binance accounts with fiat currency or crypto assets.  There are separate procedures for depositing crypto assets and for depositing fiat currency.  To deposit crypto assets, customers are required to transfer crypto assets from their own crypto asset wallets on the blockchain to wallets that Binance controls.  Binance holds these customer crypto assets in omnibus wallets, and it tracks transactions on the Binance.com Platform on an internal ledger.

97.     If a customer submits a request to withdraw crypto assets from the Binance.com

Platform, Binance transfers the requested amount of crypto assets from its omnibus wallets to a wallet designated by the customer on the relevant blockchain.

98.     Since at least 2018, Binance has also allowed customers to fund their accounts and purchase crypto assets with U.S. dollars or other fiat currencies by, among other things, linking credit cards through a third-party processor, or through bank accounts or payment services.  It also has corresponding methods of permitting customers to withdraw in fiat.

99.     Until at least 2021, accounts in the name of Binance entities, beneficially owned by Zhao, sent billions of dollars of customer assets to U.S.-based bank accounts in the name of Merit Peak, which transferred to Trust Company A all of those funds that appear to relate to the issuance of Binance's stablecoin, called "BUSD."  The use of Merit Peak as an intermediary to transfer platform customer money to buy BUSD presented an undisclosed counterparty risk for investors.

### C.     Binance Clears and Settles Customers' Trades.

100.     Binance clears and settles all trades on the Binance.com Platform.  After matching a buy and sell order, Binance settles the resulting trade by debiting and crediting the accounts associated with each of the counterparties on the internal ledger Binance maintains.  Customer crypto assets generally stay in Binance-controlled omnibus wallets.

### D.     Binance's Receives Compensation.

101.     Binance's revenue derives primarily from taking fees for transactions in crypto assets effected through the Binance.com Platform.  For spot trading, Binance typically charges between 0.015 percent and 0.2 percent of the nominal value of transactions, depending on various parameters.  Binance also charges fees for withdrawals and for trading on margin.

102.     By 2021, its trading volume spiked to $9.58 trillion, making it the largest crypto

asset trading platform in the world.

103.    Between June 2018 and July 2021, Binance earned at least $11.6 billion in revenue, most of which derived from transaction fees.

**E.    Zhao and Binance Actively Solicited Investors in the United States to Trade Crypto Assets on the Binance.com Platform.**

*i.    Binance Marketed its Services Worldwide, Including Specifically to U.S. Customers.*

104.    At least since the launch of the Binance.com Platform in 2017, Binance has regularly solicited customers in the United States—at first overtly and later furtively—to transact in crypto asset securities.  Throughout, it has held itself out as being in the business of effecting transactions in many different crypto assets offered and sold as securities.  It has engaged in this solicitation on a worldwide basis, including through its website, blog posts, and social media.

105.    Among other things, Binance's website has solicited "investors" and "traders" to "buy and sell crypto in minutes," inviting them to "Trade.  Anywhere."  Binance advertises the Binance.com Platform on its social media accounts, including on Facebook, Twitter, and Reddit, where it collectively has over 12 million followers, many of whom reside in the United States.

106.    From the Binance.com Platform's launch until at least September 2019, Binance overtly marketed its services to all customers and imposed no restrictions whatsoever on the ability of U.S. persons to buy, sell, and trade crypto assets on the Binance.com Platform.  During this period, Binance opened tens of thousands of accounts for customers who submitted "Know Your Customer" ("KYC") identity verification information that indicated they were based in the United States or who accessed the platform via Internet Protocol ("IP") addresses indicating that they were physically located in the United States.  Binance, and Zhao as its control person, knew that U.S. persons transacted on the Binance.com Platform.

28

107.     In addition, until at least August 2021, Binance did not require customers whose accounts were limited to withdrawing two bitcoin per day to submit *any* KYC information, allowing those investors to bypass well-recognized international anti-money laundering restrictions and disclosures when seeking to open accounts on the Binance.com Platform.

108.     Zhao and Binance regularly tracked customer activity on the Binance.com Platform and were thus aware that U.S. customers made up a substantial portion of Binance's business.  For example, in an August 2019 internal presentation, Binance estimated that the Binance.com Platform had over 1.47 million customers in the United States.

109.     Moreover, by 2019, Binance had over 3,500 U.S. customers who were large-volume traders that Binance referred to as "VIPs."  These U.S. customers were important to Binance not only because they directly produced substantial revenues, but also because they provided substantial liquidity on the Binance.com Platform, which in turn encouraged other investors to trade on the platform.

   ii.     *Zhao and Binance Developed a Plan to Evade U.S. Legal Scrutiny While Continuing to Profit from U.S. Investors.*

110.     Zhao and Binance understood that they were operating the Binance.com Platform in violation of numerous U.S. laws, including the federal securities laws, and that these ongoing violations presented existential risks to their business.

111.     As Binance's CCO bluntly admitted to another Binance compliance officer in December 2018, "*we are operating as a fking unlicensed securities exchange in the USA bro.*" (Emphasis added.)

112.     In 2018, Zhao and Binance hired several advisors to advise them on managing their U.S. legal exposure.  One of these advisors was a consultant who operated a crypto asset trading firm in the United States ("Binance Consultant").  In November 2018, the Binance

29

Consultant proposed a plan to Zhao and Binance that involved the creation of a U.S. entity, which the Binance Consultant at the time dubbed the "Tai Chi" entity ("Tai Chi Plan").

113.    In presentations shared with Zhao and other Binance senior officials in November 2018, the Binance Consultant warned against Binance continuing the "*status quo*" of unrestricted U.S. customer access to the Binance.com Platform, dubbing this a "high" risk due to potential U.S. "regulatory actions," including actions by the SEC with respect to the "[i]ssuance of BNB to US Persons" and "for [operating an] unregistered securities brokerage."

114.    The Binance Consultant then discussed two alternative approaches for Zhao and Binance to consider.  *First*, he discussed what he described as a "low" risk approach of "[a]ctive outreach to regulators and resolve all potential issues," but ultimately advised against this approach because, among other things, "settlement costs can be substantial" and could result in the "**complete loss of the US market during the settlement process**."

115.    *Second*, the Binance Consultant described a "moderate" risk approach in which Binance would establish a U.S. entity—the Tai Chi entity—that "will become the target of all built-up enforcement tensions," "**reveal**, **retard**, and **resolve** built-up enforcement tensions," and "**[i]nsulate Binance from legacy and future liabilities**."  The Binance Consultant recommended that Zhao and Binance adopt this approach, known as the Tai Chi Plan.

116.    To implement the Tai Chi Plan, the Binance Consultant recommended that Binance brand a U.S. entity a Binance entity through a "franchise model" that would rely on Binance's technology "by visualizing Binance as a technology vendor."

117.    He further recommended that Binance provide liquidity and market access from the Binance.com Platform to the proposed U.S. crypto asset platform established by the Tai Chi entity "through either affiliated . . . or contracted market makers."

30

118.    The Binance Consultant touted this approach as both "maintaining functional access to the US market," and providing "[l]icense and services fees paid by the US Service Company to Binance" that "are functionally US-sourced trading fees."

119.    As another benefit to Binance, the Binance Consultant further recommended that Binance use the Tai Chi entity's OTC trading services to provide "functional fiat capacity" – *i.e.*, Binance could serve as an OTC counterparty on the U.S. platform to sell crypto assets for fiat currency, thereby giving Binance ready access to fiat currency without having to separately establish a bank account.

120.    In addition, the Binance Consultant recommended steps to "insulate Binance from US Enforcement."  Those steps included having "[k]ey Binance personnel continue to operate from non-US locations to avoid enforcement risk" and ensuring that "[c]ryptocurrency wallets and key servers continue to be hosted at non-US locations to avoid asset forfeiture."

121.    As to the SEC, the Binance Consultant also recommended that, "***just for publicity***," the Tai Chi entity should "release a long and detailed *Howey* Test Asset-Evaluation Framework … to show *Howey* test sophistication" and then engage with the SEC to discuss the "formation or acquisition of a broker/dealer or alternative trading system (ATS), ***with no expectation of success and solely to pause potential enforcement efforts***." (Emphasis added.)

122.    The Binance Consultant also recommended that Binance take steps to "reduce the attractiveness of enforcement" by U.S. regulators concerning the Binance.com Platform.  This included publicly "restrict[ing] US persons' access to the main Binance site" while privately encouraging U.S. customers to bypass these restrictions through the "strategic treatment" of virtual private networks ("VPNs") that would disguise their locations and thereby "minimize [the] economic impact" of Binance's public proclamations that it was prohibiting U.S investors

31

on the platform.

123.    Longer term, the Binance Consultant recommended the "[e]ventual integration with Binance" by "acquir[ing] the US operation at a nominal price and re-arrang[ing] its leadership when it has served its purposes."

124.    After considering the Tai Chi Plan, Zhao informed the Binance Consultant that Binance had also talked to U.S. law firms that proposed "a more conservative approach" that was "probably safer for now."  But Zhao made clear that he would "still very much like to continue to work with" the Binance Consultant, explaining, "There are elements from both of your proposals[] we may combine."  Zhao further noted that "having [a U.S. law firm] behind us reduces the personal exposure you take on as well."  Finally, Zhao emphasized to the Binance Consultant that they "should work together as a team."

       *iii.*     *Consistent with the Tai Chi Plan, Binance Encouraged and Assisted U.S. Customers to Circumvent Binance's Supposed Restrictions.*

125.    In fact, Binance implemented much of the Tai Chi Plan.  In addition to creating BAM Trading and the Binance.US Platform, Zhao and Binance implemented policies and controls to give the impression that the Binance.com Platform was blocking U.S. customers while at the same time secretly subverting those controls.

126.    On June 14, 2019, Binance updated the Binance.com Platform's "Terms of Use" to provide—for the first time—that U.S. customers were not permitted to trade on the Binance.com Platform.  Binance further announced that it would begin implementing measures to block U.S. customers from trading or depositing assets on the platform after 90 days.  Zhao and Binance timed this announcement to coincide with its announcement that an ostensibly independent U.S. entity, BAM Trading, would soon launch the Binance.US Platform.

127.    But Zhao and Binance were unwilling to risk losing all of Binance's U.S.

business—particularly its VIP U.S. customers—on the well-established and more liquid Binance.com Platform. And so Zhao and Binance engaged in widespread covert efforts to permit U.S. customers to continue to trade on the platform.

128. *First*, Zhao directed Binance to implement a plan to encourage customers to circumvent Binance's geographic blocking of U.S.-based IP addresses by using a VPN service to conceal their U.S. location. *Second*, Zhao directed Binance to encourage certain U.S.-based VIP customers to circumvent the new KYC restrictions by submitting updated KYC information that omitted any U.S. nexus.

129. As Zhao explained in a June 9, 2019 weekly meeting of senior Binance officials:

> We don't want to lose all the VIPs which actually contribute to quite a large number of volume. So ideally we would help them facilitate registering companies or moving the trading volume offshore in some way—in a way that we can accept without them being labeled completely U.S. to us.

130. Binance implemented Zhao's instructions. On or about June 13, 2019, a Binance employee who belonged to a team that managed VIP customers messaged Zhao and other senior Binance officials, "We contacted 16 US top clients so far, some [of] them already have offshore entity, they said they can underst[and] and they are happy that we can get ahead of that." A few days later, Binance's Chief Marketing Officer reported that the team had reached out to the top 22 U.S. VIP customers and that 19 had "already agreed to change KYC, or change their IP."

131. With respect to its thousands of other VIP U.S. customers, Zhao explained in a June 24, 2019 meeting with other Binance senior officials:

> We do need to let users know that they can change their KYC on Binance.com and continue to use it. But the message, the message needs to be finessed very carefully because whatever we send will be public. We cannot be held accountable for it.

132. The following day, Zhao met with other senior Binance officials to discuss their

33

VIP U.S. customers, and Zhao provided further instructions on crafting the message to customers about changing IP addresses or KYC documentation. During the meeting, the Binance CCO noted that Binance would engage in "the international circumvention of KYC," and Zhao affirmed that his "goal" was "to reduce the losses to ourselves, and at the same time to make the U.S. regulatory authorities not trouble us."

133. To that end, the Binance CCO drafted a "VIP Handling" document, dated June 26, 2019, which included draft emails to send to VIP customers who were identified as having U.S. KYC documents or U.S. IP addresses, along with instructions to Binance employees about messaging to customers. For customers with U.S. KYC documents, the "VIP Handling" document instructed Binance employees to make sure the U.S. customers opened new accounts "with no US documents allowed" and to inform the customer "to keep this confidential."

134. For customers with U.S. IP addresses, the "VIP Handling" document instructed Binance employees to "[i]nform [the] user that the reason why he/she can't use our www.binance.com is because his/her IP is detected as US IP; if user doesn't get the hint, indicate that IP is the **sole** reason why he/she can't use .com." The document further instructed Binance employees not to "explicitly instruct user to use different IP. We cannot teach users how to circumvent controls. If they figure it out on their own, it[']s fine."

135. Binance continued to circumvent these controls for several years. On February 12, 2020, for example, a Binance employee asked the Binance CCO whether it was still a "hard requirement" for Binance to block U.S. customers, and the Binance CCO replied:

| | |
|---|---|
| Yes, it still is. Because if US users get on .com<br>We become subjected to the following US regulators, fincen ofac and SEC | 12/2/2020, 6:23 AM |
| But as best as we can | 12/2/2020, 6:24 AM |
| We try to ask our US users to use VPN | 12/2/2020, 6:24 AM |
| or ask them to provide (if there are an entity) non-US documents | 12/2/2020, 6:24 AM |
| On the surface we cannot be seen to have US users but in reality, we should get them through other creative means | 12/2/2020, 6:24 AM |

136. Similarly, on July 15, 2020, a Binance VIP customer team member asked the Binance CCO how they could onboard a large U.S. customer. The Binance CCO replied, "[T]he best way I can think of is to onboard with US exchange … but we let them trade on .com through a special arrangement." He further explained, "[W]e ask them to onboard with US, and then if their volume is really very big … we will push hard on .com side to accept it on an exceptional basis … we always have a way for whales … either we do it, or [a competitor crypto trading platform] does it." ("Whales" is a market term referring to large volume investors.)

137. The Binance CCO further admitted, "CZ will definitely agree to this lol … I have been briefed by top management to always find a way to support biz."

138. Moreover, despite statements about its compliance efforts, Binance did not even require all customers to submit KYC documents until after August 2021. Around that time, Binance had over 62 million worldwide customers, but only approximately 25 million had submitted KYC documentation. Thereafter, more Binance.com Platform customers began submitting KYC documentation, but Binance continued to have large numbers of customers that still had not done so at least through mid-2022.

139. Binance's plan to retain lucrative U.S. investors while pretending to restrict them

was a success. For example, a March 2020 internal Binance presentation reported that the Binance.com Platform still had approximately 159 U.S. VIP customers, representing almost 70 percent of all global VIP trading volume. Similarly, in May 2021—two years after the launch of the Binance.US Platform—an internal Binance presentation reported that U.S. VIP customers still accounted for over 63 percent of the Binance.com Platform's VIP customer trading volume.

140. U.S. customer trading volume on the Binance.com Platform included substantial activity trading in crypto asset securities. For example, between January 2019 and September 2021, over 47,000 U.S. investors traded in BNB on the Binance.com Platform.

## IV. ZHAO AND BINANCE ESTABLISHED THE BINANCE.US PLATFORM WHILE MAINTAINING SUBSTANTIAL INVOLVEMENT AND CONTROL OF ITS OPERATIONS.

141. In 2019, while continuing their efforts to covertly maintain U.S. VIP customers on the Binance.com Platform, Zhao and Binance also began implementing plans to launch a new crypto asset platform in the United States consistent with the Tai Chi Plan.

142. In March 2019, Binance's Chief Financial Officer ("Binance CFO") reaffirmed to Zhao that the "first goal" was "to protect [Binance].com from U.S. regulatory engagement." To do so, he noted that Binance "will need to launch" a new U.S. crypto asset platform, and that "the main goal for that one is to limit the loss of users from the U.S."

### A. Zhao and Binance Created U.S. Entities BAM Management and BAM Trading and Developed the Binance.US Platform.

143. In February 2019, Zhao and Binance directed the creation of two U.S. corporate entities that would launch the Binance.US Platform: BAM Management and BAM Trading.

144. Since inception, Zhao has been BAM Management's beneficial owner, directly or indirectly owning between as much as 100 percent and approximately 81 percent of its equity.

145. BAM Trading is a wholly-owned subsidiary of BAM Management. BAM

36

Trading is the public facing entity that operates the Binance.US Platform.  As further set forth below, BAM Trading operates the Binance.US Platform as part of a group of persons with Binance, which plays a significant and integral role in the operation of the platform.

146.    In June 2019, Zhao provided $500,000 in initial funding for the Binance.US Platform, and later he periodically injected additional funds, including through his entity Merit Peak.  As of July 2020, Zhao had contributed over $16 million to finance the Binance.US Platform's operations, money that was critical for the Binance.US Platform's ongoing expenses.

147.    At its inception, Zhao controlled BAM Trading's business, which was largely operated by Binance employees under Zhao's direction.

148.    At Zhao's direction, the Binance Consultant was hired to provide advice on "regulatory compliance" for the platform.  The Binance Consultant had substantial involvement in the development and operation of the Binance.US Platform until at least the fall of 2019, primarily assisting in implementing the Tai Chi Plan he had proposed to Zhao.

149.    Zhao, the Binance Consultant, and numerous Binance personnel working at Zhao's direction developed and planned the launch of the Binance.US Platform.  They designed and implemented all aspects of platform operations, including managing customer access, arranging fiat services with U.S. banks, establishing crypto asset wallets, developing a trading engine, and developing the platform's trade clearing and settlement functions.

150.    Zhao was also involved in the hiring of BAM Trading's first Chief Executive Officer ("BAM CEO A"), who began her tenure in June 2019.  At all times prior to her tenure with BAM Trading, which ended in or around March 2021, BAM CEO A reported to and was directed by Zhao and the Binance CFO.  During this period, Zhao, BAM CEO A, and the Binance CFO constituted BAM Trading's Board of Directors.

37

B. **Binance Announced the Launch of the Binance.US Platform.**

151.    On June 13, 2019, Binance issued a press release announcing that BAM Trading would soon be launching the Binance.US Platform.  Binance claimed that it had entered into a "partnership with BAM Trading … to launch trading services for users in the United States" by "licens[ing] its cutting-edge matching engine and wallet technologies to its U.S. partner BAM to launch Binance.US."

152.    Zhao was quoted in the press release, stating that "Binance.US will be led by our local partner BAM and will serve the U.S. market in full regulatory compliance."

153.    Consistent with the Tai Chi Plan, Binance's press release coincided with updates to the Binance.com Platform's Terms of Use that purported to prohibit U.S. investors.  But Binance was careful not to make the link explicit.  The same day the Binance.US Platform was announced, the Binance Consultant provided Binance internal guidelines advising that "[o]n the US launch, it is important to NOT link it to the .COM IP blocking [of U.S. investors].  That would suggest both that Binance is aware of previous violation and that BAM and .COM are alter egos of each other coordinating the work."

C. **Zhao and Binance Exerted Substantial Control Over and Were Integral Participants in the Operations of the Binance.US Platform and BAM Trading.**

154.    Binance's "partnership" with BAM Trading went beyond technology licensing.  For example, during her tenure, BAM CEO A took direction from Zhao and Binance, and she referred to Binance as the "mothership."  BAM CEO A and other BAM Trading employees also provided weekly updates to Zhao and Binance concerning BAM Trading's operations.

155.    By July 2019, the Binance Consultant had crafted four purported "service-level agreements" between Binance and BAM Trading that governed their affiliation in operating the

Binance.US Platform: a Master Services Agreement, a Wallet Custody Agreement, a Software License Agreement, and a Trademark Agreement (collectively, the "SLAs").

156.    But Zhao's and Binance's involvement in BAM Trading and the operation of the Binance.US Platform extended well beyond the SLAs.  Consistent with the Tai Chi Plan, Zhao and Binance established a U.S. platform they controlled and that they would portray as "regulatory compliant" to divert regulatory attention away from Binance itself.  Indeed, while Zhao and Binance were integrally involved in the operation of the Binance.US Platform from its inception, Zhao did not even execute the SLAs on Binance's behalf until January 2020.

       i.       *Zhao and Binance Directed and Were Integrally Involved in the Operation of the Binance.US Platform's Trading Services.*

157.    Binance—under Zhao's control—was integrally involved in managing and operating the trading functions on the Binance.US Platform.  As BAM Trading's former Director of Operations testified under oath, Binance personnel were responsible for the Binance.US Platform's matching engine, APIs, and market data systems.  These Binance personnel "operated independently of" BAM Trading, such that BAM Trading only "would talk to [Binance personnel] when we [were] adding a new token [for trading on the Binance.US Platform] or when there was an upgrade or if a market maker had some issue with the API."  Zhao gave final signoff on various decisions relating to the Binance.US Platform's trading services, including customer account opening processes, development of the front-end access, and creating a reserve to cover ACH deposits.

158.    At least for a significant period of time after Binance.US launched, Binance held and controlled BAM Trading data offshore, and, at least through much of 2021, BAM Trading employees could not obtain certain real-time trading data for the Binance.US Platform without Zhao's personal approval.

159.     As BAM CEO A testified, there was "significant opacity" with respect to the Binance.US Platform's trading data, and she "did not get answers from CZ on why or how or what we would need to do to be able to bring the data over" to the United States.  She "wanted custody of the data and ability to interact with the raw data in real-time, as to my directions, not waiting on someone else's approvals," but she never received it.

160.     Nor did the situation change when BAM CEO A's successor ("BAM CEO B") assumed the role in May 2021.  BAM CEO B testified to SEC staff that the "level of … connection" between Binance and BAM Trading was a "problem" and that he had concluded that BAM Trading "need[ed] to migrate the technology to full [BAM Trading] control."  That transfer of control had not happened at least as of BAM CEO B's resignation in August 2021.

> ii.     *Zhao and Binance Directed Selection of Crypto Assets for Trading on the Binance.US Platform.*

161.     Zhao directed which investment opportunities BAM Trading offered on the Binance.US Platform.  For example, in September 2019, Zhao directed that the Binance.US Platform offer BNB for purchase and sale.  Zhao and Binance knew that offering BNB on the Binance.US Platform created a significant risk that the SEC would take legal action against them, but they decided that the profit opportunity outweighed the risk.

162.     In an internal chat in September 2019, the Binance CFO and the Binance CCO agreed that "CZ [wa]s willing to take the legal risk in listing BNB, if [they could] find a way to quantify it."  They further quantified the legal risk of listing BNB on the Binance.US Platform as "$10 mm in legal fees and settlements," contrasted to the fact that BNB's price could "go up 20%."  And, referring to the SEC's June 2019 enforcement action in *SEC v. Kik Interactive* for the unregistered offer and sale of crypto assets as investment contracts under *Howey*, they noted that if a "Kik wells notice happens to BNB, BNB price can go down significantly."  The two also

discussed that they would "start prepping everything" for a subpoena and Wells notice, including a "War chest."

163. The Binance CFO then asked, "worst case scenario analysis for CZ? If he is ok with it and we are prepared to deal with it, then why not." The Binance CCO replied, "This is the best approach, have him put rainy day analysis and have boss decide, though we are quite certain, he will push forward … Cutting US from .com already costed him an arm/leg, he's not gonna hold back on getting that rev[enue] back somehow."

164. Before the launch of the Binance.US Platform, BAM CEO A advised against offering BNB on the Binance.US Platform, but Zhao ultimately overruled her. As the Binance CCO later described, Zhao "brought [BAM CEO A] to the room to strongarm a [BNB] listing." Pursuant to Zhao's direction, BAM Trading offered BNB for offer and sale on the Binance.US Platform starting in September 2019.

        *iii.*    *Zhao and Binance Have Controlled BAM Trading's Bank Accounts and Finances.*

165. Until at least December 2020, BAM Trading personnel did not have any ability to control BAM Trading's bank accounts, including accounts through which funds deposited by customers with the Binance.US Platform were held and transferred.

166. Instead, when BAM Trading opened bank accounts, Binance required that Zhao and/or the Binance Back Office Manager have signatory authority over the accounts. In November 2019, BAM CEO A raised questions about this directive with the Binance CFO, noting that having a "non-US resident non-employee on the bank applications … will be a red flag for regulators and will open .com to US scrutiny," while also acknowledging "there is not that much separation internally" between Binance and BAM Trading.

167. Instead of giving BAM Trading personnel authority over BAM Trading's bank

accounts, Binance required BAM CEO A to come up with an alternative to allow Binance to maintain authority over the bank accounts without eliciting regulatory scrutiny.

168.    In response, BAM CEO A proposed that "[w]e really only need [BAM Trading's Finance Director] on client account as that's the only account regulators will be looking at."

169.    As a result, until at least December 2020, the Binance Back Office Manager continued to be a signatory on BAM Trading's bank accounts.  And until at least July 2021, she was also a signatory on BAM Trading Trust Company B accounts that contained Binance.US Platform customers' fiat deposits.

170.    Zhao also controlled BAM Trading's routine business expenditures and decisions. At least through January 30, 2020, Zhao's approval was required for all BAM Trading expenditures exceeding $30,000.  BAM Trading regularly sought approval from Zhao and Binance concerning routine business expenditures including rent, franchise taxes, legal expenses, Amazon Web Services ("AWS") fees to host Binance.US Platform customer data, and even an $11,000 purchase of Binance-branded hooded sweatshirts.

171.    Binance's Shanghai-based finance team managed payment of BAM Trading's expenses, including by executing money transfers between bank accounts and depositing cash injections from Merit Peak when BAM Trading operating funds were low.

172.    Given its control over BAM Trading's bank accounts, Binance's finance team was also able to make substantial fund transfers without BAM Trading's knowledge.  For example, in June 2020, when Trust Company B alerted BAM CEO A that BAM Trading's internal transfers had increased from approximately $10 million per day to $1.5 billion per day, BAM CEO A had no knowledge of such transfers, was unable to verify them because she lacked appropriate account access, and, as a result, had to ask Binance (a purportedly separate and

distinct company) about the transfer of billions of dollars in BAM Trading's own accounts.

173.    Similarly, in December 2020, Binance transferred $17 million from BAM Trading's bank accounts to Merit Peak.  After learning of the transfer, BAM CEO A asked Binance employees about the transaction and eventually learned that the transfer related to Merit Peak's trading on the Binance.US Platform.  BAM CEO A responded, "thanks – helpful.  Just had to get explanation anytime someone breaking our limits with massive withdraw[als] I have to ask – where you get that kind of money?  And where is it going? . . . haha [I'm] on a wild goose chase to make sure we have knowledge of where $17M is moving around."

174.    Starting in or about December 2020, Binance permitted BAM Trading personnel to assume control over certain of BAM Trading's bank accounts, but as of May 2023, Zhao still had signatory authority over BAM Trading's account that held Binance.US Platform customers' funds.

> iv.    *Zhao and Binance Controlled Binance.US Platform Customers' Funds and Crypto Assets Deposited, Held, Traded, and/or Accrued on the Platform.*

175.    In addition to controlling BAM Trading bank accounts that held customer funds, at least through December 2022, Binance was the designated custodian for crypto assets deposited, held, traded, and/or accrued on the Binance.US Platform, as expressly recognized in the SLAs.  Internal communications indicate that BAM Trading and Binance understood that ".com is the custodian .us uses" and "CZ control[s] the wallet."  Binance had sufficient control to manage and authorize the transfer of crypto assets, including between various omnibus wallets, without the need for any authorization from BAM Trading.  During this time, BAM Trading employees had little or no oversight of, or insight into, Binance's custody and control of these crypto assets, and almost all the employees working on clearing and settlement for spot trading

on the Binance.US Platform were Binance employees located outside of the United States, primarily in Shanghai.

176.     At least as of the beginning of June 2023, these crypto assets are not all within the exclusive custody and control of BAM Trading personnel within the United States.

177.     This custody arrangement and lack of controls pose substantial risk to U.S. customers.  Binance.US Platform customers have no agreement with either BAM Trading or Binance relating to the custody of crypto assets that they deposit and store through the Binance.US Platform.  Customers are provided little, if any, information about the digital wallets where these crypto assets are held or about how their crypto assets are stored, secured, and transferred.  Indeed, BAM Trading and Binance have not disclosed Binance's responsibilities and ongoing involvement in the custody and control of these crypto assets or their participation in the Binance.US Platform's staking-as-a-service program and custody and control of crypto assets that are staked or accrued as part of that investment program.

178.     This arrangement has given and continues to give Zhao and Binance free reign to handle billions of dollars of crypto assets that customers have deposited, held, traded, and/or accrued on the Binance.US Platform with no oversight or controls to ensure that the assets are properly secured.

179.     BAM Trading, Binance, and Zhao were well aware that Binance's custody and control over fiat and crypto assets deposited, held, traded, and/or accrued on the Binance.US Platform created significant risks for Binance.US Platform investors.  Indeed, in a May 2, 2020 letter to BAM Management's board, the firm that audited BAM Trading's financial statements ("Audit Firm") identified for the company numerous internal control deficiencies, including the following:

44

a. As to the "Safeguarding of Assets," the Audit Firm "observed that [an employee] from Binance.com is the approver on [BAM Trading's] bank account" and recommended "handing over this power to someone … at Binance.US."

b. As to "Digital Assets," the Audit Firm found several deficiencies relating to Binance's failure to provide information concerning its custody of crypto assets deposited and traded on the Binance.US Platform, including that it "was difficult and sometimes not possible to pull wallet balances en masse as of a historical point in time. This makes it very difficult to ensure the Company is full[y] collateralized at specific points in time." It recommended that BAM Trading work with Binance "to provide the daily reconciliation and historical reporting functionality necessary for audit and operational purposes," and "instituting a formal process to track crypto units held for each" crypto asset.

c. The Audit Firm found "a lack of documented controls and overall transparency at the custodian [Binance]. Binance.us may not be aware of financial or operational risks that exist related to the custodian." It recommended that the company document its controls to ensure that Binance's processes "are functioning as intended and are reliable for operational and financial reporting purposes."

180. The following year, the Audit Firm continued to identify significant weakness in controls with respect to custody of digital assets. On May 20, 2022—in its third letter identifying weakness for the company—the Audit Firm found that BAM Trading did "not have much visibility into on-chain activity related to it[]s exchange. The Company is dependent on the .COM custodian to tell them the addresses holding the assets, or other relevant metrics." Similarly, the Audit Firm concluded that it "was difficult and sometimes not possible to pull wallet balances en masse as of a historical point in time. ***This makes it very difficult to ensure the Company is fully collateralized at specific points in time***." (Emphasis added.)

181. That Audit Firm did not continue its engagement after November 2022. BAM's new auditor stated in BAM Trading's audited financials for the year ending December 31, 2022 that Binance remained the custodian of all of BAM Trading's crypto assets, including crypto assets deposited, held, traded, and/or accrued by customers, until at least December 2022, when BAM Trading terminated the Wallet Custody Agreement. Even after that time, and as of at least

June 3, 2023, Binance continues to participate in the custody and control of Binance.US Platform's digital wallets and these crypto assets through the various services it provides to the Binance.US Platform and its possession, custody, and control of private keys or portions thereof (sometimes referred to as "key shards") associated with the security access protocols that govern the digital wallets holding certain of these crypto assets, the authorization for transfers, and operations as part of the staking-as-a-service program.

182.    BAM Trading did not even implement a formal policy concerning its crypto assets custody and operations until May 15, 2023.

183.    As of the end of 2022, BAM Trading was responsible for over $1.77 billion of Binance.US Platform customers' crypto assets.

> *v.    Zhao and Binance Directed BAM Trading to Engage Zhao-Controlled Market Makers on the Binance.US Platform.*

184.    To create and maintain liquidity on the Binance.US Platform, BAM Trading recruited market making firms and other institutions, often offering low fees as incentives. Zhao and Binance were intimately involved in these efforts, which placed Zhao's financial interests at odds with those of the customers trading on the platform he controlled.

185.    From the earliest days of the Binance.US Platform, Zhao directed BAM Trading to onboard two market makers that he owned and controlled: Sigma Chain and Merit Peak. Both entities were operated by several Binance employees who worked at Zhao's direction, including the Binance Back Office Manager, who, at least until December 2020, also had signatory authority over BAM Trading's U.S. Dollar accounts.

186.    BAM Trading's relationships with Sigma Chain and Merit Peak aligned with the Tai Chi Plan strategy to rely upon "trusted" market makers for the U.S.-based crypto platform. As Zhao characterized it, Sigma Chain needed to be a market maker on the Binance.US platform

because it was Binance's "own" market maker, compared to those an "arm['s] length away."

187.    Merit Peak and Sigma Chain were active traders on the Binance.US Platform. Merit Peak traded on it at least from November 15, 2019 to June 10, 2021.  Until at least April 2022, Sigma Chain was a frequent spot trader on the Binance.US Platform, and it also continues to serve as a counterparty for certain OTC trading, and the Convert and OCBS services on the Binance.US Platform.

188.    Sigma Chain's and Merit Peak's activity on the Binance.US Platform, and their undisclosed relationship with Zhao and Binance, have involved and continue to present conflicts between Zhao's financial interests and those of Binance.US Platform's customers.

189.    Indeed, BAM CEO B expressed concerns to Zhao about Merit Peak's and Sigma Chain's activity on the Binance.US Platform.  As he testified under oath, "To the extent that these two liquidity providers were significant sources of liquidity, meaning that our customers couldn't, you know, clear orders without the presence of those makers on our platform, I thought that was a real problem.  It suggested that the company was, in fact, heavily dependent on CZ, not just as a control person but also as an economic counterparty and that is problematic, so I thought we needed to look into deplatforming them."

190.    BAM CEO B's concerns were well founded.  Merit Peak and Sigma Chain accounts were used in the transfer of tens of billions of U.S. dollars involving BAM Trading, Binance, and related entities.  For example, by 2021, at least $145 million was transferred from BAM Trading to a Sigma Chain account, and another $45 million of funds were transferred from BAM Trading's Trust Company B account to the Sigma Chain account.  From this account, Sigma Chain spent $11 million to purchase a yacht.

191.    Further, since the launch of the Binance.US Platform, Merit Peak's U.S. bank

account received, as a "pass through" account, over $20 billion that included customer funds from both Binance Platforms. Merit Peak then transferred the vast majority of those funds to Trust Company A, in transfers that appear to relate to the purchase of BUSD. As Merit Peak was a purportedly independent entity, sending Binance customer funds to Merit Peak placed those funds at risk, including of loss or theft, and was done without notice to customers.

192.    In addition, Zhao's control over both BAM Trading and Sigma Chain has enabled Sigma Chain to conduct the manipulative trading on the Binance.US Platform described below.

**D.    Zhao Rejected BAM CEO A's and BAM CEO B's Efforts to Give BAM Trading "Independence" from Zhao and Binance.**

193.    Over time, BAM Trading's employees became increasingly dissatisfied with BAM Trading's and the Binance.US Platform's lack of independence and Zhao's and Binance's exertion of substantial oversight and control over the company's day-to-day operations.

194.    In January 2020, BAM Trading employees started compiling a list of "shackles," *i.e.*, functions "that require [Binance personnel's] answers, access, approval, funding," which demonstrated BAM Trading's lack of independence and knowledge as to the platform's operations. They noted, for example, BAM Trading's compliance team experiencing a "lack of respect and transparency between Asia/US teams"; the fact that BAM Trading was "not allow[ed] to expand US Financial Team domestically"; and BAM Trading's legal department needing a "[b]etter understanding" of BAM Trading's "internal controls/IT infrastructure."

195.    BAM CEO A later reported to the Binance CFO that her "entire team is at their breaking point." The Binance CFO later remarked that "getting our independence takes time."

196.    In the ensuing months, BAM CEO A worked with her team to propose a plan for BAM Trading to take control of more of its operations. In October 2020, she asked BAM Trading employees to diagram their job functions that required "global touchpoints," meaning

"where we rely on .com in our processes." In response to the information she received, BAM CEO A remarked, "[Y]ou guys have a lot of .com gatekeepers now that I look at it." Another BAM Trading employee responded, "LOL … Getting control over any of these (fees, or subaccounts or API limits) is an instant win."

197. BAM CEO A dubbed this effort "Project 1776." As she told another BAM Trading employee in October 2020, "Project 1776 is for our independence."

198. On October 29, 2020, while BAM CEO A was working on Project 1776, a major news media company released an article reporting on Binance's Tai Chi Plan, which the article described as Binance's plan "to intentionally deceive regulators and surreptitiously profit from crypto investors in the United States."

199. The article intensified BAM Trading employees' concerns with Zhao's and Binance's control over the business—demonstrating that this significant level of secret control remained. As BAM CEO A explained to the Binance CFO shortly after the article was released, BAM Trading employees "lost a lot of trust with the article" and "the entire team feels like they've been duped into being a puppet."

200. Binance, however, continued to resist efforts for independence. For example, on December 3, 2020, BAM CEO A reported to the Binance CFO that BAM Trading's "[b]attle for the day" was for Binance's clearing personnel to "inform[] us on their day-to-day and access," but that the Binance Back Office Manager and another Binance employee "were unwilling to share their screens at all, they were like yeah you don't need to know what we do day to day."

201. As another example, on or around March 2021, Zhao decided to replace BAM CEO A with BAM CEO B, who formally assumed his position by May 2021.

202. When hired, BAM CEO B was aware of concerns about the relationship between

Binance and BAM Trading and conditioned acceptance of the role on being able to run BAM Trading independently of Zhao and Binance. Believing that he could accomplish this goal, BAM CEO B made several public statements that BAM Trading was "not an alter-ego of Binance."

203. Upon assuming his CEO duties, however, BAM CEO B quickly learned that Binance, in fact, exerted and would not relinquish substantial control over BAM Trading and the operation of the Binance.US Platform. As he testified under oath, BAM CEO B did not "have any firsthand knowledge of exactly what [Binance] entity managed [Binance.US Platform's] servers," but he knew it "wasn't [BAM Trading]." Similarly, he also testified that the matching engine was "presumably owned and administered by some [Binance] entity, but I have no idea which one, and then there's other servers doing other functions." He concluded, the "biggest risk in this company is we are highly dependent on a bunch of technology that sits in Asia."

204. BAM CEO B tried to implement plans to migrate those functions and control of the crypto assets from Binance to BAM Trading and into the United States, but Zhao quickly overruled him, causing BAM CEO B to resign approximately three months into his tenure.

205. As BAM CEO B testified, "[W]hat became clear to me at a certain point was CZ was the CEO of BAM Trading, not me." He further explained that he spent his first 80 days as CEO trying "to get these core foundational things realigned," but "was overruled on all of them" by Zhao. BAM CEO B elaborated, "All of the things that we had previously agreed and had worked on for 80 days were suddenly repudiated with no further discussion, and on that day, I realized, huh, I'm not actually the one running this company, and the mission that I believe I signed up for isn't the mission. And as soon as I realized that, I left."

206. During this period, and consistent with the Tai Chi Plan, Zhao and Binance publicly denied that they controlled BAM Trading. In a September 23, 2019 public interview,

for example, Zhao stated, "Binance licenses its technology to Binance.US, while the business itself and local operations are managed by BAM Trading Services and [its] CEO."

207.    These and other statements were contrary to how BAM Trading and the Binance.US Platform actually operated.

208.    Rather, Binance's intent was clear.  As Binance's CCO admitted in October 2020,

> Because we do not want .com to be regulated ever, we created local entities to be registered with the regulators, and ringfence accordingly. So BAM, BAS etc. these are entities that are regulated/licensed.

## V.    UNDER ZHAO'S CONTROL, BAM TRADING AND BINANCE PROVIDE EXCHANGE AND CLEARING AGENCY FUNCTIONS TO U.S. CUSTOMERS, AND BAM TRADING ALSO PROVIDES BROKERAGE SERVICES TO U.S. CUSTOMERS.

209.    The Binance.US Platform officially launched on September 24, 2019.  Since that time, it has offered U.S. retail and institutional investors the opportunity to buy, sell, and transfer approximately 150 crypto assets, including crypto asset securities such as BNB.

210.    Today, the Binance.US Platform is available in 46 U.S. states, this District, and 8 U.S. territories.  It is one of the top five crypto asset trading platforms in the United States by daily trading volume.  As of April 1, 2023, the Binance.US Platform made available approximately 150 crypto assets for purchase or sale, and its average 24-hour trading volume was valued at over $282 million.

211.    In operating the Binance.US Platform, without registering in any capacity, BAM Trading and Binance, as a group of persons, function as an exchange, and they each also function as a clearing agency.  BAM Trading also functions as a broker.

### A.    BAM Trading and Binance, Under Zhao's Control, Solicit Investors.

212.    To solicit investors to open accounts and trade crypto asset securities on the Binance.US Platform, BAM Trading actively markets its various services in the United States,

including through its website, blog, and various social media platforms.

213.    BAM Trading publicizes when the Binance.US Platform is newly available to customers in a different U.S. state or territory.  It also markets new and available products and services, such as the OTC Desk, Convert Trading, and OCBS Services described below, including through content on its blog and "how-to" tutorials on accessing and using features of the Binance.US Platform.

214.    BAM Trading also consistently touts certain metrics of the Binance.US Platform, such as daily trading volumes and each crypto asset and trading pair available for spot trading.

215.    BAM Trading also offers investor incentives and promotions, such as new user sign-up bonuses, zero (or low) trading fees for certain crypto assets, and trading fee discounts.

216.    BAM Trading's solicitation of customers has occurred at Zhao's direction.  In addition, Zhao has regularly marketed the Binance.US Platform services and the crypto asset securities available for trading on the Binance.US Platform.  For example, through his Twitter account, Zhao has promoted the launch of new products offered on the Binance.US Platform or when the platform begins offering services to investors in a new U.S. state or territory.

217.    Binance, under Zhao's direction, has also marketed and solicited customers for the Binance.US Platform, particularly when the Binance.com Platform purported to prohibit U.S. investors after September 2019.  For example, Binance.com's blog promoted the Binance.US Platform and its news and developments, referring to the Binance.US Platform on at least one occasion as "***our*** fiat-to-crypto exchange Binance.US" (emphasis added).  In addition, if a U.S. customer tries to access the Binance.com Platform, a pop-up window appears, stating in relevant part, "If you are in the United States or select U.S. territories, Binance.us is a U.S. regulated platform where you can buy, trade, convert, and stake crypto with low fees."  The pop-up

window provides a button that allows a customer to access the Binance.US Platform directly.

**B.   BAM Trading and Binance Together, Under Zhao's Control, Maintain and Provide a Marketplace and Facilities for Trading Crypto Asset Securities.**

218.   Since the Binance.US Platform launched in September 2019, BAM Trading and Binance, both under Zhao's control, have operated the platform's exchange functions.

219.   BAM Trading has functioned as the legal owner and public face of the Binance.US Platform.  The Binance.US Platform has throughout its existence operated using Binance's matching engine software, digital wallet, clearing and settlement technology, trademarks, and related technology support and hosting environment, all of which were created, deployed, and maintained by Binance engineers and other employees at Zhao's direction and input.  Under the Software License Agreement, Binance Holdings is responsible for providing and maintaining software modules for a "[d]igital currency exchange platform," "[m]atching engine," "[d]igital currency wallet services," and frontend user applications such as the website and mobile applications, among other modules—all for the purpose of "operat[ing] a digital currency trading platform for the U.S. market," namely, the Binance.US Platform.

220.   At the time of the platform's launch, Binance personnel were primarily responsible for managing the trading functions, while BAM Trading performed certain backend system operations for Binance.US Platform customer services.  As reflected in the Master Services Agreement, Binance is responsible for maintaining, supporting, developing, and implementing additional features and upgrades to the Binance.US Platform, including the platform's crypto asset trading services and features.

221.   Binance also created the Binance.US website, a mobile phone application, and an API, all so the Binance.US Platform's interfaces resemble the Binance.com Platform's interfaces, including the displayed order book that displays available trading pairs and, for each

pair, the current top bids and offers (prioritized by price and time), various categories of pricing information, and 24-hour trading volume.

222.     Over time, Binance has transitioned certain of its responsibilities and functions to BAM Trading personnel (sometimes by converting Binance employees into BAM Trading employees), thereby increasing BAM Trading's responsibilities, and BAM Trading and Binance personnel have continued to work together to provide and maintain the Binance.US Platform's exchange functions.

> i.     *Order Matching and Trading Rules of the Binance.US Platform*

223.     To effect spot trading on the Binance.US Platform, BAM Trading licenses Binance's proprietary software, including its matching engine technology, which Binance adapted for the Binance.US Platform.  The Binance.US Platform's website, API, and mobile apps allow customers to enter orders, view account information, and otherwise access the platform's trading services and other functions.

224.     Customers can enter different order types on the Binance.US Platform.  Its matching engine, like the one for the Binance.com Platform, automatically matches and fills orders, executing trades using programmed, non-discretionary price-time priority rules. According to these rules, unless otherwise specified by a customer, an order that is posted to the order book at a different price than all other existing orders on the book rests on the order book until the customer cancels it, or future orders match with it.

> ii.     *The Binance.US Platform's OTC Desk, OCBS, and Convert Services*

225.     In addition to spot trading, BAM Trading offers customers the ability to purchase and sell crypto assets, including crypto asset securities, through additional Binance.US Platform services described as the "OTC Desk," "OCBS," and "Convert" trading services.

226.     Since in or around May 2020, the Binance.US Platform has maintained an OTC Desk that allows customers, primarily institutional traders, to execute generally large volume trades for crypto asset and fiat pairs.  In 2021, the OTC Desk had over $654 million in trades. Through the Binance.US Platform's OTC Desk, BAM Trading serves as the interface between a customer and a counterparty firm and provides requested quotes to the customer, which the customer can accept through the Binance.US Platform.  If the customer accepts the trade, the customer's account balance is updated with either the withdrawal or deposit.  Except for orders over a certain size, the process for executing trades through the OTC Desk is automated.

227.     From May 2020 to February 2022, Alameda Research, the trading firm associated with FTX founder Sam Bankman-Fried, was often the OTC Desk's only counterparty vis-à-vis BAM Trading customers.  From at least February 2022, Sigma Chain served as a counterparty.

228.     In addition, BAM Trading offers "OCBS" and "Convert" services on the Binance.US Platform.  The OCBS service permits customers to exchange U.S. dollars for crypto assets (effecting over $6.1 billion in trades in 2021), and the Convert service permits the exchange of one crypto asset for another of over 130 crypto assets.  The Binance.US Platform serves as the interface through which customers make trading requests and are provided quotes, and through which the purchases or sales are executed.  BAM Trading's marketing touts these services as a means "to avoid slippage, simplify [the] trading experience, or make one less trade."

229.     Sigma Chain has been the sole counterparty for the OCBS and Convert services since they were first offered in early 2020 and April 2021, respectively.

**C.     BAM Trading and Binance, Under Zhao's Control, Hold and Control Customers' Funds and Crypto Assets.**

230.     To trade on the Binance.US Platform, a user must create a Binance.US account.

55

BAM Trading takes steps to verify that the users meet certain terms and conditions to access the Binance.US Platform, such those related to KYC review and other eligibility criteria.

231.    Customers must deposit and maintain sufficient crypto assets or U.S. dollars to cover their orders when placed.

232.    To transact in fiat currency, generally customers first establish and deposit funds into an account with Trust Company B, a U.S.-based trust company, which is linked by APIs to the Binance.US Platform.  The Binance.US Platform allows for deposits and withdrawals in U.S. dollars via bank transfer (ACH), debit card (deposits only), Apple Pay (debit card only), or wire transfer.  Each customer enters into an agreement with Trust Company B for custodial and money transmission services, which authorizes BAM Trading to debit and credit the account directly to settle the fiat leg of any trades involving fiat, pay fees, and process withdrawals.

233.    BAM Trading manages customer onboarding and account maintenance for the cash accounts held at Trust Company B, including the deposit and withdrawal of funds deposited for use on the Binance.US Platform.  According to the trading rules that govern the Binance.US Platform, BAM Trading "settles the FIAT Currency payments in all Filled Orders on a periodic basis by debiting and crediting the relevant Fiat Currency balances" in accounts at Trust Company B, serving "as a facilitator … by sending deposit, withdrawal, and transfer instructions on behalf of [the customer] in connection with [the customer's] trading activities."

234.    Binance has also cleared and settled trades on the Binance.US Platform.  Until at least July 2021, the Binance Back Office Manager had signatory authority over the Trust Company B account holding the fiat deposits of the platform's customers.  Binance has worked with BAM Trading employees to settle user transactions on the Binance.US Platform involving U.S. dollars.

235.    To deposit crypto assets, customers transfer crypto assets to a digital wallet created through Binance software.  The crypto assets are then held in omnibus wallets.  Binance, with BAM Trading, has facilitated settlement of purchases, sales, and transfers of crypto assets, including crypto asset securities, on the Binance.US Platform by entering debits and credits on an internal accounting ledger utilizing software provided to the Binance.US Platform and maintained by Binance.  Customers can initiate a withdrawal by entering a request on the Binance.US Platform to process and approve the transfer of assets to a blockchain address specified by the customer and paying a withdrawal fee.

236.    At least through December 2022, Binance provided the digital wallets associated with the Binance.US Platform and held and controlled the crypto assets deposited, held, traded, and/or accrued on the Binance.US Platform.  BAM Trading's role with respect to clearing and settlement was limited to operating Binance-provided software to facilitate clearing and settlement of fiat and crypto asset transactions.  Over time, BAM Trading has obtained more control over these clearing and settlement functions.  Still, to this day, the AWS that host the software for the BAM Trading customers' crypto assets are associated with Binance, and, as described above, at least as of June 3, 2023, Binance continues to be involved in the custody and control of Binance.US Platform digital wallets and crypto assets therein.

### D.    BAM Trading Receives Compensation.

237.    BAM Trading charges Binance.US Platform customers transaction fees for trades on the platform, at a rate of approximately 0.1 percent per transaction.  These transaction fees are BAM Trading's primary revenue source.  For the OTC Desk, OCBS, and Convert services, BAM Trading receives as compensation a portion of the spread between the bid and ask quotations from the executed trade.  It also receives revenue from other sources, including

referral fees and interest payments on fiat currency deposits.

238.    In 2021 alone, BAM Trading generated over $265 million in revenue, primarily stemming from transaction fees.

## VI.    BAM TRADING AND BAM MANAGEMENT ENGAGED IN ACTS AND PRACTICES THAT OPERATED AS A FRAUD AND DECEIT UPON, AND MADE FALSE AND MISLEADING STATEMENTS TO, INVESTORS.

239.    Since the launch of the Binance.US Platform, BAM Trading and BAM Management, in the offer and sales of securities, obtained money and property by making untrue statements of material fact and omitting facts that rendered statements materially misleading, and engaged in acts and practices that operated as a fraud or deceit upon Binance.US customers (including retail and institutional investors in the crypto asset securities available for trading on the Binance.US Platform) and upon equity investors in BAM Management, concerning the extent to which BAM Trading and BAM Management had implemented controls to prevent manipulative trading on the Binance.US Platform.

240.    One form of manipulative trading is called "wash trading."  In a wash trading scheme, a trader buys and sells the same asset between or among his or her own accounts in transactions lacking economic purpose.  Wash trading is not arm's length market activity and is not the result of market forces of supply and demand.  Wash trading gives the artificial appearance of, among other things, increased trading volume, liquidity, and trading interest for the asset at issue.  It may also artificially inflate the aggregate trading volume of the platform upon which the asset is being traded.

241.    By the time Zhao and Binance created the Binance.US Platform, they understood the importance to investors in crypto assets transacting on crypto asset trading platforms of the platforms' monitoring for and preventing manipulative trading (including wash trading),

especially given the largely regulatory non-compliant nature of crypto asset trading platforms, the risks of manipulative conduct on such platforms, and the perceived importance of presenting accurate information to the public.

242. As Zhao confirmed in April 2019 when commenting on a ranking of crypto asset platforms by trading volume: "CREDIBILITY is the most important asset for any exchange! If an exchange fakes their volumes, would you trust them with your funds?"

243. But BAM Trading and BAM Management failed to implement controls to prevent manipulative trading on the Binance.US Platform that it falsely claimed to investors to have implemented, resulting in the exact "fake volumes" that Zhao decried in April 2019.

### A. BAM Trading and BAM Management Touted Their Prohibition of Manipulative Trading on the Binance.US Platform to Investors.

244. Since the Binance.US platform launched in September 2019, customers, including retail investors, have had to agree that they have read and accept the platform's "Terms of Use." The Terms of Use in turn require customers to review the BAM Platform "Trading Rules" before they can trade on the Binance.US platform, and since 2019, BAM Trading has publicly posted the "BAM Platform Trading Rules" on the Binance.US website.

245. These Trading Rules include a section entitled, "False Trading and Market Manipulation Prohibited," which provides that "[t]raders are prohibited from engaging in Market Manipulation" and defines "Market Manipulation" as "any action taken or procured to be taken, or any course of conduct … which is intended to, or does, or is likely to, create a false or misleading appearance of active trading in any Digital Asset on the BAM Platform; or artificially control or manipulate the price or trading volume of a Digital Asset."

246. From the inception of the Binance.US Platform, BAM Trading and BAM Management in other ways publicly touted their supposed efforts to monitor and prevent

manipulative trading.  For example, during a public CoinDesk webinar in November 2019, BAM CEO A was asked how the Binance.US Platform spot market was monitored and how manipulative activity was excluded.  She responded that BAM Trading had "on-chain analytics, monitoring all the behaviors that are taking place" on the Binance.US Platform and could see "the behavior of our trading that's taking place."  She further stressed that BAM Trading's on-chain analytics had "really clear sets and risk parameters that we're able to make sure we're not … you know, welcoming behavior that's going to be toxic."

247.    Similarly, between at least September 2021 and April 2022, when soliciting investors ("Equity Investors") during a seed funding round offering equity in BAM Management, BAM Trading and BAM Management falsely touted the trade surveillance and other measures purportedly in place on the Binance.US Platform to detect and prevent manipulative trading.  BAM Trading and BAM Management raised at least $200 million selling preferred shares to Equity Investors, including almost $40 million from six investors in the United States.

248.    For example, in a September 2021 "Seed Round Pitch Deck" (the "Pitch Deck") provided to Equity Investors, BAM Management and BAM Trading touted the Binance.US Platform's supposedly robust "trade surveillance."  The Pitch Deck further identified the numerous vendors that BAM Trading had engaged to supposedly "deploy[] human intelligence" and "artificial intelligence" to "ensure the highest level of compliance" on the Binance.US Platform.  The Pitch Deck further described the role of a third-party provider of trade surveillance software for crypto asset platforms ("Trade Surveillance Company A") as providing "[t]rade surveillance, market manipulation, and transaction monitoring."

249.    In a "Trade Surveillance Manual" dated July 2021 also provided to Equity

60

Investors, BAM Trading and BAM Management falsely described active surveillance of the

Binance.US Platform supposedly conducted by an internal team using Trade Surveillance

Company A software, which purportedly allowed for monitoring and other trade data analytics.

The Trade Surveillance Manual stated that Trade Surveillance Company A's "real-time" and

"T+1" monitoring of trading activity enabled the platform to prevent market manipulation,

identify abusive trading practices prohibited by the platform's trading rules, and conduct

monthly reviews of "all potential Wash Trades."

**B.    BAM Trading and BAM Management Misleadingly Touted the Trading Volume of the Binance.US Platform and of Various Crypto Asset Securities to Investors.**

250.    Since the launch of the Binance.US Platform, BAM Trading and BAM

Management have also defrauded the investing public about the reliability of trading volume

figures reported for the Binance.US Platform.

251.    Since the launch of the platform, BAM Trading publicly reported volume on a

token-by-token basis and made aggregate Binance.US Platform trading volume publicly

available without any qualifications as to its legitimacy.  BAM Trading has provided Binance.US

Platform trading volume through various public resources that are popular for crypto asset

investors when deciding which crypto asset to trade in and where to conduct their trading.  These

include the market data API and the Binance.US Platform and its website.

252.    For example, on April 3, 2022, the market data API indicated that the trading

volume of TRX, a crypto asset security listed on the platform, was 5,902,367.  That information

would have also been posted on the Binance.US Platform and the company's website, as both

pull from the same data as the API.

253.    BAM Trading also made the platform's trading volume data available through the

61

API for reporting and dissemination by data aggregators such as CoinMarketCap and CoinGecko, which are popular information resources for crypto asset investors.

254.    BAM Trading sought to have the Binance.US Platform's trading volumes included on CoinMarketCap because it knew that crypto asset investors look to CoinMarketCap for information on specific crypto assets and where they can be traded.  Accordingly, BAM Trading ensured ongoing information regarding trading volume was available for publication on a token-by-token and aggregate basis, and BAM Trading monitored the posted information, at times communicating with CoinMarketCap to correct certain information reported to the market. Since in or around April 2020, Zhao has owned CoinMarketCap through a Binance affiliate.

255.    BAM Trading also reported the platform's trading volume on social media.  As an example, on November 1, 2019, BAM Trading tweeted that the Binance.US Platform had "$30M in 24hr Volume."  Similarly, on January 8, 2021, BAM CEO A tweeted that the platform's total trading volume was "$500M."

256.    In addition, from September 2021 through at least April 2022, BAM Trading and BAM Management touted the Binance.US Platform's trading volume when soliciting the Equity Investors.  In the Pitch Deck, BAM Trading and BAM Management reported, with respect to the Binance.US Platform, "$24B" in average monthly trading volume, "$205B" in trading volume to date, and favorable trading volume comparisons to the Binance.US Platform's competitors.

257.    The Pitch Deck also boasted trade volume statistics for the period of time leading up to BAM Trading's and BAM Management's September 2021 outreach to Equity Investors. For example, it highlighted that the Binance.US Platform's August 2021 trading volume was "5x larger than FTX.US and ~24% of Coinbase's global volumes."

258.    BAM Management and BAM Trading also provided Equity Investors with access

to a data room that contained a voluminous spreadsheet with data on the Binance.US Platform's trading volume, including monthly data for various crypto assets made available for trading on the Binance.US Platform ("Volume Data Spreadsheet"). The Volume Data Spreadsheet reported, for example, the monthly trading volumes of one crypto asset security called "ALGO" for June through August 2021 to be over $137 million. Similarly, for another crypto asset security called "MANA," the Volume Data Spreadsheet reported over $102 million in volume for June through August 2021.

### C. BAM Trading's and BAM Management's Statements Were Materially False and Misleading, and BAM Trading and BAM Management Engaged in Acts and Practices That Operated as a Fraud and Deceit Upon Purchasers.

259. BAM Trading's and BAM Management's statements described above were false and misleading, and they engaged in acts, practices, and courses of business that operated as a fraud and deceit upon the purchasers of crypto asset securities and the Equity Investors.

260. When the Binance.US Platform launched in September 2019, BAM Trading—contrary to its public statements—had no controls to monitor for and prevent manipulative trading on the Binance.US Platform, and through at least February 2022, it had implemented no such trade surveillance or controls.

261. Moreover, when BAM Trading and BAM Management reported trading volume without disclosing the extensive nature of the wash trading that they knew existed on the Binance.US Platform—as described below—they deceived investors into thinking that the trading volumes on the platform were robust, real, and reliable.

262. Senior BAM Trading officers and employees were on notice even before the platform's launch that wash trading was possible. In August 2019, a Binance co-founder and head of the Binance team that managed the MatchBox trade matching engine used on Binance

Platforms ("Binance Co-Founder") messaged BAM CEO A and senior Binance executives that "the current matching engine allows a user to trade with themselves" asking that they "[p]lease make sure this is OK with whatever US/SEC regulations we have to follow."  He also noted, "The manipulation angle comes from the fact it will make the traded volume increase when funds did not in fact trade hands," but that "this is mainly a compliance or regulation issue.  If some US compliance or regulation says we must prevent this, we will.  Otherwise we will not."

263.    Almost a year later, on or about July 16, 2020, "takeaways" from a meeting involving BAM Trading's risk management and compliance included that "[m]arket manipulation controls have not been established," and that they had sought more information from a Binance employee "who manages market surveillance."  That Binance employee later replied to a BAM Trading compliance employee that Binance had a team monitoring for market manipulation for the Binance Platforms, but the team did "not monitor for wash trading, front running and spoofing" on the Binance.US Platform.

264.    Moreover, in January 2021, BAM Trading's Director of Institutional Sales informed BAM CEO A that "[a]pparently we have nothing in place to prevent wash trading? Just tested myself, sold market order into my own bid."  He then warned that he was "not sure if this is being exploited on any level.  The lower the fees for a [market maker], the easier it might be to manipulate the market."  Another BAM Trading employee responded, "Yikes."

265.    In fact, BAM Trading lacked *any* trade surveillance mechanisms until at least February 2022—six months after BAM Trading and BAM Management began approaching prospective Equity Investors with the Pitch Deck and more than three-and-a half years after the Binance.US Platform launched and stated publicly that it prohibited fraudulent trading.

266.    Even though BAM Trading first retained Trade Surveillance Company A in late

64

2020, it was not until February 2022 at the earliest that BAM Trading could even begin using Trade Surveillance Company A's surveillance software in any meaningful way because it was not until then that Binance personnel began providing relevant data in a usable format.

267.    But even after February 2022, BAM Management and BAM Trading failed to provide Trade Surveillance Company A with account owner information that would enable it to detect trades between related accounts, thus preventing Trade Surveillance Company A from actually monitoring for certain manipulative trading, such as wash trading between related accounts (*i.e.*, accounts bearing disparate account numbers that are, in fact, owned and/or controlled by the same entity or individual).

**D.    Sigma Chain's Wash Trading on the Binance.US Platform Further Demonstrated the Falsity of BAM Trading and BAM Management's Statements.**

268.    In fact, wash trading on the Binance.US Platform did occur and went undetected. Much of this wash trading occurred through numerous accounts affiliated with Sigma Chain, an entity owned and controlled by Zhao and operated by Binance employees at Zhao's direction.

269.    At Zhao's insistence, Sigma Chain became a market maker on the Binance.US Platform from the time of its launch.  Sigma Chain held dozens of user accounts through which it conducted wash trading that fraudulently inflated trading volumes on the Binance.US Platform.

270.    Both BAM Trading and BAM Management were aware that Sigma Chain had dozens of accounts and was an active trader on the Binance.US Platform.  On June 23, 2020, for example, in discussing a drop in trading volume from market makers on the Binance.US Platform, BAM CEO A asked the BAM Trading's Sales Director to "pull [Sigma Chain's] data to hold them accountable too . . . they should be consistent too – we can ask for more volume but they've been up to 50% for us before."  On January 6, 2021, the Sales Director messaged BAM

CEO A and other BAM Trading employees "fyi these are ALL sigma chain," and then listed 20 account numbers. Another BAM Trading employee responded, "whoa."

271. Wash trading between Sigma Chain's accounts occurred from the launch of the Binance.US Platform in 2019 through at least June 23, 2022. This wash trading activity corrupted the Binance.US Platform's reported trading volume in a strategic pattern that coincided with at least three critical periods for crypto asset investors and the Equity Investors: (1) the Binance.US Platform's launch in September 2019; (2) BAM Trading's making available certain new crypto asset securities for trading on the Binance.US Platform; and (3) the months leading up to BAM Trading's seed funding round starting in September 2021.

272. For example, on September 25, 2019, the day after the Binance.US Platform opened for trading, wash trading between Sigma Chain accounts and other accounts owned by Zhao and/or associated with Binance senior employees, constituted more than 99 percent of the initial hour of trading volume in at least one crypto asset. By the end of the day, wash trading by these accounts amounted to nearly 70 percent of that same crypto asset's total volume.

273. Sigma Chain also engaged in wash trading on or around the time when BAM Trading made at least 65 new crypto assets, including crypto asset securities, available for trading on the Binance.US Platform. Between January 1, 2022 and June 23, 2022 alone, Sigma Chain accounts engaged in wash trading in 48 of 51 newly listed crypto assets.

274. For example, on April 6, 2022, the Binance.US Platform made the crypto asset security COTI available for trading. Shortly after COTI was available on the Binance.US Platform, Sigma Chain engaged in substantial wash trading in COTI. The following chart summarizes this activity over the ensuing 11 days, in which Sigma Chain represented as much as 35.52 percent of all COTI trading volume on the platform:

## COTI

| DATE | TOTAL BINANCE.US VOLUME | SIGMA CHAIN WASH TRADING % OF TOTAL BINANCE.US VOLUME |
|---|---|---|
| 4/6/2022 | 15,209,996 | 0.98% |
| 4/7/2022 | 11,529,194 | 1.25% |
| 4/8/2022 | 6,254,580 | 1.71% |
| 4/9/2022 | 1,944,954 | 5.13% |
| 4/10/2022 | 1,439,120 | 1.60% |
| 4/11/2022 | 2,207,312 | 35.52% |
| 4/12/2022 | 3,204,328 | 27.45% |
| 4/13/2022 | 1,013,788 | 27.12% |
| 4/14/2022 | 2,874,668 | 26.92% |
| 4/15/2022 | 296,646 | 10.07% |
| 4/16/2022 | 348,124 | 5.85% |
| 4/17/2022 | 367,548 | 23.12% |
| 4/18/2022 | 1,050,762 | 32.56% |

275. In addition, from June 4 through August 31, 2021—the three-month period leading up to BAM Trading's and BAM Management's offering of equity in BAM Management to the Equity Investors—Sigma Chain accounts repeatedly wash traded 51 crypto assets of the 58 crypto assets available for trading at that time on the Binance.US Platform.

276. Although they were aware of the high number of Sigma Chain and other Zhao- and Binance-related accounts on the Binance.US Platform, neither BAM Management nor BAM Trading took any steps to ensure that their statements about either trading volume or trading surveillance were accurate and complete or not otherwise materially misleading, including but not limited to implementing controls that would ensure Sigma Chain, other Binance-connected accounts, or any other customers were not engaging in wash trading on the Binance.US Platform. Instead, BAM Management and BAM Trading provided trading volume numbers to the

investing public without qualification and without warning investors about the potential for manipulative trading given the lack of surveillance and monitoring over the platform's trading.

### E. BAM Trading's and BAM Management's False and Misleading Statements and Deceptive Acts and Practices Were Material.

277.    BAM Trading's and BAM Management's statements about trade surveillance and trading volumes were material to investors trading in crypto assets securities on the Binance.US Platform and to Equity Investors.  When deciding whether to trade in certain crypto assets on the Binance.US Platform or to invest in BAM Management, a reasonable investor would consider it important to know that BAM Management and BAM Trading were not, in fact, taking reasonable steps to surveil and prohibit manipulative trading on the Binance.US Platform, or ensuring that the platform's trading volume reflected real market demand based on arm's length transactions operating under legitimate market principles.

278.    Volume is important for investors in crypto asset securities in evaluating prices (including anticipated price movement), market activity (including demand and available liquidity), and market efficiency.  As Zhao recognized, a successful crypto asset trading platform depends on its customers believing the trading and reported liquidity are not tainted by fraud.

279.    This information was also material to Equity Investors because the Binance.US Platform's trading volume and corresponding revenue from transaction fees served as an important metric for the Equity Investors to assess BAM Management's profitability and market share, and as an indication that customers were actually engaged with the platform.  And given the active regulatory scrutiny of businesses involving crypto assets in the United States, Equity Investors would and did consider it important to know that they were investing in a compliant crypto asset platform to reduce the regulatory risk to the business and its profitability.

280.    Further, investors trading on the Binance.US Platform and investors purchasing

equity in BAM Management would have wanted to know that the platform's primary market maker—owned and controlled by Zhao—was engaged in a pattern of wash trading that would benefit BAM Trading, BAM Management, Binance, and Zhao, all at the expense of regular investors trading on the platform.

281. As a result of these transactions, practices, and course of business that operated as a fraud or deceit upon purchasers of securities, and of their numerous material misstatements and omissions, BAM Trading and BAM Management obtained substantial revenue from the transaction fees that crypto asset investors paid for trading on the Binance.US Platform and the approximately $200 million that Equity Investors invested in BAM Management.

## VII. BINANCE AND BAM TRADING ENGAGED IN UNREGISTERED OFFERS AND SALES OF SECURITIES.

282. Since at least 2017, Binance and BAM Trading further violated the federal securities laws by illegally conducting unregistered offers and sales of securities to U.S. investors—in Binance's case, the offers and sales of BNB, BUSD, Binance's "BNB Vault" program, and Binance's "Simple Earn" program, and in BAM Trading's case, the offer and sale of its staking-as-a-service program ("Staking Program"). No exemption from registration applied or applies.

283. Binance did not register with the SEC any of its offers and sales of BNB, BUSD, BNB Vault, and Simple Earn—unregistered public offerings of securities.

284. Binance used the means and instrumentalities of interstate commerce in engaging in unregistered offers and sales of BNB, BUSD, BNB Vault, and Simple Earn. Among other things, Binance touted the investment potential of these investments on its website, on social media platforms, and in public interviews on broadcasting networks, and Binance accepted payments for these securities through bank accounts in the United States.

69

285. BAM Trading did not register with the SEC any of its offers and sales of its Staking Program—also public unregistered offerings of securities.

286. BAM Trading used the means and instrumentalities of interstate commerce in engaging in unregistered offers and sales of its Staking Program. Among other things, BAM Trading touted the investment potential of the investment on its website, on social media platforms, and in public interviews on broadcasting networks, and BAM Trading accepted payments for the security through bank accounts in the United States.

**A.    Binance Offered and Sold BNB as a Security**

287. BNB is an ERC-20 token that Binance issued on the Ethereum blockchain. In June 2017, Binance began issuing BNB—which was called "Binance Coin" until February 2022—in an ICO explicitly meant to fund the launch of the Binance.com Platform in July 2017. Binance's BNB ICO was marketed and sold to investors globally, and Binance imposed no restrictions on U.S. investments in BNB or on the ability of BNB investors to immediately resell BNB to U.S. investors.

288. From the time of the ICO to the present, BNB was offered and sold as an investment contract and, therefore, as a security.

289. Binance offered and sold BNB as an exchange token, marketing it to investors as an investment in the success of the Binance.com Platform itself and touting both the potential returns that investors could achieve from purchasing the token by transacting on the platform and that investors could expect increased demand and price for the token as the platform grew.

290. To promote its ICO, Binance also issued the Binance Whitepaper to prospective BNB investors globally over the internet. The Binance Whitepaper explained that the purpose of the ICO was to raise money for Binance's team to "build a world-class crypto exchange," but

that Binance needed the "help" of ICO "investors." The Binance Whitepaper gave an overview of its proposed new crypto asset platform, touting several competitive advantages the platform would supposedly have over other crypto asset platforms due to Zhao and his cohorts' supposed entrepreneurial and managerial expertise over the trading platform.

291. The Binance Whitepaper repeatedly referred to ICO participants as "investors," and it lauded the credentials and financial expertise of Zhao and other founding members to create a successful crypto asset platform. Among other things, it highlighted that Zhao had "exchange experience" working on the Tokyo Stock Exchange and that several other "Founding Team" members had experience in the securities industry. It further touted that Binance's "team has decades of combined experience building and maintaining world class financial systems that shape the economy. We understand how these systems are built from the ground up."

292. The Binance Whitepaper concluded, "We know this will be an ultra competitive space. There are probably hundreds, if not thousands of teams wanting, planning or doing exchanges. Competition will be fierce. But in this age, this is a common risk in any decent concept/startup or mature company. The question is: given our team, track record, experience, industry resources and product, do you believe we stand a better chance than the rest of the pack? If yes, then please join our ICO."

293. During the ICO, Binance created 200 million BNB on the Ethereum blockchain and stated publicly that it would never issue more BNB. Binance offered 100 million of the 200 million BNB in the ICO at approximately $0.15 per coin, and Binance structured the ICO in phases that involved increasing BNB prices with each phase (effectively offering a sale discount and potential immediate resale profit to early BNB investors). In less than a month, however, Binance had sold all 100 million BNB tokens during the ICO's first phase at $0.15.

71

294.    In the Binance Whitepaper, Binance also stated that it would reserve 40 percent of all BNB tokens, or 80 million BNB, for its "Founding Team" and 10 percent, or 20 million BNB, for "Angel investors" who purchased BNB prior to the ICO.  For the Founding Team's BNB allocation of 80 million BNB, Binance established a "vesting plan" that permitted the release of 20 percent of the 80 million BNB allocation, or 16 million BNB, during the ICO that was unrestricted at the time of issuance, and another 20 percent every year for four years.

295.    Further, the Binance Whitepaper stated that Binance would "destroy," or burn, half of the BNB over time by using Binance's profits with respect to the Binance.com Platform to repurchase and then destroy BNB.  Binance subsequently announced plans to accelerate the BNB burn rate.  In deciding to use Binance's profits to decrease the supply of BNB over time, Binance gave BNB investors a reasonable expectation of profits because lower demand tends to increase price, similar to how a stock issuer uses profits to provide dividends to investors or to execute stock buybacks to increase the ownership stake of remaining shareholders.  In other words, in stating that it would use the profits from the platform to effectively support the price of BNB, Binance further tied the success of the platform to BNB's success as well.

296.    Indeed, on July 9, 2019, Zhao described Binance's planned BNB burn in an interview posted on YouTube, stating that a "benefit we promised in the Whitepaper is every quarter we will use 20 percent of our profits to buy back [BNB] at the market value … we will buy back and destroy those.  We will destroy up to 100 million Binance coins.  Basically half of all available coins … Financially that works the same way as a dividend economically."

297.    Binance raised approximately $15 million through its ICO by selling BNB to about 20,000 investors globally.  Approximately 32 U.S.-based investors purchased at least 504,000 BNB tokens during the ICO.

298.     Binance pooled the proceeds of its BNB ICO to develop the Binance.com Platform—as it stated publicly it would.  The Binance Whitepaper explained to BNB investors that funds raised by the ICO were to build the Binance.com Platform.  It provided the following fund allocation: (1) 35 percent "to build the Binance platform"; (2) 50 percent for "Binance branding and marketing," including to make Binance "popular among investors"; and (3) 15 percent in "reserve" for emergencies.

299.     In public comments after the ICO was completed, Zhao noted the benefits of the ICO process to include brand recognition while "getting investment at the same time."  He further advised others looking to do an ICO that the business "team is key … Binance has a strong team.  We spend a lot of effort describing our team.  Make your team shine."

300.     Since the ICO, Binance has encouraged the Binance.com Platform's customers to buy BNB by offering a 25 percent discount when investors use BNB to purchase a crypto asset. (This discount was 50 percent in the first year after the BNB ICO.)  Accordingly, Binance creates additional financial incentives to buy BNB, thereby increasing demand for BNB, and its value.  In other words, the trading discounts that Binance offered BNB purchasers further tie BNB's success, and thus BNB purchasers' profits, to Binance's success.

301.     Since Binance.com launched in July 2017, BNB has traded on the Binance.com Platform, and Binance and Zhao have continued to lead BNB investors to believe that BNB's price is tied to the success of the Binance.com Platform.  For example, in a public "Ask Me Anything" discussion on Reddit on June 28, 2017 (the "AMA"), Zhao explained:



cpzhao · 6 yr. ago

The token is a tool to facilitate the ICO. We didn't invent a new coin, our focus is on building a valuable platform. The value of the coin is heavily associated with how well the platform does. Basically, if the platform is successful, the more users use the platform to trade, the more users will buy the coin, hence the price will increase.

302.     Binance has continued to tout the investment potential of BNB over time, and has continued to tell investors after the ICO that Binance's efforts to make the Binance.com Platform more profitable will increase BNB's value.  For example:

a.   In an interview broadcasted globally on YouTube.com on October 10, 2018, Binance's Chief Growth Officer stated, "By having people invest in BNB token, they're even more interested in the success [of the Binance.com Platform] … By holding BNB, you are effectively holding an influential share of the crypto project."

b.   In an interview broadcasted globally on YouTube.com on January 10, 2020, Binance's Managing Director stated, "Recently we launched lending, we launched staking, we launched futures, all of those new businesses contribute to the value of BNB."

c.   In an internal Binance town hall on December 17, 2020, Zhao stated, "[M]ost [use cases for BNB] are still early stage … [the Binance.com Platform] is [a] relatively big driving force for [BNB] value … For anything we are significantly involved in we'll push BNB as much as we can.  We're also incentivizing the ecosystem … we have the Binance smart chain fund which we pledge $100 million we've given out … 20-30 grants already each one of them maybe about $100K or $50K um just for developers to come up with new use cases."  Zhao also stated, "I believe 100% that BNB will outpace BTC [bitcoin] … if I didn't believe that I would just hold BTC … I'm fully bullish that BNB will outrun BTC."

d.   In an interview with Forbes on July 29, 2021, BAM CEO B stated, "[W]e have learned a lot from the BNB coin (the Binance token) about the power of coupling incentives inside of a smart contract with fungibility.  Think about what the Binance token is—it represents the right to receive discounts on our trading fees, which people use it for, a lot.  But increasingly, people are choosing to hold the token, rather than spend it for the discount because they found that the increased value of the token as the company grows, exceeds the financial value of the discounts.  And so it gets our customers to act a little bit more like owners— people who want the company to succeed; their interests are aligned with that of the company."

74

303.    From the launch of BNB to the present, Binance has maintained a BNB price prediction blog on its website that tracked customers' "consensus rating" and "price target" for BNB for the upcoming three years.  Among other things, it offers the past 200-day moving average price for BNB and gives a resultant "bearish or bullish divergence" on the token, while cautioning that investors should "do your own research and trade on your own knowledge."

304.    Binance has additionally worked to increase demand for BNB by seeking to create additional ways in which BNB can be used—thereby further increasing demand for the token and its value.  For example, Binance launched a $7.5 billion "venture capital arm" called "Binance Labs."  Binance Labs has invested more than $500 million in grants to individuals and entities developing applications for Binance blockchains, including BNB-related applications.  And in October 2022, Binance announced that Binance Labs was investing in seven new projects that, as a Binance founder described, "will grow further and positively impact the BNB Chain and the broader crypto ecosystem."

305.    While Binance initially launched BNB on its own platform, it has also sought to make BNB available for trading on other platforms that, like the Binance Platforms, tend to attract investors in crypto assets.  On June 28, 2017, Zhao explained, "Our current intention is to focus on building a successful exchange platform first.  The coin will be valuable if the exchange [] has high trading volume, naturally people will want to buy and use the coin to pay for fees, which creates circulation and liquidity.  We won't be aggressively asking other exchanges to list the coin on their exchange.  But if they want to, we won't (can't) stop it.  We will happily support them, as it is good for us to have it trading on other exchanges as well."  As of March 30, 2023, BNB was traded on more than 100 crypto asset trading platforms.

306.    In addition, since at least 2019, Binance has offered and sold BNB to its

75

employees in the United States and elsewhere by offering to pay salaries in BNB.

307. Publicly reminding investors what the economic reality made plain—that Binance and its employees' fortunes with respect to BNB were tied to BNB investors' fortunes—Binance has frequently touted the popularity of Binance's program of offering BNB as compensation to its employees. For example, in a February 11, 2019 interview, Zhao stated, "Almost all [employees] take some comp in BNB. Many take 100% in BNB. They know what we do, and how we do it, literally, from inside out. And it is an easy decision for them to make."

308. Between 2019 and 2022, at least 37 U.S.-based Binance employees received over $3.89 million worth of BNB as salary. Binance did not place any restriction on these employees' ability to resell their BNB tokens to any person, in whatever amounts they wished.

309. Binance has also offered and sold BNB to recruit new employees to work with Binance or BAM Trading. For example, when Zhao hired BAM CEO A, she received 50,000 BNB as an "Incentive Bonus."

310. Further, in internal Binance town halls, Zhao frequently touted Binance's Employee Stock Token Options Plan ("ESTOP"), which granted high performing employees BNB, essentially equivalent to employee stock options, as the best way for employees to profit from the growth of the Binance.com Platform. He has also encouraged Binance employees to hold BNB to share in the company's profits, noting that it would correlate closely to the company's long-term financial growth.

311. BNB has traded on the Binance.com Platform since its July 2017 launch and on the Binance.US Platform since its September 2019 launch.

312. Each BNB token is identical to every other BNB token, and the price of all BNB tokens increases or decreases together.

313.     Furthermore, Binance's distribution of tokens among investors and its Founding Team aligned their incentives in building a successful Binance.com Platform, as that would yield an increase in BNB's market price that would yield profits to all BNB investors.

314.     Since its ICO price of $0.15, BNB's market price has risen in line with the growth of trading volume on the Binance.com Platform, which is now the largest crypto asset trading platform in the world.  BNB's market price as of March 30, 2023 was $317, and its market cap exceeded $50 billion, putting it in the top five most valuable crypto assets.

**B.     Binance Offered and Sold BUSD as a Security.**

315.     From September 2019 through February 2023, Binance offered and sold BUSD to U.S. investors as part of a profit-earning scheme within the Binance ecosystem, touting returns for investors from simply buying BUSD or deploying it in Binance profit-generating programs.

316.     Since its inception, BUSD has been offered and sold as an investment contract and, therefore, as a security.

317.     BUSD is an ERC-20 token issued on the Ethereum blockchain.  Pursuant to a September 5, 2019 "Stablecoin as a Service Agreement" ("BUSD Agreement") between Binance (Switzerland) AG, a Binance affiliate, and Trust Company A, the parties agreed to "build and manage the platform on which BUSD can be issued and redeemed" in exchange for one U.S. Dollar and to maintain reserves supporting redemptions.  Binance's affiliate agreed to "list, market, and promote BUSD" to investors.  Binance has since marketed BUSD as a so-called "stablecoin"—purportedly backed with cash (and cash equivalent) reserves and redeemable on a 1:1 basis for U.S. dollars—that allows investors to participate in various profit-making schemes available through the Binance ecosystem.  Trust Company A agreed to invest the BUSD reserves (essentially, proceeds from investors' BUSD purchases) in profit-generating opportunities for the

benefit of both Trust Company A and Binance.  Trust Company A and Binance agreed that they would evenly split the net interest revenue earned on the reserves underlying BUSD.

318.    As of February 10, 2023, over $16 billion worth of BUSD were in circulation. Approximately 90 percent of outstanding BUSD at that time was held in wallets controlled by Binance, most of which was BUSD deposited by investors and held in Binance omnibus wallets.

319.    On February 21, 2023, NYDFS—which regulates Trust Company A as a limited purpose New York trust company and authorized it to offer BUSD subject to anti-money laundering, anti-fraud, and consumer protection laws—directed Trust Company A to stop minting BUSD "as a result of several unresolved issues related to [Trust Company A's] oversight of its relationship with Binance."

320.    From September 2019 through February 2023, Binance offered and sold BUSD to investors on the Binance.com Platform.  Investors in the U.S. and elsewhere could also purchase BUSD from Trust Company A.

321.    BUSD purchasers invested in a common enterprise with each other and with Binance—the BUSD ecosystem through which BUSD holders and Binance could and did earn returns through various forms of capital deployment.  The proceeds from investor purchases of BUSD were purportedly pooled in reserves, and Binance earned 50 percent of the investment returns on those pooled assets (which increased as more investors purchased BUSD).  Binance then used at least a portion of those returns to enable and promote the Binance ecosystem that gave BUSD its profit potential.

322.    Binance has, from the outset, marketed BUSD's profit-earning potential and referred to the various "APYs" (annual percentage yield) that investors may earn with respect to their BUSD holdings.  The BUSD profit opportunities promoted by Binance include the

"Binance Earn" programs, as well as margin and futures products.

323.    For instance, Binance offered a "BUSD Reward Program" that promised interest payments to BUSD investors merely for holding BUSD on the Ethereum blockchain.  Binance explained to investors that it would "rank all crypto addresses that hold BUSD based on the average daily amount of BUSD held within 30 days.  After that, we distribute a set amount of BUSD according to the percentage of the crypto addresses' holdings relative to the total market cap of BUSD."  Binance continued: "In effect, the BUSD Reward Program allows you to earn additional funds on top of what you already earn from DeFi."  In other words, while investors' profits with respect to Binance's crypto asset security BNB came in the form of price appreciation, BUSD investors' expectation of profits came from the potential for direct, interest-like payments made by Binance, in part from the proceeds of deploying BUSD investors' capital.

324.    Binance touted and promoted these profit-making opportunities.  For example, in a September 2020 article posted on its website, Binance celebrated BUSD hitting a $1 billion market cap "in just 261 days, the fastest-ever for a stablecoin."  A subsequent Binance blog posts on its website touted "various earning opportunities for holding BUSD in Binance," including "Binance Flexible Savings, through which you can earn a bonus BUSD at a 2%-5% APY" and "an auto-deposit function, which automatically transfers BUSD from your spot wallet to Flexible Savings, making it possible for you to earn even if you forget to proactively save," a "Binance Launchpool" where a user's "BUSD deposit will get you a share of the free tokens from the offerings that launch on the platform and include BUSD in their yield options," and "DeFi staking offerings" that "can give you around 20%-30% APY."

**C.    Binance Offered and Sold Its BNB Vault and Simple Earn Programs as Securities.**

325.    Binance has offered two other securities on the Binance.com Platform—the

"BNB Vault" and "Simple Earn" programs.

326. Binance has regularly marketed the Simple Earn and BNB Vault programs as profit-making opportunities to investors in the United States and elsewhere.

327. Binance markets Simple Earn as programs that pay interest to investors who lend their crypto assets to Binance for fixed or flexible lengths of time. The interest paid depends on the crypto asset lent and the duration of the loan. For instance, investors who lent a particular crypto asset through Simple Earn as of April 24, 2023 were promised profits of 18.9%.

328. Binance determines the Simple Earn rate for each of its offerings at its discretion, taking into account various "factors which are carefully designed to ensure that rewards paid to users are sustainable and competitive."

329. According to Binance, it may pool assets loaned through Simple Earn and use its managerial expertise to deploy them "for a variety of purposes," including on-chain staking, loans, or for operational purposes by other business units within Binance.

330. Throughout the spring of 2020, Binance tweeted that it was offering a 15% APR for participants in the BUSD-specific Simple Earn product, and 10% in the Simple Earn product for another crypto asset.

331. BNB Vault is a similar program that is limited to holders of BNB and described on Binance.com as a "BNB yield aggregator" whereby investors can lend their BNB to Binance to earn investment returns.

332. In November 2020, Binance announced the BNB Vault launch: "#Binance Launches BNB Vault – Earn Daily Income from the $BNB Ecosystem."

333. Binance states on its website that BNB "deposited" in BNB Vault will be "flexibly allocated in different products to help users maximize potential rewards." These

products include Simple Earn and "Launchpool," a product advertised as rewarding users for staking tokens in connection with new token launches.  Similar to Simple Earn, Binance has offered varying APR returns for BNB Vault investors.

334.    One tweet from Binance touted the profit potential of BNB Vault: "Just one click can increase how much you earn with your #BNB.  BNB Vault combines the multiple income benefits of #Binance Smart Chain, Launchpool, Savings, #DeFi Staking, and more through just one interface."  A second tweet linked to a Binance.com page with a heading "Introducing BNB Vault: One-Click Earning for Your BNB Holdings."

335.    In both the Simple Earn and BNB Vault programs, Binance pools the crypto assets lent by investors and uses those assets to generate revenue that was used to pay returns to investors in Simple Earn and BNB Vault.  Investors share pro rata the benefits of their pooled investments in the Simple Earn and BNB Vault programs.

336.    Binance exercises discretion and uses its entrepreneurial expertise in managing both programs, including identifying liquidity needs, negotiating with Launchpool issuers, choosing terms, holding and controlling the invested assets, and generating revenue, through its operation of the Binance.com Platform to pay the Simple Earn and BNB Vault investors.

337.    From October 2019 through October 2022, at least 3,200 and as many as 16,500 U.S. investors have participated in the Simple Earn investment programs, and at least 1,400 U.S. investors have participated in the BNB Vault program.

338.    Since the inception of each, Binance has thus offered and sold both Simple Earn and BNB Vault as investment contracts and, therefore, as securities.

### D.    BAM Trading Offered and Sold Its Staking Program as a Security.

339.     In or around February 2020, BAM Trading began offering its Staking Program to

Binance.US Platform investors, marketing the program to the public as a way to earn "passive income" through the efforts of Binance. While, in theory, any individual can seek profit through their own staking efforts, BAM Trading promotes its Staking Program as a superior and much easier way to obtain staking rewards by, among other things, pooling the crypto assets of a large number of investors.

340. BAM Trading's Staking Program capitalizes on the reward structure of the "Proof of Stake" consensus mechanism used by some blockchains to reach agreement about which transactions are valid, to update the blockchain accordingly, and to reward participants with additional crypto assets. A blockchain using the Proof of Stake consensus mechanism selects a "validator" from a pool of node operators who have agreed to certain requirements necessary to maintain the blockchain and construct new blocks.

341. To be considered for selection into the pool, a potential validator must commit, or "stake," a set amount of the blockchain's native asset. These staked assets are held as collateral in the protocol to incentivize validators to perform required functions. A "correction penalty" is deducted, or "slashed," from the staked assets of validators who underperform. Conversely, validators earn rewards in the form of additional amounts of the native asset by timely voting on proposed blocks, proposing new blocks, and participating in related consensus activities.

342. To create a new block, the protocol chooses a validator from among those that have staked. The more one stakes, the more likely one is to be selected as a validator and receive the maximum staking reward. The most successful staking operations maximize the chances of being selected by staking a large number of assets and minimizing server downtime.

343. Individuals can stake assets on their own, but this requires considerable technical knowhow. Accordingly, BAM Trading markets its Staking Program as a way for investors to

rely on and profit from BAM Trading's technical expertise and knowhow, industry relationships, and infrastructure to reap the benefits of staking as a passive investment opportunity. BAM Trading also touts the advantages its staking programs offer over staking independently. These advantages include instant reward accrual, shorter holding periods, low (or no) upfront deposits or staking minimums, compensation for slashing penalties, regularly scheduled payouts at certain rates, and an easy-to-use interface that requires "just a few clicks" to reap passive income.

344.    As BAM Trading explains on its website:

> Independent cryptocurrency staking can be a daunting process for most individuals. In addition to meeting hardware requirements that may vary from asset to asset, users may also need to install and run their own nodes. That's where Binance.US Staking comes in. With a user-friendly interface and industry-leading uptime across nodes, Staking is the destination of choice for customers looking to earn rewards on their assets.

345.    BAM Trading publishes on its website the list of staking-eligible crypto assets (which has changed over time) and the annualized percentage yield (or reward rate) offered to investors with respect to each asset. The web-based interface and mobile app for the Binance.US Platform also allows users to designate the tokens that they want to stake in the program.

346.    The Staking Program's terms have evolved over time, but BAM Trading's marketing has consistently focused on the competitive yield it offers, touting a wide range of assets that users can earn profits by staking. Users are also told that the stated APY is purportedly calculated based on factors such as "Network conditions," "Staking configuration," and "Supply and demand." BAM Trading's "Terms of Use" further state that the quoted APY "is an estimate only and not guaranteed," and is determined (and may change) in BAM's "sole and absolute discretion." BAM Trading also states that it will deduct a commission from the returns that BAM Trading earns on staking, before paying investors. BAM Trading determines

how and when investors' tokens will be staked, and how and when rewards, if any, will be distributed.

347.    BAM Trading also markets its Staking Program as a way to avoid minimum staking requirements imposed under certain blockchain protocols and to maintain liquidity.  For example, BAM Trading notes that individual investors who wish to independently stake on the Ethereum 2.0 Proof of Stake consensus would need a minimum of 32 ETH (nearly $60,000 at recent values) and agree to long lock-up periods in order to become a validator.  But by pooling investor assets to launch Binance-controlled validators, BAM Trading allows investors to participate with a minimum of just 0.0001 ETH (less than $2).

348.    BAM Trading has engaged in the unregistered offer and sale of its Staking Program as an investment contract, and thus, as a security.

349.    Participation in BAM Trading's Staking Program requires the investment of money in the form of crypto assets.  Investors risk loss if BAM Trading fails to perform as a validator, is assessed slashing penalties for which it cannot make investors whole, or if assets are otherwise lost if BAM Trading fails to detect or manage hacking and other risks as it is executing its staking strategy, over which BAM Trading retains absolute discretion.  Investors also face risk of loss if the staked crypto assets significantly decrease in market value while staked because BAM Trading will not allow users to sell or withdraw crypto assets while they are staked.

350.    For each staking-eligible crypto asset that is a part of the Staking Program, BAM Trading, directly or through affiliates or other third parties, pools investor assets in a common "staking pool" in which investors "combine their staking power and share the rewards proportionally to their contributions to the pool."  Moreover, for as long as the investors choose

to stake their tokens, investors receive payouts from BAM Trading that are distributed to them *pro rata*. In addition, the larger the pool of assets for staking for each particular staking-eligible crypto asset, the higher the likelihood of obtaining rewards, which inures to the benefit of all investors in that particular asset, as well as BAM Trading, such as, for example, in the form of fees from the Staking Program. BAM Trading does not segregate or separately manage any crypto assets that ostensibly belong to any particular investor's account as part of the Staking Program. Instead, all assets of the same type tendered into the Staking Program are pooled together.

351. Finally, as alleged above, BAM Trading has consistently promoted its Staking Program in a way that fuels reasonable expectations of profits from BAM Trading's efforts. BAM Trading marketed its program as an investment to "earn" payouts or "yield" and claimed it would work to provide immediate, reliable, and predictable profitability on that investment. Investors in the Staking Program rely on BAM Trading's pooling of the invested tokens and efforts in successfully validating transaction blocks on the relevant blockchains.

## VIII. THE CRYPTO ASSETS TRADED ON THE BINANCE.COM PLATFORM AND BINANCE.US PLATFORM INCLUDE ASSETS THAT WERE OFFERED AND SOLD AS SECURITIES.

352. Since the Binance Platforms launched, Defendants have made available for trading on them crypto assets that are offered and sold as investment contracts, and thus as securities. This includes, but is not limited to, BNB, BUSD, and the units of each of the crypto asset securities further described below—with trading symbols SOL, ADA, MATIC, FIL, ATOM, SAND, MANA, ALGO, AXS, and COTI (collectively, the "Crypto Asset Securities").

353.     The crypto assets on the Binance Platforms, including but not limited to each of the Crypto Asset Securities, may be bought, sold, or traded for consideration including U.S. dollars, fiat currencies, or other crypto assets.

354.     Each unit of a crypto asset on the Binance Platforms, including but not limited to each of the Crypto Asset Securities, trades at the same price as another unit of that asset.

355.     These assets, including but not limited to each of the Crypto Asset Securities, are interchangeable (*e.g.*, any SOL token or fraction thereof is just like any other).  Accordingly, to the extent the assets change in price, all tokens of the same asset increase or decrease in price in the same amounts and to the same extent, such that one token is equal in value to any other one token, on a *pro rata* basis.

356.     The purchase of any particular asset, including but not limited to each of the Crypto Asset Securities, does not appear to give an investor any special rights not available to any other investor in that asset, such as separately managed accounts or capital appreciation or returns, that are independent of the returns that may inure to other investors in the same asset.

357.     The tokens on the Binance Platforms, including but not limited to each of the Crypto Asset Securities, are available for sale broadly to any person who creates an account with the Binance Platforms, regardless of whether that person treats it as anything other than as an investment.  In other words, the Binance Platforms do not restrict crypto asset purchasers to those who might purchase the asset for any purported non-investment purpose.  To the contrary, the "Trade" page displays changes in prices for the crypto assets similar to how properly registered national securities exchanges display information about securities to investors.

358.     The Binance Platforms do not restrict how many units of a crypto asset, including but not limited each of the Crypto Asset Securities, any given investor may purchase.  Moreover,

investors are not required to purchase quantities tied to any purported non-investment "use," if any, that may exist for the asset. To the contrary, investors may and typically do purchases these assets in any amounts.

359. The assets available for sale on the Binance Platforms, including but not limited each of the Crypto Asset Securities, are transferable and eligible for resale on the Binance Platforms or other crypto asset trading platforms without any apparent restrictions on resale.

360. The Binance Platforms have made available for trading crypto assets that have been the subject of prior SEC enforcement actions based upon their status as crypto asset securities, including but not limited to AMP (the AMP token), REP (the Augur token), UST (the TerraUSD token), and TRX (the token associated with the Tron network).

361. For purposes of prevailing on the Exchange Act claims set forth herein, the SEC need only establish that the Binance Platforms engaged in activities relating to a single crypto asset security. Nevertheless, set forth below are additional details regarding a non-exhaustive list of ten Crypto Asset Securities—in addition to BNB and BUSD, as described above—available on the Binance Platforms.

362. From the time of each of their first offer or sale, each of these Crypto Asset Securities was offered and sold as an investment contract and, therefore, was and is a security.

363. The Binance Platforms typically do not restrict any issuer of the Crypto Asset Securities (or of the other tokens available on the Binance Platforms) from offering, selling, or otherwise distributing their crypto assets (directly or through intermediaries such as underwriters, agents, and market makers) on the Binance Platforms and, in fact, the issuers of crypto assets have historically and today continue to offer, sell, or otherwise distribute their crypto asset securities on the Binance Platforms.

#### A.    SOL

364.    "SOL" is the native token of the Solana blockchain.  The Solana blockchain was created by Solana Labs, Inc. ("Solana Labs"), a Delaware corporation headquartered in San Francisco that was founded in 2018 by Anatoly Yakovenko ("Yakovenko") and Raj Gokal (Solana Labs' current CEO and COO, respectively).  According to Solana's website, www.solana.com, the Solana blockchain is a network upon which decentralized apps ("dApps") can be built, and is comprised of a platform that aims to improve blockchain scalability and achieve high transaction speeds by using a combination of consensus mechanisms.

365.    According to Solana's website, SOL may be "staked" on the Solana blockchain to earn rewards, and a certain infinitesimal amount of SOL must be "burned" to propose a transaction on the Solana blockchain, a common function for native tokens on blockchains that constitutes a method for cryptographically distributed ledgers to avoid a potential bad actor from "spamming" a blockchain by overwhelming it with an infinite number of proposed transactions.

366.    Between May 2018 and early March 2020, Solana Labs filed with the SEC multiple forms claiming that its offers and sales of securities—what Solana described in those forms as the "sale and issuance of rights to receive Solana Labs, Inc. tokens in the future via a Simple Agreement for Future Tokens (SAFTs)"—were exempt from registration under Rule 506(c) of Regulation D under the Securities Act.  Through these offers and sales of securities, Solana sold approximately 177 million SOL, raising over $23 million.

367.    Later in March 2020, Solana Labs conducted additional SOL sales on the CoinList trading platform (www.coinlist.co) in a "Dutch auction" (wherein investors place bids and the entire offering occurs at the price with the highest number of bidders).  During this offering, Solana Labs sold approximately 8 million SOL, at an average price of $0.22 per SOL,

raising approximately $1.76 million. In August 2021, Solana Labs completed another, purportedly private sale of SOL, raising over $314 million from investors, each of whom paid for SOL with fiat currency and was required to sign a purchase agreement.

368. Beginning in February 2020, Solana Labs took steps to make SOL available for trading on crypto asset trading platforms. For example, in a September 17, 2020, Twitter post, Solana Labs stated: "The Solana community in the United States has been eagerly awaiting the chance to trade SOL on a U.S. exchange, and now that day has come. SOL/USDT, SOL/USD, and SOL/BTC pairs are all open for trading on @ftx_us." In another Twitter post later the same day, Solana Labs stated: "@BinanceUS announces Support for SOL, making it the Second US Exchange to list SOL within one day."

369. SOL has been available for buying, selling, and trading on the Binance.US Platform since September 2020, and the Binance.com Platform since April 2020.

370. The information Solana Labs publicly disseminated, including since the initial sales of SOL, led SOL holders, including those who purchased SOL since September 2020, reasonably to view SOL as an investment in and expect to profit from Solana Labs' efforts to grow the Solana protocol, which, in turn, would increase the demand for and value of SOL.

371. Solana Labs stated publicly that it would pool the proceeds from its private and public SOL sales in omnibus crypto asset wallets that it controlled, and that it would use those proceeds to fund the development, operations, and marketing efforts with respect to the Solana blockchain to attract more users to that blockchain (potentially increasing the demand for, and therefore the value of, SOL itself, given the need for those who wish to interact with the Solana blockchain to tender SOL). For example, in connection with the 2021 private sale of SOL, Solana Labs stated publicly that it would use investor funds to: (i) hire engineers and support

staff to help grow Solana's developer ecosystem; (ii) "accelerate the deployment of market-ready applications focused on onboarding the next billion users into crypto"; (iii) "launch an incubation studio to accelerate the development of decentralized applications and Platforms building on Solana"; and (iv) develop a "venture investing arm" and "trading desk dedicated to the Solana ecosystem."

372.    As Solana Labs stated publicly, of the 500 million SOL tokens initially minted, 12.5% were allocated to Solana Labs' founders, including Yakovenko and Gokal, and another 12.5% were allocated to the Solana Foundation, a non-profit organization headquartered in Zug, Switzerland "dedicated to the decentralization, growth, and security of the Solana network."  In fact, on April 8, 2020, Solana Labs transferred 167 million SOL tokens to the Solana Foundation, and in its public announcement of the Solana Foundation's formation, Solana Labs stated, "The Foundation's initial focus is expanding and developing the ecosystem of the Solana protocol."

373.    Solana Labs' two original founders have worked for the Solana Foundation. Gokal currently serves as a member of the Solana Foundation Council.  Yakovenko was a member and President of the Solana Foundation Council from its founding until December 2021, when he stepped down to focus on his work at Solana Labs.

374.    In public statements on its website and social media pages, including statements made and available during the period when SOL was available to trade on the Binance Platforms, Solana specified its expertise in developing blockchain networks and described the efforts Solana and its founders had made and would continue to make to develop the Solana blockchain protocol and attract users to the technology, which, again, required those utilizing the technology to demand some amount of SOL.

375. Solana Labs undertook other promotional efforts to increase participation in its network and thus demand for SOL, including with: (a) a Solana podcast of which there have been at least 90 episodes since July 2019, with interviews of key Solana Labs management and other key personnel, including Yakovenko; (b) a YouTube channel with over 37,000 subscribers; and (c) dedicated Telegram, Twitter, Reddit, Solana Forums, Discord, GitHub, Meetup, and Weibo channels, with links to each available on Solana's website.

376. The promotional statements that Solana Labs made in these fora with respect to SOL and Solana Labs' efforts to increase demand and value for SOL included, for example:

    a. A July 28, 2019 post on Solana Labs' Medium blog in which Yakovenko stated that "Solana … supports upwards of 50,000 TPS" (transactions per second) "making it the most performant blockchain and the world's first web-scale decentralized network" and that the "Solana team—comprised of pioneering technologists from [several high-profile technology companies]—has focused on building the tech required for Solana to function with these groundbreaking performance standards";

    b. Solana's website statement that "Solana is engineered for widespread, mainstream use by being energy efficient, lightning fast, and extremely inexpensive" and that "[m]any of the core Solana builders, like co-founder Anatoly Yakovenko, have a background in building cell phone networks," which "means that they are singularly focused on building for scalability (the ability to grow) and efficiency (the ability to get the most information across with the least amount of resources)";

    c. An April 14, 2021 post on gemini.com in which Yakovenko touted the Solana network's ability to "support a theoretical peak capacity of 65,000 transactions per second, currently" ("around 10,000 times faster than Bitcoin, 4,000 times faster than Ethereum, and 35 times faster than Ripple—even around 2.5 times faster than Visa") and projecting that such speed would "doubl[e] in capacity every two years with improvements in hardware and bandwidth"; and

    d. A December 23, 2022 post on Solana's website marketing various "upgrades" that Solana and its engineers would undertake, including "turbine optimizations" introduced by the "core engineering team," which Yakovenko described as the "coolest piece of technology that we built that nobody knows about."

377.    Further, Solana Labs markets that it "burns" (or destroys) SOL tokens as part of a "deflationary model."  As Yakovenko explained in an April 14, 2021 article entitled "Solana (SOL): Scaling Crypto to the Masses" posted on gemini.com, "Solana transaction fees are paid in SOL and burnt (or permanently destroyed) as a deflationary mechanism to reduce the total supply and thereby maintain a healthy SOL price."  As explained on the Solana website, since the Solana network was launched, the "Total Current Supply" of SOL "has been reduced by the burning of transaction fees and a planned token reduction event."  This marketed burning of SOL as part of the Solana network's "deflationary mechanism" has led investors reasonably to view their purchase of SOL as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of SOL.

## B.    ADA

378.    "ADA" is the native token of the Cardano blockchain.  The Cardano blockchain was created in 2015 by an Ethereum co-founder, Charles Hoskinson, and an Ethereum operations manager, Jeremy Wood.  As described on Cardano's website, the Cardano blockchain protocol is built on its own proof-of-stake consensus protocol called Ouroboros, which is purportedly energy efficient.  Hoskinson and Wood created ADA and purported to limit the supply of ADA to 45 billion.  From 2015 to 2017, Input Output Hong Kong ("IOHK"), a company founded by Hoskinson and Wood, conducted a token sale during which they sold approximately 25.9 billion ADA in exchange for bitcoin, at what equates to an average price of $0.0024 per token, raising approximately $62 million for Cardano.

379.    Today, three entities are responsible for Cardano: (1) the Cardano Foundation, a Swiss entity that is the legal custodian of the Cardano protocol and owner of its brand; (2) IOHK, an engineering company controlled by Hoskinson and Wood responsible for designing, building,

and maintaining the Cardano blockchain; and (3) Emurgo, an entity with offices in New York and California that, according to its website, is "essentially the for-profit arm of Cardano," endeavoring "to advance the platform and drive adoption through commercial ventures." As explained on the Cardano website, "IOHK develops the technology, the Cardano Foundation is responsible for supervising development and promoting Cardano, while Emurgo drives commercial adoptions." These three entities collectively received 5.2 billion ADA following the initial mining of ADA, or approximately 16.7% of the initial token supply of 31.1 billion ADA.

380.    These three entities have used the proceeds from ADA sales to fund the development, marketing, business operations, and growth of the Cardano protocol. For example, investor funds were used to enact the Cardano Roadmap created by IOHK—specifically, to develop each of the Cardano development "eras" as shown in the following screenshot from the Cardano website:



381.    ADA has been available for buying, selling, and trading on the Binance.com Platform since November 2017, and the Binance.US Platform since September 2019.

382.    The information publicly disseminated by Cardano, IOHK, and Emurgo— including since the initial sales of ADA—have led ADA holders, including those who purchased ADA since November 2017, reasonably to view ADA as an investment in and expect to profit

from the Cardano Foundation's, IOHK's, and Emurgo's efforts to grow the Cardano platform, which, in turn, would increase demand for and value of ADA.

383.     In public statements on Twitter and other social media, as well as on their respective websites, including statements made and available during the period when ADA was available to trade on the Binance Platforms, the Cardano Foundation, IOHK, and Emurgo have specified their expertise in developing blockchain networks and described the efforts they have made and will continue to make to develop the Cardano protocol and blockchain and attract users to the technology, including but not limited to: (a) an announcement by IOHK in or around September 2021 about the creation of smart contracts on the protocol, which supposedly would "pav[e] the way" for additional demand for the blockchain protocol; (b) a blog post by IOHK in or around November 2022 describing its efforts to introduce "innovations, new functionality, and new features" to the blockchain; and (c) a blog post by IOHK on or around November 17, 2022 touting ADA being "hosted on more than 30 cryptocurrency exchanges," and outlining IOHK's plans to "improv[e] the underlying performance of the Cardano network to better support growth and adoption of thousands of applications with high transaction volumes" while giving specific examples of how this would be achieved.

### C.     MATIC

384.     "MATIC" is the native token of the Polygon blockchain.  Polygon, originally called the Matic Network and rebranded as Polygon in 2021, is a blockchain platform created in 2017 in Mumbai, India by, among others, Jaynti Kanani, Sandeep Nailwal, and Anurag Arjun. Since its creation, Polygon's founders have remained actively involved with Polygon through

"Polygon Labs" ("Polygon"), an entity they also founded for "the development and growth of Polygon."

385.    According to the Polygon website, https://polygon.technology/, the Polygon network is an Ethereum scaling platform that enables developers to build scalable user-friendly dApps with low transaction fees, purportedly by hosting "sidechains" that run alongside the Ethereum blockchain, and that allows users to process transactions and initiate the transfer of assets and technology development on Polygon's supposedly less congested sidechain network.

386.    Polygon issued a fixed supply of 10 billion MATIC tokens.  MATIC holders can earn additional MATIC for staking their MATIC on the Polygon platform and becoming a validator, from delegating their MATIC to other validators in return for a portion of the fees collected from validating transactions, or from staking their MATIC with other third parties, such as crypto asset platforms that offer staking services.

387.    According to the initial whitepaper for MATIC, "Matic Tokens [we]re expected to provide the economic incentives … of the Matic Network [now Polygon] … [W]ithout the Matic Token, there would be no incentive for users to expend resources to participate in activities or provide services for the benefit of the entire ecosystem on the Matic Network."

388.    In or around 2018, Polygon sold approximately 4 percent of the total supply of MATIC in two early rounds of sales raising $165,000 at a price of $0.00079 USD per 1 MATIC and $450,000 at a price of $0.00263 USD per 1 MATIC.  In April 2019, Polygon sold another 19% of the total supply of MATIC to the public through a so-called "initial exchange offering" (or "IEO"—essentially, an initial offer and sale of a crypto asset security on a crypto trading platform) on the Binance.com Platform at a price of $0.00263 USD per 1 MATIC, raising an additional $5 million to fund development of the network.

95

389.    The information Polygon publicly disseminated has led MATIC holders, including those who purchased MATIC since April 2019, reasonably to expect to profits from Polygon's efforts to grow the Polygon protocol, which, in turn, would increase the demand for and value of MATIC.

390.    For example, Polygon stated publicly, including in the whitepaper, that it would pool investment proceeds through its private and public fundraising to develop and grow its business.

391.    Following the IEO, moreover, Polygon engaged in additional MATIC sales, stating publicly that it was doing so in order to raise the funds needed to support the growth of its network.  On February 7, 2022, Polygon reported on its blog that it raised about $450 million through a purportedly private sale of its native MATIC token in a funding round to several prominent venture capital firms.  Polygon stated, "With this warchest, the core team can secure Polygon's lead in paving the way for mass adoption of Web3 applications, a race that we believe will result in Ethereum prevailing over alternative blockchains."

392.    Polygon has also reported fundraising from other marquee and celebrity investors.

393.    Polygon also stated that it would reserve roughly 67% of MATIC to support the Polygon ecosystem, the Foundation, and network operations.  Another 20% of MATIC was further reserved to compensate the Polygon team members and advisors, aligning their fortunes with investors' with respect to MATIC.

394.    In addition, the Polygon blog provides frequent updates on network growth and developments at Polygon, including weekly statistics on active wallets and transactions per day, as well as financial metrics such as revenue per day and total network revenue.

395.     Polygon has also routinely announced when crypto asset trading platforms have made MATIC available for trading, such as the Binance.US Platform in June 2020.

396.     Polygon has explicitly encouraged MATIC purchasers to view MATIC as an investment in other ways.  For example, in a February 5, 2021 tweet, 14 months after MATIC's single biggest price drop, Nailwal compared the token to a prize fighter that came back from defeat to become a champion:



397.     Also, on November 3, 2022, Nailwal stated on Twitter: "I will not rest till @0xPolygon gets its well-deserved 'Top 3' spot alongside BTC & ETH.  No other project comes even close."  In a May 24, 2022 "Fireside Chat" with CNBC posted on YouTube, Bejelic described part of "what's different about Polygon" as, "We are as a team very, very committed, we have a very hands on approach with all the projects out there, we are working around the clock on adoption and that is why we are currently the most adopted scaling infrastructure platform."  Currently, the founders of Polygon continue to promote the platform through various social media.  For example, on February 21, 2023, Nailwal tweeted, and Kanani retweeted, "Polygon has grown exponentially.  To continue on this path of stupendous growth we have crystallized our strategy for the next 5 yrs to drive mass adoption of web3 by scaling Ethereum. Our treasury remains healthy with a balance of over $250 million and over 1.9 billion MATIC."

398.    Since January 2022, Polygon has also marketed that it "burns" MATIC tokens accumulated as fees, indicating that the total supply of MATIC would decrease.  For example, in January 2022, Polygon emphatically announced a protocol upgrade that enabled burning in a blog post titled, "Burn, MATIC, Burn!"  As Polygon explained in another blog post on its website around the same time, "Polygon's MATIC has a fixed supply of 10 billion, so any reduction in the number of available tokens will have a deflationary effect."  As of March 28, 2023, Polygon had burned approximately 9.6 million MATIC tokens.  This marketed burning of MATIC as part of the Polygon's network's "deflationary effect" has led investors reasonably to view their purchase of MATIC as having the potential for profit to the extent there is a built-in mechanism to decrease the supply and therefore increase the price of MATIC.

**D.    FIL**

399.    "FIL" is the native crypto asset of the Filecoin network.  The Filecoin network is an open-source data storage network that runs on a blockchain, created by Protocol Labs, Inc. ("Protocol Labs"), which describes itself as a research, development, and deployment lab for network protocols.

400.    In or around July 2014, Protocol Labs and its founder and CEO, Juan Batiz-Benet ("Benet"), published whitepaper entitled "Filecoin: A Cryptocurrency Operated File Storage Network," which Protocol Labs updated approximately three years later, setting forth "path toward the construction of the Filecoin network."

401.    In 2017, Protocol Labs conducted a two-part token sale: first, an "Advisor Sale" for advisors of Protocol Labs and Filecoin; and, second, a "Public Sale" for the broader community, but supposedly limited to "accredited investors" (collectively, "2017 FIL Sales").  Investors could use U.S. dollars and certain crypto assets to buy Filecoin.

402.    Protocol Labs ran the Advisor Sale from July 21 to July 24, 2017, and sold FIL to approximately 150 investors, which included individuals, institutional investors, trusts, and established syndicate investors.  These investors paid $.075 per FIL and were offered "vesting/discount choices of 1-3 years and 0-30% discount."

403.    In the August 2017 Public Sale, the FIL price was set based on a "public sale price function," described as "price = max ($1, amountRaised / $40,000,000) USD/FIL" and increased thereafter based on the amount sold.  For the Public Sale, like the Advisor Sale, investors received discounted pricing for agreeing to longer vesting periods.

404.    In connection with the 2017 FIL Sales, which were effected pursuant to SAFTs, Protocol Labs filed forms with the SEC claiming an exemption from registration for the offerings of FIL pursuant to SAFTs.

405.    Protocol Labs reported that they raised more than $205 million for the development of Filecoin in the 2017 FIL Sales, which value increased in the days following the close of the sale based on the fluctuation in value of certain invested crypto assets.

406.    Protocol Labs pooled investment proceeds from the token sales to fund the development and growth of the Filecoin network.

407.    On October 15, 2020, Protocol Labs launched the mainnet (a publicly accessible version of the network) of the Filecoin network, and FIL began being minted and distributed. There was a stated maximum circulating supply of 2,000,000,000 FIL, meaning that no more than 2 billion FIL will ever be created, with issuance aligning with network growth.

408.    FIL has been available for buying, selling, and trading on the Binance.com Platform since October 2020, and the Binance.US Platform since June 2021.

409.    Since the October 2020 launch, Protocol Labs has continued to use funds from the sale of FIL to develop, expand, and promote the Filecoin network.

410.    The information Protocol Labs publicly disseminated, including after the initial FIL sales, has led FIL holders, including those who have purchased FIL since October 2020, reasonably to view FIL as an investment in and to expect to profit from Protocol Lab's efforts to grow its protocol, which, in turn, would increase the demand for and value of FIL.

411.    The Protocol Labs Filecoin Team posted about the sale: "The Filecoin Sale was a critical milestone in the lifetime of the project.  It raised the funding necessary to grow our team, to create the network, and build all the software tools needed to operate and use the network." They further stated, "Filecoin success will reward the investment of supporters like you by simultaneously driving down the cost of storage and increasing the value of the Filecoin tokens that incentivize miners to provide storage.  We're thrilled by your widespread, enthusiastic interest and look forward to staying engaged and including you in our success."

412.    In addition, Benet and the Filecoin team released a document titled, "Filecoin Token Sale Economics," that provided information about the 2017 FIL Sales and the Filecoin network, stating:

> Protocol Labs requires significant funding to develop, launch, and grow the Filecoin network.  We must develop all the software required: the mining software, the client software, user interfaces and apps, network infrastructure and monitoring, software that third-party wallets and exchanges need to support Filecoin, integrations with other data storage software, tooling for web application and dapps to use Filecoin, and much more.  We must deploy the network, facilitate its growth to large scale, market to and onboard miners and clients, bring key partners into the eco system, and much more.

413.     That document also stated that FIL was to be distributed to groups "critical to the network's creation, development, growth, and maintenance" with an allocation, described as follows, that tied Protocol Labs' profits to those of FIL holders:

     a.   70% to Filecoin Miners – "For providing data storage service, maintaining the blockchain, distributing data, running contracts, and more."

     b.   15% to Protocol Labs – "For research, engineering, deployment, business development, marketing, distribution, and more."

     c.   10% to investors – "For funding network development, business development, partnerships, support, and more."

     d.   5% to Filecoin Foundation – "For long-term network governance, partner support, academic grants, public works, community building, etc."

414.     The "Filecoin Token Sale Economics" document further explained: "We have structured the token sale to reward a large group of people that can help us build the [Filecoin] network, by selling Filecoin at what we think is a much lower price than it will be worth some day (caveat: as with any risky investment of course we cannot make guarantees or predictions)." As described in a July 2017 blog post, the Advisor Sale in particular was intended, in part, to secure "long-term commitment to and alignment with the Filecoin network" and "to reward their contributions so far and/or future potential with the capability to invest early."

415.     The "Filecoin Token Sale Economics" and another document made available to investors ahead of the 2017 FIL Sales, the Filecoin Primer, stated that Filecoin purchasers would be able to sell the token on crypto asset trading platforms in the future.

416.     The Filecoin Primer also touted "Large Scale Value Creation," explaining, Filecoin Network "will create value in a number of ways, and the total impact of the network can be tremendous.  Growth of the network will drive demand for the token.  The more value created

by the Filecoin Network, the more things people and organizations spend Filecoin on, and the greater the value and worth of the token."

417. Similarly, a Confidential Private Placement Offering Memorandum ("PPM") in connection with the 2017 FIL Sales stated: "A significant portion of the proceeds of the Offering will be used by the Company to achieve the Minimum Viable Product and subsequently to build-out a decentralized storage network, powered by a blockchain and the Filecoin protocol token."

418. Moreover, both before and after the 2017 FIL Sales, Protocols Labs consistently touted its expertise and ability, and led the work to develop the Filecoin network for launch.  In an August 2, 2017 Q&A Benet stated: "Over the last few years, Protocol Labs has proved to the world that we know how to deploy capital to create valuable projects, valuable technology, and valuable software. . . .  We know how to deploy capital effectively.  We have great plans for the Filecoin network and its surrounding ecosystem, at many levels of funding.  We plan to deploy 100s of millions of dollars over the next few years to make Filecoin the world's best storage network, not just the best decentralized storage network."

419. Benet also addressed the funding needs, pricing, and economics of FIL in that August 2017 Q&A, stating: "Since we think and are working for Filecoin to be worth a lot more in the future, then we naturally want to sell it at the highest price the market will bear.  Subject to reason, if we can sell it higher, then we should."

420. Benet also explained publicly that Filecoin needed funding in order to be able to compete: "Our (collective) competition is the massive, centralized cloud storage companies.  We are talking about the tech titans – AWS, Google Cloud, and Microsoft Azure – the three biggest companies in the world have cloud businesses with BILLIONS of dollars in *revenues*, not just funding.  In order to put up this fight, we will need *significant* resources.  Yes, resources in the

hundreds of millions will empower us to develop Filecoin as fast as we can, as well as the dozens

of other tools and services required to make Filecoin a service and ecosystem remotely close to

competitive with the centralized counterparts."

421.    The economic structure of FIL distribution and public statements about that

structure further invited investors to view FIL as an investment in Protocol Labs' and the

Filecoin Foundation's efforts and to conclude that FIL investors' interests were aligned with

those of FIL's developers.  Specifically, the tokens allocated to Protocol Labs and Filecoin

Foundation were to vest over a six-year period beginning after the network launch.  As stated in

the "Filecoin Token Sale Economics" document, Protocol Labs and the Filecoin Foundation

"aim[ed] to make Filecoin massively valuable in the long-term, and we want to attract investors

similarly interested in long-term value creation and growth" and "[v]esting creates long-term

alignment" because "Protocol Labs and the Filecoin Foundation are deeply committed for the

long-term, and 6-year vesting boldly proves that to all other network participants."

422.    Filecoin has also implemented a process to burn FIL tokens, thereby reducing the

FIL supply.  As with the "burn" mechanisms of other crypto asset securities set forth herein, this

marketed burning of FIL as part of the Filecoin's economic features has led investors reasonably

to view their purchase of FIL as having the potential for profit.

423.    Following the release of the protocol in October 2020, Protocol Labs continued to

be heavily involved in the development and promotion of the Filecoin network and its pursuit of

success.

424.    In late 2021, Raul Kripalani, a Protocol Labs Researcher, introduced the "Filecoin

Virtual Machine" ("FVM"), described as a "core pillar in the next evolution of the decentralized

storage ecosystem."  On November 6, 2022, Kripalani tweeted, "These were amazing weeks for

the #FVM + team.  Momentum and expectation are through the roof.  100s of teams building on the Wallaby testnet.  Many promising @Filecoin apps to launch on mainnet the minute FEVM kicks in.  Pumped to be building the future of $FIL with these rockstars!"  The Protocol Labs Twitter account has posted updates regarding FVM, including through April 2023.

425.    The Protocol Labs team has continued to release "roadmaps" or "master plans," available online and through recorded video presentations, that showcase future development plans for the Filecoin network.  For example, in September 2022, Benet delivered the keynote address at FIL-Singapore, which "gathered builders from around the world to build, share experiences, and hear from other community members on what's next for the network."  In his address, Benet presented "The Filecoin Masterplan" which included building the world's largest decentralized storage network.

426.    In a February 3, 2023 Protocol Labs Blog post addressing the impact of the "crypto winter" economic downturn, Benet touted the Filecoin team's supposed successes to date in growing the Filecoin ecosystem, "[w]e've achieved a tremendous amount in the past several years - from Filecoin launch; to scaling IPFS to millions of users; building one of the fastest growing developer ecosystems; supporting 300+ companies across the network; growing movements like SBS and FTC; launching testnets for FVM, Saturn, SpaceNet, and Bacalhau just last quarter; and much more."

### E.    ATOM

427.    "ATOM" is the native crypto asset of the Cosmos Hub.  The Cosmos project was launched in 2017 by Jae Kwon and Ethan Buchman.  According to Cosmos' website (https://cosmos.network), Cosmos is an ecosystem of blockchains designed to scale and interoperate with each other, and the Cosmos team aims to "create an Internet of Blockchains" or

"a network of blockchains able to communicate with each other in a decentralized way." Cosmos is built on a proof-of-stake consensus mechanism.

428.     The Cosmos Hub is a central blockchain that provides services to other blockchains connected to it, including "the largest interchain token exchange, shared security through interchain security, bridges to ethereum (ETH) and bitcoin (BTC), and secure custodianship of digital assets." Cosmos described the Cosmos Hub as "the first hub among many hubs that [w]as launched within the Cosmos Network of sovereign blockchains."

429.     ATOM is described as "a license for the holder to vote, validate, or delegate to other validators" and "can also be used to pay for transaction fees to mitigate spam."

430.     In 2017, the Interchain Foundation (the "ICF") (a Swiss non-profit organization of which Buchman is President) sold ATOM by conducting what it termed the "Cosmos Fundraiser" to collect so-called "donations" for the development of the Cosmos network. Pursuant to this offering, participants received ATOM tokens in exchange for BTC or ETH. The ICF offered ATOM at a value of $0.10 per token, with a 25 percent discount on that price for partnering "strategic funders" and a 15 percent discount for individual "Pre-Fundraisers." By April 2017, ICF had raised approximately $17.3 million in BTC and ETH through its "fundraiser" by selling ATOM tokens.

431.     At least four entities are currently or have been significantly involved in the development of Cosmos: (1) the ICF, which was created in 2017 by Kwon and Buchman, and— according to Cosmos' public website—was formed "to support the development of Cosmos and the ecosystem that will contribute to the Cosmos Network"; (2) Interchain GmbH, LLC, a German limited liability company and subsidiary of ICF, which employs a team of approximately 35 software engineers and operations personnel working primarily on the Cosmos

network; (3) All in Bits, Inc. d/b/a Tendermint (n/k/a Ignite, Inc.) ("Tendermint"), a Delaware

corporation created by Kwon and headquartered in Berkley, California, with which the ICF

contracted in 2017 "to develop the initial portion of the CESS [Cosmos Essential Software and

Services]"; and (4) NewTendermint, Inc., a Delaware corporation of which Kwon is CEO and

which supports and develops the Cosmos ecosystem.

432.    In February 2022, NewTendermint was spun off from All in Bits, Inc. (d/b/a

Tendermint), which, at the same time, was rebranded to and became Ignite, Inc., which has

focused on developing products and developing tools "to onboard the next wave of developers

and crypto enthusiasts to Cosmos."

433.    ATOM has been available for buying, selling, and trading on the Binance.com

Platform since April 2019, and the Binance.US Platform since October 2019.

434.    The information publicly disseminated by ICF, Kwon, and Buchman has led

ATOM holders, including those who purchased ATOM since April 2019, reasonably to view

ATOM as an investment in and to expect to profit from ICF's, Kwon's, and Buchman's efforts to

grow the Cosmos protocol, which, in turn, would increase the demand for and value of ATOM.

435.    The ICF collected and pooled the $17.3 million raised from investors in the

Cosmos Fundraiser.  In promoting the Cosmos Fundraiser, the ICF represented that the funds

raised would be deployed to develop the Cosmos network.  For example, the March 31, 2017

"Cosmos Plan" posted on the Cosmos GitHub page provided that the raised funds would be used

"to contract with entities"—including Tendermint—"and their agents for the development of the

Cosmos Essential Software and Services (CESS) and to help foster a community around CESS."

The ICF later disclosed how they spent investor funds, for example in a 2019 post, "Projects

Funded in 2018" posted to the ICF's public GitHub page.

436.    In the 2017 Cosmos Whitepaper and "Fundraiser Plan" (both of which were publicly available on the Cosmos website), Kwon and Buchman described the Cosmos Fundraiser and said that the 236 million ATOM tokens initially minted would be distributed: 10% to the "Cosmos Network Foundation" (the ICF), 10% to All in Bits, Inc. (Tendermint), 5% to initial or "lead donors," and 75% to "the donors of the Cosmos Fundraiser" (investors).

437.    In public statements on the Cosmos and ICF websites, including statements made and available during the period when ATOM was available to trade on the Binance Platforms, the ICF described its expertise in developing blockchain networks and the efforts it and related entities (including Interchain GmbH and Tendermint) have made and that they will continue to make to develop the Cosmos network and attract users to the technology.  For example:

    a.  Cosmos's website stated that "Cosmos is supported by the Interchain Foundation" and identifies Tendermint, Interchain GmbH, and 15 other "Cosmos core development teams";

    b.  The ICF website stated that it "funds, stewards, and responsibly advances the Cosmos ecosystem" and its "core teams maintain the protocols and applications" in the "Cosmos tech stack" (including Cosmos Hub and Cosmos SDK), and identified 35 "Team" members, including Cosmos Hub and Cosmos SDK project, strategy, and developer relations leads, and software and developer relations engineers," that "[w]e help support projects like the Cosmos Network," and that with its "Engineering and Product" work "[w]e are primarily interested in general purpose technologies that expand the environment, capabilities, and security of the Cosmos ecosystem";

    c.  The 2019 "Projects Funded in 2018" post on the ICF's GitHub page (referenced above) identified grants, service agreements, and investments to develop the Cosmos network in 2018; and

    d.  The ICF website has touted the "Builders Program," which supposedly "provides mentorship, structured support and access to a wide network of partners"; "is led by a team experienced in building the ecosystem's software and infrastructure"; "is made by builders for builders, linking together our team of entrepreneurs, software engineers and designers with years of experience in building and launching chains"; and is a vehicle for ICF to "help teams navigate the ecosystem by giving access to our large network of investors, exchanges, custodians, auditors, development and design agencies, data providers and

107

infrastructure partners."

F.    SAND

438.    "SAND" was created on the Ethereum blockchain as the native token of the Sandbox platform, a virtual gaming platform first released in 2012 by Pixowl, Inc. ("Pixowl") as a mobile game for download on mobile phones.  Pixowl, which is headquartered in San Francisco, was founded in 2011 by Arthur Madrid ("Madrid") and Sebastien Borget ("Borget"). In 2018, Animoca Brands, Inc. ("Animoca"), headquartered in Hong Kong, acquired Pixowl and announced its intention to build a new 3D version of the Sandbox by leveraging blockchain technology.  After Pixowl's acquisition, the Sandbox's intellectual property, along with the rest of Pixowl's assets, were transferred to TSB Gaming Ltd ("TSB"), a wholly owned subsidiary of Animoca.  Madrid is CEO of TSB, and Borget is the COO.

439.    According to Sandbox's website, SAND is required to access the Sandbox platform, participate in the platform's governance, and earn rewards through the staking program on the platform as further described below.

440.    On or about May 23, 2019, before the minting of SAND in July 2019, Animoca raised approximately $2.5M in cash and crypto assets through TSB via the issue of Simple Agreements for Future Equity ("SAFEs") and SAND tokens, to "fund the development of the upcoming blockchain version of The Sandbox."  According to Animoca's May 23, 2019 press release, the majority of investors allocated their investment to the purchase of both SAND tokens and future equity in TSB via the SAFE agreements (in the amount of $2 million), while some investors allocated their investment exclusively to the purchase of SAND tokens ($500,000).  Per the release, the funding round was led by Hashed, for approximately $1 million, and also included a number of other crypto venture capital investors.

441. TSB then minted a total supply of 3 billion SAND on the Ethereum blockchain in or around July 2019 and offered and sold SAND through purportedly private sales and in an IEO that raised $3 million on the Binance.com Platform starting August 13, 2020.

442. SAND has been available for buying, selling, and trading on the Binance.US Platform since October 2022.

443. The information TSB publicly disseminated has led SAND holders, including those who have purchased SAND since August 2020, reasonably to view SAND as an investment in and to expect to profit from TSB's efforts to grow the Sandbox protocol, which, in turn, would increase the demand for and value of SAND.

444. On its blog posts announcing "exchange listings," Sandbox touted its efforts to obtain "listings" and the SAND token's liquidity in the secondary market. For example, in a September 21, 2021 Medium blog post, Sandbox stated that "$SAND is listed on over 60 global cryptocurrency exchanges, including a dozen of the top exchanges by market capitalization."

445. In addition, the Sandbox stated that it would pool the proceeds from the private token sales and the IEO to develop and promote use of the platform. For example, the May 23, 2019 press release stated: "The funds raised through this transaction will be used to grow the development team and infrastructure for the [Sandbox] Game Platform, support marketing efforts through the acquisition of creators and IP licenses, and provide for security, legal, and compliance expenses as well as general and administrative costs." The Sandbox Whitepaper similarly described identical uses for the $3 million in funds intended to be raised during the IEO.

446.    Moreover, according to the Sandbox Whitepaper, of the 3 billion SAND tokens that were initially minted, 19% were to be allocated to the Sandbox founders and team, and another 25.8% were to be allocated to the Company Reserve.

447.    In addition, the Sandbox's Medium blog post on July 25, 2019 stated, "[A]n interesting feature of [the $SAND] token is that it can accrue in value over time, due to the fact that it is scarce. There will be a limited supply of 3 billion units of $SAND available."

448.    Moreover, TSB stated publicly that it would take steps to manage the market for SAND, including the SAND Whitepaper stating that the Sandbox team controls the supply of SAND tokens and has implemented a "controllable supply mechanism, such as purchasing SAND from multiple exchanges," and that "while the total supply of SAND is fixed, the initial amount of SAND offered will provide a scarcity effect reducing the SAND available per capita and therefore fostering demand."

449.    Additionally, in many instances, Animoca has touted the backgrounds of Pixowl, TSB, and the Sandbox core members, including Madrid and Borget, in describing the success and future development of the Sandbox:

    a.   After the acquisition of Pixowl, Yat Siu, the co-founder and director of Animoca, stated in a press release, dated August 27, 2018 (the "2018 Press Release") that "Pixowl's experienced developers will significantly increase our development capabilities. Its founders are highly respected game industry veterans who have developed multimillion dollar franchises. We believe the blockchain version of *The Sandbox* has incredible potential . . . We look forward to utilizing the many opportunities for growth conferred by this acquisition";

    b.   In the 2018 Press Release, Madrid also commented: "Animoca Brands is a perfect fit for Pixowl and we are happy to add our brand relationships to its portfolio while accelerating growth for our key IP, *The Sandbox*[.] . . .";

    c.   The 2018 Press Release also touted that Ed Fries, the creator of Microsoft Game Studios and co-founder of the Xbox project, is a special advisor to The Sandbox's original game developer Pixowl and will therefore continue to serve on the advisory team.

d. The Sandbox Whitepaper further claimed, "We have a strong product roadmap ahead and a top team to execute a strong vision to build a unique virtual world gaming platform where players can build, own, and monetize their gaming experiences and spread the power of blockchain as the lead technology in the gaming industry."

450. Moreover, the Sandbox Whitepaper describes that the role of the "Sandbox Foundation" is to support the ecosystem of the Sandbox by, among other things, offering grants to incentivize high quality content and game production on the platform and further notes that the "overall valuation of the metaverse grows through the valuation of all games funded by the Foundation, creating a virtuous circle to enable funding bigger games." The Sandbox's Gitbook also notes that the Sandbox Foundation has, among other things, (a) supported play-to-earn tournaments and cross-gaming to encourage the broader adoption of SAND and (b) supported marketing activities contributing to the growth of awareness about NFTs, Metaverse and SAND adoption, including co-marketing with exchanges and influencers.

## G. MANA

451. "MANA" is the digital token minted by Decentraland. Decentraland is a virtual reality platform that began development in June 2015 but was not made available to the public until its launch in February 2020. Decentraland was launched through an entity named Metaverse Holdings by a team of core individual developers: Ariel Meilich, Esteban Ordano, Manual Araoz, and Yemel Jardi. Decentraland operates on the Ethereum blockchain. According to Decentraland's website, www.decentraland.org, Decentraland is a three-dimensional virtual reality platform, where users can create, experience, and monetize their content and applications.

452. According to Decentraland's website, and as discussed more fully below, MANA serves as the crypto asset involved in all transactions in the Decentraland virtual reality ecosystem. On August 18, 2017, Decentraland held an ICO MANA tokens in exchange for

ETH, raising approximately $24.1 million. Currently, there is a total supply of approximately 2.19 billion MANA tokens.

453. Decentraland offered early contributors to the Decentraland ecosystem a discounted price when purchasing MANA.

454. MANA has been available for buying, selling, and trading on the Binance Platforms since August 2020.

455. The information Decentraland publicly disseminated has led MANA holders, including those who have purchased MANA since August 2020, reasonably to view MANA as an investment in and to expect to profit from Decentraland's efforts to grow the Decentraland protocol, which, in turn, would increase the demand for and value of MANA.

456. Investor proceeds raised during the MANA ICO were pooled to fund the marketing, business expenses, and completion of the Decentraland platform. For instance, on July 5, 2017—a few weeks before the MANA ICO—Jardi published a blog post detailing Decentraland's intended use of revenue from the token sale as follows:



457. The blog post further explained that the "top priority" for use of the revenue was to develop a virtual world and that even after Decentraland was created, "the development budget will focus on the continued improvement of the end-user experience within the world."

112

458.     Indeed, Meilich explained in a separate blog post that after the ICO, Decentraland would implement a "Continuous Token Model," where it would increase the MANA supply by 8 percent in the first year, followed by a lower rate in subsequent years, to allow Decentraland to "regularly expand while accommodating new users … The proceeds of the tokens sold by [the Continuous Token Model] will finance Decentraland over the long haul, perpetually aligning it with the prosperity of the network."

459.     In April 2020, the Decentraland Team announced the creation of the Decentraland Foundation (the "Foundation"), which today holds the intellectual property rights over and makes available the products and services, including virtual environment and tools, offered on the Decentraland platform.  Meilich publicly stated that the distribution of the initial supply of MANA tokens issued at the time of the ICO would be as follows: 20 percent to the founding team, advisors, and early contributors; 20 percent to the Foundation; 40 percent to be available for purchase by the public; and 20 percent reserved to "incentivize early users, developers, and partners who want to build within Decentraland."

460.     As Meilich explained in his public blog post, "To incentivize value creation within Decentraland, extra tokens will be allocated to the [development team], organization, and a reserve to accelerate Community and Partner engagement."

461.     For example, Decentraland publicly issued a whitepaper ("Decentraland Whitepaper") described the architecture that would be built in the virtual reality platform and steps that would be taken to support Decentraland's growth.  It further made clear that the development of the platform was only beginning, and listed a number of "Challenges" that would need to be addressed in the development process in order for the platform to succeed.

462.    Decentraland has continued to invest efforts in new developments and tools for the platform.  According to Melich, even after the ICO, Decentraland was still "preparing a land allocation policy to ensure fair distribution, as well as a method for groups to purchase larger contiguous plots of land."  Since the ICO, Decentraland has developed tools for purported use on its platform (*e.g.*, the "Marketplace" and "Builder" tools).  In a public blog post published on March 19, 2018, the Decentraland team described the marketplace tool as the "first … in what will be a series of tools."

463.    Additionally, the Decentraland Whitepaper explained how the Foundation would "Foster the Network" in that it will "hold contests to create art, games, applications, and experiences, with prizes contingent on meeting a set of milestones.  At the same time, new users will be assigned allowances, allowing them to participate in the economy immediately."  The Decentraland Whitepaper further claimed, "These financial incentives will help bootstrap the utility value of the network until it independently attracts users and developers."

464.    The Decentraland Whitepaper and website have also marketed that the protocol "burns" (or destroys) MANA tokens when used within the Decentraland ecosystem.

**H.    ALGO**

465.    "ALGO" is the native token of the Algorand blockchain and has a maximum supply of 10 billion, which were minted at the launch of the Algorand network.  Algorand is a blockchain protocol founded by Silvio Micali.  The Algorand blockchain uses a consensus algorithm it calls "pure proof-of-stake," in which each user's ability to influence the choice of a new block is proportional to its stake (number of tokens) in the system.  Because ALGO is the native token of the Algorand blockchain, those utilizing the Algorand blockchain need to hold (and potentially stake) certain amounts of ALGO.

466.     The Algorand Foundation Ltd. (the "Algorand Foundation") conducted an initial ALGO token sale on or about June 19, 2019, selling 25 million tokens at $2.40 per ALGO, raising approximately $60 million.  In advance of the token sale, the Algorand Foundation promoted the token sale on Twitter and included a link to its website.

467.     The Algorand Foundation promoted the June 19, 2019 token sale in part with a refund policy that allowed ALGO investors to return the ALGO to the Algorand Foundation one year later at 90% of the original purchase price.  The Algorand Foundation explained the economic rationale behind the refund policy by noting its own belief in and commitment to the value of ALGO: "We believe in the underlying value of the Algorand blockchain, the Algo, and the potential of the borderless economy.  Our goal is to invest in the growth, sustainability and performance of that economy."

468.     In other words, in promoting the ALGO token sale, the Algorand Foundation tied the potential growth of the Algorand blockchain to potential demand for the ALGO token itself, and to its own commitment to preserving a price floor for ALGO.

469.     In or around August 2019, the Algorand Foundation publicly offered ALGO investors an early refund opportunity, and ALGO investors returned a total of approximately 20 million ALGO tokens to the Algorand Foundation in exchange for a refund that was 85% of the original purchase price.  In or around June 2020, ALGO investors who did not refund their ALGO tokens in August 2019 were publicly offered a second refund window.  ALGO investors returned a total of approximately 5 million ALGO tokens for a refund that was 90% of the original purchase price.

470.    Through its rewards programs and incentive structures, the Algorand Foundation continued distributing tokens after the June 2019 token sale.  As of September 2022, approximately 6.9 billion ALGO were in circulation.

471.    Today, two entities are responsible for Algorand: (1) the Algorand Foundation, an organization purportedly focused on Algorand "protocol governance, token dynamics and supporting grassroots, open-source development on the Algorand ecosystem," which was incorporated in Singapore; and (2) Algorand, Inc., a company purportedly focused on "layer-1 development of the Algorand Protocol and enabling Enterprise adoption of Algorand blockchain technology."

472.    The Algorand Foundation and Algorand, Inc. purportedly collaborate on projects and initiatives for the Algorand community.

473.    Shortly before the June 19, 2019 ALGO token sale, Steven Kokinos, the CEO of Algorand, Inc., posted a publicly available article stating: "(a) We will be holding our founder's tokens for the long term and will not be selling them.  (b) We will use our founder's tokens to participate in consensus and assist in securing the network, though we will never represent more than 49% of the voting.  (c) We will use our founder's tokens to support the ecosystem and encourage development."

474.    The Algorand Foundation purportedly owns 500 million ALGO tokens and the participation and governance rewards associated with those tokens.  Also, members of the Algorand Foundation's board of directors and its advisory committees receive ALGO as compensation.

475.    In addition to the tokens it owns, as of September 2022, the Algorand Foundation also controls over 3 billion ALGO tokens in wallets publicly identified as for "Community &

116

Governance Rewards," "Ecosystem Support," and "Foundation Endowment," signaling to the public that the Algorand Foundation would use the ALGO tokens to support the ALGO economy or ecosystem as well as to reward itself and participants in this ecosystem.

476. ALGO has been available for buying, selling, and trading on the Binance.com Platform since June 2019, and the Binance.US Platform since October 2019.

477. The information Algorand, Inc. and the Algorand Foundation publicly disseminated has led ALGO holders, including those who have purchased ALGO since June 2019, reasonably to view ALGO as an investment in and to expect to profit from Algorand, Inc.'s and the Algorand Foundation's efforts to grow the Algorand protocol, which, in turn, would increase demand for and value of ALGO.

478. In public statements on Twitter, as well as on their respective websites, Algorand, Inc. and the Algorand Foundation promoted the Algorand protocol.

479. Until approximately May 14, 2022, the Algorand Foundation told the investing public that ALGO investors could receive participation rewards (purportedly a form of staking by delegation) by "participation in the Algorand ecosystem via holding Algo in an online wallet."

480. As of approximately May 14, 2022, the Algorand Foundation publicly stated that it would replace the participation rewards that ALGO holders were entitled to receive with so-called governance rewards. The Algorand Foundation described "Governance" as a way for investors to make investment returns on their ALGO purchases—stating it is "a decentralized program which allows Algo holders to vote on the future of Algorand" and "the best way to earn rewards for holding Algo, with APY% of 10.02% - 14.05% seen in previous periods."

481.    The Algorand, Inc. and Algorand Foundation websites tout their teams' technical experience and expertise in the areas of cryptography and business development.  For example, Algorand, Inc.'s website states: "Blending technical mastery and professional stability, the Algorand team consists of internationally recognized researchers, mathematicians, cryptographers, and economists along with proven business leaders from global technology companies."

482.    In a March 2022 report, the Algorand Foundation publicly stated that it had started a new program to incentivize the "growth of the ecosystem, which is the fundamental need of a maturing blockchain.  The program includes a series of loans to help the growth of our DeFi network and to expand the institutional investments in the ecosystem . . . The Algorand Ecosystem team facilitates the development and growth of the ecosystem and developer pipeline including undiluted funding, technical onboarding and standardization conventions for ASAs, Wallets and AVM."

483.    Algorand, Inc. and the Algorand Foundation have also taken steps to incentivize third parties to participate in and attract users to the ALGO protocol.  For example, in or around February 2022, the Algorand Foundation announced a $10 million incentive for developers that can make the Algorand blockchain compatible with applications built on the Ethereum blockchain.

484.    Also in or around February 2022, the Algorand Foundation announced a section of its website called AlgoHub, "a virtual community designed to grow the pipeline of #Algorand developers."

485.    These statements have led ALGO investors, including those who purchased ALGO after it became available for trading on the Binance Platforms, to reasonably expect that

the demand for ALGO would likely increase based on Algorand, Inc.'s and Algorand Foundation's efforts to increase demand for the Algorand technology, thereby resulting in a price increase for ALGO.

**I.     AXS**

486.    Axie Infinity Shards ("AXS") are ethereum tokens that are native to the Axie Infinity ("Axie") game, a blockchain game that allows players to interact in a virtual world through digital pets called "Axies."

487.    Axie was created by Sky Mavis PTE LTD (Sky Mavis) and launched in 2018. The Sky Mavis team has 40 full-time employees, which include CEO Trung Nguyen and COO Aleksander Leonard Larsen, who are part of the founding team responsible for key decisions regarding Axie, such as product development, marketing, digital design, and software engineering.

488.    Players of the Axie game can earn AXS for successfully playing the Axie game and can use AXS to make in-game purchases.  AXS can also be staked through Axie.  The total AXS token supply is 270 million with over 100 million in circulation.

489.    In 2020, Sky Mavis raised about $864,000 in a purportedly private sale of AXS tokens to "strategic investors."  That same year, Sky Mavis conducted a public sale of AXS, resulting in the distribution of 29.7 million AXS tokens, raising $2.9 million for Axie.  The AXS tokens sold to "strategic investors" were offered at a 20 percent discount to those sold in the public offering, and were subject to a quarterly unlocking schedule over a two-year period.

490.    AXS has been available for buying, selling, and trading on the Binance.com Platform since October 2020, and the Binance.US Platform since November 2021.

491.    The information Sky Mavis publicly disseminated has led AXS holders, including

those who have purchased AXS since August 2021, reasonably to view AXS as an investment in

and to expect to profit from Sky Mavis's efforts to grow the Axie protocol, which, in turn, would

increase demand for and value of AXS.

492.    For example, Sky Mavis explained publicly that funds raised in the AXS 2020

offerings were pooled and used to develop and improve the Axie platform.  An October 26, 2020

article explains that the "team has used funds raised according to the allocations below: 85%

[d]evelopmental expenses; 10% [a]dministrative costs; 5% [b]usiness development and

marketing."

493.    Also, on November 19, 2020, the Axie Twitter account stated: "Today, we're

proud to share more info on the $AXS strategic sale!  The participants will help open amazing

new doors.  The capital will help us scale the team so we can better deliver on the gameplay and

feature updates you're all patiently waiting for!"  To keep the Sky Mavis team "incentivized to

keep building after a successful token sale," 21 percent of the total AXS tokens—56.7 million

AXS—were issued to these individuals, which will be gradually unlocked over a 4.5 year period

to ensure that "the team, community and investors have aligned incentives."

494.    An Axie whitepaper further explained that the Sky Mavis team will use its

experience and efforts to develop and grow the Axie game.  For example, it lists the Axie

founding team, their roles, and background experience and touts that "we've established a core

team to lead product development and oversee most decisions related to the progress of the

game.  This allows us to build and iterate quickly towards product-market fit."

495.    At the time of the initial sale of AXS, the Axie platform was not complete, and

while several features of the platform have been implemented since 2020, others are still in the

development phase today.  Further, the whitepaper explicitly set growth goals in terms of daily average users of Axie Infinity and average weekly growth rates, that if "not met by the end of 2023, Sky Mavis will lead the formation of a steering committee or similar vehicle to discuss a path forward."

**J.      COTI**

496.    "COTI" is the native token of the Coti blockchain and ecosystem.  Coti is company that purports to provide a digital infrastructure for payments, co-founded by Samuel Falkon and David Assaraf.  Shahaf Bar-Geffen is Coti's CEO.  The Coti website, www.coti.io, is operated by Coti (BVI) Limited, a company incorporated and registered in the British Virgin Islands.

497.    On June 4, 2019 Coti conducted an IEO on a crypto asset trading platform for approximately 46 million COTI, raising approximately $3 million.  Coti has a maximum supply of two billion COTI.

498.    COTI has been available for buying, selling, and trading on the Binance.com Platform since February 2020, and the Binance.US Platform since April 2022.

499.    The information Coti publicly disseminated has led COTI holders, including those who have purchase COTI since February 2020, reasonably to view COTI as an investment in and to expect to profit from Coti's efforts to grow the Coti protocol, which, in turn, would increase demand for and value of COTI.

500.    For example, in a May 28, 2019 Medium post Coti stated that the purpose of the upcoming IEO was "to ensure an effective launch," and that the IEO "enable[s] us to amplify our community base and to generate greater visibility and liquidity measures."

501.     In that post, Coti also stated that the Coti team was allocated 15% of the total COTI supply and advisors were allocated 10% of the total COTI supply. Coti further noted that "[t]eam tokens have a minimum six-month lockup and are released over a 24-month period" and that "[a]dvisor tokens are locked for a 6-36-month period."

502.     Moreover, the webpage announcing the June 4, 2019 IEO disclosed a so-called "private" sale allocation of 10.01% of the total COTI supply at $0.08 per COTI, and a so-called "seed" sale allocation of 2.87% of the total COTI supply at $0.06 per COTI.

503.     On that date Coti also published a Medium post entitled, "COTI's IEO [] creates buying frenzy," touting COTI's "trading volume hit $1M USD within 30 minutes of launching," and that COTI's "price sprinted over 10 times the opening value twice and stalled at a peak appreciation of x18."

504.     The "Purchase Agreement" for the IEO stated that "proceeds from the Token Sale will be deployed to fund the development of the COTI Project, for the development of the COTI technology and the COTI eco-system."

505.     Coti posted a number of "Meet the COTI Team" Medium blog posts, including one from April 2022 highlighting its COO. In the post, the COO stated: "COTI has one of the best (probably THE best) teams in the world"; that "we are continuing to build this special DNA and culture of excellence"; and that his aim was to "keep improving current processes and to bring the most optimized communication tools into all of COTI's different departments, which [he] believed is bound to make it more successful!"

506.     Another Coti "Meet the COTI Team" post in October 2022 highlighted Coti's Talent Acquisition Manager. The Talent Acquisition Manager stated that since she started at Coti, she had "managed to double the amount of employees from the entire range of departments

like R&D, Marketing, research and more," and that because "[t]he Crypto industry is a fiercely competitive one … every company needs the best talents for them to stand out in the industry."

507.    In public statements on social media, as well as in Medium posts and posts on its website, Coti has described the efforts that this team and team members made and would continue to make to develop the Coti blockchain and attract users to the technology.

508.    For example, in a January 2023 Medium post outlining its plans for 2023 and beyond, Coti claimed that it is "uniquely optimized to solve challenges around payments," stated that it will "continue to gain more traction with more enterprises," and said that it "plan[s] on expanding." It also stated that its "ecosystem of [COTI] holders will continue to benefit from the network's success by engaging with our Treasury app" with "new and innovative features geared toward the growth of value captured."

509.    Coti also states on its website, "COTI is an all-in-one company – protocol and commercial development are both in-house. COTI offers a turn-key solution for enterprises which can be white labeled with products."

## IX.    BINANCE AND BAM TRADING WERE REQUIRED TO BUT DID NOT REGISTER AS AN EXCHANGE, BROKER-DEALER, OR CLEARING AGENCY.

510.    Binance (through the Binance.com Platform) and Binance and BAM Trading (acting as a group of persons through the Binance.US Platform) used the means and instrumentalities of interstate commerce to bring together the orders of multiple buyers and sellers of crypto assets that were offered and sold as securities using a trading facility programmed with non-discretionary rules for orders to interact and for buyers and sellers to agree upon the terms of trades in these securities. Binance and BAM Trading were therefore each required to register with the SEC as a national securities exchange or operate pursuant to an exemption from registration, but did not do so.

511.    Binance and BAM Trading used the means and instrumentalities of interstate commerce to engage in the business of effecting transactions in securities for the account of others by, for example, soliciting potential investors in crypto asset securities, holding themselves out as places to buy and sell crypto asset securities, facilitating trading in crypto asset securities by opening customer accounts, handling customer funds and crypto asset securities (which they commingled and treated as fungible) through Binance and BAM Trading-controlled accounts and digital wallets, and being compensated for doing so.  Binance and BAM Trading were therefore each required to register with the SEC as a broker or operate pursuant to an exemption from registration, but did not do so.

512.    Binance used means and instrumentalities of interstate commerce to regularly purchase and sell crypto asset securities for its own accounts while providing Binance OTC services.  Binance held itself out as a dealer by advertising its Binance OTC services on its website and on social media to solicit new customers, and through these services, quoted prices directly to users, served as the counterparty to all block trades transacted through Binance OTC, and earned fees from the spread on each completed block trade.  Binance was therefore required to register with the SEC as a dealer or operate pursuant to an exemption, but did not do so.

513.    Binance (as to trading on the Binance.com Platform) and Binance and BAM Trading (as to trading on the Binance.US Platform) each served as an intermediary in settling all transactions in crypto asset securities occurring on these platforms.  They also each acted as a custodian of securities by requiring customers to deposit their crypto asset securities in Binance-controlled (or, in the case of the Binance.US Platform – Binance and BAM Trading-controlled) wallets, and creating a system for the central handling of securities whereby crypto asset securities deposited, held, traded, and/or accrued on the Binance Platforms were treated as

fungible and customer accounts debited and credited by Binance and BAM Trading to settle customers' transactions. Binance and BAM Trading were therefore each required to register with the SEC as a clearing agency or operate pursuant to an exemption, but did not do so.

### FIRST CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Against Binance for Unregistered Offers and Sales of BNB)**

514.    The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-238, 282-314, 325-363, and 510-513.

515.    At all relevant times, by engaging in the conduct alleged in the Complaint, specifically by offering and selling BNB without a registration statement filed or in effect as to that security, Binance, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, that security for the purpose of sale or for delivery after sale, and/or made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise of that security.

516.    By reason of the conduct described above, Binance, violated, is violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].

### SECOND CLAIM FOR RELIEF
**Violations of Sections 5(a) and 5(c) of the Securities Act**
**(Against Binance for the Unregistered Offers and Sales of BUSD)**

517.    The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-238, 282-286, 315-324, 352-363, and 510-513.

518.   At all relevant times, by engaging in the conduct alleged in the Complaint, specifically by offering and selling BUSD without a registration statement filed or in effect as to that security, Binance, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, that security for the purpose of sale or for delivery after sale, and/or made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise of that security.

519.   By reason of the conduct described above, Binance violated, is violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].

### THIRD CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against Binance for the Unregistered Offer and Sale of Simple Earn and BNB Vault)

520.   The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-238, 282-363, and 510-513.

521.   At all relevant times, by engaging in the conduct alleged in the Complaint, specifically by offering and selling the Simple Earn and BNB Vault programs without a registration statement filed or in effect as to those securities, Binance, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, those securities for the purpose of sale or for delivery

126

after sale, and/or made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise of those securities.

522.    By reason of the conduct described above, Binance violated, is violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

### FOURTH CLAIM FOR RELIEF
### Violations of Sections 5(a) and 5(c) of the Securities Act
### (Against BAM Trading for the Unregistered Offer and Sale of its Staking Program)

523.    The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-238, 282-363, and 510-513.

524.    At all relevant times, by engaging in the conduct alleged in the Complaint, specifically by offering and selling its Staking program without a registration statement filed or in effect as to that security, BAM Trading, directly and indirectly, made use of the means and instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, that security for the purpose of sale or for delivery after sale, and/or made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of a prospectus or otherwise of that security.

525.    By reason of the conduct described above, BAM Trading violated, is violating, and, unless enjoined, will continue to violate Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a), (c)].

## FIFTH CLAIM FOR RELIEF
### Violation of Exchange Act Section 5
**(Against Binance for Failing to Register as an Exchange for the Binance.com Platform)**

526. The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-153, 282-338, and 352-513.

527. At all relevant times, by engaging in the acts and conduct described in this Complaint, specifically by operating the Binance.com Platform, Binance met and continues to meet the definition of "exchange" and, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce for the purpose of using any facility of an exchange within or subject to the jurisdiction of the United States to effect transactions in a security, or to report any such transaction, without registering as a national securities exchange under Exchange Act Section 6 [15 U.S.C. § 78f], and without being exempted from such registration.

528. By reason of the conduct described above, Binance, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 5 [15 U.S.C. § 78e].

## SIXTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 15(a)
**(Against Binance for Failing to Register as a Broker-Dealer for the Binance.com Platform)**

529. The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-153, 282-338, and 352-513.

530. At all relevant times, by engaging in the acts and conduct described in this Complaint, specifically by operating the Binance.com Platform, Binance, a person other than a natural person under the Exchange Act, was and is a broker and dealer and, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to effect any

transactions in, or to induce or attempt to induce the purchase or sale of, any security, without registering as a broker or dealer, and without being exempted from such registration.

531.     By reason of the conduct described above, Binance, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a) [15 U.S.C. § 78o(a)].

**SEVENTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 17A(b)**
**(Against Binance for Failing to Register as a Clearing Agency**
**for the Binance.com Platform)**

532.     The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-153, 282-338, and 352-513.

533.     At all relevant times, by engaging in the acts and conduct described in this Complaint, specifically by operating the Binance.com Platform, Binance, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to perform the functions of a clearing agency with respect to securities, without registering in accordance with Section 17A(b) of the Exchange Act and without being exempted from registration.

534.     By reason of the conduct described above, Binance, directly or indirectly, violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 17A(b) [15 U.S.C. § 78q-1(b)].

**EIGHTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 5**
**(Against Binance and BAM Trading for Failure to Register as an Exchange**
**for the Binance.US Platform)**

535.     The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35 and 110-513.

536.     At all relevant times, by engaging in the acts and conduct described in this

129

Complaint, specifically by operating the Binance.US Platform, Binance and BAM Trading met

and continue to meet the definition of "exchange" and, directly or indirectly, made use of the

mails and the means and instrumentalities of interstate commerce for the purpose of using any

facility of an exchange within or subject to the jurisdiction of the United States, to effect

transactions in a security, or to report any such transaction, without registering as a national

securities exchange under Exchange Act Section 6 [15 U.S.C. § 78f], and without being

exempted from such registration.

537.     By reason of the conduct described above, Binance and BAM Trading, directly or

indirectly, violated, are violating, and, unless enjoined, will continue to violate Exchange Act

Section 5 [15 U.S.C. § 78e].

**NINTH CLAIM FOR RELIEF**
**Violations of Exchange Act Section 15(a)**
**(Against BAM Trading for Failing to Register as a Broker for the Binance.US Platform)**

538.     The Commission realleges and incorporates by reference herein the allegations in

Paragraphs 1-35 and 110-513.

539.     At all relevant times, by engaging in the acts and conduct described in this

Complaint, specifically by operating the Binance.US Platform, BAM Trading, a person other

than a natural person under the Exchange Act, was and is a broker and, directly or indirectly,

made use of the mails and the means and instrumentalities of interstate commerce to effect any

transactions in, or to induce or attempt to induce the purchase or sale of, any security, without

registering as a broker or dealer, and without being exempted from such registration.

540.     By reason of the conduct described above, BAM Trading, directly or indirectly,

violated, is violating, and, unless enjoined, will continue to violate Exchange Act Section 15(a)

[15 U.S.C. § 78o(a)].

## TENTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 17A(b)
**(Against Binance and BAM Trading Failing to Register as a Clearing Agency
for the Binance.US Platform)**

541.    The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35 and 110-513.

542.    At all relevant times, by engaging in the acts and conduct described in this Complaint, specifically by operating the Binance.US Platform, Binance and BAM Trading, each, directly or indirectly, made use of the mails and the means and instrumentalities of interstate commerce to perform the functions of a clearing agency with respect to securities, without registering in accordance with Section 17A(b) of the Exchange Act and without being exempted from registration.

543.    By reason of the conduct described above, Binance and BAM Trading, directly or indirectly, violated, are violating, and, unless enjoined, will continue to violate Exchange Act Section 17A(b) [15 U.S.C. § 78q-1(b)].

## ELEVENTH CLAIM FOR RELIEF
### Violations of Exchange Act Sections 5, 15(a), and 17A(b)
**(Against Zhao as Control Person over Binance for the Binance.com Platform)**

544.    The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 80-153, 282-338, and 352-513.

545.    As alleged above, Binance violated Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)] in connection with its operation of the Binance.com Platform.

546.    At all relevant times, Zhao was a control person of Binance for purposes of Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

547.    At all relevant times, Zhao exercised power and control over Binance, including

by managing and directing Binance, and by directing and participating in the acts constituting Binance's violations of the securities laws.

548.     By reason of the foregoing, Zhao is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Binance's violations of Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)].

**TWELFTH CLAIM FOR RELIEF**
**Violations of Exchange Act Sections 5, 15(a), and 17A(b)**
**(Against Zhao as Control Person over Binance and BAM Trading**
**for the Binance.US Platform Violations)**

549.     The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35 and 80-513.

550.     As alleged above, Binance and BAM Trading violated Exchange Act Sections 5, and 17A(b), and BAM Trading violated Exchange Act 15(a) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)] in connection with their operation of the Binance.US Platform.

551.     At all relevant times, Zhao was a control person of Binance and BAM Trading for purposes of Exchange Act Section 20(a) [15 U.S.C. § 78t(a)].

552.     At all relevant times, Zhao exercised power and control over Binance and BAM Trading, including by managing and directing Binance and BAM Trading, and by directing and participating in the acts constituting Binance's and BAM Trading's violations of the securities laws.

553.     By reason of the foregoing, Zhao is liable as a control person under Exchange Act Section 20(a) [15 U.S.C. § 78t(a)] for Binance's and BAM Trading's violations of Exchange Act Sections 5, 15(a), and 17A(b) [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)].

**THIRTEENTH CLAIM FOR RELIEF**
**Violations of Securities Act Sections 17(a)(2) and (a)(3)**
**(Against BAM Management and BAM Trading)**

554.    The Commission realleges and incorporates by reference herein the allegations in Paragraphs 1-35, 110-324, and 352-513

555.    At all relevant times, by engaging in the conduct alleged in this Complaint, specifically by making materially false and misleading statements to investors and engaging in acts and practices that operated as a fraud upon purchasers, BAM Management and BAM Trading have, in the offer or sale of securities by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

556.    By reasons of the foregoing, BAM Management and BAM Trading, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Securities Act Section 17(a)(2)-(3) [15 U.S.C. § 77q(a)(2) and 77q(a)(3)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court order temporary and preliminary injunctive relief, including, but not limited to, asset freezes, a verified accounting, repatriation of assets, expedited discovery, preservation of documents and information, prohibition on the destruction of evidence, the appointment of a receiver, alternative service, and/or any other necessary equitable relief that the Court deems just and proper.

Further, the Commission respectfully requests that the Court enter a Final Judgment:

## I.

Permanently enjoining (i) Binance, BAM Trading, and Zhao, and each of their respective agents, servants, employees, attorneys, and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 5, 15(a), and 17A(b) of the Exchange Act [15 U.S.C. §§ 78e, 78o(a), and 78q-1(b)]; (ii) Binance and BAM Trading, and each of their respective agents, servants, employees, attorneys, and other persons in active concert or participation with any of them, from violating, directly or indirectly, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)]; and (iii) BAM Trading and BAM Management, and each of their respective agents, servants, employees, attorneys, and other persons in active concert or participation with any of them, from violating, directly or directly, Section 17(a)(2) and (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and (3)].

## II.

Ordering Defendants to disgorge all ill-gotten gains, with prejudgment interest thereon, pursuant to Sections 20(a), 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78t(a), 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

## III.

Ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

## IV.

Pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(6)] permanently barring Zhao from acting as an officer or director of any issuer whose securities are registered

with the Commission pursuant to Section 12 of the Exchange Act or which are required to file reports with the Commission pursuant to Section 15(d) of the Exchange Act.

**V.**

Permanently enjoining Binance, BAM Trading, and Zhao, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)], from directly or indirectly, including, but not limited to, through any entity owned or controlled by BAM Trading, Binance, or Zhao, using means or instrumentalities of interstate commerce to: (i) participate in the issuance, purchase, offer, or sale of any security, including any crypto asset security, in an unregistered transaction; (ii) act as an unregistered exchange with respect to any securities, including any crypto asset securities, (iii) act as an unregistered broker or dealer with respect to any securities, including any crypto asset securities, and (iv) act as an unregistered clearing agency with respect to any securities, including any crypto asset securities.

**VI.**

Granting any other and further relief this Court may deem just and proper for the benefit of investors.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands

trial by jury in this action of all issues so triable.


Dated: June 5, 2023    By:    ___/s___ Matthew Scarlato_____
Washington, D.C.    Matthew Scarlato (D.C. Bar No. 484124)
Jennifer L. Farer (D.C. Bar No. 1013915)
J. Emmett Murphy*
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F Street N.E.
Washington, D.C. 20549
Phone:    (202) 551-3746 (Scarlato)
(202) 551-5072 (Farer)
(212) 336-0078 (Murphy)
Emails:    scarlatom@sec.gov
farerj@sec.gov
murphyJoh@sec.gov

*Attorneys for the Plaintiff*

*\*Government attorney certification pursuant to
Local Rule 83.2(d) pending*


Of Counsel:    Jorge G. Tenreiro
David L. Hirsch
David A. Nasse
Michael Baker
Kathleen Hitchens
Donna Norman
Ann Rosenfield
Colby Steele
Martin Zerwitz

SECURITIES AND EXCHANGE
COMISSION