# EXHIBIT E

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Commodity Futures Trading Commission,<br><br>Plaintiff,<br><br>v.<br><br>Changpeng Zhao, Binance Holdings Limited, Binance Holdings (IE) Limited, Binance (Services) Holdings Limited, and Samuel Lim,<br><br>Defendants. | CIVIL ACTION NO:<br><br>Hon._____<br><br>**Jury Trial Demanded** |

**COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND
CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT
AND COMMISSION REGULATIONS**

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission"), an independent federal agency, for its Complaint against Defendants Changpeng Zhao ("Zhao"), Binance Holdings Limited, Binance Holdings (IE) Limited, Binance (Services) Holdings Limited (collectively "Binance" or the "Binance platform"), and Samuel Lim ("Lim") (collectively, "Defendants"), alleges as follows:

## I.  SUMMARY

1.       Binance operates the world's largest centralized digital asset exchange, emerging through an opaque web of corporate entities, all of which are ultimately controlled by Zhao, the Chief Executive Officer ("CEO") of Binance, and constitute a common enterprise called "Binance" or the "Binance ecosystem." Much of Binance's reported trading volume, and its profitability, has come from its extensive solicitation of and access to customers located in the

United States, including in this District, that enter into several different types of digital asset spot and derivative transactions involving commodities in interstate commerce on the Binance platform.

2.    Beginning no later than July 2019 and continuing through the present (the "Relevant Period"), Binance, under Zhao's direction and control and with Lim's willful and substantial assistance, has solicited and accepted orders, accepted property to margin, and operated a facility for the trading of futures, options, swaps, and leveraged retail commodity transactions involving digital assets that are commodities including bitcoin (BTC), ether (ETH), and litecoin (LTC) for persons in the United States.

3.    Since the launch of its platform in 2017, Binance has taken a calculated, phased approach to increase its United States presence despite publicly stating its purported intent to "block" or "restrict" customers located in the United States from accessing its platform. Binance's initial phase of strategically targeting the United States focused on soliciting retail customers.  In a later phase, Binance increasingly relied on personnel and vendors in the United States and actively cultivated lucrative and commercially important "VIP" customers, including institutional customers, located in the United States.  All the while, Binance, Zhao, and Lim, the platform's former Chief Compliance Officer ("CCO"), have each known that Binance's solicitation of customers located in the United States subjected Binance to registration and regulatory requirements under U.S. law.  But Binance, Zhao, and Lim have all chosen to ignore those requirements and undermined Binance's ineffective compliance program by taking steps to help customers evade Binance's access controls.

4.    Defendants have disregarded applicable federal laws while fostering Binance's U.S. customer base because it has been profitable for them to do so.  For example, according to

Binance's own documents for the month of August 2020 the platform earned $63 million in fees from derivatives transactions and approximately 16% of its accounts were held by customers Binance identified as being located in the United States. By May 2021, Binance's monthly revenue earned from derivatives transactions increased to $1.14 billion. Binance's decision to prioritize commercial success over compliance with U.S. law has been, as Lim paraphrased Zhao's position on the matter, a "biz decision."

5.      Binance purposefully obscures the identities and locations of the entities operating the trading platform. For example, Binance's customer-facing "Terms of Use," purports to be a contract between the customer and something simply called the "Binance operators," which is a term that has no concrete meaning. While Binance has maintained offices in numerous locations, including Singapore, Malta, Dubai, and Tokyo at various times during the Relevant Period, Binance intentionally does not disclose the location of its executive offices. Instead, Zhao has stated that Binance's headquarters is wherever he is located at any point in time, reflecting a deliberate approach to attempt to avoid regulation. Zhao explained this strategy during a June 2019 internal meeting, stating that Binance conducts its operations through various entities incorporated in numerous jurisdictions to "keep countries clean [of violations of law]" by "not landing .com anywhere. This is the main reason .com does not land anywhere."

6.      Zhao, Lim, and other members of Binance's senior management have failed to properly supervise Binance's activities and, indeed, have actively facilitated violations of U.S. law, including by assisting and instructing customers located in the United States to evade the compliance controls Binance purported to implement to prevent and detect violations of U.S. law. Binance and its officers, employees, and agents have instructed U.S. customers to use virtual private networks ("VPNs") to obscure their location; allowed customers that had not

submitted proof of their identity and location to continue to trade on the platform long after announcing such conduct was prohibited; and directed VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.

7.    Despite Binance's solicitation of and reliance on customers located in the United States to generate revenue and provide liquidity for its various markets, Binance has never been registered with the CFTC in any capacity and has disregarded federal laws essential to the integrity and vitality of the U.S. financial markets, including laws that require the implementation of controls designed to prevent and detect money laundering and terrorism financing, in violation of the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1–26, and the CFTC Regulations ("Regulations"), 17 C.F.R. pts. 1–190 (2022).

8.    Throughout the Relevant Period, and through the operation of the Binance platform, Defendants Binance, aided and abetted by Lim, and Zhao have violated core provisions of the CEA and the Regulations, including:

   i.    offering, entering into, confirming the execution of, or otherwise dealing in, off-exchange commodity futures transactions, in violation of Section 4(a) of the Act, 7 U.S.C. § 6(a), or, alternatively, Section 4(b), 7 U.S.C. § 4(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2022);

   ii.    offering, entering into, confirming the execution of, or transacting in off-exchange transactions in commodity options, in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2 (2022);

   iii.    soliciting and accepting orders for commodity futures, options, swaps, and retail commodity transactions or acting as a counterparty in any agreement, contract, or transaction described in Section 2(c)(2)(D)(i) of the Act; and, in connection with these activities, accepting money, securities or property (or extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the Binance platform, in violation of Section 4d of the Act, 7 U.S.C. § 6d;

iv.    operating a facility for the trading or processing of swaps without being registered as a swap execution facility ("SEF") or designated as a contract market ("DCM"), in violation of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2022);

v.     failing to diligently supervise Binance's activities relating to the conduct that subjects Binance to Commission registration requirements, in violation of Regulation 166.3, 17 C.F.R. § 166.3 (2022);

vi.    failing to implement an effective customer information program and to otherwise comply with applicable provisions of the Bank Secrecy Act, in violation of Regulation 42.2, 17 C.F.R. § 42.2 (2022); and

vii.   willfully conducting activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities to willfully evade or attempt to evade any provision of the [CEA] as enacted by Subtitle A of the Wall Street Transparency and Accountability Act of 2010, in violation of Regulation 1.6, 17 C.F.R. § 1.6 (2022).

9.     Unless restrained and enjoined by this Court, Defendants are likely to continue to engage in the acts and practices alleged in this Complaint and similar acts and practices, as more fully described below.

10.    Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-l, to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, disgorgement, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1345 (district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress).  Section 6c of the CEA, 7 U.S.C. § 13a-1(a), authorizes the CFTC to seek injunctive

relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the CEA or any rule, regulation, or order thereunder.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the CEA, 7 U.S.C. § 13a-1(e), because Defendants transacted business in the Northern District of Illinois and Defendants engaged in acts and practices in violation of the CEA and Regulations within this District.

### III.     PARTIES

#### A.     The CFTC

13.     Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder.

#### B.     Defendants

14.     **Changpeng Zhao** is the Chief Executive Officer ("CEO") of Binance.  Zhao launched Binance in 2017 from Shanghai, China and has ultimately controlled all of Binance's business activities at all times.  Zhao is a Canadian citizen who, based on recent media reports, currently resides in Dubai, United Arab Emirates.  Zhao has directly or indirectly owned the scores of entities that collectively operate the Binance platform.  In addition to the entities that operate the Binance platform, Zhao is the direct or indirect owner of entities that have engaged in proprietary trading activity on the Binance platform, including Merit Peak Limited and Sigma Chain AG, and Zhao is also the direct or indirect owner of approximately 300 separate Binance accounts that have engaged in proprietary trading activity on the Binance trading platform.  Zhao has never been registered with the Commission in any capacity.

15. **Binance Holdings Limited** ("Binance Holdings") is incorporated in the Cayman Islands and directly or indirectly owned by Zhao. Binance Holdings has held intellectual property for Binance, including trademarks and domain names, and has employed at least certain individuals who perform work for or on behalf of the Binance platform. Binance Holdings has never been registered with the Commission in any capacity.

16. **Binance Holdings (IE) Limited** ("Binance IE") is incorporated in Ireland and directly or indirectly owned by Zhao. Binance IE is a holding company that has directly or indirectly owned at least 24 corporate entities that have acted as Binance's digital asset and virtual asset service providers in a variety of jurisdictions and held Binance's non-U.S. regulatory licenses. Binance IE has never been registered with the Commission in any capacity.

17. **Binance (Services) Holdings Limited** ("Binance Services") is incorporated in Ireland and directly or indirectly owned by Zhao. Binance Services is a holding company that has directly or indirectly owned at least 43 different corporate entities, including companies that conduct technology and operations services for Binance, hold the intellectual property related to Binance's matching engines and financial products, and enter into contracts with vendors, as well as a company called Ality Technologies DE LLC that functions as Binance's "U.S. Tech/Ops Hub." Binance Services owns Binance Holdings. Binance Services has never been registered with the Commission in any capacity.

18. **Samuel Lim** was hired in April 2018 as Binance's first Chief Compliance Officer ("CCO") and remained in that role until at least January 2022. On information and belief, Lim resides in Singapore. Binance Holdings refused to provide Lim's residential address in response to a CFTC investigative subpoena. While acting as CCO, Lim advised, directed, and assisted Binance employees and customers in circumventing compliance controls intended to detect and

prevent violations of law. Lim also made representations on behalf of Binance regarding the platform's compliance program and controls to regulators located in the United States. On information and belief, Binance placed Lim on paid, administrative leave in or around May 2022 but continues to employ Lim. Lim has never been registered with the Commission in any capacity.

### C.    Other Relevant Entities

19.    **Binance UAB** is incorporated in Lithuania and directly or indirectly owned by Zhao. Binance UAB is the only entity specifically identified as one of the indeterminate group of "Binance Operators" referenced in Binance's Terms of Use. Binance UAB has never been registered with the Commission in any capacity.

20.    **Merit Peak Limited** ("Merit Peak") is incorporated in the Cayman Islands and directly or indirectly owned by Zhao. Merit Peak has primarily engaged in over the counter ("OTC") transactions with institutional counterparties. Merit Peak has never been registered with the Commission in any capacity.

21.    **Sigma Chain AG** ("Sigma Chain") is incorporated in Switzerland and directly or indirectly owned by Zhao. It has engaged in proprietary trading in Binance's various markets, including its markets for digital asset derivatives. Sigma Chain has never been registered with the Commission in any capacity.

22.    **BAM Trading Services Inc. ("BAM Trading")** is a Delaware company with its principal address in Palo Alto, California. BAM Trading operates Binance.US, a spot digital asset trading platform that offers its services to U.S. residents and relies on Binance's services and technology, obtained through intercompany agreements, to operate. BAM Trading is directly or indirectly majority owned and controlled by Zhao, and Zhao has been a director of

BAM Trading at all relevant times.  BAM Trading has never been registered with the Commission in any capacity.

## IV.     RELEVANT STATUTORY BACKGROUND AND LEGAL FRAMEWORK

### A.     Applicable Provisions Under the Commodity Exchange Act and Regulations

22.     The purpose of the CEA is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the] Act and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants."  Section 3 of the Act, 7 U.S.C. § 5.

23.     Derivatives are financial instruments such as futures, options, or swaps that derive their value from something else, including, for example, a benchmark rate, a physical commodity such as oil or wheat, or digital asset commodities.  The CEA requires that, subject to certain exemptions, commodity derivative transactions must be conducted on exchanges designated by, or registered with, the CFTC.

24.     A digital asset is anything that can be stored and transmitted electronically and has associated ownership or use rights.  Digital assets include virtual currencies that are digital representations of value that function as mediums of exchange, units of account, and/or stores of value.  Certain digital assets, including BTC, ETH, LTC, and at least two fiat-backed stablecoins, tether ("USDT") and the Binance USD ("BUSD"), as well as other virtual currencies as alleged herein, are "commodities," as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).  In recent

years, as digital asset markets have evolved, futures contracts have been offered on certain digital

assets by boards of trade that are registered with the CFTC, such as the Chicago Mercantile

Exchange and Chicago Board Options Exchange.

25.    With limited exceptions, Section 5h(a) of the Act, 7 U.S.C. § 7b-3, and

Regulation 37.3, 17 C.F.R. § 37.3 (2022), make it illegal for a person to operate a facility for the

trading or processing of swaps unless the facility is registered with the CFTC as a SEF or DCM.

26.    Sections 1a(47)(A)(iii), (iv), and (vi) of the Act, 7 U.S.C. §§ 1a(47)(A)(iii), (iv),

and (vi), broadly define "swap" to include "any agreement, contract, or transaction"—

> (iii) [T]hat provides on an executory basis for the exchange, on a fixed or
> contingent basis, of 1 or more payments based on the value or level of 1 or more
> interest or other rates, currencies, commodities, securities, instruments of
> indebtedness, indices, quantitative measures, or other financial or economic
> interest or property of any kind, or any interest therein or based on the value
> thereof, and that transfers, as between the parties to the transaction, in whole or in
> part, the financial risk associated with a future change in any such value or level
> without also conveying a current or future direct or indirect ownership interest in
> an asset (including any enterprise or investment pool) or liability that incorporates
> the financial risk so transferred, including any agreement, contract or transaction
> commonly known as . . . (I) an interest rate swap; . . . (VII) a currency
> swap; . . . (XXII) a commodity swap . . . ;

> (iv) that is an agreement, contract, or transaction that is, or in the future becomes,
> commonly known to the trade as a swap; [or]

> (vi) that is any combination or permutation of, or option on, any agreement,
> contract, or transaction described in any of [these clauses].

27.    Section 1a(47)(D) of the Act, 7 U.S.C. §§ 1a(47)(D), defines a "mixed swap" as

including any "any agreement, contract, or transaction that is described in section 3(a)(68)(A) of

the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(68)(A)) and also is based on the value

of 1 or more interest or other rates, currencies, commodities, instruments of indebtedness,

indices, quantitative measures, or other financial or economics interest or property of any kind

10

(other than a single security or a narrow-based security index)."  Mixed swaps are jointly regulated by the CFTC and the Securities and Exchange Commission.

28.     The provisions of the Act and Regulations that apply to DCMs and SEFs, the facilities where the trading of commodity derivatives typically occurs, establish important protections for U.S. derivatives markets and market participants, including retail customers. For example, DCMs and SEFs must:

(a) conform to core principles that are designed to prevent market abuse, Sections 5(d)(12)(a) and 5h(f)(2)(B) of the Act, 7 U.S.C. §§ 7(d)(12)(a), 7b-3(f)(2)(B);

(b) ensure their financial stability, Sections 5(d)(21) and 5h(f)(13) of the Act, 7 U.S.C. §§ 7(d)(21), 7b-3(f)(13);

(c) protect their information security, Regulations 38.1051(a)(2) and 37.1401(a)(2), 17 C.F.R. §§ 38.1051(a)(2), 37.1401(a)(2) (2022); and

(d) safeguard their systems in the event of a disaster, Sections 5(d)(20) and 5h(f)(14) of the Act, 7 U.S.C. §§ 7(d)(20),  7b-3(f)(14).

29.     A futures commission merchant ("FCM") is an individual, association, partnership, corporation, or trust that (i) is engaged in soliciting or in accepting orders for regulated transactions including futures, swaps, commodity options, or retail commodity transactions, or (ii) acts as a counterparty to retail commodity transactions; and which, in connection with either of these activities, "accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom."  Section la(28)(A) of the Act, 7 U.S.C. § la(28)(A).

30.     Retail commodity transactions are commodity transactions that are entered into with, or offered to persons that are not eligible contract participants "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis."  Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D).

Subject to certain exceptions, retail commodity transactions are subject to Section 4(a) of the Act, 7 U.S.C. § 6(a), "as if" they are contracts of sale of a commodity for future delivery, and therefore may only be executed on a regulated futures exchange.

31.     An eligible contract participant ("ECP") is, in general, an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million, or $5 million if the individual enters into the transaction "in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual."  Section 1a(18)(xi) of the Act, 7 U.S.C. § 1a(18)(xi).

32.     Among other things, FCMs hold customer funds to margin commodity derivative transactions.  In this intermediary role, FCMs are thus a critical component of the U.S. financial system and must comply with requirements, including customer protection and financial integrity requirements, imposed by the Act and Regulations.  Among the most fundamental of these requirements is that any person that acts as an FCM shall register as such with the Commission. Section 4d(a) of the Act, 7 U.S.C. § 6d(a).  In addition to registration, FCMs must establish safeguards to prevent conflicts of interest, Section 4d(c) of the Act, 7 U.S.C. § 6d(c); segregate customer assets to protect them from the risk of the FCM's insolvency, 7 U.S.C. § 6d(a)(2); and employ only salespeople who register with the CFTC and meet strict proficiency requirements, Section 4k(1) of the Act, 7 U.S.C. § 6k(1).

33.     Regulation 166.3, 17 C.F.R. § 166.3 (2022), requires a Commission registrant such as an FCM to diligently supervise all activities of its officers, employees, and agents relating to its business as a Commission registrant.  The term "Commission registrant" as used in 17 C.F.R. § 166.3 means "any person who is registered or required to be registered with the

Commission pursuant to the Act or any rule, regulation, or order thereunder." Regulation 166.1(a), 17 C.F.R. § 166.1(a).

34.     Regulation 42.2, 17 C.F.R. § 42.2 (2022), requires, among other things, that every FCM shall comply with applicable provisions of the Bank Secrecy Act ("BSA") and the regulations promulgated by the Department of the Treasury under that Act at 31 C.F.R. chapter X, and with the requirements of 31 U.S.C. § 5318(l) and the implementing regulation jointly promulgated by the Commission and the Department of the Treasury at 31 C.F.R. § 1026.220, which require that an FCM adopt a customer identification program ("CIP") and file reports with the Financial Crimes Enforcement Network ("FinCEN") concerning certain specified activities and transactions as components of its BSA compliance program.

35.     The regulations promulgated by the Department of Treasury under 31 C.F.R. chapter X require, as relevant here, that every FCM must:  (1) implement a written CIP that, at a minimum, includes procedures for verifying the identity of each customer sufficient to enable the FCM to form a reasonable belief that it knows the true identity of each customer; (2) retain records collected pursuant to the CIP; and (3) implement procedures for determining whether a customer appears on any list of known or suspected terrorists or terrorist organizations.

**B.     Provisions Authorizing Imposition of Derivative Liability Under the CEA**

36.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), provide that the "act, omission, or failure of any official, agent, or other person acting for any . . . corporation . . . within the scope of his employment or office, shall be deemed the act, omission, or failure of such . . . corporation . . . as well as such official, agent, or other person."

37.     Section 13(a) of the Act, 7 U.S.C. § 13c(a), provides:  "Any person who commits, or who willfully aids, abets, counsels, commands, induces or procures the commission of, a

violation of any of the provisions of this Act, or any of the regulations or orders issued pursuant to this Act, or who acts in combination or concert with any person in such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this Act or any of the rules, regulations, or orders may be held responsible for such violation as a principal."

38.     Section 13(b) of the Act, 7 U.S.C. § 13c(b), provides that any "person who, directly or indirectly, controls any person who has violated the Act, or regulations promulgated thereunder, may be held liable for such violations to the same extent as the controlled person if the controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation."

### C.    Anti-Evasion Principles in the CEA and Regulations

39.     Regulation 1.6(a), 17 C.F.R. § 1.6(a) (2022), provides that it "shall be unlawful to conduct activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade any provision of the Commodity Exchange Act as enacted by Subtitle A of the Wall Street Transparency and Accountability Act of 2010 or the rules, regulations, and orders of the Commission promulgated thereunder."  *See also* Section 2(i)(2) of the Act, 7 U.S.C. § 2(i)(2) (authorizing promulgation of anti-evasion regulations).

### V.    <u>FACTS</u>

### A.    Overview of the Binance Platform and Operations

40.     Binance is a centralized, web-based "crypto-products platform" that has offered trading in digital asset commodities and related derivatives, among other financial products and services, to over 100 million customers throughout the world, including in the United States. Binance holds itself out as the world's "largest crypto exchange by trade volume" and is reported

14

to have amassed over half the global market share for digital asset exchange activity as of the end of 2022.

41.     Beginning with its launch in July 2017, Binance has offered customers transactions in digital asset spot markets.  In July 2019, Binance began offering its customers leverage with which to trade in its digital asset spot markets.  According to Binance, its two most heavily traded digital assets in its spot markets are BTC and ETH.  In September 2019, Binance began offering digital asset derivative products.  Binance's most heavily traded derivative products incorporate BTC or ETH as underlying assets.

42.     Although Binance now offers numerous financial products, its core offering is to act as a centralized trading platform at which market participants (i.e. customers) may transact in digital assets or digital asset derivatives by transmitting orders to buy or sell into what Binance calls order books.  Binance's order book-based markets execute transactions based generally on price-time priority pursuant to non-discretionary order matching methodology.

43.     Customers may also purchase and trade digital assets on Binance through other trading protocols, including bilateral transactions (also called "OTC") in which Binance acts as one counterparty to the trade.  Binance customers can also acquire digital assets directly from Binance through Binance's "Buy Crypto" functionality.

44.     Binance customers may place orders through the user interface available at www.binance.com, through the Binance mobile application, and by direct connection to Binance's matching engines via the Binance application programming interface ("API").  API connections are generally used by more technologically sophisticated customers, such as proprietary trading firms or other institutional market participants.

45.     Among other sources of revenue, Binance makes money by charging its customers transaction fees for trades made on its platform.  Transaction fees vary based on the product and the customer's trading volume, and are Binance's largest source of revenue.  In a December 2022 interview, Zhao estimated that transaction revenue accounts for approximately 90 percent of Binance's revenue.  A meaningful percentage of that revenue has been and continues to be derived from digital asset derivative transactions entered into by U.S. customers, including customers in this District.

46.     Binance launched its own digital asset called the Binance Coin (BNB) through an initial coin offering in 2017.  Customers can trade BNB like any other digital asset on Binance and Binance incentivizes its users to purchase, use, and hold BNB tokens.  For example, Binance customers that elect to pay their trading fees using BNB receive a discount for doing so.  BNB holdings are one criterion for customers to gain VIP status, which as described below confers benefits on the customer including lower transaction fees.

47.     Since approximately September 2019, Binance has offered BUSD, a proprietary stablecoin.  At least prior to February 21, 2023, it did so through a contract with Paxos Trust Company LLC ("Paxos"), a New York trust company.  Binance has represented that BUSD is "compliant with [] strict regulatory standards."

48.     Binance refers to its important customers as VIPs.  Binance's VIP customers are often institutional market participants.  VIP customers are important to Binance because they provide liquidity to Binance's markets and pay Binance a lot of fees.  Binance is aware of its VIPs' identities and geographic locations because Binance monitors its sources of transaction volume and fee-based revenue as a matter of course in conducting its operations.

49.     Binance's VIP program rewards important customers by providing reduced rates for transaction fees and white-glove customer service, as well as exceptions to Binance's trading rules including order messaging limits.  Higher status VIPs also receive preferential access to Binance's matching engines, among other benefits.  Binance categorizes its VIPs into levels one to nine, with VIP 9 being the highest level occupied by the most important Binance customers.  A customer's VIP level is determined by, among other things, their 30-day trading volume and BNB holdings.  For example, in December 2021, a customer could maintain a VIP 9 level by engaging in "futures trading" volume of 25,000,000,000 (as measured by BUSD) and maintaining a 5,500 BNB balance over a 30-day period.

50.     Binance has relied on a dedicated team of employees and other agents to provide personalized service to its VIP customers.  These personnel have been known by various labels including the VIP team, Key Account Managers, and institutional sales representatives.

51.     Another important benefit that Binance has provided its VIP customers is prompt notification of any law enforcement inquiry concerning their account.  According to a policy titled "For management of LE requests for information and funds transfer," created by Lim based on directions from Zhao, Binance instructed its VIP team to notify a customer

> [A]t point of [account] freeze [based on a request from a law enforcement agency] and immediately after the unfreeze [which would occur 24 hours after the account freeze].  VIP team is to contact the user through all available means (text, phone) to inform him/her that his account has been frozen or unfrozen.  Do not directly tell the user to run, just tell them their account has been unfrozen and it was investigated by XXX.  If the user is a big trader, or a smart one, he/she will get the hint.

52.     Binance officers, employees, and agents have used numerous messaging applications for business communications during the Relevant Period.  In addition to email and

internal messaging applications, Binance's personnel have also used at least Telegram, WeChat, and Signal to communicate internally and with Binance customers.

53. The Signal messaging application allows a user to enable an auto-delete functionality to cover their tracks after communicating about inculpatory matters. Zhao and others acting on behalf of Binance have used Signal—with its auto-delete functionality enabled—to engage in business communications, even after Binance received document requests from the CFTC and after Binance purportedly distributed document preservation notices to its personnel.

54. Zhao has communicated over Signal with the auto-delete functionality enabled with numerous Binance officers, employees, and agents for widely varying purposes. For example, the following Signal text chains or group chats collected from Zhao's telephone were among those set to auto-delete:

    a. a group chat between Zhao, Binance's then-head of institutional sales, and Binance's head of "Big Data," which is the operational group responsible for creating and maintaining Binance's data and databases including the database that contains customer- and transaction-related information;

    b. a text chain with a senior member of Binance's VIP team;

    c. a text chain with a compliance consultant who participated in the creation of the strategy concerning the launch of Binance.US and Binance's attendant efforts to retain U.S. customers;

    d. a text chain with an accounting employee who participated in the preparation of Binance's monthly revenue reports for Zhao;

    e. text chains with senior operations personnel; and

    f. group chats titled "Finance," "HR," "Mkt hr," and "CEO office."

55. Zhao has also instructed Binance officers, employees, and agents to use Signal to communicate with U.S. customers. On information and belief, Binance does not have a corporate communications policy and continues to use Signal for business communications.

### B.    Relevant Financial Products Offered by Binance

56.    Beginning in July 2019, Binance has offered leverage to retail customers (that is, non-ECPs) trading in its spot markets, which generally include its markets for BTC, ETH, and other digital assets.  These leveraged transactions do not result in actual delivery of the digital asset within 28 days of the transaction.  According to Binance, "leverage refers to using borrowed capital to make trades.  Leverage trading can amplify your buying or selling power, allowing [the customer] to trade larger [notional] amounts."  Zhao approved Binance's retail leverage trading products before they were launched.

57.    When a retail customer trades in Binance's spot markets using leverage, Binance extends the customer a loan that is denominated in a digital asset that is selected by the customer. The customer may then use the loan proceeds to transact in Binance's spot markets.  Until the loan is paid back by the customer, Binance retains a security interest in the loan proceeds and in any assets purchased with the loan proceeds, up to the value of the loan.

58.    Beginning in April 2020, Binance has offered a product called "Binance Options."  According to Binance, Binance Options are a financial derivative that "give traders the right but not the obligation to buy or sell the underlying asset" upon the expiration of the options contract.  The underlying assets for Binance Options include BTC, ETH, and BNB. Binance Options are denominated and settled in USDT, not the option's underlying digital asset.

59.    At times during the Relevant Period, Binance has been the sole seller of Binance Options.  An options seller is one counterparty to an options transaction, so when Binance sells options it is trading against its customers.

60.    During the Relevant Period, Binance has also offered two categories of digital asset derivatives that it calls "futures"—one category, called quarterly futures, is composed of contracts that have pre-determined expiration dates while the other category, perpetual contracts,

is composed of contracts that do not have an expiration date.  These products all derive their value from the price of the underlying digital asset.

61.     Binance began offering quarterly futures in or around September 2019.  Binance's quarterly futures are futures contracts.  Binance customers trade quarterly futures with numerous digital assets as the base asset (what would in traditional financial markets be called the underlier), including BTC, ETH, and LTC.  Binance's quarterly futures are settled in whatever digital asset the customer uses to collateralize their trading.

62.     Following in the footsteps of its competitors, since at least September 2019 Binance has offered a product that Binance calls perpetuals contracts, sometimes called simply "perpetuals" by Binance's customers.  Binance's perpetuals are swaps.  Binance's perpetuals transfer the price risk of the underlying digital asset as between the counterparties to a transaction.  Binance's perpetuals do not have a pre-determined expiration date; a trader closes a position in perpetual contracts by entering into an offsetting transaction, at which time the trade settles in whatever digital asset the customer uses to collateralize their trading.  Binance offers perpetuals on numerous digital assets, including contracts with BTC, ETH, and LTC as the base asset.  Its most popular perpetuals include BTC/USDT, ETH/USDT and BTC/BUSD.

63.     Every eight hours, Binance causes the counterparties to a transaction in its perpetuals to exchange a payment that Binance calls a "funding fee."  In the context of Binance's perpetuals, the funding fee is intended to ensure the price of the perpetual contract stays sufficiently correlated to the price of the underlying digital asset as reflected by a price index that is determined by Binance and calculated based on prices reported by other digital asset exchanges.

64.     Transactions in Binance's quarterly futures and perpetual contracts do not result in an exchange of the underlying digital asset between the counterparties to a trade.  As explained by Binance: "Crypto futures are contracts that represent the value of a specific cryptocurrency.  You do not own the underlying cryptocurrency when you purchase a futures contract.  Instead, you own a contract under which you have agreed to buy or sell a specific cryptocurrency at a later date."  In this way, a derivatives trade on Binance is more like placing a bet on the price of a digital asset, rather than a way to purchase digital assets themselves.

65.     Customers have had the option to collateralize their trading in Binance's quarterly futures and perpetual contracts with either certain stablecoins, including USDT or BUSD, or certain non-stablecoin digital assets, including BTC.

66.     Binance customers may trade quarterly futures and perpetual contracts on margin, or with leverage.  The amount of leverage offered by Binance for trading in its quarterly futures and perpetual contracts has varied over time across its products and categories of customers. During the Relevant Period, customers have been allowed to trade Binance's quarterly futures and perpetual contracts with leverage ratios of up to 125x.  A leverage ratio of 125x means a customer with one BTC in their account can assume a position worth 125 BTC.  Unlike the leverage that Binance offers in connection with its spot markets, Binance does not actually extend its customers a loan when providing leverage to trade in Binance's derivatives markets.

67.     Zhao has been directly involved in Binance's product offerings.  He has monitored the derivative products offered by competing digital asset exchanges and brainstormed ways for Binance to keep pace with its competition.  For example, in an October 28, 2020 chat among the Binance Market Intelligence Group, Zhao circulated a web link

referencing "gamified-crypto-trading" and told an employee to "keep an eye on this."  The

employee responded:

> We have done some research on this . . . .  Right now most of the gamification
> trading are based on some complex derivative financial instruments, such as
> binary options, exotic options or perpetual swaps.  The reason why we did the
> Futures Battle is we wanted to lower the barrier of complex financial products and
> increase the conversion/retention rate.  But there is [sic] 2 things we need to be
> very careful:
> 1. Usually this kind of products looks like gambling, which may bring us some
>    compliance and reputation risk. So we need to make sure the product does not
>    look like a gamble game.
> 2. User might be much easier to get addicted to these products. So we need to
>    enhance responsible trading (or you could say playing) as well

Binance currently offers a "Battle function" that "allows users to compete with each other and

earn points" by trading Binance derivative contracts in a "head to head battle to see who is the

most profitable" in "a one-minute battle period."

68.     In an August 2020 blog post announcing the launch of BTC-margined perpetuals

(in addition to USDT-margined perpetuals, which had been offered since September 2019) at up

to 125x leverage, Binance touted the success of its perpetual contracts.  Binance stated that its

"perpetual futures consistently owns the largest trading volume, with recent monthly market

share averaging 37%."  In that same blog post, Binance highlighted its "competitive leverage of

up to 125x" and Zhao lauded that "shortly after hitting an all-time-high of $13 billion in daily

futures volume last month, we crossed the $1 billion mark in open interest last week."

### C.     Binance's Proprietary Trading Activity on Binance

69.     During the Relevant Period, Binance has traded on its own platform through

approximately 300 "house accounts" that are all directly or indirectly owned by Zhao, as well as

accounts owned by Merit Peak and Sigma Chain.  Zhao has also traded on the Binance platform

through two individual accounts.  At various times during the Relevant Period, Merit Peak has

entered into OTC transactions with Binance customers (and settled such trades by depositing

digital assets directly into its counterparties' Binance accounts), while Sigma Chain has engaged in proprietary trading in Binance's various markets, including its markets for digital asset derivatives. On information and belief, Binance's proprietary trading activity on Binance's own markets is directed by Binance's "quant desk."

70.     Binance does not disclose to its customers that Binance is trading in its own markets in its Terms of Use or elsewhere. Consistent with its apparent attempt to keep its proprietary trading activity on its own markets top secret, Binance has refused to respond to Commission-issued investigative subpoenas seeking information concerning its proprietary trading activity on Binance, including transaction data and communications among the members of the Binance "quant desk."

71.     On information and belief, Binance has not subjected the trading activity of Merit Peak, Sigma Chain, or its approximately 300 house accounts to any anti-fraud or anti-manipulation surveillance or controls and to the extent Binance purports to have required its officers, employees, and agents to abide by a relatively new "insider trading" policy, Binance's approximately 300 house accounts are exempt from that policy.

### D.     Binance's Presence in the United States

72.     Throughout the Relevant Period, Binance has maintained significant ties to the U.S. financial system and economy and has actively solicited customers in the United States through its marketing efforts including on numerous social media applications such as Twitter.

73.     Binance has employed at least 60 people in the United States, and that number continues to increase. Among Binance's U.S.-based employees are compliance and investigations personnel; personnel involved with Binance's private equity arm, known as "Binance Labs"; a key employee who managed the business unit that was responsible for

"Binance's official crypto wallet," a product Binance has offered called "Trust Wallet"; in-house lawyers; and Binance's current "Chief Strategy Officer."

74.     During the Relevant Period, Binance has enlisted U.S. residents to act as "Binance Angels" to solicit and interact with U.S. customers.  Generally, Binance Angels attempt to recruit new customers to Binance, answer questions from customers and prospective customers, and test new Binance features.  In return, Binance Angels receive benefits such as invitations to events and Binance swag.

75.     From Binance's early days, Zhao has known that U.S. customers trade on the platform.  Zhao has personally interacted with Binance's U.S. customers.  For example, in 2017, and in connection with Binance's early phase of targeting U.S. customers, Zhao provided instructions to a U.S. resident with respect to an English-language customer support channel over the Telegram messaging application.  Later, on January 8, 2018, a U.S. trading firm emailed Zhao directly to onboard to Binance, identified the owner of the company as a U.S. citizen, and provided the company's owner's U.S. passport and Illinois driver's license to Zhao.

76.     Zhao, Lim, and other Binance senior management have known that U.S. customers trade on Binance and have tracked and monitored their activities for multiple purposes.  For example, Zhao has received periodic reports concerning the nature and geographic location of Binance's customers as well as the sources of Binance's revenue.  These reports contain information about Binance's U.S. customers and the effectiveness of Binance's efforts to capture the U.S. market.

77.     An example of a periodic report that contains information about Binance's sources of revenue is titled August [2019] Financial Reporting Package.  The August Financial Reporting Package breaks downs Binance's trading revenue by base asset (with BTC-related

transactions comprising 44% of Binance's revenue for that month), and trading volume, among other metrics.  One slide on the August Financial Reporting Package is titled "Trading Revenue by Country" and displays Binance's focus on the geographic sources of its revenue, including the 16% for that month (and 19% for July 2019) that Binance attributed to customers located in the "US" as shown here:



78.     Binance officers, employees, and agents have interacted with U.S.-based institutional customers at Binance-hosted networking and social events in the United States at various times during the Relevant Period, including an April 2022 party in Las Vegas to which Binance invited its "largest accounts" such as "top heavy weights of hfts, prime brokerage, [and] vcs," and a networking event in Austin, Texas.  Binance and Zhao have also participated in numerous digital asset industry conferences in the United States.

79.     During the Relevant Period, Binance has procured professional services from U.S.-based law firms, compliance consultants, and other vendors concerning various aspects of its business operations.  For example, Binance relies on the Google suite of products for

information management and email services. Binance uses Webex for its internal messaging functionality. Binance leases office space from WeWork that it makes available to its U.S.-based employees and other personnel. Binance has entered into long term contracts with Amazon Web Services, a United States company headquartered in Washington. Among the services Binance purchases from Amazon Web Services that are provided to Binance in the United States is "AWS CloudFront," which according to Amazon Web Services is a "Global content delivery network." Zhao has paid for certain of Binance's Amazon Web Services accounts using his personal credit card.

80.     Binance avails itself of the U.S. legal system to seek protection for its intellectual property. For example, Binance Holdings filed trademark applications for "Binance"; "Binance Chain"; and "Binance DEX" with the assistance of U.S. attorneys. These U.S. trademarks remain active.

81.     In 2019, Zhao and BAM Trading launched Binance.US, a digital asset spot market trading platform that offers its services to U.S. customers. When he hired BAM Trading's first CEO, Zhao described Binance as a pirate ship and explained that he wished for Binance.US to be a navy boat. BAM Trading is under common ownership and control with Binance and continues to operate the Binance.US spot platform. Binance personnel, including Zhao, have dictated Binance.US's corporate strategy, launch, and early operations. At Zhao's direction, Binance.US's marketing and branding has mirrored that of Binance.com. BAM Trading has licensed Binance's trademarks to advertise in the United States. Binance.US has also relied on one of Binance's matching engines through a software licensing agreement.

### E.     Zhao Controls Binance and Operates Binance as a Common Enterprise

82.     Throughout the Relevant Period, Zhao has directly or indirectly owned and controlled all of the corporate entities, including Binance Holdings, Binance IE, Binance

Services and dozens of other corporate vehicles included in the Binance ecosystem that operate the Binance platform together as a common enterprise.  Binance's corporate organizational chart includes over 120 entities incorporated in numerous jurisdictions around the world.  At times, at least certain of those entities, including Binance Holdings, Binance IE, and Binance Services have commingled funds, relied on shared technical infrastructure, and engaged in activities to collectively advertise and promote the Binance brand.

83.     Binance's reliance on a maze of corporate entities to operate the Binance platform is deliberate; it is designed to obscure the ownership, control, and location of the Binance platform.  Consistent with this design, Binance's enigmatic Terms of Use define "Binance" as "an ecosystem comprising Binance websites (whose domain names include but are not limited to https://www.binance.com/en), mobile applications, clients, applets and other applications that are developed to offer Binance Services, and includes independently-operated platforms, websites and clients within the ecosystem" and the "Binance Operators" to include "all parties that run Binance, including but not limited to legal persons (including Binance UAB), unincorporated organizations and teams that provide Binance Services and are responsible for such services." The Terms of Use also state that Binance Operators and Binance are the same thing and the composition of the Binance Operators may change at any time.

84.     Binance is so effective at obfuscating its location and the identities of its operating companies that it has even confused its own Chief Strategy Officer.  For example, in September 2022 he was quoted as saying that "Binance is a Canadian company."  The Chief Strategy Officer's statement was quickly corrected by a Binance spokesperson, who clarified that Binance is an "international company."

85. As founder and CEO of Binance, Zhao has been responsible for all major strategic decisions, business development, and management of the Binance enterprise. Zhao also involves himself in the minutiae of Binance's operations. For example, Zhao personally approved an approximately $60 expense related to office furniture in January 2021, a month in which Binance earned over $700 million in revenue.

86. Zhao has been responsible for directing and overseeing the creation and operation of Binance's trade matching engines, website, API functionalities, and order entry system. Zhao is also the public face of Binance; he represents Binance in public speaking engagements and appearances, gives interviews to magazines and other news media, and frequently authors Tweets and blog posts related to Binance business.

87. Over time, Zhao hired a senior management team that included Lim. However, Zhao has been involved in and ultimately retained control over all critical decisions for the enterprise, including which products to offer and whether and how to implement and enforce anti-money laundering ("AML") controls and Know Your Customer ("KYC") procedures. Zhao is ultimately responsible for evaluating the legal and regulatory risks associated with Binance's business activities, including those related to the launch of Binance.US, and has been directly involved in discussions with compliance consultants and lawyers concerning legal and regulatory issues implicated by Binance's business activities.

88. Zhao answers to no one but himself. Binance does not have a board of directors.

F. **Binance's Superficial Efforts to Limit Trading by United States Customers and Internal Recognition That Its Compliance Program Was Just "For Show"**

89. Throughout the Relevant Period, Binance purposefully grew, maintained, and simultaneously concealed its U.S. customer base while also failing to implement an effective AML program that is required of financial institutions such as FCMs to detect and prevent

terrorist financing or other criminal activity, among other things. One component of this failure to implement an effective AML program is Binance's ongoing lack of effective KYC procedures or a CIP that would enable it to determine the true identity of its customers, whether from the United States or elsewhere. Further, as of at least May 2022, Binance had not filed a single suspicious activity report ("SAR") in the United States despite having filed such reports in other jurisdictions.

90.     For approximately the first two years of its operations, Binance did not take any steps to limit or restrict the ability of U.S. customers to trade on the platform.

91.     Even after Binance began to purportedly restrict access to its platform from certain jurisdictions in mid-2019, it left open a loophole for customers to sign up, deposit assets, trade, and make withdrawals without submitting to any KYC procedures as long as the customer withdrew less than the value of two BTC in one day. Binance has referred to this two BTC-no KYC loophole by various labels, including "email registration," and "tier 1" customers. The two BTC withdrawal limit was effectively meaningless—the notional value of two BTC in July 2019 was more than $22,000 and in March 2021 was more than $100,000.

92.     Even before Binance made any attempts to restrict access to the platform by U.S. customers, Lim privately explained to Zhao that the two BTC-no KYC loophole would continue to allow U.S. customers to access the platform. In February 2019, Lim chatted to Zhao: "a huge number" of Binance's "TIER 1 [meaning customers trading via the two BTC-no KYC loophole] could be U.S. citizens in reality. They have to get smarter and VPN through non-U.S. IP." And Zhao stated during a management meeting in June 2019 that the "under 2 BTC users is [sic] a very large portion of our volume, so we don't want to lose that," although he also understood

that due to "very clear precedents," Binance's policy of allowing "those two BTCs without KYC, this is definitely not possible in the United States."

93. In June 2019, around the same time Binance announced a "partnership" with BAM Trading to launch what would become the Binance.US platform, Binance updated its Terms of Use to state for the first time that "Binance is unable to provide services to any U.S. person." Binance also announced that "[a]fter 90 days, effective on 2019/09/12, users who are not in accordance with Binance's Terms of Use will continue to have access to their wallets and funds, but will no longer be able to trade or deposit on Binance.com."

94. In September 2019, Binance claimed it had begun to block customers based on their internet protocol ("IP") address. In reality, Binance simply added a pop-up window on its website that appeared when customers attempted to log in from an IP address associated with the United States. The pop-up did not block customers from logging in to their account, depositing assets, or trading on the platform, it just asked them to self-certify that they were not a U.S. person before accessing the platform by clicking a button on the pop-up.

95. Notwithstanding the pop-up compliance control, Binance knew that U.S. customers continued to comprise a substantial proportion of Binance's customer base even after September 2019 because, among other reasons, Binance's internal reporting told them so. According to periodic revenue reports prepared for and sent to Zhao every month, as of January 2020 approximately 19.9% of Binance's customers were located in the United States, and as of June 2020—about a year after Binance amended its Terms of Use as alleged above in paragraph 93—approximately 17.8% of Binance's customers were located in the United States.

96.     In keeping with Binance and Zhao's ethos of prioritizing profits over legal compliance, they knowingly allowed the two BTC-no KYC loophole to persist.  In an October 2020 chat between Lim and a Binance colleague, Lim explained:

> [Because you attended a telephone conference on which Zhao participated] then you will also know that as a company, we are probably not going to remove no kyc (email registration) because its too painful . . . i think cz understands that there is risk in doing so, but I believe this is something which concerns our firm and its survivability. If Binance forces mandatory KYC, then [competing digital asset exchanges] will be VERY VERY happy.

97.     Binance senior management, including Zhao, continued to be aware of and discuss the two BTC-no KYC loophole.  For example, in a March 2021 Signal message group that included multiple senior managers, Zhao asked:  "Who was in the 2BTC limit meeting last time?"

98.     And on August 20, 2021, Binance announced that "all Binance users are required to verify their accounts," meaning that all new customers would be required to complete "Intermediate Verification" and provide a government issued identification evidencing their geographic location.  Binance also announced that existing customers that had not yet completed Intermediate Verification would have their account changed to "withdrawal only" status by October 19, 2021.  Binance did not limit the ability of unverified customers to deposit funds and trade on the platform by October 19, 2021 as represented.  In February 2022, Binance testified that the identities of approximately only 30–40% of its customers had been verified though KYC documentation.

99.     Binance has been aware that its compliance controls have been ineffective.  As Lim—at the time Binance's CCO—recognized in an October 2020 chat with other Binance compliance personnel, Binance's compliance environment has amounted to "email sending and no action . . . for media pickup . . . I guess you can say its 'fo sho.'"

100.     Zhao's strategy of refusing to implement effective compliance controls at Binance was widely known within Binance.  In a January 2019 chat between Lim and a senior member of the compliance team discussing their plan to "clean up" the presence of U.S. customers on Binance, Lim explained:  "Cz doesn't wanna do us kyc on .com."  And Lim acknowledged in February 2020 that Binance had a financial incentive to avoid subjecting customers to meaningful KYC procedures, as Zhao believed that if Binance's compliance controls were "too stringent" then "[n]o users will come."

101.     Despite their awareness of Binance's compliance failures, Zhao, Lim, and others acting on behalf of Binance publicly represented that the platform had effective compliance controls.  For example, in an August 14, 2019 letter sent on Binance letterhead, Lim assured a state financial regulator in the United States that

> [O]ur [compliance] program provides for AML/CFT controls to ensure the safe and legitimate use of our platforms . . . .  Binance screens all its customers prior to the establishment of a business relations or undertaking a transaction against OFAC, EU, UK and Hong Kong sanctions . . . .  Binance performs customer due diligence (CDD) anytime the company establishes a customer relationship with all customers engaged in crypto-fiat activity, where there is suspicion of money laundering or terrorism financing . . . .

102.     Four months later, in an internal December 2019 message to a colleague, Lim admitted that ".com doesn't even do AML namescreening/sanctions screening."

103.     Binance also intentionally tried to hide the scope of its compliance program's ineffectiveness from its business partners.  For example, in or around October 2020, Binance underwent a compliance audit to satisfy a request from Paxos.  But according to Lim, Binance purposely engaged a compliance auditor that would "just do a half assed individual sub audit on geo[fencing]" to "buy us more time."  As part of this audit, the Binance employee who held the title of Money Laundering Reporting Officer ("MLRO") lamented that she "need[ed] to write a

fake annual MLRO report to Binance board of directors wtf." Lim, who was aware that Binance did not have a board of directors, nevertheless assured her, "yea its fine I can get mgmt. to sign" off on the fake report. Around the same time as the referenced "half assed" compliance audit, in November 2020 the MLRO exclaimed to Lim in a chat, "I HAZ NO CONFIDENCE IN OUR GEOFENCING."

104. Internally, Binance officers, employees, and agents have acknowledged that the Binance platform has facilitated potentially illegal activities. For example, in February 2019, after receiving information "regarding HAMAS transactions" on Binance, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." Lim's colleague replied: "can barely buy an AK47 with 600 bucks." And with regard to certain Binance customers, including customers from Russia, Lim acknowledged in a February 2020 chat: "Like come on. They are here for crime." Binance's MLRO agreed that "we see the bad, but we close 2 eyes."

105. Lim's internal discussions with compliance colleagues illustrate that Binance has tolerated Binance customers' use of the platform to facilitate "illicit activity." For example, in July 2020, a Binance employee wrote to Lim and another colleague asking if a customer whose recent transactions "were very closely associated with illicit activity" and "over 5m USD worth of his transactions were indirectly sourced from questionable services" should be off-boarded or if it was in the class of cases "where we would want to advise the user that they can make a new account." Lim chatted in response:

> Can let him know to be careful with his flow of funds, especially from darknet like hydra
>
> He can come back with a new account
> But this current one has to go, it's tainted

106.    Lim's instruction to allow a customer "very closely associated with illicit activity" to open a new account and continue trading on the platform is consistent with Zhao's business strategy, which has counseled against off-boarding customers even if they presented regulatory risk.  For example, in a September 2020 chat Lim explained to Binance employees that they

> Don't need to be so strict.
> Offboarding = bad in cz's eyes.

107.    Binance's corporate communications strategy has attempted to publicly portray that Binance has not targeted the United States at the same time Binance executives acknowledge behind closed doors that the opposite is true.  For example, on June 9, 2019, around the time Zhao and Binance hatched their secret plot to retain U.S. customers even after the launch of Binance.US, Binance's Chief Financial Officer stated during a meeting with senior management including Zhao:

> [S]ort of, the messaging, I think would develop it as we go along is rather than saying we're blocking the US, is that we're preparing to launch Binance US.  So, we would never admit it publicly or privately anywhere that we serve US customers in the first place because we don't.  So, it just so happens we have a website and people sign up and we have no control over [access by U.S. customers] . . . .  [B]ut we will never admit that we openly serve US clients.  That's why the PR messaging piece is very, very critical

Zhao agreed that Binance's "PR messaging" was critical, explaining in a meeting the next day that "we need to, we need to finesse the message a little bit . . . .  And the message is never about Binance blocking US users, because our public stance is we never had any US users.  So, we never targeted the US.  We never had US users."  But during the June 9, 2019 meeting, Zhao himself stated that "20% to 30% of our traffic comes from the US," and Binance's "July [2019 Financial] Reporting Package," which was emailed directly to Zhao, attributes approximately 22% of Binance's revenue for June 2019 to U.S. customers.

### G. Binance Was Aware of United States Regulatory Requirements but Ignored Them

108.    Defendants have been aware of the regulatory regime that applies to U.S. financial institutions such as FCMs, and exchanges such as DCMs and SEFs, throughout the Relevant Period, but have made deliberate, strategic decisions to evade federal law.

109.    Internal messages among Zhao, Lim, and other Binance senior managers document that Binance was aware of the applicability of U.S. regulatory and legal requirements since its early days.  For example, in October 2018, and before the Relevant Period, Lim wrote to Zhao:

> Cz I know it's a pain in the ass but its my duty to constantly remind you
> 1.  We have made no mention of sanctions/or support of sanctions on our platform already (done, cleaned up)
> 2.  Are we going to proceed to block sanction countries ip addresses (we currently have users from sanction countries on .com)
>
> Or do you want to adopt a clearer strategy after we engaged and finalised our USA strategy?
> Downside risk is if fincen or ofac has concrete evidence we have sanction users, they might try to investigate or blow it up big on worldstage

110.    Two months later, in a December 2018 chat, Lim acknowledged that Binance was operating "in the USA" and advised his colleagues that "there is no fking way in hell I am signing off as the cco for the ofac shit."  In that same chat, Lim recognized that Binance's customer support was "teaching ppl how to circumvent sanctions."  And Lim stated in an October 2019 chat: "the ofac regulation clearly states U.S. persons, doing biz with OFAC is wrong," but clarified that Zhao desired to place competitive advantage over compliance: "thing is [Zhao] will only agree to block US on .com once US exchange has gotten all [money transmitter licenses] (to match [a U.S.-based digital asset exchange])."

111.    In December 2019, approximately three months after Binance began offering quarterly futures and perpetual contracts, Lim wrote to a colleague in a chat:

1. We still have US users on our platform (regulatory risk) 2. We do not perform Worldcheck on .com (sanctions risk) 3. We do not perform [transaction monitoring] on .com (sanctions risk).

112.     Lim has displayed a nuanced understanding of applicable regulatory requirements

and the potential individual liability that may accompany a failure to comply with U.S. law.  For

example, in October 2020 Lim chatted to a colleague:

US users = CFTC = civil case can pay fine and settle
no kyc = BSA act [sic] = criminal case have to go [to] jail

113.     Zhao has also been keenly aware of U.S. laws that apply to Binance's activities.

For example, Zhao explained during a June 9, 2019 management meeting:

[T]here are a bunch of laws in the US that prevent Americans from having any kind of transaction with any terrorist, and then in order to achieve that, if you serve US or US sanctioned countries there are about 28 sanctioned countries in the US you would need to submit all relevant documents for review [but that is not] very suitable for our company structure to do so.  So, we don't want to do that and it is very simple if you don't want to do that: you can't have American users.  Honestly it is not reasonable for the US to do this
. . . .

[U.S. regulators] can't make a special case for us.  We are already doing a lot of things that are obviously not in line with the United States.

114.     Zhao has kept information reflecting Binance's U.S. customer base secret even

from certain senior managers and has been cautious in circulating internal materials to a broad

audience due, at least in part, to the risk that inculpatory information could be leaked to

regulators or other law enforcement personnel.  On information and belief, Binance refers to this

type of risk as "leak risk."  For example, in a March 2019 discussion regarding the circulation of

data that categorized Binance users by geographic location, Zhao said "Let me see it first then,

and not distribute it, especially guys who have to deal with US regulators."  And in an August

2020 chat, Zhao instructed a Binance employee that transaction volume data concerning U.S.

API customers should not be published to a group; rather, such data should be sent only to Zhao.

### H. Binance Has Guided United States Customers to Evade Its Compliance Controls Through the Use of VPNs and Other Creative Means

115.    During the Relevant Period, Binance implemented IP address-based compliance controls that collect a customer's IP address and compare it to the list of countries Binance has purported to "restrict" from its platform.  At least as of September 2019, the list of "restricted" jurisdictions included the United States.  Nonetheless, Binance's IP address-based compliance controls, sometimes called "geofencing," have not been effective at preventing customers from "restricted" jurisdictions including the United States from accessing and trading on the Binance platform.

116.    One reason Binance's IP address-based compliance controls have not been effective is that Binance has instructed U.S. customers to evade such controls by using VPNs to conceal their true location.  VPNs have the effect of masking an internet user's true IP address.  VPN use by customers to access and trade on the Binance platform has been an open secret, and Binance has consistently been aware of and encouraged the use of VPNs by U.S. customers.

117.    At least as early as April 2019, Binance published a guide on the "Binance Academy" section of its website titled "A Beginner's Guide to VPNs."  Binance's VPN guide explained to Binance customers that "[i]f you want to be private about the websites you visit – and your location – you should use a VPN."  Binance's VPN guide also hints: "you might want to use a VPN to unlock sites that are restricted in your country."

118.    Binance's senior management, including Zhao, knew the Binance VPN guide was used to teach U.S. customers to circumvent Binance's IP address-based compliance controls.  In a March 2019 chat, Lim explained to his colleagues that "CZ wants people to have a way to know how to vpn to use [a Binance functionality] . . . it's a biz decision."  And in an April 2019 conversation between Binance's Chief Financial Officer and Lim regarding Zhao's reaction to

controls that purported to block customers attempting to access Binance from U.S.-based IP addresses, Lim said: "We are actually pretty explicit about [encouraged VPN use] already – even got a fking guide. Hence CZ is ok with blocking even usa."

119. Binance senior management, including Lim, have used other workarounds to indirectly instruct Binance customers to evade Binance's IP address-based compliance controls. For example, in a July 8, 2019, conversation regarding customers that ought to have been "restricted" from accessing the Binance platform, Lim explained to a subordinate: "they can use vpn but we are not supposed to tell them that . . . it cannot come from us . . . but we can always inform our friends/third parties to post (not under the umbrella of Binance) hahah."

120. Lim continued his crafty efforts to assist Binance customers in circumventing Binance's compliance controls, as documented in a February 12, 2020 chat:

> Employee: hi Samuel, we are helping [an intermediary] to integrate with us to introduce new users and trade liquidity, but find most of their users are from US. Now Binance.com block US IP from registration. May I ask whether it is still a hard requirement nowadays?
>
> Lim: Yes, it still is. Because if US users get on .com we become subjected to the following US regulators, fincen ofac and SEC. But as best we can we try to ask our users to use VPN or ask them to provide (if there are an entity) non-US documents. On the surface we cannot be seen to have US users but in reality we should get them through other creative means.

121. Binance's use of creative workarounds to its compliance controls is further documented in a July 17, 2020 chat in which Lim clarified to a colleague:

> No we cannot change their status to non us if they are us
> Thats fraud
> But we can encourage them to be a non kyc account
> Or use a vpn
> . . .
>
> Yea can bypass [limitations on non-KYC accounts, such as withdrawal limits], give a little hand
> that you guys can work something out

please be clear we only do this for our biggest traders/VIPs

. . .

this is SPECIAL treatment

122.    Lim also used Binance.US as a laboratory to identify important U.S. customers that could be prioritized for expedited on-boarding to the Binance platform.  In a July 15, 2020 chat, Lim explained to a Binance employee that he should first ask a prospective customer "to onboard with US, then if their volume is really very big we will push hard on .com to accept it on an exceptional basis . . . CZ will definitely agree to this lol."  Lim continued: "but they need to really be doing sick ass volumes . . . we always have a way for whales."  Lim reiterated this procedure in a July 27, 2020 chat, explaining that "getting on .com" would be "an issue" for a prospective customer with "US beneficial owners" but that the prospective customer could "of course get on Binance US and then if the volumes are good, we can find a way to backdoor them to .com."

### I.    Binance Has Directed Its VIP Customers to Evade Compliance Controls, Including Through Submission of "New" KYC Documents

123.    In addition to instructing retail customers located in the United States to use VPNs to avoid IP address-based compliance controls, Binance has also created special policies and procedures to help its VIP customers evade Binance's compliance controls so Binance could continue to access and derive profits from U.S. customers.  Binance designed these special policies and procedures to help VIP customers evade both IP address-based compliance controls and KYC documentation-based compliance controls.

124.    In February 2019, Lim and Zhao met in person to discuss how to address the regulatory risk stemming from Binance's U.S. customers that access Binance via API.  These customers are generally institutional market participants and include VIPs.  In advance of their meeting, Lim sent Zhao a numbered list of "Compliance parameters," including that "US API

users (identified through IP) will have 2 options. They can remain on main exchange or move over to US exchange," while "US API users (identified through KYC) have to move over to US exchange, they don't have a choice. We will notify them through Email."

125.    Right after meeting with Lim, Zhao sent the compliance parameters to other senior managers, one of whom replied to Zhao that "[US users, with US, non international KYC] is [where] we will get nailed." The senior manager asked Zhao if Binance had to "enforce" the contemplated block of US API users identified through KYC "in the matching engine? That's the only way to guarantee this doesn't break. [It] is not a hard thing to enforce in the matching engine." Zhao replied: "let's worry about enforcement in a later stage, think we may have to do it by users."

126.    On June 13, 2019, Binance released a press release that "announced its partnership with BAM Trading Services Inc. to begin preparation to launch trading services for users in the United States." While outwardly preparing for the launch of Binance.US, internally, Zhao, Lim, and other key Binance personnel remained focused on retaining U.S. VIP customers, and the liquidity and revenue they supplied, on Binance.

127.    In and around June 2019, Zhao, Lim, and other key Binance personnel engaged in a series of strategy sessions concerning the retention of U.S. VIPs on the Binance platform. One method discussed was to instruct U.S. VIP customers to submit "new" KYC documentation in connection with a "new" account. This approach would allow VIP customers to continue to trade on Binance and maintain their preferential VIP status and benefits that resulted from their historical trading activity on Binance. During one meeting that Binance recorded, a senior employee proposed that Binance instruct U.S. customers to submit "new" KYC documentation

over social media—but Lim corrected the employee and mandated that such instructions should

only occur in secret.

128.    Binance's plan to instruct U.S. VIP customers to submit "new" KYC

documentation was devised by Zhao.  During a June 24, 2019 meeting with senior management,

Zhao stated: "We do need to let users know that they can change their KYC on Binance.com and

continue to use it.  But the message, the message needs to be finessed very carefully because

whatever we send will be public.  We cannot be held accountable for it."  In a meeting the next

day, a senior VIP team member and Zhao engaged in the following colloquy:

> VIP team member:  We don't tell them explicitly because that's marketing.  But
> they [referring to U.S. VIP customers] understand . . . they know to send [their
> digital assets] the blockchain, then that's their own control.  And then so they
> send it to themselves, but we just help them expedite.  As we speed up the account
> of the corporate account of the BVI or Cayman entity.
>
> Zhao:  Okay, so is this them creating a new account, but we talked about having
> them change KYC has that ever been done?
> . . . .
>
> VIP team member:  We quietly mentioned to them that, you know, US, you know,
> it could be an issue and you know, if they have any offshore entities, maybe they
> should open another one as well for their offshore entities.  That's how, that's
> how we, that's how we've been telling them.  We haven't really sent anything
> blasting because that's, that's sensitive.  That's marketing.  I mean, [a U.S.-based
> compliance consultant] can comment on that.

129.    Binance personnel began assisting U.S. VIP customers in creating "new" accounts

using "new" KYC documentation as early as June 2019, and reported directly to Zhao on their

efforts.  For example, in a Binance group chat dated June 12, 2019, a Binance employee directed

the following message to "@czhao," which is a handle used by Zhao:

> Today our VIP team talked with three VIP8 users, we didn't talk too much details
> and they all satisfied that we can help them onboarding their new non-US
> corporate accounts.  That's a good start, we'll contact more VIPs tmr.

Zhao responded in the same chat: "cool."

130.    At some point before October 2020, Binance formalized its processes for instructing U.S. VIP customers on the best methods to evade Binance's compliance controls in a corporate policy titled "VIP Handling."  Zhao contributed ideas that were incorporated into the VIP Handling policy.  Pursuant to the VIP Handling policy, once a customer service representative "hands the affected user over to VIP," the VIP team would "[m]ake sure the user has completed his/her new account creation with no U.S. documents allowed."  U.S. VIP customers often followed these instructions by submitting "new" KYC documentation associated with a shell company incorporated in a jurisdiction other than the United States, such as the British Virgin Islands, to act as the nominee for the "new" account.

131.    Acting pursuant to the VIP Handling policy, Binance's VIP team would then "coordinate the transfer" of the VIP customer's "Referral Bonuses, VIP level, Withdrawal Limits etc." to the "new" account from the VIP customer's pre-existing account.  Thus, if the VIP team followed the VIP Handing policy correctly, from the customer's perspective nothing about their trading on Binance would be disrupted—the "new" account would be the same as the old account with the exception of the name of the accountholder.

132.    Recognizing the evasive nature of the procedures and strategies memorialized in the VIP Handling policy, the document required Binance employees to "[m]ake sure to inform user to keep this confidential."  In line with the intent to keep any "new account creations" by U.S. VIPs a secret, Zhao instructed during his October 13, 2020 "daily call" that any communications about the "US ban" should be done over the Signal messaging application. Thereafter, Lim circulated Zhao's directive to a senior compliance staff member in a chat, explaining: "we do all U.S. comms via signal as mandated by cz."

133.    Binance's VIP Handling policy also established methods for Binance personnel to troubleshoot for U.S. customers that were identified as such through their IP address (as opposed to KYC documentation).  For these customers, Binance instructed its personnel to "[i]nform the user that the reason why he/she cant use our www.binance.com is because his/her IP is detected as US IP.  If user doesn't get the hint, indicate that IP is the **sole** reason why he/she can't use .com" [emphasis in original].  Lim flagged a passage in the VIP Handling policy for his colleagues that further explained: "We cannot teach users how to circumvent the controls.  If they figure it out on their own, its fine."

134.    Displaying the ecosystem's tone at the top, Zhao helped manage the implementation of Binance's VIP Handling policy.  On October 9, 2020, around the time Binance began sending emails to U.S. customers pursuant to the policy, Zhao had the following exchange with an employee who would ultimately become Binance's head of institutional sales:

> VIP team member:  Hi CZ . . . I went through list of affected API clients, it includes a number of large strategic accounts including [a Chicago-headquartered trading firm] who is currently is a top 5 client and 12% of our volume

> Zhao:  Give them a heads up to ensure they don't connect from a us Ip.  Don't leave anything in writing.  They have non us entities.  Let's also make sure we don't hit the biggest market makers with that email first.  Do you have signal?

135.    At least until August 2021, over two years after Binance updated its Terms of Use to "restrict" U.S. customers, Binance employees continued to observe customers they had previously identified as U.S. VIPs trading on the platform.  In an August 14, 2021 chat, members of the VIP and Compliance teams discussed the issue:

> Compliance employee:  We have two corporate clients . . . which were detected as US nexus (US UBOs > 50%). Considering they are big clients, our compliance team wants to further check with you if we need to talk with the clients and give them a period before going offboard. Please advise. Thank you.

VIP team member 1:  we've gone through multiple offboarding exercises how is this coming up again?

VIP team member 2:  I guess because they're a big client so there were delays here and there previously . . . there are still transactions going on during the month of august hahaha scary indeed.

136.    Binance's efforts to hold itself out as "compliant" while at the same time taking steps to assist customers in submitting "new" KYC documents has continued.  For example, on August 5, 2021, Binance posted an announcement to Binance.com titled "Updates to API Services" that states:

> To ensure a safe and fair trading environment for all users and remain compliant with the latest industry requirements, Binance is updating its API services to limit new API key creation by accounts that have only completed basic account verification.  This update is effective starting 2021-08-09 03:00 (UTC).
>
> For accounts that have not completed intermediate verification, any existing API keys will be changed to "read only" after 2021-08-23 00:00 AM (UTC).  Trading functions via relevant API keys will be deactivated.  Users can complete intermediate verification to reset API access and resume trading functions.

But internal documents confirm that Binance was still up to its old tricks as of August 5, 2021.  In a presentation concerning business operations that occurred during the week of August 9 through August 15, 2021, Binance personnel noted that they had made progress "Follow[ing] up [with high] value users KYC projuect [sic]."

### J.    Binance Knowingly Concealed the Presence of United States Customers In Internal Documents and Data

137.    Zhao wanted U.S. customers, including VIP customers, to transact on Binance because it was profitable for Binance to retain those customers.  Binance has tracked the sources of its revenues by customers' geographic location, among other analytical methods.  Zhao routinely received reporting that unambiguously demonstrated that U.S. customers contributed a substantial amount of Binance's revenues.  For example, Binance tracked revenues derived from U.S. customers and summarized that information in the Binance monthly revenue reports.  In

addition, Binance's "Futures Team" created periodic reports that showed the trading volume, revenue to Binance, and other account and transactional information concerning U.S. customers' derivatives trading.

138.   Binance's revenue reports rely on data drawn from Binance's internal database. The monthly revenue report for September 2020 reflects that 2.51 million customers were located in "U.S."  That same month, Binance's revenue report shows 0.31 million Binance customers' locations were "UNKWN."  This report, provided to Zhao and at least certain members of Binance senior management, showed:



139.   Then in October 2020, the same month a rival digital asset exchange and its principals were sued by the CFTC, Zhao directed Binance personnel to replace the U.S. value for certain data fields in Binance's internal database with the value UNKWN.  As a result, Binance's October 2020 monthly revenue report identified approximately 2.83 million customers' locations as UNKWN, while omitting any reference to U.S.  Thereafter, Binance's revenue reports

continued to attribute U.S.-derived customers and revenue to UNKWN and did not reflect the presence of any customers from the U.S.  The October 2020 report, also provided to Zhao and at least certain members of Binance senior management, showed:



140.    It is widely understood by Binance personnel that UNKWN is a code word for United States for purposes of interpreting Binance's internal documents and data.  For example, on October 2, 2020, Binance's Director of Operations told a colleague: "The recent Bitmex incident has had a great impact on the industry.  Please remove US data from all our charts together with Big Data.  Everyone in the future will not see our US data, except for financial and very few people."  And in a November 17, 2020 internal chat, the Director of Operations explained: "at present, the keyword US for internal information is also a sensitive word, so you have to use Unknow to mark the country."

### K. Binance Has Relied On "Brokers" to Introduce Customers to the Binance Platform Without Effective Access Controls

141.    During the Relevant Period, Binance implemented a "broker program" pursuant to which third parties introduce customers to the Binance platform. Binance did not have effective controls in place—beyond Binance's own ineffective access controls—to ensure these brokers did not permit their own customers to access Binance from the United States or any other "restricted" jurisdiction during the Relevant Period.

142.    The participants in Binance's broker program include "exchange brokers" that allow their customers to transmit orders directly into Binance spot and derivatives markets. In addition, during the Relevant Period Binance has relied on "prime brokers" to solicit and accept orders for Binance's digital asset derivatives from institutional customers, including those located in the United States.

143.    While Binance's Terms of Use state that a "Binance Account can only be used by the account registrant," Binance does not uniformly enforce this provision. During the Relevant Period, Binance has knowingly allowed at least two "prime brokers" to open "sub-accounts" through which U.S. customers have and continue to trade digital asset derivatives on the Binance platform.

144.    Prime Broker A is a British Virgin Islands entity. Its CEO resides and works in New York and its sales force includes personnel that reside and work in the United States.

145.    Prime Broker A's customers include institutional market participants that are located in the United States. Prime Broker A holds a "main account" on Binance. For each of its customers, Prime Broker A opens one or more new "sub-accounts" on Binance under Prime Broker A's "main account." Binance does not collect any identity-verifying documentation

when Prime Broker A opens up new "sub-accounts" on behalf of its customers or otherwise attempt to learn the identity of Prime Broker A's customers.

146.    Prime Broker A's U.S.-based customers transmit orders to Binance directly through API connections that Binance attributes to Prime Broker A.  Binance is aware that Prime Broker A allows its customers to trade on Binance through Prime Broker A's "sub-accounts."

147.    Prime Broker B is an entity organized under the laws of Malta.  Prime Broker B's CEO resides and works in California and Prime Broker B's sales force includes personnel that reside in the United States.

148.    Prime Broker B holds a "main account" on Binance.  For each of its customers, Prime Broker B opens one or more new "sub-accounts" on Binance under its "main account."  Binance does not collect any identity-verifying documentation when Prime Broker B opens up new "sub-accounts" on behalf of its customers or otherwise attempt to learn the identity of Prime Broker B's customers.

149.    Prime Broker B's customers include institutional market participants that are located in the United States, including Trading Firm A.  Binance is aware that Prime Broker B allows its customers to trade on Binance through Prime Broker B's "sub-accounts."

     **L.**    **Examples of Market Participants Currently Trading on Binance and Binance's Efforts to Help Them Evade Its Compliance Controls**

       <u>**Trading Firm A**</u>

150.    Trading Firm A is a quantitative trading firm that has traded bitcoin perpetuals on Binance, among other products, through at least three different accounts during the Relevant Period.  Trading Firm A is a Delaware limited liability company headquartered in Chicago, Illinois.  Trading Firm A also has offices in New York and Amsterdam.

151.     Trading Firm A is majority owned by U.S. residents.  Its executive management, including Trading Firm A's two principals, one of whom functions as its Chief Risk Officer and one of whom functions as its Chief Technology Officer ("CTO"), work from Trading Firm A's Chicago headquarters.  Trading Firm A's personnel access Binance.com through VPNs.

152.     Trading Firm A's trading activity on Binance is conducted through automated trading strategies programmed into computer algorithms.  These algorithms determine whether to place or cancel any orders based on instructions in their code.  Trading Firm A's algorithms are developed by quantitative technologists that work at Trading Firm A's Chicago headquarters, among other locations.  The algorithms are built using computer code that Trading Firm A considers to be valuable intellectual property.  Trading Firm A's computer code and its algorithms are owned by an Illinois limited liability company that is a wholly-owned subsidiary of Trading Firm A.

153.     At all times, whether trading in a Binance account in its own name, in the name of a foreign-incorporated nominee subsidiary, or through a sub-account opened on its behalf by Prime Broker B, Trading Firm A has been the real economic party to its trading activity on Binance.  Trading Firm A has capitalized its trading activity on Binance and Trading Firm A's net trading revenue derived from its trading activity on Binance is consolidated into Trading Firm A's financial statements.

154.     At the time it maintained an account directly on Binance, Trading Firm A benefited from its status as a VIP customer.  Binance provided Trading Firm A with the "incentive" of "lower latency access [to Binance's matching engine] for up to 2 IP addresses," Trading Firm A received exceptions to Binance's default order-messaging limits, and Trading Firm A received reduced trading fees relative to non-VIP customers.

155.    Trading Firm A has conducted its trading activity on Binance through a series of accounts during the Relevant Period.  First, beginning before the Relevant Period, Trading Firm A conducted its trading activity on Binance through a "personal" account registered under the name of one of Trading Firm A's principals, who is a U.S. citizen that resides in Illinois.

156.    In June 2019, a Binance Key Account Manager instructed Trading Firm A to "switch the account KYC."  Following Binance's instructions, Trading Firm A opened a "new" Binance account in August 2019 in the name of a wholly-owned subsidiary incorporated in the Cayman Islands.  Substantially all personnel that perform work for this Cayman Islands nominee entity are employed by Trading Firm A or its subsidiaries and Trading Firm A controls all aspects of its Cayman Islands subsidiary.  During the account opening process, Binance instructed Trading Firm A to access the Binance website through a VPN to avoid Binance's IP-address based compliance controls.  Once this account was opened, Trading Firm A transferred all of its trading activity, and Binance transferred Trading Firm A's VIP status and benefits, to the "new" account.  Trading Firm A did not make any material changes in the way it traded on Binance in August 2019, other than the name on the account.

157.    In December 2020, Binance sent Trading Firm A an email that stated that Trading Firm A had "identified [itself to Binance] as a U.S. Person."  Following numerous telephone conferences with Binance personnel concerning their "corporate structure," Trading Firm A, again with the assistance of Binance personnel, opened a "new" account held by a different nominee shell entity in April 2021.  This time, the nominee was a Netherlands entity that was 100 percent capitalized by Trading Firm A.  Once this "new" Binance account was opened, Binance transferred Trading Firm A's VIP status and benefits to the new account.  Trading Firm

A did not make any material changes in the way it traded on Binance in April 2021, other than the name on the account.

158. In or around August 2021, Binance told Trading Firm A that it was no longer permitted to trade derivatives on Binance but, on information and belief, took no further action at that time. Approximately three months later, in or around November 2021 Trading Firm A temporarily discontinued its trading activity on Binance.

159. In or around January 2022, Trading Firm A began discussing opening an account with Prime Broker B. Prime Broker B offered Trading Firm A "direct exchange access [to Binance] with no . . . intermediation if you can pre-fund the trades." Trading Firm A explained to Prime Broker B: "the market we are most interested in right now would be Binance Futures" but "Binance does not let us use [the Netherlands nominee entity to trade derivatives]" and "[o]ur other entities are either US based or have US UBOs." Prime Broker B responded that it could "definitely" allow Trading Firm A to "trade futures [on Binance] via our non-US [Prime Broker B] entity."

160. Shortly thereafter, Trading Firm A opened an account with Prime Broker B in the name of its Cayman Islands-incorporated subsidiary referenced in paragraph 156 and resumed its trading activity on Binance through Prime Broker B's Binance "sub-accounts." Trading Firm A has continued to trade bitcoin perpetuals, among other products, on Binance and has not made any material changes to the manner in which it trades on Binance, other than that it is now trading through intermediated access.

161. At all times, whether trading in an account in its own name, in the name of a foreign-incorporated nominee subsidiary, or through a sub-account opened on its behalf by Prime Broker B, the development and control of Trading Firm A's algorithms, the capitalization

of its trading activity, and the location of the company's senior management has remained the same.

### **Trading Firm B**

162.     Trading Firm B is a quantitative trading firm headquartered in New York and incorporated in Delaware.  Trading Firm B has at all relevant times been ultimately majority owned by U.S. residents.  Numerous senior managers, including the individual who functions as Trading Firm B's CEO, have worked from Trading Firm B's New York headquarters.  Trading Firm B also has offices in London, Amsterdam, Hong Kong, and Singapore.  Trading Firm B uses "proxy servers" to access the internet.  Like VPNs, proxy servers obscure an internet user's true IP address.

163.     Trading Firm B conducts its digital asset trading activity on Binance through a dedicated trading desk that utilizes automated trading strategies programmed into computer algorithms developed by personnel at Trading Firm B's New York headquarters, among other locations.  Trading Firm B's algorithms determine whether to place or cancel any orders based on the instructions in their code.  Trading Firm B's algorithms are built using computer code that Trading Firm B considers to be valuable intellectual property.  Trading Firm B's computer code is owned, directly or by assignment from its various wholly-owned subsidiaries, by Trading Firm B.

164.     The global head of Trading Firm B's digital asset trading desk works from Trading Firm B's New York headquarters.  Other employees, including members of the business development team responsible for interacting with Binance, also work from Trading Firm B's New York headquarters.

165.     Trading Firm B has been among Binance's largest customers and has consistently received reduced trading fees due to its status as a Binance VIP.  Binance has also permitted

Trading Firm B to exceed Binance's default order-messaging limits and has "whitelisted" Trading Firm B's API connections to the platform's matching engines so Trading Firm B can "benefit from lower latency and stability" relative to customers that do not have "whitelisted" connections. Binance personnel explained to Trading Firm B that Binance's: "low-latency futures api/fstream . . . carry a different domain than the public fapi/fstream . . . which will route to a more dedicated machine/gateway that open exclusively for MM and top tier VIP clients. So generally client can expect a slight 5-10ms latency reduction on roundtrip for normal trading environment and more normalized latency distribution (less extreme tail) in busy environment."

166.    Beginning in July 2018, prior to the Relevant Period, Trading Firm B began trading digital assets in Binance's spot markets through an account held in the name of a wholly-owned Hong Kong-incorporated subsidiary.

167.    On February 13, 2020, Trading Firm B tried to "open a futures account" and received an "error message." Senior Binance personnel then concluded this may have been due to "US ip" or that "the UBO would be a US person." Binance employees chatted: "How annoying," and surmised that Trading Firm B's account was "[g]randfathered" from "back before [Binance] screened for" the location of its customers. After confirming that Trading Firm B was a "US entity in our system," Binance employees conferred with Trading Firm B's New York-based cryptocurrency business development personnel and "discussed with him (a) short term opening a personal account and (b) moving this personal account to their HK legal entity in medium term."

168.    The next day, February 14, 2020, a Trading Firm B employee who is a resident of the United Kingdom opened a personal account on Binance. Trading Firm B then began to

conduct its digital asset derivative trading activity in that account and would ultimately conduct substantially all of its corporate trading activity through this "personal" account for several years.

169.     In August and September 2020, Trading Firm B asked Binance "to transfer [its] VIP status from" the account held in the name of Trading Firm B's Hong Kong-incorporated subsidiary to the "personal" account held in the name of their United Kingdom-based employee. In January 2021, Binance confirmed that it understood Trading Firm B was trading on Binance through a "personal" account and at all times applied the VIP benefits associated with Trading Firm B's corporate trading activity to this "personal" account.

170.     Trading Firm B continued to trade BTC perpetuals and other derivative products through its "personal" account until approximately October 2022.  Binance routinely communicated with Trading Firm B about the activity in Trading Firm B's "personal" account, including through email to addresses with the domain @[tradingfirmb].com, and interacted with Trading Firm B personnel in a Telegram chat group titled "Binance < > [Trading Firm B]."

171.     On March 11, 2022, Trading Firm B submitted KYC documents to Binance concerning an application for a "new" Binance account to be held by a nominee shell company organized under the laws of Jersey.  The shares of this new nominee entity are "owned" by a third party that has no affiliation with Trading Firm B and does not exercise any control over Trading Firm B's trading activity on Binance.

172.     Trading Firm B's Jersey nominee does not have any employees and does not have any meaningful sources of capital, apart from Trading Firm B.  Trading Firm B's Jersey nominee has entered into at least two contracts with Trading Firm B subsidiaries.  First, a "Services Agreement."  Under the terms of that agreement, a Trading Firm B subsidiary agrees to provide office space, personnel, technology, information technology support, including maintenance of

all services and systems databases, and "any services as the parties may agree from time to time."  Second, a "Confirmatory Note."  Under the terms of that note, a Trading Firm B subsidiary agrees to transfer funds to Trading Firm B's Jersey nominee for the purpose of engaging in "Nominee Trading Activities."  In return, Trading Firm B's Jersey nominee agrees to provide Trading Firm B with the "Net Proceeds" of its nominee trading activity on Binance.

173.    On March 17, 2022, a New York-based Trading Firm B employee wrote to Binance: "I'm currently trying to make sure we can get our account entity-verified before the May 15 deadline . . . .  We've been trying to set up a new account . . . do you think you could help us get more color on what info [Binance is] looking for?"  A Binance salesperson responded:

> I am channeling internally with the onboarding agent reviewing the case . . . .  On the deadline [to open a new account], don't worry, we will apply for a whitelisting for a couple of more weeks so there is no risk of trading disruption . . . .  We cannot apply the new [KYC] documents to the existing account because it is a Personal Account.  Once the corporate one is approved, we will help migrating with the ad hoc setups it might have.

On April 7, 2022, Trading Firm B received an email from Binance concerning the contemplated "new" account that read:  Corporate Verification Successful.

174.    Despite the "successful" corporate verification, Trading Firm B continued to trade through its "personal" account and on July 5, 2022, asked Binance if "it [would] be possible to apply the limits and mm levels to the new account immediately?"  Binance responded that it had "good news" that it could "migrate" Trading Firm B's "personal account (the one you guys are currently using for trading)" to the new account held by Trading Firm B's Jersey nominee following "exceptional approval."  Still trading through its "personal" account as of October 6, 2022, Trading Firm B sent a Telegram message to Binance outlining "some things . . . to make

sure get reflected in the new account to match our existing account," including "rate limits, fee tiers/mms status, [and] withdrawal limits."  Binance responded: "we can do all."

175.    Ultimately, Trading Firm B did not even need to migrate its trading activity despite applying for a "new" account and getting "exceptional approval" from Binance.  Instead, Binance just swapped out the name on Trading Firm B's "personal" account with the name of the Jersey nominee.  Everything else—VIP benefits, preferential matching engine access, open positions, even the account number—stayed the same.  Trading Firm B continues to trade on Binance, including in digital asset derivative products such as bitcoin perpetuals.

176.    Trading Firm B has been the real economic party to Trading Firm B's trading activity on Binance at all times no matter what the name on its account has been.  Trading Firm B has at all times capitalized Trading Firm B's trading activity on Binance and the net trading revenue derived from its trading activity on Binance has been consolidated into Trading Firm B's financial statements.

### **Trading Firm C**

177.    Trading Firm C, another quantitative trading firm that trades digital asset derivatives on Binance through automated trading strategies, is headquartered and incorporated in New York.  Trading Firm C is majority owned by U.S. residents and the individual with the largest ownership share is also a U.S. citizen.  Trading Firm C trades in numerous financial markets around the globe and is part of a corporate "umbrella" of commonly controlled affiliates and subsidiaries that has branch offices in London, Singapore, and Hong Kong, among other locations.

178.    Zhao has communicated directly with Trading Firm C's CEO, who has a New York phone number.  In one Signal text chain, Trading Firm C's CEO messaged to Zhao:

Hello CZ. This is [first name of the CEO] from [Trading Firm C]. Firstly I wanted to reach out and thank you for meeting with me and my team several weeks ago. Secondly, I also kindly wanted to follow up with [you] regarding the day limit on Spot. I have been struggling internally with my portfolio management teams to get traction on increasing the day limit as we are looking to expand our trading as well as bring on a few more portfolio teams onto the platform. Please let me know when it would be a convenient time to discuss with you. Thank you. We had heard that we would be expecting an increase last Friday but that did not happen, and we are not sure how to interpret.

Zhao replied within five minutes: "Looking into." Zhao has also been a member of a Signal group chat titled "Binance/[Trading Firm C's d/b/a]," that includes Trading Firm C's New York-based Chief Investment Officer.

179. Trading Firm C's trading activity on Binance is conducted through automated trading strategies that use tailor made computer algorithms that take in market data and other trading information to generate orders to send to market to fulfil the strategies' overall objectives. Development of Trading Firm C's algorithms used for trading on Binance occurs in the United States and in other locations.

180. Trading Firm C conducts its trading activity on Binance through at least 15 independent trading teams, including teams based in and managed from New York. Trading Firm C's trading teams are managed by "portfolio managers," who are responsible for the overall management of their respective trading teams, including trading strategy development. Most, if not all, of the relevant portfolio managers are physically located in the United States and some are partners in Trading Firm C.

181. Trading Firm C's trading activity, including its trading activity on Binance, relies on functionalities the development of which is supervised by three CTOs, two of whom are located in the United States and ultimately report to Trading Firm C's New York-based CEO.

182.    Trading Firm C and its commonly-owned corporate affiliate (a Delaware limited liability company) have been the real economic party to Trading Firm C's trading activity on Binance at all times, regardless of whether it traded through accounts held by wholly-owned corporate subsidiaries or an off-shore nominee company.  Trading Firm C's net trading revenue derived from its trading activity on Binance is consolidated into the financial statements of Trading Firm C's commonly-owned Delaware-incorporated affiliate and combined into Trading Firm C's financial statements.

183.    Initially, Trading Firm C traded on Binance through an account opened in the name of a Singapore-incorporated subsidiary.  In approximately October 2021, Trading Firm C "migrated" its Binance trading activity to an account opened under the name of a corporate entity that is organized under the laws of the Cayman Islands.  Binance confirmed that the "migration" would have "no impact on [Trading Firm C's] trading."  Consistent with this representation, Binance ported over Trading Firm C's VIP status including its reduced trading fees, as well as Trading Firm C's low latency connection to Binance's matching engines and ability to exceed Binance's default order-messaging limits to the "new" account.

184.    In connection with the opening of the "new" account, Trading Firm C informed Binance that it "structured" its Cayman Islands-incorporated nominee to roll up to a trust that owns certain "voting" shares but "does not hold any participating shares so all economic interest flows through [a holding company] and then to [Trading Firm C's commonly-owned domestic affiliate] as the sole shareholder of the participating shares" so that Trading Firm C "retains all decision making power and economic interest" in its Binance account.  Trading Firm C explained to Binance that the "main reason for using this structure is to comply with the Binance requirements" concerning "US beneficial ownership."

185. Consistent with its understanding that the trading activity in the "new" account held by the Cayman nominee is attributable to Trading Firm C, Binance has communicated about that account with Trading Firm C personnel that use @[trading-firmc].com email addresses and through Telegram chat groups with titles that include "Binance" and "Trading Firm C."

186. Trading Firm C continues to trade digital asset derivative products on Binance, including bitcoin perpetuals.

## VI. VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND REGULATIONS

### COUNT I

**Violations of Section 4(a) of the Act, 7 U.S.C. § 6(a), or, alternatively, Section 4(b) of the Act, 7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. 48.3 (2022)**

**Execution of Futures Transactions on an Unregistered Board of Trade**

187. The allegations set forth in paragraphs 1 through 186 are re-alleged and incorporated herein by reference.

188. During the Relevant Period, Defendants Binance Holdings, Binance IE, and Binance Services, all acting as a common enterprise and doing business as Binance, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6(a) by:

a. offering to enter into retail commodity transactions, or contracts for the purchase or sale of digital assets that are commodities for future delivery;

b. entering into retail commodity transactions, or contracts for the purchase or sale of digital assets that are commodities for future delivery;

c. confirming the execution of retail commodity transactions, or contracts for the purchase or sale of digital assets that are commodities for future delivery; and

d. conducting an office or business in the U.S. for the purpose of soliciting, or accepting any order for, or otherwise dealing in, any transaction in, or in connection

with, retail commodity transactions or contracts for the purchase or sale of digital

assets that are commodities for future delivery;

without conducting its futures transactions on or subject to the rules of a board of trade that was

designated or registered by the CFTC as a contract market.

189.    Binance's retail commodity transactions are and were offered, entered into on a

leveraged or margined basis, or are and were financed by the offeror, the counterparty, or a

person acting in concert with the offeror or counterparty on a similar basis.

190.    Binance's retail commodity transactions are and were offered to, entered into with

persons who are not eligible contract participants or eligible commercial entities and who are not

engaged in a line of business related to cryptocurrencies.

191.    In the alternative, during the Relevant Period, Defendants Binance Holdings,

Binance IE, and Binance Services, all acting as a common enterprise and doing business as

Binance, and through their officers, employees, and agents, violated and are continuing to violate

7 U.S.C. § 6(b) and Regulation 48.3, 17 C.F.R. § 48.3 (2022), by permitting direct access to its

electronic trading and order matching system without obtaining an Order of Registration for a

foreign board of trade from the Commission.

192.    Each offer to enter into, entrance into, execution of, and/or confirmation of the

execution of illegal off exchange futures transactions, including, without limitation, those

specifically alleged herein, is alleged as a separate and distinct violation of 7 U.S.C. § 6(a) or,

alternatively, 7 U.S.C. § 6(b) and 17 C.F.R. § 48.3.

193.    During the Relevant Period, Zhao directly or indirectly controlled Binance, and

did not act in good faith or knowingly induced, directly or indirectly, the acts constituting

Binance's violations described in this Count.  Therefore, pursuant to Section 13(b) of the Act,

7 U.S.C. § 13c(b), Zhao is liable as a control person for Binance's violations described in this Count.

194.    The acts and omissions of Zhao, Lim, and other officers, employees, or agents acting for Binance described in this Complaint were done within the scope of their office, employment, or agency with Binance.  Therefore, pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2 (2022), Binance is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Binance.

195.    From July 2019 through at least January 2022 and while acting as Binance's Chief Compliance Officer, Lim willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting Binance's violations described in this Count, or acted in combination or concert with any other person in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Lim or another would constitute a violation described in this Count.  Pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), Lim is therefore liable for Binance's violations described in this Count to the same extent as Binance.

## COUNT II

### Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2 (2022)

### Illegal Off-Exchange Commodity Options

196.    Paragraphs 1 through 186 of this Complaint are re-alleged and incorporated herein by reference.

197.    During the Relevant Period, Defendants Binance Holdings, Binance IE, and Binance Services, all acting as a common enterprise and doing business as Binance, and through their officers, employees, and agents, violated 7 U.S.C. § 6c(b) and Regulation 32.2 by offering

to enter into, entering into, confirming the execution of, maintaining positions in, and otherwise conducting activities relating to commodity option transactions in interstate commerce.

198.    The commodity options that Binance offered to enter into, entered into, confirmed the execution of, maintained positions in, and otherwise conducted activities relating to, were not executed on any registered board of trade, nor has Binance sought registration as an exempt foreign board of trade.

199.    Each act in violation of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

200.    During the Relevant Period, Zhao directly or indirectly controlled Binance, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Binance's violations described in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Zhao is liable as a control person for Binance's violations described in this Count.

201.    The acts and omissions of Zhao, Lim, and other officers, employees, or agents acting for Binance described in this Complaint were done within the scope of their office, employment, or agency with Binance.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Binance is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Binance, constituting violations of 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2.

202.    From July 2019 through at least January 2022 and while acting as Binance's Chief Compliance Officer, Lim willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting Binance's violations described in this Count, or acted in combination or concert with any other person in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Lim or another would constitute a

violation described in this Count.  Pursuant to 7 U.S.C. § 13c(a), Lim is therefore liable for

Binance's violations described in this Count to the same extent as Binance.

## COUNT III

### Violation of Section 4d of the Act, 7 U.S.C. § 6d

### Failure to Register as a Futures Commission Merchant

203.    Paragraphs 1 through 186 of this Complaint are re-alleged and incorporated

herein by reference.

204.    During the Relevant Period, Defendants Binance Holdings, Binance IE, and

Binance Services, all acting as a common enterprise and doing business as Binance, and through

their officers, employees, and agents, have operated as an FCM, and are continuing to operate as

an FCM, by:

    a.   engaging in soliciting or accepting orders for the purchase or sale of commodities

        for future delivery;

    b.   engaging in soliciting or accepting orders for swaps;

    c.   engaging in soliciting or accepting orders for agreements, contracts or transactions

        described in Section 2(c)(2)(D)(i) of the Act [7 U.S.C. § 2(c)(2)(D)(i)] (retail

        commodity transactions); and/or

    d.   acting as a counterparty in agreements, contracts, or transactions described in

        Section 2(C)(2)(D)(i) of the Act [7 U.S.C. § 2(c)(2)(D)(i)];

and, in or in connection with these activities, accepting money, securities, or property (or

extending credit in lieu thereof) to margin, guarantee, or secure resulting trades on the Binance

platform.

205.    During the Relevant Period, Defendants Binance Holdings, Binance IE, and Binance Services, all acting as a common enterprise and doing business as Binance, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 6d by failing to register with the Commission as an FCM.

206.    Each act in violation of 7 U.S.C. § 6d, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

207.    During the Relevant Period, Zhao directly or indirectly controlled Binance, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Binance's violations described in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Zhao is liable as a control person for Binance's violations described in this Count.

208.    The acts and omissions of Zhao, Lim, and other officers, employees, or agents acting for Binance described in this Complaint were done within the scope of their office, employment, or agency with Binance.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Binance is liable as a principal for each act, omission, or failure of any officers, employees, agents, or other persons acting for Binance, constituting violations of 7 U.S.C. § 6d.

209.    From July 2019 through at least January 2022 and while acting as Binance's Chief Compliance Officer, Lim willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting Binance's violations described in this Count, or acted in combination or concert with any other person in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Lim or another would constitute a violation described in this Count.  Pursuant to 7 U.S.C. § 13c(a), Lim is therefore liable for Binance's violations described in this Count to the same extent as Binance.

## COUNT IV

### Violations of Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2022)

### Failure to Register as a Designated Contract Market or Swap Execution Facility

210.    Paragraphs 1 through 186 of this Complaint are re-alleged and incorporated herein by reference.

211.    During the Relevant Period, Defendants Binance Holdings, Binance IE, and Binance Services, all acting as a common enterprise and doing business as Binance, and through their officers, employees, and agents, violated and are continuing to violate 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3(a)(1) by operating a facility for the trading of swaps on digital assets that are commodities including BTC, ETH and LTC without registering with the CFTC as a DCM or a SEF.

212.    Binance has operated and is continuing to operate a trading system or platform in which more than one market participant has the ability to execute or trade swaps with more than one other market participant on the system or platform, including the trading or processing of swap on digital assets that are commodities without being registered as a DCM or SEF.

213.    Certain products that have traded on Binance, including "perpetual futures" or "perpetual contracts" on BTC, ETH and/or LTC are swaps as defined by 7 U.S.C. § 1a(47).

214.    Each act in violation of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

215.    During the Relevant Period, Zhao directly or indirectly controlled Binance, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Binance's violations described in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Zhao is liable as a control person for Binance's violations described in this Count.

216.    The acts and omissions of Zhao, Lim, and other officers, employees, or agents acting for Binance described in this Complaint were done within the scope of their office, employment, or agency with Binance.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Binance is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Binance, constituting violations of 7 U.S.C. § 7b-3 and 17 C.F.R. § 37.3.

217.    From July 2019 through at least January 2022 and while acting as Binance's Chief Compliance Officer, Lim willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting Binance's violations described in this Count, or acted in combination or concert with any other person in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Lim or another would constitute a violation described in this Count.  Pursuant to 7 U.S.C. § 13c(a), Lim is therefore liable for Binance's violations described in this Count to the same extent as Binance.

## COUNT V

### Violations of Regulation 166.3, 17 C.F.R. § 166.3 (2022)

### Failure to Diligently Supervise

218.    Paragraphs 1 through 186 of this Complaint are re-alleged and incorporated herein by reference.

219.    During the Relevant Period, Defendants Binance Holdings, Binance IE, and Binance Services, all acting as a common enterprise and doing business as Binance, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 166.3 by employing an inadequate supervisory system and failing to perform their supervisory duties diligently.  More specifically, Binance violated and is continuing to violate 17 C.F.R. § 166.3 by, among other things, (i) failing to implement an effective Customer Information Program;

(ii) failing to implement effective Know-Your-Customer procedures; (iii) failing to implement effective Anti-Money Laundering procedures; (iv) failing to ensure that its partners, officers, employees, and agents, lawfully and appropriately handled all commodity interest accounts at Binance; (v) purposefully instructing customers to evade compliance controls; and, (vi) intentionally destroying documents related to illegal conduct.

220. Binance is and has been acting as an FCM, and therefore 17 C.F.R. § 166.3 applies to Binance as if it were a Commission registrant.

221. Each act in violation of 17 C.F.R. § 166.3, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

222. During the Relevant Period, Zhao directly or indirectly controlled Binance, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Binance's violations described in this Count. Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Zhao is liable as a control person for Binance's violations described in this Count.

223. The acts and omissions of Zhao, Lim, and other officers, employees, or agents acting for Binance described in this Complaint were done within the scope of their office, employment, or agency with Binance. Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Binance is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Binance, constituting violations of 17 C.F.R. § 166.3.

224. From July 2019 through at least January 2022 and while acting as Binance's Chief Compliance Officer, Lim willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting Binance's violations described in this Count, or acted in combination or concert with any other person in any such violation, or willfully caused an act to

be done or omitted which if directly performed or omitted by Lim or another would constitute a violation described in this Count. Pursuant to 7 U.S.C. § 13c(a), Lim is therefore liable for Binance's violations described in this Count to the same extent as Binance.

## COUNT VI

### Violations of Regulation 42.2, 17 C.F.R. § 42.2 (2022)

### Failure to Implement Customer Information Program, and Failure to Implement Know Your Customer and Anti-Money Laundering Procedures

225.     Paragraphs 1 through 186 of this Complaint are re-alleged and incorporated herein by reference.

226.     During the Relevant Period, Defendants Binance Holdings, Binance IE, and Binance Services, all acting as a common enterprise and doing business as Binance, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 42.2 by failing to implement a Customer Information Program, failing to implement Know-Your-Customer policies and procedures, failing to implement an Anti-Money Laundering program, failing to retain required customer information, and failing to implement procedures to determine whether a customer appears on lists of known or suspected terrorists or terrorist organizations such as those issued by OFAC.

227.     Each act in violation of 17 C.F.R. § 42.2, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

228.     During the Relevant Period, Zhao directly or indirectly controlled Binance, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Binance's violations described in this Count. Therefore, pursuant to 7 U.S.C. § 13c(b), Zhao is liable as a control person for Binance's violations described in this Count.

229.     The acts and omissions of Zhao, Lim, and other officers, employees, or agents acting for Binance described in this Complaint were done within the scope of their office, employment, or agency with Binance.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Binance is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Binance, constituting violations of 17 C.F.R. § 42.2.

230.     From July 2019 through at least January 2022 and while acting as Binance's Chief Compliance Officer, Lim willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting Binance's violations described in this Count, or acted in combination or concert with any other person in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Lim or another would constitute a violation described in this Count.  Pursuant to 7 U.S.C. § 13c(a), Lim is therefore liable for Binance's violations described in this Count to the same extent as Binance.

## COUNT VII

### Violations of Regulation 1.6, 17 C.F.R. § 1.6 (2022)

### Anti-Evasion

231.     Paragraphs 1 through 186 of this Complaint are re-alleged and incorporated herein by reference.

232.     During the Relevant Period, Defendants Zhao and Lim, as well as Defendants Binance Holdings, Binance IE, and Binance Services, all acting as a common enterprise and doing business as Binance, and through their officers, employees, and agents, violated and are continuing to violate 17 C.F.R. § 1.6 by conducting activities outside the United States, including entering into agreements, contracts, and transactions and structuring entities, to willfully evade or attempt to evade provisions of the Act and its Regulations.

233.     Each act in violation of 17 C.F.R. § 1.6, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

234.     During the Relevant Period, Zhao directly or indirectly controlled Binance, and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting Binance's violations described in this Count.  Therefore, pursuant to 7 U.S.C. § 13c(b), Zhao is liable as a control person for Binance's violations described in this Count.

235.     The acts and omissions of Zhao, Lim, and other officers, employees, or agents acting for Binance described in this Complaint were done within the scope of their office, employment, or agency with Binance.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) and 17 C.F.R. § 1.2, Binance is liable as a principal for each act, omission, or failure of the other officers, employees, or agents acting for Binance, constituting violations of 17 C.F.R. § 1.6.

236.     From July 2019 through at least January 2022 and while acting as Binance's Chief Compliance Officer, Lim willfully aided, abetted, counseled, commanded, induced, or procured the acts constituting Binance's violations described in this Count, or acted in combination or concert with any other person in any such violation, or willfully caused an act to be done or omitted which if directly performed or omitted by Lim or another would constitute a violation described in this Count.  Pursuant to 7 U.S.C. § 13c(a), Lim is therefore liable for Binance's violations described in this Count to the same extent as Binance.

## VII.     RELIEF REQUESTED

**WHEREFORE,** the Commission respectfully requests that the Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-l, and pursuant to the Court's own equitable powers, enter:

A.     An order finding that Defendants Binance Holdings Limited, Binance Holdings (IE) Limited, and Binance (Services) Holdings Limited, collectively doing business as Binance, and through their officers, employees, and agents, including without limitation Zhao, violated

70

Section 4(a) of the Act, 7 U.S.C. § 6(a) (or, in the alternative, Section 4(b) of the Act, 7 U.S.C. § 6(b), and Regulation 48.3, 17 C.F.R. 48.3 (2022)); Section 4c(b) of the Act, 7 U.S.C. § 6c(b), and Regulation 32.2, 17 C.F.R. § 32.2 (2022); Section 4d of the Act, 7 U.S.C. § 6d; Section 5h(a)(1) of the Act, 7 U.S.C. § 7b-3(1), and Regulation 37.3(a)(1), 17 C.F.R. § 37.3(a)(1) (2022); Regulation 166.3, 17 C.F.R. § 166.3 (2022); Regulation 42.2, 17 C.F.R. § 42.2 (2022); and Regulation 1.6(a), 17 C.F.R. § 1.6(a) (2022); finding that Changpeng Zhao is liable for Binance's aforementioned violations as a control person pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), and for violating Regulation 1.6(a); and further finding that Samuel Lim is liable for aiding and abetting Binance's aforementioned violations pursuant to Section 13(a) of the Act, 7 U.S.C. § 13c(a), and for violating Regulation 1.6(a).

B.    An order of permanent injunction prohibiting Defendants and any other person or entity associated with them, from engaging in conduct described above, in violation of 7 U.S.C. §§ 6(a) (or in the alternative 6(b) and 17 C.F.R. 48.3), 6c(b), 6d, and 7b-3(1), and 17 C.F.R. §§ 1.6(a), 32.2, 37.3(a)(1), 42.2, and 166.3.

C.    An order of permanent injunction prohibiting Defendants and any of their affiliates, officers, agents, employees, successors, assigns, attorneys, and persons in active concert or participation with Defendants, from directly or indirectly:

> (i)    trading on or subject to the rules of any registered entity (as that term is defined in Section la of the Act, 7 U.S.C. § la(40));

> (ii)   entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2022)) and/or digital asset commodities as defined herein, for Defendants' own accounts or for any account in which they have a direct or indirect interest;

(iii) having any commodity interests and/or digital asset commodities as defined herein traded on Defendants' behalf;

(iv) controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests and/or digital asset commodities as defined herein;

(v) soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests and/or digital asset commodities as defined herein;

(vi) applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2022); and

(vii) acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2022)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9);

D.    An order directing Defendants and any third party transferee and/or successors thereof, to disgorge to any officer appointed or directed by the Court all benefits received including, but not limited to, trading profits, revenues, salaries, commissions, loans, or fees derived, directly or indirectly, from acts or practices which constitute violations of the Act as described herein, including pre-judgment and post-judgment interest;

E.    An order directing Defendants and any successors thereof, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or

express, entered into between, with, or among Defendants and any customer or investor whose funds were received by Defendants a result of the acts and practices that constituted violations of the Act, as described herein;

      F.    An order requiring Defendants to make full restitution by making whole each and every customer or investor whose funds were received or utilized by them in violation of the provisions of the Act as described herein, including pre-judgment interest;

      G.    An order directing Defendants to pay civil monetary penalties, to be assessed by the Court, in an amount not more than the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114–74, tit. VII, § 701, 129 Stat. 584, 599-600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2022), for each violation of the Act, as described herein;

      H.    An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

      I.    Such other and further relief as the Court deems proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a jury trial on all issues so triable.

Dated:  March 27, 2023              Respectfully submitted,

                                    Commodity Futures Trading Commission
                                    By its attorneys:

                                    */s/ Joseph Platt*
                                    ───────────────────────

                                    Joseph Platt
                                    Trial Attorney
                                    *jplatt@cftc.gov*
                                    312-596-0562 (office)
                                    773-241-1543 (cell)

                                    Candice Haan
                                    Senior Trial Attorney
                                    *chaan@cftc.gov*

                                    Elizabeth N. Pendleton
                                    Chief Trial Attorney
                                    *ependleton@cftc.gov*

                                    Scott R. Williamson
                                    Deputy Regional Counsel
                                    *swilliamson@cftc.gov*

                                    Robert T. Howell
                                    Deputy Director
                                    *rhowell@cftc.gov*

                                    Commodity Futures Trading Commission
                                    Ralph Metcalfe Federal Building
                                    77 West Jackson Boulevard, Suite 800
                                    Chicago, Illinois 60604
                                    (312) 596-0700
                                    (312) 596-0714 (fax)
                                    *Attorneys for Plaintiff*
                                    *Commodity Futures Trading Commission*