# EXHIBIT F

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> RIPPLE LABS INC., BRADLEY GARLINGHOUSE, and CHRISTIAN A. LARSEN, <br><br> Defendants. | Case No. 20-CV-10832 (AT) (SN) |

## DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

In accordance with Rule 56.1 of the Local Civil Rules of the Southern District of New York, Defendants Ripple Labs Inc. ("Ripple"), Bradley Garlinghouse, and Christian A. Larsen submit the following statement of material facts.[1]

## RIPPLE'S USE OF OPEN-SOURCE BLOCKCHAIN TECHNOLOGY TO MODERNIZE INTERNATIONAL CURRENCY TRANSFERS

### A. The Creation of the XRP Ledger and XRP

1.      A blockchain is a system for securely recording information.  Each transaction is recorded as a "chunk[] of information" known as a block on the digital ledger, and each block, in turn, "has a cryptographically secure reference to the prior block," resulting in an immutable timeline of transactions.  Ex. 1, Dep. Tr. of David Schwartz ("D. Schwartz Tr.") 28:14-20; *see also* Ex. 2, Decl. of David Schwartz ("D. Schwartz Decl.") ¶ 2.

---

[1] Defendants have included facts that they believe are relevant based on their understanding of the SEC's theory of the case, and they reserve all rights to argue that any facts included herein are immaterial.

2.      A blockchain database is typically recorded across a network of computer systems.  *See* Ex. 2, D. Schwartz Decl. ¶ 2; Ex. 1, D. Schwartz Tr. 29:9-11.

3.      The distributed nature of the blockchain helps make it difficult, if not impossible, for would-be bad actors to alter past transactions.  *See*, *e.g.*, Ex. 2, D. Schwartz Decl. ¶ 2; Ex. 3, Expert Report of Carol Osler (Oct. 4, 2021) ("Osler Rep.") ¶ 48 ("Computers can be taken over by corrupt parties, and falsely label invalid transactions as valid.  A consensus mechanism identifies when the signals from a set of computers can be trusted.  This represents a version of the 'Byzantine Generals Problem' in computer science:  How can one verify information from multiple sources, without knowing which are trustworthy?"); *id.* ¶ 49 (detailing Bitcoin's "solution to the Byzantine Generals Problem").

4.      The first blockchain ledger, Bitcoin, launched in 2009.  *See* Ex. 2, D. Schwartz Decl. ¶ 3.

5.      The Bitcoin blockchain records transactions through a "proof of work" process, using large amounts of computing power to solve complex mathematical problems that verify which transactions will be added to the blockchain.  *See* Ex. 4, Dep. Tr. of Dinuka Samarasinghe ("Samarasinghe Tr.") 141:4-142:16 (explaining Bitcoin's "proof of work" process and distinguishing it from the XRP Ledger's validation process); *see also* Ex. 2, D. Schwartz Decl. ¶ 3.

6.      Although it ordinarily takes about 10 minutes to validate a transaction using the Bitcoin proof-of-work algorithm, this time can vary dramatically.  *See* Ex. 3, Osler Rep. ¶ 50 & Fig. 8 ("The average time to verify a Bitcoin transaction is generally about ten minutes, as shown in Figure 8.  The time occasionally rises when transaction volumes are high, as happened when the price fell dramatically in May of 2021."); *see also* Ex. 2, D. Schwartz Decl. ¶ 5.

7.      The Bitcoin ledger can process 4.6 transactions per second.  *See* Ex. 3, Osler Rep. ¶ 55.

8.      Bitcoin transactions have, in the past, cost up to $60 per transaction.  *See* Ex. 3, Osler Rep. ¶ 50 ("Bitcoin transaction fees over approximately the past year have been at least $2 and can range up to $60 per transaction.").

9.      By 2012, other small cryptocurrencies had copied the Bitcoin ledger's open-source code with minimal alterations, but none deviated in any significant way from the structure of the Bitcoin ledger.  *See* Ex. 2, D. Schwartz Decl. ¶ 3; *see also* Ex. 5, Expert Report of Peter Adriaens (Oct. 4, 2021) ("Adriaens Rep.") ¶ 36 ("As Bitcoin increased in popularity and the idea of decentralized and encrypted currencies caught on, the first alternative cryptocurrencies appeared.  Sometimes known as 'altcoins,' these cryptocurrencies generally tried to improve on the original Bitcoin design by offering greater speed, anonymity, or other advantages (such as energy requirements for validation).").

10.     When the XRP Ledger launched, all known existing blockchains relied on proof-of-work mechanisms.  Today, most major blockchains (including the two largest, Bitcoin and Ethereum) still do (though developers of the Ethereum blockchain are moving to a different approach called "proof of stake").  *See* Ex. 2, D. Schwartz Decl. ¶ 4; Ex. 5, Adriaens Rep. ¶ 37 ("There are thousands of digital currencies (including, for example, Einsteinium, Litecoin, Dash, Zcash, and Novacoin) that use the Bitcoin blockchain codebase, with developers changing a few minor details."); *id.* ¶¶ 38-41 (explaining proof-of-work mechanism and noting that the XRP Ledger was "the second ledger to be created").

11.     In 2011 and early 2012, three individuals – David Schwartz, Jed McCaleb, and Arthur Britto – developed the source code for an alternative blockchain, now known as the XRP

Ledger. *See* Ex. 1, D. Schwartz Tr. 23:16-24:7 (in "2011/2012," the "two primary developers were" Messrs. Schwartz and Britto); *id.* 118:15-20 ("Jed McCaleb had the original idea to replace -- to take something Bitcoin-like and replace Proof of Work with some sort of distributed agreement algorithm"); Ex. 6, Dep. Tr. of Phillip Rapoport 73:2-14 ("Jed McCaleb, Arthur Britto, and David Schwartz . . . were the primary architects of . . . the method by which the network, the network of computers, reaches consensus about the state of the ledger."); *see also* Ex. 2, D. Schwartz Decl. ¶ 3.

12.     These individuals intended to create a better blockchain than Bitcoin by increasing the speed of transactions, reducing their cost, and minimizing energy consumption. *See* Ex. 2, D. Schwartz Decl. ¶ 3; Ex. 7, Osler Dep. Ex. 11 (David Schwartz, *The Environmental Impact:  Cryptocurrency Mining vs. Consensus* (July 8, 2020), https://ripple.com/insights/the-environmental-impact-cryptocurrency-mining-vs-consensus/) (explaining that the XRP Ledger was "designed with sustainability in mind; it is an inherently green currency"); Ex. 8, Dep. Tr. of Christian A. Larsen ("Larsen Tr.") 233:5-21 ("[The XRP Ledger is] substantially faster.  It's substantially lower cost.  It has much higher throughput. . . .  [I]t produces a small fraction of the energy consumption and is carbon neutral . . . .").

13.     XRP is the "native currency" of the XRP Ledger.  *See* Ex. 9, Dep. Tr. of Asheesh Birla ("Birla Tr.") 248:23-25; Ex. 10, Dep. Tr. of Miguel Vias 206:22-24; Ex. 11, Expert Report of Allen Ferrell (Oct. 4, 2021) ("Ferrell Rep.") ¶ 16 ("XRP is the native digital asset of the XRP Ledger, an open-source, decentralized blockchain technology."); Ex. 3, Osler Rep. ¶ 62 ("XRP is the native currency of the XRP Ledger.").

14.     XRP is required in order to operate the XRP Ledger.  *See* Ex. 1, D. Schwartz Tr. 35:16-36:19 (each transaction costs a fraction of a unit of XRP; that fraction is destroyed); Ex. 2, D. Schwartz Decl. ¶ 5.

15.     XRP is fungible.  *See* Ex. 8, Larsen Tr. 233:7-12; *see also* Ex. 12, Rebuttal Expert Report of Allen Ferrell (Nov. 12, 2021) ¶ 53 ("XRP is a fungible virtual currency.").

16.     The core code for the XRP Ledger was completed in June 2012.  *See* Ex. 2, D. Schwartz Decl. ¶ 8.

17.     The XRP Ledger launched in 2012.  *See* Ex. 2, D. Schwartz Decl. ¶ 9.

18.     Upon the launch of the XRP Ledger in 2012, the XRP Ledger's code automatically generated a fixed supply of 100 billion XRP.  *See* Ex. 1, D. Schwartz Tr. 26:5-7 ("That code placed 100 billion units, each divisible into one million subunits, into the genesis block."); Ex. 7, Osler Dep. Ex. 11 ("All XRP is already in existence"); Ex. 13, RPLI_SEC 0258174 at -199 ("All XRP that will ever exist already exists (100 billion)").

19.     The XRP Ledger was fully operational upon launch, and everyone who had or received XRP could use that XRP to operate the ledger or for other uses.  *See* Ex. 2, D. Schwartz Decl. ¶ 4.

20.     No XRP was sold before the launch of the XRP Ledger.  *See* Ex. 2, D. Schwartz Decl. ¶ 6.

21.     Rather, the original recipients of XRP (Larsen, McCaleb, and Britto) granted 80 billion units of XRP to a newly formed corporate entity, now called Ripple, while retaining 20 billion among themselves.  Larsen and McCaleb each retained approximately 9 billion; Britto received the remaining 2 billion.  *See* Ex. 2, D. Schwartz Decl. ¶ 6; Ex. 14, Decl. of Christian Larsen ("Larsen Decl.") ¶ 2; Ex. 15, O'Gorman Dep. Ex. AO-26, RPLI_SEC 0624327 at -331

("[T]he creators of XRP gifted much of [the original 100 billion] XRP to the Company."); Ex. 8, Larsen Tr. 66:14-20, 67:18-68:3 (Larsen retained 9 billion XRP; Larsen, McCaleb, and Britto retained this amount of XRP based on their understanding that Bitcoin founder Satoshi Nakamoto also kept approximately 20% of the Bitcoin in existence); *id.* 165:24-166:3 (Ripple was gifted 80 billion XRP); Ex. 16, LARSEN_NAT_00000165 (explaining that Larsen, McCaleb, and Britto retained this amount of XRP based on their understanding that Bitcoin founder Satoshi Nakamoto also kept approximately 20% of the Bitcoin in existence).

22. Ripple never owned the 20 billion XRP retained by Larsen, McCaleb, and Britto. *See* Ex. 2, D. Schwartz Decl. ¶ 7.

23. When those three individuals have sold any of their 20 billion XRP since 2012, the proceeds from those sales were never held by Ripple or commingled in Ripple accounts with Ripple-owned assets (including any proceeds Ripple earned from selling XRP). *See* Ex. 2, D. Schwartz Decl. ¶ 7; Ex. 14, Larsen Decl. ¶ 2; Ex. 17, Decl. of Bradley Garlinghouse ("Garlinghouse Decl.") ¶ 3; *see also*, *e.g.*, Ex. 8, Larsen Tr. 67:18-69:2 (explaining that Larsen, McCaleb, and Britto decided to retain 20% of the initial 100 billion).

24. The XRP Ledger uses a "consensus protocol" to verify transactions. Ex. 3, Osler Rep. ¶ 53 ("The XRP Ledger . . . relies on a 'consensus protocol.' "); *see also* Ex. 18, D. Schwartz Dep. Ex. DS-15 at 5-10; Ex. 7, Osler Dep. Ex. 11.

25. A "validator" is a node that coordinates with other nodes in the consensus process. *See* Ex. 1, D. Schwartz Tr. 30:1-31:3 (explaining that, "[i]n the context of the XRP Ledger, a validator is a node that coordinates with other nodes in the consensus process," and that doing so "ensure[s] there's a -- that it's possible to have a single view on how the ledger makes forward progress"); Ex. 18, D. Schwartz Dep. Ex. DS-15 at 9-10; Ex. 3, Osler Rep. ¶ 53.

6

26.     The consensus mechanism of the XRP Ledger is much faster, more reliable, and less costly than Bitcoin's proof-of-work mechanism.  *See* Ex. 2, D. Schwartz Decl. ¶ 5; Ex. 8, Larsen Tr. 233:5-21; Ex. 3, Osler Rep. ¶ 50 & Fig. 8 ("The average time to verify a Bitcoin transaction is generally about ten minutes, as shown in Figure 8.  The time occasionally rises when transaction volumes are high, as happened when the price fell dramatically in May of 2021.  Ten minutes is certainly speedy relative to the days or weeks required for traditional currency conversion channels.  However, time is now measured in microseconds in financial markets, which makes even ten minutes an extremely long time.  If each microsecond were a full second, a 'ten-minute delay' would be 57 years."); *id.* ¶ 53 ("The consensus mechanism in the XRP Ledger is faster, less costly, and less energy-intensive than proof-of-work because its solution to the Byzantine Generals Problem is based on voting.").

27.     The XRP Ledger ordinarily can process 1,500 transactions per second.  *See* Ex. 3, Osler Rep. ¶ 55 ("The XRP Ledger has had far greater capacity" than the Bitcoin and Ethereum blockchains "for years – it could handle 500 transactions per second in 2015.  By now it can readily process 1,500 transactions per second.") (footnote omitted); Ex. 19, RPLI_SEC 0537730 at -753; Ex. 2, D. Schwartz Decl. ¶ 5.

28.     Transactions on the XRP Ledger ordinarily settle in 3 to 5 seconds.  *See* Ex. 2, D. Schwartz Decl. ¶ 5; *see also* XRP Ledger Found., *XRPL / XRP Ledger Overview*, https://perma.cc/ME9L-BUGA (last visited Sept. 12, 2022) ("XRPL uses a consensus protocol, in which designated servers called validators come to an agreement on the order and outcome of XRP transactions every 3-5 seconds."); Ex. 3, Osler Rep. ¶ 54 (citing same and explaining that "[t]he XRP Ledger's verification protocol requires just a few seconds, less than 1% of the 10 minutes required by proof-of-work").

29. Transactions on the XRP Ledger typically cost 0.00001 XRP – a fraction of a penny. That XRP is destroyed and does not go to Ripple or to any other entity. *See* Ex. 2, D. Schwartz Decl. ¶ 5; Ex. 1, D. Schwartz Tr. 323:9-14 (in 2017, fee for a transaction was "a hundred-thousandth of an XRP"); *see also* Ex. 3, Osler Rep. ¶ 54 ("A Bitcoin transaction fee of $10 (which appears to be a bit below the average of the past year, according to Figure 9) would be roughly 1 million times the cost of an XRP transaction."); XRP Ledger Found., *Transaction Cost*, https://perma.cc/9VWY-8WGQ (last visited Sept. 12, 2022) ("The transaction cost is not paid to any party: XRP is irrevocably destroyed.").

30. The XRP Ledger is more energy efficient than the Bitcoin ledger (*i.e.*, each transaction on the XRP Ledger consumes less than 0.002% of the energy consumed by a transaction on the Bitcoin ledger), making the XRP Ledger significantly more environmentally friendly. *See* Ex. 8, Larsen Tr. 233:5-21 (XRP "produces a small fraction of the energy consumption and is carbon neutral, whereas Bitcoin, as [the SEC] know[s], it produces 80 -- roughly megatons of CO2 per year, using 100 trillion-watt hours of power."); Ex. 2, D. Schwartz Decl. ¶ 5; Ex. 7, Osler Dep. Ex. 11 ("The unsustainable mining practices and Proof-of-Work mechanism behind Bitcoin and Ethereum are massive barriers for the more widespread adoption of cryptocurrencies. But not all blockchains are made equally. For example . . . , for every 1 million transactions, XRP could power 79,000 lightbulb hours. In contrast, for every 1M transactions, Bitcoin could power 4.51 billion lightbulb hours. This means that the energy consumption of XRP is 57,000x more efficient.").

## B. The Founding of Ripple

31. Ripple is a privately held financial technology company employing more than 700 people in 15 offices worldwide. *See* Ex. 20, Decl. of Monica Long ("Long Decl.") ¶ 2.

32.     Ripple was founded in 2012, after the core code for the XRP Ledger was already completed. *See* Ex. 2, D. Schwartz Decl. ¶ 8; Ex. 15, O'Gorman Dep. Ex. AO-26, at RPLI_SEC 0624331 ("100 billion XRP were created **before** the Company was created, and **after Ripple was founded** the creators of XRP gifted much of that XRP to the Company.") (second emphasis added).

33.     Ripple was initially named NewCoin, Inc. and incorporated under California law in September 2012. *See* California Sec'y of State, *Articles of Incorporation of NewCoin, Inc.* (Sept. 19, 2012), https://perma.cc/7NHN-T9RP.  It was promptly renamed OpenCoin Inc. in October 2012.  *See* California Sec'y of State, *Certificate of Amendment to Articles of Incorporation of NewCoin, Inc.* (Oct. 3, 2012), https://perma.cc/7HZB-DW97 (rename to OpenCoin Inc.).  It was renamed Ripple Labs Inc. in 2013 and incorporated under Delaware law in 2014.  *See* California Sec'y of State, *Certificate of Amendment of the Articles of Incorporation of OpenCoin Inc.* (Oct. 18, 2013), https://perma.cc/RR9G-72SS (rename to Ripple Labs Inc.); Delaware Sec'y of State, *Certificate of Ownership and Merger* (Sept. 15, 2014), https://perma.cc/X5SG-2GE2.

34.     Ripple has raised investment capital through multiple funding rounds in which it sold the company's stock to investors.  *See* Ex. 11, Ferrell Rep. ¶¶ 20-32 & Ex. 1.

35.     Since its early days, Ripple's mission has been to realize an "Internet of Value" – using technology to enable value to move as seamlessly as information does today over the Internet.  More particularly, Ripple seeks to modernize international payments by developing a global payments network for international currency transfers.  *See* Ex. 21, Dep. Tr. of Ethan Beard ("Beard Tr.") 45:10-13 ("So it was very much around building cross-border payments, trying to fix a broken payments industry, trying to build a global technology business."); Ex. 8,

Larsen Tr. 232:19-234:4 ("Ripple wants to be part of what we consider to be an internet of value. We think what is happening here is exactly the same thing that happened with the internet of data, which now dominates global communications.  We think being part of an internet of value is going to be the future of the way value moves around the world."); Ex. 22, Dep. Tr. of Ryan Zagone ("Zagone Tr.") 64:6-8 ("[t]he goal of the company was we were building a payment network"); Ex. 3, Osler Rep. ¶ 19; *see also id.* ¶ 43 (noting Ripple's stated "goal" of " '[e]nabling the world to move value like it moves information today' ") (alteration in Osler Rep.); *id.* ¶¶ 43-44 (describing Ripple's "ambition . . . to modernize international payments" and that "Ripple's ODL service," described below, "is designed to provide a cost-effective and efficient alternative to the cross-border payments market").

36.     Many traditional cross-border payment rails still depend on mid-20th-century payment technologies.  *See* Ex. 3, Osler Rep. ¶ 25.

37.     Cross-border payments constitute a nearly $20 trillion market worldwide.  *See* Ex. 3, Osler Rep. ¶ 43 ("[i]n 2020 [payments associated with international trade in goods and services] were worth $17.6 trillion").

38.     Cross-border remittances on traditional payment rails can take several days to reach their intended recipients – particularly in parts of the world that do not have technological infrastructure like that of the United States.  *See* Ex. 3, Osler Rep. ¶ 25.

39.     Traditional cross-border remittance transfers are costly:  in 2020, the worldwide average total cost to remit $200 by traditional channels was estimated to be 6.7%.  *See* Ex. 3, Osler Rep. ¶ 26.  The cost to remit $200 through a bank was greater than 10%.  *See id.* ¶ 27 & Fig. 3.

40.     Traditional cross-border payment rails are opaque:  during a standard funds transfer, neither sender nor receiver knows the status of the transfer.  *See* Ex. 3, Osler Rep. ¶ 25.

41.     RippleNet is a software product developed by Ripple that allows customers to clear and settle cross-border financial transactions on terms upon which the customers mutually agree.  *See* Ex. 1, D. Schwartz Tr. 265:2-4 ("[W]e always imagined that the goal of RippleNet would be to allow XRP settlement."); Ex. 20, Long Decl. ¶ 2; *see generally* Ripple, *Cross-Border Payments*, https://perma.cc/8W42-7XRX (last visited Sept. 12, 2022) (describing service).

42.     RippleNet has hundreds of customers who are financial institutions and payment providers across more than 55 countries and six continents.  *See* Ex. 20, Long Decl. ¶ 2.

43.     Ripple's customers currently send more than $1 billion across RippleNet every month, and that number generally has been increasing over time.  *See* Ex. 20, Long Decl. ¶ 2.

44.     Some, but not all, of Ripple's products and services rely on the XRP Ledger and XRP.  *See* Ex. 9, Birla Tr. 44:14-50:8 (RippleNet today does "not need XRP to function," but a feature known as ODL, discussed below, does); *see also* Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 31-34.

45.     RippleNet customers can settle cross-border transactions using fiat currency only, or they can opt to use a feature of RippleNet known as ODL, or "on demand liquidity" (formerly known as xRapid).  *See* Ex. 20, Long Decl. ¶ 3; Ex. 4, Samarasinghe Tr. 48:9-11, 228:15-16; Ex. 24, Dep. Tr. of Monica Long ("Long Tr.") 220:7-8 ("xRapid . . . later became on-demand liquidity."); Ex. 9, Birla Tr. 41:14-22 ("Over the years the precursor to ODL was called a number of different things at Ripple.  One name was xRapid."); *id.* 263:24-264:3 ("you can have fiat settlement with xCurrent, . . . now known as RippleNet").

46.      ODL leverages the inherent properties of XRP – fast settlement and low transaction costs – to allow cross-border transactions to settle in nearly real time rather than in days that traditional means require.  *See* Ex. 9, Birla Tr. 43:10-17 ("the way" xRapid, now ODL, "works is that it facilitates the liquidity or the settlement portion from one currency to another by leveraging exchanges around the world"); Ex. 25, Dep. Tr. of ██████████ Tr.") 238:11-239:9 ("My understanding is that ODL is supposed to significantly reduce the time and cost involved in sending FX payments, overseas or from overseas to onshore. . . .  I think when ODL came about, and even today, it facilitated the movement, small amounts of fiat from one currency to another.  And that is something that, today, you simply cannot do using the normal banking system.  So it was innovative then, and in some ways, it still is today."); Ex. 24, Long Tr. 145:18-146:6 (ODL is "the part of the [RippleNet] product that sends the payment through XRP"); *see also* Ex. 26, Pl.'s Answers & Objs. to Defs.' Third Set of Reqs. for Admis., SEC Answer to RFA No. 217 ("certain entities made cross border transactions using XRP" using Ripple's "xRapid product"); *see also* Ex. 3, Osler Rep. ¶¶ 54-64; Ex. 27, Dep. Tr. of Patrick Griffin 110:22-111:18 ("the value proposition for" XRP was that it "could be utilized to facilitate cross-currency, cross-asset transactions"); *id.* 112:1-3 (the XRP Ledger's "value proposition was to facilitate seamless transactions from one currency or one system to another system").

47.      ODL also enables transactions during hours and weekends when traditional banks are closed.  *See* Ex. 28, Dep. Tr. of Lawrence Angelilli 46:16-47:2 ("[W]hat was particularly interesting [about ODL] to us in the beginning was that it was 24/7, and for a while, we were doing trades on Saturdays and Sundays and holidays when the banks were closed. . . .  [T]he blockchain was extremely effective in getting those trades through when -- on seven days a week."); Ex. 4, Samarasinghe Tr. 231:1-5 ("XRP allows movement of value from one,

12

essentially borderless and close to free 24 hours a day. If a market maker can deliver Filipino peso, they can still support orders, say, over weekends and holidays where banks may be closed.").

48.     Since its launch, ODL has experienced tremendous growth. To date, more than $10 billion in ODL payments have been made – which means more than $10 billion in XRP has been used to facilitate cross-border transactions using Ripple's products. *See* Ex. 20, Long Decl. ¶ 3.

49.     Ripple's product successes have earned it accolades from publications such as Forbes FinTech 50, CBInsights FinTech 250, the World Economic Forum, and American Banker. *See* Michael del Castillo, *Blockchain 50: Billion Dollar Babies*, Forbes (Apr. 16, 2019), https://perma.cc/99AP-LEZ5; BusinessWire, *CB Insights Reveals the Fintech 250 List at Future of Fintech*, Bloomberg (June 29, 2017), https://perma.cc/Z56N-6CSN; Press Release, Ripple, *Ripple Labs Awarded as Technology Pioneer by World Economic Forum* (Aug. 5, 2015), https://perma.cc/NLL6-PRY5; American Banker, 2*0 Fintech Companies to Watch* (Oct. 12, 2015), https://perma.cc/2VWN-7UNC.

50.     The Consumer Financial Protection Bureau has stated it "believe[d] that expanded adoption of . . . Ripple's suite of products could . . . allow banks and credit unions to know the exact final amount that recipients of remittance transfers will receive before they are sent," contrary to the current state of play. Final Rule, Remittance Transfers Under the Electronic Fund Transfer Act, 85 Fed. Reg. 34,870, 34,880 (June 5, 2020).

## C.     Community Involvement in the XRP Ledger and XRP Transactions

51.     Ripple does not own the XRP Ledger. *See* Ex. 2, D. Schwartz Decl. ¶ 9.

52.     The XRP Ledger's underlying code, known as "rippled," is open-source. *See* Ex. 2, D. Schwartz Decl. ¶ 9.

53.     The ledger is operated by an independent network of validators.  *See* Ex. 2, D. Schwartz Decl. ¶ 9.

54.     Anyone can use the XRP Ledger, submit transactions to the XRP Ledger, host a node to contribute to the validation of transactions, propose changes to the XRP Ledger's source code, or develop applications that run on the XRP Ledger.  *See* Ex. 26, Pl.'s Answers & Objs. to Defs.' Third Set of Reqs. for Admis., SEC Answer to RFA No. 197 (admitting "that rippled's source code has been open source since September 26, 2013"); Ex. 2, D. Schwartz Decl. ¶ 9; *see also* XRP Ledger Found., *Tutorials*, https://perma.cc/X4RT-ZT4W (last visited Sept. 12, 2022) (compendium of "step-by-step guidance to perform common tasks with the XRP Ledger," such as creating and trading tokens, building applications, and "running businesses that interface with the XRP Ledger"); XRP Ledger Found., *Contribute Code to the XRP Ledger*, https://perma.cc/GN33-9LUX (last visited Sept. 12, 2022) ("The software that powers the XRP Ledger is open-source, so anyone can download, modify, extend, or explore it."); XRP Ledger Found., *XRP Ledger Servers*, https://perma.cc/SKU2-K8B2 (last visited Sept. 12, 2022) ("Anyone can run instances of [the] types of servers [that power the XRP Ledger] based on their needs."); XRP Ledger Found., *FAQ*, https://perma.cc/3W72-43EA (last visited Sept. 12, 2022) (the XRP Ledger does not have "a formal process for adding validators," "because it is a system with no central authority").

55.     Ripple cannot unilaterally force through changes to the XRP Ledger.  *See* Ex. 29, D. Schwartz Dep. Ex. DS-70, RPLI_SEC 0526578 (July 6, 2020 email from D. Schwartz to Ripple leadership explaining that Ripple lacks "any ability to unilaterally make arbitrary changes").

56.     The XRP Ledger's consensus protocol requires a supermajority of validators to validate transactions.  *See* Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 28; Ex. 1, D. Schwartz Tr. 62:17-23 ("[Y]ou need . . . 80 percent of the servers that particular server has chosen to listen to."); *see also* Ex. 2, D. Schwartz Decl. ¶ 4.

57.     Other operators of XRP Ledger validators can implement changes to the XRP Ledger's code without Ripple's input and indeed even over Ripple's express objections.  That has happened in practice:  in June 2020, over Ripple's objection, the XRP Ledger's code was modified to introduce a "check-writing" feature, which allows one account to claim funds from another.  *See* Ex. 1, D. Schwartz Tr. 151:15-22 (Ripple "opposed [the Checks Amendment] and it was accepted anyway"); Ex. 29, D. Schwartz Dep. Ex. DS-70 ("A few weeks ago, community support started gathering for [the Checks Amendment].  Enough validators voted in favor of it that it activated on the network despite no Ripple-operated validator voting for it and over Ripple's veto."); *see also* Ex. 2, D. Schwartz Decl. ¶ 10.

58.     Ripple funded companies as part of its Xpring initiative to incentivize the development of other use cases on the XRP Ledger by investing money in or providing grants to (sometimes in U.S. dollars and sometimes in the form of XRP) promising new companies that were developing them.  *See* Ex. 21, Beard Tr. 57:8-16 ("The Xpring initiative was an initiative to build an ecosystem of companies that were building on the XRP Ledger. . . .  [O]ur goal was to have a lot of companies building on XRP Ledger."); Ex. 1, D. Schwartz Tr. 390:3-9 ("Initially, the Xpring initiative was like a venture capital arm of -- for Ripple to get us access to being close so we could see what was going on in the industry, perhaps steer projects in better directions, perhaps combat projects."); *id.* 392:9-22 (agreeing that "one of the purposes of the Xpring initiative [was] to potentially incentivize the development of other uses for XRP"); Ex. 30, Dep.

Tr. of Alan Schwartz 174:6-19 (explaining that the Xpring program was "a program under which Ripple made investments in other companies and which [Ripple] exchanged either cash or XRP for [other companies'] equity or services").

59.     Many other developers with no connection to Ripple have built software products that use the XRP Ledger, such as a range of payment-processing applications including micropayments.  *See* Ex. 2, D. Schwartz Decl. ¶ 9; ECF No. 124 (proposed intervenors' non-exhaustive list of publicly available use cases for XRP).

60.     Before the SEC filed this lawsuit, various individuals and businesses independent of Ripple accepted XRP as a form of payment for goods and services ranging from coffee to furniture to travel.  *See* Ex. 5, Adriaens Rep. ¶ 130 (travel) & App'x C (TOCA Coffee, Beliani); Ex. 3, Osler Rep. ¶ 13 ("XRP can be used to pay for physical goods through online platforms including Bitcoin Superstore and Shopify and travel through Travala."); *see also* Ex. 22, Zagone Tr. 303:7-9 ("It is an open-source technology.  You could access it on an exchange and use it however you'd like.  So as a currency."); Ex. 9, Birla Tr. 257:21-259:2 (using an early Ripple product, "in essence, you could go to this cafe next door and pay for your coffee in," among others, "XRP").

61.     Several major charities have accepted XRP for donations, including the American Red Cross, American Cancer Society, St. Jude Children's Research Hospital, and Fidelity Charitable.  *See* Ex. 20, Long Decl. ¶ 7; American Red Cross, https://web.archive.org/web/20201001214144/https://bitpay.com/520663/donate (last visited Sept. 10, 2022); BitPay, *Donate bitcoin to American National Red Cross*, https://perma.cc/F5QB-L42F (last visited Sept. 12, 2022); BitPay, *American Red Cross*, https://perma.cc/4T9Y-E4H4 (last visited Sept. 12, 2022); BitPay, *American Cancer Society*,

https://perma.cc/8P6S-JC89 (last visited Sept. 12, 2022); St. Jude Children's Rsch. Hosp., *Giving for the future with cryptocurrency* (2021), https://web.archive.org/web/20210729150656/ https://www.stjude.org/donate/crypto.html#e9873e2ce6da1d8c2fac3611e94e1fb1c6ebe04ad2b6f 2ab38d3735900a1278e=4; Yogita Khatri, *Fidelity's charity unit includes XRP to its list of accepted cryptos for donation; hits $100 million-mark*, Yahoo Finance (Aug. 19, 2019), https://perma.cc/44SS-ZXPP.

62.    The exact number of individuals and businesses that use or have used the XRP Ledger or XRP is unknown and unknowable to Ripple.  *See* Ex. 2, D. Schwartz Decl. ¶ 11.

63.    As of December 21, 2020, more than 9 million distinct accounts existed on the XRP Ledger; as of September 1, 2022, the number of distinct accounts increased to more than 22 million.  *See* Ex. 2, D. Schwartz Decl. ¶ 11.

64.    XRP is also part of a worldwide market for the exchange of currencies, including trades between XRP and various other currencies (both traditional fiat currencies and cryptocurrencies).  *See* Ex. 20, Long Decl. ¶ 4.

65.    Scores of exchanges chose to list (and sometimes de-list) XRP with no involvement from Ripple.  *See* Ex. 20, Long Decl. ¶ 6; Ex. 8, Larsen Tr. 390:19-392:23 (Ripple gave only "a handful of exchanges of the hundreds that trade XRP" incentives to list it); *see also* XRP Ledger Found., *List XRP as an Exchange*, https://perma.cc/2JC7-8DK4 (last visited Sept. 12, 2022) (explaining how to list XRP as an exchange, without mentioning any contract with Ripple).

66.    Only six of the exchanges that listed XRP as of December 2020 had contracts with Ripple relating to their listing of XRP.  *See* Ex. 11, Ferrell Rep. ¶ 137 ("Ripple contracted with only six cryptocurrency exchanges, which represents less than 4% of the more than 150

17

exchanges that listed XRP as of December 2020."); *id.* Ex. 13 (identifying "Effective and Termination Dates of Ripple's Contracts with Exchanges") (citing Ex. 31, RPLI_SEC 0507279 and sources identified in Appendix B as Ex. 32, RPLI_SEC 0153866; Ex. 33, RPLI_SEC 0066688; Ex. 34, RPLI_SEC 0154338; Ex. 35, RPLI_SEC 0511334; Ex. 36, RPLI_SEC 0507292; and Ex. 37, RPLI_SEC 0847167).

67.     On September 4, 2013, a Ripple subsidiary that engaged in the sale of XRP elected to register with the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN").  *See* Settlement Agreement, Attach. A ¶¶ 22, 24, U.S. Dep't of Justice (May 5, 2015), https://perma.cc/382H-K4LC.

68.     In 2015, Ripple settled with the Department of Justice ("DOJ") and FinCEN, both of which determined that XRP was a "virtual currency."  *See* Settlement Agreement, Attach. A ¶ 2 & Attach. B ¶¶ 2-3, U.S. Dep't of Justice (May 5, 2015), https://perma.cc/382H-K4LC.

69.     In 2015, FinCEN and the DOJ determined that XRP is a "virtual currency" and described it as "the second-largest largest cryptocurrency by market capitalization, after Bitcoin."  Settlement Agreement, Attach. A ¶¶ 2-3, 17, U.S. Dep't of Justice (May 5, 2015), https://perma.cc/382H-K4LC; *see also* DOJ, *Ripple Labs Inc. Resolves Criminal Investigation* (May 5, 2015), https://perma.cc/A3YG-FG5Z; FinCEN, *FinCEN Fines Ripple Labs Inc. in First Civil Enforcement Action Against a Virtual Currency Exchanger* (May 5, 2015), https://perma.cc/N5PN-CD5F.

70.     As a result of the settlement, Ripple was required to sell XRP through a registered "money services business" pursuant to federal money transmission laws.  *See* DOJ, *Ripple Labs Inc. Resolves Criminal Investigation* (May 5, 2015), https://perma.cc/A3YG-FG5Z; FinCEN, *Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual*

18

*Currencies* (Mar. 18, 2013), https://perma.cc/22YK-DHSE; FinCEN Director Jennifer Shaskey Calvery, *Speech at West Coast AML Forum* (May 6, 2015), https://perma.cc/4D8R-5GNN.

71.     In June 2016, a Ripple subsidiary was one of the first entities ever to receive a "BitLicense" – a business license to conduct virtual currency activities – from the New York State Department of Financial Services ("NYDFS").  *See* Ex. 22, Zagone Tr. 297:12-298:23; *see also* Ripple, *Ripple Receives New York's First BitLicense for an Institutional Use Case of Digital Assets* (June 13, 2016), https://perma.cc/RQB2-JXG8 ("While previous approvals were for consumer-facing businesses, Ripple's BitLicense is the first granted for an additional institutional use case for digital assets."); Press Release, NYDFS, *DFS Grants Virtual Currency License to XRP II, LLC, an Affiliate of Ripple* (June 13, 2016), https://perma.cc/DCN6-2VTT.

72.     At the time the SEC brought this lawsuit, XRP was the third-largest cryptocurrency in terms of market capitalization (behind Bitcoin and Ether), with a total asset value of around $50-60 billion.  *See* CoinMarketCap, *Historical Snapshot – 13 December 2020*, https://perma.cc/QR5X-2AXN (last visited Sept. 12, 2022) (price on December 13, 2020 was $0.5115, which implies a total value of approximately $51 billion when multiplied by approximately 100 billion units of XRP); CoinMarketCap, *Historical Snapshot – 06 December 2020*, https://perma.cc/8M8R-WWSB (last visited Sept. 12, 2022) (price on December 6, 2020 was $0.6199).

73.     Before the SEC filed this lawsuit, XRP was listed on more than 200 exchanges globally.  *See* Ripple, *Q4 2020 XRP Markets Report* (Feb. 5, 2021), https://perma.cc/XC4R-7KWE ("For eight years, XRP has been trading on the open market and has grown to a massive scale – trading more than $1B per day on some 200 exchanges."); *see also* Ex. 20, Long Decl. ¶ 4.

74.     Ripple voluntarily and publicly reported its sales of XRP in quarterly market reports starting with the fourth quarter of 2016.  *See* Ripple, *Q4 2016 XRP Markets Report* (Jan. 24, 2017), https://web.archive.org/web/20170603164903/https://ripple.com/insights/q4-2016-xrp-markets-report/; Ripple, *Q1 2017 XRP Markets Report* (Apr. 18, 2017), https://web.archive.org/web/20170712084015/https://ripple.com/insights/q1-2017-xrp-markets-report/; Ripple, *Q2 2017 XRP Markets Report* (July 20, 2017), https://web.archive.org/web/20180509214545/https://ripple.com/insights/q2-2017-xrp-markets-report/; Ripple, *Q3 2017 XRP Markets Report* (Oct. 19, 2017), https://perma.cc/MME5-XXDR; Ripple, *Q4 2017 XRP Markets Report* (Jan. 28, 2018), https://perma.cc/G5K9-DG6K; Ripple, *Q1 2018 XRP Markets Report* (Apr. 25, 2018), https://perma.cc/7HFD-YFNE; Ripple, *Q2 2018 XRP Markets Report* (July 24, 2018), https://perma.cc/F9V9-KHW2; Ripple, *Q3 2018 XRP Markets Report* (Oct. 25, 2018), https://perma.cc/FQ5K-M84Q; Ripple, *Q4 2018 XRP Markets Report* (Jan. 24, 2019), https://perma.cc/6VPU-VW48; Ripple, *Q1 2019 XRP Markets Report* (Apr. 24, 2019), https://perma.cc/N62F-Q8ZA; Ripple, *Q2 2019 XRP Markets Report* (July 24, 2019), https://perma.cc/G9TA-32LJ; Ripple, *Q3 2019 XRP Markets Report* (Oct. 18, 2019), https://perma.cc/XZ9B-JGW9; Ripple, *Q4 2019 XRP Markets Report* (Jan. 22, 2020), https://perma.cc/MS3M-PFVU; Ripple, *Q1 2020 XRP Markets Report* (Apr. 30, 2020), https://perma.cc/EV3V-MEBG; Ripple, *Q2 2020 XRP Markets Report* (Aug. 3, 2020), https://perma.cc/3KVN-7KJJ; Ripple, *Q3 2020 XRP Markets Report* (Nov. 5, 2020), https://perma.cc/W8H6-BMJJ; Ripple, *Q4 2020 XRP Markets Report* (Feb. 5, 2021), https://perma.cc/L2QB-LEWM; Ripple, *Q1 2021 XRP Markets Report* (May 6, 2021), https://perma.cc/A4YR-3VDN; Ripple, *Q2 2021 XRP Markets Report* (July 29, 2021), https://perma.cc/DE7V-ZCP8; Ripple, *Q3 2021 XRP Markets Report* (Oct. 29, 2021),

https://perma.cc/4J6N-3B8T; Ripple, *Q4 2021 XRP Markets Report* (Jan. 28, 2022),

https://perma.cc/VHK2-84ES; Ripple, *Q1 2022 XRP Markets Report* (May 2, 2022),

https://perma.cc/UQ9Q-3WAR; Ripple, *Q2 2022 XRP Markets Report* (July 28, 2022),

https://perma.cc/TH3S-2E2T; *see also* Ex. 38, Dep. Tr. of Breanne Madigan 110:2-16 (Ripple

"used the XRP markets report to communicate to the market what was going on with respect to

XRP" and "chose, before [the witness's time], to voluntarily provide information to the market

regarding its holdings of XRP and any activity around it"); Ex. 4, Samarasinghe Tr. 175:8-24

(quarterly market reports "typically included," among other things, "the amount of XRP that was

sold by Ripple").

75.     The vast majority of Ripple's total net outflows of XRP was distributed before

August 2020; roughly 25 billion XRP were distributed by that date.  *See* Ex. 11, Ferrell Rep.

¶ 109 (Ripple had distributed approximately 25 billion as of December 20, 2020) & Ex. 10 (total

distributions of XRP not materially different as of August 2020).[2]

76.     From the XRP Ledger's launch in 2012 to the filing of this litigation, more than

1.28 trillion XRP traded hands globally.  *See* Ex. 2, D. Schwartz Decl. ¶ 12.

77.     Since at least 2017, Ripple's distributions of XRP have represented a small

fraction of XRP's total overall trading volume.  *See* Ex. 11, Ferrell Rep. ¶ 143 ("Ripple's sales of

XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not

purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.

Since at least the second quarter of 2017, Ripple's monthly XRP distributions have been under

---

[2] The figures reflected in Exhibit 10 include the units of XRP retained by Ripple's
Founders.

1% of the overall XRP trading volume reported by CryptoCompare."); *see also XRP Markets Reports* cited *supra* ¶ 74.

78.     A cryptographic escrow established in 2017 prevents Ripple from accessing and distributing more than 1 billion XRP from the escrow in any given month. *See* Ex. 8, Larsen Tr. 374:12-16; Ex. 24, Long Tr. 87:12-16; Ex. 11, Ferrell Rep. ¶ 119; Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 10 ("[i]n May 2017, Ripple publicly reported that it would . . . plac[e] a portion of its XRP into cryptographically-secured escrow contracts").

79.     The escrow makes only 1 billion XRP available for use by Ripple every month. *See* Ex. 11, Ferrell Rep. ¶ 119; Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 11 ("[I]n December 2017, Ripple implemented a cryptographically-secured escrow – a series of smart contracts on the XRP Ledger – that made only 1 billion XRP available for use by Ripple every month.").

80.     Ripple has in fact distributed far less than the 1 billion that is permissible in any given month. *See* Ex. 11, Ferrell Rep. ¶ 119 ("I analyzed the monthly net outflow of XRP from Ripple divided by 1 billion XRP, the Escrow monthly limit.  In the 12 months ending December 31, 2017, the monthly ratio ranged from -0.7% to 55.8% (22.3% on average).  In the 12 months ending December 31, 2018, the monthly ratio ranged from 2.1% to 55.9% (17% on average).  On average, the ratio is less than 100%, which shows that Ripple consistently distributed less than one billion XRP.").

81.     Unused XRP released by the escrow has been locked up again at the end of the month by Ripple. *See* Ex. 9, Birla Tr. 183:19-23; Ripple, *An Explanation of Ripple's XRP Escrow* (Dec. 15, 2017), https://perma.cc/7SDX-E3W6 ("Any additional XRP leftover each

month will be placed into a new escrow to release in the first month in which no escrow currently releases.").

82.     Throughout 2018, Ripple's XRP sales never exceeded one-half of 1% (0.5%) of the global XRP trading volume.  *See* Ripple, *Q1 2018 XRP Markets Report* (Apr. 25, 2018), https://perma.cc/7HFD-YFNE; Ripple, *Q2 2018 XRP Markets Report* (July 24, 2018), https://perma.cc/F9V9-KHW2; Ripple, *Q3 2018 XRP Markets Report* (Oct. 25, 2018), https://perma.cc/FQ5K-M84Q; Ripple, *Q4 2018 XRP Markets Report* (Jan. 24, 2019), https://perma.cc/6VPU-VW48.

83.     In the first quarter of 2019, Ripple's sales amounted to only 0.32% of the overall trading volume of XRP.  *See* Ripple, *Q1 2019 XRP Markets Report* (Apr. 24, 2019), https://perma.cc/N62F-Q8ZA.

84.     Since May 2020, essentially all of Ripple's sales of XRP – which were conducted with full disclosure to the SEC – have been to certain ODL customers that have sourced XRP directly from Ripple for cross-border transactions.  *See* Ex. 20, Long Decl. ¶ 10.

85.     The price of XRP declined by approximately 70% in the days following the filing of the SEC's complaint in this action, wiping out approximately $15 billion in market value.  *See generally* CoinMarketCap, *XRP*, https://perma.cc/D8WR-3TE7 (last visited Sept. 12, 2022) (decline from market cap of more than $25 billion on December 21, 2020 to more than $10 billion on December 23, 2020).

86.     Nearly every known exchange accessible to U.S. parties de-listed XRP or blocked U.S. parties' access to it in the weeks following the SEC's filing of this lawsuit.  *See* Ex. 20, Long Decl. ¶ 5 (de-listing and blocking by exchanges).

87.     As of December 20, 2020, Ripple had transferred roughly 25 billion XRP to various counterparties, including through XRP sales, giveaways, and purchases of goods and services.  *See* Ex. 11, Ferrell Rep. ¶ 109 ("[a]s of December 20, 2020, Ripple's aggregate distributions were approximately 25 billion XRP").

88.     Ripple reports the amount of XRP it holds on its website.  *See* Ripple, *XRP – Utility for the new global economy*, https://perma.cc/QRK3-2MMC (last visited Sept. 7, 2022) (click on "[t]he majority of Ripple's XRP supply is in escrow").

89.     As of September 4, 2022, Ripple owns approximately 50.2 billion XRP (compared to 49.8 billion held by persons and institutions other than (and mostly unknown to) Ripple).  *See* Ex. 20, Long Decl. ¶ 11; Ripple, https://perma.cc/QRK3-2MMC (last visited Sept. 12, 2022) (*see* bottom section with black background, expand the second point re: escrow).

90.     As of September 4, 2022, Ripple has only about 5.5 billion in XRP outside the escrow.  *See* Ex. 20, Long Decl. ¶ 11.

91.     Global XRP trading markets remain active, with 24-hour trading volumes approaching $1,000,000,000.  *See* Ex. 20, Long Decl. ¶ 6.

**D.     Ripple's Sales, Giveaways, and Payments of XRP**

**1.     Giveaways**

92.     Ripple in its early years (roughly 2013-2015) gave away more than 500 million XRP to early adopters and developers, before ending those programs due to abuse by scammers. No contracts accompanied these giveaways, and Ripple did not receive any consideration.  *See* Ex. 20, Long Decl. ¶ 8; Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 56 (admitting "that the recipients of XRP in the Bounty Program did not pay money or property to Ripple"); *see also, e.g.*, Ex. 8, Larsen Tr. 173:24-174:14 (Ripple terminated its initial plan to "give away ▮▮▮▮▮ XRP to the public" because it found that

24

"giving away opened you up to too much abuse and spamming, too many fake accounts posing to be different individuals would take advantage of the giveaways once the currencies had value").

93.     Ripple has donated more than 2 billion XRP to charities and grant recipients, and Larsen has given away more than 2 billion to charity as well.  *See* Ex. 20, Long Decl. ¶ 9; Ex. 14, Larsen Decl. ¶ 5; *see generally* Rippleworks, *Our Story*, https://perma.cc/6BJ4-VRMP (last visited Sept. 12, 2022); Rippleworks, *Making a difference at home with Community Grants*, https://perma.cc/CTZ9-BQFE (last visited Sept. 12, 2022).

94.     Ripple's donations were not in exchange for any consideration.  Ripple made no promise to make efforts to increase the price of XRP; no promise that the price or value of XRP would increase; and no promise to pay out a share of any future profits.  *See* Ex. 20, Long Decl. ¶ 8.

### 2.     Exchange-Based Sales

95.     Ripple has sold XRP on digital asset exchanges via market makers "programmatic[ally]," meaning through the use of trading algorithms.  *See* Ex. 40, Expert Report of Alan Schwartz (Oct. 4, 2021) ("A. Schwartz Rep.") ¶¶ 18, 32-35, 89-104; Ex. 4, Samarasinghe Tr. 45:11-20 (explaining that "programmatic sales" means "Ripple used market makers such as GSR ███████████ to use algorithms to sell XRP across global digital asset exchanges"); *see also* Ex. 25, ███ Tr. 27:6-21 (explaining that GSR is "an algorithmic trading firm that specializes in crypto," such that most of its trading "is programmatic in nature").

96.     When a digital asset, such as XRP, is sold on exchanges, there is no contract or privity between the buyer and the seller.  Rather, a buyer communicates to the exchange that it wants to buy the asset, and the exchange matches a blind sell offer with a blind buy offer; a

prospective buyer does not, and cannot, solicit a specific potential seller, and a prospective seller does not, and cannot, target a specific potential buyer. *See, e.g.*, Ex. 41, Expert Report of Yesha Yadav (Oct. 4, 2021) ("Yadav Rep.") ¶ 77 ("[E]lectronic order matching trading systems are, overwhelmingly, anonymous spaces. In other words, parties do not generally know in advance with whom they are trading. They cannot submit an offer with the express aim of trading with a specific party on the other side.") (footnote omitted); Ex. 11, Ferrell Rep. ¶ 143 ("[A] majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."); Ex. 42, Dep. Tr. of Yesha Yadav ("Yadav Tr.") 195:15-196:23 ("It is a[n] absolutely cardinal rule of traditional marketplaces, modern electronic marketplaces, that pretrade anonymity be sacrosanct.").

97.      As a result, when selling XRP on exchanges, Ripple, Larsen, and Garlinghouse did not and could not know who was purchasing the XRP, and the purchasers did not and could not know who was selling the XRP they purchased. *See, e.g.*, Ex. 25, ▮ Tr. 297:25-298:7 ("I have no way of knowing who is on the other side of the trades").

98.      Ripple entered into contracts with third parties that agreed to sell Ripple's XRP over digital asset exchanges and remit the sale proceeds to Ripple, less a fee. *See* Ex. 40, A. Schwartz Rep. ¶¶ 18, 32-35, 89-104 & Ex. D (setting forth and explaining Ripple's "Programmatic Contracts under which Ripple transfers possessory interests in units of XRP to the counterparty and the counterparty promises to sell those units of XRP to various third parties on one or more digital asset exchanges"); Ex. 43, RPLI_SEC 0507300; Ex. 44, RPLI_SEC 0537727.

99.      Ripple undertook no contractual obligations to exchange-based purchasers, and exchange-based purchasers received no rights in Ripple's business or right to demand anything

from Ripple.  *See* Ex. 40, A. Schwartz Rep. ¶ 33 ("Ripple either disclaims, or the Programmatic Sales Contracts contain no provision under which Ripple agrees to assume, any post-contractual obligations either to the counterparty or any third-party subsequent purchaser."); *id.* ¶ 35 ("Further, each of the Programmatic Contracts lacks any express provision or representation . . . that entitles the counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive profits from any other source[.]").

100.    Ripple's programmatic sales contracts contained a provision stating that the contract and any related documents constituted the entire agreement between the parties.  *See* Ex. 40, A. Schwartz Rep. ¶ 34 & Ex. D ("Each of the Programmatic Contracts contains a provision stating that the agreement and any related documents constitute the entire agreement between the parties."); Ex. 43, RPLI_SEC 0507300 at -305, § 13.

101.    Ripple's programmatic sales contracts lacked any provision promising that Ripple would make efforts to increase the price of XRP.  *See* Ex. 40, A. Schwartz Rep. ¶¶ 33, 35 & Ex. D (noting the absence or disclaimer of "any post-contractual obligations either to the counterparty or any third-party subsequent purchaser" or any "express provision or representation"); *see generally* Ex. 43, RPLI_SEC 0507300.

102.    Ripple's programmatic sales contracts lacked any provision otherwise imposing post-sale obligations on Ripple.  *See* Ex. 40, A. Schwartz Rep. ¶ 35 & Ex. D (noting that "each of the Programmatic Contracts lacks any express provision or representation" "pursuant to which Ripple promises to make efforts to increase the price of XRP"); *see generally* Ex. 43, RPLI_SEC 0507300.

103.    Ripple's programmatic sales contracts lacked any provision representing that the price of XRP would increase.  *See* Ex. 40, A. Schwartz Rep. ¶ 35 & Ex. D (noting that "each of

the Programmatic Contracts lacks any express provision or representation" "in which Ripple represents or warrants that the price or value of XRP will increase"); *see generally* Ex. 43, RPLI_SEC 0507300.

104.     Ripple's programmatic sales contracts lacked any provision entitling the counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive profits from any other source.  *See* Ex. 40, A. Schwartz Rep. ¶ 35 & Ex. D (noting that "each of the Programmatic Contracts lacks any express provision or representation" "that entitles the counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive profits from any other source"); *see generally* Ex. 43, RPLI_SEC 0507300.

### 3.     Wholesale Sales

105.     Ripple has sold XRP through sales to counterparties – typically, institutional buyers and ODL customers – through arm's-length agreements that did not provide the purchaser of XRP any right to demand or receive anything from Ripple beyond delivery of the purchased XRP.  *See* Ex. 40, A. Schwartz Rep. ¶¶ 18-31 & Ex. C; *see also*, *e.g.*, Ex. 45, RPLI_SEC 0668885; Ex. 46, RPLI_SEC 0000517; Ex. 47, RPLI_SEC 0301016; Ex. 48, RPLI_SEC 0609008; Ex. 49, RPLI_SEC 0609563; Ex. 50, RPLI_SEC 0676713.[3]

106.     The contracts that governed these transactions (whether wholesale or direct) typically included provisions stating that the agreement and any subsequent documents related to an individual transaction (*e.g.*, a Summary of XRP Purchase) constituted the entire agreement between the parties.  *See* Ex. 40, A. Schwartz Rep. ¶ 29 & Ex. C ("The governing Sales

---

[3] In order to avoid unduly burdening the Court, Defendants are not filing copies of the more than 1,700 relevant contracts in support of the assertion of this paragraph and those that follow.  Defendants are, however, prepared to provide copies of the more than 1,700 contracts, and to introduce all such contracts at trial, should the need arise.

Contracts typically contain . . . a provision stating that the agreement and any subsequent documents related to an individual transaction (*e.g.*, a Summary of XRP Purchase) constitute the entire agreement between the parties[.]"); Ex. 45, RPLI_SEC 0668885 at -891, § 7(c); Ex. 51, RPLI_SEC 0304341 at -344, § 9.7.

107.     The contracts that governed these transactions typically contained an acknowledgement that the purchased units of XRP did not grant the purchaser any right to make any demand on Ripple.  None included any provision entitling the counterparty to share in Ripple's profits as a result of holding XRP or obligating Ripple to undertake efforts to increase the price of XRP.  *See* Ex. 40, A. Schwartz Rep. ¶ 29 & Ex. C ("The governing Sales Contracts typically contain . . . an acknowledgement that the purchased units of XRP do not grant the purchaser any right to make any demand on Ripple[.]"); *see also id.* ¶ 14 ("[T]he typical sales contract provides that 'all title to and risk of loss related to such XRP passes to the customer.' . . . Rather than assume any post-sale obligation to promote and increase the value of XRP, the typical Ripple sales contract warns the customer that the future value of XRP depends on 'the continued willingness of market participants to exchange fiat currency for virtual currency.' ") (quoting Ex. 52, RPLI_SEC 0608975 at -977, § 3(c), and Ex. 45, RPLI_SEC 0668885 at -890, § 6(c)(v)); *e.g.*, Ex. 45, RPLI_SEC 0668885 at -890, § 6(c)(v)); Ex. 40, A. Schwartz Rep. ¶ 60 (exemplar provision through which purchaser " 'acknowledges and agrees that (i) the Purchased XRP do not represent a right to make any demand on [Ripple]; (ii) [Ripple] has no obligation to redeem or exchange the Purchased XRP for monetary value, goods, services or any other item; and (iii) [Ripple] is not responsible for any use by [the purchaser] or any third party of the Purchased XRP' ") (quoting Ex. 45, RPLI_SEC 0668885 at -887, § 3(d)) (last alteration added); Ex. 11, Ferrell Rep. ¶¶ 36, 41.

108.    Ripple's contracts lacked any express provision or representation that the price or value of XRP will increase.  *See* Ex. 40, A. Schwartz Rep. ¶ 30 & Ex. C ("each of the Sales Contracts lacks any express provision or representation . . . pursuant to which Ripple promises to make efforts to increase the price of XRP" or "in which Ripple represents or warrants that the price or value of XRP will increase"); *see, e.g.*, Ex. 45, RPLI_SEC 0668885; Ex. 46, RPLI_SEC 0000517; Ex. 47, RPLI_SEC 0301016; Ex. 48, RPLI_SEC 0609008; Ex. 49, RPLI_SEC 0609563; Ex. 50, RPLI_SEC 0676713.

109.    A handful of contracts in which Ripple provided custody services imposed an additional obligation on Ripple to safeguard the custodied units of XRP and distribute them in accordance with the counterparty's instructions, but those contracts still conferred no further rights to make other demands on Ripple or to share in Ripple's profits, nor any obligation for Ripple to undertake efforts to increase the price of XRP.  *See* Ex. 40, A. Schwartz Rep. ¶ 31.

**4.    Form of Payment**

110.    Ripple has used XRP as a currency to pay for services that it obtains from certain vendors and employees who are willing to accept XRP instead of or in addition to other currencies (such as U.S. dollars).  *See* Ex. 40, A. Schwartz Rep. ¶¶ 36-40 & Ex. E (explaining Ripple's "Services Contracts," each of which "requires a third party to provide various services to Ripple at a price quoted in XRP," and identifying common types); *see also, e.g.*, Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56, RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

111.    In its market-making contracts, Ripple purchased market-making services, such as the quoting of bid and offer prices for transactions in currency pairs of XRP and various fiat currencies, and paid the market makers in XRP.  *See* Ex. 40, A. Schwartz Rep. ¶ 38 & Ex. E

(noting that "[t]he market-making services include, but are not limited to, quoting bid and offer prices for transactions in currency pairs of XRP and various fiat currencies," and include payments in the form of grants, loans, and leases of XRP); *see* Ex. 55, GSR00010953.

112.    Ripple's services contracts lacked provisions obligating Ripple to take efforts to increase the price of XRP.  *See* Ex. 40, A. Schwartz Rep. ¶ 42 & Ex. E (explaining that "each of the Services Contracts lacks any express provision or representation . . . pursuant to which Ripple promises to make efforts to increase the price of XRP"); *id.* ¶¶ 105-115 (analysis of exemplar market-making contract); *id.* ¶¶ 116-134 (analysis of exemplar product incentive contracts); *id.* ¶¶ 135-143 (analysis of exemplar employee and executive compensation contract); *see id.* ¶ 129 (quoting agreement in which counterparty " 'acknowledges and agrees that (i) XRP do not represent a right to make any demand on [Ripple;] (ii) [Ripple] has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item; and (iii) [Ripple] is not responsible for any use by [counterparty] or any third party of XRP that Ripple has delivered to [counterparty] under this Agreement' ") (quoting Ex. 57, RPLI_SEC 0899553, -555, § 14) (last alteration added); *see also*, *e.g.*, Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56, RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

113.    Ripple's services contracts lacked provisions representing that the price of XRP would increase.  *See* Ex. 40, A. Schwartz Rep. ¶ 42 & Ex. E (explaining that "each of the Services Contracts lacks any express provision or representation . . . in which Ripple represents or warrants that the price or value of XRP will increase"); *id.* ¶¶ 105-115 (analysis of exemplar market-making contract); *id.* ¶¶ 116-134 (analysis of exemplar product incentive contracts); *id.* ¶¶ 135-143 (analysis of exemplar employee and executive compensation contract); *see also*, *e.g.*,

Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56, RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

114.    Ripple's services contracts lacked provisions entitling the counterparty to share in profits earned by Ripple or to receive profits from any other source.  *See* Ex. 40, A. Schwartz Rep. ¶ 42 & Ex. E (explaining that "each of the Services Contracts lacks any express provision or representation . . . that entitles the counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive profits from any other source"); *id.* ¶¶ 105-115 (analysis of exemplar market-making contract); *id.* ¶¶ 116-134 (analysis of exemplar product incentive contracts); *id.* ¶¶ 135-143 (analysis of exemplar employee and executive compensation contract); *see also*, *e.g.*, Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56, RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

### 5.    Ripple's Other Contracts

115.    Examples of other contracts by which Ripple distributed its XRP include Master Hosted Services Agreements, Loans and Promissory Notes, Custody Agreements, RippleWorks Contracts, Settlement Agreements, Xpring Contracts, and Joint Venture Contracts.  *See generally* Ex. 40, A. Schwartz Rep. ¶¶ 18, 144-218; Ex. 59, RPLI_SEC 0272291; Ex. 60, RPLI_SEC 0239684; Ex. 61, MONEYGRAM_SEC_0005812; Ex. 62, RPLI_SEC 0000906; Ex. 63, RPLI_SEC 0895307; Ex. 64, RPLI_SEC 0314261; Ex. 65, RPLI_SEC 0265201; Ex. 66, RPLI_SEC 0576504; Ex. 67, RPLI_SEC 0863819; Ex. 68, RPLI_SEC 0609230; Ex. 69, RPLI_SEC 0609222; Ex. 70, RPLI_SEC 0443186; Ex. 71, RPLI_SEC 0991609; Ex. 72, RPLI_SEC 0796371; Ex. 73, RPLI_SEC 0266000.

116.    Some of Ripple's contracts provide that a buyer may obtain a refund from Ripple as a remedy, but only if the sale does *not* occur.  *See* Ex. 40, A. Schwartz Rep. ¶ 14.

32

117.    None of Ripple's contracts granted post-sale rights to recipients as against Ripple

or imposed post-sale obligations on Ripple to act for the benefit of those recipients.  *See* Ex. 23,

Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 57-65

(admitting that XRP holders have no right to demand from Ripple, and Ripple has no obligation

to give to XRP holders, any form of money, property, or dividends, or any participation rights in

Ripple's business); Ex. 40, A. Schwartz Rep. ¶ 11 ("[T]he contracts I have reviewed do not

obligate Ripple to perform any relevant post-sale actions at all.").

118.    Nothing in Ripple's contracts requires Ripple to pay, or entitles an XRP holder to

demand, any share of Ripple's revenue, profits, or dividends, or "any other payment or

consideration" from Ripple or any other common pool.  *See* Ex. 23, Pl.'s Answers & Objs. to

Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 57-72, 90.

119.    Ripple's equity can increase in value even as XRP decreases in price, such that

XRP holders experience a loss when Ripple turns a profit.  *See* Ex. 23, Pl.'s Answers & Objs. to

Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 32 (admitting "that some XRP

holders may experience losses on the fair market value of their XRP holdings during periods

when Ripple has claimed positive income").

120.    The price of XRP can go up when Ripple is unprofitable.  *See* Ex. 23, Pl.'s

Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 31.

121.    Ripple can experience losses or decreases in equity while XRP increases in price

and XRP holders realize gains.  *See* Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for

Admis., SEC Answer to RFA No. 34 (admitting "that some XRP holders may experience gains

on the value of their XRP holdings during periods when Ripple experienced negative income").

122.     The price of XRP can go down when Ripple turns a profit.  *See* Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 33.

123.     Since at least 2018, the price of XRP has correlated more closely with the prices of Bitcoin and Ether – that is, the cryptocurrency market as a whole – than with any action or statement of Ripple.  XRP owners' "profits" (if any) thus result primarily from market forces of supply and demand.  *See* Ex. 11, Ferrell Rep. ¶¶ 90-106 (showing that variations in long-run XRP price return can be explained by exogenous cryptocurrency market factors); *see also* Ex. 74, Amended Expert Report of ███████ ¶ 121 & Fig. 40 (Oct. 6, 2021) (conceding that, since at least mid-2018, broader cryptocurrency trends explain more than 50% of XRP returns, and that, in the final two full calendar quarters before the SEC filed this action (Q2 and Q3 2020), returns for Bitcoin and Ether "can explain as much as almost 90% of XRP returns").[4]

**E.     The SEC's Positions**

124.     The SEC does not contend that XRP is a security on any basis other than it is an "investment contract."  *See* Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 1-19.

125.     When asked in discovery, the only contractual provisions the SEC identified to support (which appear in only a handful of Ripple's contracts) were (i) "lock ups and other sales restrictions" that bind the buyer in certain of Ripple's contracts with wholesale purchasers, and (ii) discounts in some of Ripple's wholesale contracts and contracts with digital asset platforms. *E.g.*, Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 11, 13, 19-20, 22, 31.

---

[4] For the reasons Defendants have explained, the Court should exclude ███████'s testimony (as well as that of the SEC's other experts).  *See* ECF No. 547.  Defendants cite ███████'s reports only for the purpose of showing that the facts described herein are undisputed, and they adhere to their previously expressed objections to the admissibility of his opinions.

126.     The SEC bases its claims instead on a list of public statements – most of which occurred in 2017, and the last of which occurred on August 3, 2020 (the date the Q2 2020 XRP Markets Report was published).  Specifically, the SEC claims that Ripple publicly reported "it would control and restrict the timing and volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into cryptographically-secured escrow contracts," Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 10; "its contracts with wholesale purchasers contained lock ups and other sales restrictions," *id.* at 11; "its efforts to create liquidity and demand for XRP by selling XRP directly to institutional investors and making it easier for these purchasers to buy, sell, and trade XRP," *id.* at 12, and "by partnering with digital asset trading platforms," *id.* at 13; and "its efforts to develop a use for XRP through its On-Demand Liquidity Product," *id.* at 14, and "its xPring initiative," *id.* at 15.  The SEC also cites Ripple's statements that, "according to rules of the XRP Ledger, no additional XRP could ever be created or issued and as a result, an increase in demand for XRP would lead to an increase in the value and price of XRP," *id.* at 10, and, in Q2 2020, that it "had begun purchasing XRP in the secondary market to ensure 'a healthy, orderly XRP market,'" *id.* at 12.  It contends that these statements, along with Ripple's "contracts with wholesale purchasers, digital asset trading platforms, and market makers[,] led XRP holders to believe that they would be able to sell XRP at a profit."  *Id.* at 14.

127.     The SEC has alleged that Ripple deposited the funds it obtained from its own sales of XRP into specific bank accounts it owned and thus, according to the SEC, "pooled" those funds.  *See* Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 43-44.

**F.     Christian Larsen**

128.     Larsen is the current Executive Chairman, and former CEO, of Ripple.  *See* Ex. 8, Larsen Tr. 49:9-18, 57:16-24; Ex. 1, D. Schwartz Tr. 27:10-14.

129. On November 1, 2016, Ripple announced that Larsen had decided to transition from his operational role as CEO of Ripple to Executive Chairman of the Board of Directors to spend more time with his family, and that Brad Garlinghouse would be CEO effective January 1, 2017. *See* Ex. 75, RPLI_SEC 0042736; Ex. 76, Dep. Tr. of Bradley Garlinghouse ("Garlinghouse Tr.") 25:16-21.

130. When the XRP Ledger was launched, a fixed supply of 100 billion of the token native to the XRP Ledger – what became known as XRP – was automatically generated. *See* Ex. 1, D. Schwartz Tr. 25:23-26:7.

131. Ripple was granted 80 billion XRP, and McCaleb, Larsen, and Britto retained the other 20 billion of XRP. *See* Ex. 8, Larsen Tr. 165:24-166:11; Ex. 14, Larsen Decl. ¶¶ 2-3.

132. Larsen retained approximately 9 billion XRP. *See* Ex. 8, Larsen Tr. 66:14-20; Ex. 14, Larsen Decl. ¶ 2.

133. McCaleb retained approximately 9 billion XRP. *See* Ex. 14, Larsen Decl. ¶ 3.

134. Britto retained approximately 2 billion XRP. *See* Ex. 14, Larsen Decl. ¶ 3.

135. Larsen, McCaleb, and Britto retained this amount of XRP based on their understanding that bitcoin founder Satoshi Nakamoto also kept approximately 20% of the bitcoin in existence. *See* Ex. 8, Larsen Tr. 67:18-68:14.

## G. Bradley Garlinghouse

136. Garlinghouse graduated from the University of Kansas with a Bachelor of Arts in Economics in 1994, and then attended Harvard Business School. *See* Ex. 77, *In re Ripple Labs Inc.*, NY-09875, Bradley Garlinghouse Testimony Tr. ("Garlinghouse SEC Test.") 12:5-9; Ex. 76, Garlinghouse Tr. 104:25.

137. After graduating with a Master's in Business Administration from Harvard Business School in 1997, Garlinghouse was employed by several leading technology companies,

including Yahoo! and AOL.  Garlinghouse's roles at these companies focused on business strategy.  At Yahoo!, Garlinghouse was the general manager of the group responsible for Yahoo!'s suite of communication projects, which included Yahoo! Mail and Yahoo! Messenger.  *See* Ex. 77, Garlinghouse SEC Test. 13:16-14:4.  At AOL, Garlinghouse was president of consumer applications and was responsible for product strategy and development.  *Id.* 16:5-23.

138.     Garlinghouse was not involved in the creation of the XRP Ledger or its native currency (XRP), the founding of Ripple, the transfer of XRP to Ripple, or Ripple's early (*i.e.*, before 2015) distributions and sales of XRP.  *See* Ex. 17, Garlinghouse Decl. ¶ 2.  Garlinghouse had not worked in the digital asset industry before interviewing for a position at Ripple in early 2015.  *See* Ex. 77, Garlinghouse SEC Test. 27:12-21.

139.     After learning of the open Chief Operating Officer ("COO") position at Ripple from a recruiter, Garlinghouse met with Larsen, who at the time was Ripple's CEO.  *See* Ex. 76, Garlinghouse Tr. 32:5-14; Ex. 77, Garlinghouse SEC Test. 25:2-6, 25:12-21.

140.     Ripple hired Garlinghouse as COO in April 2015.  *See* Am. Compl. ¶ 17, ECF No. 46; Ex. 76, Garlinghouse Tr. 25:16-26:2.

141.     By the time Garlinghouse joined Ripple in April 2015, the XRP Ledger had been completed, *see* Am. Compl. ¶ 45, XRP was being used as a means of payment and a bridge currency, *see* Ex. 1, D. Schwartz Tr. 35:16-20, 37:5-15, 39:17-22, and XRP's market cap exceeded $270 million, *see* CoinMarketCap, *Historical Snapshot – 12 April 2015*, https://perma.cc/3Z8J-AW7J (last visited Sept. 12, 2022).

142.     As COO, Garlinghouse was responsible for Ripple's operating strategy, and he worked on building a commercial product using XRP to enhance cross-border payments for financial institutions.  *See* Ex. 77, Garlinghouse SEC Test. 34:9-15, 75:1-76:7, 77:11-20, 82:6-15.

143.    Garlinghouse became CEO of Ripple in January 2017 and remains in that position today.  *See* Am. Compl. ¶ 17.

144.    As CEO, Garlinghouse's duties include:

- Managing Ripple's senior employees, *see* Ex. 77, Garlinghouse SEC Test. 33:13-19;

- Overseeing the development of Ripple's products, including ODL, which allows customers to settle cross-border transactions in nearly real time using XRP, *see* Ex. 77, Garlinghouse SEC Test. 36:10-14, 98:5-21; Ex. 9, Birla Tr. 20:18-21:17;

- Developing and managing Ripple's strategic outlook, *see* Ex. 77, Garlinghouse SEC Test. 36:10-14;

- Communicating with Ripple's board of directors and shareholders, *see* Ex. 77, Garlinghouse SEC Test. 37:13-38:8, 38:21-39:1; Ex. 76, Garlinghouse Tr. 267:14-17;

- Meeting with global regulators and central bankers about digital asset regulation and discussing with them Ripple and its products, *see* Ex.77, Garlinghouse SEC Test. 43:20-44:1; Ex. 22, Zagone Tr. 254:20-255:17; and

- Meeting with potential investors in Ripple equity and helping to raise funds for Ripple's Series B and Series C rounds, *see* Ex. 76, Garlinghouse Tr. 284:20-21; Ex. 77, Garlinghouse SEC Test. 36:15-37:2; ECF No. 462 ¶ 78.

145.    As COO and CEO, Garlinghouse has received compensation for his services from Ripple in various forms, including salary, Ripple stock options, and XRP grants.  *See* Ex. 78, RPLI_02156366 (April 2015 Employment Agreement); Ex. 79, RPLI_SEC 0259758 (December 2016 XRP Unit Bonus Award); Ex. 80, RPLI_01708774 (May 2019 XRP Ledger Address Award).

## H.    Digital Asset Exchanges

### 1.    Operation of Digital Asset Exchanges

146.    A cryptocurrency exchange is a platform that facilitates transactions between potential buyers and sellers of virtual currencies.  *See* Ex. 41, Yadav Rep. ¶ 57 ("Cryptocurrency exchanges permit users to buy and sell various cryptocurrencies and other digital tokens as well

38

as to engage in a variety of strategies and transactions relating to crypto assets (*e.g.*, derivatives, mining, yield farming).").

147.    Since 2017, the majority of offers to sell and sales in the virtual currency markets have occurred on cryptocurrency exchanges. *See* Ex. 25, █ Tr. 28:8-21 ("Most of the trading volume in digital assets to date has been performed on what they call centralized exchanges."); *id.* 128:23-129:4 ("I believe 2017 was when this whole thing was the first kind of big explosion in activity").

148.    Cryptocurrency exchanges mirror the role, structure, and operating principles of traditional exchanges, such as the Chicago Mercantile Exchange and the London Stock Exchange. *See* Ex. 41, Yadav Rep. ¶¶ 27, 34 (with respect to traditional exchanges, "the CME stipulates that all trading must occur on or through its trading facilities and in compliance with its rulebook to be acceptable"); *id.* ¶ 41 (describing the London Stock Exchange); *id.* ¶ 58 ("Cryptocurrency exchanges resemble traditional financial exchanges in important ways."); *id.* ¶ 59 (with respect to cryptocurrency exchanges, "[u]sers that wish to transact on an exchange are generally required to agree to a set of pre-agreed set of rules and trading standards when they apply").

149.    Like traditional exchanges, such as commodities exchanges, cryptocurrency exchanges typically operate as centralized forums for market participants to transact pursuant to rules set by the exchange through its user agreements. *See* Ex. 41, Yadav Rep. ¶¶ 30, 59 ("[C]ryptocurrency exchanges tend to . . . establish a core set of rules and standards for their particular market.").

150.    Cryptocurrency exchanges' rules include the mechanics and rules for account creation, order placement, bid/offer matching, finality, and dispute resolution.  *See* Ex. 41, Yadav Rep. ¶¶ 59-60, 63, 65, 90.

151.    Cryptocurrency exchanges and traditional exchanges provide predictability and certainty to users transacting on common and accepted terms.  *See* Ex. 41, Yadav Rep. ¶¶ 30, 59 ("[O]ne of the key benefits of cryptocurrency exchanges is that they allow for trading with predictability, confidence, and certainty of outcome.").

152.    Cryptocurrency exchange rules, like those of more traditional exchanges, govern the visibility, revocability, and acceptance of offers, in addition to the finality of trades.  *See* Ex. 41, Yadav Rep. ¶¶ 24-48 (describing traditional exchanges); *id.* ¶¶ 57-66 (providing an overview of cryptocurrency exchanges, noting "[m]any cryptocurrency exchanges . . . contractually stipulate rules-of-the-road for order submission, matching, trade execution and settlement"); *id.* ¶ 70.

153.    Cryptocurrency exchange rules are typically laid out in user agreements or other publicly available documentation about the exchange.  *See*, *e.g.*, Ex. 41, Yadav Rep. ¶ 60 (describing key elements of the Binance user agreement); *id.* ¶ 61 (describing elements of the Ascendex (BitMax) user agreement); *id.* ¶ 63 (examples of placing orders on Korbit and Binance); *id.* ¶ 64 (describing when orders matched); *id.* ¶ 65 (describing when orders are final); *id.* ¶ 90 (noting the user agreement sets out the process for disputes).

154.    Most exchanges enable users from around the world to submit orders, often facilitating this cross-border trading by locating offices and computer servers globally.  *See* Ex. 41, Yadav Rep. ¶ 41 (describing the London Stock Exchange's global outreach); *id.* ¶¶ 100, 102.

155.    While an exchange may have servers in multiple locations, it is subject to the oversight of its host country.  *See* Ex. 41, Yadav Rep. ¶¶ 40-41.  For example, while the London Stock Exchange has local offices, including in the United States, the London Stock Exchange is governed by the rules of the United Kingdom, not the United States.  *See id.* ¶ 40 ("[E]ven though [traditional and cryptocurrency exchanges] host and conduct extensive business on a cross-border basis, they remain subject to a domestic home base and regulatory system.").

156.    In order to use a cryptocurrency exchange, users must deposit any cryptocurrencies they want to trade into custodial accounts, or "wallets," held on the exchange itself.  Users who wish to sell cryptocurrencies must upload their assets to accounts (or "wallets") on the exchange, and only those assets held in wallets on that cryptocurrency exchange can be bought or sold on the exchange.  *See* Ex. 41, Yadav Rep. ¶ 62 ("[E]xchanges require that a user apply to the exchange for an account and crypto-wallet(s) that are specifically hosted by the exchange, as opposed to a wallet or wallets on the underlying blockchains for the cryptocurrencies users wish to trade."); *id.* ¶¶ 67-68; Ex. 25, ▮▮ Tr. 288:22-289:21 (describing the process of GSR creating accounts on exchanges for wallets).

157.    Sell or buy orders are processed by the exchange and matched automatically and instantaneously by the cryptocurrency exchanges' matching engines under their rules, resulting in a final trade.  *See* Ex. 41, Yadav Rep. ¶¶ 37, 64 ("Orders, once matched, then become automatically binding in the [cryptocurrency] exchange's trading system."); *id.* ¶¶ 67-68; Ex. 25, ▮▮ Tr. 289:22-290:12 ("When an offer and a bid cross, a transaction occurs.").

158.    Transactions on cryptocurrency exchanges settle instantaneously once trades are matched.  *See* Ex. 41, Yadav Rep. ¶ 69; Ex. 25 ▮▮ Tr. 293:7-16 ("[I]n crypto, there is instantaneous settlement.").

159.    The finalized trade is binding on the parties to the transaction.  *See* Ex. 41, Yadav

Rep. ¶¶ 71-72, 83-84, 89; Ex. 42, Yadav Tr. 156:12-14 ("It is a fundamental principle of

exchange design that orders, when they match, become final and binding on the exchange."); Ex.

25, █ Tr. 296:15-20.

160.    Once a trade has been finalized, it is only the exchange – not the user – that

retains the ability to modify, cancel, or reverse a trade.  *See* Ex. 41, Yadav Rep. ¶¶ 37-38

(describing rules for modifying, canceling, or reversing trades on CME); *id.* ¶¶ 64-65 (noting

that, in an example agreement, "Ascendex . . . retains the power to reverse trades and cancel

orders in the event that the exchange suffers some form of system malfunction"); *id.* ¶ 65

("Customers cannot cancel, modify or seek reversal of any trade that is marked by the exchange

as 'complete,' 'under review,' or 'pending.'"); *id.* ¶ 89; Ex. 25, █ Tr. 296:15-20 ("[O]nce the

bid and the offer ha[ve] crossed[,] the trade has occurred and you cannot reverse it.").

161.    The finalized trade is recorded on the exchange, but it is not typically recorded on

a blockchain or the XRP Ledger.  *See* Ex. 41, Yadav Rep. ¶ 67 (describing that most

cryptocurrency exchanges use "off-chain" settlement where "the exchange reconciles trades on

its own books and records, rather than on the blockchain"); *id.* ¶ 68; Ex. 25, █ Tr. 299:16-23

(explaining trades are final when recorded on an exchange, even if not validated by the nodes of

the XRP Ledger).

162.    Instead, completed trades are recorded solely on the books and records of the

relevant exchange, usually by moving assets into or out of a user's wallet.  *See* Ex. 41, Yadav

Rep. ¶¶ 45, 64, 78 ("Numerous user agreements . . . specifically describe the authority that the

user confers on the exchange to execute an order on the user's behalf and to make subsequent

debits and credits to their account."); *id.* ¶ 82 ("Because exchanges demand that users open an

42

account and hold digital wallets with the exchange, . . . [a]n order to buy/sell a cryptocurrency . . . cannot exist unless it can connect to the exchange that can settle it by updating the entitlements in the user's exchange account.").

163.    Offers to buy an asset at a particular volume and price are viewable and executable only on the exchange itself.  *See* Ex. 41, Yadav Rep. ¶ 77 (for "any offer to materialize and become executable," the offer must "be published on the exchange's platform, or otherwise be entered into the exchange's systems").

164.    For an offer to sell to be viewable on an exchange by potential buyers, the cryptocurrency generally must already be pre-loaded in the seller's exchange account.  An order to buy or sell "cannot exist unless it can connect to the exchange that can settle it by updating the entitlements in the user's exchange account."  Ex. 41, Yadav Rep. ¶ 82.

165.    Only once the above prerequisites (*see supra* ¶¶ 156-164) are met can orders be viewed by other users on the exchange, and sales take place.  *See* Ex. 41, Yadav Rep. ¶¶ 77, 81 (until an "order [is] . . . actually entered into the exchange's systems . . . , the order is not visible to the exchange or any potential counterparties"); *id.* ¶¶ 82-83 ("an offer to trade is made on an exchange"); Ex. 25, █████ Tr. 306:1-307:20 (a potential purchaser of XRP knows when an offer to sell XRP has been placed only when they see an offer in the order book of an exchange).

166.    Unless and until the offers are published by cryptocurrency exchanges, no information about a seller's specific offers on an exchange is communicated to the market. *See* Ex. 41, Yadav Rep. ¶¶ 77, 79, 81.

167.    No buyer can accept an offer that has not been published on an exchange.  *See* Ex. 41, Yadav Rep. ¶¶ 77, 79, 81.

168.     Offers to buy or sell cryptocurrencies on exchanges are made on the exchanges themselves, as if the buyers and sellers were exchanging information and shaking hands there. *See* Ex. 41, Yadav Rep. ¶¶ 33, 83.

169.     Participants on cryptocurrency exchanges are mostly anonymous.  *See* Ex. 41, Yadav Rep. ¶ 77 ("[E]lectronic order matching trading systems are, overwhelmingly, anonymous spaces."); Ex. 42, Yadav Tr. 195:15-196:23 ("It is a[n] absolutely cardinal rule of traditional marketplaces, modern electronic marketplaces, that pretrade anonymity be sacrosanct.").

170.     A prospective buyer on a cryptocurrency exchange does not, and cannot, solicit a specific potential seller, and a prospective seller does not, and cannot, target a specific potential buyer.  *See* Ex. 41, Yadav Rep. ¶ 77; Ex. 42, Yadav Tr. 195:15-196:23; Ex. 25, ██ Tr. 297:25-298:7 ("I have no way of knowing who is on the other side of the trades").

### 2.     Specific Exchanges at Issue

171.     Larsen and Garlinghouse made offers to sell and sales on the following foreign cryptocurrency exchanges:  Binance, Bitfinex, Bitforex, Bithumb, Bitlish, BitMart, AscendEX/BitMax, Bitrue, Bitstamp, Coinbene, Coinone, HitBTC, Huobi, Korbit, OKEx, Upbit, ZB, and ZBG.  *See* Ex. 81, Summary Exhibit of Larsen Trading Data ("Larsen Trading Summary"); Ex. 82, Summary Exhibit of Garlinghouse Trading Data ("Garlinghouse Trading Summary").

172.     Larsen and Garlinghouse made offers to sell and sales on the following additional cryptocurrency exchanges:  Bittrex, Coinbase, Kraken, and Poloniex.  *See* Ex. 81, Larsen Trading Summary; Ex. 82, Garlinghouse Trading Summary.

173.    Larsen also made sales on the following exchanges:  Bitso, RippleChina, RippleFox, GateHub, GateHub Fifth, Mr. Ripple, Rippex, RippleTradeJapan, SnapSwap, and Tokyo JPY.  *See* Ex. Ex. 81, Larsen Trading Summary.

174.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service, and public sources, Binance Holdings Ltd. ("Binance") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

175.    The SEC is not asserting that Binance was incorporated in the United States.  The SEC is not asserting that Binance was domiciled in the United States.  The SEC is not asserting that Binance's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1031-1032, 1034.

176.    The SEC requested assistance from the Cayman Islands to obtain documents and communications related to Defendants' trades from Binance and, in its request, described Binance as "a digital asset exchange platform and company incorporated in the Cayman Islands." Ex. 84, NYRO_RIPPLE_RFA_000143.

177.    The SEC does not contend that the digital asset trading platform operated by Binance is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFP No. 1037.

178.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, iFinex, Inc. Bitfinex, Inc. ("Bitfinex") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

179.    The SEC is not asserting that Bitfinex was incorporated in the United States.  The SEC is not asserting that Bitfinex was domiciled in the United States.  The SEC is not asserting that Bitfinex's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1049-1050, 1052.

180.    The SEC requested assistance from Hong Kong to obtain documents and communications related to Defendants' trades from Bitfinex and, in its request, described iFinex, Inc. as "headquartered in Hong Kong."  Ex. 85, NYRO_RIPPLE_RFA_000150.

181.    The SEC does not contend the digital asset trading platform operated by Bitfinex is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1055.

182.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Noah Trade Ltd. ("BitForex") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

183.    The SEC is not asserting that BitForex was incorporated in the United States.  The SEC is not asserting that BitForex was domiciled in the United States.  The SEC is not asserting that BitForex's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1058-1059, 1061.

184.    The SEC does not contend the digital asset trading platform operated by BitForex is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1064.

185.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, BGH One Ltd. ("Bithumb") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

186.    The SEC is not asserting that Bithumb was incorporated in the United States.  The SEC is not asserting that Bithumb was domiciled in the United States.  The SEC is not asserting that Bithumb's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1067-1068, 1070.

187.    The SEC requested assistance from the Republic of Korea to obtain documents and communications related to Defendants' trades from Bithumb and noted in its request that Bithumb is a "digital asset trading platform[] based in South Korea."  Ex. 86, NYRO_RIPPLE_RFA_000111.

188.    GSR identified Bithumb's country as Korea.  *See* Ex. 87, GSR00000443.

189.    The SEC does not contend that the digital asset trading platform operated by Bithumb is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1073.

190.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Bitlish Ltd. ("Bitlish") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

191.    The SEC is not asserting that Bitlish was incorporated in the United States.  The SEC is not asserting that Bitlish was domiciled in the United States.  The SEC is not asserting

that Bitlish's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers &

Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1076-1077, 1079.

192.    The SEC requested assistance from the United Kingdom to obtain documents and

communications related to Defendants' trades from Bitlish and described Bitlish as "UK-based"

in its request.  Ex. 88, NYRO_RIPPLE_RFA_000118.

193.    The SEC does not contend that the digital asset trading platform operated by

Bitlish is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank*

*Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for

Admis., SEC Answer to RFA No. 1082.

194.    Based on the place of incorporation, principal place of business, registered office

address, location referenced in the terms of service or user agreement, and public sources, GBM

Foundation Company Ltd. ("BitMart") has no indicia of being based in the United States.  *See*

Ex. 41, Yadav Rep. Table A.

195.    The SEC is not asserting that BitMart was incorporated in the United States.  The

SEC is not asserting that BitMart was domiciled in the United States.  *See* Ex. 83, Pl.'s Answers

& Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1085-1086.  The

SEC requested assistance from the Cayman Islands to obtain documents and communications

related to Defendants' trades from BitMart and, in its request, described BitMart as "a digital

asset exchange platform and company incorporated in the Cayman Islands."  Ex. 89,

NYRO_RIPPLE_RFA_000130.

196.    The SEC does not contend that the digital asset trading platform operated by

BitMart is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank*

*Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1091.

197. Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, BMXDM Technology Pte. Ltd. (currently called AscendEX, formerly called Bitmax) ("BitMax") has no indicia of being based in the United States. *See* Ex. 41, Yadav Rep. Table A.

198. The SEC is not asserting that BitMax was incorporated in the United States. The SEC is not asserting that BitMax was domiciled in the United States. The SEC is not asserting that BitMax's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1094-1095, 1097.

199. The SEC requested assistance from Singapore to obtain documents and communications related to Defendants' trades from BitMax and, in its request, described BitMax as a "digital asset trading platform[] based in Singapore." Ex. 90, NYRO_RIPPLE_RFA_000124.

200. The SEC does not contend that the digital asset trading platform operated by BitMax is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1100.

201. Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Bitrue Singapore Pte. Ltd. ("Bitrue") has no indicia of being based in the United States. *See* Ex. 41, Yadav Rep. Table A.

202. The SEC is not asserting that Bitrue was incorporated in the United States. The SEC is not asserting that Bitrue was domiciled in the United States. The SEC is not asserting

that Bitrue's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1103-1104, 1106.

203.    The SEC requested assistance from Singapore to obtain documents and communications related to Defendants' trades from Bitrue and, in its request, described Bitrue as a "digital asset trading platform[] based in Singapore."  Ex. 90, NYRO_RIPPLE_RFA_000124.

204.    The SEC does not contend that the digital asset trading platform operated by Bitrue is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1109.

205.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Bitstamp Ltd. ("Bitstamp") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

206.    The SEC is not asserting that Bitstamp was incorporated in the United States. The SEC is not asserting that Bitstamp was domiciled in the United States.  The SEC is not asserting that Bitstamp's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1112-1113, 1115.

207.    GSR identified Bitstamp's country as Luxembourg, United Kingdom, or Slovenia. *See* Ex. 87, GSR00000443.

208.    Employees at Bitstamp had email signatures indicating their address was in London.  *See* Ex. 91, RPLI_01956976 (████████████████████ email signature indicated Bitstamp was located in London).

209. The SEC does not contend that the digital asset trading platform operated by Bitstamp is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1118.

210. Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, CoinBene Limited Vanuatu ("Coinbene") has no indicia of being based in the United States. *See* Ex. 41, Yadav Rep. Table A.

211. The SEC is not asserting that Coinbene was incorporated in the United States. The SEC is not asserting that Coinbene was domiciled in the United States. The SEC is not asserting that Coinbene's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1175-1176, 1178.

212. The SEC requested assistance from Singapore to obtain documents and communications related to Defendants' trades from Coinbene and, in its request, described Coinbene as a "digital asset trading platform[] based in Singapore." Ex. 90, NYRO_RIPPLE_RFA_000124.

213. The SEC does not contend that the digital asset trading platform operated by Coinbene is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1181.

214. Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources,

Coinone Inc. ("Coinone") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

215.    The SEC is not asserting that Coinone was incorporated in the United States.  The SEC is not asserting that Coinone was domiciled in the United States.  The SEC is not asserting that Coinone's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1184-1185, 1187.

216.    The SEC requested assistance from the Republic of Korea to obtain documents and communications related to Defendants' trades from Coinone and, in its request, described Coinone as a "digital asset trading platform[] based in South Korea."  Ex. 86, NYRO_RIPPLE_RFA_000111.

217.    GSR identified Coinone's country as Korea.  *See* Ex. 87, GSR00000443.

218.    The SEC does not contend that the digital asset trading platform operated by Coinone is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1190.

219.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Hit Tech Solutions Development Ltd. ("HitBTC") has no indicia of being based in the United States. *See* Ex. 41, Yadav Rep. Table A.

220.    The SEC is not asserting that HitBTC was incorporated in the United States.  The SEC is not asserting that HitBTC was domiciled in the United States.  The SEC is not asserting that HitBTC's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1202-1203, 1205.

221.    The SEC does not contend that the digital asset trading platform operated by HitBTC is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1208.

222.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Huobi Global Ltd. ("Huobi") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

223.    The SEC is not asserting that Huobi was incorporated in the United States.  The SEC is not asserting that Huobi was domiciled in the United States.  The SEC is not asserting that Huobi's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1211-1212, 1214.

224.    The SEC does not contend that the digital asset trading platform operated by Huobi is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1217.

225.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Korbit, Inc. ("Korbit") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

226.    The SEC is not asserting that Korbit was incorporated in the United States.  The SEC is not asserting that Korbit was domiciled in the United States.  The SEC is not asserting

that Korbit's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1220-1221, 1223.

227. The SEC requested assistance from the Republic of Korea to obtain documents and communications related to Defendants' trades from Korbit and, in its request, described Korbit as a "digital asset trading platform[ ] based in South Korea." Ex. 86, NYRO_RIPPLE_RFA_000111.

228. GSR identified Korbit's country as Korea. *See* Ex. 87, GSR00000443.

229. The SEC does not contend that the digital asset trading platform operated by Korbit is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1226.

230. Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Aux Cayes FinTech Co. Ltd. ("OKEx") has no indicia of being based in the United States. *See* Ex. 41, Yadav Rep. Table A.

231. The SEC is not asserting that OKEx was incorporated in the United States. The SEC is not asserting that OKEx was domiciled in the United States. The SEC is not asserting that OKEx's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1238-1239, 1241.

232. The SEC requested assistance from Malta and Malaysia to obtain documents and communications related to Defendants' trades from OKEx and, in its requests, described OKEx as "a digital asset trading platform based in Malta" and "with offices in Malaysia." Ex. 92, NYRO_RIPPLE_RFA_000137; Ex. 93, NYRO_RIPPLE_RFA_000163.

233.    The SEC does not contend that the digital asset trading platform operated by OKEx is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1244.

234.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Upbit Singapore Pte. Ltd. ("Upbit") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

235.    The SEC is not asserting that Upbit was incorporated in the United States.  The SEC is not asserting that Upbit was domiciled in the United States.  The SEC is not asserting that Upbit's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1256-1257, 1259.

236.    The SEC requested assistance from the Republic of Korea to obtain documents and communications related to Defendants' trades from Upbit and, in its request, described Upbit as a "digital asset platform[] based in South Korea."  Ex. 86, NYRO_RIPPLE_RFA_000111.

237.    The SEC does not contend that the digital asset trading platform operated by Upbit is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1262.

238.    Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, ZillionByte Limited ("ZB") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

239.     The SEC is not asserting that ZB was incorporated in the United States.  The SEC is not asserting that  ZB was domiciled in the United States.  The SEC is not asserting that ZB's principal place of business was in the United States.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1265-1266, 1268.

240.     The SEC does not contend that the digital asset trading platform operated by ZB is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1271.

241.     Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Zillion Biz Global Limited ("ZBG") has no indicia of being based in the United States.  *See* Ex. 41, Yadav Rep. Table A.

242.     The SEC does not contend that the digital asset trading platform operated by ZBG is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010).  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1280.

243.     GSR identified Bitso's country as Mexico.  *See* Ex. 87, GSR00000443.

244.     The SEC requested assistance from Mexico and Gibraltar to obtain documents and communications related to Defendants' trades from Bitso and, in its request, described Bitso as a "Mexico-based digital asset trading platform."  Ex. 94, NYRO_RIPPLE_RFA_000099; Ex. 95, NYRO_RIPPLE_RFA_000105.

245.     The SEC is not asserting that GateHub Ltd. ("GateHub") was incorporated in the United States.  The SEC is not asserting that GateHub was domiciled in the United States.  The

SEC is not asserting that GateHub's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1283-1284, 1286.

246. GSR identified GateHub's country as the United Kingdom or Slovenia. *See* Ex. 87, GSR00000443.

247. GSR also identified GateHub Fifth's country as the United Kingdom or Slovenia. *See* Ex. 87, GSR00000443.

248. The SEC does not contend that the digital asset trading platform operated by GateHub is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1289.

249. GSR identified Mr. Exchange, Inc.'s (formerly known as "Mr. Ripple") country as Japan. *See* Ex. 87, GSR00000443.

250. The SEC is not asserting that Mr. Ripple was incorporated in the United States. The SEC is not asserting that Mr. Ripple was domiciled in the United States. The SEC is not asserting that Mr. Ripple's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1292-1293, 1295.

251. The SEC does not contend that the digital asset trading platform operated by Mr. Ripple is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1298.

252. GSR identified RippleChina's country as China. *See* Ex. 87, GSR00000443.

253.    The SEC is not asserting that RippleChina was incorporated in the United States. The SEC is not asserting that RippleChina was domiciled in the United States. The SEC is not asserting that RippleChina's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1319-1320, 1322.

254.    The SEC does not contend that the digital asset trading platform operated by RippleChina is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1325.

255.    GSR identified Rippex's country as Brazil. *See* Ex. 87, GSR00000443.

256.    The SEC is not asserting that Rippex was incorporated in the United States. The SEC is not asserting that Rippex was domiciled in the United States. The SEC is not asserting that Rippex's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1301-1302, 1304.

257.    The SEC does not contend that the digital asset trading platform operated by Rippex is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1307.

258.    GSR identified RippleFox's country as China. *See* Ex. 87, GSR00000443.

259.    The SEC is not asserting that RippleFox was incorporated in the United States. The SEC is not asserting that RippleFox was domiciled in the United States. The SEC is not asserting that RippleFox's principal place of business was in the United States. *See* Ex. 83, Pl.'s

Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1310-1311, 1313.

260. The SEC does not contend that the digital asset trading platform operated by RippleFox is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1316.

261. GSR identified RippleTradeJapan's country as Japan. *See* Ex. 87, GSR00000443.

262. GSR indicated that SnapSwap has a European-based website and identified its country as Luxembourg. *See* Ex. 87, GSR00000443.

263. The SEC asked for assistance from Luxembourg in obtaining documents from SnapSwap and, in its request, described SnapSwap as "Luxembourg-based." Ex. 96, NYRO_RIPPLE_RFA_000157.

264. GSR identified Tokyo JPY's country as Japan. *See* Ex. 87, GSR00000443.

265. The SEC is not asserting that Tokyo JPY was incorporated in the United States. The SEC is not asserting that Tokyo JPY was domiciled in the United States. The SEC is not asserting that Tokyo JPY's principal place of business was in the United States. *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1328-1329, 1331.

266. The SEC does not contend that the digital asset trading platform operated by Tokyo JPY is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1334.

267.    There is no evidence in the record that, to the extent any of the above exchanges described *supra* ¶¶ 171 to 266 had U.S.-based subsidiaries, Larsen's and Garlinghouse's trades occurred on any such U.S.-based subsidiaries.

**I.    Larsen's and Garlinghouse's Relationship with GSR**

268.    For both Larsen and Garlinghouse, the overwhelming majority of their offers to sell and sales on cryptocurrency exchanges were conducted by a foreign market maker called GSR.  *See* Ex. 8, Larsen Tr. 70:4-20, 84:8-13; Ex. 82, Garlinghouse Trading Summary n.1; Ex. 25 █ Tr. 281:8-15 (since 2017, the "vast majority" of XRP transactions by Larsen and Garlinghouse were on cryptocurrency exchanges).

269.    GSR is a market maker that was contracted by Larsen and Garlinghouse to trade XRP and other digital assets.  *See* Ex. 8, Larsen Tr. 84:23-85:4 (GSR was engaged prior to 2015); Ex. 97, GSR00008433 (Larsen Liquidity Agreement, dated March 5, 2015); Ex. 98, GSR00001645 (Larsen Continuing Liquidity Extraction Agreement, dated May 14, 2017); Ex. 99, GSR00000689 (Larsen Continuing Liquidity Extraction Agreement, dated January 24, 2020); Ex. 100, GSR00000681 (Garlinghouse Liquidity Agreement, dated December 18, 2017); Ex. 25, █ Tr. 141:5-10 (GSR sold XRP for Larsen and Garlinghouse).

270.    At all relevant times, GSR was incorporated in Hong Kong, Singapore, or Andorra.  *See* Ex. 25, █ Tr. 274:7-276:22.

271.    While GSR has a U.S. affiliate, this affiliate was not involved in the services GSR provided to Larsen and Garlinghouse.  *See* Ex. 25, █ Tr. 276:25-277:12; Ex. 4, Samarasinghe Tr. 314:19-315:11.

272.    None of GSR's U.S.-based personnel were traders, conducted trades for Larsen and Garlinghouse, or were otherwise involved in the services GSR provided.  *See* Ex. 25, █ Tr. 277:20-278:5; Ex. 4, Samarasinghe Tr. 314:19-315:11.

273.   The principal point of contact for Larsen's and Garlinghouse's sales of XRP was ████████ See Ex. 25 ████ Tr. 278:8-13 (confirming he was the "primary point of contact" for Larsen and Garlinghouse).

274.   ████ was domiciled in Malaga, Spain during the relevant period and conducted business from there.  See Ex. 25 ████ Tr. 278:14-19.

275.   To transfer XRP to GSR, Larsen and Garlinghouse would first send XRP from a wallet on the ledger to a wallet that GSR designated to receive the XRP.  These transfers were not sales to GSR.  It paid no consideration to Larsen or Garlinghouse for the XRP.  Instead, Larsen and Garlinghouse loaned XRP to GSR in order to make sales on their behalf.  See Ex. 100, GSR00000681 (§§ 2.1-2.7); Ex. 97, GSR00008433 (§§ 2.1-2.7); Ex. 25, ████ Tr. 284:1-21, 285:14-288:6.

276.   GSR exercised its discretion to determine where, when, and how to sell the XRP. See Ex. 97, GSR00008433, § 2.4 ("The decision about the volume of Loaned XRP that will be sold on a given day will be [GSR's], but [GSR] is required to take the reaction of the global XRP market to its sales activities into account as it sells the Loaned XRPs.").

277.   Larsen and Garlinghouse relied on GSR's expertise and only occasionally provided instruction regarding sales targets or to pause or resume selling.  See Ex. 25, ████ Tr. 292:6-293:3; Ex. 8, Larsen Tr. 126:14-17 ("I'm not a market maker.  It's a complicated business, especially in these – these are sophisticated global markets.  So I would defer to them."); id. 106:10-16 ("As far as directing, I'm more relying on their expertise."); id. 74:9-13 (similar); Ex. 101, GSR00021503; Ex. 41, Yadav Rep. ¶ 73 ("[I]t is commonplace for agents to have discretion in how they execute their client's instructions, particularly to account for volatile and shifting markets.").

278. GSR executed trades on behalf of Larsen and Garlinghouse using algorithms (or "bots") that GSR developed and programmed, which decided how much to trade, when to trade, and the exchanges on which to trade. *See* Ex. 25, ██ Tr. 115:15-17, 144:4-6, 290:16-291:1, 292:13-21, 312:5-313:6 (GSR executed trades using algorithms).

279. GSR used bots to make offers and sales on exchanges, and those bots were programmed to find the best possible execution price. *See* Ex. 25, ██ Tr. 27:19-21, 62:2-63:23, 115:15-17 ("[T]he algorithm just cares about finding best execution, finding the best possible price."); *id.* 143:5-14 (GSR could adjust the algorithm for different clients); *id.* 312:9-12 (confirming trades were supposed to occur 24 hours a day, 7 days a week).

280. The way "GSR would execute a trade on a cryptocurrency exchange [was] the same for Mr. Larsen and Mr. Garlinghouse." Ex. 25, ██ Tr. 283:1-6.

281. When GSR sold XRP on exchanges, it did not know the identity of the buyer and the purchasers did not know the identity of the seller. *See* Ex. 25, ██ Tr. 150:22-25 (Q: "Did you have any understanding who was buying the XRP that you sold on either – on behalf of either Ripple, Mr. Larsen or Mr. Garlinghouse?" A: "No."); *id.* 297:11-16; Ex. 41, Yadav Rep. ¶ 77 ("[E]lectronic order matching trading systems are, overwhelmingly, anonymous spaces.").

282. Similarly, Larsen and Garlinghouse did not know the identities of the buyers when GSR sold XRP on exchanges on their behalf. *See* Ex. 8, Larsen Tr. 88:7-23; Ex. 76, Garlinghouse Tr. 487:23-24 ("I don't know who the purchasers of my XRP are.").

283. Larsen and Garlinghouse did not provide GSR with instructions to offer or sell XRP to any particular individuals at a particular price, or instruct GSR to execute specific offers and sales at precise times on designated exchanges. *See* Ex. 25, ██ Tr. 162:12-17 (GSR was not

restricted in the amount of XRP, other than sales targets); *id.* 292:13-21 ("The client gives us instructions to buy or sell or pause, and we executed that.").

284.    Unless and until GSR sold Larsen's and Garlinghouse's XRP on exchanges, Larsen and Garlinghouse could require that GSR return their XRP or that GSR stop the trading algorithm. *See* Ex. 25, ▮ Tr. 291:22-293:8 (before a trade is accepted, "[a]s soon as a client says stop, return the funds, we stop the bots"); *id.* 285:25-286:2 (if XRP is not sold by GSR, GSR must return it to clients).

285.    The vast majority of the sales GSR made on behalf of Larsen and Garlinghouse were done on foreign exchanges, from accounts at those exchanges maintained by GSR in its own name. *See* Ex. 82, Garlinghouse Trading Summary; Ex. 81, Larsen Trading Summary; Ex. 25, ▮ Tr. 289:14-21, 303:20-304:16.

286.    After consummating a sale, GSR would remit the proceeds to Larsen and Garlinghouse. *See* Ex. 99, GSR00000689 (§ 2.3); Ex. 100, GSR00000681 (§ 2.3); Ex. 76, Garlinghouse Tr. 180:7-9.

287.    GSR received compensation based on a commission from executed sales. It was not compensated based on prospective sales or offers. *See* Ex. 97, GSR00008433 (§ 2.6); Ex. 100, GSR00000681 (§ 2.6); Ex. 99, GSR00000689 (§ 2.6); Ex. 25, ▮ Tr. 286:12-287:3.

**J.    Larsen's Uses of XRP**

288.    Larsen has donated more than 2 billion XRP to a number of charities, including RippleWorks, Silicon Valley Community Foundation, GiveDirectly, DonorsChoose, the Khmer Buddhist Temple Foundation, San Francisco State University, Tipping Point Community, and Larkin Street Youth Services charity. *See* Ex. 14, Larsen Decl. ¶ 5; Ex. 102, LARSEN-SEC-LIT-00006428.

289.     In addition to charitable donations, Larsen sold XRP, principally on foreign exchanges through GSR. *See* Ex. 97, GSR00008433 (Larsen Liquidity Agreement); *see infra* ¶¶ 292-301; Ex. 81, Larsen Trading Summary.

290.     When Larsen sold XRP, he sold it for his personal benefit, not for Ripple's benefit. *See* Ex. 8, Larsen Tr. 69:23-70:12 (discussing Larsen's sales).

291.     Larsen's proceeds from sales of his XRP have not been held by Ripple or combined with Ripple's corporate accounts. *See* Ex. 14, Larsen Decl. ¶ 4.

292.     Prior to 2017, GSR sold Larsen's XRP only on exchanges that have no significant indicia of being in the United States. *See* Ex. 87, GSR00000443.

293.     In 2014, according to GSR, Larsen's XRP was sold on SnapSwap and RippleTradeJapan. *See* Ex. 87, GSR00000443.

294.     Neither SnapSwap nor RippleTradeJapan has any significant indicia of being in the United States. *See supra* ¶¶ 261-263.

295.     In 2015, according to GSR, Larsen's XRP was sold on SnapSwap, RippleTradeJapan, Tokyo JPY, Bitstamp, Bitso, RippleFox, RippleChina, Mr. Ripple, and GateHub. *See* Ex. 87, GSR00000443.

296.     None of the exchanges listed in ¶ 295 has any significant indicia of being in the United States. *See supra* ¶¶ 205-209, 243-266.

297.     In 2016, according to GSR, Larsen's XRP was sold on Tokyo JPY, Bitstamp, Bitso, RippleFox, RippleChina, Mr. Ripple, GateHub, and Rippex. *See* Ex. 87, GSR00000443.

298.     None of the exchanges listed in ¶ 297 has any significant indicia of being in the United States. *See supra* ¶¶ 205-209, 243-260, 264-266.

299.    Between 2017 and December 22, 2020, according to GSR, Larsen's XRP was sold on Binance, Bitfinex, BitForex, Bithumb, Bitlish, BitMart, AscendEX/BitMax, Bitrue, Bitstamp, Bittrex, Coinbase, Coinbene, Coinone, GateHub, GateHub Fifth, HitBTC, Huobi, Huobi Pro, Kraken, Korbit, Mr. Ripple, Rippex, RippleChina, RippleFox, OKEx, Poloniex, Tokyo JPY, Upbit, ZB, and ZBG.  *See* Ex. 81, Larsen Trading Summary.

300.    The exchanges listed in ¶ 299, except for Bittrex, Coinbase, Kraken, and Poloniex, have no significant indicia of being in the United States.  *See supra* ¶¶ 174-266.

301.    By dollar amount, of Larsen's total sales of XRP through GSR between 2017 and December 22, 2020, only 12.89% of the sales were made on exchanges with any indicia of being located in the United States.  *See* Ex. 81, Larsen Trading Summary.  The remaining 87.11% of Larsen's sales between 2017 and December 22, 2020 occurred on exchanges that have "no significant indicia of being located in the United States."  Ex. 41, Yadav Rep. ¶ 106 & Table A; *see also* Ex. 81, Larsen Trading Summary.

**K.    Garlinghouse's Uses of XRP**

302.    Garlinghouse has donated more than 3 million XRP to a number of charities, including Sacred Heart Schools, GiveCrypto.org, and the Peninsula Arts Guild.  *See* Ex. 17, Garlinghouse Decl. ¶ 4 (describing XRP donation to Sacred Heart Schools, GiveCrypto.org, and the Peninsula Arts Guild).

303.    Garlinghouse first began selling XRP in April 2017.  *See* Ex. 17, Garlinghouse Decl. ¶ 3.

304.    When Garlinghouse sold XRP, he sold it for his personal benefit, not for Ripple's benefit.  *See* Ex. 76, Garlinghouse Tr. 182:25-183:2.

305.    Garlinghouses's proceeds from sales of his XRP have not been held by Ripple or combined with Ripple's corporate accounts.  *See* Ex. 17, Garlinghouse Decl. ¶ 3.

306.    Between April and December 2017, virtually all of Garlinghouse's sales of XRP were conducted on the foreign exchange Bitstamp.  *See* Ex. 82, Garlinghouse Trading Summary n.1; *supra* ¶¶ 205-209 (Bitstamp has no significant indicia of being located in the United States).

307.    Beginning in December 2017, Garlinghouse relied on GSR to sell XRP on his behalf.  *See* Ex. 82, Garlinghouse Trading Summary n.1; *supra* ¶¶ 205-209 (Bitstamp has no significant indicia of being located in the United States).

308.    Between April 2017 and the present, Garlinghouse sold XRP on the following foreign exchanges:  Binance, Bitfinex, Bitforex, Bithumb, Bitlish, BitMart, AscendEx/BitMax, Bitrue, Bitstamp, Coinbene, Coinone, HitBTC, Huobi, Korbit, OKEx, Upbit, ZB, and ZBG.  *See* Ex. 82, Garlinghouse Trading Summary; *see supra* ¶¶ 174-242.

309.    Between April 2017 and the present, Garlinghouse sold XRP on the following other exchanges:  Bittrex, Coinbase, Kraken, and Poloniex.  *See* Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1337 (admitting that the SEC is not asserting Garlinghouse sold XRP on any exchanges other than the ones listed in this paragraph and in ¶ 308).

310.    In total, 94.86% of the total proceeds from Garlinghouse's sales of XRP derived from sales on the foreign exchanges, and 5.14% of the total proceeds from these sales were on the other exchanges.  *See* Ex. 82, Garlinghouse Trading Summary.

Date:  September 13, 2022

Respectfully submitted,

KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.

By:  */s/ Michael Kellogg*
Michael K. Kellogg
Reid M. Figel
Gregory G. Rapawy
Bradley E. Oppenheimer

PAUL, WEISS, WHARTON, RIFKIND &
GARRISON LLP

Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
mkellogg@kellogghansen.com
rfigel@kellogghansen.com
grapawy@kellogghansen.com
boppenheimer@kellogghansen.com

By:  */s/ Martin Flumenbaum*
Martin Flumenbaum
Michael E. Gertzman
Meredith Dearborn

1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
mflumenbaum@paulweiss.com
mgertzman@paulweiss.com
mdearborn@paulweiss.com

DEBEVOISE & PLIMPTON LLP

By:  */s/ Andrew J. Ceresney*
Andrew J. Ceresney
Mary Jo White
Lisa Zornberg
Christopher S. Ford
919 Third Avenue
New York, NY 10022
(212) 909-6000
aceresney@debevoise.com
mjwhite@debevoise.com
lzornberg@debevoise.com
csford@debevoise.com

*Counsel for Defendant Christian A. Larsen*

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By:  */s/ Matthew C. Solomon*
Matthew C. Solomon
Nowell D. Bamberger

2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 974-1680
msolomon@cgsh.com
nbamberger@cgsh.com

*Counsel for Defendant Ripple Labs Inc.*

*Counsel for Defendant Bradley Garlinghouse*

67