# EXHIBIT J

SIL23812 CHK                                                        S.L.C.

118TH CONGRESS
1ST SESSION

# S. _____

To provide for consumer protection and responsible financial innovation, to bring crypto assets within the regulatory perimeter, and for other purposes.

_____

## IN THE SENATE OF THE UNITED STATES

_____

Ms. LUMMIS (for herself and Mrs. GILLIBRAND) introduced the following bill; which was read twice and referred to the Committee on _____

_____

# A BILL

To provide for consumer protection and responsible financial innovation, to bring crypto assets within the regulatory perimeter, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2  *tives of the United States of America in Congress assembled,*

3  **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4      (a) SHORT TITLE.—This Act may be cited as the

5  "Lummis-Gillibrand Responsible Financial Innovation

6  Act".

7      (b) TABLE OF CONTENTS.—The table of contents for

8  this Act is as follows:

Sec. 1. Short title; table of contents.
Sec. 2. Definitions.

SIL23812 CHK                                                              S.L.C.

2

## TITLE I—DEFINITIONS

Sec. 101. Definitions.

## TITLE II—PUTTING CONSUMER PROTECTION FIRST

Sec. 201. Sense of Congress relating to crypto asset enforcement powers.
Sec. 202. Enforcement of consumer protection requirements.
Sec. 203. Mandatory proof of reserves; annual verification.
Sec. 204. Plain language crypto asset customer agreements.
Sec. 205. Basic consumer protection standards for crypto assets.
Sec. 206. Cleaning up crypto asset lending.
Sec. 207. Settlement finality.
Sec. 208. Advertisements of crypto asset intermediaries and certain other persons.
Sec. 209. Cybersecurity standards for crypto asset intermediaries.

## TITLE III—COMBATING ILLICIT FINANCE

Sec. 301. Higher penalties for crypto asset crimes.
Sec. 302. Anti-money laundering examination standards.
Sec. 303. Crypto asset kiosks.
Sec. 304. Independent Financial Technology Working Group to Combat Terrorism and Illicit Financing.
Sec. 305. Sanctions compliance responsibilities of payment stablecoin issuers.
Sec. 306. Crypto asset mixers and tumblers.
Sec. 307. Financial Crimes Enforcement Network Innovation Laboratory.

## TITLE IV—RESPONSIBLE COMMODITIES REGULATION

Sec. 401. Definitions.
Sec. 402. Reporting and recordkeeping.
Sec. 403. Jurisdiction over crypto asset transactions.
Sec. 404. Registration of crypto asset exchanges.
Sec. 405. Supervision of affiliates.
Sec. 406. Violations.
Sec. 407. Market reports.
Sec. 408. Bankruptcy treatment of crypto assets.
Sec. 409. Identified banking products.
Sec. 410. Financial institutions definition.
Sec. 411. Offsetting the costs of crypto asset regulation.

## TITLE V—RESPONSIBLE SECURITIES REGULATION

Sec. 501. Securities offerings involving certain intangible assets.
Sec. 502. Guidance relating to satisfactory control location.

## TITLE VI—CUSTOMER PROTECTION AND MARKET INTEGRITY AUTHORITY

Sec. 601. Customer protection and market integrity authority.
Sec. 602. Registration, rulemaking, and supervision of customer protection and market integrity authorities.
Sec. 603. Records and reports; duties and powers of customer protection and market integrity authorities.

## TITLE VII—RESPONSIBLE PAYMENTS INNOVATION

Sec. 701. Issuance of payment stablecoins.
Sec. 702. Treatment of endogenously referenced crypto assets.
Sec. 703. Certificate of authority to commence banking.
Sec. 704. Holding company supervision of covered depository institutions.
Sec. 705. Codifying custodial principles for financial institutions.
Sec. 706. Implementation rules to preserve adequate competition in payment
          stablecoins.
Sec. 707. Study on use of distributed ledger technology for reduction of risk in
          depository institutions.
Sec. 708. Clarifying application review times with respect to the Federal bank-
          ing agencies.
Sec. 709. Conforming amendments.

TITLE VIII—RESPONSIBLE TAXATION OF CRYPTO ASSETS

Sec. 801. De minimis gain from sale or exchange of crypto assets.
Sec. 802. Information reporting requirements imposed on brokers with respect
          to crypto assets.
Sec. 803. Sources of income.
Sec. 804. Tax treatment of crypto asset lending agreements and related mat-
          ters.
Sec. 805. Loss from wash sales of crypto assets.
Sec. 806. Mark-to-market election.
Sec. 807. Forks, airdrops, and subsidiary value.
Sec. 808. Crypto asset mining and staking.
Sec. 809. Charitable contributions and qualified appraisals.

TITLE IX—RESPONSIBLE INTERAGENCY COORDINATION

Sec. 901. Timeline for interpretive guidance issued by Federal financial agen-
          cies.
Sec. 902. State money transmission coordination relating to crypto assets.
Sec. 903. Information sharing among Federal and State financial regulators.
Sec. 904. Report on energy consumption in crypto asset markets.
Sec. 905. Analysis of energy consumption by distributed ledger technologies.
Sec. 906. Report on distributed ledger applications in energy.
Sec. 907. Permitting Federal Government employees to gain experience with
          crypto asset technologies.
Sec. 908. Advisory Committee on Financial Innovation.

TITLE X—EQUIPPING AGENCIES TO PROTECT CONSUMERS AND
PROMOTE RESPONSIBLE INNOVATION

Sec. 1001. Executive Office of the President appropriations.
Sec. 1002. Financial Crimes Enforcement Network appropriations.
Sec. 1003. Commodity Futures Trading Commission appropriations.
Sec. 1004. Securities and Exchange Commission appropriations.
Sec. 1005. Federal Trade Commission appropriations.
Sec. 1006. Advisory Commission on Financial Innovation appropriations.

**SEC. 2. DEFINITIONS.**

In this Act:

SIL23812 CHK                                                S.L.C.

4

1        (1) COMMODITY.—The term "commodity" has

2    the meaning given the term in section 1a of the

3    Commodity Exchange Act (7 U.S.C. 1a).

4        (2) CRYPTO ASSET; CRYPTO ASSET INTER-

5    MEDIARY; DISTRIBUTED LEDGER TECHNOLOGY; PAY-

6    MENT   STABLECOIN;   SMART   CONTRACT.—.—The

7    terms "crypto asset", "crypto asset intermediary",

8    "distributed    ledger    technology",    "payment

9    stablecoin" and "smart contract" have the meanings

10   given the terms in section 9801 of title 31, United

11   States Code, as added by section 101 of this Act.

12       (3) SECURITY.—Except as otherwise expressly

13   provided, the term "security" has the meaning given

14   the term in section 3(a) of the Securities Exchange

15   Act of 1934 (15 U.S.C. 78c(a)).

# TITLE I—DEFINITIONS

**SEC. 101. DEFINITIONS.**

18   (a) IN GENERAL.—Subtitle VI of title 31, United

19   States Code, is amended by adding after chapter 97 the

20   following:

## "CHAPTER 98—CRYPTO ASSETS

"Sec.
"9801. Definitions.

## "§ 9801. Definitions

23       "In this chapter:

1        "(1) APPROPRIATE COMMISSION.—The term

2    'appropriate commission' means the Commodity Fu-

3    tures Trading Commission or the Securities and Ex-

4    change Commission, or both, if applicable, based on

5    the commission that has statutory jurisdiction over

6    a crypto asset intermediary and acts as the primary

7    registration or licensing authority for that inter-

8    mediary.

9        "(2) CRYPTO ASSET.—The term 'crypto

10    asset'—

11            "(A) means a natively electronic asset

12        that—

13                "(i) confers economic, proprietary, or

14            access rights or powers;

15                "(ii) is recorded using cryptographi-

16            cally secured distributed ledger technology,

17            or any similar analogue; and

18                "(iii) does not represent, derive value

19            from, or maintain backing by, a financial

20            asset (except other crypto assets); and

21            "(B) does not include—

22                "(i) a payment stablecoin, except as

23            otherwise provided by this chapter; and

24                "(ii) other interests in financial assets

25            (except other crypto assets) represented on

SIL23812 CHK                                                              S.L.C.

6

1            a distributed ledger or any similar ana-

2            logue.

3        "(3) CRYPTO ASSET INTERMEDIARY.—The term

4    'crypto asset intermediary'—

5            "(A) means—

6                "(i) a person who holds a license, reg-

7            istration, or other similar authorization, as

8            specified by this chapter, the Commodity

9            Exchange Act (7 U.S.C. 1 et seq.), the Se-

10           curities Act of 1933 (15 U.S.C. 77a et

11           seq.), the Corporation of Foreign Bond-

12           holders Act, 1933 (15 U.S.C. 77bb et

13           seq.), the Trust Indenture Act of 1939 (15

14           U.S.C. 77aaa et seq.), the Securities Ex-

15           change Act of 1934 (15 U.S.C. 78a et

16           seq.), the Securities Investor Protection

17           Act of 1970 (15 U.S.C. 78aaa et seq.), the

18           Investment Company Act of 1940 (15

19           U.S.C. 80a–1 et seq.), the Investment Ad-

20           visers Act of 1940 (15 U.S.C. 80b–1), or

21           the Omnibus Small Business Capital For-

22           mation Act of 1980 (15 U.S.C. 80c), that

23           conducts market activities relating to

24           crypto assets; or

7

1              "(ii) a person who is required by law

2          to hold a license, registration, or other

3          similar authorization described in clause

4          (i); and

5          "(B) does not include a depository institu-

6      tion.

7      "(4) DEPOSITORY INSTITUTION.—The term 'de-

8  pository institution' has the meaning given the term

9  in section 19(b)(1) of the Federal Reserve Act (12

10  U.S.C. 461(b)(1)).

11      "(5) DISTRIBUTED LEDGER TECHNOLOGY.—

12  The term 'distributed ledger technology' means tech-

13  nology that enables the operation and use of a ledger

14  that—

15          "(A) is shared across a set of distributed

16      nodes that participate in a network and store a

17      complete or partial replica of the ledger;

18          "(B) is synchronized between the nodes;

19          "(C) has data appended to the ledger by

20      following the specified consensus mechanism of

21      the ledger;

22          "(D) may be accessible to anyone or re-

23      stricted to a subset of participants; and

1          "(E) may require participants to have au-

2     thorization to perform certain actions or require

3     no authorization.

4     "(6) PAYMENT STABLECOIN.—The term 'pay-

5     ment stablecoin' means a claim represented on a dis-

6     tributed ledger or a similar analogue that is—

7          "(A) redeemable, on demand, on a 1-to-1

8     basis for instruments denominated in United

9     States dollars;

10          "(B) issued by a business entity;

11          "(C) accompanied by a statement from the

12     issuer that the asset is redeemable, as specified

13     in subparagraph (A), from the issuer or another

14     identified person;

15          "(D) backed by 1 or more financial assets

16     (excluding other crypto assets), consistent with

17     subparagraph (A); and

18          "(E) intended to be used as a medium of

19     exchange.

20     "(7) SECURITY.—The term 'security' has the

21     meaning given the term in section 3(a) of the Secu-

22     rities Exchange Act of 1934 (15 U.S.C. 78c(a)).

23     "(8) SMART CONTRACT.—The term 'smart con-

24     tract'—

25          "(A) means—

1          ''(i) computer code deployed to a dis-
2       tributed ledger technology network that
3       executes an instruction based on the occur-
4       rence or nonoccurrence of specified condi-
5       tions; or
6          ''(ii) any similar analogue; and
7       ''(B) includes taking possession or control
8    of a crypto asset and transferring the asset or
9    issuing executable instructions for these ac-
10   tions.''.

11   (b) TECHNICAL AND CONFORMING AMENDMENT.—
12 The table of contents for subtitle VI of title 31, United
13 States Code, is amended by adding at the end the fol-
14 lowing:

**''98. Crypto assets** ............................................................................ **9801''.**

# TITLE II—PUTTING CONSUMER PROTECTION FIRST

**SEC. 201. SENSE OF CONGRESS RELATING TO CRYPTO ASSET ENFORCEMENT POWERS.**

19   (1) Congress finds the following relating to the
20 authority of the Commodity Futures Trading Com-
21 mission:

22          (A) The Commodity Futures Trading
23       Commission has enforcement tools to ensure
24       compliance with the commodities laws of the
25       United States, which Congress has designed to

SIL23812 CHK                                                    S.L.C.

10

1  promote responsible innovation through a prin-
2  ciples-based approach and to police fraud,
3  scams, and wrongdoing.

4      (B) The authority of the Commodity Fu-
5  tures Trading Commission described in sub-
6  paragraph (A) includes the following:

7          (i) Recommending criminal prosecu-
8      tion to the Department of Justice and
9      State prosecutors for fraud and conspiracy.

10          (ii) Bringing civil actions to enjoin
11      violations of this Act and other commod-
12      ities laws.

13          (iii) Seeking civil monetary penalties,
14      disgorgement of benefits, and restitution
15      and freezing assets.

16          (iv) Revoking exchange trading privi-
17      leges, registration, licenses, and other au-
18      thorizations.

19          (v) Issuing cease and desist orders.

20      (C) Congress has granted the authorities
21  described in this paragraph to the Commodity
22  Futures Trading Commission to—

23          (i) ensure fair and transparent com-
24      modities markets with accurate price dis-

SIL23812 CHK
S.L.C.

11

1      covery and appropriate risk management;

2      and

3           (ii) facilitate responsible innovation.

4      (D) The Commodity Futures Trading

5      Commission has a duty to use the authorities

6      provided to the Commission to protect all mar-

7      ket participants, regardless of sophistication

8      level, from fraud, scams, and wrongdoing relat-

9      ing to crypto assets that are not securities, as

10     defined in this Act, the Commodity Exchange

11     Act (7 U.S.C. 1 et seq.), and case law.

12     (2) Congress finds the following relating to the

13     authority of the Securities and Exchange Commis-

14     sion:

15          (A) The Securities and Exchange Commis-

16     sion has enforcement tools to—

17               (i) ensure compliance with the securi-

18          ties laws of the United States, which have

19          made United States markets the envy of

20          the world; and

21               (ii) police fraud, scams, and wrong-

22          doing.

23          (B) The authority of the Securities and

24     Exchange Commission described in subpara-

25     graph (A) includes the following:

SIL23812 CHK                                                    S.L.C.

12

(i) Recommending criminal proceedings to the Department of Justice or State prosecutors for fraud, investment scams, insider trading, conspiracy, and other violations of the securities laws of the United States.

(ii) Bringing civil actions to enjoin violations of this Act and the other securities laws.

(iii) Seeking civil monetary penalties, disgorgement of profits, and restitution.

(iv) Barring individuals from the securities industry and from serving as an officer or director of a particular company.

(v) Revoking registrations, licenses, or other authorizations.

(vi) Issuing cease and desist orders.

(C) Congress has granted the authorities described in this paragraph to the Securities and Exchange Commission to ensure fair, honest, and transparent securities markets that enable robust capital formation and a thriving economy.

(D) The Securities and Exchange Commission has a duty to use the authorities provided

13

1          to the Commission appropriately and propor-

2          tionately to protect consumers from fraud,

3          scams, and wrongdoing relating to crypto assets

4          that are securities, as defined in this Act, the

5          Securities Act of 1933 (15 U.S.C. 77a et seq.),

6          the Securities Exchange Act of 1934 (15

7          U.S.C. 78a et seq.), and case law, while pro-

8          viding clear guidance to innovators and market

9          participants so that those innovators and mar-

10          ket participants are able to clearly determine

11          their legal obligations pursuant to the laws en-

12          acted by Congress.

**SEC. 202. ENFORCEMENT OF CONSUMER PROTECTION RE-**

**QUIREMENTS.**

15   (a) IN GENERAL.—Chapter 98 of title 31, United

16 States Code, as added by section 101(a) of this Act, is

17 amended by adding at the end the following:

**"§ 9802. Enforcement; rules**

19   "(a) ENFORCEMENT OF STANDARDS.—Except as

20 otherwise provided by this chapter, the standards of this

21 chapter shall be enforced in an appropriate manner, com-

22 mensurate with other customer protection standards—

23          "(1) in the case of a crypto asset intermediary,

24          if a crypto asset customer protection and market in-

14

 1    tegrity authority has been chartered, by that author-

 2    ity;

 3         ''(2) in the case of crypto asset intermediary, if

 4    a crypto asset customer protection and market integ-

 5    rity authority has not been chartered, by the Federal

 6    or State licensing, registration, or chartering author-

 7    ity of the intermediary; and

 8         ''(3) in the case of a depository institution or

 9    other chartered financial institution, by the appro-

10    priate State or Federal banking supervisor.

11    ''(b) RULEMAKING.—The Federal agencies specified

12    in paragraphs (2) and (3) of subsection (a) shall promul-

13    gate final rules to implement this title not later than 2

14    years after the date of enactment of this section.''.

15    (b) TECHNICAL AND CONFORMING AMENDMENT.—

16    The table of sections for chapter 98 of title 31, United

17    States Code, as added by section 101(a) of this Act, is

18    amended by adding at the end the following:

      "9802. Enforcement; rules.''.

19    **SEC. 203. MANDATORY PROOF OF RESERVES; ANNUAL**

20              **VERIFICATION.**

21    (a) IN GENERAL.—Chapter 98 of title 31, United

22    States Code, as amended by section 202 of this Act, is

23    amended by adding at the end the following:

SIL23812 CHK S.L.C.

15

### "§ 9803. Mandatory proof of reserves; annual verification

"(a) MANDATORY PROOF OF RESERVES.—A crypto asset intermediary shall maintain a system, and the requisite policies and procedures, to demonstrate cryptographically verifiable possession or control of all crypto assets under custody or otherwise provided for safekeeping by a customer to the intermediary. A system created under this subsection shall be protected against disclosure of customer data, proprietary intermediary information, and other data which may lead to operational or cybersecurity risk.

"(b) REGULAR FINANCIAL AUDIT.—An independent public accountant retained by the intermediary shall annual verify possession or control of all crypto assets under custody, or otherwise provided for safekeeping by the intermediary, consistent with subsection (a). This verification shall include an examination of the system and the policies and procedures required by subsection (a) and shall take place pursuant to a written agreement between the intermediary and the accountant, at a time chosen by the accountant without prior notice which is irregular from year to year.

"(c) REPORT AND MATERIAL DISCREPANCIES.— Within 120 days of conducting a verification under subsection (b), the independent public accountant retained

16

1 under subsection (b) shall file a report with the appro-
2 priate commission and the applicable customer protection
3 and market integrity authority, stating that the account-
4 ant has verified proof of reserves consistent with this sec-
5 tion. If material discrepancies in the verification have been
6 found by the independent public accountant, the account-
7 ant shall inform the appropriate commission and the cus-
8 tomer protection and market integrity authority within 1
9 day of the conclusion of the verification.

10 "(d) STANDARDS.—The Public Company Accounting
11 Oversight Board shall adopt standards to implement sub-
12 sections (a) and (b), in consultation with the Securities
13 and Exchange Commission and Commodity Futures Trad-
14 ing Commission.".

15 (b) TECHNICAL AND CONFORMING AMENDMENT.—
16 The table of sections for chapter 98 of title 31, United
17 States Code, as amended by section 202, is amended by
18 adding at the end the following:

"9803. Mandatory proof of reserves; annual verification.".

19 **SEC. 204. PLAIN LANGUAGE CRYPTO ASSET CUSTOMER**
20 **AGREEMENTS.**

21 (a) IN GENERAL.—Chapter 98 of title 31, United
22 States Code, as amended by section 203 of this Act, is
23 amended by adding at the end the following:

Case 3:23-cv-06003-WHO   Document 70-8   Filed 05/09/24   Page 18 of 275
SIL23812 CHK                                                          S.L.C.

17

1 **"§ 9804. Plain language crypto asset customer agree-**
2 **ments**

3    "(a) PLAIN LANGUAGE CUSTOMER AGREEMENTS.—
4 In consultation with the Securities and Exchange Commis-
5 sion and the Commodity Futures Trading Commission,
6 the Bureau of Consumer Financial Protection shall issue
7 guidance setting forth best practices for crypto asset inter-
8 mediary standard customer agreements and all disclosures
9 required to be made under title II of the Lummis-Gilli-
10 brand Responsible Financial Innovation Act and other ap-
11 plicable law, which shall require the customer agreements
12 and disclosures, in accordance with applicable law, to be
13 written in plain language that is easily comprehensible to
14 customers. Not later than 180 days after the date of en-
15 actment of this section, the Bureau shall create a publicly
16 available database for the filing of all required documents
17 under this section.

18    "(b) ANCILLARY ASSET DISCLOSURES.—

19        "(1) IN GENERAL.—The Securities and Ex-
20    change Commission, in consultation with the Bureau
21    of Consumer Financial Protection, shall issue guid-
22    ance setting forth best practices for issuers under
23    section 42 of the Securities Exchange Act of 1934
24    to create plain language summaries of disclosures re-
25    quired to be made to customers under that section.

SIL23812 CHK                                                          S.L.C.

18

1        ''(2) CONTENTS.—Each summary described in

2    paragraph (1) shall be—

3            ''(A) not more than 2 pages in length; and

4            ''(B) filed by the applicable issuer with the

5        Securities and Exchange Commission at the

6        same time as disclosures are filed under section

7        42 of the Securities Exchange Act of 1934.

8    ''(c) REQUIREMENT TO FILE.—Crypto asset inter-

9    mediaries shall file the following with the Bureau of Con-

10   sumer Financial Protection:

11       ''(1) Not later than 180 days after the date of

12   enactment of this section, the standard customer

13   agreement used by the intermediary on the date of

14   enactment.

15       ''(2) Any standard customer agreement used

16   after the date of enactment of this section, but be-

17   fore the database under subsection (a) becomes

18   operational, to be filed not more than 60 days after

19   the date on which the database under subsection (a)

20   becomes operational.

21       ''(3) Any standard customer agreement used

22   after the database under subsection (a) becomes

23   operational, not more than 30 days after the date on

24   which the agreement is first used by customers.

19

1          ''(4) For all crypto assets supported by the

2     crypto asset intermediary, all disclosures made

3     under section 42 of the Securities Exchange Act of

4     1934 and the accompanying summaries.

5          ''(5) Any other document that contains required

6     disclosures under title II of the Lummis-Gillibrand

7     Responsible Financial Innovation Act, not more than

8     30 days after the date on which the document is

9     made available to customers.

10     ''(d) FILING AND SUMMARY.—When filing a stand-

11     ard customer agreement under subsection (c), a crypto

12     asset intermediary shall include a summary of changes (as

13     compared to the previous filed version) that is in plain

14     language, as determined by the Bureau of Consumer Fi-

15     nancial Protection.

16     ''(e) RULE OF CONSTRUCTION.—A filing under this

17     section may not be construed to permit the Bureau of

18     Consumer Financial Protection to approve the contents of

19     any standard customer agreement.

20     ''(f) RULES.—The Bureau of Consumer Financial

21     Protection shall adopt rules to implement this section,

22     with a comment period of not less than 90 days.''.

23     (b) TECHNICAL AND CONFORMING AMENDMENT.—

24     The table of sections for chapter 98 of title 31, United

SIL23812 CHK                                                    S.L.C.

20

1  States Code, as amended by section 203 of this Act, is

2  amended by adding at the end the following:

"9804. Plain language crypto asset customer agreements.".

**SEC. 205. BASIC CONSUMER PROTECTION STANDARDS FOR**

**CRYPTO ASSETS.**

5  (a) IN GENERAL.—Chapter 98 of title 31, United

6  States Code, as amended by section 203 of this Act, is

7  amended by adding at the end the following:

**"§ 9805. Basic consumer protection standards for**

**crypto assets**

10  "(a) IN GENERAL.—Each crypto asset intermediary

11  shall ensure that the scope of permissible transactions that

12  may be undertaken with crypto assets belonging to a cus-

13  tomer is disclosed clearly in a customer agreement.

14  "(b) NOTICE.—Each crypto asset intermediary shall

15  provide clear notice to each customer and require acknowl-

16  edgment of the following:

17      "(1) Whether customer crypto assets are seg-

18      regated from other customer assets and the manner

19      of segregation.

20      "(2) How the crypto assets of the customer

21      would be treated in a bankruptcy or insolvency sce-

22      nario and the risk of loss.

23      "(3) The time period and manner in which the

24      intermediary is obligated to return the crypto asset

25      of the customer upon request.

SIL23812 CHK                                                          S.L.C.

21

1          ''(4) Applicable fees imposed on a customer.

2          ''(5) The dispute resolution process of the inter-

3     mediary.

4     ''(c) SUBSIDIARY PROCEEDS.—

5          ''(1) DEFINITIONS.—In this subsection:

6               ''(A) AGREEMENT.—The term 'agreement'

7          includes the standard terms of service of a

8          crypto asset intermediary.

9               ''(B) SUBSIDIARY PROCEEDS.—The term

10         'subsidiary proceeds' includes forks, airdrops,

11         staking, and other gains that accrue to a crypto

12         asset through market transactions as a finan-

13         cial asset or as a result of being held in custody

14         or safekeeping by a crypto asset intermediary.

15         ''(2) ACCRUAL TO CUSTOMER.—Except as oth-

16    erwise specified by an agreement with a customer,

17    all subsidiary proceeds relating to crypto asset serv-

18    ices provided to a customer shall accrue to the ben-

19    efit of the customer in accordance with paragraph

20    (3).

21         ''(3) ELECTION.—A crypto asset intermediary

22    may elect not to collect certain subsidiary proceeds

23    if the election is disclosed in an agreement with the

24    customer.

SIL23812 CHK                                                      S.L.C.

22

1        ''(4) WITHDRAWAL.—A customer may request

2    return of a crypto asset from an intermediary in a

3    method that permits the collection of the subsidiary

4    proceeds of the crypto asset.

5        ''(5)  AGREEMENT.—A  crypto  asset  inter-

6    mediary shall enter into an agreement with a cus-

7    tomer, if desired by the customer, regarding the

8    manner in which to invest subsidiary proceeds or

9    other gains attributable to the crypto assets of the

10   customer.

11   ''(d) CEO ATTESTATIONS.—Each year, the chief ex-

12   ecutive officer of a crypto asset intermediary shall, under

13   penalty of perjury, certify compliance with the following,

14   to the best of the knowledge and belief of the chief execu-

15   tive officer:

16       ''(1) Applicable anti-money laundering, cus-

17   tomer identification, prevention of terrorist financ-

18   ing, and sanctions laws.

19       ''(2) Applicable custodial and safekeeping laws,

20   including proof of reserve requirements.

21       ''(3) The other provisions of this chapter.''.

22   (b) TECHNICAL AND CONFORMING AMENDMENT.—

23   The table of sections for chapter 98 of title 31, United

24   States Code, as amended by section 204 of this Act, is

25   amended by adding at the end the following:

''9805. Basic consumer protection standards for crypto assets.''.

1    **SEC. 206. CLEANING UP CRYPTO ASSET LENDING.**

2        (a) IN GENERAL.—Chapter 98 of title 31, United

3    States Code, as amended by section 205 of this Act, is

4    amended by adding at the end the following:

5    **"§ 9806. Crypto asset lending arrangements**

6        "(a) LENDING ARRANGEMENTS.—A crypto asset

7    intermediary shall ensure that any lending arrangements

8    relating to crypto assets are—

9            "(1) clearly disclosed to customers before any

10            lending services take place, including the potential

11            bankruptcy treatment of customer assets in the

12            event of insolvency;

13            "(2) subject to the affirmative consent of the

14            customer;

15            "(3) fully enforceable as a matter of State com-

16            mercial law, including the Uniform Commercial

17            Code;

18            "(4) accompanied by full disclosures of applica-

19            ble terms and risks, yield, and the manner in which

20            the yield is calculated;

21            "(5) accompanied by appropriate disclosures re-

22            lating to collateral requirements and policies, includ-

23            ing—

24                    "(A) possible reductions in value and

25                    overcollateralization requirements with respect

26                    to a crypto asset;

SIL23812 CHK                                                    S.L.C.

24

1          "(B) collateral the intermediary accepts

2      when calling for additional collateral from a

3      customer, including collateral substitution;

4          "(C) whether customer collateral is com-

5      mingled with the collateral of other customers

6      or of the intermediary; and

7          "(D) how customer collateral is invested

8      and whether the yield belongs to the customer

9      or to the intermediary;

10     "(6) accompanied by disclosures of mark-to-

11  market and monitoring arrangements, including—

12         "(A) the frequency of mark-to-market

13     monitoring and how frequently the intermediary

14     will call for additional collateral from a cus-

15     tomer;

16         "(B) the time period in which the customer

17     must supply additional collateral to the inter-

18     mediary after a collateral call is conducted con-

19     sistent with subparagraph (A);

20         "(C) whether the intermediary permits

21     failures to deliver customer crypto assets or

22     other collateral; and

23         "(D) in the event of a failure to deliver,

24     the period of time in which the failure must be

25     cured; and

25

1          ''(7) compliant with all applicable Federal and

2     State laws.

3     ''(b) REHYPOTHECATION.—

4          ''(1) DEFINITION.—In this subsection, the term

5     'rehypothecation' means the pledging of an asset as

6     collateral for a financial transaction multiple times

7     by a person, including the pledging of a customer

8     asset by a crypto asset intermediary as collateral for

9     a subsequent financial transaction after delivery of

10    the crypto asset to the intermediary by a customer.

11         ''(2) REHYPOTHECATION.—No rehypothecation

12    of crypto assets by a crypto asset intermediary shall

13    be permitted.''.

14    (b) TECHNICAL AND CONFORMING AMENDMENT.—

15    The table of sections for chapter 98 of title 31, United

16    States Code, as amended by section 202, is amended by

17    adding at the end the following:

''9806. Crypto asset lending arrangements.''.

18    **SEC. 207. SETTLEMENT FINALITY.**

19    (a) IN GENERAL.—Chapter 98 of title 31, United

20    States Code, as amended by section 206 of this Act, is

21    amended by adding at the end the following:

22    **''§ 9807. Settlement finality**

23         ''To promote legal certainty and customer protection,

24    a crypto asset intermediary and a customer shall, upon

25    the opening of an account, agree on the terms of settle-

26

1 ment finality for all transactions with respect to crypto

2 assets, including the following:

3 ''(1) The conditions under which a crypto asset

4 may be deemed fully transferred, provided that those

5 legal conditions may diverge from operational condi-

6 tions under which crypto assets are considered

7 transferred, based on the distributed and prob-

8 abilistic nature of crypto assets.

9 ''(2) The exact moment of transfer of a crypto

10 asset.

11 ''(3) The discharge of any obligations upon

12 transfer of a crypto asset.

13 ''(4) Conformity to applicable provisions of the

14 Uniform Commercial Code.''.

15 (b) TECHNICAL AND CONFORMING AMENDMENT.—

16 The table of sections for chapter 98 of title 31, United

17 States Code, as amended by section 206 of this Act, is

18 amended by adding at the end the following:

''9806. Settlement finality.''.

19 **SEC. 208. ADVERTISEMENTS OF CRYPTO ASSET INTER-**

20 **MEDIARIES AND CERTAIN OTHER PERSONS.**

21 (a) IN GENERAL.—Chapter 98 of title 31, United

22 States Code, as amended by section 207 of this Act, is

23 amended by adding at the end the following:

27

## "§ 9808. Advertising of crypto asset intermediaries and certain other persons

1  "(a) DEFINITIONS.—In this section:

2  "(1) COMMISSIONS.—The term 'Commissions' means the Securities and Exchange Commission and the Commodity Futures Trading Commission, acting jointly.

3  "(2) COVERED ADVERTISEMENT.—The term 'covered advertisement'—

4  "(A) means a communication that—

5  "(i) relates to—

6  "(I) the desirability of purchasing or entering into a transaction for a crypto asset; or

7  "(II) the availability of crypto asset-related services; and

8  "(ii) is widely available to the general public, as specified by rule of the Commissions; and

9  "(B) includes any script, slide, handout, or other written (including electronic) material used in connection with a public appearance with respect to a crypto asset or the availability of crypto asset-related services.

10  "(b) APPROVAL BY OFFICER.—Before a crypto asset intermediary may make a covered advertisement available

SIL23812 CHK                                                             S.L.C.

28

1  to the public, an officer of the crypto asset intermediary

2  shall be required to approve that covered advertisement

3  and certify compliance with the requirements of this sec-

4  tion.

5      ''(c) PROCEDURES.—

6          ''(1) IN GENERAL.—Each crypto asset inter-

7      mediary shall establish written procedures, which are

8      appropriate and reasonable to the business, size,

9      structure, and customers of the crypto asset inter-

10     mediary, for the approval of covered advertisements,

11     as required under subsection (b), which shall in-

12     clude—

13             ''(A) provisions for the education and

14         training of applicable employees of the crypto

15         asset intermediary regarding the procedures of

16         the crypto asset intermediary governing covered

17         advertisements;

18             ''(B) documentation of the education and

19         training required under subparagraph (A); and

20             ''(C) surveillance and follow-up measures

21         to ensure that the crypto asset intermediary im-

22         plements and adheres to those procedures.

23         ''(2) RECORDKEEPING.—

24             ''(A) PERIOD OF MAINTENANCE.—Each

25         crypto asset intermediary shall maintain the

1    records required under this subsection for not

2    less than 5 years.

3         "(B) TYPES OF RECORDS.—The types of

4    records that a crypto asset intermediary is re-

5    quired to maintain under subparagraph (A) in-

6    clude, with respect to each covered advertise-

7    ment made by the crypto asset intermediary—

8              "(i) a copy of the covered advertise-

9         ment;

10             "(ii) the dates of the first and, if ap-

11        plicable, last use of the covered advertise-

12        ment;

13             "(iii) the name of the officer of the

14        crypto asset intermediary who approved

15        the covered advertisement, as required

16        under subsection (b), including the date on

17        which the officer gave that approval;

18             "(iv) information concerning the

19        source of all data, statistical tables, charts,

20        graphs, or other illustrations or outside

21        sources used in the covered advertisement;

22        and

23             "(v) for a covered advertisement that

24        includes or incorporates a performance

25        ranking or comparison with another crypto

1     asset intermediary, a copy of the ranking

2     or performance used.

3  ''(d) REQUIREMENTS FOR COVERED ADVERTISE-

4 MENTS.—Each covered advertisement shall adhere to the

5 following standards:

6   ''(1) The covered advertisement shall—

7    ''(A) be based on principles of fair dealing

8    and good faith; and

9    ''(B) provide a sound basis for evaluating

10    the facts with respect to any particular crypto

11    asset or type of crypto asset, industry, or serv-

12    ice that is the subject of the covered advertise-

13    ment.

14   ''(2) The covered advertisement does not omit

15 any material fact or qualification if that omission, in

16 light of the context of the material presented, would

17 cause the covered advertisement to be misleading.

18   ''(3) The covered advertisement does not make

19 any false, exaggerated, unwarranted, promissory, or

20 misleading statement or claim.

21   ''(4) Information may be placed in a legend or

22 footnote within the covered advertisement only if

23 that placement would not inhibit understanding of

24 the covered advertisement.

1          "(5) The covered advertisement shall be con-
2     sistent with risks that are present with respect to
3     the subject matter of the covered advertisement, in-
4     cluding volatility with respect to the value of crypto
5     assets, the amount of potential returns, and oper-
6     ational risks for crypto asset intermediaries.
7          "(6) The covered advertisement shall—
8               "(A) consider the nature of the audience to
9          which the covered advertisement will be di-
10         rected; and
11              "(B) provide details and explanations that
12         are appropriate for the audience described in
13         subparagraph (A).
14         "(7)(A) The covered advertisement may not
15    predict or project performance, imply that past per-
16    formance will recur, or make any exaggerated or un-
17    warranted claim, opinion, or forecast.
18         "(B) Nothing in subparagraph (A) may be con-
19    strued to prohibit the use of—
20              "(i) a hypothetical illustration of mathe-
21         matical principles, if that illustration does not
22         predict or project the performance of a par-
23         ticular strategy;
24              "(ii) an analysis tool or a written report
25         produced by an analysis tool; or

32

1          ''(iii) a price target contained in a research

2          report, if the target has a reasonable basis, the

3          report discloses the valuation methods used to

4          determine the price target, and the price target

5          is accompanied by a disclosure concerning the

6          risks that may impede achievement of the price

7          target.

8     ''(8) Any comparison in the covered advertise-

9  ment between crypto assets, crypto asset inter-

10 mediaries, or crypto asset-related services shall dis-

11 close key material differences between the applicable

12 items, including, as applicable, differences with re-

13 spect to return objectives, costs and expenses, liquid-

14 ity, safety, guarantees or insurance, volatility, and

15 tax features.

16    ''(9) The covered advertisement shall promi-

17 nently disclose the following:

18          ''(A) The fact that the covered advertise-

19          ment is governed by this section and is subject

20          to Federal law.

21          ''(B) The name of the applicable crypto

22          asset intermediary.

23          ''(C) Any relationship between the applica-

24          ble crypto asset intermediary and any person

25          that appears in the covered advertisement or

33

1    any compensation offered by that crypto asset

2    intermediary to such a person.

3        "(D) Registrations, licenses, or other au-

4    thorizations in good standing that are held by

5    the applicable crypto asset intermediary.

6    "(10)(A) In the covered advertisement, any ref-

7    erence to tax-free or tax-exempt income shall indi-

8    cate which taxes apply, or which do not, unless in-

9    come is free from all applicable taxes.

10    "(B) For the purposes of subparagraph (A), the

11    covered advertisement may not characterize income

12    or returns as tax-free or exempt from income tax if

13    tax liability is merely postponed or deferred, such as

14    when taxes are payable upon redemption.

15    "(C) The Commissions may, by rule, adopt fur-

16    ther standards regarding tax considerations that ap-

17    pear in covered advertisements.

18    "(11) The covered advertisement shall disclose

19    the amounts of the following fees with respect to the

20    crypto asset or crypto asset-related services that are

21    the subject of the covered advertisement, which shall

22    be set forth prominently and, in any print advertise-

23    ment, in a prominent text box that contains only

24    such information:

25        "(A) Custody fees.

1          ''(B) Account fees.

2          ''(C) Applicable bank fees.

3     ''(12) If any testimonial in the covered adver-

4  tisement concerns a technical aspect of purchasing

5  or otherwise entering into a transaction for crypto

6  assets—

7          ''(A) the person making the testimonial

8      shall have the knowledge and experience to

9      form a valid opinion regarding the issue; and

10          ''(B) the testimonial, if the testimonial

11      concerns the advisability of purchasing crypto

12      assets or the performance of a crypto asset,

13      shall prominently disclose—

14              ''(i) the fact that the testimonial may

15          not be representative of the experience of

16          other customers;

17              ''(ii) the fact that the testimonial is

18          no guarantee of future performance or suc-

19          cess; and

20              ''(iii) if more than $1,000 in value is

21          paid for the testimonial—

22                  ''(I) the fact that the testimonial

23              is a paid testimonial; and

24                  ''(II) the amount and type of

25              compensation paid, which shall in-

35

1             clude, if compensation was paid in

2             crypto assets, an identification of each

3             specific crypto asset.

4        "(13) If the covered advertisement includes a

5    recommendation to purchase, or otherwise transact

6    in, a crypto asset, the covered advertisement shall—

7             "(A) have a reasonable basis for the rec-

8        ommendation; and

9             "(B) if applicable, disclose—

10             "(i) that, at the time the covered ad-

11        vertisement was published or distributed,

12        the applicable crypto asset intermediary

13        was conducting trading activities in the

14        crypto asset;

15             "(ii) that the applicable crypto asset

16        intermediary—

17             "(I) is directly and materially in-

18        volved in the preparation of the con-

19        tent of the covered advertisement; and

20             "(II) has a financial interest the

21        crypto assets being recommended; and

22             "(iii) the nature of any financial inter-

23        est disclosed under clause (ii), including

24        whether that financial interest consists of

25        any option, right, warrant, future, or long

36

 1          or short position, unless the extent of that

 2          financial interest is nominal.

 3      ''(14)(A) Except as otherwise provided by sub-

 4  paragraph (B), the covered advertisement may not

 5  refer, directly or indirectly, to past specific rec-

 6  ommendations made by the applicable crypto asset

 7  intermediary that were or would have been profitable

 8  to any person.

 9      ''(B) The covered advertisement may set out or

10  offer to furnish a list of all recommendations as to

11  the same type of crypto assets made by the applica-

12  ble crypto asset intermediary during the 1-year pe-

13  riod preceding the date on which the covered adver-

14  tisement is released, if the communication or list—

15          ''(i) states the name of each crypto asset

16          recommended, the date and nature of each such

17          recommendation (such as whether to buy, sell,

18          or hold the crypto asset), the market price (as

19          of the date of the recommendation), the price at

20          which a person was meant to act upon the rec-

21          ommendation, and the market price of each

22          such crypto asset, as of the most recent prac-

23          ticable date; and

24          ''(ii) contains the following warning, which

25          shall appear prominently within the communica-

1          tion or list: 'It should not be assumed that rec-
2          ommendations made in the future will be profit-
3          able or will equal the performance of the crypto
4          assets in this list.'.

5      "(e) SOURCES SUPPORTING A RECOMMENDATION.—

6          "(1) IN GENERAL.—A crypto asset inter-
7      mediary shall provide, or offer to provide upon re-
8      quest, available information or sources supporting
9      any recommendation described in subsection (d)(13).

10         "(2) PRICE DISCLOSURE.—When a crypto asset
11     intermediary recommends a crypto asset in a covered
12     advertisement, as described in subsection (d)(13),
13     the crypto asset intermediary shall provide the price
14     of the crypto asset, as of the date on which the rec-
15     ommendation is made.

16     "(f) INFORMATION PROVIDED IN PUBLIC APPEAR-
17 ANCES.—

18         "(1) IN GENERAL.—When an officer or em-
19     ployee of a crypto asset intermediary is sponsoring
20     or participating in a seminar, forum, or broadcast,
21     or when such an individual is otherwise engaged in
22     a public appearance or speaking activity, paragraphs
23     (1), (2), and (3) of subsection (d), shall apply to
24     that appearance to the same extent as those provi-
25     sions apply to a covered advertisement.

38

1           ''(2) RECOMMENDATIONS.—If an officer or em-
2      ployee of a crypto asset intermediary recommends a
3      crypto asset in a public appearance, that individual
4      shall—

5                ''(A) have a reasonable basis for the rec-
6           ommendation; and

7                ''(B) disclose, as applicable—

8                     ''(i) whether the individual has a fi-
9                nancial interest in the crypto asset rec-
10               ommended;

11                    ''(ii) the nature of the financial inter-
12               est disclosed under clause (i), including
13               whether that financial interest consists of
14               any option, right, warrant, future, or long-
15               or short- position, unless the extent of that
16               financial interest is nominal; and

17                    ''(iii) any other actual, material con-
18               flict of interest of which the individual
19               knows or has reason to know at the time
20               of the public appearance.

21      ''(g) PROCEDURES FOR PUBLIC APPEARANCES.—
22 Each crypto asset intermediary shall establish written pro-
23 cedures that are appropriate and reasonable to the busi-
24 ness, size, structure, and customers of the crypto asset
25 intermediary in order to supervise the public appearances

39

1 of the officers and employees of the crypto asset inter-

2 mediary, which shall include—

3     ''(1) provisions for the education and training

4     of employees of the crypto asset intermediary re-

5     garding those procedures;

6     ''(2) documentation of the education and train-

7     ing required under paragraph (1); and

8     ''(3) surveillance and follow-up measures to en-

9     sure that the crypto asset intermediary implements

10     and adheres to those procedures.

11 ''(h) ENFORCEMENT BY COMMISSIONS.—

12     ''(1) IN GENERAL.—The Securities and Ex-

13     change Commission, the Commodity Futures Trad-

14     ing Commission, or a customer protection and mar-

15     ket integrity authority operating under delegated au-

16     thority by the appropriate commission, as applicable

17     to a crypto asset intermediary, shall regularly ascer-

18     tain the compliance with this section by the crypto

19     asset intermediary (and applicable individuals) at

20     the time of each regular examination of the inter-

21     mediary by the applicable entity.

22     ''(2) INVESTIGATIONS.—The appropriate com-

23     mission or customer protection and market integrity

24     authority, as applicable, may conduct an investiga-

25     tion into a suspected violation of this section and

1    take enforcement action outside of a regular exam-
2    ination of a crypto asset intermediary, which shall be
3    comprised of the following:

4        ''(A) With respect to such a violation by
5        that crypto asset intermediary, the following:

6            ''(i) For an initial violation of this
7            section, the imposition of a civil monetary
8            penalty in an amount that is not more
9            than $100,000.

10            ''(ii) For any subsequent violation of
11            this section, the imposition of a civil mone-
12            tary penalty in an amount that is not more
13            than $1,000,000.

14            ''(iii) The enjoinment of future viola-
15            tions of this section by the crypto asset
16            intermediary and the requirement that the
17            crypto asset intermediary submit to the en-
18            forcing entity appropriate remediation
19            plans.

20        ''(B) For repeated, knowing violations of
21        this section by an individual, the imposition of
22        a temporary or permanent bar from the crypto
23        asset industry with respect to that individual.

24    ''(i) APPLICABILITY TO DISCLOSURES.—A document
25    filed with the Securities and Exchange Commission, as

41

1 otherwise required by law or regulation, is not subject to

2 the requirements of this section.

3 "(j) RULES.—The Commissions, after not less than

4 a 120-day comment period, shall adopt rules to implement

5 this section.".

6 (b) TECHNICAL AND CONFORMING AMENDMENT.—

7 The table of section for chapter 98 of title 31, United

8 States Code, as amended by section 206, is amended by

9 adding at the end the following:

"9808. Advertising of crypto asset intermediaries and certain other persons.".

## SEC. 209. CYBERSECURITY STANDARDS FOR CRYPTO ASSET

## INTERMEDIARIES.

12 (a) APPLICABILITY OF CYBER INCIDENT REPORTING

13 FOR CYBER INCIDENT REPORTING FOR CRITICAL INFRA-

14 STRUCTURE ACT OF 2002.—

15     (1) DEFINITIONS.—Section 2240 of the Home-

16     land Security Act of 2002 (6 U.S.C. 681) is amend-

17     ed by striking paragraph (4) and inserting the fol-

18     lowing:

19         "(4) COVERED ENTITY.—The term 'covered en-

20     tity'—

21         "(A) means an entity in a critical infra-

22         structure sector, as defined in Presidential Pol-

23         icy Directive 21, that satisfies the definition es-

24         tablished by the Director in the final rule issued

25         pursuant to section 2242(b); and

1          ''(B) includes a crypto asset intermediary,

2      as defined in section 9801 of title 31, United

3      States Code.''.

4          (2) REQUIRED REPORTING.—If a crypto asset

5      intermediary makes a required report under section

6      2242 of the Homeland Security Act of 2002 (6

7      U.S.C. 681b), the crypto asset intermediary shall

8      make a copy of that report available to the Federal

9      or State financial regulator responsible for licensing

10      or supervising the crypto asset intermediary.

11      (b) REQUIREMENT.—Not later than 18 months after

12  the date of enactment of this Act, the Commodity Futures

13  Trading Commission and the Securities and Exchange

14  Commission, in consultation with the Secretary of the

15  Treasury and the Director of the Cybersecurity and Infra-

16  structure Security Agency, shall develop comprehensive,

17  principles-based guidance relating to cybersecurity for

18  crypto asset intermediaries that account for, with respect

19  to such a crypto asset intermediary—

20          (1) the internal governance, and organizational

21      culture, of the cybersecurity program of the crypto

22      asset intermediary;

23          (2) security operations of the crypto asset inter-

24      mediary, including threat identification, incident re-

25      sponse, and mitigation;

SIL23812 CHK                                    S.L.C.

43

1    (3) risk identification and measurement by the

2    crypto asset intermediary;

3    (4) the mitigation of risk by the crypto asset

4    intermediary, including policies of the crypto asset

5    intermediary, controls implemented by the crypto

6    asset intermediary, change management with respect

7    to the crypto asset intermediary, and the supply

8    chain integrity of the crypto asset intermediary;

9    (5) assurance provided by, and testing con-

10   ducted by, the crypto asset intermediary, including

11   penetration testing and independent audits so con-

12   ducted; and

13   (6) the potential for crypto asset intermediaries

14   to be used to facilitate illicit activities, including

15   sanctions avoidance.

16   (c) CONSUMER BEST PRACTICES.—Not later than 18

17   months after the date of enactment of this Act, the Securi-

18   ties and Exchange Commission and the Commodity Fu-

19   tures Trading Commission, in consultation with industry

20   and the Director of the Cybersecurity and Infrastructure

21   Security Agency, shall adopt plain-language cybersecurity

22   guidance for customers to safely transact in crypto assets.

# TITLE III—COMBATING ILLICIT FINANCE

**SEC. 301. HIGHER PENALTIES FOR CRYPTO ASSET CRIMES.**

Section 127 of Public Law 91–508 (12 U.S.C. 1957) is amended by inserting ''in relation to a transaction principally composed of crypto assets or'' after ''committed''.

**SEC. 302. ANTI-MONEY LAUNDERING EXAMINATION STANDARDS.**

(a) TREASURY.—Not later than 2 years after the date of enactment of this Act, the Secretary of the Treasury, in consultation with the Conference of State Bank Supervisors and the Federal Financial Institutions Examination Council, shall establish a risk-focused examination and review process for money service businesses, as defined in section 1010.100 of title 31, Code of Federal Regulations, to assess—

(1) the adequacy of reporting obligations and anti-money laundering programs under subsections (g) and (h) of section 5318 of title 31, United States Code, respectively as applied to those businesses; and

(2) compliance of those businesses with anti-money laundering and countering the financing of terrorism requirements under subchapter II of chapter 53 of title 31, United States Code.

45

1   (b) SECURITIES EXCHANGE COMMISSION.—Not later
2   than 2 years after the date of enactment of this Act, the
3   Securities and Exchange Commission shall establish a
4   dedicated risk-focused examination and review process for
5   entities regulated by the Commission to assess—

6       (1) the adequacy of reporting obligations and
7       anti-money laundering programs under subsections
8       (g) and (h) of section 5318 of title 31, United States
9       Code, respectively as applied to those entities; and

10      (2) compliance of those entities with anti-money
11      laundering and countering the financing of terrorism
12      requirements under subchapter II of chapter 53 of
13      title 31, United States Code.

14  (c) COMMODITY FUTURES TRADING COMMISSION.—
15  Not later than 2 years after the date of enactment of this
16  Act, the Commodity Futures Trading Commission shall
17  establish a dedicated risk-focused examination and review
18  process for entities regulated by the Commodity Futures
19  Trading Commission to assess—

20      (1) the adequacy of reporting obligations and
21      anti-money laundering programs under subsections
22      (g) and (h) of section 5318 of title 31, United States
23      Code, respectively, as applied to those entities; and

24      (2) compliance of those entities with anti-money
25      laundering and countering the financing of terrorism

 1   requirements under subchapter II of chapter 53 of

 2   title 31, United States Code.

**SEC. 303. CRYPTO ASSET KIOSKS.**

 4      (a) DEFINITION.—In this section, the term "crypto

 5   asset kiosk" means a stand-alone machine, including a

 6   crypto asset automated teller machine, which facilitates

 7   the buying, selling, or exchange of crypto assets.

 8      (b) UPDATE.—Beginning not later than 2 years after

 9   the date of enactment of this Act, the Director of the Fi-

10   nancial Crimes Enforcement Network of the Department

11   of the Treasury shall require crypto asset kiosk owners

12   and administrators to submit and update the physical ad-

13   dresses of the kiosks owned or operated by the owner or

14   administrator, as applicable, once every 120 days.

15      (c) RULEMAKING.—Not later than 2 years after the

16   date of enactment of this Act, the Director of the Finan-

17   cial Crimes Enforcement Network of the Department of

18   the Treasury shall issue rules requiring crypto asset kiosk

19   owners and administrators to verify the identity of each

20   customer using a valid form of government-issued identi-

21   fication or other documentary method, as determined by

22   the Secretary of the Treasury.

23      (d) REPORTS.—

24         (1) FINANCIAL CRIMES ENFORCEMENT NET-

25      WORK.—Not later than 180 days after the date of

1      enactment of this Act, the Director of the Financial

2      Crimes Enforcement Network of the Department of

3      the Treasury shall issue a public report identifying

4      unlicensed kiosk operators and administrators, in-

5      cluding identification of known unlicensed operators

6      and estimates of the number and locations of sus-

7      pected unlicensed operators, as applicable.

8          (2) DRUG ENFORCEMENT AGENCY.—Not later

9      than 1 year after the date of enactment of this Act,

10     the Drug Enforcement Administration shall issue a

11     report to Congress identifying recommendations to

12     reduce drug trafficking with crypto asset kiosks.

**SEC. 304. INDEPENDENT FINANCIAL TECHNOLOGY WORK-**

**              ING GROUP TO COMBAT TERRORISM AND IL-**

**              LICIT FINANCING.**

16     (a) DEFINITIONS.—In this section:

17         (1) APPROPRIATE CONGRESSIONAL COMMIT-

18     TEES.—The term "appropriate congressional com-

19     mittees" means—

20             (A) the Committee on Banking, Housing,

21         and Urban Affairs, the Committee on Home-

22         land Security and Governmental Affairs, the

23         Committee on the Judiciary, the Select Com-

24         mittee on Intelligence, and the Committee on

25         Foreign Relations of the Senate; and

SIL23812 CHK                                                           S.L.C.

48

(B) the Committee on Financial Services, the Committee on Homeland Security, the Committee on the Judiciary, the Permanent Select Committee on Intelligence, and the Committee on Foreign Affairs of the House of Representatives.

(2) DISTRIBUTED LEDGER INTELLIGENCE COMPANIES.—The term "distributed ledger intelligence companies" means any business providing software, research, or other services such as but not limited to distributed ledger tracing tools, geofencing, transaction screening, the collection of business data, and sanctions screening, which supports private and public sector investigations and risk management activities involving cryptographically secured distributed ledgers or any similar analogue.

(3) FOREIGN TERRORIST ORGANIZATION.—The term "foreign terrorist organization" means an organization that is designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act ( 8 U.S.C. 1189).

(4) ILLICIT USE.—The term "illicit use" includes fraud, darknet marketplace transactions, money laundering, the purchase and sale of illicit goods, sanctions evasion, theft of funds, funding of

 1    illegal activities, transactions related to child sexual

 2    abuse material, and any other financial transaction

 3    involving the proceeds of specified unlawful activity

 4    (as defined in section 1956(c) of title 18, United

 5    States Code).

 6        (5) TERRORIST.—The term "terrorist" includes

 7    a person carrying out domestic terrorism or inter-

 8    national terrorism (as those terms are defined in

 9    section 2331 of title 18, United States Code).

10        (6) WORKING GROUP.—The term "Working

11    Group" means the Independent Financial Tech-

12    nology Working Group to Combat Terrorism and Il-

13    licit Financing established under subsection (b).

14    (b) ESTABLISHMENT.—There is established the Inde-

15    pendent Financial Technology Working Group to Combat

16    Terrorism and Illicit Financing, which shall consist of the

17    following:

18        (1) The Secretary of the Treasury, acting

19    through the Under Secretary for Terrorism and Fi-

20    nancial Intelligence, who shall serve as the chair of

21    the Working Group.

22        (2) A senior-level representative from each of

23    the following:

24            (A) Each of the following components of

25            the Department of the Treasury:

50

(i) The Financial Crimes Enforcement Network.

(ii) The Internal Revenue Service.

(iii) The Office of Foreign Assets Control.

(B) The Department of Justice and each of the following components of the Department:

(i) The Federal Bureau of Investigation.

(ii) The Drug Enforcement Administration.

(C) The Department of Homeland Security and the United States Secret Service.

(D) The Department of State.

(3) Five individuals appointed by the Under Secretary for Terrorism and Financial Intelligence to represent the following:

(A) Financial technology companies.

(B) Distributed ledger intelligence companies.

(C) Financial institutions.

(D) Institutions or organizations engaged in research.

(c) DUTIES.—The Working Group shall—

51

1        (1) conduct independent research on terrorist

2    and illicit use of new financial technologies, includ-

3    ing crypto assets;

4        (2) analyze how crypto assets and emerging

5    technologies may bolster the national security and

6    economic competitiveness of the United States in fi-

7    nancial innovation; and

8        (3) develop legislative and regulatory proposals

9    to improve anti-money laundering, counter-terrorist,

10   and other counter-illicit financing efforts in the

11   United States.

12   (d) REPORTS.—

13       (1) IN GENERAL.—Not later than 1 year after

14   the date of enactment of this Act, and annually for

15   the 2 years thereafter, the Working Group shall sub-

16   mit to the Secretary of the Treasury, the heads of

17   each agency represented in the Working Group pur-

18   suant to subsection (b)(2), and the appropriate con-

19   gressional committees a report containing the find-

20   ings and determinations made by the Working

21   Group in the previous year and any legislative and

22   regulatory proposals developed by the Working

23   Group.

24       (2) FINAL REPORT.—Before the date on which

25   the Working Group terminates under subsection

1      (f)(1), the Working Group shall submit to the appro-

2      priate congressional committees a final report detail-

3      ing the findings, recommendations, and activities of

4      the Working Group.

5      (e) TRAVEL EXPENSES.—Members of the Working

6    Group shall serve without pay, but shall receive travel ex-

7    penses in accordance with sections 5702 and 5703 of title

8    5, United States Code.

9      (f) SUNSET.—

10          (1) IN GENERAL.—The Working Group shall,

11      subject to paragraph (3), terminate on the date that

12      is 4 years after the date of the enactment of this

13      Act.

14          (2) EXPIRATION AND RETURN OF APPRO-

15      PRIATED FUNDS.—On the date on which the Work-

16      ing Group terminates under paragraph (1)—

17              (A) all authorities granted to the Working

18          Group under this section shall expire, subject to

19          paragraph (3); and

20              (B) any funds appropriated for the Work-

21          ing Group that are available for obligation as of

22          that date shall be returned to the Treasury.

23          (3) AUTHORITY TO WIND UP ACTIVITIES.—The

24      termination of the Working Group under paragraph

25      (1) and the expiration of authorities under para-

1    graph (2) shall not affect any investigations, re-
2    search, or other activities of the Working Group on-
3    going as of the date on which the Working Group
4    terminates under paragraph (1). Such investigations,
5    research, and activities may continue until their
6    completion.

7    (g) REPORT AND STRATEGY WITH RESPECT TO
8    CRYPTO ASSETS AND OTHER RELATED EMERGING TECH-
9    NOLOGIES.—

10        (1) IN GENERAL.—Not later than 180 days
11    after the date of the enactment of this section, the
12    President, acting through the Secretary of the
13    Treasury, and in consultation with the head of each
14    agency represented on the Working Group under
15    subsection (b), shall submit to the appropriate con-
16    gressional committees a report that describes—

17            (A) to the extent not currently disclosed in
18        other reports, the potential uses of crypto as-
19        sets and other related emerging technologies by
20        states, non-state actors, and foreign terrorist
21        organizations to evade sanctions, finance ter-
22        rorism, or launder monetary instruments, and
23        threaten United States national security; and

1          (B) a strategy how the United States will
2     mitigate and prevent the illicit use of crypto as-
3     sets and other related emerging technologies.

4     (2) FORM OF REPORT; PUBLIC AVAILABILITY.—

5          (A) IN GENERAL.—The report required by
6     paragraph (1) shall be submitted in unclassified
7     form, but may include a classified annex.

8          (B) PUBLIC AVAILABILITY.—The unclassi-
9     fied portion of the report required by paragraph
10    (1) shall be made available to the public and
11    posted on a publicly accessible website of the
12    Department of Treasury—

13               (i)   in   precompressed,   easily
14          downloadable versions, in all appropriate
15          formats; and

16               (ii) in machine-readable format, if ap-
17          plicable.

18    (3) SOURCES OF INFORMATION.—In preparing
19    the report required by paragraph (1), the President
20    may utilize any credible publication, database, or
21    web-based resource, and any credible information
22    compiled by any government agency, nongovern-
23    mental organization, or other entity that is made
24    available to the President.

55

1    (h) BRIEFING.—Not later than 2 years after the date

2 of the enactment of this Act, the Secretary of the Treasury

3 shall brief the appropriate congressional committees on

4 the implementation of the strategy required by subsection

5 (g)(1).

6 **SEC. 305. SANCTIONS COMPLIANCE RESPONSIBILITIES OF**

7              **PAYMENT STABLECOIN ISSUERS.**

8    Not later than 120 days after the date of the enact-

9 ment of this Act, the Secretary of the Treasury shall adopt

10 guidance clarifying the sanctions compliance responsibil-

11 ities and liability of an issuer of a payment stablecoin with

12 respect to downstream transactions relating to the

13 stablecoin that take place after the stablecoin is first pro-

14 vided to a customer of the issuer.

15 **SEC. 306. CRYPTO ASSET MIXERS AND TUMBLERS.**

16    (a) IN GENERAL.—Not later than 1 year after the

17 date of enactment of this Act, the Director of the Finan-

18 cial Crimes Enforcement Network of the Department of

19 the Treasury shall submit to the Committee on Banking,

20 Housing and Urban Affairs of the Senate and the Com-

21 mittee on Financial Services of the House of Representa-

22 tives a report that analyzes the following issues:

23       (1) Current (as of the date on which the report

24       is submitted) typologies of crypto asset mixers and

25       tumblers and historical transaction volume.

56

1 (2) Estimates of the percentage of transactions

2 relating to mixers and tumblers which are used by

3 actors engaged in illicit finance.

4 (3) An assessment of potential non-illicit uses

5 of mixers and tumblers described in paragraph (1).

6 (4) Analysis of regulatory approaches employed

7 by other jurisdictions relating to mixers and tum-

8 blers.

9 (5) Recommendations for legislation or regula-

10 tion relating to mixers and tumblers.

11 **SEC. 307. FINANCIAL CRIMES ENFORCEMENT NETWORK IN-**

12 **NOVATION LABORATORY.**

13 Section 310 of title 31, United States Code, is

14 amended—

15 (1) by redesignating subsections (k) and (l) as

16 subsections (l) and (m), respectively; and

17 (2) by inserting after subsection (j) the fol-

18 lowing:

19 "(k) INNOVATION LABORATORY.—

20 "(1) IN GENERAL.—There is established within

21 the Financial Crimes Enforcement Network an In-

22 novation Laboratory to promote regulatory dialogue,

23 data sharing between the Financial Crimes Enforce-

24 ment Network and financial companies, and an as-

25 sessment of potential changes in law, rules, or poli-

Case 3:23-cv-06003-WHO   Document 70-8   Filed 05/09/24   Page 58 of 275
SIL23812 CHK                                                    S.L.C.

57

1  cies to facilitate the appropriate supervision of finan-
2  cial technology and the laws under the jurisdiction
3  of the bureau.

4      "(2) CHIEF INNOVATION OFFICER.—The Inno-
5  vation Officer appointed within the Financial Crimes
6  Enforcement Network under section 6208 of the
7  Anti-Money Laundering Act of 2020 (31 U.S.C.
8  5311 note) shall manage the Innovation Laboratory
9  established under paragraph (1).

10      "(3) PILOT PROJECTS.—The Innovation Lab-
11  oratory established under paragraph (1) shall, as ap-
12  propriate, conduct pilot projects with financial com-
13  panies to more effectively facilitate the supervision
14  of financial technology, consistent with applicable
15  law.".

# TITLE IV—RESPONSIBLE COMMODITIES REGULATION

**SEC. 401. DEFINITIONS.**

19      Section 1a of the Commodity Exchange Act (7 U.S.C.
20  1a) is amended—

21      (1) in paragraph (9), by striking "and frozen
22  concentrated orange juice" and inserting "frozen
23  concentrated orange juice, and a crypto asset (con-
24  sistent with section 2(c)(2)(F))";

SIL23812 CHK S.L.C.

58

1      (2) by redesignating paragraphs (15) through

2  (37), (38), (39), and (40) through (51) as para-

3  graphs (18) through (40), (42), (43), and (45)

4  through (56), respectively;

5      (3) by inserting after paragraph (14) the fol-

6  lowing:

7      "(15) CRYPTO ASSET.—

8        "(A) IN GENERAL.—Except as provided in

9     subparagraph (B), the term 'crypto asset' has

10     the meaning given the term in section 9801 of

11     title 31, United States Code.

12      "(B) EXCLUSION.—The term 'crypto asset'

13     does not include an asset that provides the

14     holder of the asset with any of the following

15     rights in a business entity:

16        "(i) A debt or equity interest in that

17        entity.

18        "(ii) Liquidation rights with respect

19        to that entity.

20        "(iii) An entitlement to an interest or

21        dividend payment from that entity.

22        "(iv) Any other financial interest in

23        that entity.

59

1       "(16) CRYPTO ASSET EXCHANGE.—The term

2   'crypto asset exchange' means a trading facility that

3   lists for trading at least 1 crypto asset.

4       "(17) DECENTRALIZED CRYPTO ASSET EX-

5   CHANGE.—

6          "(A) IN GENERAL.—The term 'decentral-

7       ized crypto asset exchange' means software

8       that—

9             "(i) comprises predetermined and

10         publicly disclosed code deployed to a public

11         distributed ledger;

12            "(ii) permits a user or group of users

13         to create a pool or group of pools for

14         crypto assets;

15           "(iii) enables a user or group of users

16         to conduct crypto asset transactions from

17         a pool or group of pools, with such trans-

18         actions occurring pursuant to the code de-

19         scribed in clause (i); and

20           "(iv) no person, or group of persons,

21         known to one another who have entered

22         into an agreement (implied or otherwise)

23         to act in concert, can unilaterally control

24         or cause to control the software protocol

25         through altering transactions, functions, or

SIL23812 CHK                                          S.L.C.

60

1          actions on the protocol, or blocking or ap-

2          proving transactions on the protocol.

3              "(B) RULE OF CONSTRUCTION.—For the

4          purposes of subparagraph (A)(iv), the term

5          'control' shall not include mining, validation, or

6          the communication of transactions to a distrib-

7          uted ledger.";

8          (4) in paragraph (31)(A)(i) (as so redesig-

9      nated)—

10              (A) in subclause (I)—

11                  (i) in item (aa)—

12                      (I) in subitem (EE), by striking

13                  "or" at the end; and

14                      (II) by adding at the end the fol-

15                  lowing:

16                          "(GG) the purchase or

17                      sale of a crypto asset that is

18                      traded on or subject to the

19                      rules of a registered entity;";

20                  (ii) in item (bb), by striking "and" at

21              the end and inserting "or"; and

22                  (iii) by adding at the end the fol-

23              lowing:

24                          "(cc)    acting    as    a

25                      counterparty (not on a principal

61

1          basis) to any cash or spot agree-
2          ment, contract, or transaction in-
3          volving a crypto asset, which may
4          include a payment stablecoin,
5          with a person who is not an eligi-
6          ble contract participant, unless
7          the activity is—

8              "(AA) conducted in
9              compliance with the laws of
10             the State in which the activ-
11             ity occurs;

12             "(BB) subject to regu-
13             lation by another Federal
14             authority; or

15             "(CC) separately regu-
16             lated under this Act; and";

17             and

18         (B) in subclause (II), by striking "items
19     (aa) or (bb)" and inserting "item (aa), (bb), or
20     (cc)";

21         (5) by inserting after paragraph (40) (as so re-
22     designated) the following:

23         "(41) PAYMENT STABLECOIN.—The term 'pay-
24     ment stablecoin' has the meaning given the term in
25     section 9801 of title 31, United States Code.";

SIL23812 CHK                                                S.L.C.

62

1          (6) by inserting after paragraph (43) (as so re-

2      designated) the following:

3          "(44) REGISTERED   CRYPTO   ASSET   EX-

4      CHANGE.—The term 'registered crypto asset ex-

5      change' means a crypto asset exchange registered

6      under section 5i.";

7          (7) in paragraph (45) (as so redesignated)—

8              (A) in subparagraph (E), by striking

9          "and" at the end;

10             (B) by redesignating subparagraph (F) as

11         subparagraph (G); and

12             (C) by inserting after subparagraph (E)

13         the following:

14             "(F) a registered crypto asset exchange;

15         and"; and

16         (8) in paragraph (56)(B)(i) (as so redesig-

17     nated), by inserting "or a decentralized crypto asset

18     exchange" after "execution algorithm".

**SEC. 402. REPORTING AND RECORDKEEPING.**

20     Section 4g of the Commodity Exchange Act (7 U.S.C.

21 6g) is amended—

22         (1) in subsection (a), by inserting "crypto as-

23     sets or" before "commodities"; and

1       (2) in subsection (d), in the second sentence, by

2   striking "commodity futures" and inserting "com-

3   modities".

**SEC. 403. JURISDICTION OVER CRYPTO ASSET TRANS-**

5         **ACTIONS.**

6   (a) COMMISSION JURISDICTION OVER RETAIL

7 CRYPTO ASSET TRANSACTIONS.—

8       (1) IN GENERAL.—Section 2(c)(2) of the Com-

9   modity Exchange Act (7 U.S.C. 2(c)(2)) is amend-

10  ed—

11          (A) in subparagraph (D)(ii)—

12            (i) in subclause (III), in the matter

13         preceding item (aa), by inserting "of a

14         commodity, other than a crypto asset,"

15         after "sale";

16            (ii) by redesignating subclauses (IV)

17         and (V) as subclauses (V) and (VI), re-

18         spectively; and

19            (iii) by inserting after subclause (III)

20         the following:

21              "(IV) a contract of sale of a

22            crypto asset that—

23               "(aa) results in actual deliv-

24             ery within 2 days or such other

25             period as the Commission may

SIL23812 CHK                                                    S.L.C.

64

 1          determine by rule based upon the

 2          typical commercial practice in

 3          cash or spot markets for the

 4          crypto asset involved; or

 5               "(bb) is executed on or sub-

 6          ject to the rules of a registered

 7          crypto asset exchange or with a

 8          registered futures commission

 9          merchant;"; and

10     (B) by adding at the end the following:

11     "(F) COMMISSION JURISDICTION OVER

12  CRYPTO ASSET TRANSACTIONS.—

13          "(i) IN GENERAL.—

14               "(I) JURISDICTION.—Subject to

15          sections 6d and 12(e) and section 403

16          of the Commodity Futures Moderniza-

17          tion Act of 2000 (7 U.S.C. 27a) and

18          except as provided in subclauses (II)

19          and (III), the Commission shall have

20          exclusive jurisdiction over any agree-

21          ment, contract, or transaction involv-

22          ing a contract of sale of a crypto asset

23          in or affecting interstate commerce,

24          including—

1              "(aa) ancillary assets that
2          are in compliance with the re-
3          quirements of section 42 of the
4          Securities Exchange Act of 1934;
5          and

6              "(bb) all activities relating
7          to a payment stablecoin con-
8          ducted by an entity registered
9          under this Act, including
10         brokering, trading, and custodial
11         activities relating to payment
12         stablecoins.

13         "(II)   EXCEPTIONS.—Subclause
14     (I) shall not apply to specified peri-
15     odic reporting requirements made by
16     an issuer that provided the holder of
17     a security with an ancillary asset
18     under section 42(b)(4) of the Securi-
19     ties Exchange Act of 1934 and the se-
20     curity that constitutes an investment
21     contract (within the meaning of sec-
22     tion 2(a)(1) of the Securities Act of
23     1933 (15 U.S.C. 77b(a)(1))) with re-
24     spect to that ancillary asset.

 1                    ''(III) FUNGIBILITY REQUIRE-

 2               MENT.—The Commission shall only

 3               exercise jurisdiction over an agree-

 4               ment, contract, or transaction involv-

 5               ing a contract of sale of a crypto asset

 6               that is commercially fungible, which

 7               shall not include digital collectibles

 8               and other unique crypto assets.

 9          ''(ii) WITHHOLDING OF RULEMAKING

10     AUTHORITY OVER CERTAIN TRANS-

11     ACTIONS.—Nothing in this subparagraph

12     authorizes the Commission to issue any

13     rule regarding any agreement, contract, or

14     transaction that is not offered, solicited,

15     traded, facilitated, executed, cleared, re-

16     ported, or otherwise dealt in—

17               ''(I) on or subject to the rules of

18               a registered entity (with the exception

19               of entities required to register under

20               this Act); or

21               ''(II) by any other entity reg-

22               istered by the Commission.

23          ''(iii) LIMITATION.—Clause (i) shall

24     not apply to custodial activities with re-

25     spect to a crypto asset of an entity super-

SIL23812 CHK                                                     S.L.C.

67

1          vised or regulated by a State or other Fed-

2          eral regulatory agency.''.

3     (2) CONFORMING AMENDMENT.—Section

4     2(a)(1)(A) of the Commodity Exchange Act (7

5     U.S.C. 2(a)(1)(A)) is amended, in the first sentence,

6     by striking ''section 19 of this Act'' and inserting

7     ''subsection (c)(2)(F) or section 19''.

8     (b) SEGREGATION OF CRYPTO ASSETS.—Section 4d

9  of the Commodity Exchange Act (7 U.S.C. 6d) is amended

10 by adding at the end the following:

11     ''(i) SEGREGATION OF CRYPTO ASSETS.—

12          ''(1) HOLDING OF CUSTOMER ASSETS.—

13               ''(A) IN GENERAL.—Each futures commis-

14          sion merchant shall hold customer money, as-

15          sets, and property in a manner to minimize the

16          customer's risk of loss of, or unreasonable delay

17          in the access to, the money, assets, and prop-

18          erty.

19               ''(B) CUSTODIAN.—A futures commission

20          merchant shall hold the property of a customer

21          of the futures commission merchant with a sep-

22          arate licensed, chartered, or registered entity

23          subject to regulation or supervision by 1 of the

24          following agencies:

25                    ''(i) The Commission.

1          "(ii) The Securities and Exchange
2     Commission.

3          "(iii) An appropriate Federal banking
4     agency (as defined in section 3 of the Fed-
5     eral Deposit Insurance Act (12 U.S.C.
6     1813)).

7          "(iv) A State bank supervisor (as de-
8     fined in that section).

9          "(v) An appropriate foreign govern-
10    mental authority in the home country of
11    the custodian.

12     "(2) SEGREGATION OF FUNDS.—

13     "(A) DEFINITION OF CRYPTO ASSET CUS-
14     TOMER.—In this paragraph, the term 'crypto
15     asset customer' means a customer involved in a
16     cash or spot, leveraged, margined, or financed
17     crypto asset transaction, which may include a
18     payment stablecoin, in which the futures com-
19     mission merchant is acting as the counterparty.

20          "(B) REQUIREMENTS.—

21          "(i) IN GENERAL.—A futures commis-
22     sion merchant shall treat and deal with all
23     money, assets, and property of any crypto
24     asset customer received as belonging to the
25     customer.

1          ''(ii)  COMMINGLING  PROHIBITED.—

2     Money, assets, and property of a crypto

3     asset customer described in clause (i)—

4               ''(I) shall be separately accounted

5          for; and

6               ''(II) shall not be—

7                    ''(aa)  commingled  with  the

8               funds  of  the  futures  commission

9               merchant; or

10                    ''(bb)  used  to  margin,  se-

11               cure, or guarantee any trades or

12               accounts of any customer or per-

13               son  other  than  the  person  for

14               whom the money, assets, or prop-

15               erty are held.

16     ''(C) EXCEPTIONS.—

17          ''(i) USE OF FUNDS.—

18               ''(I)   IN   GENERAL.—Notwith-

19          standing  subparagraph  (B),  money,

20          assets, and property of a crypto asset

21          customer  may,  for  the  purposes  de-

22          scribed in subclause (II), be commin-

23          gled  and  deposited  in  the  same  ac-

24          count  or  accounts  with  an  entity  de-

25          scribed in paragraph (1)(B).

 1                            "(II)   WITHDRAWAL.—Notwith-

 2                        standing subparagraph (B), the share

 3                        of the money, assets, and property de-

 4                        scribed in subclause (I) as in the nor-

 5                        mal course of business is necessary to

 6                        margin, guarantee, secure, transfer,

 7                        adjust, or settle a crypto asset trans-

 8                        action with a registered entity may be

 9                        withdrawn and applied to those pur-

10                        poses, including the payment of com-

11                        missions, brokerage, interest, taxes,

12                        storage, and other charges, lawfully

13                        accruing in connection with the crypto

14                        asset transaction.

15                        "(ii) COMMISSION ACTION.—Notwith-

16                    standing subparagraph (B), in accordance

17                    with such terms and conditions as the

18                    Commission may prescribe by rule or

19                    order, any money, assets, or property of a

20                    crypto asset customer may be commingled

21                    and deposited in customer accounts with

22                    any other money, assets, or property re-

23                    ceived by the futures commission merchant

24                    and required by the Commission to be sep-

25                    arately accounted for and treated and dealt

1          with as belonging to the crypto asset cus-

2          tomer.

3                  "(D) PERMITTED INVESTMENTS.—Money

4          of a crypto asset customer may be invested—

5                      "(i) in—

6                          "(I) obligations of the United

7                      States;

8                          "(II) general obligations of any

9                      State or of any political subdivision of

10                     a State that are investment-grade;

11                         "(III) obligations fully guaran-

12                     teed as to principal and interest by

13                     the United States; or

14                         "(IV) any other investment that

15                     the Commission may by rule pre-

16                     scribe; and

17                     "(ii) in accordance with such rules

18                 and subject to such conditions as the Com-

19                 mission may prescribe.

20                 "(E) PROHIBITION.—It shall be unlawful

21          for any person, including any derivatives clear-

22          ing organization or depository institution, that

23          has received any money, assets, or property for

24          deposit in a separate account or accounts as re-

25          quired by subparagraph (B) to hold, dispose of,

72

1 or use any of the money, assets, or property

2 that belongs to the depositing futures commis-

3 sion merchant or any person other than the

4 crypto asset customer of the futures commis-

5 sion merchant.

6 "(3) CUSTOMER RIGHT TO OPT OUT.—

7 "(A) IN GENERAL.—A customer shall have

8 the right to waive any requirement under this

9 subsection by affirmatively electing, in writing

10 to the futures commission merchant, to waive

11 the requirement.

12 "(B) LIMITATIONS.—The Commission

13 may, by rule, establish notice and disclosure re-

14 quirements, segregation requirements, invest-

15 ment limitations, and other rules relating to the

16 waiving of any requirement under this sub-

17 section that are reasonably necessary to protect

18 customers, including eligible contract partici-

19 pants, non-eligible contract participants, and

20 any other class of customers.".

21 (c) LIMITATION ON FUTURES COMMISSION MER-

22 CHANTS ACTING AS A COUNTERPARTY IN CRYPTO ASSET

23 TRANSACTIONS.—Section 4d of the Commodity Exchange

24 Act (7 U.S.C. 6d) (as amended by subsection (b)) is

25 amended by adding at the end the following:

SIL23812 CHK                                                      S.L.C.

73

1    "(j) RISK MANAGEMENT STANDARDS FOR DECEN-

2    TRALIZED CRYPTO ASSET EXCHANGES.—

3        "(1) IN GENERAL.—Prior to conducting trading

4    activity (including routing orders and directed trad-

5    ing) through a decentralized crypto asset exchange,

6    or otherwise providing customer access to a decen-

7    tralized crypto asset exchange, a futures commission

8    merchant shall implement risk management stand-

9    ards with respect to trading activity through that

10   decentralized crypto asset exchange.

11       "(2) REQUIREMENTS.—A futures commission

12   merchant shall—

13           "(A) implement an effective risk-based

14       procedure for determining whether to execute,

15       reject, or suspend an incoming or outgoing

16       transaction relating to a decentralized crypto

17       asset exchange, including a determination based

18       on suspected money laundering, sanctions eva-

19       sion, fraud, or market manipulation;

20           "(B) conduct an effective risk-based anal-

21       ysis of the code of the decentralized crypto

22       asset exchange to determine whether crypto

23       asset transactions can occur on the exchange

24       securely, consistently, and immutably;

74

1          "(C) verify that the code for the decentral-
2      ized crypto asset exchange is widely available to
3      the public;

4          "(D) verify that there are appropriate de-
5      veloper documents relating to the decentralized
6      crypto asset exchange that appropriately dis-
7      close all risks of the software;

8          "(E) conduct an effective risk analysis
9      with respect to the decentralized crypto asset
10     exchange, including—

11              "(i) money laundering and sanctions
12          evasion;

13              "(ii) settlement;

14              "(iii) fraud and market manipulation;
15          and

16              "(iv) operational and cybersecurity
17          risk, including—

18                  "(I) the use of multi-signature
19              wallets;

20                  "(II) integration with third-party
21              software or vendors;

22                  "(III) any material efforts to
23              alter the functionality of the protocol;
24              and

25                  "(IV) all other material risks;

75

1          ''(F) implement robust policies and proce-

2     dures to mitigate the risks identified in sub-

3     paragraph (E);

4          ''(G) disclose the risks identified in sub-

5     paragraph (E) using plain language to cus-

6     tomers;

7          ''(H) maintain robust capability to detect

8     market manipulation, fraud, money laundering,

9     and sanctions evasion occurring on the decen-

10     tralized crypto asset exchange, including

11     through the use of tools that will properly tar-

12     get those risks, including through distributed

13     ledger intelligence companies;

14          ''(I) ensure that the merchant is not trad-

15     ing with a decentralized crypto asset exchange

16     on a principal basis, but solely on an agency

17     basis at the request of a customer; and

18          ''(J) consistent with this subsection, imple-

19     ment other standards the Commission may re-

20     quire by rule.

21     ''(k) RISK MANAGEMENT STANDARDS FOR SELF-

22 HOSTED WALLETS.—

23          ''(1) IN GENERAL.—The Commission shall

24     adopt risk management standards relating to money

25     laundering, customer identification and sanctions for

1   self-hosted wallets that conduct transactions with a

2   futures commission merchant.

3        "(2) DEFINITION OF SELF-HOSTED WALLET.—

4   In this subsection, the term 'self-hosted wallet'

5   means a digital interface used to secure and transfer

6   crypto assets, in which the owner of the assets re-

7   tains independent control in a manner that is se-

8   cured by that interface.".

9   "(l) LIMITATION ON FUTURES COMMISSION MER-

10  CHANTS ACTING AS A COUNTERPARTY IN CRYPTO ASSET

11  TRANSACTIONS.—A registered futures commission mer-

12  chant shall not act as a counterparty in any agreement,

13  contract, or transaction involving a crypto asset that has

14  not been listed for trading on a registered crypto asset

15  exchange.

16  "(m) APPLICABILITY OF OTHER CORE PRIN-

17  CIPLES.—The Commission may require a registered fu-

18  tures commission merchant to comply with other stand-

19  ards of section 5i, including the core principles described

20  in that section, if appropriate based on the activities and

21  risk profile of the merchant.".

22  (d) COMMON PROVISIONS APPLICABLE TO REG-

23  ISTERED ENTITIES.—Section 5c of the Commodity Ex-

24  change Act (7 U.S.C. 7a–2) is amended—

SIL23812 CHK                                                         S.L.C.

77

1          (1) in subsection (a)(1), by striking "5(d) and

2    5b(c)(2)" and inserting "5(d), 5b(c)(2), and 5i(c)";

3          (2) in subsection (b), by inserting "registered

4    crypto asset exchange," before "derivatives" each

5    place it appears; and

6          (3) in subsection (c)—

7               (A) in paragraph (2), by inserting "or par-

8          ticipants" before "(in a";

9               (B) in paragraph (4)(B), by striking

10         "1a(10)" and inserting "1a(9)"; and

11              (C) in paragraph (5), by adding at the end

12         the following:

13              "(D) SPECIAL RULES FOR THE LISTING OF

14         CERTAIN CRYPTO ASSETS.—

15                   "(i) IN GENERAL.—In the case of a

16              listing for trading a crypto asset that has

17              not previously been listed for trading on

18              another registered entity—

19                        "(I) paragraphs (2) and (3) shall

20                   apply as if the listing were a rule; and

21                        "(II) paragraph (2) shall be ap-

22                   plied by substituting '20 business

23                   days' for '10 business days'.

24                   "(ii) TRANSITIONAL EXTENSION.—

25              During the 18-month period beginning on

78

1     the date of the registration of the first

2     crypto asset exchange, the Commission

3     shall have an additional 20 business days

4     to review any certification under clause (i).

5      ''(iii) CONSIDERATION OF COM-

6     MENTS.—In conducting a review under

7     clause (i), the Commission shall consider

8     any comments provided by the Securities

9     and Exchange Commission with respect to

10    the legal classification of a crypto asset.''.

11 **SEC. 404. REGISTRATION OF CRYPTO ASSET EXCHANGES.**

12 (a) IN GENERAL.—The Commodity Exchange Act (7

13 U.S.C. 1 et seq.) is amended by inserting after section

14 5h the following:

15 **''SEC. 5i. REGISTRATION OF CRYPTO ASSET EXCHANGES.**

16 ''(a) DEFINITION OF CUSTOMER.—In this section,

17 the term 'customer' means any person that maintains an

18 account for the trading of crypto assets or payment

19 stablecoins directly with a registered crypto asset ex-

20 change (other than a person that is owned or controlled,

21 directly or indirectly, by the registered crypto asset ex-

22 change).

23 ''(b) REGISTRATION.—

24  ''(1) IN GENERAL.—Any trading facility that

25  offers or seeks to offer a market in crypto assets or

1    payment stablecoins shall register with the Commis-
2    sion as a crypto asset exchange by submitting to the
3    Commission an application in such form and con-
4    taining such information as the Commission may re-
5    quire for the purpose of making the determinations
6    required for approval under subsections (d) and (f).

7         "(2) DEEMED REGISTRATION.—A registered
8    designated contract market or registered swap exe-
9    cution facility that fulfills the requirements of this
10   section may elect to be considered a registered
11   crypto asset exchange, in such form and manner as
12   the Commission shall prescribe.

13        "(3) ADDITIONAL REGISTRATION.—A registered
14   crypto asset exchange shall be registered with the
15   Secretary of the Treasury as a money services busi-
16   ness and with a customer protection and market in-
17   tegrity authority registered under section 9809 of
18   title 31, United States Code.

19   "(c) TRADING.—

20        "(1) IN GENERAL.—A registered crypto asset
21   exchange may make available for trading any crypto
22   asset or payment stablecoin, that is not readily sus-
23   ceptible to manipulation, subject to this subsection.

24        "(2) REQUIREMENTS.—

SIL23812 CHK                                                            S.L.C.

80

1          "(A) ANCILLARY ASSETS.—An ancillary

2     asset shall not be made available for trading on

3     a registered crypto asset exchange unless the

4     asset is in compliance with section 42 of the Se-

5     curities Exchange Act of 1934.

6          "(B) CONFIRMATION.—A registered crypto

7     asset exchange shall have a duty to confirm an

8     ancillary asset is in compliance before making

9     the asset available for trading.

10     "(3) RULES GOVERNING MARGINED OR LEVER-

11     AGED TRADING.—The Commission may make, pro-

12     mulgate, and enforce such additional rules governing

13     margined, leveraged, or financed transactions as are

14     reasonably necessary to protect market participants

15     and promote the orderly settlement of transactions

16     with respect to—

17          "(A) disclosure;

18          "(B) recordkeeping;

19          "(C) capital, margin, and other financial

20     resources;

21          "(D) reporting;

22          "(E) business conduct;

23          "(F) documentation; and

24          "(G) such other matters as the Commis-

25     sion determines to be necessary.

SIL23812 CHK                                                           S.L.C.

81

1          "(4) PROHIBITION.—

2               "(A) IN GENERAL.—Registration as a

3          crypto asset exchange shall not permit a trad-

4          ing facility to offer any contract of sale of a

5          commodity for future delivery, option, or swap

6          for trading without also being registered as a

7          designated contract market or swap execution

8          facility.

9               "(B) PROPRIETARY TRADING.—A reg-

10         istered crypto asset exchange shall not conduct

11         proprietary trading, but may conduct market

12         making under standards established by the

13         Commission by rule.

14     "(d) CORE PRINCIPLES FOR CRYPTO ASSET EX-

15 CHANGES.—

16         "(1) COMPLIANCE WITH CORE PRINCIPLES.—

17               "(A) IN GENERAL.—To be registered, and

18         maintain registration, as a crypto asset ex-

19         change, the registered crypto asset exchange

20         shall comply with—

21                    "(i) the core principles described in

22               this subsection, and annually certify such

23               compliance; and

82

1          "(ii) any requirement that the Com-

2     mission may impose by rule pursuant to

3     section 8a(5).

4          "(B) REASONABLE DISCRETION OF

5     CRYPTO ASSET EXCHANGE.—Unless otherwise

6     determined by the Commission by rule, a reg-

7     istered crypto asset exchange described in sub-

8     paragraph (A) shall have reasonable discretion

9     in establishing the manner in which the reg-

10    istered crypto asset exchange complies with the

11    core principles described in this subsection.

12        "(2) COMPLIANCE WITH RULES.—A registered

13    crypto asset exchange shall—

14         "(A) establish and enforce compliance with

15    1 or more rules of the registered crypto asset

16    exchange, including—

17              "(i) the terms and conditions of the

18         trades traded or processed on or through

19         the registered crypto asset exchange; and

20              "(ii) any limitation on access to the

21         registered crypto asset exchange;

22         "(B) establish and enforce compliance with

23    trading, trade processing, and participation

24    rules that will deter abuses and have the capac-

SIL23812 CHK                                               S.L.C.

83

1          ity to detect, investigate, and enforce violations

2          of those rules, including means—

3                    "(i) to provide market participants

4                    with impartial access to the market; and

5                    "(ii) to capture information that may

6                    be used in establishing whether rule viola-

7                    tions have occurred; and

8               "(C) establish rules governing the oper-

9          ation of the registered crypto asset exchange,

10         including rules specifying trading procedures to

11         be used in entering and executing orders traded

12         or posted on the registered crypto asset ex-

13         change.

14         "(3) CRYPTO ASSETS NOT READILY SUSCEP-

15     TIBLE TO MANIPULATION.—

16              "(A) IN GENERAL.—A registered crypto

17         asset exchange shall permit trading only in as-

18         sets that are not readily susceptible to manipu-

19         lation.

20              "(B) LISTING RESTRICTIONS.—A reg-

21         istered crypto asset exchange shall not permit

22         trading in a crypto asset or payment stablecoin

23         if it is reasonably likely that—

24                   "(i) the transaction history of the

25                   asset can be fraudulently altered by any

SIL23812 CHK                                                    S.L.C.

84

1        person or group of persons acting collec-

2        tively; or

3            "(ii) the functionality or operation of

4        the asset can be materially altered by any

5        person or group of persons under common

6        control.

7        "(C)  CONSIDERATIONS.—In assessing a

8    crypto asset or payment stablecoin under this

9    paragraph, a registered crypto asset exchange

10   shall consider—

11           "(i) the purpose and use of the asset;

12           "(ii) the creation or release process of

13       the asset;

14           "(iii) the consensus mechanism of the

15       asset;

16           "(iv) the governance structure of the

17       asset;

18           "(v) the participation and distribution

19       of the asset;

20           "(vi) the current and proposed

21       functionality of the asset;

22           "(vii) the legal classification of the

23       asset; and

24           "(viii) any other factor required by

25       the Commission.

1      ''(4) Treatment of customer assets.—

2          ''(A) Required standards and proce-

3      dures.—A registered crypto asset exchange

4      shall establish standards and procedures that

5      are designed to protect and ensure the safety of

6      customer money, assets, and property.

7          ''(B) Holding of customer assets.—

8              ''(i) In general.—A registered

9          crypto asset exchange shall hold customer

10         money, assets, and property in a manner

11         to minimize the customer's risk of loss of,

12         or unreasonable delay in the access to, the

13         money, assets, and property.

14             ''(ii) Segregation of funds.—

15                 ''(I) In general.—A registered

16             crypto asset exchange shall treat and

17             deal with all money, assets, and prop-

18             erty of any customer received as be-

19             longing to the customer.

20                 ''(II) Commingling prohib-

21             ited.—Money, assets, and property of

22             a customer described in subclause

23             (I)—

24                     ''(aa) shall be separately ac-

25                 counted for; and

86

1          "(bb) shall not be—

2               "(AA) commingled with

3          the funds of the registered

4          crypto asset exchange; or

5               "(BB) used to margin,

6          secure, or guarantee any

7          trades or accounts of any

8          customer or person other

9          than the person for whom

10         the money, assets, or prop-

11         erty are held.

12    "(iii) EXCEPTIONS.—

13         "(I) USE OF FUNDS.—

14              "(aa) IN  GENERAL.—Not-

15         withstanding clause (ii), money,

16         assets, and property of customers

17         of a registered crypto asset ex-

18         change may, for the purposes de-

19         scribed in item (bb), be commin-

20         gled and deposited with an entity

21         described in section 4d(i)(1)(B).

22              "(bb) WITHDRAWAL.—Not-

23         withstanding clause (ii), the

24         share of the money, assets, and

25         property described in item (aa)

 1          as in the normal course of busi-

 2          ness is necessary to margin,

 3          guarantee, secure, transfer, ad-

 4          just, or settle a crypto asset

 5          transaction with a registered en-

 6          tity may be withdrawn and ap-

 7          plied to those purposes, including

 8          the payment of commissions, bro-

 9          kerage, interest, taxes, storage,

10          and other charges, lawfully ac-

11          cruing in connection with the

12          crypto asset transaction.

13      ''(II) COMMISSION ACTION.—

14          Notwithstanding clause (ii), in accord-

15          ance with such terms and conditions

16          as the Commission may prescribe by

17          rule or order, any money, assets, or

18          property of the customers of a reg-

19          istered crypto asset exchange may be

20          commingled and deposited in cus-

21          tomer accounts with any other money,

22          assets, or property received by the

23          registered crypto asset exchange and

24          required by the Commission to be sep-

25          arately accounted for and treated and

SIL23812 CHK S.L.C.

88

1          dealt with as belonging to the cus-

2          tomer of the registered crypto asset

3          exchange.

4              "(C) PERMITTED INVESTMENTS.—Money

5      referred to in subparagraph (B)(ii)(I) may be

6      invested—

7              "(i) in—

8                  "(I) obligations of the United

9              States;

10                  "(II) general obligations of any

11              State or of any political subdivision of

12              a State that are investment-grade;

13                  "(III) obligations fully guaran-

14              teed as to principal and interest by

15              the United States; or

16                  "(IV) any other investment that

17              the Commission may by rule pre-

18              scribe; and

19              "(ii) in accordance with such rules

20          and subject to such conditions as the Com-

21          mission may prescribe.

22          "(D) MISUSE OF CUSTOMER PROPERTY.—

23      It shall be unlawful—

24              "(i) for any registered crypto asset ex-

25          change that has received any customer

89

money, assets, or property for custody to
dispose of, or use any of the money, assets,
or property as belonging to the registered
crypto asset exchange; or

"(ii) for any other person, including
any other registered crypto asset exchange
or custodian that has received any cus-
tomer money, assets, or property for de-
posit, to hold, dispose of, or use any of the
money, assets, or property as belonging
to—

"(I) the registered crypto asset
exchange that deposited the money,
assets, or property; or

"(II) any person other than the
customers of the registered crypto
asset exchange.

"(E) CUSTOMER RIGHT TO OPT OUT.—

"(i) IN GENERAL.—A customer shall
have the right to waive any requirement
under subparagraph (B) by affirmatively
electing, in writing to the registered crypto
asset exchange, to waive the requirement.

"(ii) LIMITATIONS.—The Commission
may, by rule, establish notice and disclo-

1    sure requirements, segregation require-
2    ments, investment limitations, and other
3    rules relating to the waiving of any re-
4    quirement under this paragraph that is
5    reasonably necessary to protect customers,
6    including eligible contract participants,
7    non-eligible contract participants, or any
8    other class of customers.

9   ''(5) MONITORING OF TRADING AND TRADE
10 PROCESSING.—

11    ''(A) IN GENERAL.—A registered crypto
12   asset exchange shall provide a competitive,
13   open, and efficient market and mechanism for
14   executing transactions that protects the price
15   discovery process of trading on the registered
16   crypto asset exchange.

17    ''(B) PROTECTION OF MARKETS AND MAR-
18   KET PARTICIPANTS.—A registered crypto asset
19   exchange shall establish and enforce compliance
20   with rules—

21     ''(i) to protect markets and market
22    participants from abusive practices com-
23    mitted by any party, including abusive
24    practices committed by a party acting as
25    an agent for a participant; and

SIL23812 CHK                                                    S.L.C.

91

1           "(ii) to promote fair and equitable

2           trading on the registered crypto asset ex-

3           change.

4           "(C) PROCEDURES AND MONITORING.—A

5       registered crypto asset exchange shall—

6           "(i) establish and enforce compliance

7           with rules or terms and conditions defin-

8           ing, or specifications detailing—

9               "(I) trading procedures to be

10              used in entering and executing orders

11              traded on or through the facilities of

12              the registered crypto asset exchange;

13              and

14              "(II) procedures for trade proc-

15              essing of crypto assets on or through

16              the facilities of the registered crypto

17              asset exchange; and

18          "(ii) monitor trading in crypto assets

19          to prevent manipulation, price distortion,

20          and disruptions of the delivery or cash set-

21          tlement process through surveillance, and

22          compliance, including methods for con-

23          ducting real-time monitoring of trading

24          and comprehensive and accurate trade re-

25          constructions.

92

1             ''(6) ABILITY TO OBTAIN INFORMATION.—A

2    registered crypto asset exchange shall—

3                  ''(A) establish and enforce rules that will

4          allow the registered crypto asset exchange to

5          obtain any necessary information to perform

6          any of the functions described in this section;

7                  ''(B) provide the information to the Com-

8          mission on request; and

9                  ''(C) have the capacity to carry out such

10         international information-sharing agreements as

11         the Commission may require.

12           ''(7) EMERGENCY AUTHORITY.—A registered

13    crypto asset exchange shall adopt rules to provide

14    for the exercise of emergency authority, in consulta-

15    tion or cooperation with the Commission or a reg-

16    istered entity, as is necessary and appropriate, in-

17    cluding the authority to facilitate the liquidation or

18    transfer of open positions in any crypto asset or to

19    suspend or curtail trading in a crypto asset.

20           ''(8) REPORTING REQUIREMENTS.—

21                  ''(A) IN GENERAL.—A registered crypto

22         asset exchange shall provide to the Commission

23         information that is determined by the Commis-

24         sion to be necessary to perform any responsi-

25         bility of the Commission under this Act.

93

1              "(B) TIMELY PUBLICATION OF TRADING

2          INFORMATION.—

3                  "(i) IN GENERAL.—

4                      "(I) PUBLICATION.—A registered

5                  crypto asset exchange shall make pub-

6                  lic timely information on price, trad-

7                  ing volume, and other trading data on

8                  crypto assets to the extent prescribed

9                  by the Commission.

10                     "(II) ACCESSIBILITY.—A   reg-

11                 istered  crypto  asset  exchange  may

12                 make trading data freely accessible to

13                 the public under rules established by

14                 the Commission.

15                 "(ii) CAPACITY OF CRYPTO ASSET EX-

16             CHANGE.—A  registered  crypto  asset  ex-

17             change shall be required to have the capac-

18             ity to electronically capture and transmit

19             trade information with respect to trans-

20             actions executed on the registered crypto

21             asset exchange.

22          "(9) RECORDKEEPING AND REPORTING.—

23              "(A) IN GENERAL.—A registered crypto

24          asset exchange shall—

94

1          "(i) maintain records of all activities

2     relating to the business of the registered

3     crypto asset exchange, including a com-

4     plete audit trail, in a form and manner ac-

5     ceptable to the Commission for a period of

6     5 years;

7          "(ii) report to the Commission, in a

8     form and manner acceptable to the Com-

9     mission, such information as the Commis-

10    sion determines to be necessary or appro-

11    priate for the Commission to perform the

12    duties of the Commission under this Act;

13    and

14         "(iii) keep any records relating to an-

15    cillary assets open to inspection and exam-

16    ination by the Securities and Exchange

17    Commission.

18    "(B) INFORMATION SHARING.—Subject to

19    section 8, and on request, the Commission shall

20    share information collected under subparagraph

21    (A) with—

22         "(i) a customer protection and market

23    integrity authority or other entity dele-

24    gated regulatory and disciplinary authority

25    by a governmental agency;

1          "(ii) the Securities and Exchange

2      Commission;

3              "(iii) an appropriate Federal banking

4      agency (as defined in section 3 of the Fed-

5      eral Deposit Insurance Act (12 U.S.C.

6      1813));

7              "(iv) a State bank supervisor (as de-

8      fined in that section);

9              "(v) a State securities or commodities

10      regulator;

11              "(vi) the Financial Stability Oversight

12      Council;

13              "(vii) the Department of Justice; and

14              "(viii) any other person that the Com-

15      mission determines to be appropriate, in-

16      cluding—

17                  "(I) foreign financial supervisors

18              (including foreign futures authorities);

19                  "(II) foreign central banks; and

20                  "(III) foreign ministries.

21          "(C) CONFIDENTIALITY AGREEMENT.—Be-

22      fore the Commission may share information

23      with any entity described in subparagraph (B),

24      the Commission shall enter into a written

25      agreement with each entity stating that the en-

96

1          tity shall abide by the confidentiality require-
2          ments described in section 8 relating to the in-
3          formation on crypto asset transactions that is
4          provided.

5              "(D) PROVIDING INFORMATION.—Each
6          registered crypto asset exchange shall provide
7          to the Commission (including any designee of
8          the Commission) information under subpara-
9          graph (A) in such form and at such frequency
10         as is required by the Commission.

11         "(10) ANTITRUST CONSIDERATIONS.—Unless
12    necessary or appropriate to achieve the purposes of
13    this Act, a registered crypto asset exchange shall
14    not—

15             "(A) adopt any rules or take any actions
16         that result in any unreasonable restraint of
17         trade; or

18             "(B) impose any material anticompetitive
19         burden on trading.

20         "(11) CONFLICTS OF INTEREST.—A registered
21    crypto asset exchange shall—

22             "(A) establish and enforce rules to mini-
23         mize conflicts of interest in the decisionmaking
24         process of the registered crypto asset exchange;

Case 3:23-cv-06003-WHO   Document 70-8   Filed 05/09/24   Page 98 of 275
SIL23812 CHK                                                         S.L.C.

97

1          ''(B) establish a process for resolving con-

2     flicts of interest described in subparagraph (A);

3     and

4          ''(C) disclose fee arrangements from affili-

5     ates and third-party service providers, and

6     crypto assets traded on the exchange in which

7     the exchange may have a financial interest.

8     ''(12) FINANCIAL RESOURCES.—

9          ''(A) IN GENERAL.—A registered crypto

10    asset exchange shall have adequate financial,

11    operational, and managerial resources, as deter-

12    mined by the Commission, to discharge each re-

13    sponsibility of the registered crypto asset ex-

14    change.

15         ''(B) MINIMUM AMOUNT OF FINANCIAL RE-

16    SOURCES.—A registered crypto asset exchange

17    shall possess financial resources that, at a min-

18    imum, exceed the total amount that would en-

19    able the registered crypto asset exchange to

20    conduct an orderly wind-down of the activities

21    of the registered crypto asset exchange.

22         ''(C) ADDITIONAL FINANCIAL RESOURCES

23    FOR LEVERAGE TRADING.—The Commission

24    may require such additional financial resources

25    as are necessary to enable a registered crypto

Case 3:23-cv-06003-WHO   Document 70-8   Filed 05/09/24   Page 99 of 275
SIL23812 CHK                                                    S.L.C.

98

 1     asset exchange that offers margined, leveraged,

 2     or financed transactions to fulfill the customer

 3     obligations of the registered crypto asset ex-

 4     change.

 5     "(13) GOVERNANCE FITNESS STANDARDS.—

 6          "(A) GOVERNANCE ARRANGEMENTS.—A

 7     registered crypto asset exchange shall—

 8               "(i) establish governance arrange-

 9          ments that are transparent to fulfill public

10          interest requirements; and

11               "(ii) at all times, maintain a chief

12          compliance officer and an appropriate com-

13          pliance and risk management function.

14          "(B) FITNESS STANDARDS.—A registered

15     crypto asset exchange shall establish and en-

16     force appropriate fitness standards for—

17               "(i) directors;

18               "(ii) any individual or entity with

19          legal or technological authority to execute

20          the settlement activities of the registered

21          crypto asset exchange;

22               "(iii) any individual or entity with di-

23          rect access to any custodian affiliated with

24          the registered crypto asset exchange;

1           "(iv) any entity offering affiliated
2       services for the registered crypto asset ex-
3       change; and
4           "(v) any party affiliated with any in-
5       dividual or entity described in clauses (i)
6       through (iv).
7       "(14) SYSTEM SAFEGUARDS.—A registered
8   crypto asset exchange shall—
9           "(A) establish and maintain a program of
10      risk analysis and oversight to identify and mini-
11      mize sources of operational and security risks,
12      through the development of appropriate controls
13      and procedures and automated systems that—
14          "(i) are reliable and secure; and
15          "(ii) have adequate scalable capacity;
16          "(B) establish and maintain emergency
17      procedures, backup facilities, and a plan for dis-
18      aster recovery that allow for—
19          "(i) the timely recovery and resump-
20      tion of operations; and
21          "(ii) the fulfillment of the responsibil-
22      ities and obligations of the registered
23      crypto asset exchange; and
24          "(C) periodically conduct tests to verify
25      that the backup resources of the registered

SIL23812 CHK                                                                S.L.C.

100

1      crypto asset exchange are sufficient to ensure

2      continued—

3              "(i) order processing and trade

4           matching;

5              "(ii) price reporting;

6              "(iii) market surveillance; and

7              "(iv) maintenance of a comprehensive

8           and accurate audit trail.

9      "(15) DECENTRALIZED CRYPTO ASSET EX-

10     CHANGES.—

11             "(A) IN GENERAL.—Prior to conducting

12         trading activity (including routing orders and

13         directed trading) through a decentralized crypto

14         asset exchange, or otherwise providing customer

15         access to a decentralized crypto asset exchange,

16         a crypto asset exchange shall implement risk

17         management standards with respect to its trad-

18         ing activity using that decentralized crypto

19         asset exchange.

20             "(B) REQUIREMENTS.—A crypto asset ex-

21         change shall—

22             "(i) implement an effective risk-based

23          procedure for determining whether to exe-

24          cute, reject, or suspend an incoming or

25          outgoing transaction relating to a decen-

101

1 tralized crypto asset exchange, including a

2 determination based on suspected money

3 laundering, sanctions evasion, fraud, or

4 market manipulation;

5 ''(ii) conduct an effective risk-based

6 analysis of the code of the decentralized

7 crypto asset exchange to determine wheth-

8 er crypto asset transactions can occur on

9 the exchange securely, consistently, and

10 immutably;

11 ''(iii) verify that the code for the de-

12 centralized crypto asset exchange is widely

13 available to the public;

14 ''(iv) verify that there are appropriate

15 developer documents relating to the decen-

16 tralized crypto asset exchange that appro-

17 priately disclose all risks of the software;

18 ''(v) conduct an effective risk analysis

19 with respect to the decentralized crypto

20 asset exchange, including—

21 ''(I) money laundering and sanc-

22 tions evasion;

23 ''(II) settlement;

24 ''(III) fraud and market manipu-

25 lation; and

SIL23812 CHK                                                          S.L.C.

102

1          "(IV) operational and cybersecu-

2      rity risk, including—

3              "(aa) the use of multi-signa-

4          ture wallets;

5              "(bb) integration with third-

6          party software or vendors;

7              "(cc) any material efforts to

8          alter the functionality of the pro-

9          tocol; and

10             "(dd) all other material

11         risks;

12        "(vi) implement robust policies and

13     procedures to mitigate the risks identified

14     under clause (v);

15        "(vii) disclose the risks identified

16     under clause (v) using plain language to

17     customers;

18        "(viii) maintain robust capability to

19     detect market manipulation, fraud, money

20     laundering, and sanctions evasion occur-

21     ring on the decentralized crypto asset ex-

22     change, including through the use of alter-

23     native tools that will properly target those

24     risks, including through distributed ledger

25     intelligence companies;

103

1              ''(ix) ensure that the merchant is not
2          trading with a decentralized crypto asset
3          exchange on a principal basis, but solely on
4          an agency basis at the request of a cus-
5          tomer; and
6              ''(x) consistent with this subsection,
7          implement other standards which may be
8          required by the Commission by rule.
9      ''(e) RISK MANAGEMENT STANDARDS FOR SELF-
10  HOSTED WALLETS.—
11         ''(1) IN GENERAL.—The Commission shall
12     adopt risk management standards relating to money
13     laundering, customer identification, and sanctions
14     for self-hosted wallets that conduct transactions with
15     a registered crypto asset exchange, which shall be
16     consistent with standards under section 4d(k).
17         ''(2) DEFINITION OF SELF-HOSTED WALLET.—
18     In this subsection, the term 'self-hosted wallet'
19     means a digital interface used to secure and transfer
20     crypto assets, in which the owner of the assets re-
21     tains independent control in a manner that is se-
22     cured by that interface.
23     ''(f) APPOINTMENT OF TRUSTEE.—
24         ''(1) IN GENERAL.—If a proceeding under sec-
25     tion 5e results in the suspension or revocation of the

SIL23812 CHK                                                    S.L.C.

104

1    registration of a crypto asset exchange, or if a

2    crypto asset exchange withdraws from registration,

3    the Commission, after providing notice to the crypto

4    asset exchange, may apply to the district court of

5    the United States for the judicial district in which

6    the crypto asset exchange is located for the appoint-

7    ment of a trustee.

8        ''(2) ASSUMPTION OF JURISDICTION.—If the

9    Commission applies to a court for appointment of a

10   trustee under paragraph (1)—

11           ''(A) the court may take exclusive jurisdic-

12       tion over—

13               ''(i) the crypto asset exchange; and

14               ''(ii) the records and assets of the

15           crypto asset exchange, wherever those

16           records and assets are located; and

17           ''(B) if the court takes jurisdiction under

18       subparagraph (A), the court shall appoint the

19       Commission, or a person designated by the

20       Commission, as trustee with power to take pos-

21       session and continue to operate or terminate

22       the operations of the crypto asset exchange in

23       an orderly manner for the protection of cus-

24       tomers, subject to such terms and conditions as

25       the court may prescribe.

105

1    "(g) CUSTODIAN.—A registered crypto asset ex-
2  change shall deposit with an entity described in section
3  4d(i)(1)(B) each crypto asset that is—

4        "(1) the property of a customer of the reg-
5    istered crypto asset exchange;

6        "(2) required to be held by the registered
7    crypto asset exchange under subsection (c)(3) or
8    (d)(12); or

9        "(3) otherwise required by the Commission to
10   be so held to reasonably protect customers or pro-
11   mote the public interest.

12   "(h) CHANGE IN CONTROL.—

13       "(1) IN GENERAL.—No person, acting directly
14   or indirectly, or through or in concert with 1 or
15   more persons, shall acquire control of a crypto asset
16   exchange unless—

17           "(A) the person has provided to the Com-
18       mission prior notice of the proposed acquisition;
19       and

20           "(B) the Commission has not disapproved
21       the acquisition during the 60-day period begin-
22       ning on the date of the notice under subpara-
23       graph (A).

24       "(2) VOTING SECURITIES.—No person who has
25   been approved to acquire control of a crypto asset

SIL23812 CHK                                                S.L.C.

106

1    exchange and who has maintained that control shall
2    acquire, directly or indirectly, or through or in con-
3    cert with 1 or more persons, voting securities of the
4    exchange if the ownership, control, or power to vote
5    of that person will increase from less than 25 per-
6    cent to 25 percent or more of any class of voting se-
7    curities of the exchange unless—

8        ''(A) the person has provided to the Com-
9        mission prior notice of the proposed acquisition;
10       and

11       ''(B) the Commission has not disapproved
12       the acquisition during the 60-day period begin-
13       ning on the date of the notice under subpara-
14       graph (A).

15       ''(3) INFORMATION.—The Commission may, by
16   rule, specify information relating to a proposed ac-
17   quisition described in paragraph (1) or (2), which
18   shall be submitted with an application.

19       ''(4) PUBLIC NOTICE.—As specified by the
20   Commission, public notice of a proposed acquisition
21   described in paragraph (1) or (2) shall be given at
22   the time an application is filed.

23       ''(5) APPROVAL.—The Commission shall ap-
24   prove a proposed acquisition described in paragraph

SIL23812 CHK                                                    S.L.C.

107

1   (1) or (2) unless, by order, it finds either of the fol-

2   lowing:

3        ''(A) The proposed acquisition would pose

4        an unacceptable risk to customers or to the op-

5        eration of the exchange.

6        ''(B) The proposed acquisition would oth-

7        erwise violate Federal law.

8        ''(6) DEFINITION OF CONTROL.—In this sub-

9        section, the term 'control' means the power, directly

10       or indirectly, to direct the management or policies of

11       a crypto asset exchange, to vote 25 percent or more

12       of any class of voting securities of the exchange or

13       control in any manner the election of a majority of

14       the directors of the exchange, as may be provided by

15       rule.

16   ''(i) JURISDICTION.—Except as otherwise provided by

17   Federal law, the Commission shall have exclusive jurisdic-

18   tion over the regulation, supervision, and all other activi-

19   ties of a registered crypto asset exchange.

20   ''(j) IMPLEMENTATION.—The Commission shall pre-

21   scribe rules to implement this section.''.

22   (b) CERTAIN CRYPTO ASSET EXCHANGE FUNCTIONS

23   NOT SUFFICIENT TO TRIGGER REQUIREMENT TO REG-

24   ISTER AS FUTURES COMMISSION MERCHANT.—Section

108

1  4f(c) of the Commodity Exchange Act (7 U.S.C. 6f(c))

2  is amended by adding at the end the following:

3      "(12) CLARIFICATION OF SCOPE OF REGISTRATION

4  REQUIREMENT.—A registered crypto asset exchange shall

5  not be required to register as a futures commission mer-

6  chant for any activity for which the registered crypto asset

7  exchange is regulated under section 5i.".

8  **SEC. 405. SUPERVISION OF AFFILIATES.**

9      (a) IN GENERAL.—The Commodity Exchange Act (7

10  U.S.C. 1 et seq.) (as amended by section 404(a))is amend-

11  ed by inserting after section 5i the following:

12  **"SEC. 5j. COMMISSION SUPERVISION OF CRYPTO ASSET AF-**

13              **FILIATES.**

14      "(a) DEFINITION OF COVERED AFFILIATE.—In this

15  section, 'covered affiliate' means, based on the totality of

16  the facts and circumstances as determined by the Commis-

17  sion, a person with a substantial legal or financial relation-

18  ship to an entity registered under this Act that is pri-

19  marily engaged in crypto asset activities, based on the fol-

20  lowing factors:

21          "(1) The degree to which conflicts of interest

22      may be present, or the financial interests of the enti-

23      ty may come into conflict with the fiduciary duty of

24      the entity to customers or the prudent operation of

25      the entity.

SIL23812 CHK                                                   S.L.C.

109

1          "(2) The legal relationship between the entity

2     and the affiliate.

3          "(3) The overall financing requirements of the

4     entity and the affiliate, and the degree, if any, to

5     which the entity and the affiliate are financially de-

6     pendent on each other.

7          "(4) The degree, if any, to which the entity or

8     its customers rely on the affiliate for operational

9     support or services in connection with the business

10    of the entity.

11         "(5) The level of market, credit, or other risk

12    present in the activities of the affiliate.

13         "(6) The extent to which the affiliate has the

14    authority or the ability to cause a withdrawal of cap-

15    ital from the entity.

16         "(7) Any other factor determined by the Com-

17    mission by rule to be material.

18   "(b) COMMISSION DESIGNATION OF COVERED AF-

19   FILIATES.—

20         "(1) IN GENERAL.—In consultation with an en-

21    tity registered under this Act, not later than 1 year

22    after the date of enactment of this section, and not

23    less frequently than 90 days before the examination

24    of an entity by the Commission or a customer pro-

25    tection and market integrity authority registered

110

1 under section 9809 of title 31, United States Code,
2 the Commission shall designate the covered affiliates
3 of the entity.

4     "(2) REQUIREMENT.—Each covered affiliate of
5 the entity shall be required to provide to the Com-
6 mission, by not later than the date on which an ex-
7 amination of the entity by the Commission or a cus-
8 tomer protection and market integrity authority reg-
9 istered under section 9809 of title 31, United States
10 Code, begins, the following:

11         "(A) A description of all activities the affil-
12     iate is engaged with relating to the entity.

13         "(B) The most recent audited financial
14     statements of the affiliate.

15         "(C) All legal agreements entered into be-
16     tween the affiliate and the entity.

17         "(D) A description of all transactions be-
18     tween the affiliate and the entity since the last
19     examination.

20         "(E) Any other information that may be
21     determined to be material by the Commission.

22 "(c) REMEDIAL MEASURES.—If the Commission
23 finds that it is in the public interest and has good cause
24 to believe it is necessary to protect the customers of an

SIL23812 CHK                                                          S.L.C.

111

1 entity registered under this Act that is primarily engaged

2 in crypto asset activities, the Commission may, by order—

3        ''(1) conduct an examination of a covered affil-

4     iate;

5        ''(2) require a person with control of an entity

6     to divest or sever their relationship with the entity;

7        ''(3) limit covered affiliates from providing serv-

8     ices to an entity or entering into legal relationships

9     or specified transactions with an entity.

10 ''(d) RULES.—Not later than 18 months after the

11 date of enactment of this section, the Commission shall

12 issue rules to implement this section.''.

**SEC. 406. VIOLATIONS.**

14 Section 9 of the Commodity Exchange Act (7 U.S.C.

15 13) is amended—

16        (1) in subsection (a)(2), by striking ''subsection

17     4c'' and inserting ''section 4c''; and

18        (2) in subsection (e)—

19           (A) in paragraph (1), by inserting ''con-

20        tracts for the sale of crypto assets,'' after ''op-

21        tions thereon,''; and

22           (B) in paragraph (2), by inserting ''or con-

23        tracts for the sale of crypto assets'' after ''op-

24        tions thereon''.

112

1    **SEC. 407. MARKET REPORTS.**

2        Section 16(a) of the Commodity Exchange Act (7

3    U.S.C. 20(a)) is amended—

4            (1) in the first sentence, by striking "which are

5        the subject of futures contracts," and inserting

6        "under the jurisdiction of the Commission,"; and

7            (2) in the second sentence, by striking "futures

8        markets." and inserting "markets under the juris-

9        diction of the Commission.".

10   **SEC. 408. BANKRUPTCY TREATMENT OF CRYPTO ASSETS.**

11       (a) IN GENERAL.—Section 20(a) of the Commodity

12   Exchange Act (7 U.S.C. 24(a)) is amended in paragraphs

13   (1) and (2) by inserting "crypto assets, payment

14   stablecoins," after "securities," each place it appears.

15       (b) COMMODITY BROKER DEFINITION.—Section

16   101(6) of title 11, United States Code, is amended by in-

17   serting "registered crypto asset exchange, as defined in

18   section 1a of the Commodity Exchange Act," before "for-

19   eign".

20       (c) COMMODITIES CONTRACTS.—Section 556 of title

21   11, United States Code, is amended by inserting "a reg-

22   istered crypto asset exchange, as defined in section 1a of

23   the Commodity Exchange Act," before "a contract".

24       (d) CONTRACTUAL RIGHTS.—Section 561 of title 11,

25   United States Code, is amended by inserting ", a reg-

26   istered crypto asset exchange, as defined in section 1a of

113

1 the Commodity Exchange Act," after "designated under

2 the Commodity Exchange Act" each place it appears.

3    (e) DEFINITIONS.—Section 761 of title 11, United

4 States Code, is amended—

5        (1) in paragraph (4)—

6            (A) in subparagraph (A), by inserting

7        "crypto asset, payment stablecoin, or a" before

8        "commodity";

9            (B) in subparagraph (I), by striking "or"

10       at the end;

11           (C) in subparagraph (J), by adding "or"

12       at the end; and

13           (D) by adding at the end the following:

14       "(K) a contract for the sale of a crypto

15       asset or payment stablecoin by a registered

16       crypto asset exchange;"; and

17       (2) in paragraph (10)—

18           (A) in the matter preceding subparagraph

19       (A)—

20               (i) by inserting "a crypto asset, pay-

21           ment stablecoin," after "a security,"; and

22               (ii) by inserting "crypto asset, pay-

23           ment stablecoin," after "cash, security,";

24           (B) in subparagraph (A)—

114

1     (i) in clause (vi), by inserting ''a

2   crypto asset, payment stablecoin'' after ''a

3   security,''; and

4     (ii) in clause (vii)—

5       (I) by inserting ''payment

6     stablecoin or a crypto asset'' before

7     ''held as property'';

8       (II) by inserting ''payment

9     stablecoin or crypto asset'' after ''such

10     security''; and

11       (III) by inserting ''payment

12     stablecoin or crypto asset'' after

13     ''based on a security''; and

14   (C) in subparagraph (B)—

15     (i) by striking ''not including prop-

16   erty'' and inserting ''not including—

17     ''(i) property'';

18     (ii) in clause (i), as so designated, by

19   adding ''and'' at the end; and

20     (iii) by adding at the end the fol-

21   lowing:

22     ''(ii) money, assets, or property with

23   respect to which any requirement under

24   subsection (i) of section 4d of the Com-

25   modity Exchange Act (7 U.S.C. 6d) is

SIL23812 CHK                                                            S.L.C.

115

1          waived pursuant to paragraph (3) of that
2          subsection, or any requirement under sub-
3          paragraph (B) of paragraph (4) of section
4          5i(d) of that Act is waived pursuant to
5          subparagraph (E) of that paragraph;".

6     (f) VOIDABLE TRANSFERS.—Section 764(b)(1) of
7  title 11, United States Code, is amended by inserting ",
8  crypto assets" before ", or other property".

9     (g) TREATMENT OF CUSTOMER PROPERTY.—Section
10  766 of title 11, United States Code, is amended—

11          (1) in subsection (b)(1), by striking "physical
12       commodity underlying" and inserting "commodity
13       underlying";

14          (2) in subsection (c), by inserting "crypto asset,
15       payment stablecoin" before "or commodity contract"
16       each place the term appears;

17          (3) in subsection (d), by inserting "crypto asset,
18       payment stablecoin" before "or commodity contract"
19       each place the term appears;

20          (4) in subsection (f)—

21               (A) in striking "and other property" and
22            inserting "crypto assets, payment stablecoins
23            and other property"; and

116

1          (B) by striking "or property" and insert-

2      ing ", crypto assets, payment stablecoins or

3      property";

4          (5) in subsection (g), by striking "security or

5      property" and inserting "security, crypto asset, pay-

6      ment stablecoin or property"; and

7          (6) in subsection (h)(2), by inserting "crypto

8      assets, payment stablecoins," after "customer securi-

9      ties,".

**SEC. 409. IDENTIFIED BANKING PRODUCTS.**

11     Section 206(a) of the Gramm-Leach-Bliley Act (15

12 U.S.C. 78c note) is amended—

13         (1) in paragraph (5)(B)(ii), by striking "or" at

14     the end;

15         (2) in paragraph (6), by striking the period at

16     the end and inserting "; or"; and

17         (3) by adding at the end the following:

18         "(7) a payment stablecoin issued by a deposi-

19     tory institution under section 722A, except as pro-

20     vided under section 2(c)(2)(F) of the Commodity

21     Exchange Act (7 U.S.C. 2(c)(2)(F)).".

**SEC. 410. FINANCIAL INSTITUTIONS DEFINITION.**

23     Section 5312(c)(1) of title 31, United States Code,

24 is amended by adding at the end the following:

117

1         "(B) A registered crypto asset exchange,

2     as defined in section 1a of the Commodity Ex-

3     change Act.".

4  **SEC. 411. OFFSETTING THE COSTS OF CRYPTO ASSET REG-**

5         **ULATION.**

6     The Commodity Exchange Act (7 U.S.C. 1 et seq.)

7  is amended by adding at the end the following:

8  **"SEC. 24. OFFSETTING THE COSTS OF CRYPTO ASSET REG-**

9         **ULATION.**

10    "(a) RECOVERY OF CERTAIN COSTS OF ANNUAL AP-

11  PROPRIATION.—

12        "(1) IN GENERAL.—Effective beginning Octo-

13    ber 1, 2024, the Commission may, by rule, collect

14    fees—

15            "(A) to fund expenses relating to regula-

16        tion of crypto asset cash and spot markets; and

17            "(B) that are designed to recover the costs

18        to the Federal Government of the annual ap-

19        propriation to the Commission by Congress.

20        "(2) REGISTERED ENTITIES.—Fees under

21    paragraph (1) shall only be imposed—

22            "(A) on registered entities engaged in cash

23        or spot crypto asset activities; and

24            "(B) in relation to the regulation of those

25        activities under this Act.

SIL23812 CHK                                                    S.L.C.

118

1          "(3) FEE RATES.—Fees under paragraph (1)

2     shall—

3               "(A) be strictly related to the cost to the

4          Commission of the regulation of crypto asset

5          cash and spot markets;

6               "(B) be reduced for newly registered enti-

7          ties with less than $100,000,000 in daily trad-

8          ing volume; and

9               "(C)(i) minimize negative impacts on mar-

10         ket liquidity; and

11              "(ii) maintain the efficiency, competitive-

12         ness, and financial integrity of crypto asset

13         markets.

14         "(4) COLLECTION OF FEES.—The Commission

15    shall collect fees under this subsection in such man-

16    ner and within such time as may be specified by the

17    Commission by rule.

18    "(b) FEE RATE ORDERS.—

19         "(1) IN GENERAL.—Not later than 60 days

20    after the date on which a law providing a regular

21    appropriation to the Commission for a fiscal year is

22    enacted, the Commission shall adopt an order set-

23    ting rates for fees to be collected under subsection

24    (a) for that fiscal year.

1       ''(2) PUBLICATION.—The Commission shall

2     publish in the Federal Register the order adopted

3     under paragraph (1), including—

4        ''(A) projections on which the fees are

5       based; and

6        ''(B) an explanation of the method used

7       for calculating applicable fee rates.

8   ''(c) DEPOSIT OF FEES.—

9     ''(1) OFFSETTING COLLECTIONS.—Fees col-

10   lected under subsection (a) for any fiscal year—

11       ''(A) shall be deposited and credited as off-

12     setting collections to the account providing ap-

13     propriations to the Commission; and

14       ''(B) shall not be collected or available for

15     obligation for any fiscal year except to the ex-

16     tent provided in advance in appropriation Acts.

17     ''(2) GENERAL REVENUES PROHIBITED.—No

18   fees collected under subsection (a) shall be deposited

19   and credited as general revenue of the Treasury.

20   ''(d) LAPSE OF APPROPRIATIONS.—If a regular ap-

21 propriation to the Commission has not been enacted on

22 the first day of a fiscal year, the Commission shall con-

23 tinue to collect fees under this section at the rates in effect

24 on September 30 of the preceding fiscal year.

25   ''(e) LIMITATIONS.—

1        ''(1) LEVERAGED, MARGINED, OR FINANCED
2    TRANSACTIONS.—Nothing in this section authorizes
3    the imposition of fees on a registered entity relating
4    to leveraged, margined, or financed transactions
5    under this Act, including those activities relating to
6    crypto assets.

7        ''(2) OTHER APPROPRIATIONS.—Notwith-
8    standing any other provision of law, the Commission
9    may use appropriations otherwise made available by
10    law to fund expenses relating to the regulation of
11    crypto asset cash and spot markets.

12    ''(f) CEILING ON FEES.—Unless otherwise provided
13    by law, fees collected under this section shall not exceed
14    $30,000,000.

15    ''(g) AUTHORIZATION REQUIRED.—The authority
16    under this section to impose and collect fees shall only be
17    in effect during a period that a legislative authorization
18    of the Commission is in effect, as otherwise provided by
19    law.''.

# TITLE V—RESPONSIBLE SECURITIES REGULATION

**SEC. 501. SECURITIES OFFERINGS INVOLVING CERTAIN IN-TANGIBLE ASSETS.**

Title I of the Securities Exchange Act of 1934 (15 U.S.C. 78a et seq.) is amended by adding at the end the following:

**"SEC. 42. SECURITIES OFFERINGS INVOLVING CERTAIN IN-TANGIBLE ASSETS.**

"(a) DEFINITIONS.—In this section:

"(1) ANCILLARY ASSET.—

"(A) IN GENERAL.—The term 'ancillary asset' means an intangible, fungible asset that is offered, sold, or otherwise provided to a person in connection with the purchase and sale of a security through an arrangement or scheme that constitutes an investment contract, as that term is used in section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)).

"(B) EXCLUSION.—The term 'ancillary asset' does not include an asset that provides the holder of the asset with any of the following rights in a business entity:

"(i) A debt or equity interest in that entity.

SIL23812 CHK                                                    S.L.C.

122

1    "(ii) Liquidation rights with respect

2   to that entity.

3    "(iii) An entitlement to an interest or

4   dividend payment from that entity.

5    "(iv) Any other financial interest in

6   that entity.

7  "(2) BUSINESS ENTITY.—The term 'business

8 entity' means—

9   "(A) a corporation, limited liability com-

10   pany, or other entity that is created by filing a

11   document with the Secretary of State of a State

12   (or a similar office); or

13   "(B) a foreign entity that is eligible for

14   registration, or that is registered to do busi-

15   ness, under the laws of a State or Indian Tribe.

16  "(3) FOREIGN PRIVATE ISSUER.—The term

17 'foreign private issuer' means a foreign issuer, other

18 than a foreign government, except that the term

19 does not include a foreign issuer that, as of the last

20 business day of the most recently completed fiscal

21 quarter of the issuer, satisfies the following condi-

22 tions:

23   "(A) More than 50 percent of the out-

24   standing voting securities of the issuer are di-

123

1 rectly or indirectly owned by residents of the
2 United States.

3        "(B) Any of the following:

4              "(i) The majority of the executive offi-
5        cers or directors of the issuer are citizens
6        or residents of the United States.

7              "(ii) More than 50 percent of the as-
8        sets of the issuer are located in the United
9        States.

10             "(iii) The business of the issuer is
11        principally administered in the United
12        States.

13 "(b) DISCLOSURE REQUIREMENTS.—

14       "(1) INITIAL COMPLIANCE WITH SPECIFIED
15 PERIODIC DISCLOSURE REQUIREMENTS.—Subject to
16 paragraphs (4) and (5), an issuer engaged in busi-
17 ness in or affecting interstate commerce, or that is
18 organized outside of the United States and is not a
19 foreign private issuer, that offers, sells, or otherwise
20 provides a security through an arrangement or
21 scheme that constitutes an investment contract, as
22 that term is used in section 2(a)(1) of the Securities
23 Act of 1933 (15 U.S.C. 77b(a)(1)), and that pro-
24 vides or proposes to provide any holder of the secu-
25 rity with an ancillary asset, shall be subject to the

SIL23812 CHK                                                        S.L.C.

124

1    periodic disclosure requirements under subsection (c)

2    for the 1-year period beginning on the date that is

3    180 days after the first date on which the security

4    is offered, sold, or otherwise provided by the issuer,

5    if—

6           ''(A) the average daily aggregate value of

7    all ancillary assets offered, sold, or otherwise

8    provided by the issuer in relation to the offer,

9    sale, or provision of the security in all spot

10   markets open to the public in the United States

11   (based on the knowledge of the issuer after due

12   inquiry) is greater than $5,000,000 for the

13   180-day period immediately succeeding the date

14   of that first offer, sale, or provision; and

15          ''(B) during the 180-day period described

16   in subparagraph (A), the issuer, or any person

17   owning not less than 10 percent of any class of

18   equity securities of the issuer, engaged in entre-

19   preneurial or managerial efforts that primarily

20   determined the value of the ancillary asset.

21       ''(2) ONGOING COMPLIANCE WITH SPECIFIED

22   PERIODIC DISCLOSURE REQUIREMENTS.—Subject to

23   paragraphs (4) and (5), an issuer that is engaged in

24   business in or affecting interstate commerce, or that

25   is organized outside of the United States and is not

125

1    a foreign private issuer, that offers, sells, or other-

2    wise provides a security through an arrangement or

3    scheme that constitutes an investment contract, as

4    that term is used in section 2(a)(1) of the Securities

5    Act of 1933 (15 U.S.C. 77b(a)(1)), and that pro-

6    vides the holder of the security with an ancillary

7    asset in connection with the acquisition of the secu-

8    rity, shall be subject to the periodic disclosure re-

9    quirements under subsection (c) for a given fiscal

10   year of that issuer, if, in the immediately preceding

11   fiscal year of the issuer (or any portion thereof)—

12        "(A) the average daily aggregate value of

13        all trading in the ancillary asset in all spot mar-

14        kets open to the public in the United States

15        was greater than $5,000,000, based on the

16        knowledge of the issuer after due inquiry; and

17        "(B) the issuer, or any person owning not

18        less than 10 percent of any class of equity secu-

19        rities of the issuer, engaged in entrepreneurial

20        or managerial efforts that primarily determined

21        the value of the ancillary asset.

22        "(3) TRANSITION RULE.—Subject to para-

23   graphs (4) and (5), an issuer that is engaged in

24   business in or affecting interstate commerce, or that

25   is organized outside of the United States and is not

SIL23812 CHK                                                    S.L.C.

126

1    a foreign private issuer, that offers, sells, or other-

2    wise provides a security through an arrangement or

3    scheme that constitutes an investment contract, as

4    that term is used in section 2(a)(1) of the Securities

5    Act of 1933 (15 U.S.C. 77b(a)(1)), and that pro-

6    vides the holder of the security with an ancillary

7    asset before January 1, 2025, in connection with the

8    acquisition of the security shall be subject to the

9    periodic disclosure requirements under subsection (c)

10   beginning in the first fiscal year of the issuer that

11   begins on or after that date, if, in the immediately

12   preceding fiscal year of the issuer—

13        ''(A) the average daily aggregate value of

14        trading in the ancillary asset in all spot mar-

15        kets open to the public for which trading vol-

16        ume is generally available was greater than

17        $5,000,000, based on the knowledge of the

18        issuer after due inquiry; and

19        ''(B) the issuer, or any person owning not

20        less than 10 percent of any class of equity secu-

21        rities of the issuer, engaged in entrepreneurial

22        or managerial efforts that primarily determined

23        the value of the ancillary asset.

24   ''(4) TREATMENT OF ANCILLARY ASSETS.—

1          ''(A) IN GENERAL.—Notwithstanding any

2     other provision of law, if an issuer issues a se-

3     curity through an arrangement or scheme that

4     constitutes an investment contract, as that term

5     is used in section 2(a)(1) of the Securities Act

6     of 1933 (15 U.S.C. 77b(a)(1)), is subject to

7     paragraph (1), (2), or (3), and has complied

8     with the periodic disclosure requirements under

9     subsection (c), to the extent applicable, an an-

10    cillary asset owned by the issuer, or any person

11    affiliated with the issuer, shall be presumed—

12          ''(i) to be a commodity, consistent

13       with section 2(c)(2)(F) of the Commodity

14       Exchange Act (7 U.S.C. 2(c)(2)(F)); and

15          ''(ii) not to be a security under—

16             ''(I) section 3(a);

17             ''(II) such section 2(a)(1);

18             ''(III) section 2(a) of the Invest-

19          ment Company Act of 1940 (15

20          U.S.C. 80a–2(a));

21             ''(IV) section 202(a) of the In-

22          vestment Advisers Act of 1940 (15

23          U.S.C. 80b–2(a)); or

24             ''(V) any applicable provision of

25          State law.

128

1          "(B) OTHER PERSONS.—A person who is

2      not an issuer, an entity controlled by an issuer

3      (including a person that acquires an ancillary

4      asset from such an issuer for the purpose of re-

5      sale or distribution of the ancillary asset), or a

6      person acting at the direction or on the behalf

7      of an issuer shall be not required to treat an

8      ancillary asset provided by, or on behalf of, an

9      issuer as a security under this Act or any provi-

10     sion of law described in subparagraph (A)(ii).

11          "(C) EXCEPTION.—

12          "(i) IN GENERAL.—Subparagraph (A)

13      shall not apply to an ancillary asset if the

14      United States Court of Appeals for the

15      District of Columbia Circuit, after an ap-

16      propriate proceeding, issues an order find-

17      ing by clear and convincing evidence that

18      the ancillary asset meets not less than 1 of

19      the bases for exclusion under subsection

20      (a)(1)(B).

21          "(ii) RULES OF CONSTRUCTION.—

22      Nothing in this subparagraph shall be con-

23      strued to preclude the Commission from

24      entering into a settlement agreement relat-

25      ing to violations or alleged violations of

129

1          this section. Compliance under this section

2          shall not be used in any administrative or

3          judicial proceeding as evidence that an an-

4          cillary asset is a security.

5      "(5) CALCULATION.—For the purposes of para-

6      graphs (1), (2), and (3), the calculation of daily ag-

7      gregate value shall be based on data disclosed by

8      spot markets or otherwise available to the public for

9      inspection.

10      "(c) SPECIFIED PERIODIC DISCLOSURE REQUIRE-

11      MENTS.—If an issuer is subject to paragraph (1), (2), or

12      (3) of subsection (b), the issuer shall file, or cause the

13      relevant affiliate to file, with the Commission, on a semi-

14      annual basis, information that the Commission may, by

15      rule, require relating to the issuer and any relevant ancil-

16      lary asset, as necessary or appropriate in the public inter-

17      est or for the protection of investors, which shall be exclu-

18      sively comprised of the following:

19          "(1) Basic corporate information regarding the

20          issuer, including the following:

21              "(A) The experience of the issuer in devel-

22              oping assets similar to the ancillary asset.

23              "(B) If the issuer has previously provided

24              ancillary assets to purchasers of securities, in-

25              formation on the subsequent history of those

SIL23812 CHK                                                    S.L.C.

130

1   previously provided ancillary assets, including

2   price history, if the information is publicly

3   available.

4       ''(C) The activities that the issuer has

5   taken in the relevant disclosure period, and is

6   projecting to take in the 1-year period following

7   the submission of the disclosure, with respect to

8   promoting the use, value, or resale of the ancil-

9   lary asset (including any activity to facilitate

10  the creation or maintenance of a trading mar-

11  ket for the ancillary asset and any network or

12  system that utilizes the ancillary asset).

13      ''(D) The anticipated cost of the activities

14  of the issuer in subparagraph (C) and whether

15  the issuer has unencumbered, liquid funds equal

16  to that amount.

17      ''(E) To the extent the ancillary asset in-

18  volves the use of a particular technology, the

19  experience of the issuer with the use of that

20  technology.

21      ''(F) The backgrounds of the board of di-

22  rectors (or equivalent body), senior manage-

23  ment, and key employees of the issuer, the ex-

24  perience or functions of whom are material to

25  the value of the ancillary asset, as well as any

131

1    personnel changes relating to the issuer during

2    the period covered by the disclosure.

3        ''(G) A description of the assets and liabil-

4    ities of the issuer, to the extent material to the

5    value of the ancillary asset.

6        ''(H) A description of any legal pro-

7    ceedings in which the issuer is engaged (includ-

8    ing inquiries by governmental agencies into the

9    activities of the issuer), to the extent material

10   to the value of the ancillary asset.

11       ''(I) Risk factors relating to the impact of

12   the issuer on, or unique knowledge relating to,

13   the value of the ancillary asset.

14       ''(J) Information relating to ownership of

15   the ancillary asset by—

16           ''(i) persons owning not less than 10

17       percent of any class of equity security of

18       the issuer; and

19           ''(ii) the management of the issuer.

20       ''(K) Information relating to transactions

21   involving the ancillary asset by the issuer with

22   related persons, promoters, and control persons.

23       ''(L) Recent sales or similar dispositions of

24   ancillary assets by the issuer and affiliates of

25   the issuer.

132

1         ''(M) Purchases or similar dispositions of

2     ancillary assets by the issuer and affiliates of

3     the issuer.

4         ''(N) A going concern statement from the

5     chief financial officer of the issuer or equivalent

6     official, signed under penalty of perjury, stating

7     whether the issuer maintains the financial re-

8     sources to continue business as a going concern

9     for the 1-year period following the submission

10     of the disclosure, absent a material change in

11     circumstances.

12     ''(2) Information relating to the ancillary asset,

13 including the following:

14         ''(A) A general description of the ancillary

15     asset, including the standard unit of measure

16     with respect to the ancillary asset, the intended

17     or known functionality and uses of the ancillary

18     asset, the market for the ancillary asset, other

19     assets or services that may compete with the

20     ancillary asset, and the total supply of the an-

21     cillary asset or the manner and rate of the on-

22     going production or creation of the ancillary

23     asset.

24         ''(B) If ancillary assets have been offered,

25     sold, or otherwise provided by the issuer to in-

133

1   vestors, intermediaries, or resellers, a descrip-
2   tion of the amount of assets offered, sold, or
3   provided, the terms of each such transaction,
4   and any contractual or other restrictions on the
5   resale of the assets by intermediaries.

6       "(C) If ancillary assets were distributed
7   without charge, a description of each distribu-
8   tion, including the identity of any recipient that
9   received more than 5 percent of the total
10  amount of the ancillary assets in any such dis-
11  tribution.

12      "(D) The amount of ancillary assets owned
13  by the issuer.

14      "(E) For the 1-year period following the
15  submission of the disclosure, a description of
16  the plans of the issuer to support (or to cease
17  supporting) the use or development of the ancil-
18  lary asset, including markets for the ancillary
19  asset and each platform or system that uses the
20  ancillary asset.

21      "(F) Each third party not affiliated with
22  the issuer, the activities of which may have a
23  material impact on the value of the ancillary
24  asset.

134

1          ''(G) Risk factors known to the issuer that

2     may limit demand for, or interest in, the ancil-

3     lary asset.

4          ''(H) The names and locations of the mar-

5     kets in which the ancillary asset is known by

6     the issuer to be available for sale or purchase.

7          ''(I) To the extent available to the issuer,

8     the average daily price for a constant unit of

9     value of the ancillary asset during the relevant

10     reporting period, as well as the 12-month high

11     and low prices for the ancillary asset.

12          ''(J) If applicable, information relating to

13     any external audit of the code and functionality

14     of the ancillary asset, including the entity per-

15     forming the audit and the experience of the en-

16     tity in conducting similar audits.

17          ''(K) If applicable, any valuation report or

18     economic analysis commissioned by the issuer

19     regarding the ancillary asset or the projected

20     market of the ancillary asset.

21          ''(L) If the ancillary asset is intangible, in-

22     formation relating to custody by the owner of

23     the ancillary asset or a third party.

135

1          "(M) Information on intellectual property

2     rights claimed or disputed relating to the ancil-

3     lary asset.

4          "(N) A description of the technology un-

5     derlying the issuance and trading of the ancil-

6     lary asset.

7          "(O) Any material tax considerations ap-

8     plicable to owning, storing, using, or trading

9     the ancillary asset.

10          "(P) Any material legal or regulatory con-

11     siderations applicable to owning, storing, using,

12     or trading the ancillary asset, including any

13     legal proceeding that may impact the value of

14     the ancillary asset.

15          "(Q) Any other material factor or informa-

16     tion that may impact the value of the ancillary

17     asset and about which the issuer is reasonably

18     aware.

19     "(d) APPLICATION TO SUCCESSOR ENTITIES AND

20 CERTAIN AFFILIATES.—

21          "(1) IN GENERAL.—If an issuer would other-

22     wise be subject to specified periodic disclosure re-

23     quirements under subsection (c) and is no longer in

24     operation, any successor entity that directly or indi-

25     rectly received not less than 50 percent of the re-

SIL23812 CHK                                                    S.L.C.

136

1    maining proceeds raised by the sale of the related

2    securities of that issuer shall file, or cause to be

3    filed, with the Commission the information required

4    under that subsection.

5        ''(2) CERTAIN AFFILIATES.—If an entity con-

6    trolled by an issuer is subject to specified periodic

7    disclosure requirements under subsection (c) and is

8    engaged in entrepreneurial or managerial efforts

9    that primarily determine the value of an ancillary

10   asset, the entity may file with the Commission the

11   information required under that subsection.

12       ''(e) VOLUNTARY DISCLOSURE.—An issuer that is

13   not subject to the specified periodic disclosure require-

14   ments under subsection (c) and that offers or sells a secu-

15   rity through an arrangement or scheme that constitutes

16   an investment contract, as that term is used in section

17   2(a)(1) of the Securities Act of 1933 (15 U.S.C.

18   77b(a)(1)), and that provides the holder of that security

19   with an ancillary asset in connection with the acquisition

20   of the security may voluntarily file with the Commission

21   the information required under that subsection if the

22   issuer believes that it is reasonably likely that the issuer

23   will become subject to those requirements in the future.

24       ''(f) EXEMPTIONS.—The Commission may, by order,

25   exempt an ancillary asset from the specified periodic dis-

SIL23812 CHK                                                      S.L.C.

137

1 closure requirements under subsection (c) if the Commis-

2 sion determines that the public policy goals of disclosure

3 and consumer protection are not satisfied by requiring dis-

4 closures relating to an ancillary asset.

5     ''(g) RULE OF CONSTRUCTION.—If an issuer fails to

6 comply with a provision of this section, an ancillary asset

7 provided by the issuer shall not be presumed to be a secu-

8 rity under a provision of law described in subsection

9 (b)(4)(A)(ii), solely because of such failure.

10    ''(h) LIABILITY FOR FALSE AND MISLEADING

11 STATEMENTS.—Any statement made in a disclosure, ap-

12 plication, or other document filed under this section shall

13 be subject to section 18.

14    ''(i) TERMINATION OF SPECIFIED PERIODIC DISCLO-

15 SURE REQUIREMENTS.—

16        ''(1) IN GENERAL.—The obligation of an issuer

17     to file the information required under subsection (c)

18     shall terminate on the date that is 90 days, or such

19     shorter period as the Commission may determine,

20     after the date on which the issuer files a certification

21     described in paragraph (2).

22        ''(2) CERTIFICATION.—

23            ''(A) IN GENERAL.—A certification de-

24         scribed in this paragraph shall be supported by

25         reasonable evidence, based on the knowledge of

SIL23812 CHK                                                    S.L.C.

138

the issuer filing the certification, after due in-
quiry, that—

    "(i) the average daily aggregate value
    of all trading in the applicable ancillary
    asset in all spot markets open to the public
    in the United States in the 12-month pe-
    riod preceding the date on which the cer-
    tification is filed was not greater than
    $5,000,000; or

    "(ii) during the 12-month period pre-
    ceding the date on which the certification
    is filed, neither the applicable issuer, nor
    any entity controlled by the applicable
    issuer, engaged in entrepreneurial or man-
    agerial efforts that primarily determined
    the value of the ancillary asset.

"(B) DENIAL.—

    "(i) IN GENERAL.—Subject to sub-
    paragraph (C)(ii), the Commission may, by
    majority vote and after notice and oppor-
    tunity for hearing, deny a certification filed
    under paragraph (1) if the Commission
    finds that the certification is not supported
    by substantial evidence.

SIL23812 CHK

S.L.C.

139

1         ''(ii) Effect.—The denial, under

2         clause (i), of a certification filed under

3         paragraph (1)—

4            ''(I) shall terminate the certifi-

5            cation so filed; and

6            ''(II) shall not prevent the appli-

7            cable issuer from filing another cer-

8            tification under paragraph (1), if the

9            re-filed certification is filed not earlier

10           than 180 days after the date on which

11           the original certification is denied.

12    ''(C) Pending status.—

13         ''(i) In general.—Termination of

14         the disclosure requirements described in

15         paragraph (1) applicable to an issuer that

16         has filed a certification under that para-

17         graph shall be deferred pending review by

18         the Commission of the evidence supporting

19         the certification.

20         ''(ii) Effect of delay.—If, as of

21         the date that is 90 days after receiving a

22         certification filed under paragraph (1), the

23         Commission has not requested additional

24         evidence with respect to the certification

25         from the applicable issuer, the disclosure

140

1          obligations that are the subject of the cer-
2          tification shall terminate.

3     "(j) RULES.—The Commission may adopt rules and
4 guidance to implement this section, consistent with the
5 statutory intent of this section.".

**6 SEC. 502. GUIDANCE RELATING TO SATISFACTORY CON-**
**7          TROL LOCATION.**

8     Not later than 180 days after the date of the enact-
9 ment of this Act, the Securities and Exchange Commission
10 shall issue guidance relating to section 240.15c3–3 of title
11 17, Code of Federal Regulations, or any successor regula-
12 tion, providing that the requirement to designate a satis-
13 factory control location for a crypto asset that is, or may
14 represent ownership of, a security may be satisfied by pro-
15 tecting the crypto asset through commercially reasonable
16 cybersecurity practices to maintain control of sufficient
17 private key material to transfer control of the crypto asset
18 to another person, or to cause another person to obtain
19 control of the crypto asset, including by means of a smart
20 contract that generates private key material without the
21 involvement of a natural person.

141

# TITLE VI—CUSTOMER PROTEC-TION AND MARKET INTEG-RITY AUTHORITY

**SEC. 601. CUSTOMER PROTECTION AND MARKET INTEG-RITY AUTHORITY.**

(a) IN GENERAL.—Chapter 98 of title 31, United States Code, as amended by section 208, is amended by adding at the end the following:

**"§ 9809. Customer protection and market integrity authorities**

"(a) DEFINITIONS.—In this section:

"(1) NONMEMBER PROFESSIONAL.—The term 'nonmember professional' means any person that—

"(A) is a crypto asset intermediary; and

"(B) is a not a member of a customer pro-tection and market integrity authority or affili-ated organization.

"(2) REGISTRATION INFORMATION.—The term 'registration information' means the information re-ported in connection with the licensing, registration, or other authorization of crypto asset intermediaries and their associated persons, including—

"(A) disciplinary actions, regulatory, judi-cial, and arbitration proceedings, and other in-

142

1        formation required by law or authority rule;

2        and

3            ''(B) the source and status of the informa-

4            tion described in subparagraph (A).

5    ''(b) REGISTRATION; APPLICATION.—An association

6 of crypto asset intermediaries may be registered as a cus-

7 tomer protection and market integrity authority, under

8 the terms and conditions provided in this section, and in

9 accordance with the provisions of this section and section

10 9810, by jointly filing with the Securities and Exchange

11 Commission and the Commodity Futures Trading Com-

12 mission an application for registration, in such form as

13 the commissions may require, containing the rules of the

14 authority and such other information and documents that

15 may be prescribed as necessary or appropriate in the pub-

16 lic interest or for customer protection.

17    ''(c) DETERMINATIONS BY COMMISSIONS REQUISITE

18 TO REGISTRATION.—An association of crypto asset inter-

19 mediaries may not be registered as a customer protection

20 and market integrity authority under subsection (b) unless

21 a majority of the members of each of the Securities and

22 Exchange Commission and the Commodity Futures Trad-

23 ing Commission, voting separately, determine that each of

24 the following is satisfied:

SIL23812 CHK                                                    S.L.C.

143

1        ''(1) By reason of the number and the scope of

2   the transactions of the authority, the authority will

3   be able to carry out the purposes of this section.

4        ''(2) The authority is so organized, and has the

5   capacity, to—

6            ''(A) be able to carry out the purposes of

7        this section and other applicable State and Fed-

8        eral laws; and

9            ''(B) subject to any rule or order of the

10       appropriate commission, enforce compliance by

11       members of the authority (and persons associ-

12       ated with those members) with the provisions of

13       applicable law, the rules under those provisions,

14       and the rules of the authority.

15       ''(3) The rules of the authority provide that any

16  crypto asset intermediary may become a member of

17  the authority and any person may become associated

18  with a member of the authority.

19       ''(4) The rules of the authority provide for the

20  following allocation of a 13-member board of direc-

21  tors:

22           ''(A) 3 governmental directors, as follows:

23               ''(i) The Director of the Office of Fi-

24           nancial Innovation of the Commodity Fu-

SIL23812 CHK                                                    S.L.C.

144

1    tures Trading Commission, or the designee

2    of the Director.

3         ''(ii) The Director of the Office of Fi-

4    nancial Innovation of the Securities and

5    Exchange Commission, or the designee of

6    the Director.

7         ''(iii) The Director of the Financial

8    Crimes Enforcement Network, or the des-

9    ignee of the Director.

10        ''(B) 4 independent directors—

11            ''(i) who are appointed by the Presi-

12       dent, with specializations in financial tech-

13       nology, consumer protection, and financial

14       markets, except that those 4 directors shall

15       not be affiliated, through a close relative or

16       a financial interest with any member of the

17       authority; and

18            ''(ii) 1 of whom is designated by the

19       President as chair of the authority.

20        ''(C) 6 directors appointed by the members

21   of the prospective authority.

22    ''(5) The rules of the authority provide for the

23   equitable allocation of reasonable dues, fees, and

24   other charges among members of the authority and

SIL23812 CHK                                                S.L.C.

145

1     other persons using any facility or system that the

2     authority operates or controls.

3         ''(6) The rules of the authority—

4             ''(A) are designed to—

5                 ''(i) prevent fraudulent and manipula-

6             tive acts and practices in order to promote

7             just and equitable principles of trade;

8                 ''(ii) foster cooperation and coordina-

9             tion with persons engaged in regulating,

10            clearing, settling, processing information

11            with respect to, and facilitating trans-

12            actions in crypto assets;

13                ''(iii) remove impediments to, and per-

14            fect the mechanism of, a free and open

15            market; and

16                ''(iv) protect customers and the public

17            interest; and

18            ''(B) are not designed to—

19                ''(i) permit unfair discrimination be-

20            tween customers and crypto asset inter-

21            mediaries;

22                ''(ii) fix minimum profits;

23                ''(iii) impose any schedule or fix rates

24            of commissions, allowances, discounts, or

SIL23812 CHK                                                          S.L.C.

146

1          other fees to be charged by the members of
2          the authority; or

3                  "(iv) regulate by virtue of any author-
4          ity conferred by law matters not related to
5          the purposes of this section or the adminis-
6          tration of the authority.

7          "(7) The rules of the authority provide that,
8     subject to any rule or order of the appropriate com-
9     mission, the members of the authority (and persons
10    associated with those members) shall be appro-
11    priately disciplined for a violation of any provision of
12    applicable law, the rules under such a provision, or
13    the rules of the authority by expulsion, suspension,
14    limitation of activities, functions, and operations,
15    fine, censure, a suspension or bar from being associ-
16    ated with a member, or any other fitting sanction.

17         "(8) The rules of the authority are consistent
18    with the provisions of subsection (h) and, in general,
19    provide a fair procedure for—

20                 "(A) the disciplining of members and per-
21          sons associated with members;

22                 "(B) the denial of membership to any per-
23          son seeking membership in the authority;

SIL23812 CHK                                                            S.L.C.

147

1          "(C) the barring of any person from be-
2       coming associated with a member of the author-
3       ity; and

4          "(D) the prohibition or limitation by the
5       authority of any person with respect to access
6       to services offered by the authority or a mem-
7       ber of the authority.

8       "(9) The rules of the authority do not impose
9    any burden on competition not necessary or appro-
10   priate in furtherance of the purposes of this section.

11      "(10) The requirements of subsection (d), as
12   applicable, are satisfied.

13      "(11) The rules of the authority include provi-
14   sions governing the form and content of quotations
15   relating to crypto assets, which shall be designed
16   to—

17          "(A) produce fair and informative
18       quotations;

19          "(B) prevent fictitious or misleading
20       quotations; and

21          "(C) promote orderly procedures for col-
22       lecting, distributing, and publishing quotations.

23   "(d) RULES; PROVISION FOR REGISTRATION OF AF-
24   FILIATED ORGANIZATION.—

SIL23812 CHK S.L.C.

148

1        "(1) IN GENERAL.—The Securities and Ex-
2   change Commission and the Commodity Futures
3   Trading Commission may permit or require the rules
4   of an authority applying for registration under sub-
5   section (b) to provide for the admission of an organi-
6   zation registered as an affiliated organization pursu-
7   ant to subsection (e), to participate in the applicant
8   authority as an affiliate of the applicant authority,
9   under terms permitting powers and responsibilities
10  to the affiliate, and under such other appropriate
11  terms and conditions, as may be provided by the
12  rules of the applicant authority, if those rules appear
13  to the commissions jointly to be necessary or appro-
14  priate in the public interest or for customer protec-
15  tion and to carry out the purposes of this section.

16       "(2) DUTIES AND POWERS OF THE COMMIS-
17  SIONS.—The duties and powers of the Securities and
18  Exchange Commission and the Commodity Futures
19  Trading Commission with respect to any authority
20  or affiliate organization shall in no way be limited
21  by reason of any such affiliation.

22       "(e) REGISTRATION AS AFFILIATED ORGANIZATION;
23  PREREQUISITES; AUTHORITY RULES.—

149

1        ''(1) IN GENERAL.—An applicant organization

2    shall not be registered as an affiliated organization,

3    unless—

4            ''(A)  the  organization,  notwithstanding

5        that the organization does not satisfy the re-

6        quirements  under  subsection  (c)(1),  will,  upon

7        the registration of the organization under this

8        subsection,  be  admitted  to  affiliation  with  an

9        organization registered as an authority pursu-

10       ant to subsection (c), in the manner and under

11       the  terms  and  conditions  provided  by  the  rules

12       of the customer protection and market integrity

13       authority  in  accordance  with  subsection  (d);

14       and

15           ''(B) the organization and the rules of the

16       organization  satisfy  the  requirements  under

17       paragraphs (2) through (11) of subsection (c).

18       ''(2) EXCEPTION.—Any restrictions upon mem-

19   bership of an applicant organization shall not be less

20   stringent than in the case of the customer protection

21   and market integrity authority with which the orga-

22   nization is to be affiliated.

23   ''(f)  DEALINGS  WITH  NONMEMBER  PROFES-

24   SIONALS.—

150

1           "(1) IN GENERAL.—The rules of a customer

2 protection and market integrity authority may pro-

3 vide that no member of the authority may deal with

4 any nonmember professional except at the same

5 prices, for the same commissions or fees, and on the

6 same terms and conditions the member accords to

7 the general public.

8           "(2) RULE OF CONSTRUCTION.—Nothing in

9 this subsection may be construed to prevent any

10 member of a customer protection and market integ-

11 rity authority from granting to any other member of

12 any other such authority any discount, allowance,

13 commission, or special terms in connection with a

14 crypto asset transaction.

15    "(g) DENIAL OF MEMBERSHIP.—

16           "(1) IN GENERAL.—Membership in a customer

17 protection and market integrity authority under this

18 section shall be limited to crypto asset inter-

19 mediaries.

20           "(2) DENIAL FOR PUBLIC INTEREST OR CON-

21 SUMER PROTECTION.—

22                "(A) IN GENERAL.—A customer protection

23 and market integrity authority may, and the

24 appropriate commission, by order, may direct

25 such an authority to, as necessary or appro-

151

1    priate in the public interest or for customer

2    protection, deny membership to any person, and

3    bar from becoming associated with a member

4    any person, that is subject to a statutory dis-

5    qualification within the laws under the jurisdic-

6    tion of that commission.

7        ''(B) NOTICE.—A customer protection and

8    market integrity authority shall file notice with

9    the appropriate commission, in such form and

10   containing such information as the appropriate

11   commission shall require, not less than 30 days

12   before admitting any person to membership or

13   permitting any person to become associated

14   with a member, if the authority knew, or in the

15   exercise of reasonable care should have known,

16   that such person was subject to a statutory dis-

17   qualification.

18   ''(3) PROCEDURE.—

19        ''(A) IN GENERAL.—A customer protection

20   and market integrity authority may—

21            ''(i) deny membership to, or condition

22       the membership of, a crypto asset inter-

23       mediary, if—

24            ''(I) the intermediary does not

25       meet such standards of financial re-

SIL23812 CHK                                                          S.L.C.

152

1          sponsibility or operational capability,
2          or such intermediary or any individual
3          associated with the intermediary does
4          not meet such standards of training,
5          experience, and competence, as are
6          prescribed by the rules of the author-
7          ity; or

8              ''(II) the intermediary or person
9          associated with the intermediary has
10         engaged, and there is a reasonable
11         likelihood the intermediary or person
12         will again engage, in acts or practices
13         inconsistent with just and equitable
14         principles of trade; and

15             ''(ii) examine and verify the qualifica-
16         tions of an applicant to become a member
17         and the individuals associated with the ap-
18         plicant in accordance with procedures es-
19         tablished by the rules of the authority.

20     ''(B) AUTHORITY.—A customer protection
21 and market integrity authority may—

22             ''(i) bar an individual from becoming
23         associated with a member, or condition the
24         association of an individual with a mem-
25         ber, if that individual—

SIL23812 CHK                                                          S.L.C.

153

1              ''(I) does not meet such stand-

2          ards of training, experience, and com-

3          petence as are prescribed by the rules

4          of the authority; or

5              ''(II) has engaged, and there is a

6          reasonable likelihood the individual

7          will again engage, in acts or practices

8          inconsistent with just and equitable

9          principles of trade;

10         ''(ii) examine and verify the qualifica-

11     tions of an applicant to become a person

12     associated with a member in accordance

13     with procedures established by the rules of

14     the authority; and

15         ''(iii) require an individual associated

16     with a member, or any class of such indi-

17     viduals, to be registered with the authority

18     in accordance with procedures so estab-

19     lished.

20     ''(C) BAR ON ASSOCIATION.—A customer

21 protection and market integrity authority may

22 bar any person from becoming associated with

23 a member if that person does not agree—

24         ''(i) to supply the authority with such

25     information with respect to the relationship

SIL23812 CHK                                                    S.L.C.

154

1          and dealings of the person with the mem-
2          ber as may be specified in the rules of the
3          authority; and

4               ''(ii) to permit examination of the
5          records of the person to verify the accuracy
6          of any information supplied by the person
7          under clause (i).

8     ''(4) DENIAL FOR TYPE OF BUSINESS.—

9          ''(A) IN GENERAL.—Subject to subpara-
10         graph (B), a customer protection and market
11         integrity authority may deny membership to a
12         crypto asset intermediary not engaged in a type
13         of business in which the rules of the authority
14         require members to be engaged.

15         ''(B) CONDITION.—No customer protection
16         and market integrity authority may deny mem-
17         bership to a crypto asset intermediary by rea-
18         son of the amount of such type of business done
19         by such intermediary or the other types of busi-
20         ness in which the intermediary is engaged.

21    ''(h) DISCIPLINE OF CUSTOMER PROTECTION AND
22 MARKET INTEGRITY AUTHORITY MEMBERS AND PER-
23 SONS ASSOCIATED WITH MEMBERS; SUMMARY PRO-
24 CEEDINGS.—

25         ''(1) DISCIPLINE.—

SIL23812 CHK                                                    S.L.C.

155

1          "(A) NOTIFICATION.—In any proceeding
2     by a customer protection and market integrity
3     authority to determine whether a member, or a
4     person associated with a member, should be dis-
5     ciplined (other than a summary proceeding pur-
6     suant to paragraph (3)), the authority shall
7     bring specific charges, notify such member or
8     person of (and give the person an opportunity
9     to defend against) those charges, and keep a
10    record.

11         "(B) STATEMENT.—A determination by a
12    customer protection and market integrity au-
13    thority to impose discipline in a proceeding
14    under subparagraph (A) shall be supported by
15    a statement setting forth—

16              "(i) any act or practice in which the
17         member, or person associated with a mem-
18         ber, has been found to have engaged, or
19         that such member or person has been
20         found to have omitted;

21              "(ii) the specific provision of law, the
22         rules under such a provision, or the rules
23         of the authority that an act or practice de-
24         scribed in clause (i), or omission to act, is
25         charged with violating; and

SIL23812 CHK                                                            S.L.C.

156

1              "(iii) the sanction imposed and a jus-

2         tification for the sanction.

3    "(2) DENIAL OF MEMBERSHIP OR SERVICES.—

4         "(A) NOTIFICATION.—In any proceeding

5    by a customer protection and market integrity

6    authority to determine whether a person shall

7    be denied membership, barred from becoming

8    associated with a member, or prohibited or lim-

9    ited with respect to access to services offered by

10   the authority or a member of the authority

11   (other than a summary proceeding pursuant to

12   paragraph (3)), the authority shall—

13              "(i) notify that person and give the

14        person an opportunity to be heard;

15              "(ii) provide the person the specific

16        grounds for denial, bar, or prohibition or

17        limitation under consideration; and

18              "(iii) maintain a record.

19        "(B) STATEMENT.—A determination by a

20   customer protection and market integrity au-

21   thority to deny membership, bar a person from

22   becoming associated with a member, or prohibit

23   or limit a person with respect to access to serv-

24   ices offered by the authority or a member under

25   subparagraph (A) shall be supported by a state-

SIL23812 CHK                                                    S.L.C.

157

1      ment setting forth the specific grounds on

2      which the denial, bar, or prohibition or limita-

3      tion is based.

4          ''(3) SUMMARY PROCEEDING.—

5              ''(A) IN GENERAL.—A customer protection

6          and market integrity authority may sum-

7          marily—

8                  ''(i) suspend a member of the author-

9              ity, or a person associated with such a

10             member, that is—

11                     ''(I) expelled or suspended from

12                 any other authority or entity dele-

13                 gated regulatory and disciplinary au-

14                 thority by a governmental agency; or

15                     ''(II) barred or suspended from

16                 being associated with a member of an-

17                 other authority;

18                 ''(ii) suspend a member of the author-

19             ity that is in such financial or operating

20             difficulty that the authority determines

21             (and so notifies the appropriate commis-

22             sion) that the member cannot be permitted

23             to continue to do business as a member, in

24             order to protect customers, creditors, other

25             members, or the authority; or

 1          "(iii) limit or prohibit any person
 2     from accessing services offered by the au-
 3     thority if clause (i) or (ii) is applicable to
 4     that person, or, in the case of a person
 5     that is not a member of the authority, if
 6     the authority determines that the person—
 7               "(I) does not meet the qualifica-
 8          tion requirements or other pre-
 9          requisites for that access; and
10               "(II) cannot be permitted to con-
11          tinue to have such access with safety,
12          in order to protect customers, credi-
13          tors, members, or the authority.
14     "(B) OPPORTUNITY FOR HEARING.—Any
15     person aggrieved by a summary action under
16     subparagraph (A) shall be promptly afforded an
17     opportunity for a hearing by the applicable au-
18     thority in accordance with the provisions of
19     paragraph (1) or (2).
20     "(C) STAY.—The appropriate commission,
21     by order, may stay a summary action described
22     in subparagraph (A) on the motion of the com-
23     mission or upon application by any person ag-
24     grieved by the summary action, if the commis-
25     sion determines summarily or after notice and

159

1    opportunity for hearing (which may consist

2    solely of the submission of affidavits or presen-

3    tation of oral arguments) that the stay is con-

4    sistent with the public interest and customer

5    protection.

6    "(i) OBLIGATION TO MAINTAIN REGISTRATION, DIS-

7    CIPLINARY, AND OTHER DATA.—

8        "(1) MAINTENANCE OF SYSTEM TO RESPOND

9    TO INQUIRIES.—A customer protection and market

10   integrity authority shall establish and maintain—

11           "(A) a system for collecting and retaining

12       registration information; and

13           "(B) a website, including an application

14       programming interface, to receive and promptly

15       respond to inquiries regarding registration in-

16       formation on the members of the authority and

17       associated persons with respect to those mem-

18       bers.

19       "(2) RECOVERY OF COSTS.—A customer protec-

20   tion and market integrity authority may charge per-

21   sons making inquiries described in paragraph

22   (1)(B), other than individual customers of crypto

23   asset intermediaries, reasonable fees for responses.

24       "(3) PROCESS FOR DISPUTED INFORMATION.—

25   Each customer protection and market integrity au-

1      thority shall adopt rules establishing a process for

2      disputing the accuracy of information provided in re-

3      sponse to inquiries under this subsection.

4          ''(4) LIMITATION ON LIABILITY.—A customer

5      protection and market integrity authority, or any

6      crypto asset intermediary reporting information to

7      such an authority, shall not have any liability to any

8      person for any actions taken or omitted in good

9      faith under this subsection.

10     ''(j) AVOIDANCE OF DUPLICATIVE RULES.—

11         ''(1) IN GENERAL.—Each customer protection

12     and market integrity authority registered under sub-

13     section (b) shall issue rules as necessary to avoid du-

14     plicative or conflicting rules applicable to any crypto

15     asset intermediary that is a member of a national

16     securities exchange, board of trade, contract market,

17     registered securities association, registered futures

18     association, or similar entity.

19         ''(2) OTHER MEMBERSHIP.—A crypto asset

20     intermediary shall not be required to become a mem-

21     ber of another entity delegated regulatory and dis-

22     ciplinary authority by a governmental agency unless

23     the intermediary performs activities with financial

24     assets other than crypto assets.

25         ''(3) NON-CRYPTO ASSET ACTIVITIES.—

SIL23812 CHK                                                                S.L.C.

161

1           ''(A) Rules by commissions.—The Secu-
2       rities and Exchange Commission and the Com-
3       modity Futures Trading Commission shall
4       jointly prescribe rules under which a crypto
5       asset intermediary that is a member or affiliate
6       of a customer protection and market integrity
7       authority registered under this section may per-
8       form activities with financial assets other than
9       crypto assets, if those activities are not a ma-
10      jority of the business of an intermediary and
11      are conducted in a responsible manner, without
12      membership in another entity delegated regu-
13      latory and disciplinary authority by a govern-
14      mental agency.

15          ''(B) Rules by customer protection
16      and market integrity authority.—A cus-
17      tomer protection and market integrity authority
18      under this section shall adopt rules governing
19      activities with financial assets other than crypto
20      assets, which shall be consistent with existing
21      law, rule, guidance or industry best practices or
22      the rules of other entities delegated regulatory
23      and disciplinary authority by a governmental
24      agency.''.

162

1    (b) TECHNICAL AND CONFORMING AMENDMENT.—
2 The table of sections for chapter 98 of title 31, United
3 States Code, as amended by section 208, is amended by
4 adding at the end the following:

"9809. Customer protection and market integrity authorities.".

## SEC. 602. REGISTRATION, RULEMAKING, AND SUPERVISION OF CUSTOMER PROTECTION AND MARKET INTEGRITY AUTHORITIES.

8    (a) IN GENERAL.—Chapter 98 of title 31, United
9 States Code, as amended by section 601, is amended by
10 adding at the end the following:

## "§ 9810. Registration, rulemaking, and supervision of customer protection and market integrity authorities

14    "(a) REGISTRATION PROCEDURES; NOTICE OF FIL
15 ING; OTHER REGULATORY AGENCIES.—

16        "(1) PUBLICATION OF NOTICE.—

17            "(A) IN GENERAL.—The Securities and
18        Exchange Commission and Commodity Futures
19        Trading Commission shall, upon the filing of an
20        application for registration as a customer pro
21        tection and market integrity authority under
22        section 9809, publish notice of that filing and
23        afford interested persons an opportunity to sub
24        mit written data, views, and arguments con
25        cerning the application.

SIL23812 CHK                                                     S.L.C.

163

1           "(B) REQUIREMENTS.—Not later than 90

2       days after the date on which notice is published

3       under subparagraph (A), or within a longer pe-

4       riod to which the applicable applicant consents,

5       the Securities and Exchange Commission and

6       Commodity    Futures    Trading    Commission

7       shall—

8               "(i) by joint order, grant registration

9           of the customer protection and market in-

10          tegrity authority; or

11              "(ii) institute proceedings to deter-

12          mine whether registration should be de-

13          nied.

14          "(C) PROCEEDINGS.—

15              "(i) IN GENERAL.—Proceedings insti-

16          tuted under subparagraph (B)(ii) shall in-

17          clude notice of the grounds for denial

18          under consideration and opportunity for

19          hearing before the joint commissions.

20              "(ii) HEARING.—A hearing described

21          in clause (i) shall be concluded not later

22          than 180 days after the date on which no-

23          tice of the filing of the application for reg-

24          istration is published under subparagraph

25          (A).

164

1 ''(iii) FURTHER PROCEEDINGS.—

2 ''(I) SEPARATE VOTES.—At the

3 conclusion of a hearing conducted

4 under this subparagraph, and not

5 later than the end of the 180-day pe-

6 riod described in clause (ii), the Secu-

7 rities and Exchange Commission and

8 Commodity Futures Trading Commis-

9 sion, voting separately, shall act to

10 grant or deny the applicable registra-

11 tion.

12 ''(II) EFFECT OF FAILURE TO

13 ISSUE JOINT ORDER.—The failure of

14 the Securities and Exchange Commis-

15 sion and Commodity Futures Trading

16 Commission to issue a joint order dur-

17 ing the period described in subclause

18 (I) shall be deemed to be a denial of

19 the applicable registration.

20 ''(D) CONSIDERATIONS.—With respect to

21 an application for registration described in this

22 paragraph, the Securities and Exchange Com-

23 mission and Commodity Futures Trading Com-

24 mission shall—

165

1     "(i) grant registration if all statutory

2     requirements have been met and the rules

3     under those statutory provisions with re-

4     spect to the applicant are satisfied; and

5     "(ii) deny such registration if the

6     commissions do not make the findings de-

7     scribed in clause (i).

8   "(2) WITHDRAWAL FROM REGISTRATION.—

9    "(A) IN GENERAL.—A customer protection

10   and market integrity authority may, upon such

11   terms and conditions as the Securities and Ex-

12   change Commission and Commodity Futures

13   Trading Commission, by rule, determine nec-

14   essary or appropriate in the public interest or

15   for the protection of customers, withdraw from

16   registration described in paragraph (1) by filing

17   a written notice of withdrawal with the commis-

18   sions.

19    "(B) CONSIDERATIONS.—If the Securities

20   and Exchange Commission and Commodity Fu-

21   tures Trading Commission, voting separately,

22   each finds that a customer protection and mar-

23   ket integrity authority is no longer in existence

24   or has ceased to do business in the capacity

25   specified in the application for registration sub-

1 mitted by the authority, the commissions may

2 cancel the registration of the authority.

3 ''(C) EFFECT OF WITHDRAWAL, CAN-

4 CELLATION, SUSPENSION, OR REVOCATION.—

5 Upon withdrawal by registration or the can-

6 cellation, suspension, or revocation of the reg-

7 istration of a customer protection and market

8 integrity authority, the registration of any affil-

9 iate shall automatically terminate.

10 ''(b) PROPOSED RULE CHANGES; NOTICE; PRO-

11 CEEDINGS.—

12 ''(1) IN GENERAL.—Except as otherwise pro-

13 vided in paragraph (2)—

14 ''(A) a customer protection and market in-

15 tegrity authority shall file with the appropriate

16 commission, in accordance with the rules of

17 that commission, copies of any proposed rule or

18 any proposed change in, addition to, or deletion

19 from the rules of such customer protection and

20 market integrity authority accompanied by a

21 concise general statement of the basis and pur-

22 pose of such proposed rule change;

23 ''(B) the appropriate commission shall—

24 ''(i) as soon as practicable after the

25 date on which a proposed rule change is

1          filed under subparagraph (A), publish no-
2          tice of that filing together with the terms
3          of substance of the proposed rule change
4          or a description of the subjects and issues
5          involved; and

6                    ''(ii) give interested persons an oppor-
7              tunity to submit written data, views, and
8              arguments concerning that proposed rule
9              change;

10         ''(C) no proposed rule change described in
11         subparagraph (A) shall take effect unless ap-
12         proved by the appropriate commission or other-
13         wise permitted in accordance with the provi-
14         sions of this subsection; and

15         ''(D) no proposed rule change described in
16         subparagraph (A) relating to a matter under
17         the jurisdiction of more than 1 commission may
18         be filed.

19     ''(2) APPROVAL PROCESS.—

20         ''(A) APPROVAL PROCESS ESTABLISHED.—

21                  ''(i) IN GENERAL.—Except as pro-
22              vided in clause (ii), not later than 30 days
23              after the date on which notice of a pro-
24              posed rule change is published under para-

1    graph (1), the appropriate commission

2    shall—

3         "(I) by order, approve or dis-

4         approve the proposed rule change; or

5         "(II) institute proceedings under

6         subparagraph (B) to determine wheth-

7         er the proposed rule change should be

8         disapproved.

9    "(ii) EXTENSION OF TIME PERIOD.—

10   The appropriate commission may extend

11   the period established under clause (i) by

12   not more than an additional 30 days, if—

13        "(I) the commission determines

14        that a longer period is appropriate

15        and publishes the reasons for that de-

16        termination; or

17        "(II) the customer protection and

18        market integrity authority that filed

19        the proposed rule change consents to

20        a longer period.

21   "(B) PROCEEDINGS.—

22        "(i) NOTICE AND HEARING.—If the

23   appropriate commission does not approve

24   or disapprove a proposed rule change

25   under subparagraph (A), the commission

169

shall provide to the customer protection
and market integrity authority that filed
the proposed rule change—

"(I) notice of the grounds for
disapproval under consideration; and

"(II) opportunity for hearing, to
be concluded not later than 180 days
after the date of publication of notice
of the filing of the proposed rule
change.

"(ii) ORDER OF APPROVAL OR DIS-
APPROVAL.—

"(I) IN GENERAL.—Except as
provided in subclause (II), not later
than 180 days after the date on which
notice is published under paragraph
(1), the appropriate commission shall
issue an order approving or dis-
approving the proposed rule change
that is the subject of the notice.

"(II) EXTENSION OF TIME PE-
RIOD.—The appropriate commission
may extend the period for issuance
under clause (I) by not more than 60
days, if—

170

1                 ''(aa) the commission deter-

2             mines that a longer period is ap-

3             propriate and publishes the rea-

4             sons for such determination; or

5                 ''(bb) the customer protec-

6             tion and market integrity author-

7             ity that filed the proposed rule

8             change consents to the longer pe-

9             riod.

10         ''(C) STANDARDS FOR APPROVAL AND DIS-

11     APPROVAL.—

12         ''(i) APPROVAL.—The appropriate

13     commission shall approve a proposed rule

14     change of a customer protection and mar-

15     ket integrity authority if the commission

16     finds that the proposed rule change is con-

17     sistent with law.

18         ''(ii) TIME FOR APPROVAL.—The ap-

19     propriate commission may not approve a

20     proposed rule change earlier than 30 days

21     after the date of publication of notice with

22     respect to the proposed rule change under

23     paragraph (1), unless the commission finds

24     good cause for so doing and publishes the

25     reason for the finding.

1      "(D) RESULT OF FAILURE TO INSTITUTE
2      OR CONCLUDE PROCEEDINGS.—A proposed rule
3      change shall be deemed to have been approved
4      by the appropriate commission, if—

5              "(i) the commission does not approve
6          or disapprove the proposed rule change, or
7          begin proceedings under subparagraph (B),
8          within the period described in subpara-
9          graph (A); or

10             "(ii) the commission does not issue an
11         order approving or disapproving the pro-
12         posed rule change under subparagraph (B)
13         within the period described in subpara-
14         graph (B)(ii).

15     "(E) PUBLICATION DATE BASED ON FED-
16     ERAL REGISTER PUBLISHING.—

17             "(i) IN GENERAL.—For purposes of
18         this paragraph, if, after filing a proposed
19         rule change with the appropriate commis-
20         sion under paragraph (1), a customer pro-
21         tection and market integrity authority pub-
22         lishes a notice of the filing of that pro-
23         posed rule change, together with the sub-
24         stantive terms of that proposed rule
25         change, on a publicly accessible website,

SIL23812 CHK                                                          S.L.C.

172

1         the commission shall send the notice to the

2         Federal Register for publication of the pro-

3         posed rule change under paragraph (1) not

4         later than 5 days after the date on which

5         that website publication is made.

6                 ''(ii) EFFECT OF FAILING TO SEND.—

7         If the appropriate commission fails to send

8         notice under clause (i) during the 5-day

9         period described in that clause, the date of

10        publication shall be deemed to be the date

11        on which the applicable website publication

12        is made.

13            ''(3) INTERNAL GOVERNANCE.—With respect to

14     a proposed rule relating to the internal operation,

15     governance, and procedures of a customer protection

16     and market integrity authority, or a proposed rule

17     relating to the determination of the legal character

18     of a crypto asset—

19                ''(A) the proposed rule shall be—

20                    ''(i) subject to approval by the Securi-

21            ties and Exchange Commission and the

22            Commodity Futures Trading Commission;

23            and

24                    ''(ii) deemed to be approved on the

25            date that is 5 days after the date on which

SIL23812 CHK                                                    S.L.C.

173

1        the proposed rule is submitted, unless ei-
2        ther commission objects to the proposed
3        rule change; and
4            "(B) if a commission objects to the pro-
5        posed rule change under subparagraph (A)(ii)—
6                "(i) the commission shall, in a public
7            format, provide to the authority and the
8            non-objecting commission the reasons for
9            the objection;
10               "(ii) the authority, and interested
11           members of the public, may provide writ-
12           ten comments to the commissions during
13           the 20-day period beginning on the date on
14           which the objection is noted; and
15               "(iii) the Securities and Exchange
16           Commission and the Commodity Futures
17           Trading Commission, voting separately,
18           shall jointly issue an order approving or
19           disapproving the proposed rule, with the
20           failure to issue such a joint order being
21           deemed to be approval of the proposed
22           rule.
23       "(4) EXCEPTION.—
24           "(A)   IN   GENERAL.—Notwithstanding
25       paragraphs (2) and (3), a proposed rule change

SIL23812 CHK                                                      S.L.C.

174

1        shall take effect upon filing if self-certified by

2        an authority as—

3               "(i) constituting a stated policy, prac-

4            tice, or interpretation with respect to the

5            meaning, administration, or enforcement of

6            an existing rule of the authority;

7               "(ii) establishing or changing a due,

8            fee, or other charge imposed by the author-

9            ity on any person, whether or not the per-

10           son is a member of the authority; or

11              "(iii) notwithstanding any other provi-

12           sion of this subsection, necessary for cus-

13           tomer protection, the maintenance of fair

14           and orderly markets, or the safeguarding

15           of crypto assets, customer funds, or other

16           property, in which case the proposed rule

17           change under shall be filed promptly there-

18           after in accordance with paragraph (1).

19       "(B) ENFORCEMENT.—

20              "(i) IN GENERAL.—Any proposed rule

21           change of an authority that has taken ef-

22           fect under subparagraph (A) may be en-

23           forced by the authority to the extent the

24           rule change is not inconsistent with appli-

25           cable law.

SIL23812 CHK                                                   S.L.C.

175

1                 "(ii) SUSPENSION.—

2                     "(I) IN GENERAL.—At any time

3             during the 60-day period beginning on

4             the date on which a proposed rule

5             change is filed under paragraph (1),

6             the appropriate commission may tem-

7             porarily and summarily suspend the

8             change in the rules of the authority

9             on a temporary basis, if the commis-

10            sion determines that such action is

11            necessary or appropriate in the public

12            interest, for customer protection, or to

13            otherwise comply with applicable law.

14                     "(II) REQUIREMENTS.—If a

15            commission takes action under sub-

16            clause (I), the commission shall insti-

17            tute proceedings under paragraph

18            (2)(B) to determine whether the ap-

19            plicable proposed rule should be ap-

20            proved or disapproved.

21                "(iii) RULE OF CONSTRUCTION.—Ac-

22        tion under this subparagraph shall not af-

23        fect the validity or force of a proposed rule

24        change during the period the rule change

25        was in effect and shall not be reviewable in

SIL23812 CHK                                                          S.L.C.

176

1           a judicial proceeding, nor deemed to be
2           final agency action for purposes of section
3           704 of title 5.

4       "(5) RULE OF CONSTRUCTION RELATING TO
5   FILING DATE OF PROPOSED RULE CHANGES.—

6           "(A) IN GENERAL.—For purposes of this
7       subsection, the date of filing of a proposed rule
8       change shall be deemed to be the date on which
9       the applicable commission receives the proposed
10      rule change.

11          "(B) EXCEPTION.—

12              "(i) IN GENERAL.—Subject to clause
13          (ii), a proposed rule has not been received
14          by the applicable commission for purposes
15          of subparagraph (A), if, not later than 7
16          business days after the date on which the
17          commission receives the rule, the commis-
18          sion notifies the authority that the pro-
19          posed rule change does not comply with
20          the rules of the commission relating to the
21          required form of a proposed rule change.

22              "(ii) LENGTHY AND COMPLEX PRO-
23          POSED RULE CHANGES.—

24                  "(I) IN GENERAL.—If the appli-
25              cable commission determines that a

SIL23812 CHK                                                    S.L.C.

177

 1             proposed rule change is unusually
 2             lengthy, and is complex or raises novel
 3             regulatory issues, the commission
 4             shall inform the authority of that de-
 5             termination not later than 7 business
 6             days after the date on which the com-
 7             mission receives the rule.

 8                   ''(II) DEADLINE.—For the pur-
 9             poses of subparagraph (A), a pro-
10             posed rule change described in sub-
11             clause (I) has not been received by the
12             applicable commission, if, not later
13             than 21 days after the date on which
14             the commission receives the rule, the
15             commission notifies the applicable au-
16             thority that the proposed rule change
17             does not comply with the rules of the
18             commission relating to the required
19             form of a proposed rule change.

20             ''(C) APPLICABILITY.—This paragraph
21       shall not apply to a rule relating to the internal
22       operations, governance, and procedure of an au-
23       thority.

24       ''(c) AMENDMENT OF RULES OF AUTHORITIES.—

SIL23812 CHK                                                    S.L.C.

178

1      ''(1) IN GENERAL.—The appropriate commis-
2   sion may, by rule, abrogate, add to, and delete from
3   the rules of an authority as the commission deter-
4   mines necessary or appropriate to ensure the fair
5   administration of the authority or to conform the
6   rules of the authority to law or applicable rule, in
7   the following manner:

8          ''(A) The appropriate commission shall no-
9       tify the authority and publish notice of the pro-
10      posed rulemaking in the Federal Register,
11      which shall include the text of the proposed
12      amendment to the rules of the authority and a
13      statement of the reasons of the commission, in-
14      cluding any pertinent facts, for commencing the
15      proposed rulemaking.

16         ''(B)(i) The appropriate commission shall
17      give interested persons an opportunity for the
18      oral presentation of data, views, and arguments,
19      in addition to an opportunity to make written
20      submissions.

21         ''(ii) A transcript shall be kept of any oral
22      presentation under clause (i).

23         ''(C) A rule adopted pursuant to this para-
24      graph shall incorporate the text of the amend-
25      ment to the rules of the authority and a state-

SIL23812 CHK                                                              S.L.C.

179

ment of the appropriate commission regarding
the basis for amendment of the rule, which
shall include an identification of any facts on
which the determination of the commission to
amend the rules of the authority is based, in-
cluding the reasons for the conclusions of the
commission relating to any facts that were dis-
puted in the rulemaking.

''(2) RULE OF CONSTRUCTION.—Nothing in
this subsection may be construed to impair or limit
the authority of the appropriate commission to
make, or to modify or alter the procedures the com-
mission may follow in making, rules pursuant to any
other authority granted by law that is consistent
with this subsection.

''(3) EFFECT OF RULES.—Any amendment to
the rules of an authority made by the appropriate
commission under this subsection shall be considered
for all purposes to be part of the rules of that au-
thority and shall not be considered to be a rule of
that commission.

''(4) CONSULTATIONS.—With respect to rules
described in subsection (b)(4)(A)(iii), the appro-
priate commission shall consult with and consider
the views of the other commission and the Secretary

1      of the Treasury before abrogating, adding to, and

2      deleting from those rules, except where the commis-

3      sion determines that an emergency exists requiring

4      expeditious or summary action and publishes the

5      reasons of the commission for taking that action.

6      ''(d) NOTICE OF DISCIPLINARY ACTION TAKEN BY

7  AUTHORITY AGAINST A MEMBER OR PARTICIPANT; RE-

8  VIEW OF ACTION BY APPROPRIATE COMMISSION; PROCE-

9  DURE.—

10          ''(1) IN GENERAL.—If an authority imposes

11      any final disciplinary sanction on any member of the

12      authority, or any participant with respect to the au-

13      thority, denies membership or participation to any

14      applicant, prohibits or limits any person from ac-

15      cessing services offered by the authority or a mem-

16      ber of the authority, imposes any final disciplinary

17      sanction on any person associated with a member, or

18      bars any person from becoming associated with a

19      member, the authority shall promptly file notice of

20      that action with the appropriate commission.

21          ''(2) REVIEW.—

22                  ''(A) IN GENERAL.—Any action with re-

23              spect to which an authority is required to file

24              notice under paragraph (1) shall be subject to

25              review by the appropriate commission for the

SIL23812 CHK                                                                                S.L.C.

181

1       applicable member, participant, applicant, or
2       other person, on its own motion, or upon appli-
3       cation by any person aggrieved by that action
4       if filed not later than 30 days after the date on
5       which the notice was filed with the appropriate
6       commission and received by the aggrieved per-
7       son, or within such longer period as the appro-
8       priate commission may determine.

9           ''(B) APPLICATION.—Application to the
10      appropriate commission for review, or the insti-
11      tution of review by the commission on its own
12      motion, shall not operate as a stay of an action
13      described in subparagraph (A) unless the ap-
14      propriate commission otherwise orders, sum-
15      marily or after notice and opportunity for hear-
16      ing on the question of a stay, which may consist
17      solely of the submission of affidavits or presen-
18      tation of oral arguments.

19          ''(C) STAYS.—For the purposes of this
20      paragraph, each of the appropriate commissions
21      shall establish for appropriate cases an expe-
22      dited procedure for consideration and deter-
23      mination of the question of a stay.

SIL23812 CHK                                                           S.L.C.

182

1          "(3) APPLICABILITY.—This subsection shall

2     apply only to the extent that an authority imposes

3     any final disciplinary sanction for—

4               "(A) a violation of Federal law or the rules

5          issued under Federal law; or

6               "(B) a violation of a rule of the authority,

7          as to which a proposed change would be re-

8          quired to be filed under this section.

9     "(e) DISPOSITION OF REVIEW; CANCELLATION, RE-

10   DUCTION, OR REMISSION OF SANCTION.—

11         "(1) IN GENERAL.—In any proceeding to review

12    a final disciplinary sanction imposed by an authority

13    on a member, a participant with respect to the au-

14    thority, or a person associated with such a member,

15    after notice and opportunity for hearing, which may

16    consist solely of consideration of the record before

17    the authority and opportunity for the presentation of

18    supporting reasons to affirm, modify, or set aside

19    the sanction—

20               "(A) if the appropriate commission finds

21          that such member, participant, or person asso-

22          ciated with a member has engaged in such acts

23          or practices, or has omitted such acts, as the

24          authority has found that person to have en-

25          gaged in or omitted, that such acts or practices,

SIL23812 CHK S.L.C.

183

or omissions to act, are in violation of law, the
rules thereunder, or the rules of the authority,
and that such provisions are, and were applied
in a manner, consistent with law, the commis-
sion, by order, shall—

    ''(i) make a declaration regarding that
finding; and

        ''(ii) as appropriate—

            ''(I) affirm the sanction imposed
        by the authority;

            ''(II) modify the sanction in ac-
        cordance with paragraph (2); or

            ''(III) remand to the authority
        for further proceedings; or

    ''(B) if the appropriate commission does
not make a finding described in subparagraph
(A), the commission shall, by order—

        ''(i) set aside the sanction imposed by
    the authority; and

        ''(ii) if appropriate, remand to the au-
    thority for further proceedings.

    ''(2) MODIFICATION.—If the appropriate com-
mission for a member, participant, or person associ-
ated with a member, having due regard for the pub-
lic interest and customer protection, finds, after a

SIL23812 CHK                                                              S.L.C.

184

1    proceeding under paragraph (1), that a sanction im-

2    posed by a authority upon that member, participant,

3    or person associated with a member imposes any

4    burden on competition not necessary or appropriate

5    or is excessive or oppressive, the commission may

6    cancel, reduce, or require the remission of that sanc-

7    tion.

8    ''(f) DISMISSAL OF REVIEW PROCEEDING.—

9        ''(1) IN GENERAL.—In any proceeding to review

10       the denial of membership or participation in an au-

11       thority to any applicant, the barring of any person

12       from becoming associated with a member of an au-

13       thority, or the prohibition or limitation by an au-

14       thority of any person from accessing services offered

15       by the authority or any member, if the appropriate

16       commission, after notice and opportunity for hear-

17       ing, which may consist solely of consideration of the

18       record before the authority and opportunity for the

19       presentation of supporting reasons to dismiss the

20       proceeding or set aside the action of the authority,

21       finds that the specific grounds on which that denial,

22       bar, or prohibition or limitation is based exist in

23       fact, that such denial, bar, or prohibition or limita-

24       tion is in accordance with the rules of the authority,

25       and that such rules are, and were applied in a man-

SIL23812 CHK S.L.C.

185

1 ner, consistent with law, the appropriate commis-

2 sion, by order, shall dismiss the proceeding.

3 "(2) FAILURE TO MAKE FINDING.—If the ap-

4 propriate commission does not make a finding de-

5 scribed in paragraph (1), or if the commission finds

6 that the applicable denial, bar, prohibition, or limita-

7 tion imposes any burden on competition not nec-

8 essary or appropriate, the commission, by order,

9 shall set aside the action of the authority and re-

10 quire the authority to admit the applicable applicant

11 to membership or participation, permit that person

12 to become associated with a member, or grant that

13 person access to services offered by the authority or

14 a member.

15 "(g) SUSPENSION OR REVOCATION OF AUTHORITY

16 REGISTRATION; OTHER SANCTIONS.—

17 "(1) IN GENERAL.—If necessary or appropriate

18 in the public interest, for customer protection, or

19 otherwise in furtherance of the purposes of this sec-

20 tion, the appropriate commissions, voting separately,

21 may issue a joint order suspending for a period not

22 exceeding 1 year or revoking the registration of an

23 authority, or censuring or imposing limitations upon

24 the activities, functions, and operations of an au-

25 thority, if, the commissions find, on the record after

186

1    notice and opportunity for hearing, that the author-

2    ity—

3            ''(A) has violated or is unable to comply

4        with any provision of law, rule, or the rules of

5        the authority without reasonable justification or

6        excuse; or

7            ''(B) has failed to enforce compliance with

8        any provision by a member of the authority or

9        a person associated with a member of the au-

10       thority.

11       ''(2) EXPULSION.—The appropriate commission

12   may, by order, if necessary or appropriate in the

13   public interest, for customer protection, or otherwise

14   in furtherance of the purposes of this section, to sus-

15   pend for a period not exceeding 1 year or expel from

16   an authority, any member of an authority, or partic-

17   ipant with respect to an authority, if such member

18   or participant is subject to an order of the commis-

19   sion or if the commission, on the record after notice

20   and opportunity for hearing, determines that the

21   member or participant has willfully violated, or has

22   effected any transaction for any other person who

23   the member or participant had reason to believe was

24   violating, with respect to such transaction any appli-

SIL23812 CHK                                                    S.L.C.

187

1   cable provision of law under the jurisdiction of the

2   commission.

3       "(3) BAR ON ASSOCIATION.—The applicable

4   commission may, by order, if necessary or appro-

5   priate in the public interest, for customer protection,

6   or otherwise in furtherance of the purposes of this

7   section, to suspend for a period not exceeding 1 year

8   or to bar any person from being associated with a

9   member of such authority, if the person is subject to

10  an order of the appropriate commission or if the ap-

11  propriate commission finds, on the record after no-

12  tice and opportunity for hearing, that the person has

13  willfully violated, or has effected any transaction for

14  any other person who the person associated with a

15  member had reason to believe was violating, with re-

16  spect to the transaction any applicable provision of

17  law under the jurisdiction of the commission.

18      "(4) REMOVAL FROM OFFICE.—If necessary or

19  appropriate in the public interest, for customer pro-

20  tection, or otherwise in furtherance of the purposes

21  of this section, the Securities and Exchange Com-

22  mission and the Commodity Futures Trading Com-

23  mission, voting separately, may, by joint order, re-

24  move from office or censure any person who is, or

25  at the time of the alleged misconduct was, an officer

SIL23812 CHK                                                    S.L.C.

188

1    or director of an authority, if the commissions find,

2    on the record after notice and opportunity for a

3    hearing before an impartial hearing officer, that

4    such person has willfully violated any provision of

5    law, the rules thereunder, or the rules of such au-

6    thority, willfully abused the authority of the person,

7    or without reasonable justification or excuse has

8    failed to enforce compliance with any provision of

9    law by any member or person associated with a

10    member.

11    ''(h) INTERAGENCY WORKING GROUP.—The Securi-

12    ties and Exchange Commission and the Commodity Fu-

13    tures Trading Commission shall each appoint an equal

14    number of employees, under the supervision of the Chair-

15    man of the respective commissions, to an interagency

16    working group, which shall coordinate and facilitate the

17    responsibilities and powers of the respective commissions

18    under this chapter.''.

19    (b) TECHNICAL AND CONFORMING AMENDMENT.—

20    The table of sections for chapter 98 of title 31, United

21    States Code, as amended by section 601, is amended by

22    adding at the end the following:

"9810. Registration, rulemaking, and supervision of customer protection and
        market integrity authorities.''.

189

1 SEC. 603. RECORDS AND REPORTS; DUTIES AND POWERS
2             OF CUSTOMER PROTECTION AND MARKET IN-
3             TEGRITY AUTHORITIES.

4     (a) IN GENERAL.—Chapter 98 of title 31, United
5 States Code, as amended by section 602, is amended by
6 adding at the end the following:

7 **"§ 9811. Records and reports; duties and powers of**
8             **customer protection and market integrity**
9             **authorities**

10     "(a) IN GENERAL.—Each customer protection and
11 market integrity authority shall—

12         "(1) with respect to the members of the author-
13     ity, ascertain and enforce compliance with the rules
14     of the authority, Federal and State law to which
15     those members are subject, and any rules issued by
16     any such member, including any rule issued under
17     section 5i of the Commodity Exchange Act (5 U.S.C.
18     7i);

19         "(2) discipline members of the authority and
20     other persons subject to the jurisdiction of the au-
21     thority under this chapter; and

22         "(3) make, and keep for prescribed periods,
23     such electronic records and disseminate reports as
24     the customer protection and market integrity au-
25     thority, by rule, prescribes as necessary or appro-
26     priate in the public interest.

1        ''(b) RECORDS SUBJECT TO EXAMINATION.—

2            ''(1) PROCEDURES FOR COOPERATION WITH

3        OTHER AGENCIES.—

4                ''(A) IN GENERAL.—All records of a mem-

5            ber described in subsection (a) are subject at

6            any time, or from time to time, to reasonable

7            periodic, special, or other examinations by the

8            customer protection and market integrity au-

9            thority of the member.

10                ''(B) NOTICE.—Before conducting an ex-

11            amination under subparagraph (A), the exam-

12            ining authority shall—

13                    ''(i) inform all other relevant regu-

14                latory agencies and entities with jurisdic-

15                tion over the member regarding the pro-

16                posed examination; and

17                    ''(ii) consult concerning the feasibility

18                and desirability of coordinating such exam-

19                ination with examinations conducted by

20                other entities with a view to avoiding un-

21                necessary duplication and undue regulatory

22                burden.

23                ''(C) EXAMINATIONS OF MEMBERS.—Upon

24            a showing of good cause, the Securities and Ex-

25            change Commission or the Commodity Futures

191

1    Trading Commission, as applicable, may con-
2    duct a special examination of a customer pro-
3    tection and market integrity authority or a
4    member of such an authority.

5        ''(D) REPORT.—With respect to an exam-
6    ination under this paragraph, the examining au-
7    thority shall share such information, including
8    reports of the examination, customer complaint
9    information, and other nonpublic regulatory in-
10   formation, as may be appropriate to foster a co-
11   ordinated approach to regulatory oversight for
12   members that are subject to examination by
13   more than 1 examining authority.

14       ''(E) REQUIREMENTS WHEN EXAMINATION
15   NOT ONGOING.—A customer protection and
16   market integrity authority, at all times when an
17   examination under this paragraph is not in
18   progress, shall conduct ongoing supervision of
19   members of the authority, as may be provided
20   by the rules of the authority.

21   ''(2) EXAMINATION STANDARDS.—A customer
22   protection and market integrity authority shall—

23       ''(A) adopt tailored supervision and exam-
24   ination standards commensurate with the size

SIL23812 CHK                                                      S.L.C.

192

1       and complexity of the authority and risks faced

2       by members of the authority; and

3           ''(B) develop standard form customer

4       agreements for the execution of crypto asset

5       transactions.

6   ''(c) AUTHORITIES.—

7       ''(1) IN GENERAL.—The Securities and Ex-

8   change Commission and Commodity Futures Trad-

9   ing Commission, shall, by rule or order, in order to

10  foster cooperation and coordination—

11          ''(A) with respect to any person that is a

12      member of or participant in more than 1 cus-

13      tomer protection and market integrity authority

14      or other entity delegated regulatory and dis-

15      ciplinary authority by a governmental agency

16      or, relieve the authority or entity of any respon-

17      sibility—

18              ''(i) to receive regulatory reports from

19          the person;

20              ''(ii) to examine the person for compli-

21          ance; or

22              ''(iii) to carry out other specified reg-

23          ulatory functions with respect to the per-

24          son; and

Case 3:23-cv-06003-WHO   Document 70-8   Filed 05/09/24   Page 194 of 275
SIL23812 CHK                                           S.L.C.

193

1           ''(B) allocate among entities the authority
2       to adopt rules with respect to matters as to
3       which, in the absence of the allocation, such en-
4       tities share authority.
5       ''(2) CONSIDERATIONS.—
6           ''(A) IN GENERAL.—In making a rule, or
7       entering an order, under paragraph (1), the ap-
8       propriate commission shall take into consider-
9       ation the regulatory capabilities and procedures
10      of the entities, availability of staff, convenience
11      of location, unnecessary regulatory duplication,
12      and all other factors applicable to customer pro-
13      tection, cooperation and coordination, and the
14      development of a healthy crypto asset market,
15      which may include providing for the acceptance
16      of examination reports prepared by a customer
17      protection and market integrity authority under
18      this chapter with respect to a crypto asset
19      intermediary for which crypto asset activities
20      constitute a majority of business, in lieu of ex-
21      aminations conducted by other entities.
22          ''(B) NOTIFICATION REQUIREMENT.—The
23      Securities and Exchange Commission or Com-
24      modity Futures Trading Commission, by rule or
25      order, may require that an authority relieved of

SIL23812 CHK                                                                 S.L.C.

194

1        any responsibility under this paragraph, and
2        any person with respect to which that responsi-
3        bility relates, take such steps as are specified in
4        any rule or order to notify customers of, and
5        persons doing business with, the person of the
6        limited nature of the responsibility of that reg-
7        istered authority for the acts, practices, and
8        course of business of the person.

9     "(d) MISSING AND STOLEN CRYPTO ASSETS.—Each
10  member of a customer protection and market integrity au-
11  thority or other financial institution conducting crypto
12  asset transactions shall report to the Financial Crimes
13  Enforcement Network of the Department of the Treasury
14  such information as may be required by rule relating to
15  crypto asset theft or missing private keys for the posses-
16  sion or control of crypto assets.

17    "(e) CONFIDENTIALITY.—

18        "(1) SHARING OF INFORMATION.—

19            "(A) IN GENERAL.—Section 24 of the Se-
20        curities Exchange Act of 1934 (15 U.S.C. 78x)
21        shall apply to the sharing of information by the
22        Securities and Exchange Commission and Com-
23        modity Futures Trading Commission in accord-
24        ance with this subsection.

SIL23812 CHK                                                    S.L.C.

195

1           "(B) PROTECTION FROM INAPPROPRIATE

2      DISCLOSURE.—The commissions and a cus-

3      tomer protection and market integrity authority

4      shall ensure that all confidential information is

5      not inappropriately disclosed pursuant to sub-

6      paragraph (A).

7      "(2) APPROPRIATE DISCLOSURE NOT PROHIB-

8  ITED.—Nothing in this subsection may be construed

9  to authorize the Securities and Exchange Commis-

10  sion and Commodity Futures Trading Commission

11  or a customer protection and market integrity au-

12  thority to—

13           "(A) withhold information from Congress;

14      or

15           "(B) prevent the commissions, an author-

16      ity or other entity delegated regulatory and dis-

17      ciplinary authority by a governmental agency

18      from complying with—

19                "(i) a request for information from

20           any Federal or State department or agency

21           requesting the information for purposes

22           within the scope of the jurisdiction of that

23           department or agency; or

SIL23812 CHK                                                    S.L.C.

196

1              "(ii) an order of a court of the United
2         States in an action brought by the United
3         States or the commissions.

4     "(f) BEST EXECUTION.—A customer protection and
5  market integrity authority, in consultation with members
6  of the authority, the Securities and Exchange Commis-
7  sion, and the Commodity Futures Trading Commission,
8  shall develop rules governing the best execution of crypto
9  asset transactions.

10     "(g) INITIAL DETERMINATION OF LEGAL CHAR-
11  ACTER.—

12          "(1) IN GENERAL.—

13               "(A) INITIAL DETERMINATION.—A cus-
14          tomer protection and market integrity authority
15          may make an initial determination of the legal
16          character of a crypto asset as a security, an an-
17          cillary asset, a commodity (as defined in section
18          1a of the Commodity Exchange Act (7 U.S.C.
19          1a)), or as otherwise provided by law, upon the
20          written request of a member of the authority.

21               "(B) CONSULTATION; HEARINGS.—Upon
22          receipt of a request under subparagraph (A), a
23          customer protection and market integrity au-
24          thority—

SIL23812 CHK                                                         S.L.C.

197

1            "(i) shall consult with the commis-
2        sions and make an initial determination re-
3        garding the request, after public notice and
4        comment, not later than 45 days after the
5        date on which the authority receives the
6        request; and
7            "(ii) may hold a public hearing with
8        respect to an initial determination de-
9        scribed in clause (i), if—
10              "(I) the matter is of significant
11          precedential value or complex; or
12              "(II) holding such a hearing is
13          otherwise in the public interest.
14      "(2) PUBLICATION.—A customer protection and
15  market integrity authority shall publish all deter-
16  minations made under paragraph (1) on the website
17  of the authority.
18  "(h) OBJECTION TO INITIAL DETERMINATION.—
19      "(1) IN GENERAL.—
20          "(A) DEADLINE FOR OBJECTION.—Not
21      later than 30 days after the date on which an
22      initial determination is made under subsection
23      (g), the Securities and Exchange Commission
24      or Commodity Futures Trading Commission
25      may object to the initial determination of the

198

1    customer protection and market integrity au-
2    thority by issuing an order, after public notice,
3    comment, and a hearing.

4        "(B) EFFECT OF OBJECTION.—Upon an
5    objection under subparagraph (A), the initial
6    determination to which the objection applies
7    shall be held in abeyance.

8        "(2) ORDER.—

9        "(A) DEADLINE FOR OBJECTION.—Not
10   later than 30 days after the date on which an
11   initial determination is made under subsection
12   (g), the Securities and Exchange Commission
13   or the Commodity Futures Trading Commission
14   may object to the initial determination by
15   issuing an order, after public notice, comment,
16   and a hearing.

17       "(B) EFFECT OF OBJECTION.—Upon an
18   objection under subparagraph (A), the initial
19   determination to which the objection applies
20   shall be held in abeyance, pending resolution
21   under section 42(b)(4)(C) of the Securities Ex-
22   change Act of 1934.".

23   (b) TECHNICAL AND CONFORMING AMENDMENT.—
24   The table of sections for chapter 98 of title 31, United

1 States Code, as amended by section 602, is amended by

2 adding at the end the following:

> "9811. Records and reports; duties and powers of customer protection and mar-
> ket integrity authorities.".

## 3 TITLE VII—RESPONSIBLE
## 4 PAYMENTS INNOVATION

**5 SEC. 701. ISSUANCE OF PAYMENT STABLECOINS.**

6     Subtitle C of title VII of the Gramm-Leach-Bliley Act

7 (Public Law 106–102; 113 Stat. 1470) is amended by

8 adding at the end the following:

**9 "SEC. 722A. ISSUANCE OF PAYMENT STABLECOINS.**

10     "(a) PROHIBITIONS.—

11         "(1) IN GENERAL.—It shall be unlawful for any

12     person other than a depository institution in accord-

13     ance with this section, or subsidiary thereof, to issue

14     a payment stablecoin.

15         "(2) KNOWING PARTICIPATION.—Whoever

16     knowingly participates in a violation of this section

17     shall be fined not more than $1,000,000, imprisoned

18     for not more than 5 years, or both.

19         "(3) OFFER OR SALE.—It shall be unlawful for

20     any person to offer or sell a payment stablecoin

21     through the use of any medium or by any means of

22     access in interstate commerce in the United States

23     or to offer or sell a payment stablecoin to a United

24     States person unless such payment stablecoin is

1    issued by a depository institution under this section,

2    except as otherwise provided by the Board of Gov-

3    ernors of the Federal Reserve System.

4        ''(4) EXTRATERRITORIAL EFFECT.—This sub-

5    section is intended to have extraterritorial effect.

6        ''(5) CIVIL ACTION.—The Board of Governors

7    of the Federal Reserve System may bring an action

8    in the appropriate district court of the United States

9    or the court of any territory of the United States for

10   the enforcement of this section and such courts shall

11   have jurisdiction and power to order and require

12   compliance herewith, including through injunctive

13   relief.

14       ''(b) ACTIVITIES.—A depository institution may

15   issue, redeem, and conduct all incidental activities relating

16   to payment stablecoins in accordance with this section.

17       ''(c) REQUIRED PAYMENT STABLECOIN ASSETS.—A

18   depository institution, or a subsidiary thereof, shall main-

19   tain high-quality liquid assets under this section equal to

20   not less than 100 percent of the face amount of the liabil-

21   ities of the institution on payment stablecoins issued by

22   the institution. In the case of a depository institution de-

23   scribed in subsection (n)(1)(A) that engages in the busi-

24   ness of banking other than the issuance of a payment

25   stablecoin and related activities under this section,

1  issuance of the payment stablecoin and all related activi-
2  ties shall take place within a wholly owned subsidiary of
3  the depository institution, within the same holding com-
4  pany structure. Payment stablecoin assets may not be
5  pledged, rehypothecated, or reused, except for the purpose
6  of creating liquidity to meet reasonable expectations of re-
7  quests to redeem payment stablecoins. The provisions of
8  section 24(j) of the Federal Deposit Insurance Act (12
9  U.S.C. 18131a(j)) shall apply to a subsidiary in the same
10 manner as the depository institution. High-quality liquid
11 assets that a bank is permitted to maintain under this
12 section shall include the following:

13        ''(1) United States coins and currency and any
14     other instrument that is legal tender, as defined in
15     section 5103 of title 31, United States Code.

16        ''(2) Demand deposits at a depository institu-
17     tion, except that deposits in an insured depository
18     institution shall not exceed the limit of deposit or
19     share insurance available for that account, or shall
20     be maintained in a special, custodial, or trust ac-
21     count or other off-balance sheet account held by the
22     insured depository institution.

23        ''(3) Balances held at a Federal Reserve bank,
24     which may be held in a master account or seg-
25     regated balance account.

1        ''(4) Foreign withdrawable reserves, as defined

2    in section 249.3 of title 12, Code of Federal Regula-

3    tions, consistent with any foreign unit of account in

4    which the payment stablecoin is denominated or

5    pegged.

6        ''(5) A security that is issued by, or uncondi-

7    tionally guaranteed as to the timely payment of prin-

8    cipal and interest by, the Department of the Treas-

9    ury, with an original maturity of 1 year or less.

10       ''(6) A reserve repurchase agreement relating to

11    a security described in paragraph (5).

12       ''(7) Any other high-quality, liquid asset deter-

13    mined to be consistent with safe and sound banking

14    practices, as determined by the appropriate Federal

15    banking agency or State bank supervisor.

16    ''(d) DISCLOSURES.—Not later than 10 business days

17 after the end of each month, a depository institution shall

18 disclose, in a publicly accessible manner, a summary de-

19 scription of the assets backing the payment stablecoin, the

20 value of the assets, and the number of outstanding pay-

21 ment stablecoins, as of the last day of the month. Such

22 explanation shall be filed with the Secretary of the Treas-

23 ury under penalty of perjury by the chief financial officer

24 of the institution, and made available on a website of the

25 Department of the Treasury, not less than 10 business

1  days after filing. The depository institution shall also re-
2  port on the summary description any instances in which
3  the institution failed to comply with any requirement of
4  subsection (b). As applicable, the appropriate Federal
5  banking agency or State bank supervisor shall, as part of
6  a regular examination of the depository institution, at the
7  frequency otherwise required by law, verify the composi-
8  tion of the assets and the accuracy of the summary de-
9  scriptions made under this subsection and reports under
10  subsection (d). Depository institutions shall clearly dis-
11  close to customers that a payment stablecoin is not guar-
12  anteed by the United States Government or subject to de-
13  posit insurance by the Federal Deposit Insurance Cor-
14  poration or by share insurance of the National Credit
15  Union Administration. Misrepresentation that a payment
16  stablecoin is guaranteed by the United States Government
17  or subject to deposit or share insurance shall be a violation
18  of section 18(a)(4) of the Federal Deposit Insurance Act
19  (12 U.S.C. 1828(a)(4)) or section 709 of title 18, United
20  States Code, as applicable.

21      ''(e) CALL REPORT.—As applicable, the appropriate
22  Federal banking agency or State bank supervisor shall re-
23  quire a depository institution that issues a payment
24  stablecoin to report, in detail, on the composition of the
25  assets and liabilities in each periodic report of condition,

204

1  or in an alternative format approved by the Federal Fi-

2  nancial Institutions Examination Council, at the fre-

3  quency otherwise required by law.

4      ''(f) PERMISSION.—A depository institution shall, as

5  applicable, obtain permission from the appropriate Fed-

6  eral banking agency and State bank supervisor, with an

7  application submitted not less than 6 months before in-

8  tended issuance of the payment stablecoin, but which may

9  be submitted as part of a charter application. A depository

10  institution under subsection (n)(1)(B) chartered by the

11  Office of the Comptroller of the Currency or a State bank

12  supervisor, consistent with the standards of this section,

13  shall, upon approval by the chartering authority, become

14  a member bank of the Federal Reserve System, and be

15  subject to supervision by the appropriate Federal Reserve

16  bank. As part of an application under this section, a de-

17  pository institution shall develop a tailored recovery and

18  resolution plan, consistent with the standards adopted

19  under subsection (k)(1)(F), that would permit the orderly

20  resumption of a safe and sound operation or the orderly

21  wind-down of operations in the event of distress, including

22  the redemption of all outstanding payment stablecoins.

23  The application shall also contain a draft customer agree-

24  ment, flow of funds explanation, a robust information

25  technology plan and operational design of the payment

1  stablecoin. As applicable, the appropriate Federal banking

2  agency or State bank supervisor shall render a written de-

3  cision, with appropriate findings, on the application within

4  4 months of the date of filing, and shall approve the appli-

5  cation unless—

6        ''(1) the payment stablecoin activities are not

7     likely to be able to operate in a safe and sound man-

8     ner;

9        ''(2) the depository institution does not have

10     the required resources and expertise to manage the

11     operation of the payment stablecoin, commensurate

12     with the size and scale of projected operations; or

13        ''(3) the depository institution does not have re-

14     quired policies and procedures relating to material

15     areas of the operation of the payment stablecoin ac-

16     tivities.

17  ''(g) REDEMPTION OF PAYMENT STABLECOINS.—

18  Upon the demand of a customer, a depository institution

19  shall redeem an outstanding payment stablecoin at par in

20  the coins, currency, or other instruments that are legal

21  tender, as defined in section 5103 of title 31, United

22  States Code, or the similar laws of the jurisdiction of the

23  unit of account in which the payment stablecoin is denomi-

24  nated or to which the value of the payment stablecoin is

25  pegged. A depository institution may redeem a payment

206

1   stablecoin issued by another depository institution at par,

2   upon demand. The Board of Governors of the Federal Re-

3   serve System, through the Federal Reserve banks, shall

4   provide for the clearing and settlement of payment

5   stablecoin liabilities among depository institutions under

6   this section and shall ensure competitive equality in all

7   clearing, settlement and related services.

8       ''(h) COLLATERAL AVAILABILITY IN THE CAPITAL

9   MARKETS.—The appropriate Federal banking agencies, in

10  consultation with State bank supervisors, the Securities

11  and Exchange Commission, and Commodity Futures

12  Trading Commission, shall monitor use of the high-quality

13  liquid assets authorized under subsection (b) and the im-

14  pact on collateral availability and the efficient functioning

15  of the capital markets.

16      ''(i) RECEIVERSHIP PRIORITY.—In the event of the

17  receivership of a depository institution that has issued a

18  payment stablecoin under this section, a person that has

19  a valid claim on a payment stablecoin issued by that insti-

20  tution shall have priority over all other claims on the insti-

21  tution with respect to any required payment stablecoin as-

22  sets, including claims with respect to insured deposits,

23  other than administrative costs incurred by the appro-

24  priate Federal banking agency and State bank supervisor,

25  as applicable, relating to the receivership of the institu-

1  tion, if applicable. Consistent with subsection (f), a deposi-

2  tory institution that redeems a payment stablecoin issued

3  by a depository institution in receivership shall be consid-

4  ered to have a valid claim, with corresponding priority

5  under this subsection, on a payment stablecoin issued by

6  the institution in receivership.

7      "(j) INCIDENTAL ACTIVITIES.—A depository institu-

8  tion may conduct all incidental activities relating to the

9  issuance and redemption of payment stablecoins, which

10  shall include the following:

11          "(1)   Management   of   required   payment

12      stablecoin assets in accordance with subsection (b).

13          "(2) Custodial services.

14          "(3) Settlement and clearing.

15          "(4) Post-trade services.

16          "(5) All other activities consistent with a safe

17      and sound operation, as determined by the appro-

18      priate Federal banking agency or State bank super-

19      visor.

20      "(k) APPLICABILITY OF DATA PRIVACY PROVI-

21  SIONS.—Title V of this Act shall apply to the payment

22  stablecoin activities of a depository institution under this

23  section.

24      "(l) RULES.—

SIL23812 CHK                                                    S.L.C.

208

1       "(1) IN GENERAL.—The appropriate Federal
2 banking agencies, in consultation with State bank
3 supervisors, shall adopt rules to implement this sec-
4 tion, including—

5           "(A) capital treatment for depository insti-
6           tutions described in subsection (n)(1) in accord-
7           ance with paragraph (2);

8           "(B) liquidity, leverage, and interest rate
9           risk;

10          "(C) third-party service provider activi-
11          ties—

12             "(i) including custodial wallet pro-
13             viders; and

14             "(ii) not including licensing or capital
15             requirements for third-party service pro-
16             viders;

17          "(D) management practices with respect to
18          required payment stablecoin assets;

19          "(E) appropriate operational, compliance,
20          and information technology risk management;

21          "(F) tailored recovery and resolution
22          standards relating to payment stablecoins; and

23          "(G) any other material topic.

24       "(2) SIGNIFICANT DIFFERENCES.—In accord-
25 ance with section 5169(c)(3)(A) of the Revised Stat-

1    utes, in determining capital and leverage require-
2    ments applicable to a depository institution that has
3    no material assets other than required payment
4    stablecoin assets under this section—

5         ''(A) the depository institution shall not be
6         subject to section 171 of the Financial Stability
7         Act of 2010 (12 U.S.C. 5371); and

8         ''(B) the appropriate Federal banking
9         agencies shall take into account the significant
10        differences between the risks of the assets of
11        the institution and those of depository institu-
12        tions with assets that consist primarily of com-
13        mercial or consumer loans.

14   ''(m) RULE OF CONSTRUCTION.—Nothing in this sec-
15   tion may be construed as—

16        ''(1) preventing a State bank supervisor from
17        imposing additional or more strict regulatory stand-
18        ards on a bank permitted to issue payment
19        stablecoins;

20        ''(2) superseding any requirement of State law
21        relating to money transmitting businesses operating
22        in that State, other than for payment stablecoin
23        issuers under this section; or

24        ''(3) limiting the authority of an insured deposi-
25        tory institution to engage in activities permissible

210

1 pursuant to applicable State and Federal law, in-
2 cluding accepting or receiving deposits represented
3 on a distributed ledger or any similar analogue.

4 ''(n) DEFINITIONS.—In this section:

5     ''(1) DEPOSITORY INSTITUTION.—The term 'de-
6 pository institution' has the meaning given the term
7 in section 19(b)(1) of the Federal Reserve Act (12
8 U.S.C. 461(b)(1)) and includes—

9         ''(A) an insured depository institution; or

10         ''(B) a depository institution operating
11         under subsection (c) of section 5169 of the Re-
12         vised Statutes (12 U.S.C. 27), or a substan-
13         tially similar State law, which is exclusively en-
14         gaged in issuing payment stablecoins, providing
15         safekeeping, trust or custodial services, or ac-
16         tivities incidental to the foregoing.

17     ''(2) PAYMENT STABLECOIN.—The term 'pay-
18 ment stablecoin' has the meaning given the term in
19 section 9801 of title 31, United States Code.

20     ''(3) SEGREGATED BALANCE ACCOUNT.—The
21 term 'segregated balance account' includes an ac-
22 count of a depository institution with a Federal Re-
23 serve bank or a foreign central bank to which only
24 required payment stablecoin assets are credited.''.

211

1 **SEC. 702. TREATMENT OF ENDOGENOUSLY REFERENCED**
2      **CRYPTO ASSETS.**

3     (a) DEFINITION.—As used in this section,
4 ''endogenously referenced crypto asset'' means a crypto
5 asset that—

6        (1) its originator has represented will be con-
7     verted, redeemed, or repurchased for a fixed amount
8     of monetary value, or a mechanism exists or is pro-
9     vided to achieve any of the preceding; and

10        (2) one of the following:

11        (A) The crypto asset relies solely on the
12        value of another crypto asset to maintain the
13        fixed amount of monetary value.

14        (B) The crypto asset relies on algorithmic
15        means to maintain the fixed amount of mone-
16        tary value.

17        (C) A combination of subparagraphs (A)
18        and (B).

19     (b) LEGAL CLASSIFICATION.—Endogenously ref-
20 erenced crypto assets are hybrid instruments, as defined
21 in section 1a of the Commodity Exchange Act (7 U.S.C.
22 1a).

23     (c) PROHIBITION ON USE OF TERM STABLECOIN.—
24 Endogenously referenced crypto assets shall not use the
25 term ''payment stablecoin'' or ''stablecoin'' in advertising
26 or marketing materials.

**SEC. 703. CERTIFICATE OF AUTHORITY TO COMMENCE BANKING.**

Section 5169 of the Revised Statutes (12 U.S.C. 27) is amended—

    (1) in subsection (a), in the third sentence, by striking "to those of a trust company and activities related thereto." and inserting the following: "to—

        "(1) those of a trust company and fiduciary activities related thereto; or

        "(2) those of a depository institution required to maintain assets valued at not less than 100 percent of the deposits of the institution, for the purposes of issuing a payment stablecoin (as defined in section 9801 of title 31, United States Code) and activities related thereto consistent with subsection (c) of this section and without the requirement to maintain deposit insurance under the Federal Deposit Insurance Act (12 U.S.C. 1811 et seq.)."; and

    (2) by adding at the end the following:

"(c)(1) Notwithstanding any other provision of law, a National Bank Association described in subsection (a) may not engage in maturity transformation or facilitate consumer lending through third parties.

"(2) Restrictions on affiliate transactions applicable for insured depository institutions shall apply to such depository institutions.

213

1 ''(3) The Comptroller of the Currency, in close con-
2 sultation with the Board of Governors of the Federal Re-
3 serve System and State bank supervisors, shall develop the
4 following:

5     ''(A) A simplified capital framework based on
6     the following:

7         ''(i) Payment system risk.

8         ''(ii) The greater of—

9             ''(I) all projected costs of receivership;
10            or

11            ''(II) 3 years of projected operating
12            expenses.

13     ''(B) Appropriate standards for the depository
14     institution to develop a community contribution
15     plan, which may include consumer education, finan-
16     cial literacy, charitable donations, volunteerism, job
17     training and internships or similar involvement.

18     ''(C) A tailored recovery and resolution plan
19     that would permit the orderly resumption of a safe
20     and sound operation or the orderly wind-down of op-
21     erations relating to a payment stablecoin in the
22     event of distress.

23     ''(D) Tailored holding company supervision, as
24     specified by section 15 of the Bank Holding Com-
25     pany Act of 1956.

214

1        ''(4) In designing the simplified capital frame-
2    work required by paragraph (3)(A), the Comptroller
3    of the Currency—

4            ''(A) shall not subject depository institu-
5        tions to the standards of section 171 of the Fi-
6        nancial Stability Act of 2010 (12 U.S.C. 5371);
7        and

8            ''(B) shall take into account the significant
9        differences between the risks of the assets of
10       the institution and those of depository institu-
11       tions with assets that consist primarily of com-
12       mercial or consumer loans.

13       ''(d) The Comptroller of the Currency may promul-
14   gate rules to carry out this section.''.

15   **SEC. 704. HOLDING COMPANY SUPERVISION OF COVERED**
16                    **DEPOSITORY INSTITUTIONS.**

17       The Bank Holding Company Act of 1956 (12 U.S.C.
18   1841 et seq.) is amended—

19       (1) in section 2(c) (12 U.S.C. 1841(c)), by
20   striking paragraph (2) and by inserting the fol-
21   lowing:

22       ''(2) EXCEPTIONS.—The term 'bank' does not
23   include a covered depository institution subject to
24   tailored holding company supervision under section
25   15.''; and

215

1        (2) by adding at the end the following:

2   **"SEC. 15. HOLDING COMPANY SUPERVISION FOR CERTAIN**

3            **DEPOSITORY INSTITUTIONS.**

4        "(a) DEFINITIONS.—In this section:

5            "(1) APPROPRIATE BANKING SUPERVISOR.—

6        The term 'appropriate banking supervisor' means

7        the Comptroller of the Currency, a State bank su-

8        pervisor, in the case of a State member bank, the

9        Board, or in the case of an insured bank, the Fed-

10       eral Deposit Insurance Corporation, as applicable.

11           "(2) CONTROLLING INTEREST.—The term 'con-

12       trolling interest' means a circumstance when a per-

13       son, directly or indirectly, or acting through or in

14       concert with 1 or more persons—

15               "(A) owns, controls, or has the power to

16           vote 25 percent or more of any class of voting

17           securities of a covered depository institution;

18               "(B) controls in any manner the election of

19           a majority of the directors of the covered depos-

20           itory institution; or

21               "(C) has the power to exercise a control-

22           ling influence over the management or policies

23           of the covered depository institution.

24           "(3) COVERED DEPOSITORY INSTITUTION.—

25       The term 'covered depository institution' means a

216

1   depository institution operating under subsection (c)

2   of section 5169 of the Revised Statutes (12 U.S.C.

3   27), or a substantially similar State law, other than

4   a bank, as defined in section 2 of the Bank Holding

5   Company Act of 1956 (12 U.S.C. 1841), or an in-

6   sured depository institution, as defined in section 3

7   of the Federal Deposit Insurance Act (12 U.S.C.

8   1813), which is exclusively engaged in issuing pay-

9   ment stablecoins, providing safekeeping, trust or

10  custodial services, or activities incidental to the fore-

11  going.

12  "(b) CONTROLLING INTEREST.—A person with a

13  controlling interest in a covered depository institution

14  shall—

15      "(1) submit annual audited financial statements

16      and other information as otherwise reasonably re-

17      quired by the appropriate banking supervisor; and

18      "(2) provide a description of all affiliated or

19      parent entities and their relationships with the insti-

20      tution, including annual updates.

21  "(c) TAX ALLOCATION AGREEMENT.—The appro-

22  priate banking supervisor may require a legal entity with

23  a controlling interest in a covered depository institution

24  to execute a tax allocation agreement with the institution

25  that—

217

1            ''(1) expressly states that an agency relation-

2     ship exists between the person and the institution

3     with respect to tax assets generated by the institu-

4     tion, and that the assets are held in trust by the

5     person for the benefit of the institution and will be

6     promptly remitted to the institution; and

7            ''(2) may provide that the amount and timing

8     of any payments or refunds to the institution by the

9     person should be no less favorable than if the insti-

10     tution were a separate taxpayer.

11   ''(d) PROHIBITION ON CONTROLLING INTERESTS.—

12 A person that is a commercial firm, as defined in section

13 602 of the Bank and Savings Association Holding Com-

14 pany and Depository Institution Regulatory Improvements

15 Act of 2010 (12 U.S.C. 1815 note), shall not obtain a

16 controlling interest in a covered depository institution.

17   ''(e) PUBLIC INTEREST.—If the appropriate banking

18 supervisor finds that it is in the public interest and has

19 reasonable cause to believe it is necessary to protect the

20 customers of a covered depository institution, the super-

21 visor may—

22            ''(1) conduct an examination of a legal entity

23     with a controlling interest in a covered depository in-

24     stitution or otherwise require information from the

25     person; and

SIL23812 CHK                                                    S.L.C.

218

1        "(2) require a person with a controlling interest

2    in a covered depository institution to divest or sever

3    their relationship with the institution, if necessary to

4    maintain safety and soundness.".

**SEC. 705. CODIFYING CUSTODIAL PRINCIPLES FOR FINAN-**

**CIAL INSTITUTIONS.**

7    (a) FINDINGS.—Congress finds the following:

8        (1) The laws surrounding custody of financial

9    assets is largely customary, uncodified, and poorly

10   understood.

11       (2) Lack of uniformity amongst various juris-

12   dictions' laws relating to custody has largely not

13   been addressed by regulators, can contribute to risk,

14   and is producing uncertainty for innovators.

15       (3) Codifying basic principles around custody of

16   financial assets will reduce systemic risk, clearly de-

17   fine the rights and duties of both custodian and cus-

18   tomer, and contribute to a more uniform and effec-

19   tive banking system.

20   (b) DEFINITION.—In this section, the term "cus-

21   tody" means the safekeeping, servicing and management

22   of customer financial assets, including currency, securities

23   and commodities, on an off-balance sheet basis.

24   (c) CUSTODY.—

SIL23812 CHK                                                         S.L.C.

219

1          (1) IN GENERAL.—Except as provided in para-
2     graph (2), custody of financial assets is accom-
3     plished by a bailment and established by a written
4     customer agreement. Custody shall not be a fidu-
5     ciary or trust activity unless the custodian is pro-
6     viding substantial discretionary services with respect
7     to an account, including through investment advice
8     or investment discretion, and the custodian owes a
9     customer a higher standard of care or duty with re-
10    spect to the customer of that account.

11         (2) EXCEPTION.—A custodian and customer
12    may establish a legal relationship other than a bail-
13    ment pursuant to a written customer agreement.

14     (d) PROPER DOCUMENTATION.—A custodial account
15 shall be properly documented in a customer agreement,
16 with a clearly defined legal relationship between the custo-
17 dian and customer. Custodial assets shall be properly iden-
18 tified and segregated from the assets of the custodian,
19 with proper documentation of asset segregation.

20     (e) NOT ASSETS OR LIABILITIES.—Assets properly
21 held in a custodial account under this section are not as-
22 sets or liabilities of the custodian and shall be maintained
23 on an off-balance sheet basis, including for the purpose
24 of accounting treatment for the custodian, notwith-
25 standing the form in which the assets are maintained.

1    (f) APPLICABILITY.—This section shall apply to all

2 depository institutions, as defined in section 19(b)(1) of

3 the Federal Reserve Act (12 U.S.C. 461(b)(1)), and non-

4 depository trust companies chartered under section 5169

5 of the Revised Statutes (12 U.S.C. 27).

**SEC. 706. IMPLEMENTATION RULES TO PRESERVE ADE-**

**QUATE        COMPETITION        IN        PAYMENT**

**STABLECOINS.**

9    (a) IN GENERAL.—The application of a non-deposi-

10 tory trust company or the holder of a State license that

11 only persons engaged in crypto asset activities may obtain,

12 which was chartered or issued under the laws of a State

13 or the National Bank Act before the date of enactment

14 of this Act, to receive a charter as a depository institution

15 and to operate under subsection (c) of section 5169 of the

16 Revised Statutes (12 U.S.C. 27), as added by section 703

17 of this Act, shall be decided upon by the Comptroller of

18 the Currency before an application for a charter to operate

19 under that section from another entity that is filed on or

20 after the date of enactment of this Act.

21    (b) APPLICATION.—The application of a covered de-

22 pository institution, as defined in section 15(a) of the

23 Bank Holding Company Act of 1956 (12 U.S.C. 1853(a)),

24 chartered before the date of enactment of this Act to be-

25 come a State member bank in the Federal Reserve System

221

1 or for access to Federal Reserve services under section
2 11A of the Federal Reserve Act (12 U.S.C. 248a) shall
3 be decided upon by the Board of Governors of the Federal
4 Reserve System, or a Federal Reserve bank, as applicable,
5 before any application to become a State member bank
6 or for Federal Reserve services from any other entity
7 which seeks to operate as a covered depository institution
8 and which is filed on or after the date of enactment of
9 this Act.

10     (c) DECISION.—The applications described in sub-
11 sections (a) and (b) of this section shall be decided upon
12 by the appropriate Federal banking agency (as defined in
13 section 3 of the Federal Deposit Insurance Act (12 U.S.C.
14 1813)) or Federal Reserve bank, as applicable, before an
15 insured depository institution in operation before the en-
16 actment date of this Act may issue a payment stablecoin
17 in accordance with section 722A of the Gramm-Leach-Bli-
18 ley Act, as added by section 601 of this Act.

**19 SEC. 707. STUDY ON USE OF DISTRIBUTED LEDGER TECH-**
**20             NOLOGY FOR REDUCTION OF RISK IN DEPOS-**
**21             ITORY INSTITUTIONS.**

22     Not later than 180 days after the date of enactment
23 of this Act, the Board of Governors of the Federal Reserve
24 System shall complete a study and submit to the Com-
25 mittee on Banking, Housing, and Urban Affairs of the

1 Senate and the Committee on Financial Services of the
2 House of Representatives a report regarding the manner
3 in which distributed ledger technology may reduce risk for
4 depository institutions, as defined in section 19(b)(1) of
5 the Federal Reserve Act (12 U.S.C. 461(b)(1)), including
6 settlement risk, operational risk and capital requirements.

**SEC. 708. CLARIFYING APPLICATION REVIEW TIMES WITH**

8         **RESPECT TO THE FEDERAL BANKING AGEN-**

9         **CIES.**

10     Section 343 of the Riegle Community Development
11 and Regulatory Improvement Act of 1994 (12 U.S.C.
12 4807) is amended by striking subsections (a) and (b) and
13 inserting the following:

14     ''(a) FINAL ACTION.—

15         ''(1) DEFINITION.—In this subsection, the term
16         'completed application'—

17             ''(A) means the information requested by
18             the Federal banking agency at the outset of an
19             application through application forms or similar
20             means; and

21             ''(B) does not include supplemental infor-
22             mation requested by the agency after filing of
23             an application.

24         ''(2) ACTION.—Each Federal banking agency,
25         including Federal Reserve banks, shall take final ac-

223

1    tion on any application to the agency before the end

2    of the 1-year period beginning on the date on which

3    a completed application is received by the agency.

4       ''(b) REPORT.—Each Federal banking agency, in-

5    cluding the Federal Reserve banks, shall annually report

6    to Congress a list of the applications that have been pend-

7    ing for 12 months or longer since the date of the initial

8    application filed by an applicant, and the date on which

9    a completed application was received. Such list—

10        ''(1) shall disclose the reason why the applica-

11        tion has not yet been approved or denied by the

12        Federal banking agency; and

13        ''(2) shall not contain confidential supervisory

14        information.

15      ''(c) WAIVER BY APPLICANT AUTHORIZED.—Any

16   person submitting an application to a Federal banking

17   agency may waive the applicability of subsection (a) with

18   respect to such application at any time.''.

19   **SEC. 709. CONFORMING AMENDMENTS.**

20      (a) FEDERAL DEPOSIT INSURANCE ACT.—Section

21   12 of the Federal Deposit Insurance Act (12 U.S.C. 1822)

22   is amended by adding at the end the following:

23      ''(g) APPOINTMENT OF RECEIVER.—

24        ''(1) DEFINITION.—In this subsection, the term

25        'covered depository institution' has the meaning

1      given the term in section 15(a) of the Bank Holding

2      Company Act of 1956.

3          ''(2) APPOINTMENT.—The Corporation may be

4      appointed as receiver of a covered depository institu-

5      tion, as defined in section 15(a) of the Bank Hold-

6      ing Company Act of 1956.

7          ''(3) PREMIUMS.—A covered depository institu-

8      tion may not be charged deposit insurance premiums

9      for the purpose of this subsection, but the Corpora-

10     tion may use the capital of the covered depository

11     institution to fund the costs of the receivership.

12         ''(4) RULES.—The Corporation may promul-

13     gate rules to carry out this subsection, which shall—

14             ''(A) be substantially consistent with the

15         rules for receivership of an insured depository

16         institution; and

17             ''(B) account for the limited activities, cap-

18         ital, and the required tailored recovery and res-

19         olution plan of the covered depository institu-

20         tion.''.

21     (b) FEDERAL RESERVE ACT.—The Federal Reserve

22     Act (12 U.S.C. 221 et seq.) is amended—

23         (1)  in  section  19(b)(1)(A)  (12  U.S.C.

24         461(b)(1)(A))—

1          (A) in clause (vi), by striking "and" at the

2       end;

3          (B) in clause (vii), by striking the period

4       at the end and inserting "; and"; and

5          (C) by adding at the end the following:

6             "(viii) a covered depository institution,

7          as defined in section 15(a) of the Bank

8          Holding Company Act of 1956."; and

9    (2) in the first undesignated paragraph of sec-

10   tion 9 (12 U.S.C. 321), in the first sentence, by in-

11   serting ", covered depository institutions, as defined

12   in section 15(a) of the Bank Holding Company Act

13   of 1956 (12 U.S.C. 1853(a))," after "Plan banks".

## TITLE VIII—RESPONSIBLE TAXATION OF CRYPTO ASSETS

**SEC. 801. DE MINIMIS GAIN FROM SALE OR EXCHANGE OF CRYPTO ASSETS.**

18   (a) IN GENERAL.—Part III of subchapter B of chap-

19   ter 1 of the Internal Revenue Code of 1986 is amended

20   by inserting after section 139I the following new section:

21   **"SEC. 139J. DE MINIMIS GAIN FROM SALE OR EXCHANGE OF CRYPTO ASSETS.**

23   "(a) IN GENERAL.—Subject to subsection (b), gross

24   income shall not include gain from the sale or exchange

25   of any crypto asset (as defined in section 9801 of title

1  31, United States Code), unless the sale or exchange is

2  for—

3        ''(1) cash or cash equivalents,

4        ''(2) any property used by the taxpayer in the

5  active conduct of a trade or business, or

6        ''(3) any property held by the taxpayer for the

7  production of income (as described in section

8  212(2)).

9  ''(b) LIMITATION.—

10        ''(1) IN GENERAL.—Subsection (a) shall not

11  apply in the case of any sale or exchange for

12  which—

13            ''(A) the total value of such sale or ex-

14        change exceeds $200, or

15            ''(B) the total gain which would otherwise

16        be recognized with respect to such sale or ex-

17        change exceeds $200.

18        ''(2) AGGREGATION RULE.—For purposes of

19  this subsection, all sales or exchanges which are part

20  of the same transaction (or a series of related trans-

21  actions) shall be treated as one sale or exchange.

22  ''(c) INFLATION ADJUSTMENT.—In the case of any

23  taxable year beginning in a calendar year after 2024, each

24  dollar amount in subsection (b)(1) shall be increased by

25  an amount equal to—

1        ''(1) such dollar amount, multiplied by

2        ''(2) the cost-of-living adjustment determined

3    under section 1(f)(3) for the calendar year in which

4    the taxable year begins, determined by substituting

5    'calendar year 2023' for 'calendar year 2016' in sub-

6    paragraph (A)(ii) thereof.

7    Any increase determined under the preceding sentence

8    shall be rounded to the nearest multiple of $10.''.

9        (b) CLERICAL AMENDMENT.—The table of sections

10   for part III of subchapter B of chapter 1 of the Internal

11   Revenue Code of 1986 is amended by inserting after the

12   item relating to section 139I the following new item:

> ''Sec. 139J. De minimis gain from sale or exchange of crypto assets.''.

13       (c) EFFECTIVE DATE.—The amendments made by

14   this section shall apply to taxable years beginning after

15   December 31, 2024.

16   **SEC. 802. INFORMATION REPORTING REQUIREMENTS IM-**

17   **POSED ON BROKERS WITH RESPECT TO**

18   **CRYPTO ASSETS.**

19       (a) CLARIFICATION OF DEFINITION OF BROKER.—

20       (1) IN GENERAL.—Section 6045(c)(1)(D) of the

21   Internal Revenue Code of 1986 is amended to read

22   as follows:

23       ''(D) any person who (for consideration)

24   stands ready in the ordinary course of a trade

SIL23812 CHK                                                  S.L.C.

228

1    or business to effect sales of crypto assets at

2        the direction of their customers.''.

3        (2) EFFECTIVE DATE.—The amendment made

4    by this subsection shall apply to returns required to

5    be filed and statements required to be furnished

6    after December 31, 2025.

7    (b) REPORTING OF CRYPTO ASSETS.—

8        (1) APPLICABLE DATE.—Section 6045(g)(3) of

9    the Internal Revenue Code of 1986 is amended—

10            (A) in subparagraph (B)(iv), by striking

11        ''digital asset'' and inserting ''crypto asset'',

12            (B)  in  subparagraph  (C),  by  striking

13        clause (iii) and inserting the following:

14                ''(iii) January 1, 2025, in the case of

15            any  specified  security  which  is  a  crypto

16            asset, and'', and

17            (C) by striking subparagraph (D) and in-

18        serting the following:

19                ''(D) CRYPTO ASSET.—The term 'crypto

20            asset' has the meaning given such term in sec-

21            tion 9801 of title 31, United States Code.''.

22        (2) FURNISHING  OF  INFORMATION.—Section

23    6045A(d) of such Code is amended to read as fol-

24    lows:

1    "(d) RETURN REQUIREMENT FOR CERTAIN TRANS-

2  FERS OF CRYPTO ASSETS NOT OTHERWISE SUBJECT TO

3  REPORTING.—Any broker, with respect to any transfer

4  (which is not part of a sale or exchange executed by such

5  broker) during a calendar year of a covered security which

6  is a crypto asset (as defined in section 9801 of title 31,

7  United States Code) from an account wholly controlled

8  and maintained by such broker to an account which is not

9  maintained by, or an address not associated with, a person

10  that such broker knows or has reason to know is also a

11  broker, shall make a return for such calendar year, in such

12  form as determined by the Secretary, showing the infor-

13  mation otherwise required to be furnished with respect to

14  transfers subject to subsection (a). Information reported

15  by brokers under this section shall be limited to customer

16  information that is voluntarily provided by the customer

17  and held by the broker for a legitimate business purpose.".

18      (3) DELAYED EFFECTIVE DATE FOR CERTAIN

19   INFORMATION REPORTING CHANGES; REVERSAL OF

20   CERTAIN ADDITIONS TO 6050I.—

21       (A) IN GENERAL.—Section 6050I(d) of

22    such Code is amended—

23        (i) in paragraph (1), by adding "and"

24       at the end,

1           (ii) in paragraph (2), by striking ",

2       and" and inserting a period, and

3           (iii) by striking paragraph (3).

4       (B) DELAYED EFFECTIVE DATE.—Section

5   80603(c) of the Infrastructure Investment and

6   Jobs Act is amended by striking "December 31,

7   2023" and inserting "December 31, 2025".

8       (4) EFFECTIVE DATES.—

9       (A) The amendments made by paragraphs

10  (1) and (2) shall apply to returns required to

11  be filed and statements required to be furnished

12  after December 31, 2025.

13      (B) The amendments made by paragraph

14  (3) shall take effect as if included in the enact-

15  ment of section 80603 of the Infrastructure In-

16  vestment and Jobs Act.

17  **SEC. 803. SOURCES OF INCOME.**

18      (a) IN GENERAL.—Paragraph (2) of section 864(b)

19  of the Internal Revenue Code of 1986 is amended by re-

20  designating subparagraph (C) as subparagraph (D) and

21  by inserting after subparagraph (B) the following new

22  subparagraph:

23          "(C) CRYPTO ASSETS.—

24              "(i) IN GENERAL.—Trading in crypto

25          assets through a resident broker, commis-

S.L.C.

231

1   sion agent, custodian, crypto asset ex-
2   change, or other independent agent.

3   ''(ii) TRADING FOR TAXPAYER'S OWN
4   ACCOUNT.—Trading in crypto assets for
5   the taxpayer's own account, whether by the
6   taxpayer or the taxpayer's employees or
7   through a resident broker, commission
8   agent, custodian, crypto asset exchange, or
9   other agent, and whether or not any such
10   employee or agent has discretionary au-
11   thority to make decisions in effecting the
12   transactions. This clause shall not apply in
13   the case of a dealer in crypto assets.

14   ''(iii) DEFINITIONS.—For purposes of
15   this subparagraph—

16         ''(I) CRYPTO ASSET EX-
17         CHANGE.—The term 'crypto asset ex-
18         change' means a centralized or decen-
19         tralized platform which facilitates the
20         transfer of crypto assets.

21         ''(II) CRYPTO ASSET.—The term
22         'crypto asset' has the meaning given
23         such term in section 9801 of title 31,
24         United States Code.

1           ''(iv)  LIMITATION.—This  subpara-
2       graph shall apply only if the crypto assets
3       are of a kind customarily dealt in on a
4       crypto asset exchange and if the trans-
5       action is of a kind customarily con-
6       summated at such exchange.''.

7       (b) CONFORMING AMENDMENT.—Subparagraph (D)
8   of section 864(b)(2) of the Internal Revenue Code of
9   1986, as redesignated by subsection (a), is amended by
10  striking ''(A)(i) and (B)(i)'' and inserting ''(A)(i), (B)(i),
11  and (C)(i)''.

12      (c) EFFECTIVE DATE.—The amendments made by
13  this section shall apply to taxable years beginning after
14  the date of enactment of this Act.

## SEC. 804. TAX TREATMENT OF CRYPTO ASSET LENDING AGREEMENTS AND RELATED MATTERS.

17      (a) IN GENERAL.—Subsection (a) of section 1058 of
18  the Internal Revenue Code of 1986 is amended by striking
19  ''(as defined in section 1236(c))''.

20      (b) FIXED TERM.—Paragraph (1) of subsection (b)
21  of section 1058 of the Internal Revenue Code of 1986 is
22  amended by inserting '', including a fixed-term transfer
23  that occurs in the ordinary course of a securities lending
24  or investment management business'' after ''transferred''.

233

1    (c) BASIS.—Subsection (c) of section 1058 of the In-
2 ternal Revenue Code of 1986 is amended by adding at the
3 end the following: "All appropriate basis adjustments to
4 an agreement under subsection (b) shall be made, as de-
5 termined by the Secretary, including upon the return of
6 the lent securities to the taxpayer.".

7    (d) SECURITIES.—Section 1058 of the Internal Rev-
8 enue Code of 1986 is amended by adding at the end the
9 following new subsections:

10    "(d) SECURITIES.—For purposes of this section, the
11 term 'securities' has the meaning given such term by sec-
12 tion 1236(c), except that such term includes any crypto
13 asset (as defined in section 9801 of title 31, United States
14 Code) and, with respect to a crypto asset, does not require
15 a call option.

16    "(e) INCOME.—An amount equal to the income which
17 would otherwise accrue to the lender but for a lending
18 transaction under this section shall be included in the
19 gross income of the lender.".

20    (e) RULE OF CONSTRUCTION.—Nothing in this sec-
21 tion, or any amendments made by this section, shall be
22 construed to create any inference with respect to the clas-
23 sification of any crypto asset as a security under the Secu-
24 rities Act of 1933 (15 U.S.C. 77a et seq.) or the Securities
25 Exchange Act of 1934 (15 U.S.C. 78a et seq.).

234

1    (f) RULEMAKING AUTHORITY.—The Secretary of the

2  Treasury (or the Secretary's delegate) may adopt rules to

3  implement the amendments made by this section, includ-

4  ing the application of the amendments made by this sec-

5  tion to forks, airdrops, and similar subsidiary value.

6    (g) EFFECTIVE DATE.—The amendments made by

7  this section shall apply to sales and exchanges in taxable

8  years beginning after the date of enactment of this Act.

9  **SEC. 805. LOSS FROM WASH SALES OF CRYPTO ASSETS.**

10    (a) IN GENERAL.—Section 1091 of the Internal Rev-

11  enue Code of 1986 is amended to read as follows:

12  **"SEC. 1091. LOSS FROM WASH SALES OF SPECIFIED ASSETS.**

13    "(a) DISALLOWANCE OF LOSS DEDUCTION.—

14      "(1) IN GENERAL.—No deduction shall be al-

15    lowed with respect to any loss claimed to have been

16    sustained from any sale or other disposition (includ-

17    ing any termination) of specified assets where it ap-

18    pears that, within a period beginning 30 days before

19    the date of such sale or other disposition and ending

20    30 days after such date, the taxpayer has—

21        "(A) acquired (by purchase, by an ex-

22      change on which the entire amount of gain or

23      loss was recognized by law, or by entering into)

24      substantially identical specified assets, or

SIL23812 CHK                                                              S.L.C.

235

1          "(B) entered into a contract or option to

2     acquire, or long notional principal contract in

3     respect of, substantially identical specified as-

4     sets.

5          "(2) EXCEPTION FOR DEALERS.—Paragraph

6     (1) shall not apply if—

7          "(A) the taxpayer is a dealer in specified

8     assets,

9          "(B) the loss is sustained in a transaction

10    made in the ordinary course of its business as

11    a dealer, and

12         "(C) the acquisition (or the entering into

13    of the contract or option to acquire or long no-

14    tional principal contract) which (without regard

15    to this paragraph) would have resulted in the

16    non-deductibility of the loss was similarly made

17    in the ordinary course of such business.

18    "(b) SPECIFIED ASSETS ACQUIRED LESS THAN

19 SPECIFIED ASSETS SOLD.—If the amount of specified as-

20 sets acquired (or covered by the contract or option to ac-

21 quire or long notional principal contract) is less than the

22 amount of specified assets sold or otherwise disposed of,

23 then the particular specified assets the loss from the sale

24 or other disposition of which is not deductible shall be de-

25 termined under regulations prescribed by the Secretary.

236

1    ''(c) SPECIFIED ASSETS ACQUIRED NOT LESS THAN
2 SPECIFIED ASSETS SOLD.—If the amount of specified as-
3 sets acquired (or covered by the contract or option to ac-
4 quire or long notional principal contract) is not less than
5 the amount of specified assets sold or otherwise disposed
6 of, then the particular specified assets the acquisition of
7 which (or the entering into of the contract or option to
8 acquire or long notional principal contract of which) re-
9 sulted in the non-deductibility of the loss shall be deter-
10 mined under regulations prescribed by the Secretary.

11    ''(d) ADJUSTMENT TO BASIS IN CASE OF WASH
12 SALE.—

13        ''(1) IN GENERAL.—The basis of the specified
14    asset acquired (or the contract, option, or long no-
15    tional principal contract entered into) shall be in-
16    creased by the amount of the deduction disallowed
17    under subsection (a) (reduced by any amount of
18    such deduction taken into account under this sub-
19    section to increase the basis of any specified asset
20    previously acquired or any contract, option, or long
21    notional principal contract previously entered into).

22        ''(2) RULES WITH RESPECT TO CERTAIN ACQUI-
23    SITIONS.—

24            ''(A)  IN  GENERAL.—In  any  case  in
25        which—

237

1           "(i) the taxpayer enters into a con-
2       tract or option to acquire, or long notional
3       principal contract in respect of, substan-
4       tially identical specified assets (within the
5       period specified in subsection (a)), and

6           "(ii) the taxpayer also acquires (with-
7       in the period specified in subsection (a))
8       substantially identical specified assets and
9       such acquisition would, but for the enter-
10      ing into of the contract, option, or long no-
11      tional principal contract described in clause
12      (i), have triggered a disallowance under
13      subsection (a),

14  then, subject to such exceptions as the Sec-
15  retary may prescribe, paragraph (1) shall apply
16  to the substantially identical specified assets de-
17  scribed in clause (ii) and not to the contract,
18  option, or long term principal contract de-
19  scribed in clause (i).

20      "(B) SPECIAL RULE FOR CONTRACTS AND
21  OPTIONS.—Subject to such exceptions as the
22  Secretary may prescribe, if the acquisition of
23  any substantially identical specified asset is
24  pursuant to a contract or option described in
25  subparagraph (A)(i), then, notwithstanding

1          whether such asset was acquired within the pe-
2          riod specified in subsection (a), paragraph (1)
3          shall apply to the substantially identical speci-
4          fied asset acquired pursuant to the contract or
5          option and not to the contract or option.

6     ''(e) Certain Short Sales of Specified Assets
7  and Contracts to Sell.—Rules similar to the rules of
8  subsection (a) shall apply to any loss realized on the clos-
9  ing of a short sale of (or the sale, disposition, or termi-
10  nation of a contract or option to sell or a short notional
11  principal contract in respect of) specified assets if, within
12  a period beginning 30 days before the date of such closing
13  and ending 30 days after such date, another such short
14  sale of (or contract or option to sell or short notional prin-
15  cipal contract in respect of) substantially identical speci-
16  fied assets was entered into by the taxpayer.

17     ''(f) Cash Settlement.—This section shall not fail
18  to apply to a contract or option to acquire or sell specified
19  assets solely by reason of the fact that the contract or
20  option settles in (or could be settled in) cash or property
21  other than such specified assets.

22     ''(g) Specified Asset.—For purposes of this sec-
23  tion, the term 'specified asset' means any of the following:
24          ''(1) Any security (as defined in section
25          475(c)(2)).

239

1  ''(2) Except as otherwise provided by the Sec-

2  retary—

3        ''(A) any crypto asset (as defined in sec-

4        tion 9801 of title 31, United States Code)

5        which is actively traded (within the meaning of

6        section 1092(d)(1)),

7        ''(B) any notional principal contract with

8        respect to any crypto asset described in sub-

9        paragraph (A), and

10        ''(C) any evidence of an interest in, or a

11        derivative instrument in, any crypto asset de-

12        scribed in subparagraph (A) or (B), including

13        any option, forward contract, futures contract,

14        short position, and any similar instrument in

15        such a crypto asset.

16  Such term shall, except as provided in regulations, include

17  contracts or options to acquire or sell, or notional principal

18  contracts in respect of, any specified assets.

19    ''(h) EXCEPTION FOR BUSINESS NEEDS AND HEDG-

20  ING TRANSACTIONS.—

21        ''(1) IN GENERAL.—Except as provided in regu-

22        lations prescribed by the Secretary, in the case of a

23        specified asset to which this subsection applies, sub-

24        section (a) shall not apply to the extent that both

25        the sale or other disposition of such asset and the

1    acquisition of (or the entering into of the contract

2    or option to acquire or long notional principal con-

3    tract in respect of) are—

4            ''(A) directly related to the business needs

5        of a trade or business of the taxpayer (other

6        than the trade or business of trading specified

7        assets described in subsection (g)(2)), or

8            ''(B) part of a hedging transaction (as de-

9        fined in section 1221(b)(2) or 988(d)(2)).

10    ''(2) SPECIFIED ASSET TO WHICH THIS SUB-

11   SECTION APPLIES.—To the extent provided by the

12   Secretary, this subsection applies to assets described

13   in subsection (g)(2).

14   ''(i) REGULATIONS.—The Secretary shall prescribe

15   such regulations or other guidance as may be necessary

16   to carry out the purposes of this section, including regula-

17   tions or other guidance for determining whether specified

18   assets are substantially identical.''.

19   (b) CONFORMING AMENDMENTS.—

20       (1) Section 1223(3) of the Internal Revenue

21   Code of 1986 is amended—

22           (A) by striking ''stock or securities'' the

23       first place it appears and inserting ''specified

24       assets (as defined in section 1091(g))'',

241

1         (B) by striking "stock or securities" the

2      second and third place it appears and inserting

3      "specified assets (as so defined)", and

4         (C) by striking "(or the contract or option

5      to acquire which)" and inserting "(or the enter-

6      ing into of a contract or option to acquire or

7      long notional principal contract in respect of

8      which)".

9     (2) Section 6045(g)(2)(B) of such Code is

10    amended—

11         (A) in clause (i)(I)—

12            (i) by striking "security (other than

13         stock" and inserting "covered security

14         (other than stock", and

15            (ii) by striking "stock sold or trans-

16         ferred" and inserting "covered security

17         sold or transferred", and

18         (B) in clause (ii)—

19            (i) by striking "stock or securities"

20         and inserting "specified assets", and

21            (ii) by striking "identical securities"

22         and inserting "identical specified assets (as

23         defined in section 1091(g))".

24     (3) The table of sections for part VII of sub-

25    chapter O of chapter 1 of such Code is amended by

1    striking the item relating to section 1091 and insert-

2    ing the following new item:

"Sec. 1091. Loss from wash sales of specified assets.".

3        (c) EFFECTIVE DATE.—The amendments made by

4    this section shall apply to sales, dispositions, and termi-

5    nations in taxable years beginning after the date of enact-

6    ment of this Act.

**SEC. 806. MARK-TO-MARKET ELECTION.**

8        (a) IN GENERAL.—Section 475(e)(2)(A) of the Inter-

9    nal Revenue Code of 1986 is amended by inserting "(as

10   defined in section 1a of the Commodity Exchange Act (7

11   U.S.C. 1a))" after "commodity".

12       (b) EFFECTIVE DATE.—The amendment made by

13   this section shall apply to taxable years beginning after

14   the date of enactment of this Act.

**SEC. 807. FORKS, AIRDROPS, AND SUBSIDIARY VALUE.**

16       (a) IN GENERAL.—Part II of subchapter B of chap-

17   ter 1 of the Internal Revenue Code of 1986 is amended

18   by inserting before section 72 the following new section:

**"SEC. 71. FORKS, AIRDROPS, AND SUBSIDIARY VALUE.**

20       "(a) IN GENERAL.—In the case of any applicable

21   asset received by a taxpayer for which the taxpayer has

22   taken affirmative steps relating to control of such asset,

23   the value of such asset shall be included in gross income

24   for the taxable year in which such asset is sold or other-

25   wise disposed of by the taxpayer.

243

1    ''(b) CHARACTER OF INCOME.—For purposes of this
2  subtitle, the amount included in gross income under this
3  section shall be treated as ordinary income (as defined in
4  section 64).

5    ''(c) APPLICABLE ASSET.—For purposes of this sec-
6  tion, the term 'applicable asset' means—

7         ''(1) a crypto asset fork,

8         ''(2) a crypto asset airdrop, or

9         ''(3) any other similar form of subsidiary value

10        relating to a crypto asset (as defined in section 9801

11        of title 31, United States Code).

12   ''(d) REGULATIONS.—Not later than 12 months after
13  the date of enactment of this Act, the Secretary shall pre-
14  scribe such regulations or other guidance as may be nec-
15  essary to carry out the purposes of this section.''.

16   (b) CONFORMING AMENDMENT.—The table of sec-
17  tions of part II of subchapter B of chapter 1 of the Inter-
18  nal Revenue Code of 1986 is amended by inserting before
19  the item relating to section 72 the following new item:

''Sec. 71. Forks, airdrops, and subsidiary value.''.

20   (c) EFFECTIVE DATE.—The amendments made by
21  this section shall apply to taxable years beginning after
22  the date of enactment of this Act.

244

## SEC. 808. CRYPTO ASSET MINING AND STAKING.

(a) IN GENERAL.—Section 451 of the Internal Revenue Code of 1986 is amended by adding at the end the following new subsection:

"(l) DEFERRAL OF INCOME RECOGNITION FOR CRYPTO ASSET ACTIVITIES.—In the case of a taxpayer who conducts crypto asset mining or staking activities, the amount of income relating to such activities shall not be included in the gross income of the taxpayer until the taxable year of the sale or other disposition of the assets produced or received in connection with the mining or staking activities.".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to taxable years beginning after the date of enactment of this Act.

## SEC. 809. CHARITABLE CONTRIBUTIONS AND QUALIFIED APPRAISALS.

(a) IN GENERAL.—Section 170(f)(11)(A)(ii)(I) of the Internal Revenue Code of 1986 is amended by inserting "actively traded crypto assets (as defined in section 9801 of title 31, United States Code)," before "and any qualified vehicle".

(b) EFFECTIVE DATE.—The amendment made by this section shall apply to contributions made in taxable years beginning after the date of enactment of this Act.

Case 3:23-cv-06003-WHO    Document 70-8    Filed 05/09/24    Page 246 of 275
SIL23812 CHK                                                         S.L.C.

245

# TITLE IX—RESPONSIBLE INTERAGENCY COORDINATION

### SEC. 901. TIMELINE FOR INTERPRETIVE GUIDANCE ISSUED BY FEDERAL FINANCIAL AGENCIES.

(a) IN GENERAL.—Title 31, United States Code, is amended by adding after chapter 98, as added by section 101(a) of this Act, the following:

## "CHAPTER 99—RESPONSIBLE INTERAGENCY COORDINATION

"Sec.
"9901. Timeline for interpretive guidance issues by Federal financial agencies.

## "§ 9901. Timeline for interpretive guidance issues by Federal financial agencies

"(a) IN GENERAL.—In this section:

"(1) FEDERAL FINANCIAL REGULATOR.—The term 'Federal financial regulator' means—

"(A) Board of Governors of the Federal Reserve System and the Federal Reserve banks;

"(B) Commodity Futures Trading Commission;

"(C) Department of the Treasury;

"(D) Federal Deposit Insurance Corporation;

"(E) Federal Housing Finance Agency;

"(F) National Credit Union Administration;

246

1          "(G) Office of the Comptroller of the Cur-

2      rency;

3          "(H) Consumer Financial Protection Bu-

4      reau; and

5          "(I) Securities and Exchange Commission.

6      "(2) REQUESTING PERSON.—The term 're-

7      questing person'—

8          "(A) means any entity that is required to

9          be chartered, licensed, supervised or registered

10         by that agency; and

11         "(B) includes State agencies, a customer

12         protection and market integrity authority, and

13         any other entity delegated regulatory and dis-

14         ciplinary authority by a governmental agency.

15     "(b) RESPONSE.—Not later than 180 days after fil-

16 ing a written request for individualized interpretive guid-

17 ance with respect to the application of a statute, rule or

18 policy under the jurisdiction of a Federal financial regu-

19 lator, the agency shall provide a final, complete and writ-

20 ten response to the requesting person. This subsection

21 shall not apply to requests for guidance that the Federal

22 financial regulator determine lack substance.

23     "(c) OTHER MATTERS.—With respect to matters del-

24 egated or otherwise under the jurisdiction of a customer

25 protection and market integrity authority or other entity

1  delegated regulatory and disciplinary authority by a gov-
2  ernment agency, including national securities exchanges
3  and boards of trade, the entity shall be subject to the same
4  requirements as a Federal financial regulator under this
5  section.''.

## SEC. 902. STATE MONEY TRANSMISSION COORDINATION RELATING TO CRYPTO ASSETS.

8      (a) IN GENERAL.—In order to increase uniformity,
9  reduce regulatory burden, and enhance consumer protec-
10  tion, the States, through the Conference of State Bank
11  Supervisors and the Money Transmission Regulators As-
12  sociation, shall, not later than 2 years after the date of
13  enactment of this Act, ensure uniform treatment of crypto
14  assets for the purposes of State money transmission laws
15  on the following matters:

16          (1) Whether crypto assets are subject to money
17      transmission licensing requirements, as appropriate,
18      which shall include the exchange of crypto assets for
19      legal tender.

20          (2) Treatment of payment stablecoins.

21          (3) Non-applicability to persons or software
22      that engage in validation of transactions, non-custo-
23      dial wallet providers, or software or hardware devel-
24      opment.

SIL23812 CHK                                                                S.L.C.

248

1          (4) Tangible net worth and permissible invest-

2      ment requirements.

3          (5) Disclosures, reporting, and recordkeeping.

4          (6) Common examination and examiner training

5      standards, including common customer identifica-

6      tion, anti-money laundering, and sanctions best

7      practices developed in consultation with the Finan-

8      cial Crimes Enforcement Network and the Office of

9      Foreign Assets Control.

10     (b) REGULATIONS.—If the Director of the Bureau of

11 Consumer Financial Protection determines that a State

12 does not have the requirements of subsection (a) in effect

13 by law (including regulations) that are substantively con-

14 sistent with the requirements of the several States on the

15 date that is 2 years after the date of enactment of this

16 section, the Director shall adopt rules applicable to that

17 State that achieve the purposes of subsection (a) and that

18 are consistent with the standards adopted in the States

19 that have the requirements of subsection (a) in effect. The

20 Director may extend the deadline under this section for

21 not more than 1 year if a State has shown a good faith

22 effort towards implementation. The Director may promul-

23 gate regulations to monitor State compliance with this

24 subsection.

249

1 **SEC. 903. INFORMATION SHARING AMONG FEDERAL AND**
2     **STATE FINANCIAL REGULATORS.**

3     Subtitle C of title VII of the Gramm-Leach-Bliley Act

4 (Public Law 106–102; 113 Stat. 1470), as amended by

5 section 701 of this Act, is amended by adding at the end

6 the following:

7 **"SEC. 722B. INFORMATION SHARING AMONG FEDERAL AND**
8     **STATE FINANCIAL REGULATORS.**

9     "(a) CONFIDENTIALITY.—Notwithstanding any other

10 provision of law, any requirement under Federal or State

11 law regarding the privacy or confidentiality of any infor-

12 mation or materials exchanged among financial regulators

13 and any privilege arising under Federal or State law (in-

14 cluding the rules of any Federal or State court) with re-

15 spect to such information or material, shall continue to

16 apply to such information or material after the informa-

17 tion or material has been disclosed to any State or Federal

18 financial regulator.

19     "(b) NON-APPLICABILITY OF CERTAIN REQUIRE-

20 MENTS.—Information or material that is subject to privi-

21 lege or confidentiality under subsection (a) shall not be

22 subject to—

23         "(1) disclosure under any Federal or State law

24     governing the disclosure to the public of information

25     held by an officer or an agency of the Federal Gov-

26     ernment or the respective State; or

1  ''(2) subpoena or discovery, or admission into
2  evidence, in any private civil action or administrative
3  process, unless with respect to any privilege held by
4  the Nationwide Mortgage Licensing System and
5  Registry or the Director with respect to such infor-
6  mation or material, the person to whom such infor-
7  mation or material pertains waives that privilege, in
8  whole or in part, based on the discretion of such per-
9  son.

10 ''(c) COORDINATION WITH OTHER LAW.—Any State
11 or Federal law, including any State open records law, re-
12 lating to the disclosure of confidential supervisory infor-
13 mation or any information or material described in sub-
14 section (a) that is inconsistent with subsection (a) shall
15 be superseded by the requirements of such provision to
16 the extent the State or Federal law provides less confiden-
17 tiality or a weaker privilege.

18 ''(d) CONFERENCE OF STATE BANK SUPERVISORS.—
19 The Conference of State Bank Supervisors shall be consid-
20 ered the agent of the State financial regulators for the
21 purposes of sharing information under this provision.

22 ''(e) DEFINITION.—In this section, the term 'finan-
23 cial regulator' means—

24  ''(1) the Board of Governors of the Federal Re-
25  serve System and the Federal Reserve banks;

251

1        "(2) the Commodity Futures Trading Commis-
2    sion;

3        "(3) the Department of the Treasury, including
4    the Financial Crimes Enforcement Network and the
5    Office of Foreign Assets Control;

6        "(4) the Federal Deposit Insurance Corpora-
7    tion;

8        "(5) the Federal Housing Finance Agency;

9        "(6) the National Credit Union Administration;

10        "(7) the Office of the Comptroller of the Cur-
11    rency;

12        "(8) the Bureau of Consumer Financial Protec-
13    tion;

14        "(9) the Securities and Exchange Commission;
15    and

16        "(10) State agencies that regulate, supervise, or
17    license banks, trust companies, credit unions, con-
18    sumer credit, consumer protection, money trans-
19    mission, securities, commodities, and similar areas.".

20   **SEC. 904. REPORT ON ENERGY CONSUMPTION IN CRYPTO**
21                   **ASSET MARKETS.**

22        (a) IN GENERAL.—Not later than December 31 of
23    each year, the Administrator of the Energy Information
24    Administration shall submit to the Committees on Energy
25    and Natural Resources and Environment and Public

252

1 Works of the Senate and the Committees on Energy and

2 Commerce and Natural Resources of the House of Rep-

3 resentatives, and make publicly available in a machine-

4 readable format, a report containing an analysis of the fol-

5 lowing topics with respect to crypto assets:

6   (1) Energy consumption for mining and staking

7   of crypto asset transactions in the financial services

8   industry.

9   (2) The effect of energy consumption described

10   in paragraph (1) on national, regional, and local en-

11   ergy prices.

12   (3) The effects of mining and staking of crypto

13   asset transactions on baseload power levels.

14   (4) The use of renewable energy sources or non-

15   renewable energy sources for powering crypto asset

16   mining operations that would otherwise be expended.

17   (5) A comparison of crypto asset market energy

18   consumption with the energy consumption of the fi-

19   nancial services industry and economy as a whole.

20   (6) The sources and reliability of the data used

21   to analyze the topics described in paragraphs (1)

22   through (5).

23 (b) CONSULTATION.—The Administrator of the En-

24 ergy Information Administration shall prepare the report

25 under subsection (a) in consultation with the Commodity

253

1 Futures Trading Commission and the Securities and Ex-

2 change Commission.

**SEC. 905. ANALYSIS OF ENERGY CONSUMPTION BY DIS-**
**TRIBUTED LEDGER TECHNOLOGIES.**

5 (a) AGREEMENT.—The Director of the National In-

6 stitute of Standards and Technology shall seek to enter

7 into an agreement with the National Academies of

8 Sciences, Engineering, and Medicine (in this section re-

9 ferred to as the ''National Academies'') to conduct the

10 analysis under subsection (b) and submit the report under

11 subsection (c).

12 (b) ANALYSIS.—Under an agreement between the Di-

13 rector and the National Academies entered into pursuant

14 to subsection (a), the National Academies shall conduct

15 an analysis of matters relating to energy consumption by

16 distributed ledger technologies, including analysis of the

17 following topics as they pertain to such technologies:

18 (1) Evidence-based analysis of energy consump-

19 tion by proof of stake and proof of work consensus

20 mechanisms relating to distributed ledger technology

21 generally.

22 (2) Industry best practices to reduce energy

23 consumption using proof of stake and proof of work

24 consensus mechanisms.

254

1        (3) Recommendations for legislative or adminis-
2    trative action to reduce energy consumption and
3    incentivize energy efficiency across related indus-
4    tries.

5    (c) REPORT.—Under an agreement entered into be-
6 tween the Director and the National Academies under
7 subsection (a), the National Academies shall, not later
8 than 1 year after the date of the enactment of this Act,
9 submit to the Director, the Secretary of Energy, the Com-
10 mittee on Energy and Natural Resources and the Com-
11 mittee on Environment and Public Works of the Senate,
12 and the Committee on Energy and Commerce and the
13 Committee on Natural Resources of the House of Rep-
14 resentatives a report containing the findings of the Na-
15 tional Academies with respect to the analysis under sub-
16 section (b) and a detailed description of such analysis.

17 **SEC. 906. REPORT ON DISTRIBUTED LEDGER APPLICA-**
18          **TIONS IN ENERGY.**

19    (a) IN GENERAL.—Not later than 1 year after the
20 date of enactment of this Act, the Secretary of Energy
21 shall submit to the Committees on Energy and Natural
22 Resources and Environment and Public Works of the Sen-
23 ate and the Committees on Energy and Commerce and
24 Natural Resources of the House of Representatives a re-
25 port containing—

255

1 (1) an analysis of, with respect to distributed

2 ledger technology in energy—

3  (A) existing, developing, and potential use

4  cases of distributed ledger technology in energy

5  development and transmission, and related top-

6  ics, as determined by the Secretary; and

7  (B) industry best practices to implement

8  distributed ledger technology; and

9 (2) recommendations for any necessary guide-

10 lines for the usage of distributed ledger technology.

11 (b) CONSULTATION.—The Secretary of Energy shall

12 prepare the report under subsection (a) in consultation

13 with the National Institute of Standards and Technology

14 and the Secretary of Commerce.

15 **SEC. 907. PERMITTING FEDERAL GOVERNMENT EMPLOY-**

16   **EES TO GAIN EXPERIENCE WITH CRYPTO**

17   **ASSET TECHNOLOGIES.**

18 (a) IN GENERAL.—Solely for the purposes of section

19 2640.202 of title 5, Code of Federal Regulations, or any

20 successor regulation, crypto assets listed for traded on a

21 crypto asset exchange registered under the Commodity

22 Exchange Act (7 U.S.C. et seq.) shall be considered to

23 be publicly traded securities, except that the de minimis

24 exemption under paragraph (a)(2) of that section, after

25 aggregation of all crypto assets, shall be $1,000.

1    (b) LEGAL OPINIONS.—The legal advisories issued by

2  the Office of Government Ethics entitled "Guidance for

3  Reporting Virtual Currency on Financial Disclosure Re-

4  ports" (LA–18–06; issued June 18, 2018) and "Applica-

5  tion of the Securities and Mutual Fund Exemptions to

6  Cryptocurrency, Stablecoins, and Related Investments"

7  (LA–22–04; issued July 5, 2022) shall have no force or

8  effect to the extent that either such advisory is incon-

9  sistent with subsection (a).

10  **SEC. 908. ADVISORY COMMITTEE ON FINANCIAL INNOVA-**

11             **TION.**

12    (a) ESTABLISHMENT.—There is established the Advi-

13  sory Committee on Financial Innovation (in this section

14  referred to as the "Committee").

15    (b) MEMBERSHIP.—

16      (1) COMPOSITION.—The Committee shall be

17    composed of 11 members, as follows:

18        (A) 2 members appointed by the President

19      from the financial technology industry.

20        (B) 4 members appointed by the President

21      with specializations in consumer protection,

22      consumer education, financial literacy, or finan-

23      cial inclusion.

SIL23812 CHK                                                    S.L.C.

257

1          (C) The Director of the Office of Financial

2       Innovation of the Commodity Futures Trading

3       Commission.

4          (D) The Director of the Office of Financial

5       Innovation of the Securities and Exchange

6       Commission.

7          (E) A member of the Board of Governors

8       of the Federal Reserve System, as voted upon

9       by the Board.

10        (F) A State banking supervisor, as des-

11      ignated by the Conference of State Bank Super-

12      visors.

13        (G) A State securities regulator, as des-

14      ignated by the National Association of State

15      Securities Administrators.

16    (2) POLITICAL AFFILIATION.—Not more than 4

17  of the members of the Committee shall be from the

18  same political party.

19    (3) APPOINTMENT DATE.—The appointments of

20  the members of the Committee shall be made not

21  later than 60 days after the date of enactment of

22  this Act.

23    (4) PERIOD OF APPOINTMENT; VACANCIES.—

24        (A) IN GENERAL.—A member of the Com-

25      mittee shall be appointed for a term of 4 years.

SIL23812 CHK                                                    S.L.C.

258

(B) VACANCIES.—A vacancy in the Committee—

(i) shall not affect the powers of the Committee; and

(ii) shall be filled in the same manner as the original appointment.

(5) MEETINGS.—

(A) INITIAL MEETING.—Not later than 60 days after the date on which all members of the Committee have been appointed, the Committee shall hold its first meeting.

(B) FREQUENCY.—The Committee shall meet at the call of the Chair.

(C) QUORUM.—A majority of the members of the Committee shall constitute a quorum, but a lesser number of members may hold hearings.

(6) CHAIRPERSON.—The members described in subparagraphs (C) and (D) of paragraph (1) shall alternate, on a yearly basis, as Chairperson of the Committee, with the member described in such subparagraph (D) serving as the Chair for the 1-year period following establishment of the Committee.

(c) DUTIES.—

(1) MATTERS STUDIED.—The matters studied by the Committee shall include—

1        (A) crypto assets;

2        (B) consumer education and financial lit-

3    eracy;

4        (C) innovations in the securities and com-

5    modities markets;

6        (D) innovations banking, payments, and

7    settlement;

8        (E) consumer credit;

9        (F) financial inclusion, including reducing

10    the cost of financial services for all people of

11    the United States and promoting access to

12    those services;

13        (G) efficiency in the financial system;

14        (H) reduction of systemic risk;

15        (I) competition in financial services; and

16        (J) the State-Federal partnership in finan-

17    cial services regulation.

18    (2) REPORT.—On an annual basis, or as other-

19    wise determined necessary by the Chair of the Com-

20    mittee, the Committee shall report to the President

21    and to Congress on, and provide recommendations

22    for legislation, regulation, and supervision relating

23    to innovation in, the matters studied under para-

24    graph (1).

25    (d) POWERS.—

SIL23812 CHK                                                    S.L.C.

260

1    (1) HEARINGS.—The Committee shall hold not

2    less than 2 hearings per calendar year to hear from

3    interested parties and to discuss the work of the

4    Committee.

5    (2) INFORMATION FROM FEDERAL AGENCIES.—

6        (A) IN GENERAL.—The Committee may

7        secure directly from a Federal department or

8        agency such information as the Committee con-

9        siders necessary to carry out this section.

10       (B) FURNISHING INFORMATION.—On re-

11       quest of the Chair of the Committee, the head

12       of the department or agency shall furnish the

13       information to the Committee.

14   (3) POSTAL SERVICES.—The Committee may

15   use the United States mails in the same manner and

16   under the same conditions as other departments and

17   agencies of the Federal Government.

18   (e) COMPENSATION.—

19   (1) IN GENERAL.—All members of the Com-

20   mittee shall serve without compensation in addition

21   to that received for their services as officers or em-

22   ployees of the United States, and all other members

23   of the Committee shall serve without compensation.

24   (2) TRAVEL EXPENSES.—Each member of the

25   Committee may be allowed travel expenses, including

per diem in lieu of subsistence, in accordance with sections 5702 and 5703 of title 5, United States Code, while away from their homes or regular places of business in performance of services for the Council.

(f) STAFF.—

(1) IN GENERAL.—The Chair of the Committee may, without regard to the civil service laws (including regulations), appoint and terminate an executive director and such other additional personnel as may be necessary to enable the Committee to perform its duties, except that the employment of an executive director shall be subject to confirmation by the Committee.

(2) COMPENSATION.—The Chair of the Committee may fix the compensation of the executive director and other personnel without regard to chapter 51 and subchapter III of chapter 53 of title 5, United States Code, relating to classification of positions and General Schedule pay rates, except that the rate of pay for the executive director and other personnel may not exceed the rate payable for level V of the Executive Schedule under section 5316 of that title.

1    (g) DETAIL OF GOVERNMENT EMPLOYEES.—A Fed-
2 eral Government employee may be detailed to the Com-
3 mittee without reimbursement, and such detail shall be
4 without interruption or loss of civil service status or privi-
5 lege.

6    (h) PROCUREMENT OF TEMPORARY AND INTERMIT-
7 TENT SERVICES.—The Chair of the Committee may pro-
8 cure temporary and intermittent services under section
9 3109(b) of title 5, United States Code, at rates for individ-
10 uals that do not exceed the daily equivalent of the annual
11 rate of basic pay prescribed for level V of the Executive
12 Schedule under section 5316 of that title.

13    (i) TERMINATION.—Section 14 of the Federal Advi-
14 sory Committee Act (5 U.S.C. App.) shall not apply to
15 the Committee.

# TITLE X—EQUIPPING AGENCIES TO PROTECT CONSUMERS AND PROMOTE RESPONSIBLE INNOVATION

**SEC. 1001. EXECUTIVE OFFICE OF THE PRESIDENT APPRO-PRIATIONS.**

22    (a) OFFICE OF SCIENCE AND TECHNOLOGY POL-
23 ICY.—For the purposes of hiring specialist positions with-
24 in the Office of Science and Technology Policy to coordi-
25 nate Federal activities and advise the President on mat-

1 ters of research and development relating to crypto assets,

2 distributed ledger technology, artificial intelligence and

3 other innovative financial technologies, including funding

4 the position created by section 10671 of 136 Stat. 1688

5 and coordinating the national research and development

6 strategy required by section 5913 of 136 Stat. 2395, there

7 is authorized to be appropriated to the Executive Office

8 of the President the following:

9        (1) $2,500,000 for fiscal year 2023, to remain

10       available until September 30, 2024.

11       (2) $2,500,000 for fiscal year 2024, to remain

12       available until September 30, 2025.

13       (3) $2,500,000 for fiscal year 2025, to remain

14       available until September 30, 2026.

15       (4) $2,500,000 for fiscal year 2026, to remain

16       available until September 30, 2027.

17       (5) $2,500,000 for fiscal year 2027, to remain

18       available until September 30, 2028.

19 (b) NATIONAL ECONOMIC COUNCIL.—For the pur-

20 poses of hiring specialist positions within the National

21 Economic Council to coordinate Federal activities and ad-

22 vise the President on matters of financial and economic

23 policy relating to crypto assets, distributed ledger tech-

24 nology, artificial intelligence and other innovative financial

264

1  technologies, there is authorized to be appropriated to the

2  Executive Office of the President the following:

3          (1) $2,500,000 for fiscal year 2023, to remain

4      available under September 30, 2024.

5          (2) $2,500,000 for fiscal year 2024, to remain

6      available until September 30, 2025.

7          (3) $2,500,000 for fiscal year 2025, to remain

8      available until September 30, 2026.

9          (4) $2,500,000 for fiscal year 2026, to remain

10     available until September 30, 2027.

11         (5) $2,500,000 for fiscal year 2027, to remain

12     available until September 30, 2028.

**13  SEC. 1002. FINANCIAL CRIMES ENFORCEMENT NETWORK**

**14         APPROPRIATIONS.**

15  (a) AUTHORIZATION OF APPROPRIATIONS.—For the

16  purposes of developing policy relating to crypto assets, ac-

17  quiring information technology resources, establishing the

18  Financial Crimes Enforcement Network Innovation Lab-

19  oratory and enforcement of the laws within its jurisdiction

20  relating to crypto assets, there is authorized to be appro-

21  priated to the Financial Crimes Enforcement Network of

22  the Department of the Treasury the following:

23         (1) $30,000,000 for fiscal year 2023, to remain

24     available until September 30, 2024.

265

1     (2) $30,000,000 for fiscal year 2024, to remain

2     available until September 30, 2025.

3     (3) $30,000,000 for fiscal year 2025, to remain

4     available until September 30, 2026.

5     (4) $30,000,000 for fiscal year 2026, to remain

6     available until September 30, 2027.

7     (5) $30,000,000 for fiscal year 2027, to remain

8     available until September 30, 2028.

9   (b) INCENTIVE PREMIUM FOR HIGHLY QUALIFIED

10 INDIVIDUALS.—Notwithstanding any other provision of

11 law or regulation, the Director of the Financial Crimes

12 Enforcement Network of the Department of the Treasury

13 may pay an annual incentive premium of not more than

14 20 percent of the annual rate of basic pay for a position

15 if necessary to attract highly qualified individuals for posi-

16 tions that the Director has certified to the Director of the

17 Office of Personnel Managements reflect the needs of the

18 Financial Crimes Enforcement Network.

19 **SEC. 1003. COMMODITY FUTURES TRADING COMMISSION**

20         **APPROPRIATIONS.**

21   (a) OFFICE OF FINANCIAL INNOVATION.—

22     (1) IN GENERAL.—There is established within

23     the Commodity Futures Trading Commission (re-

24     ferred to in this subsection as the ''Commission'')

266

1  the Office of Financial Innovation (referred to in

2  this subsection as the "Office").

3   (2) DIRECTOR.—The Commission shall appoint

4  a Director of the Office—

5    (A) to manage the duties of the Office; and

6    (B) to serve as the principal advisor to the

7   Commission on matters relating to responsible

8   financial innovation.

9   (3) DUTIES.—The duties of the Office shall

10  be—

11    (A) to coordinate the activities of the Com-

12   mission with respect to responsible financial in-

13   novation, including protection of consumers;

14    (B) to ensure the global competitiveness of

15   the United States financial system;

16    (C) to conduct research; and

17    (D) to carry out any other duties as other-

18   wise provided by law.

19  (b) AUTHORIZATION OF APPROPRIATIONS.—

20   (1) IN GENERAL.—There is authorized to be

21  appropriated to the Commodity Futures Trading

22  Commission $100,000,000 for each of fiscal years

23  2023 through 2027 for the purposes of—

24    (A) implementing this Act and the amend-

25   ments made by this Act;

SIL23812 CHK                                                        S.L.C.

267

1          (B) developing policy relating to crypto as-

2     sets;

3          (C) establishing the Office of Financial In-

4     novation under subsection (a);

5          (D) hiring experts;

6          (E) rulemaking;

7          (F) administrative and shared services;

8     and

9          (G) acquiring information technology re-

10    sources relating to crypto assets.

11    (2) AVAILABILITY.—Amounts made available

12    pursuant to paragraph (1) shall remain available for

13    a period of 1 fiscal year.

14    (3) LIMITATIONS.—Amounts made available

15    pursuant to paragraph (1)—

16         (A) with the exception of appropriations

17    made available for fiscal year 2024, shall not be

18    available until a customer protection and mar-

19    ket integrity authority has been registered

20    under section 9809 of title 31, United States

21    Code; and

22         (B) may not be used for enforcement ac-

23    tivities, unless otherwise provided by law.

268

1 **SEC. 1004. SECURITIES AND EXCHANGE COMMISSION AP-**

2 **PROPRIATIONS.**

3 (a) OFFICE OF FINANCIAL INNOVATION.—

4 (1) ESTABLISHMENT.—There is established

5 within the Securities and Exchange Commission (re-

6 ferred to in this section as the "Commission") the

7 Office of Financial Innovation (referred to in this

8 section as the "Office") to coordinate the activities

9 of the Commission with respect to responsible finan-

10 cial innovation, including—

11 (A) with respect to the protection of con-

12 sumers; and

13 (B) by—

14 (i) conducting research;

15 (ii) ensuring the global competitive-

16 ness of the financial system of the United

17 States; and

18 (iii) performing duties as otherwise

19 provided by law.

20 (2) DIRECTOR.—The Commission shall appoint

21 a Director—

22 (A) to—

23 (i) manage the duties of the Office;

24 and

SIL23812 CHK                                                                S.L.C.

269

    (ii) serve as principal advisor to the
   Commission on matters relating to respon-
   sible financial innovation; and

   (B) who shall be accountable to the Com-
  mission.

 (b) AUTHORIZATION OF APPROPRIATIONS.—Subject to subsection (c), for the purposes of implementing this Act, developing policy relating to crypto assets, establishing the Office, appointing individuals who are experts in their fields, conducting rulemakings, carrying out administrative and shared services, and acquiring information technology resources within the jurisdiction of the Commission relating to crypto assets, there is authorized to be appropriated to the Commission the following:

  (1) $100,000,000 for fiscal year 2023, to remain available until September 30, 2024.

  (2) $100,000,000 for fiscal year 2024, to remain available until September 30, 2025.

  (3) $100,000,000 for fiscal year 2025, to remain available until September 30, 2026.

  (4) $100,000,000 for fiscal year 2026, to remain available until September 30, 2027.

  (5) $100,000,000 for fiscal year 2027, to remain available until September 30, 2028.

270

1    (c) LIMITATIONS.—With respect to amounts that are

2 appropriated pursuant to the authorization under sub-

3 section (b), those amounts—

4        (1) except with respect to amounts that are

5     made available for fiscal year 2024, shall not be

6     available until a customer protection and market in-

7     tegrity authority has been registered under section

8     9809 of title 31, United States Code, as added by

9     section 601; and

10       (2) may not be used for enforcement activities,

11    unless otherwise provided by law.

12 **SEC. 1005. FEDERAL TRADE COMMISSION APPROPRIA-**

13 **TIONS.**

14   (a) FINDINGS.—Congress finds the following:

15       (1) It is important that the United States re-

16    mains a leader in innovation.

17       (2) Crypto assets and distributed ledger tech-

18    nology are driving innovation and providing con-

19    sumers with increased choice and convenience.

20       (3) The use of crypto assets and distributed

21    ledger technology is likely to increase in the future.

22       (4) The Federal Trade Commission is respon-

23    sible for protecting consumers from unfair or decep-

24    tive acts or practices, including relating to crypto as-

25    sets.

271

1    (5) The Federal Trade Commission has pre-
2    viously taken action against unscrupulous companies
3    and individuals that committed unfair or deceptive
4    acts or practices involving crypto assets.

5    (6) To bolster the ability of the Federal Trade
6    Commission to enforce against unfair or deceptive
7    acts or practices involving crypto assets, the Com-
8    mission should ensure staff have appropriate train-
9    ing and resources to identify and pursue such cases.

10    (b) AUTHORIZATION OF APPROPRIATIONS.—For the
11    purposes of executing the duties set forth in subsection
12    (c) of this section, there is authorized to be appropriated
13    to the Federal Trade Commission the following:

14        (1) $30,000,000 for fiscal year 2023, to remain
15        available until September 30, 2024.

16        (2) $30,000,000 for fiscal year 2024, to remain
17        available until September 30, 2025.

18        (3) $30,000,000 for fiscal year 2025, to remain
19        available until September 30, 2026.

20        (4) $30,000,000 for fiscal year 2026, to remain
21        available until September 30, 2027.

22        (5) $30,000,000 for fiscal year 2027, to remain
23        available until September 30, 2028.

272

1    (c) Purposes.—The Federal Trade Commission

2    shall use the funds appropriated under subsection (b) for

3    the following purposes:

4          (1) Enforcement relating to unfair or deceptive

5       acts or practices by persons in the crypto asset in-

6       dustry which are not currently supervised by a Fed-

7       eral or State financial regulator.

8          (2) Highlighting best practices by lawful crypto

9       asset businesses.

10         (3) Promoting responsible innovation.

11         (4) Consumer education relating to fraudulent

12      crypto asset activity.

13         (5) Investigating unlawful restraints of trade in

14      the crypto asset industry.

15         (6) Operations of the Office of Crypto Asset

16      Consumer Protection, as specified by subsection (d).

17    (d) Office of Crypto Asset Consumer Protec-

18    tion.—There is created within the Federal Trade Com-

19    mission the Office of Crypto Asset Consumer Protection.

20    The Office shall conduct consumer education relating to

21    crypto assets and develop best practices for consumer pro-

22    tection for the crypto asset industry, and recommend en-

23    forcement action, as appropriate, to the Division of En-

24    forcement of the Commission.

1    (e) REPORT TO CONGRESS.—Not later than Sep-

2  tember 30 of each year for which an appropriation was

3  made available under subsection (a), the Federal Trade

4  Commission shall provide a report of activities conducted

5  pursuant to subsection (b) of this section to the following

6  committees of Congress:

7        (1) The Committee on Commerce, Science, and

8     Transportation of the Senate.

9        (2) The Committee on Appropriations of the

10    Senate.

11       (3) The Committee on Energy and Commerce

12    of the House of Representatives.

13       (4) The Committee on Appropriations of the

14    House of Representatives.

15  **SEC. 1006. ADVISORY COMMISSION ON FINANCIAL INNOVA-**

16  **TION APPROPRIATIONS.**

17    To carry out the duties of the Advisory Committee

18  on Financial Innovation created by section 908 of this Act,

19  there is appropriated:

20       (1) $2,500,000 for fiscal year 2023, to remain

21    available until September 30, 2024.

22       (2) $2,500,000 for fiscal year 2024, to remain

23    available until September 30, 2025.

24       (3) $2,500,000 for fiscal year 2025, to remain

25    available until September 30, 2026.

SIL23812 CHK                                                    S.L.C.

1          (4) $2,500,000 for fiscal year 2026, to remain

2     available until September 30, 2027.

3          (5) $2,500,000 for fiscal year 2027, to remain

4     available until September 30, 2028.