# EXHIBIT K

I

118TH CONGRESS
1ST SESSION

# H. R. 4763

To provide for a system of regulation of digital assets by the Commodity Futures Trading Commission and the Securities and Exchange Commission, and for other purposes.

---

## IN THE HOUSE OF REPRESENTATIVES

JULY 20, 2023

Mr. THOMPSON of Pennsylvania (for himself, Mr. HILL, Mr. JOHNSON of South Dakota, Mr. DAVIDSON, and Mr. EMMER) introduced the following bill; which was referred to the Committee on Financial Services, and in addition to the Committee on Agriculture, for a period to be subsequently determined by the Speaker, in each case for consideration of such provisions as fall within the jurisdiction of the committee concerned

---

# A BILL

To provide for a system of regulation of digital assets by the Commodity Futures Trading Commission and the Securities and Exchange Commission, and for other purposes.

1    *Be it enacted by the Senate and House of Representa-*

2    *tives of the United States of America in Congress assembled,*

3    **SECTION 1. SHORT TITLE; TABLE OF CONTENTS.**

4    (a) SHORT TITLE.—This Act may be cited as the

5    "Financial Innovation and Technology for the 21st Cen-

6    tury Act".

2

1        (b) TABLE OF CONTENTS.—The table of contents for

2    this Act is as follows:

Sec. 1. Short title; table of contents.

### TITLE I—DEFINITIONS; RULEMAKING; PROVISIONAL REGISTRATION

Sec. 101. Definitions under the Securities Act of 1933.
Sec. 102. Definitions under the Commodity Exchange Act.
Sec. 103. Definitions under this Act.
Sec. 104. Joint rulemakings.
Sec. 105. Notice of intent to register for digital commodity exchanges, brokers, and dealers.
Sec. 106. Notice of intent to register for digital asset brokers, dealers, and trading systems.
Sec. 107. Commodity Exchange Act savings provisions.
Sec. 108. International harmonization.
Sec. 109. Implementation.

### TITLE II—DIGITAL ASSET EXEMPTIONS

Sec. 201. Exempted transactions in digital assets.
Sec. 202. Requirements to transact in certain digital assets.
Sec. 203. Enhanced disclosure requirements.
Sec. 204. Certification of certain digital assets.
Sec. 205. Effective date.

### TITLE III—REGISTRATION FOR DIGITAL ASSET INTERMEDIARIES AT THE SECURITIES AND EXCHANGE COMMISSION

Sec. 301. Treatment of digital commodities and other digital assets.
Sec. 302. Antifraud authority over permitted payment stablecoins.
Sec. 303. Registration of digital asset trading systems.
Sec. 304. Requirements for digital asset trading systems.
Sec. 305. Registration of digital asset brokers and digital asset dealers.
Sec. 306. Requirements of digital asset brokers and digital asset dealers.
Sec. 307. Rules related to conflicts of interest.
Sec. 308. Treatment of certain digital assets in connection with federally regulated intermediaries.
Sec. 309. Dual registration.
Sec. 310. Exclusion for ancillary activities.
Sec. 311. Registration and requirements for notice-registered digital asset clearing agencies.
Sec. 312. Treatment of custody activities by banking institutions.

### TITLE IV—REGISTRATION FOR DIGITAL ASSET INTERMEDIARIES AT THE COMMODITY FUTURES TRADING COMMISSION

Sec. 401. Commission jurisdiction over digital commodity transactions.
Sec. 402. Requiring futures commission merchants to use qualified digital commodity custodians.
Sec. 403. Trading certification and approval for digital commodities.
Sec. 404. Registration of digital commodity exchanges.
Sec. 405. Qualified digital commodity custodians.
Sec. 406. Registration and regulation of digital commodity brokers and dealers.

3

Sec. 407. Registration of associated persons.
Sec. 408. Registration of commodity pool operators and commodity trading advisors.
Sec. 409. Exclusion for ancillary activities.
Sec. 410. Effective date.

TITLE V—INNOVATION AND TECHNOLOGY IMPROVEMENTS

Sec. 501. Codification of the SEC Strategic Hub for Innovation and Financial Technology.
Sec. 502. Codification of LabCFTC.
Sec. 503. CFTC–SEC Joint Advisory Committee on Digital Assets.
Sec. 504. Modernization of the Securities and Exchange Commission mission.
Sec. 505. Study on decentralized finance.
Sec. 506. Study on non-fungible digital assets.
Sec. 507. Study on financial market infrastructure improvements.

# TITLE I—DEFINITIONS; RULE-MAKING; PROVISIONAL REGISTRATION

## SEC. 101. DEFINITIONS UNDER THE SECURITIES ACT OF 1933.

Section 2(a) of the Securities Act of 1933 (15 U.S.C. 77b(a)) is amended by adding at the end the following:

"(20) AFFILIATED PERSONS.—The term 'affiliated person' means a person (including a related person) that—

"(A) with respect to a digital asset issuer—

"(i) directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such digital asset issuer; and

4

1                       ''(ii) was described under clause (i) at

2                 any point in the previous 3-month period;

3                 or

4                 ''(B) with respect to any digital asset—

5                       ''(i) beneficially owns 5 percent or

6                 more of the units of such digital asset that

7                 are then outstanding; and

8                       ''(ii) was described under clause (i) at

9                 any point in the previous 3-month period.

10         ''(21) BLOCKCHAIN.—The term 'blockchain'

11 means any technology—

12                 ''(A) where data is—

13                       ''(i) shared across a network to create

14                 a public ledger of verified transactions or

15                 information among network participants;

16                       ''(ii) linked using cryptography to

17                 maintain the integrity of the public ledger

18                 and to execute other functions; and

19                       ''(iii) distributed among network par-

20                 ticipants in an automated fashion to con-

21                 currently update network participants on

22                 the state of the public ledger and any other

23                 functions; and

24                 ''(B) composed of source code that is pub-

25 licly available.

5

1          ''(22) BLOCKCHAIN PROTOCOL.—The term
2     'blockchain protocol' means any executable software
3     deployed to a blockchain composed of source code
4     that is publicly available and accessible, including a
5     smart contract or any network of smart contracts.

6          ''(23) BLOCKCHAIN SYSTEM.—The term
7     'blockchain system' means any blockchain or
8     blockchain protocol.

9          ''(24) DECENTRALIZED NETWORK.—With re-
10    spect to a blockchain system to which a digital asset
11    relates, the term 'decentralized network' means the
12    following conditions are met:

13              ''(A) During the previous 12-month period,
14         no person—

15                   ''(i) had the unilateral authority, di-
16              rectly or indirectly, through any contract,
17              arrangement, understanding, relationship,
18              or otherwise, to control or materially alter
19              the functionality or operation of the
20              blockchain system; or

21                   ''(ii) had the unilateral authority to
22              restrict or prohibit any person who is not
23              a digital asset issuer, related person, or an
24              affiliated person from—

6

1          "(I) using, earning, or transmit-
2      ting the digital asset;

3          "(II) deploying software that
4      uses or integrates with the blockchain
5      system;

6          "(III) participating in a decen-
7      tralized governance system with re-
8      spect to the blockchain system; or

9          "(IV) operating a node, validator,
10     or other form of computational infra-
11     structure with respect to the
12     blockchain system.

13     "(B) During the previous 12-month pe-
14  riod—

15          "(i) no digital asset issuer or affiliated
16     person beneficially owned, in the aggre-
17     gate, 20 percent or more of the total
18     amount of units of such digital asset
19     that—

20          "(I) can be created, issued, or
21     distributed in such blockchain system;
22     and

23          "(II) were freely transferrable or
24     otherwise used or available to be used

7

1   for the purposes of such blockchain

2   network;

3   "(ii) no digital asset issuer or affili-

4   ated person had the unilateral authority to

5   direct the voting, in the aggregate, of 20

6   percent or more of the outstanding voting

7   power of such digital asset or related de-

8   centralized governance system; or

9   "(iii) the digital asset did not include

10   voting power.

11   "(C) During the previous 3-month period,

12 the digital asset issuer, any affiliated person, or

13 any related person has not implemented or con-

14 tributed any intellectual property to the source

15 code of the blockchain system that materially

16 alters the functionality or operation of the

17 blockchain system, unless such implementation

18 or contribution to the source code—

19   "(i) addressed vulnerabilities, errors,

20   regular maintenance, cybersecurity risks,

21   or other technical improvements to the

22   blockchain system; or

23   "(ii) were adopted through the con-

24   sensus or agreement of a decentralized

25   governance system.

8

1          "(D) During the previous 3-month period,
2     neither any digital asset issuer nor any affili-
3     ated person described under paragraph (20)(A)
4     has marketed to the public the digital assets as
5     an investment.

6          "(E) During the previous 12-month period,
7     all issuances of units of such digital asset were
8     end user distributions made through the pro-
9     grammatic functioning of the blockchain sys-
10    tem.

11    "(25) DECENTRALIZED GOVERNANCE SYS-
12    TEM.—

13         "(A) IN GENERAL.—The term 'decentral-
14    ized governance system' means, with respect to
15    a blockchain system, any rules-based system
16    permitting persons using the blockchain system
17    or the digital assets related to such blockchain
18    system to form consensus or reach agreement
19    in the development, provision, publication, man-
20    agement, or administration of such blockchain
21    system.

22         "(B) RELATIONSHIP OF PERSONS TO DE-
23    CENTRALIZED GOVERNANCE SYSTEMS.—Per-
24    sons acting through a decentralized governance

9

1    system shall be treated as separate persons un-

2    less such persons are under common control.

3           "(C) EXCLUSION.—The term 'decentral-

4    ized governance system' does not include a sys-

5    tem in which—

6               "(i) a person or group of persons

7           under common control have the ability

8           to—

9               "(I) unilaterally alter the rules of

10          consensus or agreement for the

11          blockchain system; or

12             "(II) determine the final outcome

13          of decisions related to the develop-

14          ment, provision, publication, manage-

15          ment, or administration of such

16          blockchain system;

17               "(ii) a person or group of persons is

18           directly engaging in an activity that re-

19           quires registration with the Commission or

20           the Commodity Futures Trading Commis-

21           sion other than—

22             "(I) developing, providing, pub-

23          lishing, managing, or administering a

24          blockchain system; or

10

1                            ''(II) an activity with respect to

2                            which the organization is exempt from

3                            such registration; or

4                           ''(iii) a person or group of persons

5                     seeking to knowingly evade the require-

6                     ments imposed on a digital asset issuer, a

7                     related person, an affiliated person, or any

8                     other person registered (or required to be

9                     registered) under this Act, the Financial

10                   Innovation and Technology for the 21st

11                   Century Act, or the Commodity Exchange

12                   Act.

13    ''(26) DIGITAL ASSET.—

14        ''(A) IN GENERAL.—The term 'digital

15    asset' means any fungible digital representation

16    of value that can be exclusively possessed and

17    transferred, person to person, without necessary

18    reliance on an intermediary, and is recorded on

19    a cryptographically secured public distributed

20    ledger.

21        ''(B) EXCLUSIONS.—The term 'digital

22    asset' does not include—

23                ''(i) any note, stock, treasury stock,

24                security future, security-based swap, bond,

25                debenture, evidence of indebtedness, cer-

11

1    tificate of interest or participation in any

2    profit-sharing agreement, collateral-trust

3    certificate, preorganization certificate or

4    subscription, or transferable share; or

5        "(ii) any asset which represents, oper-

6    ates as the functional equivalent of, or oth-

7    erwise has embedded functionality or char-

8    acteristics which make it an agreement,

9    contract, or transaction that is—

10        "(I) a contract of sale of a com-

11        modity (as defined under section 1a of

12        the Commodity Exchange Act) for fu-

13        ture delivery or an option thereon;

14        "(II) a security futures product;

15        "(III) a swap;

16        "(IV) an agreement, contract, or

17        transaction described in section

18        2(c)(2)(C)(i) or 2(c)(2)(D)(i) of the

19        Commodity Exchange Act;

20        "(V) a commodity option author-

21        ized under section 4c of the Com-

22        modity Exchange Act; or

23        "(VI) a leverage transaction au-

24        thorized under section 19 of the Com-

25        modity Exchange Act.

12

1                 "(C) RELATIONSHIP TO A BLOCKCHAIN

2          SYSTEM.—A digital asset is considered to relate

3          to a blockchain system if the digital asset is in-

4          trinsically linked to the blockchain system, in-

5          cluding—

6                 "(i) where the digital asset's value is

7             reasonably expected to be generated by the

8             programmatic functioning of the

9             blockchain system;

10                "(ii) where the asset has voting rights

11            with respect to the blockchain system; or

12               "(iii) where the digital asset is issued

13            through the programmatic functioning of

14            the blockchain system.

15         "(D) TREATMENT OF CERTAIN DIGITAL

16         ASSETS SOLD PURSUANT TO AN INVESTMENT

17         CONTRACT.—A digital asset sold or transferred

18         or intended to be sold or transferred pursuant

19         to an investment contract is not and does not

20         become a security as a result of being sold or

21         otherwise transferred pursuant to that invest-

22         ment contract.

23       "(27) DIGITAL ASSET ISSUER.—With respect to

24  a digital asset, the term 'digital asset issuer'—

25         "(A) means—

13

1          "(i) any person that, in exchange for
2      any consideration—

3              "(I) issues or causes to be issued
4          a unit of such digital asset to a per-
5          son; or

6              "(II) offers or sells a right to a
7          future issuance of a unit of such dig-
8          ital asset to a person; or

9          "(ii) any person who seeks to know-
10     ingly evade classification as a 'digital asset
11     issuer' and facilitate an arrangement for
12     the primary purpose of effecting a sale,
13     distribution, or other issuance of such dig-
14     ital asset, by—

15             "(I) the granting of a license or
16         assignment of intellectual property;

17             "(II) the making available of free
18         software or open source licenses; or

19             "(III)   the   granting   of   other
20         rights or transfer of assets material to
21         execution of such sale, distribution, or
22         other issuance; and

23         "(B) does not include any person solely be-
24     cause such person, for the purpose of such per-
25     son participating in operations of a blockchain

14

1      system, deploys source code to create units of a
2      digital asset which are incentive-based re-
3      wards—

4            ''(i) to users of the digital asset or
5            any blockchain system to which the digital
6            asset relates; or

7            ''(ii) for activities directly related to
8            the operation of the blockchain system,
9            such as mining, validating, staking, or
10           other activity directly tied to the operation
11           of the blockchain system.

12     ''(28) DIGITAL ASSET MATURITY DATE.—The
13     term 'digital asset maturity date' means, with re-
14     spect to any units of a digital asset, the first date
15     on which 20 percent or more of the total units of
16     such digital asset that are then outstanding as of
17     such date are—

18           ''(A) digital commodities; or
19           ''(B) digital assets that have been reg-
20           istered with the Commission.

21     ''(29) DIGITAL COMMODITY.—The term 'digital
22     commodity' has the meaning given that term under
23     section 1a of the Commodity Exchange Act (7
24     U.S.C. 1a).

15

1        "(30) END USER DISTRIBUTION.—The term

2 'end user distribution' means an issuance of a unit

3 of a digital asset that—

4        "(A) does not involve an exchange of more

5        than a nominal value of cash, property, or other

6        assets; and

7        "(B) is distributed in a broad, equitable,

8        and non-discretionary manner based on condi-

9        tions capable of being satisfied by any partici-

10        pant in the blockchain system, including, as in-

11        centive-based rewards—

12        "(i) to users of the digital asset or

13        any blockchain system to which the digital

14        asset relates;

15        "(ii) for activities directly related to

16        the operation of the blockchain system,

17        such as mining, validating, staking, or

18        other activity directly tied to the operation

19        of the blockchain system; or

20        "(iii) to the existing holders of an-

21        other digital asset, in proportion to the

22        total units of such other digital asset as

23        are held by each person.

24        "(31) FUNCTIONAL NETWORK.—With respect

25 to a blockchain system to which a digital asset re-

16

1  lates, the term 'functional network' means the net-
2  work allows network participants to use such digital
3  asset for—

4          "(A) the transmission and storage of value
5      on the blockchain system;

6          "(B) the participation in services provided
7      by or an application running on the blockchain
8      system; or

9          "(C) the participation in governance of the
10     blockchain system.

11     "(32) PERMITTED PAYMENT STABLECOIN.—
12  The term 'permitted payment stablecoin'—

13          "(A) means a digital asset—

14              "(i) that is or is designed to be used
15          as a means of payment or settlement;

16              "(ii) the issuer of which—

17                  "(I) is obligated to convert, re-
18              deem, or repurchase for a fixed
19              amount of monetary value; and

20                  "(II) represents will maintain or
21              creates the reasonable expectation
22              that it will maintain a stable value rel-
23              ative to the value of a fixed amount of
24              monetary value; and

17

1          "(iii) that is subject to regulation by
2     a Federal or State regulator with authority
3     over     entities     that     issue     payment
4     stablecoins; and
5          "(B) that is not—
6          "(i) a national currency; or
7          "(ii) a security issued by an invest-
8     ment  company  registered  under  section
9     8(a) of the Investment Company Act of
10    1940 (15 U.S.C. 80a–8(a)).
11         "(33) RELATED PERSON.—With respect to a
12    digital  asset  issuer,  the  term  'related  person'
13    means—
14         "(A) a founder, promoter, employee, con-
15    sultant, advisor, or person serving in a similar
16    capacity;
17         "(B) any person that is or was in the pre-
18    vious 6-month period an executive officer, direc-
19    tor, trustee, general partner, advisory board
20    member, or person serving in a similar capacity;
21         "(C) any equity holder or other security
22    holder of a digital asset issuer; or
23         "(D) any other person that received a unit
24    of digital asset from such digital asset issuer
25    through—

18

1           ''(i) an exempt offering, other than an

2       offering made in reliance on section

3       4(a)(8); or

4           ''(ii) a distribution that is not an end

5       user distribution described under section

6       42(d)(1) of the Securities Exchange Act of

7       1934.

8   ''(34) RESTRICTED DIGITAL ASSET.—

9       ''(A) IN GENERAL.—The term 'restricted

10  digital asset' means—

11          ''(i) any unit of a digital asset held by

12      a person, other than a digital asset issuer,

13      a related person, or an affiliated person,

14      prior to the first date on which each

15      blockchain system to which the digital

16      asset relates is a functional network and

17      certified to be a decentralized network

18      under section 44 of the Securities Ex-

19      change Act of 1934, that was—

20              ''(I) issued to such person

21          through a distribution, other than an

22          end user distribution described under

23          section 42(d)(1) of the Securities Ex-

24          change Act of 1934; or

1 "(II) acquired by such person in

2 a transaction that was not executed

3 on a digital commodity exchange;

4 "(ii) any digital asset held by a re-

5 lated person or an affiliated person during

6 any period when any blockchain system to

7 which the digital asset relates is not a

8 functional network or not certified to be a

9 decentralized network under section 44 of

10 the Securities Exchange Act of 1934; or

11 "(iii) any unit of a digital asset held

12 by the digital asset issuer.

13 "(B) EXCLUSION.—The term 'restricted

14 digital asset' does not include a permitted pay-

15 ment stablecoin.

16 "(35) SECURITIES LAWS.—The term 'securities

17 laws' has the meaning given that term under section

18 3(a) of the Securities Exchange Act of 1934 (15

19 U.S.C. 78c(a)).

20 "(36) SOURCE CODE.—With respect to a

21 blockchain system, the term 'source code' means a

22 listing of commands to be compiled or assembled

23 into an executable computer program.".

20

**SEC. 102. DEFINITIONS UNDER THE COMMODITY EX-**
**CHANGE ACT.**

Section 1a of the Commodity Exchange Act (7 U.S.C.
1a) is amended—

(1) in paragraph (10)(A)—

(A) by redesignating clauses (iii) and (iv)
as clauses (iv) and (v), respectively; and

(B) by inserting after clause (ii) the fol-
lowing:

"(iii) digital commodity;";

(2) in paragraph (11)—

(A) in subparagraph (A)(i)—

(i) by redesignating subclauses (III)
and (IV) as subclauses (IV) and (V), re-
spectively; and

(ii) by inserting after subclause (II)
the following:

"(III) digital commodity;"; and

(B) by redesignating subparagraph (B) as
subparagraph (C) and inserting after subpara-
graph (A) the following:

"(B) EXCLUSION.—The term 'commodity
pool operator' does not include—

"(i) a decentralized governance sys-
tem; or

1          ''(ii) ancillary activities, as defined in

2          section 4v.'';

3     (3) in paragraph (12)(A)(i)—

4          (A) in subclause (II), by adding at the end

5     a semicolon;

6          (B) by redesignating subclauses (III) and

7     (IV) as subclauses (IV) and (V), respectively;

8     and

9          (C) by inserting after subclause (II) the

10    following:

11              ''(III) a digital commodity;'';

12    (4) in paragraph (40)—

13         (A) by striking ''and'' at the end of sub-

14    paragraph (E);

15         (B) by striking the period at the end of

16    subparagraph (F) and inserting ''; and''; and

17         (C) by adding at the end the following:

18         ''(G) a digital commodity exchange reg-

19    istered under section 5i.''; and

20    (5) by adding at the end the following:

21    ''(52) ASSOCIATED PERSON OF A DIGITAL COM-

22    MODITY BROKER.—

23         ''(A) IN GENERAL.—Except as provided in

24    subparagraph (B), the term 'associated person

25    of a digital commodity broker' means a person

22

1  who is associated with a digital commodity
2  broker as a partner, officer, employee, or agent
3  (or any person occupying a similar status or
4  performing similar functions) in any capacity
5  that involves—

6    ''(i) the solicitation or acceptance of a
7    contract for sale of a digital commodity; or

8    ''(ii) the supervision of any person en-
9    gaged in the solicitation or acceptance of a
10    contract for sale of a digital commodity.

11  ''(B) EXCLUSION.—The term 'associated
12  person of a digital commodity broker' does not
13  include any person associated with a digital
14  commodity broker the functions of which are
15  solely clerical or ministerial.

16  ''(53) ASSOCIATED PERSON OF A DIGITAL COM-
17 MODITY DEALER.—

18  ''(A) IN GENERAL.—Except as provided in
19  subparagraph (B), the term 'associated person
20  of a digital commodity dealer' means a person
21  who is associated with a digital commodity deal-
22  er as a partner, officer, employee, or agent (or
23  any person occupying a similar status or per-
24  forming similar functions) in any capacity that
25  involves—

23

1                                  "(i) the solicitation or acceptance of a

2                       contract for sale of a digital commodity; or

3                                  "(ii) the supervision of any person en-

4                       gaged in the solicitation or acceptance of a

5                       contract for sale of a digital commodity.

6         "(B) EXCLUSION.—The term 'associated

7 person of a digital commodity dealer' does not

8 include any person associated with a digital

9 commodity dealer the functions of which are

10 solely clerical or ministerial.

11         "(54) BANK SECRECY ACT.—The term 'Bank

12 Secrecy Act' means—

13         "(A) section 21 of the Federal Deposit In-

14 surance Act (12 U.S.C. 1829b);

15         "(B) chapter 2 of title I of Public Law 91–

16 508 (12 U.S.C. 1951 et seq.); and

17         "(C) subchapter II of chapter 53 of title

18 31, United States Code.

19         "(55) DIGITAL COMMODITY.—

20         "(A) IN GENERAL.—The term 'digital com-

21 modity' means—

22                 "(i) any unit of a digital asset held by

23 a person, other than a digital asset issuer,

24 a related person, or an affiliated person,

25 before the first date on which each

24

blockchain system to which the digital asset relates is a functional network and certified to be a decentralized network under section 44 of the Securities Exchange Act of 1934, that was—

"(I) issued to the person through an end user distribution described under section 42(d)(1) of the Securities Exchange Act of 1934; or

"(II) acquired by such person in a transaction that was executed on a digital commodity exchange; or

"(ii) any unit of a digital asset held by a person, other than a digital asset issuer, a related person, or an affiliated person, after the first date on which each blockchain system to which the digital asset relates is a functional network and certified to be a decentralized network under section 44 of the Securities Exchange Act of 1934; and

"(iii) any unit of a digital asset held by a related person or an affiliated person during any period when any blockchain system to which the digital asset relates is

25

1        a functional network and certified to be a
2        decentralized network under section 44 of
3        the Securities Exchange Act of 1934.
4        ''(B) EXCLUSION.—The term 'digital com-
5        modity' does not include a permitted payment
6        stablecoin.
7        ''(56) DIGITAL COMMODITY BROKER.—
8        ''(A) IN GENERAL.—The term 'digital com-
9        modity broker' means any person who, in a dig-
10       ital commodity cash or spot market, is—
11              ''(i) engaged in soliciting or accepting
12          orders for the purchase or sale of a unit of
13          a digital commodity from a customer that
14          is not an eligible contract participant;
15              ''(ii) engaged in soliciting or accepting
16          orders for the purchase or sale of a unit of
17          a digital commodity from a customer on or
18          subject to the rules of a registered entity;
19          or
20              ''(iii) registered with the Commission
21          as a digital commodity broker.
22       ''(B)   EXCEPTIONS.—The   term   'digital
23       commodity broker' does not include a person
24       solely because the person—

26

1                "(i) enters into a digital commodity

2              transaction the primary purpose of which

3              is to make, send, receive, or facilitate pay-

4              ments, whether involving a payment service

5              provider or on a peer-to-peer basis; or

6                "(ii) validates a digital commodity

7              transaction, operates a node, or engages in

8              similar activity to participate in facili-

9              tating, operating, or securing a blockchain

10             system.

11      "(57) DIGITAL COMMODITY CUSTODIAN.—The

12 term 'digital commodity custodian' means a bank or

13 trust company in the business of holding, maintain-

14 ing, or safeguarding digital commodities.

15      "(58) DIGITAL COMMODITY DEALER.—

16           "(A) IN GENERAL.—The term 'digital com-

17           modity dealer' means any person who—

18               "(i) in digital commodity cash or spot

19              markets—

20                  "(I) holds itself out as a dealer in

21              a digital commodity;

22                  "(II) makes a market in a digital

23              commodity;

24                  "(III) regularly enters into dig-

25              ital commodity transactions with

27

1             counterparties as an ordinary course

2             of business for its own account; or

3                 "(IV) engages in any activity

4             causing the person to be commonly

5             known in the trade as a dealer or

6             market maker in a digital commodity;

7              "(ii) regularly enters into any agree-

8           ment, contract, or transaction described in

9           subsection (c)(2)(D)(i) involving a digital

10          commodity; or

11              "(iii) is registered with the Commis-

12          sion as a digital commodity dealer.

13        "(B) EXCEPTION.—The term 'digital com-

14      modity dealer' does not include a person solely

15     because the person—

16             "(i) enters into a digital commodity

17           transaction with an eligible contract partic-

18          ipant;

19             "(ii) enters into a digital commodity

20           transaction on or through a registered dig-

21          ital commodity exchange;

22             "(iii) enters into a digital commodity

23           transaction for the person's own account,

24           either individually or in a fiduciary capac-

25           ity, but not as a part of a regular business;

1            "(iv) enters into a digital commodity

2            transaction the primary purpose of which

3            is to make, send, receive, or facilitate pay-

4            ments, whether involving a payment service

5            provider or on a peer-to-peer basis; or

6            "(v) validates a digital commodity

7            transaction, operates a node, or engages in

8            similar activity to participate in facili-

9            tating, operating, or securing a blockchain

10            system.

11     "(59) DIGITAL COMMODITY EXCHANGE.—The

12 term 'digital commodity exchange' means a trading

13 facility that offers or seeks to offer a cash or spot

14 market in at least 1 digital commodity.

15     "(60) DIGITAL ASSET-RELATED DEFINI-

16 TIONS.—

17            "(A) SECURITIES ACT OF 1933.—The

18            terms 'affiliated person', 'blockchain system',

19            'decentralized governance system', 'decentral-

20            ized network', 'digital asset', 'digital asset

21            issuer', 'end user distribution', 'functional net-

22            work', 'permitted payment stablecoin', 'related

23            person', and 'restricted digital asset' have the

24            meaning given the terms, respectively, under

29

1      section 2(a) of the Securities Act of 1933 (15

2      U.S.C. 77b(a)).

3          ''(B) SECURITIES EXCHANGE ACT OF

4      1934.—The terms 'digital asset broker' and 'dig-

5      ital asset dealer' have the meaning given those

6      terms, respectively, under section 3(a) of the

7      Securities Exchange Act of 1934 (15 U.S.C.

8      78c(a)).

9      ''(61) MIXED DIGITAL ASSET TRANSACTION.—

10      The term 'mixed digital asset transaction' has the

11      meaning given that term under section 3(a) of the

12      Securities Exchange Act of 1934 (15 U.S.C.

13      78c(a)).''.

14 **SEC. 103. DEFINITIONS UNDER THIS ACT.**

15      In this Act:

16          (1) ALTERNATIVE TRADING SYSTEM.—The

17      term ''alternative trading system'' has the meaning

18      given that term under section 242.300 of title 17,

19      Code of Federal Regulations.

20          (2) DEFINITIONS UNDER THE COMMODITY EX-

21      CHANGE ACT.—The terms ''digital commodity'',

22      ''digital commodity broker'', and ''digital commodity

23      exchange'' have the meaning given those terms, re-

24      spectively, under section 1a of the Commodity Ex-

25      change Act (7 U.S.C. 1a).

30

1    (3) DEFINITIONS UNDER THE SECURITIES ACT

2    OF   1933.—The   terms   "affiliated   person",

3    "blockchain", "blockchain system", "blockchain pro-

4    tocol", "decentralized network", "digital asset",

5    "digital asset issuer", "digital asset maturity date",

6    "digital asset trading system", "end user distribu-

7    tion", "functional network", "permitted payment

8    stablecoin", "restricted digital asset", "securities

9    laws", and "source code" have the meaning given

10   those terms, respectively, under section 2(a) of the

11   Securities Act of 1933 (15 U.S.C. 77b(a)).

12   (4) DEFINITIONS UNDER THE SECURITIES EX-

13   CHANGE ACT OF 1934.—The terms "digital asset

14   broker", "digital asset dealer", "digital asset trading

15   system",  "mixed  digital  asset  transaction",  and

16   "self-regulatory  organization"  have  the  meaning

17   given those terms, respectively, under section 3(a) of

18   the  Securities  Exchange  Act  of  1934  (15  U.S.C.

19   78c(a)).

20   **SEC. 104. JOINT RULEMAKINGS.**

21   (a) DEFINITIONS.—The Commodity Futures Trading

22   Commission and the Securities and Exchange Commission

23   shall, jointly, issue rules to further define the following

24   terms:

31

1          (1)   The   terms   "affiliated   person",
2     "blockchain", "blockchain system", "blockchain pro-
3     tocol", "decentralized network", "decentralized gov-
4     ernance   system",   "digital   asset",   "digital   asset
5     issuer", "digital asset maturity date", "end user dis-
6     tribution",   "functional   network",   "related   person",
7     "restricted digital asset", and "source code", as de-
8     fined   under   section   2(a)   of   the   Securities   Act   of
9     1933.

10         (2) The term "mixed digital asset transaction",
11    as defined under section 3(a) of the Securities Ex-
12    change Act of 1934.

13         (3) The term "digital commodity", as defined
14    under section 1a of the Commodity Exchange Act.

15    (b) JOINT RULEMAKING FOR EXCHANGES.—The
16    Commodity Futures Trading Commission and the Securi-
17    ties and Exchange Commission shall, jointly, issue rules
18    to exempt persons dually registered with the Commodity
19    Futures Trading Commission as a digital commodity ex-
20    change and with the Securities and Exchange Commission
21    as a digital asset trading system from duplicative, con-
22    flicting, or unduly burdensome provisions of this Act, the
23    securities laws, and the Commodity Exchange Act and the
24    rules thereunder, to the extent such exemption would fos-
25    ter the development of fair and orderly markets in digital

32

1 assets, be necessary or appropriate in the public interest,

2 and be consistent with the protection of investors.

3    (c) JOINT RULEMAKING FOR MIXED DIGITAL ASSET

4 TRANSACTIONS.—The Commodity Futures Trading Com-

5 mission and the Securities and Exchange Commission

6 shall, jointly, issue rules applicable to mixed digital asset

7 transactions under this Act and the amendments made by

8 this Act.

9    (d) PROHIBITION.—The Securities Exchange Com-

10 mission and the Commodity Futures Trading Commission

11 shall not issue a rule, a regulation, an order, or guidance,

12 or take any other administrative action, which would re-

13 strict the ability of an individual to use hardware or soft-

14 ware to facilitate the custody or safekeeping by the indi-

15 vidual of any digital asset of the individual.

16 **SEC. 105. NOTICE OF INTENT TO REGISTER FOR DIGITAL**

17    **COMMODITY EXCHANGES, BROKERS, AND**

18    **DEALERS.**

19    (a) IN GENERAL.—

20       (1) NOTICE OF INTENT TO REGISTER.—Any

21    person may file a notice of intent to register with

22    the Commodity Futures Trading Commission (in

23    this subsection referred to as the ''Commission'') as

24    a—

33

1          (A) digital commodity exchange, for a per-
2     son intending to register as a digital commodity
3     exchange under section 5i of the Commodity
4     Exchange Act;

5          (B) digital commodity broker, for a person
6     intending to register as a digital commodity
7     broker under section 4u of such Act; or

8          (C) digital commodity dealer, for a person
9     intending to register as a digital commodity
10     dealer under section 4u of such Act.

11     (2) FILING.—A person desiring to file a notice
12 of intent to register under paragraph (1) shall be in
13 compliance with this section if the person submits to
14 the Commission—

15          (A) a statement of the nature of the reg-
16     istrations the filer intends to pursue;

17          (B) the information required by sub-
18     sections (b) and (c).

19     (b) DISCLOSURE OF GENERAL INFORMATION.—A
20 person filing a notice of intent to register under subsection
21 (a) shall disclose to the Commission the following:

22     (1) Information concerning the management of
23 the person, including information describing—

24          (A) the ownership and management of the
25     person;

34

1          (B) the financial condition of the person;

2          (C) affiliated entities; and

3          (D) potential conflicts of interest.

4     (2) Information concerning the operations of

5   the person, including—

6          (A) any rulebook or other customer order

7          fulfilment rules;

8          (B) risk management procedures; and

9          (C) a description of the product listing

10         process.

11    (c) LISTING INFORMATION.—A person filing a notice

12   of intent to register under subsection (a) shall provide to

13   the Commission and the Securities and Exchange Com-

14   mission a detailed description of the product listing deter-

15   mination made by the person for each asset listed or of-

16   fered for trading by the person.

17    (d) REQUIREMENTS.—A person filing a notice of in-

18   tent to register under subsection (a) shall comply with the

19   following requirements:

20    (1) BOOKS AND RECORDS.—The person shall

21    keep their books and records open to inspection and

22    examination by the Commission.

23    (2) CUSTOMER DISCLOSURES.—The person

24    shall disclose to consumers—

35

1          (A) information about the material risks
2    and characteristics of the assets listed for trad-
3    ing on the person; and
4          (B) information about the material risks
5    and characteristics of the transactions facili-
6    tated by the person.
7    (3) CUSTOMER ASSETS.—
8          (A) IN GENERAL.—The person shall—
9                (i) hold customer money, assets, and
10             property in a manner to minimize the risk
11             of loss to the customer or unreasonable
12             delay in customer access to money, assets,
13             and property of the customer;
14                (ii) treat and deal with all money, as-
15             sets, and property, including any rights as-
16             sociated with any such money, assets, or
17             property, of any customer received as be-
18             longing to the customer;
19                (iii) segregate all money, assets, and
20             property received from any customer of the
21             person from the funds of the person, ex-
22             cept that—
23                   (I) the money, assets, and prop-
24                erty of any customer may be commin-

36

1    gled with that of any other customer,

2    if separately accounted for; and

3     (II) the share of the money, as-

4    sets, and property, as in the normal

5    course of business are necessary to

6    margin, guarantee, secure, transfer,

7    adjust, or settle a contract of sale of

8    a commodity asset, may be withdrawn

9    and applied to do so, including the

10    payment of commissions, brokerage,

11    interest, taxes, storage, and other

12    charges lawfully accruing in connec-

13    tion with the contract of sale of a dig-

14    ital commodity.

15 (B) ADDITIONAL RESOURCES.—

16   (i) IN GENERAL.—This section shall

17   not prevent or be construed to prevent the

18   person from adding to the customer

19   money, assets, and property required to be

20   segregated under subparagraph (A), addi-

21   tional amounts of money, assets, or prop-

22   erty from the account of the person as the

23   person determines necessary to prevent the

24   account of a customer from becoming

25   under-segregated.

37

1          (ii) TREATMENT AS CUSTOMER
2      FUNDS.—Any money, assets, or property
3      deposited pursuant to clause (i) shall be
4      considered customer property within the
5      meaning of this subsection.
6   (e) COMPLIANCE AND ENFORCEMENT.—
7      (1) IN GENERAL.—A person who has filed a no-
8   tice of intent to register under this section and is in
9   compliance with this section shall not be subject to
10  an enforcement action by the Securities and Ex-
11  change Commission for—
12          (A) listing or offering a digital asset
13      deemed a security; or
14          (B) failing to register as a national securi-
15      ties exchange, broker, dealer, or clearing agen-
16      cy, for activities related to digital assets deemed
17      a security.
18      (2) NONCOMPLIANCE.—Paragraph (1) shall not
19  apply if, after notice from the Commission and a
20  reasonable opportunity to correct the deficiency, a
21  person who has submitted a notice of intent to reg-
22  ister is not in compliance with this section.
23      (3) ANTIFRAUD AND ANTIMANIPULATION.—
24  Paragraph (1) shall not be construed to limit any
25  antimanipulation, antifraud, or false reporting en-

38

1    forcement authority of the Commission or the Secu-

2    rities and Exchange Commission.

3        (4) DELISTING.—Paragraph (1) shall not be

4    construed to limit the authority of the Commission

5    or the Securities and Exchange Commission to re-

6    quire a person to delist an asset for trading if the

7    Commission or the Securities and Exchange Com-

8    mission determines that the listing is inconsistent

9    with the Commodity Exchange Act, the securities

10   laws (including regulations under those laws), or this

11   Act.

12   (f) FINAL REGISTRATION.—

13       (1) IN GENERAL.—A person may not file a no-

14   tice of intent to register with the Commission after

15   the Commission has finalized its rules for the reg-

16   istration of digital commodity exchanges, digital

17   commodity brokers, or digital commodity dealers, as

18   appropriate.

19       (2) TRANSITION TO FINAL REGISTRATION.—

20           (A) ONGOING DEFERRAL FOR ENTITIES

21       REGISTERED WITH THE COMMISSION.—Sub-

22       section (e)(1) shall continue to apply to a per-

23       son who has submitted a notice of intent to reg-

24       ister while the person is registered with the

25       Commission as a digital commodity exchange, a

39

1        digital commodity broker, or a digital com-

2        modity dealer, as appropriate.

3             (B) END OF DEFERRAL.—Subsection

4        (e)(1) shall not apply to a person who has sub-

5        mitted a notice of intent to register if—

6               (i) the Commission—

7                    (I) determines that the person

8                    has failed to comply with the require-

9                    ments of this section; or

10                   (II) denies the application of the

11                   person to register; or

12               (ii) the digital commodity exchange,

13               digital commodity broker, or digital com-

14               modity dealer that filed a notice of intent

15               to register failed to register as such with

16               the Commission within 180 days after the

17               Commission finalized the rules of the Com-

18               mission for the registration of digital com-

19               modity exchanges, digital commodity bro-

20               kers, or digital commodity dealers, as ap-

21               propriate.

22      (g) LIABILITY OF THE FILER.—It shall be unlawful

23  for any person to provide false information in support of

24  a filing under this section if the person knowingly or rea-

25  sonably should have known that the information was false.

40

1 **SEC. 106. NOTICE OF INTENT TO REGISTER FOR DIGITAL**

2 **ASSET BROKERS, DEALERS, AND TRADING**

3 **SYSTEMS.**

4 (a) IN GENERAL.—

5 (1) NOTICE OF INTENT TO REGISTER.—Any

6 person may file a notice of intent to register with

7 the Securities and Exchange Commission (in this

8 subsection referred to as the "Commission") as a—

9 (A) digital asset trading system, for a per-

10 son intending to register as a digital asset trad-

11 ing system under section 6(m) of the Securities

12 Exchange Act of 1934;

13 (B) digital asset broker, for a person in-

14 tending to register as a digital asset broker

15 under section 15H of the Securities Exchange

16 Act of 1934; or

17 (C) digital asset dealer, for a person in-

18 tending to register as a digital asset dealer

19 under section 15H of the Securities Exchange

20 Act of 1934.

21 (2) FILING.—A person desiring to file a notice

22 of intent to register under paragraph (1) shall be in

23 compliance with this section if the person submits to

24 the Commission—

25 (A) a statement of the nature of the reg-

26 istrations the filer intends to pursue;

41

1           (B)  the  information  required  by  sub-
2       sections (b) and (c).

3    (b)  DISCLOSURE  OF  GENERAL  INFORMATION.—A
4  person filing a notice of intent to register under subsection
5  (a) shall disclose to the Commission the following:

6       (1) Information concerning the management of
7     the person, including information describing—

8           (A) the ownership and management of the
9         person;

10          (B) the financial condition of the person;

11          (C) affiliated entities; and

12          (D) potential conflicts of interest.

13      (2)  Information  concerning  the  operations  of
14    the person, including—

15          (A)  any  rulebook  or  other  customer  order
16        fulfilment rules;

17          (B) risk management procedures; and

18          (C)  a  description  of  the  product  listing
19        process.

20   (c) LISTING INFORMATION.—A person filing a notice
21  of intent to register under subsection (a) shall provide to
22  the  Commission  and  the  Commodity  Futures  Trading
23  Commission a detailed description of the product listing
24  determination made by the person for each asset listed or
25  offered for trading by the person.

42

1  (d) REQUIREMENTS.—A person filing a notice of in-
2 tent to register under subsection (a) shall comply with the
3 following requirements:

4    (1) BOOKS AND RECORDS.—The person shall
5    keep their books and records open to inspection and
6    examination by the Commission.

7    (2) CUSTOMER DISCLOSURES.—The person
8    shall disclose to consumers—

9        (A) information about the material risks
10       and characteristics of the assets listed for trad-
11       ing on the person; and

12       (B) information about the material risks
13       and characteristics of the transactions facili-
14       tated by the person.

15   (3) CUSTOMER ASSETS.—

16       (A) IN GENERAL.—The person shall—

17           (i) hold customer money, assets, and
18           property in a manner to minimize the risk
19           of loss to the customer or unreasonable
20           delay in customer access to money, assets,
21           and property of the customer;

22           (ii) treat and deal with all money, as-
23           sets, and property, including any rights as-
24           sociated with any such money, assets, or

43

1      property, of any customer received as be-
2      longing to the customer;

3          (iii) segregate all money, assets, and
4      property received from any customer of the
5      person from the funds of the person, ex-
6      cept that—

7              (I) the money, assets, and prop-
8          erty of any customer may be commin-
9          gled with that of any other customer,
10         if separately accounted for; and

11             (II) the share of the money, as-
12         sets, and property, as in the normal
13         course of business are necessary to
14         margin, guarantee, secure, transfer,
15         adjust, or settle a contract of sale of
16         a commodity asset, may be withdrawn
17         and applied to do so, including the
18         payment of commissions, brokerage,
19         interest, taxes, storage, and other
20         charges lawfully accruing in connec-
21         tion with the contract of sale of a dig-
22         ital commodity.

23     (B) ADDITIONAL RESOURCES.—

24         (i) IN GENERAL.—This section shall
25     not prevent or be construed to prevent the

44

1               person from adding to the customer

2               money, assets, and property required to be

3               segregated under subparagraph (A) addi-

4               tional amounts of money, assets, or prop-

5               erty from the account of the person as the

6               person determines necessary to prevent the

7               account of a customer from becoming

8               under-segregated.

9               (ii) TREATMENT AS CUSTOMER

10              FUNDS.—Any money, assets, or property

11              deposited pursuant to clause (i) shall be

12              considered customer property within the

13              meaning of this subsection.

14   (e) COMPLIANCE AND ENFORCEMENT.—

15     (1) IN GENERAL.—A person who has filed a no-

16   tice of intent to register under this section and is in

17   compliance with this section shall not be subject to

18   an enforcement action by the Commission for—

19              (A) listing or offering a digital asset

20              deemed a security; or

21              (B) failing to register as a national securi-

22              ties exchange, alternative trading system,

23              broker, dealer, or clearing agency, for activities

24              related to digital assets deemed a security.

45

1    (2) NONCOMPLIANCE.—Paragraph (1) shall not

2    apply if, after notice from the Commission and a

3    reasonable opportunity to correct the deficiency, a

4    person who has submitted a notice of intent to reg-

5    ister is not in compliance with this section.

6    (3) ANTIFRAUD AND ANTIMANIPULATION.—

7    Paragraph (1) shall not be construed to limit any

8    antimanipulation, antifraud, or false reporting en-

9    forcement authority of the Commission or the Com-

10   modity Futures Trading Commission.

11   (4) DELISTING.—Paragraph (1) shall not be

12   construed to limit the authority of the Commission

13   or the Commodity Futures Trading Commission to

14   require a person to delist an asset for trading if the

15   Commission or the Commodity Futures Trading

16   Commission determines that the listing is incon-

17   sistent with the Commodity Exchange Act, the secu-

18   rities laws (including regulations under those laws),

19   or this Act.

20   (f) FINAL REGISTRATION.—

21   (1) IN GENERAL.—A person may not file a no-

22   tice of intent to register with the Commission after

23   the Commission has finalized its rules for the reg-

24   istration of digital asset brokers, digital asset deal-

46

1    ers, and digital asset trading systems, as appro-

2    priate.

3       (2) TRANSITION TO FINAL REGISTRATION.—

4          (A) ONGOING DEFERRAL FOR ENTITIES

5         REGISTERED WITH THE COMMISSION.—Sub-

6         section (e)(1) shall continue to apply to a per-

7         son who has submitted a notice of intent to reg-

8         ister while the person is registered with the

9         Commission as a digital asset broker, digital

10        asset dealer, or digital asset trading system, as

11        appropriate.

12         (B) END OF DEFERRAL.—Subsection

13        (e)(1) shall not apply to a person who has sub-

14        mitted a notice of intent to register if—

15          (i) the Commission—

16            (I) determines that the person

17            has failed to comply with the require-

18            ments of this section; or

19            (II) denies the application of the

20            person to register; or

21          (ii) the digital asset broker, digital

22          asset dealer, or digital asset trading sys-

23          tem that filed a notice of intent to register

24          failed to register as such with the Commis-

25          sion within 180 days after the Commission

47

1           finalized the rules of the Commission for
2           the registration of digital asset brokers,
3           digital asset dealers, and digital asset trad-
4           ing systems, as appropriate.

5     (g) LIABILITY OF THE FILER.—It shall be unlawful
6  for any person to provide false information in support of
7  a filing under this section if the person knowingly or rea-
8  sonably should have known that the information was false.

9  **SEC. 107. COMMODITY EXCHANGE ACT SAVINGS PROVI-**
10      **SIONS.**

11     (a) IN GENERAL.—Nothing in this Act shall affect
12  or apply to, or be interpreted to affect or apply to—

13          (1) any agreement, contract, or transaction that
14      is subject to regulation under the Commodity Ex-
15      change Act as—

16              (A) a contract of sale of a commodity for
17          future delivery or an option on such a contract;

18              (B) a swap;

19              (C) a security futures product;

20              (D) an option authorized under section 4c
21          of such Act;

22              (E) an agreement, contract, or transaction
23          described in section 2(c)(2)(C)(i) of such Act;
24          or

48

1          (F) a leverage transaction authorized
2      under section 19 of such Act; or

3      (2) the activities of any person with respect to
4  any such agreement, contract, or transaction.

5  (b) PROHIBITIONS ON SPOT DIGITAL COMMODITY
6  ENTITIES.—Nothing in this Act authorizes, or shall be in-
7  terpreted to authorize, a digital commodity exchange, dig-
8  ital commodity broker, or digital commodity dealer to en-
9  gage in any activities involving any transaction, contract,
10  or agreement described in subsection (a)(1), solely by vir-
11  tue of being registered or filing notice of intent to register
12  as a digital commodity exchange, digital commodity
13  broker, or digital commodity dealer.

14  (c) DEFINITIONS.—In this section, each term shall
15  have the meaning provided in the Commodity Exchange
16  Act or the regulations prescribed under such Act.

**SEC. 108. INTERNATIONAL HARMONIZATION.**

18  In order to promote effective and consistent global
19  regulation of digital assets, the Commodity Futures Trad-
20  ing Commission and the Securities and Exchange Com-
21  mission, as appropriate—

22      (1) shall consult and coordinate with foreign
23      regulatory authorities on the establishment of con-
24      sistent international standards with respect to the

49

1    regulation of digital assets, restricted digital assets,

2    and digital commodities; and

3        (2) may agree to such information-sharing ar-

4    rangements as may be deemed to be necessary or

5    appropriate in the public interest or for the protec-

6    tion of investors, customers, and users of digital as-

7    sets.

**SEC. 109. IMPLEMENTATION.**

9    (a) GLOBAL RULEMAKING TIMEFRAME.—Unless oth-

10   erwise provided in this Act or an amendment made by this

11   Act, the Commodity Futures Trading Commission and the

12   Securities and Exchange Commission, or both, shall indi-

13   vidually, and jointly where required, promulgate rules and

14   regulations required of each Commission under this Act

15   or an amendment made by this Act not later than 360

16   days after the date of enactment of this Act.

17   (b) RULES AND REGISTRATION BEFORE FINAL EF-

18   FECTIVE DATES.—

19       (1) IN GENERAL.—In order to prepare for the

20   implementation of this Act, the Commodity Futures

21   Trading Commission and the Securities and Ex-

22   change Commission may, before any effective date

23   provided in this Act—

24           (A) promulgate rules, regulations, or or-

25       ders permitted or required by this Act;

50

1          (B) conduct studies and prepare reports
2      and recommendations required by this Act;

3          (C) register persons under this Act; and

4          (D) exempt persons, agreements, contracts,
5      or transactions from provisions of this Act,
6      under the terms contained in this Act.

7      (2) LIMITATION ON EFFECTIVENESS.—An ac-
8  tion by the Commodity Futures Trading Commission
9  or the Securities and Exchange Commission under
10  paragraph (1) shall not become effective before the
11  effective date otherwise applicable to the action
12  under this Act.

# TITLE II—DIGITAL ASSET EXEMPTIONS

**SEC. 201. EXEMPTED TRANSACTIONS IN DIGITAL ASSETS.**

16  (a) IN GENERAL.—The Securities Act of 1933 (15
17  U.S.C. 77a et seq.) is amended—

18      (1) in section 4(a), by adding at the end the
19  following:

20      "(8) transactions involving the offer or sale of
21  units of a digital asset by a digital asset issuer, if—

22          "(A) the aggregate amount of units of the
23      digital asset sold by the digital asset issuer in
24      reliance on the exemption provided under this
25      paragraph, during the 12-month period pre-

51

1    ceding the date of such transaction, including
2    the amount sold in such transaction, is not
3    more than $75,000,000 (as such amount is an-
4    nually adjusted by the Commission to reflect
5    the change in the Consumer Price Index for All
6    Urban Consumers published by the Bureau of
7    Labor Statistics of the Department of Labor);
8        ''(B) with respect to a transaction involv-
9    ing the purchase of units of a digital asset by
10   a person who is not an accredited investor, the
11   aggregate amount of all units of digital assets
12   purchased by such person during the 12-month
13   period preceding the date of such transaction,
14   including the unit of a digital asset purchased
15   in such transaction, does not exceed the greater
16   of—
17           ''(i) 10 percent of the person's annual
18       income or joint income with that person's
19       spouse or spousal equivalent; or
20           ''(ii) 10 percent of the person's net
21       worth or joint net worth with the person's
22       spouse or spousal equivalent;
23        ''(C) after the completion of the trans-
24   action, the purchaser does not own more than
25   10 percent of the total amount of the units of

52

1      the digital asset sold in reliance on the exemp-

2      tion under this paragraph;

3           "(D) the transaction does not involve the

4      offer or sale of any digital asset not offered as

5      part of an investment contract;

6           "(E) the transaction does not involve the

7      offer or sale of a unit of a digital asset by a

8      digital asset issuer that—

9           "(i) is not organized under the laws of

10      a State, a territory of the United States or

11      the District of Columbia;

12           "(ii) is a development stage company

13      that either—

14           "(I) has no specific business plan

15      or purpose; or

16           "(II) has indicated that the busi-

17      ness plan of the company is to merge

18      with or acquire an unidentified com-

19      pany;

20           "(iii) is an investment company, as

21      defined in section 3 of the Investment

22      Company Act of 1940 (15 U.S.C. 80a–3),

23      or is excluded from the definition of invest-

24      ment company by section 3(b) or section

53

1        3(c) of that Act (15 U.S.C. 80a–3(b) or

2        80a–3(c));

3            ''(iv) is issuing fractional undivided

4        interests in oil or gas rights, or a similar

5        interest in other mineral rights;

6            ''(v) is, or has been, subject to any

7        order of the Commission entered pursuant

8        to section 12(j) of the Securities Exchange

9        Act of 1934 during the 5-year period be-

10       fore the filing of the offering statement; or

11           ''(vi) is disqualified pursuant to sec-

12       tion 230.262 of title 17, Code of Federal

13       Regulations; and

14           ''(F) the issuer meets the requirements of

15       section 4B(a).''; and

16       (2) by inserting after section 4A the following:

17  **''SEC. 4B. REQUIREMENTS WITH RESPECT TO CERTAIN DIG-**

18           **ITAL ASSET TRANSACTIONS.**

19       ''(a) REQUIREMENTS FOR DIGITAL ASSET

20   ISSUERS.—

21           ''(1) INFORMATION REQUIRED IN STATE-

22       MENT.—A digital asset issuer offering or selling a

23       unit of digital asset in reliance on section 4(a)(8)

24       shall file with the Commission a statement con-

25       taining the following information:

54

1        ''(A) The name, legal status (including the

2    jurisdiction in which the issuer is organized and

3    the date of organization), and website of the

4    digital asset issuer.

5        ''(B) A certification that the digital asset

6    issuer meets the relevant requirements de-

7    scribed under section 4(a)(8).

8        ''(C) An overview of the material aspects

9    of the offering.

10       ''(D) A description of the purpose and in-

11   tended use of the offering proceeds.

12       ''(E) A description of the plan of distribu-

13   tion of any unit of a digital asset that is to be

14   offered.

15       ''(F) A description of the material risks

16   surrounding ownership of a unit of a digital

17   asset.

18       ''(G) A description of exempt offerings

19   conducted within the past three years by the

20   digital asset issuer.

21       ''(H) A description of the digital asset

22   issuer and the current number of employees of

23   the digital asset issuer.

55

1          "(I) A description of any material trans-
2     actions or relationships between the digital
3     asset issuer and affiliated persons.
4          "(J) A description of exempt offerings con-
5     ducted within the past three years.
6     "(2) INFORMATION REQUIRED FOR PUR-
7     CHASERS.—A digital asset issuer shall disclose the
8     information described under section 43 of the Secu-
9     rities Exchange Act of 1934 on a freely accessible
10    public website.
11    "(3) ONGOING DISCLOSURE REQUIREMENTS.—
12    A digital asset issuer that has filed a statement
13    under paragraph (1) to offer and sell a unit of a dig-
14    ital asset in reliance on section 4(a)(8) shall file the
15    following with the Commission:
16         "(A) ANNUAL REPORTS.—An annual re-
17    port that includes any material changes to the
18    information described under paragraph (2) for
19    the current fiscal year and for any fiscal year
20    thereafter, unless the issuer is no longer obli-
21    gated to file such annual report pursuant to
22    paragraph (4).
23         "(B) SEMIANNUAL REPORTS.—Along with
24    each annual report required under subpara-

56

1     graph (A), and separately six months there-
2     after, a report containing—

3         ''(i) an updated description of the cur-
4         rent state and timeline for the development
5         of the blockchain system to which the dig-
6         ital asset relates, showing how and when
7         the blockchain system intends or intended
8         to be considered a functional network and
9         a decentralized network;

10         ''(ii) the amount of money raised by
11         the digital asset issuer in reliance on sec-
12         tion 4(a)(8), how much of that money has
13         been spent, and the general categories and
14         amounts on which that money has been
15         spent; and

16         ''(iii) any material changes to the in-
17         formation in the most recent annual re-
18         port.

19     ''(C) CURRENT REPORTS.—A current re-
20     port shall be filed with the Commission reflect-
21     ing any material changes to the information
22     previously reported to the Commission by the
23     digital asset issuer.

24     ''(4) TERMINATION OF REPORTING REQUIRE-
25   MENTS.—

1          ''(A) IN GENERAL.—The ongoing reporting
2     requirements under paragraph (3) shall not
3     apply to a digital asset issuer 180 days after
4     the end of the covered fiscal year.

5          ''(B) COVERED FISCAL YEAR DEFINED.—
6     In this paragraph, the term 'covered fiscal year'
7     means the first fiscal year of an issuer in which
8     the blockchain system to which the digital asset
9     relates is a functional network and certified to
10    be a decentralized network under section 44 of
11    the Securities Exchange Act of 1934.

12    ''(b) REQUIREMENTS FOR INTERMEDIARIES.—

13        ''(1) IN GENERAL.—A person acting as an
14   intermediary in a transaction involving the offer or
15   sale of a unit of a digital asset in reliance on section
16   4(a)(8) shall—

17        ''(A) register with the Commission as a
18    broker under section 15(b) of the Securities Ex-
19    change Act of 1934 (15 U.S.C. 78o(b)); and

20        ''(B) be a member of a national securities
21    association registered under section 15A of the
22    Securities Exchange Act of 1934 (15 U.S.C.
23    78o–3).

24        ''(2) PURCHASER QUALIFICATION.—

58

1             ''(A) IN GENERAL.—Each time, before ac-

2       cepting any commitment (including any addi-

3       tional commitment from the same person), an

4       intermediary or digital asset issuer shall have a

5       reasonable basis for believing that the pur-

6       chaser satisfies the requirements of section

7       4(a)(8).

8             ''(B) RELIANCE ON PURCHASER'S REP-

9       RESENTATIONS.—For purposes of subpara-

10      graph (A), an intermediary or digital asset

11      issuer may rely on a purchaser's representa-

12      tions concerning the purchaser's annual income

13      and net worth and the amount of the pur-

14      chaser's other investments made, unless the

15      intermediary or digital asset issuer has reason

16      to question the reliability of the representation.

17             ''(C) RELIANCE ON INTERMEDIARY.—For

18      purposes of determining whether a transaction

19      meets the requirements described under sub-

20      paragraph (A) through (C) of section 4(a)(8), a

21      digital asset issuer may rely on the efforts of an

22      intermediary.

23    ''(c) ADDITIONAL PROVISIONS.—

24         ''(1) ACCEPTANCE OF WRITTEN OFFERS;

25     SALES.—After an issuer files a statement under

59

1     paragraph (1) to offer and sell a digital asset in reli-

2     ance on section 4(a)(8)—

3          ''(A) written offers of the digital asset may

4          be made; and

5          ''(B) the issuer may sell the digital assets

6          in reliance on section 4(a)(8), if such sales meet

7          all other requirements.

8     ''(2) SOLICITATION OF INTEREST.—

9          ''(A) IN GENERAL.—At any time before

10         the filing of a statement under paragraph (1),

11         a digital asset issuer may communicate orally

12         or in writing to determine whether there is any

13         interest in a contemplated offering. Such com-

14         munications are deemed to be an offer of a unit

15         of a digital asset for sale for purposes of the

16         antifraud provisions of the Federal securities

17         laws. No solicitation or acceptance of money or

18         other consideration, nor of any commitment,

19         binding or otherwise, from any person is per-

20         mitted until the statement is filed.

21         ''(B) CONDITIONS.—In any communication

22         described under subparagraph (A), the digital

23         asset issuer shall—

60

1       "(i) state that no money or other con-
2       sideration is being solicited, and if sent in
3       response, will not be accepted;

4       "(ii) state that no offer to buy a unit
5       of a digital asset can be accepted and no
6       part of the purchase price can be received
7       until the statement is filed and then only
8       through an intermediary; and

9       "(iii) state that a person's indication
10      of interest involves no obligation or com-
11      mitment of any kind.

12      "(C) INDICATIONS OF INTEREST.—Any
13      written communication described under sub-
14      paragraph (A) may include a means by which
15      a person may indicate to the digital asset issuer
16      that such person is interested in a potential of-
17      fering. A digital asset issuer may require a
18      name, address, telephone number, or email ad-
19      dress in any response form included with a
20      communication described under subparagraph
21      (A).

22      "(3) DISQUALIFICATION PROVISIONS.—The
23      Commission shall issue rules to apply the disquali-
24      fication provisions under section 230.262 of title 17,

61

1    Code of Federal Regulations, to the exemption pro-

2    vided under section 4(a)(8).

3    ''(4) DIGITAL ASSETS DEEMED RESTRICTED

4    DIGITAL ASSET.—A unit of a digital asset acquired

5    directly or indirectly from the digital asset issuer in

6    reliance on the exemption provided under section

7    4(a)(8) is deemed a restricted digital asset.''.

8    (b) ADDITIONAL EXEMPTIONS.—

9    (1) CERTAIN REGISTRATION REQUIREMENTS.—

10    Section 12(g)(6) of the Securities Exchange Act of

11    1934 (15 U.S.C. 78l(g)(6)) is amended by striking

12    ''under section 4(6)'' and inserting ''under section

13    4(a)(6) or 4(a)(8)''.

14    (2) EXEMPTION FROM STATE REGULATION.—

15    Section 18(b)(4) of the Securities Act of 1933 (15

16    U.S.C. 77r(b)(4)) is amended—

17    (A) in section (B), by striking ''section

18    4(4)'' and inserting ''section 4(a)(4)'';

19    (B) in section (C), by striking ''section

20    4(6)'' and inserting ''section 4(a)(6)'';

21    (C) in subparagraph (F)—

22    (i) by striking ''section 4(2)'' each

23    place such term appears and inserting

24    ''section 4(a)(2)'';

25    (ii) by striking ''or'' at the end;

1          (D) in subparagraph (G), by striking the
2      period and inserting ''; or''; and
3          (E) by adding at the end the following:
4          ''(H) section 4(a)(8).''.

**SEC. 202. REQUIREMENTS TO TRANSACT IN CERTAIN DIG-**
**        ITAL ASSETS.**

7      Title I of the Securities Exchange Act of 1934 (15
8  U.S.C. 78a et seq.) is amended by adding at the end the
9  following:

**''SEC. 42. REQUIREMENTS TO TRANSACT IN CERTAIN DIG-**
**          ITAL ASSETS.**

12      ''(a) TRANSACTIONS IN CERTAIN RESTRICTED DIG-
13  ITAL ASSETS.—

14          ''(1) IN GENERAL.—Notwithstanding any other
15      provision of law, subject to paragraph (2), a re-
16      stricted digital asset may be offered and sold on an
17      alternative trading system by any person other than
18      a digital asset issuer if, at the time of such offer or
19      sale, any blockchain system to which the restricted
20      digital asset relates is a functional network and the
21      information described in section 43 has been cer-
22      tified and made publicly available for any blockchain
23      system to which the restricted digital asset relates.

24          ''(2) ADDITIONAL RULES FOR RELATED AND
25      AFFILIATED PERSONS.—A restricted digital asset

63

1    owned by a related person or an affiliated person

2    may only be offered or sold after 12 months after

3    the later of—

4          ''(A) the date on which such restricted dig-

5       ital asset was acquired; or

6          ''(B) the digital asset maturity date.

7    ''(b) TRANSACTIONS IN CERTAIN DIGITAL COMMOD-

8    ITIES.—

9          ''(1) IN GENERAL.—Subject to paragraph (2), a

10      digital commodity may be offered and sold by any

11      person other than a digital asset issuer.

12         ''(2) RULES FOR RELATED AND AFFILIATED

13      PERSONS.—A digital commodity may only be offered

14      or sold by a related person or an affiliated person

15      if—

16            ''(A) the holder of the digital commodity

17         owned the digital commodity while it was a re-

18         stricted digital asset for 12 months after the

19         later of—

20               ''(i) the date on which such restricted

21            digital asset was acquired; or

22               ''(ii) the digital asset maturity date;

23            ''(B) any blockchain system to which the

24         digital commodity relates is certified to be a de-

25         centralized network under section 44; and

64

1            "(C) the digital commodity is offered or

2            sold on or subject to the rules of a digital com-

3            modity exchange registered under section 5i of

4            the Commodity Exchange Act.

5      "(3) NOT A SECURITY.—

6            "(A) IN GENERAL.—Except as provided

7            under subparagraph (B), for purposes of the se-

8            curities laws, a transaction in a digital com-

9            modity made in compliance with paragraph (1)

10           or (2) shall not be a transaction in a security.

11           "(B) EXCEPTION.—Subparagraph (A)

12           does not apply to a transaction in a digital com-

13           modity if the transaction—

14                "(i) is a mixed digital asset trans-

15                action; or

16                "(ii) is made pursuant to an invest-

17                ment contract or in conjunction with any

18                other security.

19     "(c) SALES RESTRICTIONS FOR AFFILIATED PER-

20 SONS.—A digital asset may be offered or sold by an affili-

21 ated person under subsection (a) or (b) if—

22      "(1) the aggregate amount of such digital as-

23      sets sold in any 3-month period by the affiliated per-

24      son is not greater than one percent of the digital as-

25      sets then outstanding; or

65

1           ''(2) the affiliated person promptly, following

2    the placement of an order to sell one percent of the

3    digital assets then outstanding during any 3-month

4    period, reports the sale to—

5             ''(A) the Commodity Futures Trading

6           Commission, in the case of an order to sell a

7           digital commodity on or subject to the rules of

8           a digital commodity exchange; or

9             ''(B) the Securities and Exchange Commis-

10          sion, in the case of a sell order for a restricted

11          digital asset placed with an alternative trading

12          system.

13    ''(d) TREATMENT OF CERTAIN END USER DISTRIBU-

14    TIONS UNDER THE SECURITIES LAWS.—

15        ''(1) IN GENERAL.—With respect to a digital

16    asset, an end user distribution is described under

17    this paragraph if—

18             ''(A) each blockchain system to which such

19           digital asset relates is a functional network; and

20             ''(B) with respect to the digital asset and

21           each blockchain system to which such digital

22           asset relates, the information described in sec-

23           tion 43 has been certified and made publicly

24           available.

66

1    "(2) NOT A SECURITY.—For purposes of the
2    securities laws, an end user distribution described
3    under paragraph (1) shall not be a transaction in a
4    security.

5    "(3) EXEMPTION.—Section 5 of the Securities
6    Act of 1933 (15 U.S.C. 77e) shall not apply to an
7    end user distribution described under paragraph (1)
8    or a transaction in a unit of digital asset issued in
9    such a distribution.".

10   **SEC. 203. ENHANCED DISCLOSURE REQUIREMENTS.**

11   Title I of the Securities Exchange Act of 1934 (15
12   U.S.C. 78a et seq.), as amended by section 202, is further
13   amended by adding at the end the following:

14   **"SEC. 43. ENHANCED DISCLOSURE REQUIREMENTS WITH**
15   **RESPECT TO DIGITAL ASSETS.**

16   "(a) DISCLOSURE INFORMATION.—With respect to a
17   digital asset and any blockchain system to which the dig-
18   ital asset relates, the information described under this sec-
19   tion is as follows:

20       "(1) SOURCE CODE.—The source code for any
21       blockchain system to which the digital asset relates.

22       "(2) TRANSACTION HISTORY.—A description of
23       the steps necessary to independently access, search,
24       and verify the transaction history of any blockchain
25       system to which the digital asset relates.

67

1          "(3) DIGITAL ASSET ECONOMICS.—A descrip-
2     tion of the purpose of any blockchain system to
3     which the digital asset relates and the operation of
4     any such blockchain system, including—

5               "(A) information explaining the launch
6          and supply process, including the number of
7          digital assets to be issued in an initial alloca-
8          tion, the total number of digital assets to be
9          created, the release schedule for the digital as-
10         sets, and the total number of digital assets then
11         outstanding;

12              "(B) information on any applicable con-
13         sensus mechanism or process for validating
14         transactions, method of generating or mining
15         digital assets, and any process for burning or
16         destroying digital assets on the blockchain sys-
17         tem;

18              "(C) an explanation of governance mecha-
19         nisms for implementing changes to the
20         blockchain system or forming consensus among
21         holders of such digital assets; and

22              "(D) sufficient information for a third
23         party to create a tool for verifying the trans-
24         action history of the digital asset.

68

1        ''(4) PLAN OF DEVELOPMENT.—The current

2    state and timeline for the development of any

3    blockchain system to which the digital asset relates,

4    showing how and when the blockchain system in-

5    tends or intended to be considered a functional net-

6    work and decentralized network.

7        ''(5) DEVELOPMENT DISCLOSURES.—A list of

8    all persons who are related persons or affiliated per-

9    sons who have been issued a unit of a digital asset

10   by a digital asset issuer or have a right to a unit of

11   a digital asset from a digital asset issuer.

12       ''(6) RISK FACTOR DISCLOSURES.—Where ap-

13   propriate, provide under the caption 'Risk Factors'

14   a description of the material risks surrounding own-

15   ership of a unit of a digital asset. This discussion

16   shall be organized logically with relevant headings

17   and each risk factor shall be set forth under a sub-

18   caption that adequately describes the risk.

19   ''(b) CERTIFICATION.—With respect to a digital asset

20   and any blockchain system to which the digital asset re-

21   lates, the information required to be made available under

22   this section has been certified if the digital asset issuer,

23   an affiliated person, or a decentralized governance system

24   (or, if no digital asset issuer, affiliated person, or decen-

25   tralized governance system are identifiable, an alternative

69

1 trading system or digital commodity exchange) certifies on
2 a quarterly basis to the Securities and Exchange Commis-
3 sion and Commodity Futures Trading Commission that
4 the information is true and correct.''.

**SEC. 204. CERTIFICATION OF CERTAIN DIGITAL ASSETS.**

6     Title I of the Securities Exchange Act of 1934 (15
7 U.S.C. 78a et seq.), as amended by section 203, is further
8 amended by adding at the end the following:

**''SEC. 44. CERTIFICATION OF CERTAIN DIGITAL ASSETS.**

10     ''(a) CERTIFICATION.—Any person may certify to the
11 Securities and Exchange Commission that the blockchain
12 system to which a digital asset relates is a decentralized
13 network.

14     ''(b) FILING REQUIREMENTS.—A certification de-
15 scribed under subsection (a) shall be filed with the Com-
16 mission, and include—

17         ''(1) information regarding the person making
18     the certification;

19         ''(2) a description of the blockchain system and
20     the digital asset which relates to such blockchain
21     system, including—

22             ''(A) the operation of the blockchain sys-
23         tem;

24             ''(B) the functionality of the related digital
25         asset;

70

1        ''(C) any decentralized governance system

2    which relates to the blockchain system; and

3        ''(D) the process to develop consensus or

4    agreement within such decentralized governance

5    system;

6    ''(3) a description of the development of the

7    blockchain system and the digital asset which relates

8    to the blockchain system, including—

9        ''(A) a history of the development of the

10    blockchain system and the digital asset which

11    relates to such blockchain system;

12        ''(B) a description of the issuance process

13    for the digital asset which relates to the

14    blockchain system;

15        ''(C) information identifying the digital

16    asset issuer of the digital asset which relates to

17    the blockchain system; and

18        ''(D) a list of any affiliated person related

19    to the digital asset issuer;

20    ''(4) an analysis of the factors on which such

21    person based the certification that the blockchain

22    system is a decentralized network, including—

23        ''(A) an explanation of the protections and

24    prohibitions available during the previous 12

25    months against any one person being able to—

71

1          "(i) control or materially alter the
2        blockchain system;

3          "(ii) exclude any other person from
4        using or participating on the blockchain
5        system; and

6          "(iii) exclude any other person from
7        participating in a decentralized governance
8        system;

9      "(B) information regarding the beneficial
10    ownership of the digital asset which relates to
11    such blockchain system and any the distribution
12    of voting power in any decentralized governance
13    system during the previous 12 months;

14      "(C) information regarding the history of
15    upgrades to the source code for such blockchain
16    system during the previous 3 months, includ-
17    ing—

18          "(i) a description of any consensus or
19        agreement process utilized to process or
20        approve changes to the source code;

21          "(ii) a list of any material changes to
22        the source code, the purpose and effect of
23        the changes, and the contributor of the
24        changes, if known; and

72

1          "(iii) any changes to the source code

2              made by the digital asset issuer, a related

3              person, or an affiliated person;

4          "(D) information regarding any activities

5          conducted to market the digital asset which re-

6          lates to the blockchain system during the pre-

7          vious 3 months by the digital asset issuer or an

8          affiliated person of the digital asset issuer; and

9          "(E) information regarding any issuance of

10         a unit of the digital asset which relates to such

11         blockchain system during the previous 12

12         months;

13     "(5) with respect to a blockchain system for

14     which a certification has previously been rebutted or

15     withdrawn under this section, specific information

16     relating to the analysis provided in subsection (f)(2)

17     or (g)(3), as applicable, in connection with such re-

18     buttal or withdrawal.

19     "(c) REBUTTABLE PRESUMPTION.—The Commission

20 may rebut a certification described under subsection (a)

21 with respect to a blockchain system if the Commission,

22 within 30 days of receiving such certification, determines

23 that the blockchain system is not a decentralized network.

24     "(d) CERTIFICATION REVIEW.—

73

1          "(1) IN GENERAL.—Any blockchain system that
2     relates to a digital asset for which a certification has
3     been made under subsection (a) shall be considered
4     a decentralized network 30 days after the date on
5     which the Commission receives a certification under
6     subsection (a), unless the Commission notifies the
7     person who made the certification within such time
8     that the Commission is staying the certification due
9     to—

10          "(A) an inadequate explanation by the per-
11     son making the certification; or

12          "(B) any novel or complex issues which re-
13     quire additional time to consider.

14     "(2) PUBLIC NOTICE.—The Commission shall
15     make the following available to the public and pro-
16     vide a copy to the Commodity Futures Trading
17     Commission:

18          "(A) Each certification received under sub-
19     section (a).

20          "(B) Each stay of the Commission under
21     this section, and the reasons therefore.

22          "(C) Any response from a person making
23     a certification under subsection (a) to a stay of
24     the certification by the Commission.

74

1        "(3) CONSOLIDATION.—The Commission may

2    consolidate and treat as one submission multiple cer-

3    tifications made under subsection (a) for the same

4    blockchain system which relates to a digital asset

5    which are received during the review period provided

6    under this subsection.

7    "(e) STAY OF CERTIFICATION.—

8        "(1) IN GENERAL.—A notification by the Com-

9    mission pursuant to subsection (d)(1) shall stay the

10   certification once for up to an additional 90 days

11   from the date of the notification.

12       "(2) PUBLIC COMMENT PERIOD.—Before the

13   end of the 30-day period described under subsection

14   (d)(1), the Commission may begin a public comment

15   period of at least 30 days in conjunction with a stay

16   under this section.

17   "(f) DISPOSITION OF CERTIFICATION.—

18       "(1) IN GENERAL.—A certification made under

19   subsection (a) shall—

20           "(A) become effective—

21               "(i) upon the publication of a notifica-

22           tion from the Commission to the person

23           who made the certification that the Com-

24           mission does not object to the certification;

25           or

75

1          ''(ii) at the expiration of the certifi-
2     cation review period; and

3          ''(B) not become effective upon the publi-
4     cation of a notification from the Commission to
5     the person who made the certification that the
6     Commission has rebutted the certification.

7     ''(2) DETAILED ANALYSIS INCLUDED WITH RE-
8     BUTTAL.—The Commission shall include, with each
9     publication of a notification of rebuttal described
10    under paragraph (1)(B), a detailed analysis of the
11    factors on which the decision was based.

12    ''(g) WITHDRAWAL OF CERTIFICATION.—

13    ''(1) DETERMINATION BY A DIGITAL COM-
14    MODITY EXCHANGE.—With respect to a certification
15    of a blockchain system that becomes effective pursu-
16    ant to subsection (f), if a digital commodity ex-
17    change determines that the blockchain system may
18    not be a decentralized network, the digital com-
19    modity exchange shall notify the Commodity Futures
20    Trading Commission of such determination.

21    ''(2) WITHDRAWAL PROCESS.—With respect to
22    each notification received under paragraph (1), the
23    Commodity Futures Trading Commission shall ini-
24    tiate a withdrawal process under which the Com-
25    modity Futures Trading Commission shall—

76

1          ''(A) publish a notice announcing the pro-
2     posed withdrawal;
3          ''(B) provide a 30-day comment period
4     with respect to the proposed withdrawal; and
5          ''(C) after the end of the 30-day comment
6     required under subparagraph (B), publish ei-
7     ther—
8               ''(i) a notification of withdrawal of the
9          applicable certification; or
10              ''(ii) a notice that the Commodity Fu-
11         tures Trading Commission is not with-
12         drawing the certification.
13    ''(3) DETAILED ANALYSIS REQUIRED.—The
14    Commodity Futures Trading Commission shall in-
15    clude, with each publication of a notification of with-
16    drawal described under paragraph (2)(C)(i), a de-
17    tailed analysis of the factors on which the decision
18    was based.
19    ''(h) RECERTIFICATION.—With respect to a
20    blockchain system for which a certification has been rebut-
21    ted or withdrawn under this section, no person may make
22    a certification under subsection (a) with respect to such
23    blockchain system during the 90-day period beginning on
24    the date of such rebuttal or withdrawal.
25    ''(i) APPEAL OF REBUTTAL OR WITHDRAWAL.—

1       "(1) IN GENERAL.—If a certification is rebut-
2    ted or withdrawn under this section, the person
3    making such certification may appeal the decision to
4    the United States Court of Appeals for the District
5    of Columbia, not later than 60 days after the notice
6    of rebuttal or withdrawal is made.

7       "(2) REVIEW.—In an appeal under paragraph
8    (1), the court shall have de novo review of the deter-
9    mination to rebut or withdraw the certification.

10    "(j) LIABILITY FOR PROVIDING FALSE INFORMA-
11  TION.—It shall be unlawful for any person to provide false
12  information in support of a certification under this section
13  if such person knowingly or reasonably should have known
14  such information was false.".

**15  SEC. 205. EFFECTIVE DATE.**

16    Unless otherwise provided in this title, this title and
17  the amendments made by this title shall take effect 360
18  days after the date of enactment of this Act, except that,
19  to the extent a provision of this title requires a rule-
20  making, the provision shall take effect on the later of—

21       (1) 360 days after the date of enactment of this
22    Act; or

23       (2) 60 days after the publication in the Federal
24    Register of the final rule implementing the provision.

78

# TITLE III—REGISTRATION FOR DIGITAL ASSET INTER-MEDIARIES AT THE SECURI-TIES AND EXCHANGE COM-MISSION

## SEC. 301. TREATMENT OF DIGITAL COMMODITIES AND OTHER DIGITAL ASSETS.

(a) SECURITIES ACT OF 1933.—Section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) is amended by adding at the end the following: "The term does not include a digital commodity or permitted payment stablecoin.".

(b) SECURITIES EXCHANGE ACT OF 1934.—Section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)) is amended—

(1) in paragraph (1), by adding at the end the following: "The term 'exchange' does not include a digital asset trading system, blockchain protocol, or any person or group of persons solely because of their development of a blockchain protocol.";

(2) in paragraph (2), by adding at the end the following: "A digital asset trading system is not a 'facility' of an exchange.";

(3) in paragraph (4)(A), by inserting ", other than restricted digital assets," after "securities";

79

1   (4) in paragraph (5)(A), by inserting "re-
2 stricted digital assets or" after "not including";

3   (5) in paragraph (26) by inserting "(other than
4 a notice-registered digital asset clearing agency)"
5 after "or registered clearing agency";

6   (6) in paragraph (28) by inserting "(other than
7 a notice-registered digital asset clearing agency)"
8 after "registered clearing agency";

9   (7) in paragraph (10), by adding at the end the
10 following: "Subject to subsection (i), the term does
11 not include a digital commodity or permitted pay-
12 ment stablecoin.";

13   (8) by redesignating the second paragraph (80)
14 (relating to funding portals) as paragraph (81); and

15   (9) by adding at the end the following:

16   "(81) BANK SECRECY ACT.—The term 'Bank
17 Secrecy Act' means—

18    "(A) section 21 of the Federal Deposit In-
19   surance Act (12 U.S.C. 1829b);

20    "(B) chapter 2 of title I of Public Law 91–
21   508 (12 U.S.C. 1951 et seq.); and

22    "(C) subchapter II of chapter 53 of title
23   31, United States Code.

24   "(82) DIGITAL ASSET BROKER.—The term 'dig-
25 ital asset broker'—

80

1          "(A) means any person engaged in the
2      business of effecting transactions in restricted
3      digital assets for the account of others; and
4          "(B) does not include a blockchain protocol
5      or a person or group of persons solely because
6      of their development of a blockchain protocol.
7      "(83) DIGITAL ASSET DEALER.—The term 'dig-
8  ital asset dealer'—
9          "(A) means any person engaged in the
10     business of buying and selling digital assets for
11     such person's own account through a broker or
12     otherwise; and
13         "(B) does not include—
14             "(i) a person that buys or sells digital
15         assets for such person's own account, ei-
16         ther individually or in a fiduciary capacity,
17         but not as a part of a regular business; or
18             "(ii) a blockchain protocol or a person
19         or group of persons solely because of their
20         development of a blockchain protocol.
21     "(84) DIGITAL ASSET TRADING SYSTEM.—The
22  term 'digital asset trading system'—
23         "(A) means any organization, association,
24     person, or group of persons, whether incor-
25     porated or unincorporated, that constitutes,

1    maintains, or provides a market place or facili-
2    ties for bringing together purchasers and sellers
3    of restricted digital assets or for otherwise per-
4    forming with respect to digital assets the func-
5    tions commonly performed by a stock exchange
6    within the meaning of section 240.3b–16 of title
7    17, Code of Federal Regulations, as in effect on
8    the date of enactment of this paragraph; and

9        ''(B) does not include a blockchain protocol
10   or a person or group of persons solely because
11   of their development of a blockchain protocol.

12   ''(85) MIXED DIGITAL ASSET TRANSACTION.—
13   The term 'mixed digital asset transaction' means an
14   agreement, contract, or transaction involving a re-
15   stricted digital asset and a digital commodity.

16   ''(86) NOTICE-REGISTERED DIGITAL ASSET
17   CLEARING AGENCY.—The term 'notice-registered
18   digital asset clearing agency' means a clearing agen-
19   cy that has registered with the Commission pursuant
20   to section 17A(b)(9).

21   ''(87) ADDITIONAL DIGITAL ASSET-RELATED
22   TERMS.—

23       ''(A) SECURITIES ACT OF 1933.—The
24       terms 'affiliated person', 'blockchain system',
25       'decentralized governance system', 'decentral-

82

1          ized network', 'digital asset', 'digital asset

2          issuer', 'digital asset maturity date', 'end user

3          distribution', 'functional network', 'mixed dig-

4          ital asset transaction', 'permitted payment

5          stablecoin', 'related person', 'restricted digital

6          asset', and 'source code' have the meaning

7          given those terms, respectively, under section

8          2(a) of the Securities Act of 1933 (15 U.S.C.

9          77b(a)).

10         "(B) COMMODITY EXCHANGE ACT.—The

11         terms 'digital commodity', 'digital commodity

12         broker', 'digital commodity dealer', and 'digital

13         commodity exchange' have the meaning given

14         those terms, respectively, under section 1a of

15         the Commodity Exchange Act (7 U.S.C. 1a).".

16    (c) INVESTMENT ADVISERS ACT OF 1940.—Section

17  202(a) of the Investment Advisers Act of 1940 (15 U.S.C.

18  80b–2) is amended—

19         (1) in paragraph (18), by adding at the end the

20         following: "The term does not include a digital com-

21         modity or permitted payment stablecoin.";

22         (2) by redesignating the second paragraph (29)

23         (relating to commodity pools) as paragraph (31);

24         (3) by adding at the end, the following:

83

1    ''(32) DIGITAL ASSET-RELATED TERMS.—The

2    terms 'digital commodity' and 'permitted payment

3    stablecoin' have the meaning given those terms, re-

4    spectively, under section 2(a) of the Securities Act

5    of 1933 (15 U.S.C. 77b(a)).''.

6    (d) INVESTMENT COMPANY ACT OF 1940.—Section

7    2(a) of the Investment Company Act of 1940 (15 U.S.C.

8    80a–2) is amended—

9        (1) in paragraph (36), by adding at the end the

10        following: ''The term does not include a digital com-

11        modity or permitted payment stablecoin.''; and

12        (2) by adding at the end the following:

13    ''(55) DIGITAL ASSET-RELATED TERMS.—The

14    terms 'digital commodity' and 'permitted payment

15    stablecoin' have the meaning given those terms, re-

16    spectively, under section 2(a) of the Securities Act

17    of 1933 (15 U.S.C. 77b(a)).''.

18    **SEC. 302. ANTIFRAUD AUTHORITY OVER PERMITTED PAY-**

19                 **MENT STABLECOINS.**

20    Section 10 of the Securities Exchange Act of 1934

21    (15 U.S.C. 78j) is amended—

22        (1) by moving subsection (c) so as to appear

23        after subsection (b);

24        (2) by designating the undesignated matter at

25        the end of that section as subsection (d); and

84

1          (3) by adding at the end the following:

2      ''(e)(1) Rules promulgated under subsection (b) that

3  prohibit fraud, manipulation, or insider trading (but not

4  rules imposing or specifying reporting or recordkeeping re-

5  quirements, procedures, or standards as prophylactic

6  measures against fraud, manipulation, or insider trading),

7  and judicial precedents decided under subsection (b) and

8  rules promulgated thereunder that prohibit fraud, manip-

9  ulation, or insider trading, shall apply to permitted pay-

10  ment stablecoins with respect to those circumstances in

11  which the permitted payment stablecoins are brokered,

12  traded, or custodied by a broker, dealer, digital asset

13  broker, or digital asset dealer or through an alternative

14  trading system or digital asset trading platform to the

15  same extent as they apply to securities.

16      ''(2) Judicial precedents decided under section 17(a)

17  of the Securities Act of 1933 and sections 9, 15, 16, 20,

18  and 21A of this title, and judicial precedents decided

19  under applicable rules promulgated under such sections,

20  shall apply to permitted payment stablecoins with respect

21  to those circumstances in which the permitted payment

22  stablecoins are brokered, traded, or custodied by a digital

23  asset broker, digital asset dealer, or digital asset trading

24  platform to the same extent as they apply to securities.

85

1    ''(3) Nothing in this subsection may be construed to

2 provide the Commission authority to make any rule, regu-

3 lation, requirement, or obligation on a permitted payment

4 stablecoin issuer regarding the operations of a permitted

5 payment stablecoin issuer or a permitted payment

6 stablecoin, including requirements or obligations regard-

7 ing—

8        ''(A) design;

9        ''(B) structure;

10        ''(C) issuance;

11        ''(D) redemption;

12        ''(E) financial resources;

13        ''(F) collateral; or

14        ''(G) any other aspect of the operation of a per-

15    mitted payment stablecoin issuer or permitted pay-

16    ment stablecoin.''.

17 **SEC. 303. REGISTRATION OF DIGITAL ASSET TRADING SYS-**

18        **TEMS.**

19    Section 6 of the Securities Exchange Act of 1934 (15

20 U.S.C. 78f) is amended by adding at the end the following:

21    ''(m) DIGITAL ASSET TRADING SYSTEM.—

22        ''(1) IN GENERAL.—It shall be unlawful for any

23    digital asset trading system to make use of the mails

24    or any means or instrumentality of interstate com-

25    merce within or subject to the jurisdiction of the

86

1   United States to effect any transaction in a digital

2   asset, unless such digital asset trading system is reg-

3   istered with the Commission.

4       ''(2) APPLICATION.—A person desiring to reg-

5   ister as a digital asset trading system shall submit

6   to the Commission an application in such form and

7   containing such information as the Commission may

8   require for the purpose of making the determina-

9   tions required for approval.

10      ''(3) EXEMPTIONS.—A digital asset trading sys-

11  tem that offers or seeks to offer at least one digital

12  asset shall not be required to register under this sec-

13  tion (and subparagraph (A) shall not apply to such

14  digital asset trading system) if the trading system

15  satisfies any of the exemptions set forth in section

16  240.3b–16(b) of title 17, Code of Federal Regula-

17  tions.''.

18  **SEC. 304. REQUIREMENTS FOR DIGITAL ASSET TRADING**

19          **SYSTEMS.**

20      Title I of the Securities Exchange Act of 1934 (15

21  U.S.C. 78a et seq.) is amended by inserting after section

22  6 the following:

23  **''SEC. 6A. REQUIREMENTS FOR DIGITAL ASSET TRADING**

24          **SYSTEMS.**

25      ''(a) HOLDING OF CUSTOMER ASSETS.—

"(1) IN GENERAL.—Subject to paragraph (2), a digital asset trading system, in its capacity as such, may not hold custody of customer money, assets, or property.

"(2) CUSTODY IN OTHER CAPACITY.—Nothing in this Act shall prohibit a person registered as a digital asset trading system from holding custody of customer money, assets, or property in any other permitted capacity, including as a digital asset broker or digital asset dealer, in compliance with the requirements of section 15H.

"(b) RULEMAKING.—The Commission shall prescribe rules for digital asset trading systems relating to the following:

"(1) NOTICE.—Notice to the Commission of the initial operation of a digital asset trading system or any material change to the operation of the digital asset trading system.

"(2) ORDER DISPLAY.—The thresholds at which a digital asset trading system is required to display the orders of the digital asset trading system, and the manner of such display.

"(3) FAIR ACCESS.—The thresholds at which a digital asset trading system is required to have poli-

88

1    cies regarding providing fair access to the digital

2    asset trading system.

3        ''(4) CAPACITY, INTEGRITY, AND SECURITY OF

4    AUTOMATED SYSTEMS.—Policies and procedures rea-

5    sonably designed to ensure the capacity, integrity,

6    and security of the digital asset trading system, tak-

7    ing into account the particular nature of digital

8    asset trading systems.

9        ''(5) EXAMINATIONS, INSPECTIONS, AND INVES-

10   TIGATIONS.—The examination and inspection of the

11   premises, systems, and records of the digital asset

12   trading system by the Commission or by a self-regu-

13   latory organization of which such digital asset trad-

14   ing system is a member.

15       ''(6) RECORDKEEPING.—The making, keeping

16   current, and preservation of records related to trad-

17   ing activity on the digital asset trading system.

18       ''(7) REPORTING.—The reporting of trans-

19   actions in digital assets that occur through the dig-

20   ital asset trading system.

21       ''(8) PROCEDURES.—The establishment of ade-

22   quate written safeguards and written procedures to

23   protect confidential trading information.

24       ''(c) NAME REQUIREMENT.—A digital asset trading

25   system may not use the word 'exchange' in the name of

1 the digital asset trading system, unless the digital asset

2 trading system—

3       "(1) is operated by a registered national securi-

4     ties exchange; and

5       "(2) is clearly indicated as being provided out-

6     side of the system's capacity as a national securities

7     exchange.

8     "(d) TREATMENT UNDER THE BANK SECRECY

9 ACT.—A digital asset trading system shall be treated as

10 a financial institution for purposes of the Bank Secrecy

11 Act.".

## SEC. 305. REGISTRATION OF DIGITAL ASSET BROKERS AND DIGITAL ASSET DEALERS.

14     The Securities Exchange Act of 1934 (15 U.S.C. 78a

15 et seq.) is amended by inserting after section 15G the fol-

16 lowing:

## "SEC. 15H. REGISTRATION OF DIGITAL ASSET BROKERS AND DIGITAL ASSET DEALERS.

19     "(a) REGISTRATION.—

20       "(1) IN GENERAL.—It shall be unlawful for any

21     digital asset broker or digital asset dealer (other

22     than a natural person associated with a digital asset

23     broker or digital asset dealer, and other than such

24     a digital asset broker or digital asset dealer whose

25     business is exclusively intrastate and who does not

90

1    make use of any facility of a digital asset trading

2    platform) to make use of the mails or any means or

3    instrumentality of interstate commerce to effect any

4    transactions in, or to induce or attempt to induce

5    the purchase or sale of, any digital asset unless such

6    digital asset broker or digital asset dealer is reg-

7    istered in accordance with this section.

8        "(2) APPLICATION.—A person desiring to reg-

9    ister as a digital asset broker or digital asset dealer

10   shall submit to the Commission an application in

11   such form and containing such information as the

12   Commission may require for the purpose of making

13   the determinations required for approval.

14       "(b) NATIONAL SECURITIES ASSOCIATION MEMBER-

15   SHIP.—

16       "(1) IN GENERAL.—A digital asset broker or

17   digital asset dealer may not register or maintain reg-

18   istration under this section unless such digital asset

19   broker or digital asset dealer is a member of a na-

20   tional securities association registered under section

21   15A.

22       "(2) EXCEPTION.—A digital asset broker or

23   digital asset dealer may register under this section

24   without obtaining membership in a national securi-

25   ties association until the end of the 360-day period

91

1 beginning on the date the first national securities as-

2 sociation adopts rules to admit digital asset brokers

3 or digital asset dealers as members.

4 "(c) ADDITIONAL REGISTRATIONS WITH THE COM-

5 MODITY FUTURES TRADING COMMISSION.—A registered

6 digital asset broker or digital asset dealer shall be per-

7 mitted to maintain any other registration with the Com-

8 modity Futures Trading Commission relating to the other

9 activities of the registered digital asset broker or reg-

10 istered digital asset dealer, including as a digital com-

11 modity broker or digital commodity dealer, to list or trade

12 contracts of sale for digital commodities.".

13 **SEC. 306. REQUIREMENTS OF DIGITAL ASSET BROKERS**

14    **AND DIGITAL ASSET DEALERS.**

15 Section 15H of the Securities Exchange Act of 1934,

16 as added by section 205, is amended by adding at the end

17 the following:

18 "(d) ANTIFRAUD.—No digital asset broker or digital

19 asset dealer shall make use of the mails or any means or

20 instrumentality of interstate commerce to effect any trans-

21 action in, or to induce or attempt to induce the purchase

22 or sale of, any digital asset that is not a digital commodity

23 by means of any manipulative, deceptive, or other fraudu-

24 lent device or contrivance.

25 "(e) HOLDING OF CUSTOMER ASSETS.—

92

1          "(1) IN GENERAL.—A digital asset broker or

2     digital asset dealer shall hold customer money, as-

3     sets, and property in a manner to minimize the risk

4     of loss to the customer or unreasonable delay in the

5     access to the money, assets, and property of the cus-

6     tomer.

7          "(2) RULEMAKING.—Not later than 180 days

8     after the date of enactment of this section, the Com-

9     mission shall issue rules to provide that a registered

10    digital asset broker or digital asset dealer will be

11    considered to satisfy the requirements of paragraph

12    (1), with respect to digital assets, so long as the dig-

13    ital asset broker or digital asset dealer—

14          "(A) holds such digital asset at a bank

15          that—

16               "(i) is recognized by the appropriate

17          Federal banking agency or State bank su-

18          pervisor (as such terms are defined, re-

19          spectively, in section 3 of the Federal De-

20          posit Insurance Act (12 U.S.C. 1813)) as

21          having custody over such assets;

22               "(ii) delivers the digital asset to the

23          digital asset broker or digital asset dealer

24          without requiring the payment of money or

25          value; and

93

1              "(iii) has acknowledged in writing
2          that the digital asset in the custody or con-
3          trol of the bank is free of charge, lien, or
4          claim of any kind in favor of such bank or
5          any person claiming through the bank;

6      "(B) establishes, maintains, and enforces
7  written policies, procedures, and controls rea-
8  sonably designed to demonstrate that the digital
9  asset broker or digital asset dealer—

10             "(i) has control over the digital asset
11         that the digital asset broker or digital
12         asset dealer holds in custody to protect
13         against the theft, loss, or unauthorized use
14         of the private keys necessary to access and
15         transfer such digital asset;

16             "(ii) has identified the steps that will
17         be taken in the wake of certain events that
18         could affect the custody of the digital as-
19         sets by the digital asset broker or digital
20         asset dealer;

21             "(iii) can comply with a court-ordered
22         freeze or seizure; and

23             "(iv) has established arrangements to
24         allow for the transfer of the digital asset
25         held by such digital asset broker or digital

94

1           asset dealer to another digital asset broker
2           or digital asset dealer, a trustee, receiver,
3           liquidator, or person performing a similar
4           function, or to another appropriate person,
5           in the event such digital asset broker or
6           digital asset dealer can no longer continue
7           as a going concern and self-liquidates or is
8           subject to a formal bankruptcy, receiver-
9           ship, liquidation, or similar proceeding; or
10          ''(C) complies with such other require-
11   ments as the Commission may permit.
12   ''(3) SEGREGATION OF FUNDS.—
13          ''(A) IN GENERAL.—A digital asset broker
14   or digital asset dealer shall treat and deal with
15   all money, assets, and property held for a cus-
16   tomer of the digital asset broker or digital asset
17   dealer, or that accrues to a customer as a result
18   of trading in digital assets, as belonging to the
19   customer.
20          ''(B) COMMINGLING PROHIBITED.—Money,
21   assets, and property of a customer described in
22   subparagraph (A) shall be separately accounted
23   for and shall not be commingled with the funds
24   of the digital asset broker or digital asset dealer
25   or be used to margin, secure, or guarantee any

95

1      trades of any person other than the customer of

2      the digital asset broker or digital asset dealer

3      for whom the same are held.

4      ''(4) EXCEPTIONS.—

5          ''(A) USE OF FUNDS.—

6              ''(i) IN GENERAL.—Notwithstanding

7              paragraph (3), money, assets, and property

8              of customers of a digital asset broker or

9              digital asset dealer described in paragraph

10              (3) may be maintained and deposited in

11              the same account or accounts with any

12              bank, trust company, digital asset broker,

13              or digital asset dealer, if the money, assets,

14              and property remain segregated from the

15              money, assets, and property of the digital

16              asset broker or digital asset dealer.

17              ''(ii) WITHDRAWAL.—Notwithstanding

18              paragraph (3), such share of the money,

19              assets, and property described in para-

20              graph (3) as in the normal course of busi-

21              ness shall be necessary to transfer, adjust,

22              or settle a digital asset transaction pursu-

23              ant to a customer's instruction (standing

24              or otherwise) may be withdrawn and ap-

25              plied to such purposes, including the with-

96

1   drawal and payment of commissions, bro-
2   kerage, interest, taxes, storage, and other
3   charges lawfully accruing in connection
4   with a digital asset transaction.

5       "(iii) COMMISSION ACTION.—In ac-
6   cordance with such terms and conditions
7   as the Commission may prescribe by rule,
8   regulation, or order, any money, assets, or
9   property of a customer of a digital asset
10  broker or digital asset dealer described in
11  paragraph (3) may be commingled and de-
12  posited as provided in this section with any
13  other money, assets, or property received
14  by the digital asset broker or digital asset
15  dealer and required by the Commission to
16  be separately accounted for and treated
17  and dealt with as belonging to the cus-
18  tomer of the digital asset broker or digital
19  asset dealer.

20      "(B) PARTICIPATION IN BLOCKCHAIN
21  SERVICES.—

22          "(i) IN GENERAL.—A customer shall
23      have the right to waive the restrictions in
24      paragraph (3) for any unit of a digital
25      asset, by affirmatively electing, in writing

97

1    to the digital asset broker or digital asset
2    dealer, to waive the restrictions.

3    ''(ii) USE OF FUNDS.—Customer dig-
4    ital assets removed from segregation under
5    clause (i) may be pooled and used by the
6    digital asset broker or digital asset dealer
7    or its designee to provide a blockchain
8    service for a blockchain system to which
9    the unit of the digital asset removed from
10   segregation under clause (i) relates.

11   ''(iii) LIMITATIONS.—The Commission
12   may, by rule, establish notice and disclo-
13   sure requirements, and any other limita-
14   tions and rules related to the waiving of
15   any restrictions under this subparagraph
16   that are reasonably necessary to protect
17   customers.

18   ''(iv) BLOCKCHAIN SERVICE DE-
19   FINED.—In this subparagraph, the term
20   'blockchain service' means any activity re-
21   lating to validating transactions on a
22   blockchain system, providing security for a
23   blockchain system, or other similar activity
24   required for the ongoing operation of a
25   blockchain system.

1          ''(5) FURTHER LIMITATIONS.—No person shall
2     treat or deal with a digital asset held on behalf of
3     any customer pursuant to paragraph (3) by utilizing
4     any unit of such digital asset to participate in a
5     blockchain service (as defined in paragraph
6     (4)(B)(iv) or a decentralized governance system as-
7     sociated with the digital asset or the blockchain sys-
8     tem to which the digital asset relates in any manner
9     other than that which is expressly directed by the
10    customer from which such unit of a digital asset was
11    received.
12    ''(f) CAPITAL REQUIREMENTS.—
13         ''(1) IN GENERAL.—Each registered digital
14    asset broker and registered digital asset dealer shall
15    meet such minimum capital requirements as the
16    Commission may prescribe to ensure that the digital
17    asset broker or digital asset dealer is able to—
18              ''(A) conduct an orderly wind-down of the
19         activities of the digital asset broker or digital
20         asset dealer; and
21              ''(B) fulfill the customer obligations of the
22         digital asset broker or digital asset dealer.
23         ''(2) CALCULATION.—For purposes of any
24    Commission rule or order adopted under this section
25    or any interpretation thereof regulating a digital

99

1    asset broker or digital asset dealer's financial re-
2    sponsibility obligations and capital requirements, a
3    registered digital asset broker or digital asset dealer
4    that maintains control of customer digital assets in
5    a manner that satisfies the rules issued by the Com-
6    mission under subsection (e)(2) shall not be required
7    to include the value of such digital assets as assets
8    or liabilities of the digital asset broker or digital
9    asset dealer.

10        ''(3) COORDINATION OF CAPITAL REQUIRE-
11    MENTS.—

12            ''(A) COMMISSION RULE.—The Commis-
13        sion shall, by rule, provide appropriate offsets
14        to any applicable capital requirement for a per-
15        son with multiple registrations, including as a
16        broker, dealer, digital asset broker, or digital
17        asset dealer.

18            ''(B) JOINT RULE.—The Commission and
19        the Commodity Futures Trading Commission
20        shall jointly, by rule, provide appropriate offsets
21        to any applicable capital requirement for a per-
22        son with multiple registrations, including as a
23        digital asset broker, digital asset dealer, digital
24        asset trading system, digital commodity broker,

1            digital commodity dealer, or digital commodity

2            exchange.

3      ''(g) REPORTING AND RECORDKEEPING.—Each reg-

4 istered digital asset broker and digital asset dealer—

5            ''(1) shall make such reports as are required by

6            the Commission by rule or regulation regarding the

7            transactions, positions, and financial condition of the

8            digital asset broker or digital asset dealer;

9            ''(2) shall keep books and records in such form

10           and manner and for such period as may be pre-

11           scribed by the Commission by rule or regulation; and

12           ''(3) shall keep the books and records open to

13           inspection and examination by any representative of

14           the Commission.

15      ''(h) TREATMENT UNDER THE BANK SECRECY

16 ACT.—A digital asset broker and a digital asset dealer

17 shall be treated as a financial institution for purposes of

18 the Bank Secrecy Act.''.

19 **SEC. 307. RULES RELATED TO CONFLICTS OF INTEREST.**

20      The Securities Exchange Act of 1934 (15 U.S.C. 78a

21 et seq.) is amended by inserting after section 10D the fol-

22 lowing:

101

1 ''SEC. 10E. CONFLICTS OF INTEREST RELATED TO DIGITAL
2           ASSETS.

3      ''Each registered digital asset trading system, reg-
4  istered digital asset broker, registered digital asset dealer,
5  and notice-registered digital asset clearing agency shall es-
6  tablish, maintain, and enforce written policies and proce-
7  dures reasonably designed, taking into consideration the
8  nature of such person's business, to mitigate any conflicts
9  of interest and transactions or arrangements with affili-
10 ates.''.

11 SEC. 308. TREATMENT OF CERTAIN DIGITAL ASSETS IN
12           CONNECTION WITH FEDERALLY REGULATED
13           INTERMEDIARIES.

14     Section 18(b) of the Securities Act of 1933 (15
15 U.S.C. 77r(b)) is amended by adding at the end the fol-
16 lowing:

17        ''(5) EXEMPTION FOR CERTAIN DIGITAL ASSETS
18     IN   CONNECTION   WITH   FEDERALLY   REGULATED
19     INTERMEDIARIES.—A digital asset is a covered secu-
20     rity with respect to a transaction that is exempt
21     from registration under this Act when—

22          ''(A) it is brokered, traded, custodied, or
23       cleared by a digital asset broker or digital asset
24       dealer registered under section 15H of the Se-
25       curities Exchange Act of 1934; or

102

1          ''(B) traded through a digital asset trading

2          system (as defined under section 242.301 of

3          title 17, Code of Federal Regulations).''.

**SEC. 309. DUAL REGISTRATION.**

5     Any person that is registered with the Securities and

6 Exchange Commission as a digital asset broker, digital

7 asset dealer, or digital asset trading system may register

8 with the Commodity Futures Trading Commission, as ap-

9 propriate, as—

10          (1) a digital commodity exchange under section

11     5i of the Commodity Exchange Act (7 U.S.C. 1 et

12     seq.), as added by this Act, if the person offers or

13     seeks to offer a cash or spot market in at least one

14     digital commodity;

15          (2) a digital commodity broker under section 4u

16     of the Commodity Exchange Act, as added by this

17     Act, if the person is engaged in soliciting or accept-

18     ing orders in digital commodity cash or spot mar-

19     kets; or

20          (3) a digital commodity dealer under section 4u

21     of the Commodity Exchange Act, as added by this

22     Act, if the person holds themself out as a dealer in

23     digital commodity cash or spot markets.

103

1 **SEC. 310. EXCLUSION FOR ANCILLARY ACTIVITIES.**

2    The Securities Exchange Act of 1934 (15 U.S.C. 78a

3 et seq.) is amended by inserting after section 15G the fol-

4 lowing:

5 **"SEC. 15H. EXCLUSION FOR ANCILLARY ACTIVITIES.**

6    "(a) IN GENERAL.—Notwithstanding any other pro-

7 vision of this Act, a person shall not be subject to this

8 Act and the regulations thereunder solely based on the

9 person undertaking any ancillary activities.

10    "(b) EXCEPTIONS.—Subsection (a) shall not be con-

11 strued to apply to the antimanipulation and antifraud au-

12 thorities of the Commission.

13    "(c) ANCILLARY ACTIVITIES DEFINED.—In this sec-

14 tion, the term 'ancillary activities' means any of the fol-

15 lowing activities related to the operation of a blockchain

16 system:

17       "(1) Compiling network transactions, operating

18    a pool, relaying, searching, sequencing, validating, or

19    acting in a similar capacity with respect to a re-

20    stricted digital asset.

21       "(2) Providing computational work, operating a

22    node, or procuring, offering, or utilizing network

23    bandwidth, or other similar incidental services with

24    respect to a restricted digital asset.

25       "(3) Providing a user interface that enables a

26    user to read and access data about a blockchain sys-

104

1  tem, send messages, or otherwise interact with a
2  blockchain system.

3      ''(4) Developing, publishing, constituting, ad-
4  ministering, maintaining, or otherwise distributing a
5  blockchain system.

6      ''(5) Developing, publishing, constituting, ad-
7  ministering, maintaining, or otherwise distributing
8  software or systems that create or deploy a hard-
9  ware or software wallet or other system facilitating
10 an individual user's own personal ability to keep,
11 safeguard, or custody the user's restricted digital as-
12 sets or related private keys.''.

13 **SEC. 311. REGISTRATION AND REQUIREMENTS FOR NO-**
14 **TICE-REGISTERED DIGITAL ASSET CLEARING**
15 **AGENCIES.**

16     Section 17A(b) of the Securities Exchange Act of
17 1934 (15 U.S.C. 78q–1(b)) is amended—

18     (1) in subsection (1), by inserting ''(other than
19 a notice-registered digital asset clearing agency)''
20 after ''unlawful for any clearing agency''; and

21     (2) by adding at the end, the following:

22     ''(9) REGISTRATION AND REQUIREMENTS FOR
23 NOTICE-REGISTERED DIGITAL ASSET CLEARING
24 AGENCY.——

1 "(A) ELIGIBILITY.—A person may register
2 with the Commission as a notice-registered dig-
3 ital asset clearing agency if the person—
4 "(i) is otherwise registered as a digital
5 asset broker or digital asset dealer with the
6 Commission and is engaging in a business
7 involving digital assets that are not digital
8 commodities, in compliance with Commis-
9 sion rules pursuant to section 15H(e); or
10 "(ii) is a bank engaging in a business
11 involving digital assets, in compliance with
12 applicable banking law and regulation re-
13 lating to the custody and safekeeping of
14 such assets.
15 "(B) REGISTRATION.—A person may reg-
16 ister with the Commission as a notice-registered
17 digital asset clearing agency by providing the
18 Commission with notice of the activities of the
19 person or planned activities in such form as the
20 Commission determines appropriate.
21 "(C) RULEMAKING.—The Commission may
22 adopt rules, which may not take effect until at
23 least 360 days following the date of enactment
24 of this paragraph, with regard to the activities
25 of notice-registered digital asset clearing agen-

106

1    cies, taking into account the nature of digital
2    assets.''.

**SEC. 312. TREATMENT OF CUSTODY ACTIVITIES BY BANK-**
**ING INSTITUTIONS.**

5    (a) TREATMENT OF CUSTODY ACTIVITIES.—The ap-
6    propriate Federal banking agency (as defined under sec-
7    tion 3 of the Federal Deposit Insurance Act (12 U.S.C.
8    1813)), the National Credit Union Administration (in the
9    case of a credit union), and the Securities and Exchange
10   Commission may not require a depository institution, na-
11   tional bank, Federal credit union, State credit union, or
12   trust company, or any affiliate thereof—

13       (1) to include assets held in custody as a liabil-
14       ity on any financial statement or balance sheet, in-
15       cluding payment stablecoin custody or safekeeping
16       activities;

17       (2) to hold additional regulatory capital against
18       assets in custody or safekeeping, except as necessary
19       to mitigate against operational risks inherent with
20       the custody or safekeeping services, as determined
21       by—

22           (A) the appropriate Federal banking agen-
23           cy;

24           (B) the National Credit Union Administra-
25           tion (in the case of a credit union);

107

1              (C) a State bank supervisor (as defined
2        under section 3 of the Federal Deposit Insur-
3        ance Act (12 U.S.C. 1813)); or
4              (D) a State credit union supervisor (as de-
5        fined under section 6003 of the Anti-Money
6        Laundering Act of 2020); or
7        (3) to recognize a liability for any obligations
8   related to activities or services performed for digital
9   assets that the entity does not own if that liability
10  would exceed the expense recognized in the income
11  statement as a result of the corresponding obliga-
12  tion.
13  (b) DEFINITIONS.—In this section:
14       (1) DEPOSITORY INSTITUTION.—The terms
15  "depository institution" has the meaning given that
16  term under section 3 of the Federal Deposit Insur-
17  ance Act.
18       (2) CREDIT UNION TERMS.—The terms "Fed-
19  eral credit union" and "State credit union" have the
20  meaning given those terms, respectively, under sec-
21  tion 101 of the Federal Credit Union Act.

108

# TITLE IV—REGISTRATION FOR DIGITAL ASSET INTER-MEDIARIES AT THE COM-MODITY FUTURES TRADING COMMISSION

**SEC. 401. COMMISSION JURISDICTION OVER DIGITAL COM-MODITY TRANSACTIONS.**

(a) IN GENERAL.—Section 2(a)(1) of the Commodity Exchange Act (7 U.S.C. 2(a)(1)) is amended by adding at the end the following:

"(J) Except as expressly provided in this Act, nothing in the Financial Innovation and Technology for the 21st Century Act shall affect or apply to, or be interpreted to affect or apply to—

"(i) any agreement, contract, or transaction that is subject to regulation under this Act as—

"(I) a contract of sale of a commodity for future delivery or an option on such a contract;

"(II) a swap;

"(III) a security futures product;

"(IV) an option authorized under section 4c of this Act;

109

1          ''(V) an agreement, contract, or

2      transaction described in subparagraph

3      (C)(i) or (D)(i) of subsection (c)(2) of

4      this section; or

5          ''(VI) a leverage transaction au-

6      thorized under section 19 of this Act;

7      or

8          ''(ii) the activities of any person with

9      respect to any such an agreement, con-

10     tract, or transaction.''.

11    (b) IN GENERAL.—Section 2(c)(1) of the Commodity

12 Exchange Act (7 U.S.C. 2(c)(1)) is amended—

13        (1) in subparagraph (F), by striking ''or'' at

14    the end;

15        (2) in subparagraph (G), by striking the period

16    and inserting ''; or''; and

17        (3) by adding at the end the following:

18          ''(H) permitted payment stablecoins.''.

19    (c) IN GENERAL.—Section 2(c)(2) of the Commodity

20 Exchange Act (7 U.S.C. 2(c)(2)) is amended—

21        (1) in subparagraph (D)(ii)—

22          (A) in subclause (III), in the matter that

23      precedes item (aa), by inserting ''of a com-

24      modity, other than a digital commodity,'' before

25      ''that''; and

110

1          (B) by redesignating subclauses (IV) and

2     (V) as subclauses (V) and (VI) and inserting

3     after subclause (III) the following:

4               ''(IV) a contract of sale of a dig-

5          ital commodity that—

6               ''(aa) results in actual deliv-

7          ery, as the Commission shall by

8          rule determine, within 2 days or

9          such other period as the Commis-

10         sion may determine by rule or

11         regulation based upon the typical

12         commercial practice in cash or

13         spot markets for the digital com-

14         modity involved; or

15              ''(bb) is executed with a reg-

16         istered digital commodity deal-

17         er—

18              ''(AA) directly;

19              ''(BB) through a reg-

20         istered digital commodity

21         broker; or

22              ''(CC) on or subject to

23         the rules of a registered dig-

24         ital commodity exchange;'';

25         and

111

1    (2) by adding at the end the following:

2    "(F) COMMISSION JURISDICTION WITH RESPECT TO

3  DIGITAL COMMODITY TRANSACTIONS.—

4        "(i) IN GENERAL.—Subject to sections 6d and

5     12(e), the Commission shall have exclusive jurisdic-

6     tion with respect to any account, agreement, con-

7     tract, or transaction involving a contract of sale of

8     a digital commodity in interstate commerce, includ-

9     ing in a digital commodity cash or spot market, that

10    is offered, solicited, traded, facilitated, executed,

11    cleared, reported, or otherwise dealt in—

12         "(I) on or subject to the rules of a reg-

13       istered entity or an entity that is required to be

14       registered as a registered entity; or

15         "(II) by any other entity registered, or re-

16       quired to be registered, with the Commission.

17      "(ii) LIMITATIONS.—Clause (i) shall not apply

18    with respect to custodial or depository activities for

19    a digital commodity, or custodial or depository ac-

20    tivities for any promise or right to a future digital

21    commodity, of an entity regulated by an appropriate

22    Federal banking agency or a State bank supervisor

23    (within the meaning of section 3 of the Federal De-

24    posit Insurance Act).

25      "(iii) MIXED DIGITAL ASSET TRANSACTIONS.—

112

1    "(I) IN GENERAL.—Clause (i) shall not
2    apply to a mixed digital asset transaction.

3    "(II) OVERSIGHT OF MIXED DIGITAL
4    ASSET TRANSACTIONS.—

5        "(aa) ON A CFTC REGULATED PLAT-
6    FORM.—A mixed digital asset transaction
7    that occurs on or subject to the rules of a
8    registered entity or by any other entity
9    registered with the Commission—

10        "(AA) shall not occur except on
11    or subject to the rules of a registered
12    entity or by any other entity that is
13    dually registered with the Commission
14    and the Securities and Exchange
15    Commission; and

16        "(BB) shall be subject to the ju-
17    risdiction of the Commission and the
18    Securities and Exchange Commission.

19    "(bb) OFF EXCHANGE.—A mixed dig-
20    ital asset transaction that does not occur
21    on or subject to the rules of a registered
22    entity or by any other entity registered
23    with the Commission shall be subject to
24    the exclusive jurisdiction of the Securities
25    and Exchange Commission.

113

1          "(III) REPORTS ON MIXED DIGITAL ASSET
2              TRANSACTIONS.—A digital asset issuer, related
3              person, affiliated person, or other person reg-
4              istered with the Securities and Exchange Com-
5              mission that engages in a mixed digital asset
6              transaction, shall, on request, open to inspec-
7              tion and examination by the Commodity Fu-
8              tures Trading Commission all books and
9              records relating to the mixed digital asset
10             transaction, subject to the confidentiality and
11             disclosure requirements of section 8.

12      "(G) AGREEMENTS, CONTRACTS, AND TRANS-
13  ACTIONS IN STABLECOINS.—

14          "(i) TREATMENT OF PERMITTED PAYMENT
15             STABLECOINS ON COMMISSION-REGISTERED ENTI-
16             TIES.—Except as provided in clauses (ii) and (iii),
17             the Commission shall only have jurisdiction over a
18             cash or spot agreement, contract, or transaction in
19             a permitted payment stablecoin that is offered, of-
20             fered to enter into, entered into, executed, confirmed
21             the execution of, solicited, or accepted—

22                  "(I) on or subject to the rules of a reg-
23                 istered entity; or

24                  "(II) by any other entity registered by the
25                 Commission.

114

1        "(ii) PERMITTED PAYMENT STABLECOIN
2    TRANSACTION RULES.—This Act shall only apply to
3    a transaction described in clause (i) for the purposes
4    of regulating the offer, execution, solicitation, or ac-
5    ceptance of a cash or spot permitted payment
6    stablecoin transaction on a registered entity or other
7    entity registered by the Commission with respect to
8    requirements imposed with respect to—

9            "(I) recordkeeping;
10           "(II) custody;
11           "(III) segregation;
12           "(IV) reporting;
13           "(V) trading procedures and trade proc-
14       essing requirements;
15           "(VI) information sharing;
16           "(VII) conflicts of interest;
17           "(VIII) antifraud, antimanipulation, or
18       false reporting; or
19           "(IX) any other transaction level require-
20       ment imposed on the registered entity or other
21       entity registered by the Commission that the
22       Commission by rule determines would foster the
23       development of fair and orderly cash or spot
24       markets in digital commodities, be necessary or

115

1  appropriate in the public interest, and be con-
2  sistent with the protection of customers.

3  "(iii) NO AUTHORITY OVER PERMITTED PAY-
4  MENT STABLECOINS.—Notwithstanding clause (ii),
5  the Commission shall not make a rule or regulation,
6  impose a requirement or obligation on a registered
7  entity or other entity registered by the Commission,
8  or impose a requirement or obligation on a per-
9  mitted payment stablecoin issuer, regarding the op-
10  eration of a permitted payment stablecoin issuer or
11  a permitted payment stablecoin, including a require-
12  ment or obligation regarding—

13      "(I) design;

14      "(II) structure;

15      "(III) issuance;

16      "(IV) redemption;

17      "(V) financial resources;

18      "(VI) collateral; or

19      "(VII) any other aspect of such an oper-
20      ation or such a stablecoin.".

21  (d) CONFORMING AMENDMENT.—Section 2(a)(1)(A)
22  of such Act (7 U.S.C. 2(a)(1)(A)) is amended in the 1st
23  sentence by inserting "subsection (c)(2)(F) of this section
24  or" before "section 19".

116

1 **SEC. 402. REQUIRING FUTURES COMMISSION MERCHANTS**
2        **TO USE QUALIFIED DIGITAL COMMODITY**
3        **CUSTODIANS.**

4     Section 4d of the Commodity Exchange Act (7 U.S.C.
5 6d) is amended—

6        (1) in subsection (a)(2)—

7           (A) in the 1st proviso, by striking "any
8           bank or trust company" and inserting "any
9           bank, trust company, or qualified digital com-
10           modity custodian"; and

11           (B) by inserting "*: Provided further,* That
12           any such property that is a digital commodity
13           shall be held in a qualified digital commodity
14           custodian" before the period at the end; and

15        (2) in subsection (f)(3)(A)(i), by striking "any
16 bank or trust company" and inserting "any bank,
17 trust company, or qualified digital commodity custo-
18 dian".

19 **SEC. 403. TRADING CERTIFICATION AND APPROVAL FOR**
20        **DIGITAL COMMODITIES.**

21     Section 5c of the Commodity Exchange Act (7 U.S.C.
22 7a–2) is amended—

23        (1) in subsection (a), by striking "5(d) and
24        5b(c)(2)" and inserting "5(d), 5b(c)(2), and 5i(c)";

25        (2) in subsection (b)—

117

1           (A) in each of paragraphs (1) and (2), by

2       inserting "digital commodity exchange," before

3       "derivatives"; and

4           (B) in paragraph (3), by inserting "digital

5       commodity exchange," before "derivatives" each

6       place it appears;

7       (3) in subsection (c)—

8           (A) in paragraph (2), by inserting "or par-

9       ticipants" before "(in";

10          (B) in paragraph (4)(B), by striking

11      "1a(10)" and inserting "1a(9)"; and

12          (C) in paragraph (5), by adding at the end

13      the following:

14          "(D) SPECIAL RULES FOR DIGITAL COM-

15      MODITY CONTRACTS.—In certifying any new

16      rule or rule amendment, or listing any new con-

17      tract or instrument, in connection with a con-

18      tract of sale of a commodity for future delivery,

19      option, swap, or other agreement, contract, or

20      transaction, that is based on or references a

21      digital commodity, a registered entity shall

22      make or rely on a certification under subsection

23      (d) for the digital commodity."; and

24      (4) by inserting after subsection (c) the fol-

25  lowing:

118

1    ''(d) CERTIFICATIONS FOR DIGITAL COMMODITY

2  TRADING.—

3         ''(1) IN GENERAL.—Notwithstanding subsection

4     (c), for the purposes of listing or offering a digital

5     commodity for trading in a digital commodity cash

6     or spot market, an eligible entity shall issue a writ-

7     ten certification that the digital commodity meets

8     the requirements of this Act (including regulations

9     thereunder).

10        ''(2) CONTENTS OF THE CERTIFICATION.—

11             ''(A) IN GENERAL.—In making a written

12        certification under this paragraph, the eligible

13        entity shall furnish to the Commission—

14                  ''(i) an analysis of how the digital

15             commodity meets the requirements of sec-

16             tion 5i(c)(3);

17                  ''(ii) information about the digital

18             commodity regarding—

19                       ''(I) its purpose and use;

20                       ''(II) its unit creation or release

21                  process;

22                       ''(III) its consensus mechanism;

23                       ''(IV) its governance structure;

24                       ''(V) its participation and dis-

25                  tribution; and

119

1       "(VI) its current and proposed

2           functionality; and

3       "(iii) any other information, analysis,

4           or documentation the Commission may, by

5           rule, require.

6   "(B) RELIANCE ON PRIOR DISCLO-

7   SURES.—In making a certification under this

8   subsection, an eligible entity may rely on the

9   records and disclosures of any relevant person

10  registered with the Securities and Exchange

11  Commission or other State or Federal agency.

12  "(3) MODIFICATIONS.—

13      "(A) IN GENERAL.—An eligible entity shall

14  modify a certification made under paragraph

15  (1) to—

16      "(i) account for significant changes in

17          any information provided to the Commis-

18          sion under paragraph (2)(A)(ii); or

19      "(ii) permit or restrict trading in

20          units of a digital commodity asset held by

21          a related person or an affiliated person.

22      "(B)    RECERTIFICATION.—Modifications

23  required by this subsection shall be subject to

24  the same disapproval and review process as a

25  new certification under paragraphs (4) and (5).

120

1         "(4) DISAPPROVAL.—

2             "(A) IN GENERAL.—The written certifi-

3         cation described in paragraph (1) shall become

4         effective unless the Commission finds that the

5         digital asset does not meet the requirements of

6         this Act or the rules and regulations there-

7         under.

8             "(B) ANALYSIS REQUIRED.—The Commis-

9         sion shall include, with any findings referred to

10       in subparagraph (A), a detailed analysis of the

11       factors on which the decision was based.

12           "(C) PUBLIC FINDINGS.—The Commission

13       shall make public any disapproval decision, and

14       any related findings and analysis, made under

15       this paragraph.

16         "(5) REVIEW.—

17             "(A) IN GENERAL.—Unless the Commis-

18       sion makes a disapproval decision under para-

19       graph (4), the written certification described in

20       paragraph (1) shall become effective, pursuant

21       to the certification by the eligible entity and no-

22       tice of the certification to the public (in a man-

23       ner determined by the Commission) on the date

24       that is—

121

"(i) 20 business days after the date the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation), in the case of a digital commodity that has not been certified under this section or for which a certification is being modified under paragraph (3); or

"(ii) 2 business days after the date the Commission receives the certification (or such shorter period as determined by the Commission by rule or regulation) for any digital commodity that has been certified under this section.

"(B) EXTENSIONS.—The time for consideration under subparagraph (A) may be extended through notice to the eligible entity that there are novel or complex issues that require additional time to analyze, that the explanation by the submitting eligible entity is inadequate, or of a potential inconsistency with this Act—

"(i) once, for 30 business days, through written notice to the eligible entity by the Chairman; and

122

1                 "(ii) once, for an additional 30 busi-

2              ness days, through written notice to the

3              digital commodity exchange from the Com-

4              mission that includes a description of any

5              deficiencies with the certification, including

6              any—

7                 "(I) novel or complex issues

8                 which require additional time to ana-

9                 lyze;

10                 "(II) missing information or in-

11                 adequate explanations; or

12                 "(III) potential inconsistencies

13                 with this Act.

14     "(6) CERTIFICATION REQUIRED.—Notwith-

15 standing any other requirement of this Act, a reg-

16 istered entity or other entity registered with the

17 Commission shall not list for trading, accept for

18 clearing, offer to enter into, enter into, execute, con-

19 firm the execution of, or conduct any office or busi-

20 ness anywhere in the United States, its territories or

21 possessions, for the purpose of soliciting, or accept-

22 ing any order for, or otherwise dealing in, any trans-

23 action in, or in connection with, a digital asset, un-

24 less a certification has been made under this section

25 for the digital asset.

1 ''(7) ELIGIBLE ENTITY DEFINED.—In this sub-

2 section, the term 'eligible entity' means a registered

3 entity or group of registered entities acting jointly.''.

**SEC. 404. REGISTRATION OF DIGITAL COMMODITY EX-**

**CHANGES.**

6 The Commodity Exchange Act (7 U.S.C. 1 et seq.)

7 is amended by inserting after section 5h the following:

**''SEC. 5i. REGISTRATION OF DIGITAL COMMODITY EX-**

**CHANGES.**

10 ''(a) IN GENERAL.—

11 ''(1) REGISTRATION.—

12 ''(A) IN GENERAL.—A trading facility that

13 offers or seeks to offer a cash or spot market

14 in at least 1 digital commodity shall register

15 with the Commission as a digital commodity ex-

16 change.

17 ''(B) APPLICATION.—A person desiring to

18 register as a digital commodity exchange shall

19 submit to the Commission an application in

20 such form and containing such information as

21 the Commission may require for the purpose of

22 making the determinations required for ap-

23 proval.

24 ''(C) EXEMPTIONS.—A trading facility

25 that offers or seeks to offer a cash or spot mar-

124

1    ket in at least 1 digital commodity shall not be
2    required to register under this section if the
3    trading facility—

4            ''(i) permits no more than a de mini-
5        mis amount of trading activity; or
6            ''(ii) serves only customers in a single
7        State or territory.
8    ''(2) ADDITIONAL REGISTRATIONS.—
9            ''(A) WITH THE COMMISSION.—
10               ''(i) IN GENERAL.—A registered dig-
11           ital commodity exchange may also register
12           as—
13                   ''(I) a designated contract mar-
14               ket; or
15                   ''(II) a swap execution facility.
16               ''(ii) RULES.—For an entity with
17           multiple registrations under clause (i), the
18           Commission—
19                   ''(I) shall prescribe rules to ex-
20               empt the entity from duplicative, con-
21               flicting, or unduly burdensome provi-
22               sions of this Act and the rules under
23               this Act, to the extent such an exemp-
24               tion would foster the development of
25               fair and orderly cash or spot markets

1          in digital commodities, be necessary or
2          appropriate in the public interest, and
3          be consistent with the protection of
4          customers; and

5                  "(II) may, after an analysis of
6          the risks and benefits, prescribe rules
7          to provide for portfolio margining, as
8          may be necessary to protect market
9          participants, promote fair and equi-
10         table trading in digital commodity
11         markets, and promote responsible eco-
12         nomic or financial innovation.

13     "(B) WITH THE SECURITIES AND EX-
14     CHANGE COMMISSION.—A registered digital
15     commodity exchange may register with the Se-
16     curities and Exchange Commission as a digital
17     asset trading system to list or trade contracts
18     of sale for digital assets deemed securities.

19     "(C) WITH A REGISTERED FUTURES ASSO-
20     CIATION.—

21             "(i) IN GENERAL.—A registered dig-
22         ital commodity exchange shall also be a
23         member of a registered futures association
24         and comply with rules related to such ac-
25         tivity, if the registered digital commodity

1      exchange accepts customer funds required

2      to be segregated under subsection (d).

3           "(ii) RULEMAKING REQUIRED.—The

4      Commission shall require any registered

5      futures association with a digital com-

6      modity exchange as a member to provide

7      such rules as may be necessary to further

8      compliance with subsection (d), protect

9      customers, and promote the public interest.

10      "(D) REGISTRATION REQUIRED.—A per-

11      son required to be registered as a digital com-

12      modity exchange under this section shall reg-

13      ister with the Commission as such regardless of

14      whether the person is registered as such with

15      another State or Federal regulator.

16  "(b) TRADING.—

17      "(1) PROHIBITION ON CERTAIN TRADING PRAC-

18  TICES.—

19      "(A) Section 4b shall apply to any agree-

20      ment, contract, or transaction in a digital com-

21      modity as if the agreement, contract, or trans-

22      action were a contract of sale of a commodity

23      for future delivery.

24      "(B) Section 4c shall apply to any agree-

25      ment, contract, or transaction in a digital com-

127

1       modity as if the agreement, contract, or trans-
2       action were a transaction involving the purchase
3       or sale of a commodity for future delivery.

4       ''(2) PROHIBITION ON ACTING AS A
5   COUNTERPARTY.—A registered digital commodity
6   exchange or any affiliate of such an exchange shall
7   not act as counterparty to any transaction executed
8   on or subject to the rules of the registered digital
9   commodity exchange.

10      ''(3) TRADING SECURITIES.—A registered dig-
11  ital commodity exchange that is also registered with
12  the Securities and Exchange Commission may offer
13  a contract of sale of a digital asset deemed a secu-
14  rity.

15      ''(4) RULES FOR CERTAIN DIGITAL ASSET
16  SALES.—The digital commodity exchange shall have
17  in place such rules as may be necessary to reason-
18  ably ensure the orderly sale of any unit of a digital
19  commodity sold by a related person or an affiliated
20  person.

21  ''(c) CORE PRINCIPLES FOR DIGITAL COMMODITY
22  EXCHANGES.—

23      ''(1) COMPLIANCE WITH CORE PRINCIPLES.—

24          ''(A) IN GENERAL.—To be registered, and
25      maintain registration, as a digital commodity

128

1    exchange, a digital commodity exchange shall
2    comply with—

3            "(i) the core principles described in
4        this subsection; and

5            "(ii) any requirement that the Com-
6        mission may impose by rule or regulation
7        pursuant to section 8a(5).

8        "(B) REASONABLE DISCRETION OF A DIG-
9    ITAL COMMODITY EXCHANGE.—Unless other-
10   wise determined by the Commission by rule or
11   regulation, a digital commodity exchange de-
12   scribed in subparagraph (A) shall have reason-
13   able discretion in establishing the manner in
14   which the digital commodity exchange complies
15   with the core principles described in this sub-
16   section.

17       "(2) COMPLIANCE WITH RULES.—A digital
18   commodity exchange shall—

19           "(A) establish and enforce compliance with
20       any rule of the digital commodity exchange, in-
21       cluding—

22               "(i) the terms and conditions of the
23           trades traded or processed on or through
24           the digital commodity exchange; and

129

1          "(ii) any limitation on access to the
2      digital commodity exchange;

3          "(B) establish and enforce trading, trade
4      processing, and participation rules that will
5      deter abuses and have the capacity to detect,
6      investigate, and enforce those rules, including
7      means—

8              "(i) to provide market participants
9          with impartial access to the market; and

10              "(ii) to capture information that may
11          be used in establishing whether rule viola-
12          tions have occurred; and

13          "(C) establish rules governing the oper-
14      ation of the exchange, including rules specifying
15      trading procedures to be used in entering and
16      executing orders traded or posted on the facil-
17      ity.

18      "(3) LISTING STANDARDS FOR DIGITAL COM-
19  MODITIES.—

20          "(A) IN GENERAL.—A digital commodity
21      exchange shall permit trading only in a digital
22      commodity that is not readily susceptible to ma-
23      nipulation.

24          "(B) PUBLIC INFORMATION REQUIRE-
25      MENTS.—

130

1              "(i) IN GENERAL.—A digital com-

2     modity exchange shall permit trading only

3     in a digital commodity if the information

4     required in clause (ii) is correct, current,

5     and available to the public.

6              "(ii) REQUIRED INFORMATION.—

7     With respect to a digital commodity and

8     each blockchain system to which the digital

9     commodity relates for which the digital

10    commodity exchange will make the digital

11    commodity available to the customers of

12    the digital commodity exchange, the infor-

13    mation required in this clause is as follows:

14             "(I) SOURCE CODE.—The source

15        code for any blockchain system to

16        which the digital commodity relates.

17             "(II) TRANSACTION HISTORY.—A

18        narrative description of the steps nec-

19        essary to independently access, search,

20        and verify the transaction history of

21        any blockchain system to which the

22        digital commodity relates.

23             "(III) DIGITAL ASSET ECONOM-

24        ICS.—A narrative description of the

25        purpose of any blockchain system to

131

1      which the digital asset relates and the

2      operation of any such blockchain sys-

3      tem, including—

4              "(aa) information explaining

5          the launch and supply process,

6          including the number of digital

7          assets to be issued in an initial

8          allocation, the total number of

9          digital assets to be created, the

10         release schedule for the digital

11         assets, and the total number of

12         digital assets then outstanding;

13             "(bb) information detailing

14         any applicable consensus mecha-

15         nism or process for validating

16         transactions, method of gener-

17         ating or mining digital assets,

18         and any process for burning or

19         destroying digital assets on the

20         blockchain system;

21             "(cc) an explanation of gov-

22         ernance mechanisms for imple-

23         menting changes to the

24         blockchain system or forming

132

1          consensus among holders of the

2          digital assets; and

3                ''(dd) sufficient information

4             for a third party to create a tool

5             for verifying the transaction his-

6             tory of the digital asset.

7         ''(IV) ADDITIONAL INFORMA-

8         TION.—Such additional information

9         as the Commission may, by rule, de-

10         termine to be necessary for a cus-

11         tomer to understand the financial and

12         operational risks of a digital com-

13         modity, and to be in the public inter-

14         est or in furtherance of the require-

15         ments of this Act.

16     ''(C) ADDITIONAL LISTING CONSIDER-

17     ATIONS.—In addition to the requirements of

18     subparagraphs (A) and (B), a digital com-

19     modity exchange shall consider—

20         ''(i) if a sufficient percentage of the

21         units of the digital asset are units of a dig-

22         ital commodity to permit robust price dis-

23         covery;

24         ''(ii) if it is reasonably unlikely that

25         the transaction history can be fraudulently

133

1    altered by any person or group of persons
2    acting collectively;
3        "(iii) if the operating structure and
4    system of the digital commodity is secure
5    from cybersecurity threats;
6        "(iv) if the functionality of the digital
7    commodity will protect holders from oper-
8    ational failures;
9        "(v) if sufficient public information
10   about the operation, functionality, and use
11   of the digital commodity is available; and
12       "(vi) any other factor which the Com-
13   mission has, by rule, determined to be in
14   the public interest or in furtherance of the
15   requirements of this Act.
16   "(D) RESTRICTED DIGITAL ASSETS.—A
17   digital commodity exchange shall not permit the
18   trading of a unit of a digital asset that is a re-
19   stricted digital asset.
20   "(4) TREATMENT OF CUSTOMER ASSETS.—A
21   digital commodity exchange shall establish standards
22   and procedures that are designed to protect and en-
23   sure the safety of customer money, assets, and prop-
24   erty.

134

1       ''(5) MONITORING OF TRADING AND TRADE

2    PROCESSING.—

3           ''(A) IN GENERAL.—A digital commodity

4       exchange shall provide a competitive, open, and

5       efficient market and mechanism for executing

6       transactions that protects the price discovery

7       process of trading on the exchange.

8           ''(B) PROTECTION OF MARKETS AND MAR-

9       KET PARTICIPANTS.—A digital commodity ex-

10      change shall establish and enforce rules—

11              ''(i) to protect markets and market

12          participants from abusive practices com-

13          mitted by any party, including abusive

14          practices committed by a party acting as

15          an agent for a participant; and

16              ''(ii) to promote fair and equitable

17          trading on the exchange.

18           ''(C) TRADING PROCEDURES.—A digital

19      commodity exchange shall—

20              ''(i) establish and enforce rules or

21          terms and conditions defining, or specifica-

22          tions detailing—

23                  ''(I) trading procedures to be

24              used in entering and executing orders

135

1                traded on or through the facilities of

2                the digital commodity exchange; and

3                      ''(II) procedures for trade proc-

4                essing of digital commodities on or

5                through the facilities of the digital

6                commodity exchange; and

7                ''(ii) monitor trading in digital com-

8                modities to prevent manipulation, price

9                distortion, and disruptions of the delivery

10              or cash settlement process through surveil-

11              lance, compliance, and disciplinary prac-

12              tices and procedures, including methods

13              for conducting real-time monitoring of

14              trading and comprehensive and accurate

15              trade reconstructions.

16      ''(6) ABILITY TO OBTAIN INFORMATION.—A

17  digital commodity exchange shall—

18              ''(A) establish and enforce rules that will

19           allow the facility to obtain any necessary infor-

20           mation to perform any of the functions de-

21           scribed in this section;

22              ''(B) provide the information to the Com-

23           mission on request; and

1  ''(C) have the capacity to carry out such
2  international information-sharing agreements as
3  the Commission may require.

4  ''(7) EMERGENCY AUTHORITY.—A digital com-
5  modity exchange shall adopt rules to provide for the
6  exercise of emergency authority, in consultation or
7  cooperation with the Commission or a registered en-
8  tity, as is necessary and appropriate, including the
9  authority to facilitate the liquidation or transfer of
10  open positions in any digital commodity or to sus-
11  pend or curtail trading in a digital commodity.

12  ''(8) TIMELY PUBLICATION OF TRADING INFOR-
13  MATION.—

14  ''(A) IN GENERAL.—A digital commodity
15  exchange shall make public timely information
16  on price, trading volume, and other trading
17  data on digital commodities to the extent pre-
18  scribed by the Commission.

19  ''(B) CAPACITY OF DIGITAL COMMODITY
20  EXCHANGE.—A digital commodity exchange
21  shall have the capacity to electronically capture
22  and transmit trade information with respect to
23  transactions executed on the exchange.

24  ''(9) RECORDKEEPING AND REPORTING.—

1                 "(A) IN GENERAL.—A digital commodity

2           exchange shall—

3                 "(i) maintain records of all activities

4              relating to the business of the facility, in-

5              cluding a complete audit trail, in a form

6              and manner acceptable to the Commission

7              for a period of 5 years;

8                 "(ii) report to the Commission, in a

9              form and manner acceptable to the Com-

10            mission, such information as the Commis-

11            sion determines to be necessary or appro-

12            priate for the Commission to perform the

13            duties of the Commission under this Act;

14            and

15                 "(iii) keep any such records of digital

16            commodities which relate to a security

17            open to inspection and examination by the

18            Securities and Exchange Commission.

19           "(B) INFORMATION SHARING.—Subject to

20 section 8, and on request, the Commission shall

21 share information collected under subparagraph

22 (A) with—

23                 "(i) the Board;

24                 "(ii) the Securities and Exchange

25            Commission;

138

1             "(iii) each appropriate Federal bank-

2         ing agency;

3             "(iv) each appropriate State bank su-

4         pervisor (within the meaning of section 3

5         of the Federal Deposit Insurance Act);

6             "(v) the Financial Stability Oversight

7         Council;

8             "(vi) the Department of Justice; and

9             "(vii) any other person that the Com-

10        mission determines to be appropriate, in-

11        cluding—

12               "(I) foreign financial supervisors

13            (including foreign futures authorities);

14               "(II) foreign central banks; and

15               "(III) foreign ministries.

16     "(C) CONFIDENTIALITY AGREEMENT.—Be-

17    fore the Commission may share information

18    with any entity described in subparagraph (B),

19    the Commission shall receive a written agree-

20    ment from the entity stating that the entity

21    shall abide by the confidentiality requirements

22    described in section 8 relating to the informa-

23    tion on digital commodities that is provided.

24     "(D) PROVIDING INFORMATION.—A digital

25    commodity exchange shall provide to the Com-

1    mission (including any designee of the Commis-
2    sion) information under subparagraph (A) in
3    such form and at such frequency as is required
4    by the Commission.

5    "(10) ANTITRUST CONSIDERATIONS.—Unless
6    necessary or appropriate to achieve the purposes of
7    this Act, a digital commodity exchange shall not—

8        "(A) adopt any rules or take any actions
9        that result in any unreasonable restraint of
10       trade; or

11       "(B) impose any material anticompetitive
12       burden on trading.

13   "(11) CONFLICTS OF INTEREST.—A registered
14   digital commodity exchange shall implement conflict-
15   of-interest systems and procedures that—

16       "(A) establish structural and institutional
17       safeguards—

18           "(i) to minimize conflicts of interest
19           that might potentially bias the judgment or
20           supervision of the digital commodity ex-
21           change and contravene the principles of
22           fair and equitable trading and the business
23           conduct standards described in this Act,
24           including conflicts arising out of trans-
25           actions or arrangements with affiliates (in-

1    cluding affiliates engaging in digital com-
2    modity activities) which may include infor-
3    mation partitions and the legal separation
4    of different persons or entities involved in
5    digital commodity activities; and
6        ''(ii) to ensure that the activities of
7        any person within the digital commodity
8        exchange or any affiliated entity relating to
9        research or analysis of the price or market
10       for any digital commodity or acting in a
11       role of providing dealing, brokering, or ad-
12       vising activities are separated by appro-
13       priate informational partitions within the
14       digital commodity exchange or any affili-
15       ated entity from the review, pressure, or
16       oversight of persons whose involvement in
17       pricing, trading, exchange, or clearing ac-
18       tivities might potentially bias their judg-
19       ment or supervision and contravene the
20       core principles of open access and the busi-
21       ness conduct standards described in this
22       Act; and
23           ''(B)  address  such  other  issues  as  the
24    Commission determines to be appropriate.
25       ''(12) FINANCIAL RESOURCES.—

141

1         ''(A) IN GENERAL.—A digital commodity

2         exchange shall have adequate financial, oper-

3         ational, and managerial resources, as deter-

4         mined by the Commission, to discharge each re-

5         sponsibility of the digital commodity exchange.

6         ''(B) MINIMUM AMOUNT OF FINANCIAL RE-

7         SOURCES.—A digital commodity exchange shall

8         possess financial resources that, at a minimum,

9         exceed the total amount that would enable the

10         digital commodity exchange to conduct an or-

11         derly wind-down of its activities.

12    ''(13) DISCIPLINARY PROCEDURES.—A digital

13 commodity exchange shall establish and enforce dis-

14 ciplinary procedures that authorize the digital com-

15 modity exchange to discipline, suspend, or expel

16 members or market participants that violate the

17 rules of the digital commodity exchange, or similar

18 methods for performing the same functions, includ-

19 ing delegation of the functions to third parties.

20    ''(14) GOVERNANCE FITNESS STANDARDS.—

21         ''(A) GOVERNANCE ARRANGEMENTS.—A

22         digital commodity exchange shall establish gov-

23         ernance arrangements that are transparent to

24         fulfill public interest requirements.

142

1        "(B) FITNESS STANDARDS.—A digital
2    commodity exchange shall establish and enforce
3    appropriate fitness standards for—
4            "(i) directors; and
5            "(ii) any individual or entity with di-
6        rect access to, or control of, customer as-
7        sets.
8        "(15) SYSTEM SAFEGUARDS.—A digital com-
9    modity exchange shall—
10           "(A) establish and maintain a program of
11       risk analysis and oversight to identify and mini-
12       mize sources of operational and security risks,
13       through the development of appropriate controls
14       and procedures, and automated systems, that—
15           "(i) are reliable and secure; and
16           "(ii) have adequate scalable capacity;
17           "(B) establish and maintain emergency
18       procedures, backup facilities, and a plan for dis-
19       aster recovery that allow for—
20           "(i) the timely recovery and resump-
21       tion of operations; and
22           "(ii) the fulfillment of the responsibil-
23       ities and obligations of the digital com-
24       modity exchange; and

143

1          "(C) periodically conduct tests to verify
2      that the backup resources of the digital com-
3      modity exchange are sufficient to ensure contin-
4      ued—
5              "(i) order processing and trade
6          matching;
7              "(ii) price reporting;
8              "(iii) market surveillance; and
9              "(iv) maintenance of a comprehensive
10         and accurate audit trail.
11  "(d) HOLDING OF CUSTOMER ASSETS.—
12      "(1) IN GENERAL.—A digital commodity ex-
13  change shall hold customer money, assets, and prop-
14  erty in a manner to minimize the risk of loss to the
15  customer or unreasonable delay in the access to the
16  money, assets, and property of the customer.
17          "(A) SEGREGATION OF FUNDS.—
18              "(i) IN GENERAL.—A digital com-
19          modity exchange shall treat and deal with
20          all money, assets, and property that is re-
21          ceived by the digital commodity exchange,
22          or accrues to a customer as the result of
23          trading in digital commodities, as belong-
24          ing to the customer.

144

1                      ''(ii) COMMINGLING PROHIBITED.—

2              Money, assets, and property of a customer

3              described in clause (i) shall be separately

4              accounted for and shall not be commingled

5              with the funds of the digital commodity ex-

6              change or be used to margin, secure, or

7              guarantee any trades or accounts of any

8              customer or person other than the person

9              for whom the same are held.

10        ''(B) EXCEPTIONS.—

11              ''(i) USE OF FUNDS.—

12                     ''(I) IN GENERAL.—Notwith-

13                 standing subparagraph (A), money,

14                 assets, and property of customers of a

15                 digital commodity exchange described

16                 in subparagraph (A) may, for conven-

17                 ience, be commingled and deposited in

18                 the same account or accounts with

19                 any bank, trust company, derivatives

20                 clearing organization, or qualified dig-

21                 ital commodity custodian.

22                     ''(II) WITHDRAWAL.—Notwith-

23                 standing subparagraph (A), such

24                 share of the money, assets, and prop-

25                 erty described in item (aa) as in the

145

1            normal course of business shall be

2            necessary to margin, guarantee, se-

3            cure, transfer, adjust, or settle a con-

4            tract of sale of a digital commodity

5            with a registered entity may be with-

6            drawn and applied to such purposes,

7            including the payment of commis-

8            sions, brokerage, interest, taxes, stor-

9            age, and other charges, lawfully ac-

10           cruing in connection with the contract

11           of sale of a digital commodity.

12           ''(ii) COMMISSION ACTION.—Notwith-

13        standing subparagraph (A), in accordance

14        with such terms and conditions as the

15        Commission may prescribe by rule, regula-

16        tion, or order, any money, assets, or prop-

17        erty of the customers of a digital com-

18        modity exchange described in subpara-

19        graph (A) may be commingled and depos-

20        ited in customer accounts with any other

21        money, assets, or property received by the

22        digital commodity exchange and required

23        by the Commission to be separately ac-

24        counted for and treated and dealt with as

146

1    belonging to the customer of the digital

2    commodity exchange.

3        ''(2) PERMITTED INVESTMENTS.—Money de-

4    scribed in subparagraph (A) may be invested in obli-

5    gations of the United States, in general obligations

6    of any State or of any political subdivision of a

7    State, and in obligations fully guaranteed as to prin-

8    cipal and interest by the United States, or in any

9    other investment that the Commission may by rule

10   or regulation prescribe, and such investments shall

11   be made in accordance with such rules and regula-

12   tions and subject to such conditions as the Commis-

13   sion may prescribe.

14       ''(3) CUSTOMER PROTECTION DURING BANK-

15   RUPTCY.—

16           ''(A) CUSTOMER PROPERTY.—All assets

17       held on behalf of a customer by a digital com-

18       modity exchange, and all money, assets, and

19       property of any customer received by a digital

20       commodity exchange registered under section 5i

21       of this Act for trading or custody, or to facili-

22       tate, margin, guarantee, or secure contracts of

23       sale of a digital commodity (including money,

24       assets, or property accruing to the customer as

25       the result of the transactions), shall be consid-

1    ered customer property for purposes of section

2    761 of title 11, United States Code.

3         ''(B) TRANSACTIONS.—A transaction in-

4    volving a unit of a digital commodity occurring

5    on or subject to the rules of a digital com-

6    modity exchange shall be considered a 'contract

7    for the purchase or sale of a commodity for fu-

8    ture delivery, on or subject to the rules of, a

9    contract market or board of trade' for the pur-

10   poses of the definition of a 'commodity con-

11   tract' in section 761 of title 11, United States

12   Code.

13        ''(C) EXCHANGES.—A digital commodity

14   exchange shall be considered a futures commis-

15   sion merchant for purposes of section 761 of

16   title 11, United States Code.

17   ''(4) MISUSE OF CUSTOMER PROPERTY.—

18        ''(A) IN GENERAL.—It shall be unlawful—

19             ''(i) for any digital commodity ex-

20        change that has received any customer

21        money, assets, or property for custody to

22        dispose of, or use any such money, assets,

23        or property as belonging to the digital

24        commodity exchange; or

148

1          "(ii) for any other person, including

2      any depository, other digital commodity ex-

3      change, or digital commodity custodian

4      that has received any customer money, as-

5      sets, or property for deposit, to hold, dis-

6      pose of, or use any such money, assets, or

7      property, or property, as belonging to the

8      depositing digital commodity exchange or

9      any person other than the customers of the

10     digital commodity exchange.

11         "(B) USE FURTHER DEFINED.—For pur-

12     poses of this section, 'use' of a digital com-

13     modity includes utilizing any unit of a digital

14     asset to participate in a blockchain service de-

15     fined in paragraph (5) or a decentralized gov-

16     ernance system associated with the digital com-

17     modity or the blockchain system to which the

18     digital commodity relates in any manner other

19     than that expressly directed by the customer

20     from whom the unit of a digital commodity was

21     received.

22         "(5) PARTICIPATION IN BLOCKCHAIN SERV-

23     ICES.—

24         "(A) IN GENERAL.—A customer shall have

25     the right to waive the restrictions in paragraph

149

1    (1) for any unit of a digital commodity, by af-
2    firmatively electing, in writing to the digital
3    commodity exchange, to waive the restrictions.
4        ''(B) USE OF FUNDS.—Customer digital
5    commodities removed from segregation under
6    subparagraph (A) may be pooled and used by
7    the digital commodity exchange or its designee
8    to provide a blockchain service for a blockchain
9    system to which the unit of the digital asset re-
10   moved from segregation in subparagraph (A)
11   relates.
12       ''(C)    LIMITATIONS.—The    Commission
13   may, by rule, establish notice and disclosure re-
14   quirements, and any other limitations and rules
15   related to the waiving of any restrictions under
16   this paragraph that are reasonably necessary to
17   protect customers, including eligible contract
18   participants, non-eligible contract participants,
19   or any other class of customers.
20       ''(D) BLOCKCHAIN SERVICE DEFINED.—In
21   this subparagraph, the term 'blockchain service'
22   means any activity relating to validating trans-
23   actions on a blockchain system, providing secu-
24   rity for a blockchain system, or other similar

1        activity required for the ongoing operation of a

2        blockchain system.

3    "(e) MARKET ACCESS REQUIREMENTS.—

4        "(1) IN GENERAL.—A digital commodity ex-

5    change shall require any person who is not an eligi-

6    ble contract participant to access trading on the ex-

7    change through a digital commodity broker.

8        "(2) AFFILIATED COMMODITY BROKERS.—A

9    registered digital commodity exchange may maintain

10   an affiliated digital commodity broker to facilitate

11   access to the digital commodity exchange, if—

12        "(A) no other digital commodity brokers

13       are permitted to facilitate access to the ex-

14       change;

15        "(B) the affiliated digital commodity

16       broker limits its activities only to providing cus-

17       tomer access to the digital commodity exchange;

18       and

19        "(C) the affiliated digital commodity

20       broker is not also registered as a digital com-

21       modity dealer.

22        "(3) DIRECT ACCESS FOR ELIGIBLE CONTRACT

23   PARTICIPANTS.—Nothing in this section shall pro-

24   hibit a digital commodity exchange in compliance

151

1    with this section from permitting direct access for

2    eligible contract participants.

3          ''(4) ADDITIONAL REQUIREMENTS.—

4              ''(A) IN GENERAL.—The Commission may,

5          by rule, impose any additional requirements re-

6          lated to the operations and activities of the dig-

7          ital commodity exchange and the affiliated dig-

8          ital commodity broker necessary to protect mar-

9          ket participants, promote fair and equitable

10         trading on the digital commodity exchange, and

11         promote responsible economic or financial inno-

12         vation.

13            ''(B) DELEGATION OF AUTHORITY.—The

14         Commission may delegate to a registered fu-

15         tures association such oversight and regulatory

16         requirements as the Commission determines are

17         necessary to—

18              ''(i) supervise the activities of the dig-

19            ital commodity exchange and an affiliated

20            digital commodity broker; and

21              ''(ii) protect market participants, pro-

22            mote fair and equitable trading on the dig-

23            ital commodity exchange, and promote re-

24            sponsible economic or financial innovation.

152

1     ''(f) DESIGNATION OF CHIEF COMPLIANCE OFFI-

2   CER.—

3          ''(1) IN GENERAL.—A digital commodity ex-

4       change shall designate an individual to serve as a

5       chief compliance officer.

6          ''(2) DUTIES.—The chief compliance officer

7       shall—

8              ''(A) report directly to the board or to the

9          senior officer of the exchange;

10             ''(B) review compliance with the core prin-

11         ciples in this subsection;

12             ''(C) in consultation with the board of the

13         exchange, a body performing a function similar

14         to that of a board, or the senior officer of the

15         exchange, resolve any conflicts of interest that

16         may arise;

17             ''(D) establish and administer the policies

18         and procedures required to be established pur-

19         suant to this section;

20             ''(E) ensure compliance with this Act and

21         the rules and regulations issued under this Act,

22         including rules prescribed by the Commission

23         pursuant to this section; and

24             ''(F) establish procedures for the remedi-

25         ation of noncompliance issues found during

153

1  compliance office reviews, look backs, internal
2  or external audit findings, self-reported errors,
3  or through validated complaints.

4  "(3) REQUIREMENTS FOR PROCEDURES.—In
5  establishing procedures under paragraph (2)(F), the
6  chief compliance officer shall design the procedures
7  to establish the handling, management response, re-
8  mediation, retesting, and closing of noncompliance
9  issues.

10  "(4) ANNUAL REPORTS.—

11      "(A) IN GENERAL.—In accordance with
12  rules prescribed by the Commission, the chief
13  compliance officer shall annually prepare and
14  sign a report that contains a description of—

15          "(i) the compliance of the digital com-
16  modity exchange with this Act; and

17          "(ii) the policies and procedures, in-
18  cluding the code of ethics and conflict of
19  interest policies, of the digital commodity
20  exchange.

21      "(B) REQUIREMENTS.—The chief compli-
22  ance officer shall—

23          "(i) submit each report described in
24  subparagraph (A) with the appropriate fi-
25  nancial report of the digital commodity ex-

154

1    change that is required to be submitted to

2    the Commission pursuant to this section;

3    and

4         ''(ii) include in the report a certifi-

5         cation that, under penalty of law, the re-

6         port is accurate and complete.

7    ''(g) APPOINTMENT OF TRUSTEE.—

8         ''(1) IN GENERAL.—If a proceeding under sec-

9    tion 5e results in the suspension or revocation of the

10   registration of a digital commodity exchange, or if a

11   digital commodity exchange withdraws from registra-

12   tion, the Commission, on notice to the digital com-

13   modity exchange, may apply to the appropriate

14   United States district court where the digital com-

15   modity exchange is located for the appointment of a

16   trustee.

17        ''(2) ASSUMPTION OF JURISDICTION.—If the

18   Commission applies for appointment of a trustee

19   under paragraph (1)—

20        ''(A) the court may take exclusive jurisdic-

21        tion over the digital commodity exchange and

22        the records and assets of the digital commodity

23        exchange, wherever located; and

24        ''(B) if the court takes jurisdiction under

25        subparagraph (A), the court shall appoint the

1 Commission, or a person designated by the
2 Commission, as trustee with power to take pos-
3 session and continue to operate or terminate
4 the operations of the digital commodity ex-
5 change in an orderly manner for the protection
6 of customers subject to such terms and condi-
7 tions as the court may prescribe.

8 "(h) QUALIFIED DIGITAL COMMODITY CUSTO-
9 DIAN.—A digital commodity exchange shall hold in a
10 qualified digital commodity custodian each unit of a digital
11 commodity that is—

12 "(1) the property of a customer of the digital
13 commodity exchange;

14 "(2) required to be held by the digital com-
15 modity exchange under subsection (c)(12) of this
16 section; or

17 "(3) otherwise so required by the Commission
18 to reasonably protect customers or promote the pub-
19 lic interest.

20 "(i) EXEMPTIONS.—In order to promote responsible
21 economic or financial innovation and fair competition, or
22 protect customers, the Commission may (on its own initia-
23 tive or on application of the registered digital commodity
24 exchange) exempt, either unconditionally or on stated
25 terms or conditions or for stated periods and either retro-

156

1 actively or prospectively, or both, a registered digital com-

2 modity exchange from the requirements of this section, if

3 the Commission determines that—

4        ''(1)(A) the exemption would be consistent with

5      the public interest and the purposes of this Act; and

6          ''(B) the exemption will not have a material ad-

7      verse effect on the ability of the Commission or the

8      digital commodity exchange to discharge regulatory

9      or self-regulatory duties under this Act; or

10       ''(2) the digital commodity exchange is subject

11     to comparable, comprehensive supervision and regu-

12     lation by the appropriate government authorities in

13     the home country of the exchange.

14 ''(j) CUSTOMER DEFINED.—In this section, the term

15 'customer' means any person that maintains an account

16 for the trading of digital commodities directly with a dig-

17 ital commodity exchange (other than a person that is

18 owned or controlled, directly or indirectly, by the digital

19 commodity exchange) for its own behalf or on behalf of

20 other any person.

21 ''(k) FEDERAL PREEMPTION.—Notwithstanding any

22 other provision of law, the Commission shall have exclusive

23 jurisdiction over any digital commodity exchange reg-

24 istered under this section.

157

1    "(l) Treatment Under the Bank Secrecy

2  Act.—A registered digital commodity exchange shall be

3  treated as a financial institution for purposes of the Bank

4  Secrecy Act.''.

**SEC. 405. QUALIFIED DIGITAL COMMODITY CUSTODIANS.**

6       The Commodity Exchange Act (7 U.S.C. 1 et seq.),

7  as amended by the preceding provisions of this Act, is

8  amended by inserting after section 5i the following:

**"SEC. 5j. QUALIFIED DIGITAL COMMODITY CUSTODIANS.**

10     "(a) In General.—For purposes of this Act, a

11 qualified digital commodity custodian is a digital com-

12 modity custodian who meets the following conditions:

13          "(1) Supervision.—The digital commodity

14      custodian is subject to adequate supervision and ap-

15      propriate regulation.

16          "(2) No prohibition.—The digital commodity

17      custodian is—

18              "(A) subject to the supervision of—

19                  "(i) an appropriate Federal banking

20              agency;

21                  "(ii) a State bank supervisor (within

22              the meaning of section 3 of the Federal

23              Deposit Insurance Act); or

158

1          "(iii) an appropriate foreign govern-
2      mental authority in the home country of
3      the digital commodity custodian; and
4          "(B) not prohibited by the applicable su-
5      pervisor referred to in subparagraph (A) from
6      engaging in any activity with respect to the
7      holding of digital commodities.
8      "(3) INFORMATION SHARING.—
9          "(A) IN GENERAL.—The digital commodity
10     custodian agrees to such periodic sharing of in-
11     formation regarding customer accounts the dig-
12     ital commodity custodian holds on behalf of an
13     entity registered with the Commission, as the
14     Commission determines by rule shall be reason-
15     ably necessary to effectuate any of the provi-
16     sions, or to accomplish any of the purposes, of
17     this Act.
18         "(B) PROVISION OF INFORMATION.—Any
19     person that is subject to regulation and exam-
20     ination by a prudential regulator may satisfy
21     any information request described in subpara-
22     graph (A), by providing the Commission with a
23     detailed listing, in writing, of the digital com-
24     modities of a customer within the custody or
25     use of the person.

159

1    "(b) ADEQUATE SUPERVISION AND APPROPRIATE

2  REGULATION FURTHER DEFINED.—

3        "(1) IN GENERAL.—In subsection (a), the

4      terms 'adequate supervision' and 'appropriate regu-

5      lation' mean such minimum standards for super-

6      vision and regulation as are reasonably necessary to

7      protect the digital commodities of customers of an

8      entity registered with the Commission, including

9      minimum standards relating to—

10            "(A) accessibility of customer assets;

11            "(B) financial resources;

12            "(C) risk management requirements;

13            "(D) governance arrangements;

14            "(E) fitness standards;

15            "(F) recordkeeping;

16            "(G) information sharing; and

17            "(H) conflicts of interest.

18        "(2) DEEMED COMPLIANCE.—For purposes of

19      subsection (a), a bank subject to the supervision of

20      an appropriate Federal banking agency or a State

21      bank supervisor (within the meaning of section 3 of

22      the Federal Deposit Insurance Act) is deemed to be

23      subject to adequate supervision and appropriate reg-

24      ulation.

1    "(3) RULEMAKING AUTHORITY.—For purposes

2    of subsection (a), the Commission, by rule or order,

3    may further define the terms 'adequate supervision'

4    and 'appropriate regulation' as necessary in the pub-

5    lic interest, as appropriate for the protection of cus-

6    tomers, and consistent with the purposes of this Act.

7    "(c) AUTHORITY TO TEMPORARILY SUSPEND

8    STANDARDS.—The Commission may, by rule or order,

9    temporarily suspend, in whole or in part, any requirement

10   imposed under, or any standard referred to in, this section

11   if the Commission determines that the suspension would

12   be consistent with the public interest and the purposes of

13   this Act.".

14   **SEC. 406. REGISTRATION AND REGULATION OF DIGITAL**

15   **COMMODITY BROKERS AND DEALERS.**

16   The Commodity Exchange Act (7 U.S.C. 1 et seq.),

17   as amended by the preceding provisions of this Act, is

18   amended by inserting after section 4t the following:

19   **"SEC. 4u. REGISTRATION AND REGULATION OF DIGITAL**

20   **COMMODITY BROKERS AND DEALERS.**

21   "(a) REGISTRATION.—It shall be unlawful for any

22   person to act as a digital commodity broker or digital com-

23   modity dealer unless the person is registered as such with

24   the Commission.

25   "(b) REQUIREMENTS.—

161

1          "(1) IN GENERAL.—A person shall register as

2     a digital commodity broker or digital commodity

3     dealer by filing a registration application with the

4     Commission.

5          "(2) CONTENTS.—

6               "(A) IN GENERAL.—The application shall

7          be made in such form and manner as is pre-

8          scribed by the Commission, and shall contain

9          such information as the Commission considers

10         necessary concerning the business in which the

11         applicant is or will be engaged.

12              "(B) CONTINUAL REPORTING.—A person

13         that is registered as a digital commodity broker

14         or digital commodity dealer shall continue to

15         submit to the Commission reports that contain

16         such information pertaining to the business of

17         the person as the Commission may require.

18         "(3) TRANSITION.—Within 180 days after the

19    date of the enactment of this section, the Commis-

20    sion shall prescribe rules providing for the registra-

21    tion of digital commodity brokers and digital com-

22    modity dealers under this section.

23         "(4) STATUTORY DISQUALIFICATION.—Except

24    to the extent otherwise specifically provided by rule,

25    regulation, or order, it shall be unlawful for a digital

1  commodity broker or digital commodity dealer to
2  permit any person who is associated with a digital
3  commodity broker or a digital commodity dealer and
4  who is subject to a statutory disqualification to ef-
5  fect or be involved in effecting a contract for sale of
6  a digital commodity on behalf of the digital com-
7  modity broker or the digital commodity dealer, re-
8  spectively, if the digital commodity broker or digital
9  commodity dealer, respectively, knew, or in the exer-
10  cise of reasonable care should have known, of the
11  statutory disqualification.

12  "(5) LIMITATIONS ON CERTAIN ASSETS.—A
13  registered digital commodity broker or registered
14  digital commodity dealer shall not offer, offer to
15  enter into, enter into, or facilitate any contract for
16  sale of a digital commodity that has not been cer-
17  tified under section 5c(d).

18  "(c) ADDITIONAL REGISTRATIONS.—

19  "(1) WITH THE COMMISSION.—Any person re-
20  quired to be registered as a digital commodity
21  broker or digital commodity dealer may also be reg-
22  istered as a futures commission merchant, intro-
23  ducing broker, or swap dealer.

24  "(2) WITH THE SECURITIES AND EXCHANGE
25  COMMISSION.—Any person required to be registered

163

1    as a digital commodity broker or digital commodity

2    dealer under this section may register with the Secu-

3    rities and Exchange Commission as a digital asset

4    broker or digital asset dealer, pursuant to section

5    15(b) of the Securities Exchange Act of 1934, as ap-

6    plicable, if the digital asset broker or digital asset

7    dealer limits its solicitation of orders, acceptance of

8    orders, or execution of orders, or placing of orders

9    on behalf of others involving any contract of sale of

10   digital assets.

11       "(3) WITH MEMBERSHIP IN A REGISTERED FU-

12   TURES ASSOCIATION.—Any person required to be

13   registered as a digital commodity broker or digital

14   commodity dealer under this section shall be a mem-

15   ber of a registered futures association.

16       "(4) REGISTRATION REQUIRED.—Any person

17   required to be registered as a digital commodity

18   broker or digital commodity dealer under this sec-

19   tion shall register with the Commission as such re-

20   gardless of whether the person is registered as such

21   with another State or Federal regulator.

22   "(d) RULEMAKING.—

23       "(1) IN GENERAL.—The Commission shall pre-

24   scribe such rules applicable to registered digital com-

25   modity brokers and registered digital commodity

164

1   dealers as are appropriate to carry out this section,

2   including rules in the public interest that limit the

3   activities of digital commodity brokers and digital

4   commodity dealers.

5       ''(2) MULTIPLE REGISTRANTS.—The Commis-

6   sion shall prescribe rules or regulations permitting,

7   or may otherwise authorize, exemptions or additional

8   requirements applicable to persons with multiple reg-

9   istrations under this Act, including as futures com-

10  mission merchants, introducing brokers, digital com-

11  modity brokers, digital commodity dealers, or swap

12  dealers, as may be in the public interest to reduce

13  compliance costs and promote customer protection.

14  ''(e) CAPITAL REQUIREMENTS.—

15      ''(1) IN GENERAL.—Each registered digital

16  commodity broker and registered digital commodity

17  dealer shall meet such minimum capital require-

18  ments as the Commission may prescribe to ensure

19  that the digital commodity broker or digital com-

20  modity dealer, respectively, is able to—

21          ''(A) meet, and continue to meet, at all

22      times, the obligations of such a registrant;

23          ''(B) conduct an orderly wind-down of the

24      activities of the digital commodity broker or

25      digital commodity dealer, respectively; and

165

1          "(C) in the case of a digital commodity
2      dealer, fulfill the customer obligations of the
3      digital commodity dealer for any margined, le-
4      veraged, or financed transactions.

5      "(2) RULE OF CONSTRUCTION.—Nothing in
6  this section shall limit, or be construed to limit, the
7  authority of the Securities and Exchange Commis-
8  sion to set financial responsibility rules for a broker
9  or dealer registered pursuant to section 15(b) of the
10 Securities Exchange Act of 1934 (15 U.S.C. 78o(b))
11 (except for section 15(b)(11) of such Act (15 U.S.C.
12 78o(b)(11)) in accordance with section 15(c)(3) of
13 such Act (15 U.S.C. 78o(c)(3)).

14     "(3) FUTURES COMMISSION MERCHANTS AND
15 OTHER DEALERS.—

16         "(A) IN GENERAL.—Each futures commis-
17     sion merchant, introducing broker, digital com-
18     modity broker, digital commodity dealer,
19     broker, and dealer shall maintain sufficient cap-
20     ital to comply with the stricter of any applicable
21     capital requirements to which the futures com-
22     mission merchant, introducing broker, digital
23     commodity broker, digital commodity dealer,
24     broker, or dealer, respectively, is subject under

166

1 this Act or the Securities Exchange Act of 1934

2 (15 U.S.C. 78a et seq.).

3   "(B) COORDINATION OF CAPITAL RE-

4  QUIREMENTS.—

5    "(i) COMMISSION RULE.—The Com-

6   mission shall, by rule, provide appropriate

7   offsets to any applicable capital require-

8   ment for a person with multiple registra-

9   tions as a digital commodity dealer, digital

10   commodity broker, futures commission

11   merchant, or introducing broker.

12    "(ii) JOINT RULE.—The Commission

13   and the Securities and Exchange Commis-

14   sion shall jointly, by rule, provide appro-

15   priate offsets to any applicable capital re-

16   quirement for a person with multiple reg-

17   istrations as a digital commodity dealer,

18   digital commodity broker, futures commis-

19   sion merchant, introducing broker, broker,

20   or dealer.

21 "(f) REPORTING AND RECORDKEEPING.—Each reg-

22 istered digital commodity broker and registered digital

23 commodity dealer—

24   "(1) shall make such reports as are required by

25  the Commission by rule or regulation regarding the

167

1    transactions, positions, and financial condition of the

2    digital commodity broker or digital commodity deal-

3    er, respectively;

4        ''(2) shall keep books and records in such form

5    and manner and for such period as may be pre-

6    scribed by the Commission by rule or regulation; and

7        ''(3) shall keep the books and records open to

8    inspection and examination by any representative of

9    the Commission.

10    ''(g) DAILY TRADING RECORDS.—

11        ''(1) IN GENERAL.—Each registered digital

12    commodity broker and registered digital commodity

13    dealer shall maintain daily trading records of the

14    transactions of the digital commodity broker or dig-

15    ital commodity dealer, respectively, and all related

16    records (including related forward or derivatives

17    transactions) and recorded communications, includ-

18    ing electronic mail, instant messages, and recordings

19    of telephone calls, for such period as the Commission

20    may require by rule or regulation.

21        ''(2) INFORMATION REQUIREMENTS.—The daily

22    trading records shall include such information as the

23    Commission shall require by rule or regulation.

24        ''(3) COUNTERPARTY RECORDS.—Each reg-

25    istered digital commodity broker and registered dig-

168

1    ital commodity dealer shall maintain daily trading

2    records for each customer or counterparty in a man-

3    ner and form that is identifiable with each digital

4    commodity transaction.

5        "(4) AUDIT TRAIL.—Each registered digital

6    commodity broker and registered digital commodity

7    dealer shall maintain a complete audit trail for con-

8    ducting comprehensive and accurate trade recon-

9    structions.

10    "(h) BUSINESS CONDUCT STANDARDS.—

11        "(1) IN GENERAL.—Each registered digital

12    commodity broker and registered digital commodity

13    dealer shall conform with such business conduct

14    standards as the Commission, by rule or regulation,

15    prescribes related to—

16           "(A) fraud, manipulation, and other abu-

17        sive practices involving spot or margined, lever-

18        aged, or financed digital commodity trans-

19        actions (including transactions that are offered

20        but not entered into);

21           "(B) diligent supervision of the business of

22        the registered digital commodity broker or dig-

23        ital commodity dealer, respectively; and

24           "(C) such other matters as the Commis-

25        sion deems appropriate.

169

1         "(2) BUSINESS CONDUCT REQUIREMENTS.—

2    The Commission shall, by rule, prescribe business

3    conduct requirements which—

4         "(A) require disclosure by a registered dig-

5        ital commodity broker and registered digital

6        commodity dealer to any counterparty to the

7        transaction (other than an eligible contract par-

8        ticipant) of—

9             "(i) information about the material

10           risks and characteristics of the digital com-

11           modity; and

12             "(ii) information about the material

13           risks and characteristics of the transaction;

14         "(B) establish a duty for such a digital

15        commodity broker and such a digital commodity

16        dealer to communicate in a fair and balanced

17        manner based on principles of fair dealing and

18        good faith;

19         "(C) establish standards governing digital

20        commodity platform marketing and advertising,

21        including testimonials and endorsements; and

22         "(D) establish such other standards and

23        requirements as the Commission may determine

24        are—

25             "(i) in the public interest;

170

1     "(ii) appropriate for the protection of

2    customers; or

3     "(iii) otherwise in furtherance of the

4    purposes of this Act.

5  "(3) PROHIBITION ON FRAUDULENT PRAC-

6 TICES.—It shall be unlawful for a registered digital

7 commodity broker or registered digital commodity

8 dealer to—

9    "(A) employ any device, scheme, or artifice

10   to defraud any customer or counterparty;

11    "(B) engage in any transaction, practice,

12   or course of business that operates as a fraud

13   or deceit on any customer or counterparty; or

14    "(C) engage in any act, practice, or course

15   of business that is fraudulent, deceptive, or ma-

16   nipulative.

17 "(i) DUTIES.—

18  "(1) RISK MANAGEMENT PROCEDURES.—Each

19 registered digital commodity broker and registered

20 digital commodity dealer shall establish robust and

21 professional risk management systems adequate for

22 managing the day-to-day business of the digital com-

23 modity broker or digital commodity dealer, respec-

24 tively.

171

1          "(2) DISCLOSURE OF GENERAL INFORMA-
2     TION.—Each registered digital commodity broker
3     and registered digital commodity dealer shall dis-
4     close to the Commission information concerning—
5               "(A) the terms and conditions of the trans-
6          actions of the digital commodity broker or dig-
7          ital commodity dealer, respectively;
8               "(B) the trading operations, mechanisms,
9          and practices of the digital commodity broker
10         or digital commodity dealer, respectively;
11              "(C) financial integrity protections relating
12         to the activities of the digital commodity broker
13         or digital commodity dealer, respectively; and
14              "(D) other information relevant to trading
15         in digital commodities by the digital commodity
16         broker or digital commodity dealer, respectively.
17         "(3) ABILITY TO OBTAIN INFORMATION.—Each
18    registered digital commodity broker and registered
19    digital commodity dealer shall—
20              "(A) establish and enforce internal systems
21         and procedures to obtain any necessary infor-
22         mation to perform any of the functions de-
23         scribed in this section; and
24              "(B) provide the information to the Com-
25         mission, on request.

172

1    ''(4) CONFLICTS OF INTEREST.—Each reg-
2    istered digital commodity broker and digital com-
3    modity dealer shall implement conflict-of-interest
4    systems and procedures that—
5        ''(A) establish structural and institutional
6        safeguards—
7            ''(i) to minimize conflicts of interest
8            that might potentially bias the judgment or
9            supervision of the digital commodity broker
10           or digital commodity dealer, respectively,
11           and contravene the principles of fair and
12           equitable trading and the business conduct
13           standards described in this Act, including
14           conflicts arising out of transactions or ar-
15           rangements with affiliates (including affili-
16           ates acting as digital asset issuers, digital
17           commodity dealers, or qualified digital
18           commodity custodians), which may include
19           information partitions and the legal sepa-
20           ration of different digital commodity trans-
21           action intermediaries; and
22               ''(ii) to ensure that the activities of
23           any person within the digital commodity
24           broker or digital commodity dealer relating
25           to research or analysis of the price or mar-

173

1          ket for any digital commodity or acting in
2          a role of providing exchange activities or
3          making determinations as to accepting ex-
4          change customers are separated by appro-
5          priate informational partitions within the
6          digital commodity broker or digital com-
7          modity dealer from the review, pressure, or
8          oversight of persons whose involvement in
9          pricing, trading, exchange, or clearing ac-
10         tivities might potentially bias their judg-
11         ment or supervision and contravene the
12         core principles of open access and the busi-
13         ness conduct standards described in this
14         Act; and

15         ''(B) address such other issues as the
16    Commission determines to be appropriate.

17    ''(5) ANTITRUST CONSIDERATIONS.—Unless
18    necessary or appropriate to achieve the purposes of
19    this Act, a digital commodity broker or digital com-
20    modity dealer shall not—

21         ''(A) adopt any process or take any action
22         that results in any unreasonable restraint of
23         trade; or

24         ''(B) impose any material anticompetitive
25         burden on trading or clearing.

174

1 &ldquo;(j) DESIGNATION OF CHIEF COMPLIANCE OFFI-

2 CER.&mdash;

3     &ldquo;(1) IN GENERAL.&mdash;Each registered digital

4     commodity broker and registered digital commodity

5     dealer shall designate an individual to serve as a

6     chief compliance officer.

7     &ldquo;(2) DUTIES.&mdash;The chief compliance officer

8     shall&mdash;

9         &ldquo;(A) report directly to the board or to the

10         senior officer of the registered digital com-

11         modity broker or registered digital commodity

12         dealer;

13         &ldquo;(B) review the compliance of the reg-

14         istered digital commodity broker or registered

15         digital commodity dealer with respect to the

16         registered digital commodity broker and reg-

17         istered digital commodity dealer requirements

18         described in this section;

19         &ldquo;(C) in consultation with the board of di-

20         rectors, a body performing a function similar to

21         the board, or the senior officer of the organiza-

22         tion, resolve any conflicts of interest that may

23         arise;

175

1     "(D) be responsible for administering each

2   policy and procedure that is required to be es-

3   tablished pursuant to this section;

4     "(E) ensure compliance with this Act (in-

5   cluding regulations), including each rule pre-

6   scribed by the Commission under this section;

7     "(F) establish procedures for the remedi-

8   ation of noncompliance issues identified by the

9   chief compliance officer through any—

10     "(i) compliance office review;

11     "(ii) look-back;

12     "(iii) internal or external audit find-

13   ing;

14     "(iv) self-reported error; or

15     "(v) validated complaint; and

16     "(G) establish and follow appropriate pro-

17   cedures for the handling, management response,

18   remediation, retesting, and closing of non-

19   compliance issues.

20  "(3) ANNUAL REPORTS.—

21     "(A) IN GENERAL.—In accordance with

22   rules prescribed by the Commission, the chief

23   compliance officer shall annually prepare and

24   sign a report that contains a description of—

1          "(i) the compliance of the registered

2      digital commodity broker or registered dig-

3      ital commodity dealer with respect to this

4      Act (including regulations); and

5          "(ii) each policy and procedure of the

6      registered digital commodity broker or reg-

7      istered digital commodity dealer of the

8      chief compliance officer (including the code

9      of ethics and conflict of interest policies).

10          "(B) REQUIREMENTS.—The chief compli-

11      ance officer shall ensure that a compliance re-

12      port under subparagraph (A)—

13          "(i) accompanies each appropriate fi-

14      nancial report of the registered digital

15      commodity broker or registered digital

16      commodity dealer that is required to be

17      furnished to the Commission pursuant to

18      this section; and

19          "(ii) includes a certification that,

20      under penalty of law, the compliance re-

21      port is accurate and complete.

22      "(k) SEGREGATION OF DIGITAL COMMODITIES.—

23          "(1) HOLDING OF CUSTOMER ASSETS.—

24          "(A) IN GENERAL.—Each registered dig-

25      ital commodity broker and registered digital

177

1    commodity dealer shall hold customer money,
2    assets, and property in a manner to minimize
3    the risk of loss to the customer or unreasonable
4    delay in customer access to the money, assets,
5    and property of the customer.

6    "(B) QUALIFIED DIGITAL COMMODITY
7    CUSTODIAN.—Each registered digital com-
8    modity broker and registered digital commodity
9    dealer shall hold in a qualified digital com-
10   modity custodian each unit of a digital com-
11   modity that is—

12        "(i) the property of a customer or
13        counterparty of the digital commodity
14        broker or digital commodity dealer, respec-
15        tively; or

16        "(ii) otherwise so required by the
17        Commission to reasonably protect cus-
18        tomers or promote the public interest.

19   "(2) SEGREGATION OF FUNDS.—

20        "(A) IN GENERAL.—Each registered dig-
21   ital commodity broker and registered digital
22   commodity dealer shall treat and deal with all
23   money, assets, and property that is received by
24   the registered digital commodity broker or reg-
25   istered digital commodity dealer, or accrues to

178

1        a customer as the result of trading in digital
2        commodities, as belonging to the customer.
3            "(B) COMMINGLING PROHIBITED.—
4                "(i) IN GENERAL.—Except as pro-
5            vided in clause (ii), each registered digital
6            commodity broker and registered digital
7            commodity dealer shall separately account
8            for money, assets, and property of a digital
9            commodity customer, and shall not com-
10           mingle any such money, assets, or property
11           with the funds of the digital commodity
12           broker or digital commodity dealer, respec-
13           tively, or use any such money, assets, or
14           property to margin, secure, or guarantee
15           any trades or accounts of any customer or
16           person other than the person for whom the
17           money, assets, or property are held.
18               "(ii) EXCEPTIONS.—
19                   "(I) USE OF FUNDS.—
20                       "(aa) IN GENERAL.—A reg-
21                   istered digital commodity broker
22                   or registered digital commodity
23                   dealer may, for convenience, com-
24                   mingle and deposit in the same
25                   account or accounts with any

1        bank, trust company, derivatives

2        clearing organization, or qualified

3        digital    commodity    custodian

4        money, assets, and property of

5        customers.

6            "(bb)    WITHDRAWAL.—The

7        share of the money, assets, and

8        property described in item (aa)

9        as in the normal course of busi-

10       ness shall be necessary to mar-

11       gin, guarantee, secure, transfer,

12       adjust, or settle a contract for

13       sale of a digital commodity with

14       a registered entity may be with-

15       drawn and applied to such pur-

16       poses, including the payment of

17       commissions, brokerage, interest,

18       taxes, storage, and other charges,

19       lawfully accruing in connection

20       with the contract.

21          "(II)  COMMISSION  ACTION.—In

22       accordance with such terms and con-

23       ditions as the Commission may pre-

24       scribe by rule, regulation, or order,

25       any money, assets, or property of the

180

1                    customers of a registered digital com-

2                    modity broker or registered digital

3                    commodity dealer may be commingled

4                    and deposited in customer accounts

5                    with any other money, assets, or prop-

6                    erty received by the digital commodity

7                    broker or digital commodity dealer,

8                    respectively, and required by the Com-

9                    mission to be separately accounted for

10                   and treated and dealt with as belong-

11                   ing to the customer of the digital com-

12                   modity broker or digital commodity

13                   dealer, respectively.

14      "(3) PERMITTED INVESTMENTS.—Money de-

15 scribed in paragraph (2) may be invested in obliga-

16 tions of the United States, in general obligations of

17 any State or of any political subdivision of a State,

18 in obligations fully guaranteed as to principal and

19 interest by the United States, or in any other invest-

20 ment that the Commission may by rule or regulation

21 allow.

22      "(4) CUSTOMER PROTECTION DURING BANK-

23 RUPTCY.—

24           "(A) CUSTOMER PROPERTY.—All money,

25                assets, or property described in paragraph (2)

181

1 shall be considered customer property for pur-
2 poses of section 761 of title 11, United States
3 Code.

4 "(B) TRANSACTIONS.—A transaction in-
5 volving a unit of a digital commodity occurring
6 with a digital commodity dealer shall be consid-
7 ered a 'contract for the purchase or sale of a
8 commodity for future delivery, on or subject to
9 the rules of, a contract market or board of
10 trade' for purposes of the definition of a 'com-
11 modity contract' in section 761 of title 11,
12 United States Code.

13 "(C) BROKERS AND DEALERS.—A reg-
14 istered digital commodity dealer and a reg-
15 istered digital commodity broker shall be con-
16 sidered a futures commission merchant for pur-
17 poses of section 761 of title 11, United States
18 Code.

19 "(D) ASSETS REMOVED FROM SEGREGA-
20 TION.—Assets removed from segregation due to
21 a customer election under paragraph (5) shall
22 not be considered customer property for pur-
23 poses of section 761 of title 11, United States
24 Code.

25 "(5) MISUSE OF CUSTOMER PROPERTY.—

1      "(A) IN GENERAL.—It shall be unlawful—

2          "(i) for any digital commodity broker

3      or digital commodity dealer that has re-

4      ceived any customer money, assets, or

5      property for custody to dispose of, or use

6      any such money, assets, or property as be-

7      longing to the digital commodity broker or

8      digital commodity dealer, respectively; or

9          "(ii) for any other person, including

10     any depository, digital commodity ex-

11     change, other digital commodity broker,

12     other digital commodity dealer, or digital

13     commodity custodian that has received any

14     customer money, assets, or property for

15     deposit, to hold, dispose of, or use any

16     such money, assets, or property, as belong-

17     ing to the depositing digital commodity

18     broker or digital commodity dealer or any

19     person other than the customers of the

20     digital commodity broker or digital com-

21     modity dealer, respectively.

22     "(B) USE FURTHER DEFINED.—For pur-

23     poses of this section, 'use' of a digital com-

24     modity includes utilizing any unit of a digital

25     asset to participate in a blockchain service de-

183

1      fined in paragraph (5) or a decentralized gov-

2      ernance system associated with the digital com-

3      modity or the blockchain system to which the

4      digital commodity relates in any manner other

5      than that expressly directed by the customer

6      from whom the unit of a digital commodity was

7      received.

8      "(6) PARTICIPATION IN BLOCKCHAIN SERV-

9      ICES.—

10      "(A) IN GENERAL.—A customer shall have

11      the right to waive the restrictions in paragraph

12      (1) for any unit of a digital commodity, by af-

13      firmatively electing, in writing to the digital

14      commodity broker or digital commodity dealer,

15      to waive the restrictions.

16      "(B) USE OF FUNDS.—Customer digital

17      commodities removed from segregation under

18      subparagraph (A) may be pooled and used by

19      the digital commodity broker or digital com-

20      modity dealer, or one of their designees, to pro-

21      vide a blockchain service for a blockchain sys-

22      tem to which the unit of the digital asset re-

23      moved from segregation in subparagraph (A)

24      relates.

184

1       ''(C)   Limitations.—The   Commission
2   may, by rule, establish notice and disclosure re-
3   quirements, and any other limitations and rules
4   related to the waiving of any restrictions under
5   this paragraph that are reasonably necessary to
6   protect customers, including eligible contract
7   participants, non-eligible contract participants,
8   or any other class of customers.

9       ''(D) Blockchain service defined.—In
10   this subparagraph, the term 'blockchain service'
11   means any activity relating to validating trans-
12   actions on a blockchain system, providing secu-
13   rity for a blockchain system, or other similar
14   activity required for the ongoing operation of a
15   blockchain system.

16   ''(l) Federal Preemption.—Notwithstanding any
17   other provision of law, the Commission shall have exclusive
18   jurisdiction over any digital commodity broker or digital
19   commodity dealer registered under this section.

20   ''(m) Exemptions.—In order to promote responsible
21   economic or financial innovation and fair competition, or
22   protect customers, the Commission may (on its own initia-
23   tive or on application of the registered digital commodity
24   broker or registered digital commodity dealer) exempt, un-
25   conditionally or on stated terms or conditions, or for stat-

185

1 ed periods, and retroactively or prospectively, or both, a

2 registered digital commodity broker or registered digital

3 commodity dealer from the requirements of this section,

4 if the Commission determines that—

5        ''(1)(A) the exemption would be consistent with

6     the public interest and the purposes of this Act; and

7        ''(B) the exemption will not have a material ad-

8     verse effect on the ability of the Commission or the

9     digital commodity broker or digital commodity deal-

10    er to discharge regulatory duties under this Act; or

11       ''(2) the registered digital commodity broker or

12    registered digital commodity dealer is subject to

13    comparable, comprehensive supervision and regula-

14    tion by the appropriate government authorities in

15    the home country of the registered digital commodity

16    broker or registered digital commodity dealer, re-

17    spectively.

18 ''(n) TREATMENT UNDER THE BANK SECRECY

19 ACT.—A registered digital commodity broker and a reg-

20 istered digital commodity dealer shall be treated as a fi-

21 nancial institution for purposes of the Bank Secrecy Act.''.

22 **SEC. 407. REGISTRATION OF ASSOCIATED PERSONS.**

23    (a) IN GENERAL.—Section 4k of the Commodity Ex-

24 change Act (7 U.S.C. 6k) is amended—

1        (1) by redesignating subsections (4) through
2    (6) as subsections (5) through (7), respectively; and
3        (2) by inserting after subsection (3) the fol-
4    lowing:
5    ''(4) It shall be unlawful for any person to act as an
6    associated person of a digital commodity broker or an as-
7    sociated person of a digital commodity dealer unless the
8    person is registered with the Commission under this Act
9    and such registration shall not have expired, been sus-
10   pended (and the period of suspension has not expired),
11   or been revoked. It shall be unlawful for a digital com-
12   modity broker or a digital commodity dealer to permit
13   such a person to become or remain associated with the
14   digital commodity broker or digital commodity dealer if
15   the digital commodity broker or digital commodity dealer
16   knew or should have known that the person was not so
17   registered or that the registration had expired, been sus-
18   pended (and the period of suspension has not expired),
19   or been revoked.''; and
20       (3) in subsection (5) (as so redesignated), by
21       striking ''or of a commodity trading advisor'' and in-
22       serting ''of a commodity trading advisor, of a digital
23       commodity broker, or of a digital commodity deal-
24       er''.

187

1    (b) CONFORMING AMENDMENTS.—The Commodity

2 Exchange Act (7 U.S.C. 1a et seq.) is amended by striking

3 ''section 4k(6)'' each place it appears and inserting ''sec-

4 tion 4k(7)''.

5 **SEC. 408. REGISTRATION OF COMMODITY POOL OPERA-**

6           **TORS AND COMMODITY TRADING ADVISORS.**

7    Section 4m(3) of the Commodity Exchange Act (7

8 U.S.C. 6m(3)) is amended—

9       (1) in subparagraph (A)—

10          (A) by striking ''any commodity trading

11         advisor'' and inserting ''a commodity pool oper-

12         ator or commodity trading advisor''; and

13          (B) by striking ''acting as a commodity

14         trading advisor'' and inserting ''acting as a

15         commodity pool operator or commodity trading

16         advisor''; and

17       (2) in subparagraph (C), by inserting ''digital

18       commodities,'' after ''physical commodities,''.

19 **SEC. 409. EXCLUSION FOR ANCILLARY ACTIVITIES.**

20    The Commodity Exchange Act (7 U.S.C. 1 et seq.),

21 as amended by the preceding provisions of this Act, is

22 amended by inserting after section 4u the following:

23 **''SEC. 4v. EXCLUSION FOR ANCILLARY ACTIVITIES.**

24    ''(a) IN GENERAL.—Notwithstanding any other pro-

25 vision of this Act, a person shall not be subject to this

188

1  Act and the regulations promulgated under this Act solely

2  based on the person undertaking any ancillary activities.

3      "(b) EXCEPTIONS.—Subsection (a) shall not be con-

4  strued to apply to the antimanipulation, antifraud, or false

5  reporting enforcement authorities of the Commission.

6      "(c) ANCILLARY ACTIVITIES DEFINED.—In this sec-

7  tion, the term 'ancillary activities' means any of the fol-

8  lowing activities related to the operation of a blockchain

9  system:

10          "(1) Compiling network transactions, operating

11      a pool, relaying, searching, sequencing, validating, or

12      acting in a similar capacity with respect to a digital

13      commodity transaction.

14          "(2) Providing computational work, operating a

15      node, or procuring, offering, or utilizing network

16      bandwidth, or other similar incidental services with

17      respect to a digital commodity transaction.

18          "(3) Providing a user interface that enables a

19      user to read, and access data about a blockchain

20      system, send messages, or otherwise interact with a

21      blockchain system.

22          "(4) Developing, publishing, constituting, ad-

23      ministering, maintaining, or otherwise distributing a

24      blockchain system.

189

1    "(5) Developing, publishing, constituting, ad-

2  ministering, maintaining, or otherwise distributing

3  software or systems that create or deploy hardware

4  or software, including wallets or other systems, fa-

5  cilitating an individual user's own personal ability to

6  keep, safeguard, or custody a user's digital commod-

7  ities or related private keys.".

8 **SEC. 410. EFFECTIVE DATE.**

9   Unless otherwise provided in this title, this title and

10 the amendments made by this title shall take effect 360

11 days after the date of enactment of this Act, except that,

12 to the extent a provision of this title requires a rule-

13 making, the provision shall take effect on the later of—

14   (1) 360 days after the date of enactment of this

15  Act; or

16   (2) 60 days after the publication in the Federal

17  Register of the final rule implementing the provision.

# TITLE V—INNOVATION AND TECHNOLOGY IMPROVEMENTS

20 **SEC. 501. CODIFICATION OF THE SEC STRATEGIC HUB FOR**

21     **INNOVATION AND FINANCIAL TECHNOLOGY.**

22   Section 4 of the Securities Exchange Act of 1934 (15

23 U.S.C. 78d) is amended by adding at the end the fol-

24 lowing:

190

1    "(l) STRATEGIC HUB FOR INNOVATION AND FINAN-

2    CIAL TECHNOLOGY.—

3        "(1) OFFICE ESTABLISHED.—There is estab-

4        lished within the Commission the Strategic Hub for

5        Innovation and Financial Technology (referred to in

6        this section as the 'FinHub').

7        "(2) PURPOSES.—The purposes of FinHub are

8        as follows:

9            "(A) To assist in shaping the approach of

10           the Commission to technological advancements

11           in the financial industry.

12           "(B) To examine financial technology inno-

13           vations within capital markets, market partici-

14           pants, and investors.

15           "(C) To coordinate the response of the

16           Commission to emerging technologies in finan-

17           cial, regulatory, and supervisory systems.

18       "(3) DIRECTOR OF FINHUB.—FinHub shall

19       have a Director who shall be appointed by the Com-

20       mission, from among individuals having experience

21       in both emerging technologies and Federal securities

22       law and serve at the pleasure of the Commission.

23       The Director shall report directly to the Commission

24       and perform such functions and duties as the Com-

25       mission may prescribe.

191

1           "(4) RESPONSIBILITIES.—FinHub shall—

2               "(A) foster responsible technological inno-

3           vation and fair competition within the Commis-

4           sion, including around financial technology, reg-

5           ulatory technology, and supervisory technology;

6               "(B) provide internal education and train-

7           ing to the Commission regarding financial tech-

8           nology;

9               "(C) advise the Commission regarding fi-

10          nancial technology that would serve the Com-

11          mission's oversight functions;

12              "(D) analyze technological advancements

13          and the impact of regulatory requirements on

14          financial technology companies;

15              "(E) advise the Commission with respect

16          to rulemakings or other agency or staff action

17          regarding financial technology;

18              "(F) provide businesses working in emerg-

19          ing financial technology fields with information

20          on the Commission, its rules and regulations;

21          and

22              "(G) encourage firms working in emerging

23          technology fields to engage with the Commis-

24          sion and obtain feedback from the Commission

25          on potential regulatory issues.

192

1           "(5) ACCESS TO DOCUMENTS.—The Commis-

2 sion shall ensure that FinHub has full access to the

3 documents and information of the Commission and

4 any self-regulatory organization, as necessary to

5 carry out the functions of FinHub.

6           "(6) REPORT TO CONGRESS.—

7                "(A) IN GENERAL.—Not later than Octo-

8 ber 31 of each year after 2024, FinHub shall

9 submit to the Committee on Banking, Housing,

10 and Urban Affairs of the Senate and the Com-

11 mittee on Financial Services of the House of

12 Representatives a report on the activities of

13 FinHub during the immediately preceding fiscal

14 year.

15                "(B) CONTENTS.—Each report required

16 under subparagraph (A) shall include—

17                     "(i) the total number of persons that

18 met with FinHub;

19                     "(ii) the total number of market par-

20 ticipants FinHub met with, including the

21 classification of those participants;

22                     "(iii) a summary of general issues dis-

23 cussed during meetings with persons;

24                     "(iv) information on steps FinHub

25 has taken to improve Commission services,

193

 1          including responsiveness to the concerns of

 2          persons;

 3                  ''(v) recommendations—

 4                      ''(I) with respect to the regula-

 5                  tions of the Commission and the guid-

 6                  ance and orders of the Commission;

 7                  and

 8                      ''(II) for such legislative actions

 9                  as the FinHub determines appro-

10                  priate; and

11                  ''(vi) any other information, as deter-

12          mined appropriate by the Director of

13          FinHub.

14          ''(C) CONFIDENTIALITY.—A report under

15     subparagraph (A) may not contain confidential

16     information.

17          ''(7) SYSTEMS OF RECORDS.—

18          ''(A) IN GENERAL.—The Commission shall

19     establish a detailed system of records (as de-

20     fined under section 552a of title 5, United

21     States Code) to assist FinHub in commu-

22     nicating with interested parties.

23          ''(B) ENTITIES COVERED BY THE SYS-

24     TEM.—Entities covered by the system required

25     under subparagraph (A) include entities or per-

194

1      sons submitting requests or inquiries and other

2      information to Commission through FinHub.

3            ''(C) SECURITY AND STORAGE OF

4      RECORDS.—FinHub shall store—

5                  ''(i) electronic records—

6                        ''(I) in the system required under

7                  subparagraph (A); or

8                        ''(II) on the secure network or

9                  other electronic medium, such as

10                 encrypted hard drives or back-up

11                 media, of the Commission; and

12                 ''(ii) paper records in secure facilities.

13           ''(8) EFFECTIVE DATE.—This subsection shall

14     take effect on the date that is 180 days after the

15     date of the enactment of this subsection.''.

16 **SEC. 502. CODIFICATION OF LABCFTC.**

17     (a) IN GENERAL.—Section 18 of the Commodity Ex-

18 change Act (7 U.S.C. 22) is amended by adding at the

19 end the following:

20     ''(c) LABCFTC.—

21           ''(1) ESTABLISHMENT.—There is established in

22     the Commission LabCFTC.

23           ''(2) PURPOSE.—The purposes of LabCFTC

24     are to—

195

1          "(A) promote responsible financial tech-
2     nology innovation and fair competition for the
3     benefit of the American public;

4          "(B) serve as an information platform to
5     inform the Commission about new financial
6     technology innovation; and

7          "(C) provide outreach to financial tech-
8     nology innovators to discuss their innovations
9     and the regulatory framework established by
10    this Act and the regulations promulgated there-
11    under.

12    "(3) DIRECTOR.—LabCFTC shall have a Direc-
13    tor, who shall be appointed by the Commission and
14    serve at the pleasure of the Commission. Notwith-
15    standing section 2(a)(6)(A), the Director shall re-
16    port directly to the Commission and perform such
17    functions and duties as the Commission may pre-
18    scribe.

19    "(4) DUTIES.—LabCFTC shall—

20         "(A) advise the Commission with respect
21    to rulemakings or other agency or staff action
22    regarding financial technology;

23         "(B) provide internal education and train-
24    ing to the Commission regarding financial tech-
25    nology;

1    "(C) advise the Commission regarding fi-

2 nancial technology that would bolster the Com-

3 mission's oversight functions;

4    "(D) engage with academia, students, and

5 professionals on financial technology issues,

6 ideas, and technology relevant to activities

7 under this Act;

8    "(E) provide persons working in emerging

9 technology fields with information on the Com-

10 mission, its rules and regulations, and the role

11 of a registered futures association; and

12    "(F) encourage persons working in emerg-

13 ing technology fields to engage with the Com-

14 mission and obtain feedback from the Commis-

15 sion on potential regulatory issues.

16   "(5) ACCESS TO DOCUMENTS.—The Commis-

17 sion shall ensure that LabCFTC has full access to

18 the documents and information of the Commission

19 and any self-regulatory organization or registered fu-

20 tures association, as necessary to carry out the func-

21 tions of LabCFTC.

22   "(6) REPORT TO CONGRESS.—

23    "(A) IN GENERAL.—Not later than Octo-

24 ber 31 of each year after 2024, LabCFTC shall

25 submit to the Committee on Agriculture of the

197

1    House of Representatives and the Committee

2    on Agriculture, Nutrition, and Forestry of the

3    Senate a report on its activities.

4         "(B) CONTENTS.—Each report required

5    under paragraph (1) shall include—

6              "(i) the total number of persons that

7         met with LabCFTC;

8              "(ii) a summary of general issues dis-

9         cussed during meetings with the person;

10             "(iii) information on steps LabCFTC

11        has taken to improve Commission services,

12        including responsiveness to the concerns of

13        persons;

14             "(iv) recommendations made to the

15        Commission with respect to the regula-

16        tions, guidance, and orders of the Commis-

17        sion and such legislative actions as may be

18        appropriate; and

19             "(v) any other information determined

20        appropriate by the Director of LabCFTC.

21        "(C) CONFIDENTIALITY.—A report under

22   paragraph (A) shall abide by the confidentiality

23   requirements in section 8.

24        "(7) SYSTEMS OF RECORDS.—

1          "(A) IN GENERAL.—The Commission shall
2      establish a detailed system of records (as de-
3      fined in section 552a of title 5, United States
4      Code) to assist LabCFTC in communicating
5      with interested parties.

6          "(B) PERSONS COVERED BY THE SYS-
7      TEM.—The persons covered by the system of
8      records shall include persons submitting re-
9      quests or inquiries and other information to the
10     Commission through LabCFTC.

11         "(C) SECURITY AND STORAGE OF
12     RECORDS.—The system of records shall store
13     records electronically or on paper in secure fa-
14     cilities, and shall store electronic records on the
15     secure network of the Commission and on other
16     electronic media, such as encrypted hard drives
17     and back-up media, as needed.".

18     (b) CONFORMING AMENDMENTS.—Section
19 2(a)(6)(A) of such Act (7 U.S.C. 2(a)(6)(A)) is amend-
20 ed—

21         (1) by striking "paragraph and in" and insert-
22     ing "paragraph,"; and

23         (2) by inserting "and section 18(c)(3)," before
24     "the executive".

199

1    (c) EFFECTIVE DATE.—The Commodity Futures

2 Trading Commission shall implement the amendments

3 made by this section (including complying with section

4 18(c)(7) of the Commodity Exchange Act) within 180

5 days after the date of the enactment of this Act.

6 **SEC. 503. CFTC–SEC JOINT ADVISORY COMMITTEE ON DIG-**

7        **ITAL ASSETS.**

8    (a) ESTABLISHMENT.—The Commodity Futures

9 Trading Commission and the Securities and Exchange

10 Commission (in this section referred to as the ''Commis-

11 sions'') shall jointly establish the Joint Advisory Com-

12 mittee on Digital Assets (in this section referred to as the

13 ''Committee'').

14    (b) PURPOSE.—

15       (1) IN GENERAL.—The Committee shall—

16          (A) provide the Commissions with advice

17          on the rules, regulations, and policies of the

18          Commissions related to digital assets;

19          (B) further the regulatory harmonization

20          of digital asset policy between the Commissions;

21          (C) examine and disseminate methods for

22          describing, measuring, and quantifying digital

23          asset—

24             (i) decentralization;

25             (ii) functionality;

1        (iii) information asymmetries; and

2        (iv) transaction and network security;

3     (D) examine the potential for digital as-

4 sets, blockchain systems, and distributed ledger

5 technology to improve efficiency in the oper-

6 ation of financial market infrastructure and

7 better protect financial market participants, in-

8 cluding services and systems which provide—

9        (i)  greater  transparency  regarding

10        customer funds;

11        (ii) reduced transaction cost; and

12        (iii) increased access to financial mar-

13        ket services; and

14     (E)  discuss  the  implementation  by  the

15 Commissions of this Act and the amendments

16 made by this Act.

17     (2) REVIEW BY AGENCIES.—Each Commission

18 shall—

19     (A) review the findings and recommenda-

20 tions of the Committee;

21     (B)  each  time  the  Committee  submits  a

22 finding or recommendation to a Commission,

23 promptly issue a public statement—

24        (i)  assessing  the  finding  or  rec-

25        ommendation of the Committee;

201

(ii) disclosing the action or decision not to take action made by the Commission in response to a finding or recommendation; and

(iii) the reasons for the action or decision not to take action; and

(C) each time the Committee submits a finding or recommendation to a Commission, provide the Committee with a formal response to the finding or recommendation not later than 3 months after the date of the submission of the finding or recommendation.

(c) Membership and Leadership.—

(1) Non-federal members.—

(A) In general.—The Commissions shall appoint at least 20 nongovernmental stakeholders with a wide diversity of opinion and who represent a broad spectrum of interests representing the digital asset ecosystem, equally divided between the Commissions, to serve as members of the Committee. The appointees shall include—

(i) digital asset issuers;

202

1          (ii) persons registered with the Com-
2      missions and engaged in digital asset re-
3      lated activities;
4          (iii) individuals engaged in academic
5      research relating to digital assets; and
6          (iv) digital asset users.
7      (B) MEMBERS NOT COMMISSION EMPLOY-
8  EES.—Members appointed under subparagraph
9  (A) shall not be deemed to be employees or
10  agents of a Commission solely by reason of
11  membership on the Committee.
12  (2) CO-DESIGNATED FEDERAL OFFICERS.—
13      (A) NUMBER; APPOINTMENT.—There shall
14  be 2 co-designated Federal officers of the Com-
15  mittee, as follows:
16          (i) The Director of LabCFTC of the
17      Commodity Futures Trading Commission.
18          (ii) The Director of the Strategic Hub
19      for Innovation and Financial Technology.
20      (B) DUTIES.—The duties required by
21  chapter 10 of title 5, United States Code, to be
22  carried out by a designated Federal officer with
23  respect to the Committee shall be shared by the
24  co-designated Federal officers of the Com-
25  mittee.

1    (3) COMMITTEE LEADERSHIP.—

2         (A) COMPOSITION; ELECTION.—The Com-

3         mittee members shall elect, from among the

4         Committee members—

5              (i) a chair;

6              (ii) a vice chair;

7              (iii) a secretary; and

8              (iv) an assistant secretary.

9         (B) TERM OF OFFICE.—Each member

10        elected under subparagraph (A) in a 2-year pe-

11        riod referred to in section 1013(b)(2) of title 5,

12        United States Code, shall serve in the capacity

13        for which the member was so elected, until the

14        end of the 2-year period.

15   (d) NO COMPENSATION FOR COMMITTEE MEM-

16   BERS.—

17   (1) NON-FEDERAL MEMBERS.—All Committee

18   members appointed under subsection (d)(1) shall—

19        (A) serve without compensation; and

20        (B) while away from the home or regular

21        place of business of the member in the perform-

22        ance of services for the Committee, be allowed

23        travel expenses, including per diem in lieu of

24        subsistence, in the same manner as persons em-

25        ployed intermittently in the Government service

204

1    are allowed expenses under section 5703(b) of
2    title 5, United States Code.

3    (2) NO COMPENSATION FOR CO-DESIGNATED
4    FEDERAL OFFICERS.—The co-designated Federal of-
5    ficers shall serve without compensation in addition
6    to that received for their services as officers or em-
7    ployees of the United States.

8    (e) FREQUENCY OF MEETINGS.—The Committee
9  shall meet—

10    (1) not less frequently than twice annually; and
11    (2) at such other times as either Commission
12  may request.

13    (f) DURATION.—Section 1013(a)(2) of title 5, United
14  States Code, shall not apply to the Committee.

15    (g) TIME LIMITS.—The Commissions shall—

16    (1) adopt a joint charter for the Committee
17    within 90 days after the date of the enactment of
18    this section;

19    (2) appoint members to the Committee within
20    120 days after such date of enactment; and

21    (3) hold the initial meeting of the Committee
22    within 180 days after such date of enactment.

23    (h) FUNDING.—The Commissions may jointly fund
24  the Committee.

205

**SEC. 504. MODERNIZATION OF THE SECURITIES AND EX-CHANGE COMMISSION MISSION.**

(a) SECURITIES ACT OF 1933.—Section 2(b) of the Securities Act of 1933 (15 U.S.C. 77(b)) is amended—

(1) in the heading, by inserting "INNOVATION," after "EFFICIENCY,"; and

(2) by inserting "innovation," after "efficiency,".

(b) SECURITIES EXCHANGE ACT OF 1934.—Section 3(f) of the Securities Exchange Act of 1934 (15 U.S.C. 78(c)) is amended—

(1) in the heading, by inserting "INNOVATION," after "EFFICIENCY,"; and

(2) by inserting "innovation," after "efficiency,".

(c) INVESTMENT ADVISERS ACT OF 1940.—Section 202(c) of the Investment Advisers Act of 1940 (15 U.S.C. 80b–2) is amended—

(1) in the heading, by inserting "INNOVATION," after "EFFICIENCY,"; and

(2) by inserting "innovation," after "efficiency,".

(d) INVESTMENT COMPANY ACT OF 1940.—Section 2(c) of the Investment Company Act of 1940 (15 U.S.C. 80a–2) is amended—

206

1          (1) in the heading, by inserting "INNOVATION,"

2      after "EFFICIENCY,"; and

3          (2) by inserting "innovation," after "effi-

4      ciency,".

**SEC. 505. STUDY ON DECENTRALIZED FINANCE.**

6      (a) IN GENERAL.—The Securities and Exchange

7  Commission and the Commodity Futures Trading Com-

8  mission shall jointly carry out a study on decentralized

9  finance that analyzes—

10          (1) the nature, size, role, and use of decentral-

11      ized finance blockchain protocols;

12          (2) the operation of blockchain protocols that

13      comprise decentralized finance;

14          (3) the interoperability of blockchain protocols

15      and blockchain systems;

16          (4) the interoperability of blockchain protocols

17      and software-based systems, including websites and

18      wallets;

19          (5) the decentralized governance systems

20      through which blockchain protocols may be devel-

21      oped, published, constituted, administered, main-

22      tained, or otherwise distributed, including—

23              (A) whether the systems enhance or de-

24          tract from—

207

1            (i) the decentralization of the decen-
2        tralized finance; and
3            (ii) the inherent risks of the decentral-
4        ized governance system; and
5        (B) any procedures or requirements that
6    would mitigate the risks identified in subpara-
7    graph (A)(ii);
8    (6) the benefits of decentralized finance, includ-
9 ing—
10        (A) operational resilience and interoper-
11    ability of blockchain-based systems;
12        (B) market competition and innovation;
13        (C) transaction efficiency;
14        (D) transparency and traceability of trans-
15    actions; and
16        (E) disintermediation; and
17    (7) the risks of decentralized finance, includ-
18 ing—
19        (A) pseudonymity of users and trans-
20    actions;
21        (B) disintermediation; and
22        (C) cybersecurity vulnerabilities;
23    (8) the extent to which decentralized finance
24 has integrated with the traditional financial markets
25 and any potential risks to stability of the markets;

1 (9) how the levels of illicit activity in decentral-

2 ized finance compare with the levels of illicit activity

3 in traditional financial markets;

4 (10) how decentralized finance may increase the

5 accessibility of cross-border transactions; and

6 (11) the feasibility of embedding self-executing

7 compliance and risk controls into decentralized fi-

8 nance.

9 (b) REPORT.—Not later than 1 year after the date

10 of enactment of this Act, the Securities and Exchange

11 Commission and the Commodity Futures Trading Com-

12 mission shall jointly submit to the relevant congressional

13 committees a report that includes the results of the study

14 required by subsection (a).

15 (c) GAO STUDY.—The Comptroller General of the

16 United States shall—

17 (1) carry out a study on decentralized finance

18 that analyzes the information described under para-

19 graphs (1) through (10) of subsection (a); and

20 (2) not later than 1 year after the date of en-

21 actment of this Act, submit to the relevant congres-

22 sional committees a report that includes the results

23 of the study required by paragraph (1).

24 (d) DEFINITIONS.—In this section:

25 (1) DECENTRALIZED FINANCE.—

1        (A) IN GENERAL.—The term "decentral-
2    ized finance" means blockchain protocols that
3    allow users to engage in financial transactions
4    in a self-directed manner so that a third-party
5    intermediary does not effectuate the trans-
6    actions or take custody of digital assets of a
7    user during any part of the transactions.

8        (B) RELATIONSHIP TO ANCILLARY ACTIVI-
9    TIES.—The term "decentralized finance" shall
10   not be interpreted to limit or exclude any activ-
11   ity from the meaning of "ancillary activities",
12   as defined in section 15H(c) of the Securities
13   Exchange Act of 1934 or section 4v(c) of the
14   Commodity Exchange Act.

15   (2) RELEVANT CONGRESSIONAL COMMIT-
16   TEES.—The term "relevant congressional commit-
17   tees" means—

18       (A) the Committees on Financial Services
19   and Agriculture of the House of Representa-
20   tives; and

21       (B) the Committees on Banking, Housing,
22   and Urban Affairs and Agriculture, Nutrition,
23   and Forestry of the Senate.

210

**SEC. 506. STUDY ON NON-FUNGIBLE DIGITAL ASSETS.**

(a) The Comptroller General of the United States shall carry out a study of non-fungible digital assets that analyzes—

(1) the nature, size, role, purpose, and use of non-fungible digital assets;

(2) the similarities and differences between non-fungible digital assets and other digital assets, including digital commodities and payments stablecoins, and how the markets for those digital assets intersect with each other;

(3) how non-fungible digital assets are minted by issuers and subsequently administered to purchasers;

(4) how non-fungible digital assets are stored after being purchased by a consumer;

(5) the interoperability of non-fungible digital assets between different blockchain systems;

(6) the scalability of different non-fungible digital asset marketplaces;

(7) the benefits of non-fungible digital assets, including verifiable digital ownership;

(8) the risks of non-fungible tokens, including—

(A) intellectual property rights;

(B) cybersecurity risks; and

(C) market risks;

211

(9) whether and how non-fungible digital assets have integrated with traditional marketplaces, including those for music, real estate, gaming, events, and travel;

(10) whether non-fungible tokens can be used to facilitate commerce or other activities through the representation of documents, identification, contract, licenses, and other commercial, government, or personal records;

(11) any potential risks to such traditional markets from such integration; and

(12) the levels and types of illicit activity in non-fungible digital asset markets.

(b) REPORT.—Not later than 1 year after the date of the enactment of this Act, the Secretary of Commerce, shall make publicly available a report that includes the results of the study required by subsection (a).

**SEC. 507. STUDY ON FINANCIAL MARKET INFRASTRUCTURE IMPROVEMENTS.**

(a) IN GENERAL.—The Securities and Exchange Commission and the Commodity Futures Trading Commission shall jointly conduct a study to assess whether additional guidance or rules are necessary to facilitate the development of tokenized securities and derivatives products, and to the extent such rules would foster the develop-

212

1   ment of fair and orderly financial markets, be necessary
2   or appropriate in the public interest, and be consistent
3   with the protection of investors.

4       (b) REPORT.—

5           (1) TIME LIMIT.—Not later than 1 year after
6       the date of enactment of this Act, the Securities and
7       Exchange Commission and the Commodity Futures
8       Trading Commission shall jointly submit to the rel-
9       evant congressional committees a report that in-
10      cludes the results of the study required by sub-
11      section (a).

12          (2) RELEVANT CONGRESSIONAL COMMITTEES
13      DEFINED.—In this section, the term "relevant con-
14      gressional committees" means—

15              (A) the Committees on Financial Services
16          and on Agriculture of the House of Representa-
17          tives; and

18              (B) the Committees on Banking, Housing,
19          and Urban Affairs and on Agriculture, Nutri-
20          tion, and Forestry of the Senate.

○