# EXHIBIT V

SECURITIES AND EXCHANGE COMMISSION
(Release No. 34-99306; File Nos. SR-NYSEARCA-2021-90; SR-NYSEARCA-2023-44; SR-NYSEARCA-2023-58; SR-NASDAQ-2023-016; SR-NASDAQ-2023-019; SR-CboeBZX-2023-028; SR-CboeBZX-2023-038; SR-CboeBZX-2023-040; SR-CboeBZX-2023-042; SR-CboeBZX-2023-044; SR-CboeBZX-2023-072)

January 10, 2024

Self-Regulatory Organizations; NYSE Arca, Inc.; The Nasdaq Stock Market LLC; Cboe BZX Exchange, Inc.; Order Granting Accelerated Approval of Proposed Rule Changes, as Modified by Amendments Thereto, to List and Trade Bitcoin-Based Commodity-Based Trust Shares and Trust Units

## I.     INTRODUCTION

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Exchange Act")[1]

and Rule 19b-4 thereunder,[2] each of NYSE Arca, Inc. ("NYSE Arca"), The Nasdaq Stock

Market LLC ("Nasdaq"), and Cboe BZX Exchange, Inc. ("BZX"; and together with NYSE Arca

and Nasdaq, the "Exchanges") filed with the Securities and Exchange Commission

("Commission") proposed rule changes to list and trade shares of the following.  NYSE Arca

proposes to list and trade shares of (1) the Grayscale Bitcoin Trust[3] and (2) the Bitwise Bitcoin

ETF[4] under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares), and (3) the Hashdex

Bitcoin ETF[5] under NYSE Arca Rule 8.500-E (Trust Units); Nasdaq proposes to list and trade

---

[1]     15 U.S.C. 78s(b)(1).

[2]     17 CFR 240.19b-4.

[3]     See Amendment No. 2 to Proposed Rule Change to List and Trade Shares of the Grayscale Bitcoin Trust (BTC) under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) (SR-NYSEARCA-2021-90), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190-358659-884182.pdf ("Grayscale Amendment").

[4]     See Amendment No. 2 to Proposed Rule Change to List and Trade Shares of the Bitwise Bitcoin ETF under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) (SR-NYSEARCA-2023-44), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-nysearca-2023-44/srnysearca202344-358800-884322.pdf ("Bitwise Amendment").

[5]     See Amendment No. 1 to Proposed Rule Change to List and Trade Shares of the Hashdex Bitcoin ETF under NYSE Arca Rule 8.500-E (Trust Units) (SR-NYSEARCA-2023-58), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-nysearca-2023-58/srnysearca202358-358819-884342.pdf ("Hashdex Amendment").

shares of (4) the iShares Bitcoin Trust[6] and (5) the Valkyrie Bitcoin Fund[7] under Nasdaq Rule

5711(d) (Commodity-Based Trust Shares); and BZX proposes to list and trade shares of (6) the

ARK 21Shares Bitcoin ETF,[8] (7) the Invesco Galaxy Bitcoin ETF,[9] (8) the VanEck Bitcoin

Trust,[10] (9) the WisdomTree Bitcoin Fund,[11] (10) the Fidelity Wise Origin Bitcoin Fund,[12] and

(11) the Franklin Bitcoin ETF[13] under BZX Rule 14.11(e)(4) (Commodity-Based Trust Shares).

Each filing was subject to notice and comment.[14]

---

[6]   See Amendment No. 1 to Proposed Rule Change to List and Trade Shares of the iShares Bitcoin Trust under Nasdaq Rule 5711(d), Commodity-Based Trust Shares (SR-NASDAQ-2023-016), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-nasdaq-2023-016/srnasdaq2023016-357659-883042.pdf ("iShares Amendment").

[7]   See Amendment No. 1 to Proposed Rule Change to List and Trade Shares of the Valkyrie Bitcoin Fund under Nasdaq Rule 5711(d), Commodity-Based Trust Shares (SR-NASDAQ-2023-019), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-nasdaq-2023-019/srnasdaq2023019-358120-883602.pdf ("Valkyrie Amendment").

[8]   See Amendment No. 5 to Proposed Rule Change to List and Trade Shares of the ARK 21Shares Bitcoin ETF under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares (SR-CboeBZX-2023-028), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-cboebzx-2023-028/srcboebzx2023028-358679-884202.pdf ("ARK Amendment").

[9]   See Amendment No. 2 to Proposed Rule Change to List and Trade Shares of the Invesco Galaxy Bitcoin ETF under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares (SR-CboeBZX-2023-038), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-cboebzx-2023-038/srcboebzx2023038-358719-884222.pdf ("Invesco Amendment").

[10]  See Amendment No. 2 to Proposed Rule Change to List and Trade Shares of the VanEck Bitcoin Trust under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares (SR-CboeBZX-2023-040), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-cboebzx-2023-040/srcboebzx2023040-366299-893383.pdf ("VanEck Amendment").

[11]  See Amendment No. 2 to Proposed Rule Change to List and Trade Shares of the WisdomTree Bitcoin Fund under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares (SR-CboeBZX-2023-042), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-cboebzx-2023-042/srcboebzx2023042-366319-893402.pdf ("WisdomTree Amendment").

[12]  See Amendment No. 3 to Proposed Rule Change to List and Trade Shares of the Fidelity Wise Origin Bitcoin Fund under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares (SR-CboeBZX-2023-044), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-cboebzx-2023-044/srcboebzx2023044-358759-884163.pdf ("Wise Origin Amendment").

[13]  See Amendment No. 1 to Proposed Rule Change to List and Trade Shares of the Franklin Bitcoin ETF under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares (SR-CboeBZX-2023-072), filed Jan. 5, 2024, available at https://www.sec.gov/comments/sr-cboebzx-2023-072/srcboebzx2023072-358799-884282.pdf ("Franklin Amendment").

[14]  Comments received on SR-NYSEARCA-2021-90 are available at https://www.sec.gov/comments/sr-nysearca-2021-90/srnysearca202190.htm.  Comments received on SR-NYSEARCA-2023-44 are available at https://www.sec.gov/comments/sr-nysearca-2023-44/srnysearca202344.htm.  Comments received on SR-

Each of the foregoing proposed rule changes, as modified by their respective amendments, is referred to herein as a "Proposal" and collectively as the "Proposals."  Each trust (or series of a trust) described in a Proposal is referred to herein as a "Trust" and collectively as the "Trusts."  As described in more detail in the Proposals' respective amended filings,[15] each Proposal seeks to list and trade shares of a Trust that would hold spot bitcoin,[16] in whole or in part.[17]  This order approves the Proposals on an accelerated basis.[18]

## II.   DISCUSSION AND COMMISSION FINDINGS

After careful review, the Commission finds that the Proposals are consistent with the Exchange Act and rules and regulations thereunder applicable to a national securities exchange.[19]

---

NYSEARCA-2023-58 are available at https://www.sec.gov/comments/sr-nysearca-2023-58/srnysearca202358.htm.  Comments received on SR-NASDAQ-2023-016 are available at https://www.sec.gov/comments/sr-nasdaq-2023-016/srnasdaq2023016.htm.  Comments received on SR-NASDAQ-2023-019 are available at https://www.sec.gov/comments/sr-nasdaq-2023-019/srnasdaq2023019.htm.  Comments received on SR-CboeBZX-2023-028 are available at https://www.sec.gov/comments/sr-cboebzx-2023-028/srcboebzx2023028.htm.  Comments received on SR-CboeBZX-2023-038 are available at https://www.sec.gov/comments/sr-cboebzx-2023-038/srcboebzx2023038.htm.  Comments received on SR-CboeBZX-2023-040 are available at https://www.sec.gov/comments/sr-cboebzx-2023-040/srcboebzx2023040.htm.  Comments received on SR-CboeBZX-2023-042 are available at https://www.sec.gov/comments/sr-cboebzx-2023-042/srcboebzx2023042.htm.  Comments received on SR-CboeBZX-2023-044 are available at https://www.sec.gov/comments/sr-cboebzx-2023-044/srcboebzx2023044.htm.  Comments received on SR-CboeBZX-2023-072 are available at https://www.sec.gov/comments/sr-cboebzx-2023-072/srcboebzx2023072.htm.

[15]   See supra notes 3-13.

[16]   Bitcoins are digital assets that are issued and transferred via a distributed, open-source protocol used by a peer-to-peer computer network through which transactions are recorded on a public transaction ledger known as the "Bitcoin blockchain."  The Bitcoin protocol governs the creation of new bitcoins and the cryptographic system that secures and verifies bitcoin transactions.

[17]   The Trust described in the Hashdex Amendment currently holds, and could continue to hold, bitcoin futures contracts traded on the Chicago Mercantile Exchange.  See Hashdex Amendment at 37.  Most of the Trusts could also hold cash, and some Trusts could also hold cash equivalents, as described in their respective amended filings.  See Bitwise Amendment at 5; Hashdex Amendment at 37; iShares Amendment at 4; Valkyrie Amendment at 5; ARK Amendment at 43; Invesco Amendment at 28; VanEck Amendment at 30; WisdomTree Amendment at 28; Wise Origin Amendment at 68; Franklin Amendment at 29.

[18]   See infra Section III.

[19]   In approving the Proposals, the Commission has considered the Proposals' impacts on efficiency, competition, and capital formation.  See 15 U.S.C. 78c(f).  See also infra note 51 and accompanying text, discussing comments received regarding the efficiency of spot bitcoin ETPs; Letter from Michael McGinley, dated July 18, 2023, regarding SR-CboeBZX-2023-044 ("McGinley Letter"), stating that

In particular, the Commission finds that the Proposals are consistent with Section 6(b)(5) of the Exchange Act,[20] which requires, among other things, that the Exchanges' rules be designed to "prevent fraudulent and manipulative acts and practices" and, "in general, to protect investors and the public interest;" and with Section 11A(a)(1)(C)(iii) of the Exchange Act,[21] which sets forth Congress' finding that it is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities.

### A.   <u>Exchange Act Section 6(b)(5)</u>

When considering previous proposals to list bitcoin-based commodity trusts and bitcoin-based trust issued receipts,[22] the Commission has explained that one way an exchange that lists bitcoin-based exchange-traded products ("ETPs") can meet the obligation under Exchange Act Section 6(b)(5) that its rules be designed to prevent fraudulent and manipulative acts and practices is by demonstrating that the exchange has a comprehensive surveillance-sharing agreement with a regulated market of significant size related to the underlying or reference bitcoin assets.[23]  Such an agreement would assist in detecting and deterring fraud and

---

approving a spot bitcoin ETP "under stringent regulation ... aids the formation of new capital in this increasingly relevant market sector."

[20]   15 U.S.C. 78f(b)(5).

[21]   15 U.S.C. 78k-1(a)(1)(C)(iii).

[22]   <u>See</u> Order Disapproving a Proposed Rule Change To List and Trade Shares of the VanEck Bitcoin Trust Under BZX Rule 14.11(e)(4), Commodity-Based Trust Shares, Securities Exchange Act Release No. 97102 (Mar. 10, 2023), 88 FR 16055 (Mar. 15, 2023) (SR-CboeBZX-2022-035) ("VanEck Order II") and n.11 therein for the complete list of previous proposals.  The Grayscale order referenced therein ("Grayscale Order") is discussed below.

[23]   <u>See</u>, <u>e.g.</u>, VanEck Order II at 16056.  The Commission has provided an illustrative definition for "market of significant size" to include a market (or group of markets) as to which (a) there is a reasonable likelihood that a person attempting to manipulate the ETP would also have to trade on that market to successfully manipulate the ETP, so that a surveillance-sharing agreement would assist in detecting and deterring misconduct, and (b) it is unlikely that trading in the ETP would be the predominant influence on prices in that market.  <u>See</u> Order Setting Aside Action by Delegated Authority and Disapproving a Proposed Rule Change, as Modified by Amendments No. 1 and 2, To List and Trade Shares of the Winklevoss Bitcoin

manipulation related to that underlying asset.  While past proposals to list spot bitcoin-based
ETPs have argued that the bitcoin futures market of the Chicago Mercantile Exchange ("CME")
is a market of "significant size" related to spot bitcoin, for reasons discussed in the orders
disapproving each such proposal, the Commission was unable to make such a finding.[24]

The Commission also has consistently recognized, however, that having a comprehensive
surveillance-sharing agreement with a regulated market of significant size related to the
underlying or reference bitcoin assets is not the *exclusive* means by which an ETP listing
exchange can meet this statutory obligation under Exchange Act Section 6(b)(5).[25]  A listing
exchange could, alternatively, demonstrate that "other means to prevent fraudulent and
manipulative acts and practices will be sufficient" to justify dispensing with a surveillance-
sharing agreement with a regulated market of significant size.[26]

In the Grayscale Order,[27] the Commission determined that the proposing Exchange had
not established that the CME bitcoin futures market was a market of significant size related to
spot bitcoin, or that the "other means" asserted were sufficient to satisfy the statutory standard.
On review of the Grayscale Order, the U.S. Court of Appeals for the D.C. Circuit held that the
Commission failed to adequately explain its reasoning.  The court therefore vacated the
Grayscale Order and remanded the matter to the Commission.[28]

---

Trust, Securities Exchange Act Release No. 83723 (July 26, 2018), 83 FR 37579, 37594 (Aug. 1, 2018)
(SR-BatsBZX-2016-30) ("Winklevoss Order").

[24]   See, e.g., VanEck Order II at 16064-67 and the disapproval orders listed at n.11 therein.

[25]   See, e.g., Winklevoss Order at 37580; VanEck Order II at 16059 n.43 and accompanying text.

[26]   See Winklevoss Order at 37580.

[27]   See supra note 22.

[28]   See Grayscale Investments, LLC v. SEC, 82 F.4th 1239 (D.C. Cir. 2023).

The Commission is considering in this order the remand of the Grayscale Order and the other Proposals referenced above.  For the reasons discussed below, based on the record before the Commission and the Commission's analysis of available data and information, the Commission finds that sufficient "other means" of preventing fraud and manipulation in this context have been demonstrated.

Each Exchange has a comprehensive surveillance-sharing agreement with the CME via their common membership in the Intermarket Surveillance Group.[29]  This facilitates the sharing of information that is available to the CME through its surveillance of its markets, including its surveillance of the CME bitcoin futures market.

Spot bitcoin, however, does not trade on the CME and the CME does not engage in surveillance of spot bitcoin markets.  As with prior proposals, this raises questions regarding the sufficiency of a surveillance-sharing agreement with the CME in preventing fraud and manipulation when the proposed ETPs hold spot bitcoin.  If a would-be manipulator of a spot bitcoin ETP engages in misconduct (such as fraud, manipulation, or other trading abuses) on the CME itself, the CME's surveillance can be reasonably expected to detect such misconduct.  But if the would-be manipulator is not transacting on the CME itself, the impacts of its misconduct would not necessarily be surveilled by the CME unless the misconduct also impacts the CME bitcoin futures market.  Thus, when assessing the sufficiency of a surveillance-sharing agreement with the CME, it is critical to establish whether, and to what extent, fraud or manipulation that impacts the spot bitcoin market also impacts the CME bitcoin futures market.

In making that assessment, the Commission begins with a correlation analysis provided in one Proposal (the "ARK Analysis") that examines the relationship between prices in the CME

---

29      See, e.g., VanEck Order II at 16064.

bitcoin futures market and the spot bitcoin market.[30]  The ARK Analysis calculates Pearson correlation statistics[31] using time series of price returns data[32] that were compiled at the hour- and minute-levels, which account for intra-day movements in prices, and over a lengthy sample period (January 20, 2021, through February 1, 2023).  The ARK Analysis claims[33] that price changes in its selected spot bitcoin markets and the CME bitcoin futures market are "highly correlated."  Using hourly data, the correlation results are "no less than 92%".  Using minute-by-minute data, the results are "no less than 78%".  Importantly, however, the analysis does not assess whether any of the results are consistent across the sample period.

---

[30]    See ARK Amendment at 24-27.  A commenter to another Proposal also conducted a correlation analysis and found a 99.9 percent correlation between a "daily" spot bitcoin price and a "daily" CME bitcoin futures price over a four-month sample period (Nov. 4, 2021, through Feb. 23, 2022).  See Letter from Paul Grewal, Chief Legal Officer, Coinbase Global, Inc., dated Mar. 3, 2022, regarding SR-NYSEARCA-2021-90.  However, based on the commenter's description of its correlation analysis at Figure 6 therein, it appears that this correlation was calculated using time series of price *levels*.  Time series of price *levels* are often non-stationary, which leads to results that indicate relationships that do not actually exist.  In addition, calculating correlation using only *daily* price observations provides no information on how prices in the two markets are associated—if at all—*throughout* the trading day.  Moreover, correlation over a single four-month sample period does not provide evidence of a *consistently* high correlation over time.  Several other commenters also assert a relationship between spot bitcoin prices and futures prices, but provide no evidence to support their assertions.  See, e.g., Letter from James J. Angel, Georgetown University, dated Aug. 11, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044 ("Angel Letter"), at 2 (asserting that spot and futures markets are "closely locked together through arbitrage, and the difference in market prices between the spot bitcoin price and the futures price is negligible"); Letter from Mike Spotto, dated Aug. 23, 2023, regarding SR-CboeBZX-2023-028 ("Spotto Letter") (asserting that the price of a futures-based exchange-traded vehicle "is derived from" the spot market); Letter from Michael Es, dated Aug. 27, 2023, regarding SR-CboeBZX-2023-028 ("Es Letter") (asserting that "the price of futures are correlated with spot").

[31]    See ARK Amendment at 24 n.54 (explaining that Pearson correlation is a measure of linear association between two variables and indicates the magnitude as well as direction of this relationship, and that the value can range between -1 (suggesting a strong negative association) and 1 (suggesting a strong positive association)).

[32]    Price *returns* data are typically stationary and thus less prone to misleading results than price *levels* data.  See also supra note 30.

[33]    Several aspects of the ARK Analysis are unclear based on the description in the ARK Amendment.  For example, the description does not indicate the particular time series that were used for the correlation analysis (e.g., last trade price, bid price, ask price, midpoint of bid-ask).  The ARK Analysis also computed correlations among several spot bitcoin markets, in addition to between the CME bitcoin futures market and those spot markets.  However, the ARK Amendment does not present the individual numerical results for each correlation, and thus the results that are specific to the CME bitcoin futures market are unknown.

The Commission undertook to verify the ARK Analysis' correlation results for a subset of its selected spot bitcoin markets, as well as to supplement the analysis by assessing the *consistency* of the results across the sample period.  For robust[34] results, the Commission used stationary time series of price returns data at hourly, five-minute, and one-minute intervals for the spot BTC/USD trading pair on Coinbase and Kraken, as well as for the closest-to-maturity CME bitcoin futures contract, over a similarly lengthy sample period (March 1, 2021, through October 20, 2023).[35]  Pearson correlation statistics were calculated for the full sample period as well as for rolling three-month segments within the sample period.  The Commission's correlation analysis utilized frequent intra-day trading data over the lengthy sample period on this subset of spot bitcoin platforms[36] and—crucially—on the CME bitcoin futures market as well.[37]

---

[34]   See also infra note 38.

[35]   Data were sourced from the CME via the SEC's Market Information Data Analytics System ("MIDAS") for the closest-to-maturity CME bitcoin futures contract price and from Kaiko for the BTC/USD prices on Coinbase and Kraken.  All data sets used in the Commission's analysis are publicly available (although some require subscriptions).  One-minute, five-minute, and hourly price *level* time series were created using the last trade price over the given interval for the spot BTC/USD pairs and the closest-to-maturity CME bitcoin futures contract.  Each price *level* time series was then log differenced to create price *returns* time series.  The stationarity of each price *returns* time series was confirmed through Augmented Dickey-Fuller tests.

[36]   The spot bitcoin market has grown since 2009 into a 24-hour, global marketplace.  However, due to the unregulated and fragmented nature of the spot bitcoin market, there are no authoritative published figures for spot bitcoin trading.  Nonetheless, multiple sources of pricing information for the spot bitcoin market are available 24 hours per day on public websites and through subscription services.  See, e.g., Grayscale Amendment at 41 (stating that real-time price and volume data for bitcoin is available by subscription from Reuters and Bloomberg).

[37]   The CME bitcoin futures market, which is regulated by the U.S. Commodity Futures Trading Commission ("CFTC"), has developed since its inception in Dec. 2017 into an active market, growing from 498 open BTC contracts on Dec. 31, 2017, to 16,281 open BTC contracts and 6,409 open MBT contracts on Oct. 31, 2023 (source: Refinitiv).  Real-time trade information, including prices, for the CME bitcoin futures market is made available through CME at: https://www.cmegroup.com/markets/cryptocurrencies/bitcoin/bitcoin.quotes.html#venue=globex and https://www.cmegroup.com/markets/cryptocurrencies/bitcoin/micro-bitcoin.quotes.html#venue=globex.

The results of the Commission's analysis confirm that the CME bitcoin futures market has been consistently highly correlated with this subset of the spot bitcoin market throughout the past 2.5 years. The correlation between the CME bitcoin futures market and this subset of spot bitcoin platforms for the full sample period is no less than 98.4 percent using data at an hourly interval, 94.2 percent using data at a five-minute interval, and 76.9 percent using data at a one-minute interval. The rolling three-month correlation results are similar: ranging between 95.0 and 99.2 percent using data at an hourly interval, 84.0 and 94.5 percent using data at a five-minute interval, and 67.9 and 83.2 percent using data at a one-minute interval.

Correlations between Certain Spot Bitcoin Markets and the CME Bitcoin Futures Market

|  | Coinbase | | | Kraken | | |
|---|---|---|---|---|---|---|
|  | Hourly | 5 Minutes | 1 Minute | Hourly | 5 Minutes | 1 Minute |
| Full Sample:<br>03/01/21 to 10/20/23 | 98.4 | 94.6 | 77.1 | 98.4 | 94.2 | 76.9 |
| Rolling Three-Month Correlations Over the Full Sample Period: |  |  |  |  |  |  |
| Maximum | 99.2 | 94.3 | 83.2 | 99.1 | 94.5 | 82.4 |
| Minimum | 95.0 | 87.6 | 69.5 | 95.0 | 84.0 | 67.9 |

Moreover, the results of the Commission's robust correlation analysis[38] provide empirical evidence supporting the ARK Analysis' conclusion that prices generally move in close (although not perfect) alignment between the spot bitcoin market and the CME bitcoin futures market.[39]

---

[38] The robustness of the Commission's correlation analysis rests on the pre-requisites of (1) the correlations being calculated with respect to bitcoin futures that trade on *the CME*, a U.S. market regulated by the CFTC, (2) the lengthy sample period of price returns for both the CME bitcoin futures market and the spot bitcoin market, (3) the frequent intra-day trading data in both the CME bitcoin futures market and the spot bitcoin market over that lengthy sample period, and (4) the consistency of the correlation results throughout the lengthy sample period.

[39] Correlation should not be interpreted as an indicator of a causal relationship or whether one variable leads or lags the other.

As such, in contrast to previous proposals,[40] based on the record before the Commission and the improved quality of the correlation analysis in the record, including the Commission's own analysis, the Commission is able to conclude that fraud or manipulation that impacts prices in spot bitcoin markets would likely similarly impact CME bitcoin futures prices. And because the CME's surveillance can assist in detecting those impacts on CME bitcoin futures prices, the Exchanges' comprehensive surveillance-sharing agreement with the CME—a U.S. regulated market whose bitcoin futures market is consistently highly correlated to spot bitcoin, albeit not of "significant size" related to spot bitcoin—can be reasonably expected to assist in surveilling for fraudulent and manipulative acts and practices in the specific context of the Proposals.[41]

---

[40]   The Commission years ago, in analyzing previous proposals, recognized that there may be a change in conditions or available information that affects the Exchange Act analysis, and that the Commission would then have the opportunity to consider whether a spot bitcoin ETP would be consistent with the requirements of the Exchange Act. See Winklevoss Order at 37580.

[41]   In the original filings of their respective Proposals, Nasdaq and BZX had each stated that they expected to enter into a bilateral surveillance-sharing agreement with Coinbase, Inc. ("Coinbase") that would provide supplemental access to certain data regarding spot bitcoin trades on Coinbase. The Commission received comments regarding such potential agreements. Some commenters state that such agreements would adequately address the Commission's concerns around market manipulation with respect to the operation of spot bitcoin ETPs (see, e.g., Letter from Simpson Thacher & Bartlett LLP on behalf of Skybridge Capital LLC, dated Aug. 14, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044, at 2-3; Letter from Jason Grunstra, dated Aug. 15, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044), would help to protect against attempted manipulation (see Letter from Joe Stevens, dated Nov. 29, 2023, regarding SR-CboeBZX-2023-072), and would significantly enhance the Exchanges' market monitoring capabilities (see Letter from Julian Schettler, dated Dec. 2, 2023, regarding SR-CboeBZX-2023-072 ("Schettler Letter")). Other commenters disagree that such agreements would add much value, citing, among other reasons, Coinbase's small portion of overall, global spot bitcoin trading; its lack of registration with either the SEC or CFTC; and that utilizing just Coinbase for surveillance purposes could introduce a single point of failure. See, e.g., Letter from Stephen W. Hall, Legal Director and Securities Specialist, and Scott Farnin, Legal Counsel, Better Markets, Inc., dated Aug. 8, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044 ("Better Markets Letter I"), at 6-7; Letter from Dennis M. Kelleher, Co-Founder, President, and CEO, and Stephen W. Hall, Legal Director and Securities Specialist, Better Markets, Inc., dated Jan. 5, 2024, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044 ("Better Markets Letter II"), at 9-10; Letter from Occupy the SEC, dated Aug. 30, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, SR-CboeBZX-2023-044, and SR-NYSEARCA-2023-44 ("Occupy Letter"), at 2-3; Letter from Travis Kling, dated Aug. 14, 2023, regarding SR-CboeBZX-2023-

### B.    Exchange Act Section 11A(a)(1)(C)(iii)

Each Proposal sets forth aspects of its proposed ETP, including the availability of pricing

information, transparency of portfolio holdings, and types of surveillance procedures, that are

consistent with other spot commodity ETPs that the Commission has approved.[42]  This includes

commitments regarding: the availability via the relevant securities information processor of

quotation and last-sale information for the shares of each Trust; the availability on the websites

of each Trust of certain information related to the Trusts' intra-day indicative values ("IIV") and

net asset values; the dissemination of IIV by one or more major market data vendors, updated

every 15 seconds throughout the Exchanges' regular trading hours; the Exchanges' surveillance

procedures and ability to obtain information regarding trading in the shares of the Trusts; the

conditions under which the Exchanges would implement trading halts and suspensions; and the

requirements of registered market makers in the shares of each Trust.[43]  In addition, in each

Proposal, the applicable Exchange deems the shares of the applicable Trust to be equity

---

028 ("Kling Letter").  Another commenter contends that the Commission may not require that an Exchange enter into such an agreement to satisfy Exchange Act Section 6(b)(5).  See Letter from Davis Polk & Wardell LLP on behalf of Grayscale Investments, LLC, dated July 27, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044.  Nasdaq's and BZX's amended filings (see supra notes 6-13) removed any statements regarding such potential agreements.  Because those amended filings no longer reference these agreements, and because the Commission finds that other means have been demonstrated to satisfy the Exchange Act Section 6(b)(5) statutory obligation that an exchange's rules be designed to prevent fraudulent and manipulative acts and practices, the surveillance-sharing agreements with Coinbase are not a basis for approval.

[42]    See, e.g., Securities Exchange Act Release No. 61220 (Dec. 22, 2009), 74 FR 68895 (Dec. 29, 2009) (SR-NYSEARCA-2009-94) (Order Granting Approval of Proposed Rule Change Relating To Listing and Trading Shares of the ETFS Palladium Trust); Securities Exchange Act Release No. 94518 (Mar. 25, 2022), 87 FR 18837 (Mar. 31, 2022) (SR-NYSEARCA-2021-65) (Notice of Filing of Amendment No. 1 and Order Granting Accelerated Approval of a Proposed Rule Change, as Modified by Amendment No. 1, To List and Trade Shares of the Sprott ESG Gold ETF Under NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares)).

[43]    See Grayscale Amendment at 40-45; Bitwise Amendment at 54-58; Hashdex Amendment at 50-55; iShares Amendment at 41-47, 55-57; Valkyrie Amendment at 32-40, 44-48; ARK Amendment at 51-53, 56-62; Invesco Amendment at 32-34, 37-43; VanEck Amendment at 34-36, 39-45; WisdomTree Amendment at 32-35, 37-44; Wise Origin Amendment at 71-74, 77-83; Franklin Amendment at 34-36, 38-45.

securities, thus rendering trading in such shares subject to that Exchange's existing rules governing the trading of equity securities.[44]  Further, the applicable listing rules of each Exchange require that all statements and representations made in its filing regarding, among others, the description of the applicable Trust's holdings, limitations on such holdings, and the applicability of that Exchange's listing rules specified in the filing, will constitute continued listing requirements.[45]  Moreover, each Proposal states that: its issuer has represented to the applicable Exchange that it will advise that Exchange of any failure to comply with the applicable continued listing requirements; pursuant to obligations under Section 19(g)(1) of the Exchange Act, that Exchange will monitor for compliance with the continued listing requirements; and if the applicable Trust is not in compliance with the applicable listing requirements, that Exchange will commence delisting procedures.[46]

The Commission therefore believes that the Proposals, as with the other spot commodity ETPs that the Commission has approved,[47] are reasonably designed to promote fair disclosure of information that may be necessary to price the shares of the Trusts appropriately, to prevent trading when a reasonable degree of transparency cannot be assured, to safeguard material non-public information relating to the Trusts' portfolios, and to ensure fair and orderly markets for the shares of the Trusts.

---

[44]     See Grayscale Amendment at 42; Bitwise Amendment at 55; Hashdex Amendment at 52; iShares Amendment at 44; Valkyrie Amendment at 37; ARK Amendment at 59; Invesco Amendment at 40; VanEck Amendment at 43; WisdomTree Amendment at 41; Wise Origin Amendment at 80; Franklin Amendment at 42.

[45]     See Nasdaq Rule 5711(d)(iii); NYSE Arca Rule 8.201-E(e)(2)(vii); NYSE Arca Rule 8.500-E(d)(2)(i)(C); BZX Rule 14.11(a).

[46]     See Grayscale Amendment at 44; Bitwise Amendment at 57; Hashdex Amendment at 54; iShares Amendment at 40; Valkyrie Amendment at 39; ARK Amendment at 61; Invesco Amendment at 41-42; VanEck Amendment at 44; WisdomTree Amendment at 42-43; Wise Origin Amendment at 82; Franklin Amendment at 43-44.

[47]     See supra note 42.

C.    __Other Comments Related to Bitcoin ETPs__

Some commenters assert that the Commission must approve the Proposals because exchange-traded funds ("ETFs") and ETPs holding CME bitcoin futures, including leveraged ETFs, are already trading on national securities exchanges.[48]  Other commenters state that the Commission should approve the Proposals because ETFs/ETPs holding CME bitcoin futures and spot bitcoin ETPs ultimately track the same underlying asset.[49]  These commenters, however, do not provide any empirical evidence to support these claims.

The Commission has considered and, for the reasons described above, is approving the Proposals on their own merits and under the standards applicable to them; namely, the standards provided by Section 6(b)(5) and Section 11A(a)(1)(C)(iii) of the Exchange Act.[50]  As described above, based on the record before the Commission and the Commission's own correlation analysis, the Commission concludes that fraud or manipulation that impacts prices in spot bitcoin markets would likely similarly impact CME bitcoin futures prices, such that a surveillance-sharing agreement with the CME can be reasonably expected to assist in surveilling for fraud and manipulation that may impact the proposed spot bitcoin ETPs.

Some commenters state that the Commission should approve the Proposals for a variety of investor protection reasons, including that spot bitcoin ETPs would offer a less costly and

---

[48]    See, e.g., Letter from Chris, dated Aug. 11, 2023, regarding SR-CboeBZX-2023-028; Letter from Rocket Academic Services, LLC, dated July 23, 2023, regarding SR-NASDAQ-2023-019.

[49]    See, e.g., Angel Letter at 2; Letter from Douglas A. Cifu, Chief Executive Officer, Virtu Financial, Inc., regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, SR-CboeBZX-2023-044, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, and SR-NYSEARCA-2023-44 ("Virtu Letter"), at 2; Letter from Erica Woods, dated July 18, 2023, regarding SR-CboeBZX-2023-044 ("Woods Letter"); Letter from John Rundle, dated July 18, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, and SR-CboeBZX-2023-044.

[50]    15 U.S.C. 78f(b)(5); 15 U.S.C. 78k-1(a)(1)(C)(iii).

more efficient way to gain exposure to bitcoin,[51] would be more convenient and secure relative

to directly holding bitcoin,[52] and would be more regulated.[53]  Other commenters state that the

Commission should disapprove the Proposals on investor protection grounds, citing concerns

that certain market players would take advantage of retail investors.[54]

---

[51]  See, e.g., Spotto Letter; Letter from John Smith, dated July 18, 2023, regarding SR-CboeBZX-2023-040 ("John Smith Letter"); Letters from Peter L. Briger, Jr., Chairman, Fortress Investment Group LLC, dated Sept. 29, 2023, regarding SR-CboeBZX-2023-028, and dated Oct. 20, 2023, regarding SR-NASDAQ-2023-016 ("Fortress Letters"), at 2.

[52]  See, e.g., Virtu Letter at 1 and 3; Fortress Letters at 1; McGinley Letter; Letter from Nick, dated July 18, 2023, regarding SR-NASDAQ-2023-016; Letter from Patrick Brogan, dated July 17, 2023, regarding SR-NASDAQ-2023-016 ("Brogan Letter"); Letter from Parthiban Rathinaswamy, dated July 21, 2023, regarding SR-CboeBZX-2023-044; Letter from Richard Sapp, dated July 17, 2023, regarding SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044 ("Sapp Letter"); Letter from Eric Murphy, dated Aug. 31, 2023, regarding SR-CboeBZX-2023-028; Letter from Dave Lester, dated Aug. 11, 2023, regarding SR-CboeBZX-2023-028 ("Lester Letter"); Letter from Anonymous, dated Nov. 28, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, SR-CboeBZX-2023-044, SR-CboeBZX-2023-072, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-NYSEARCA-2023-44, and SR-NYSEARCA-2023-58.

[53]  See, e.g., Fortress Letters at 1-2; Es Letter; Woods Letter; Brogan Letter; Letter from Mark S. Abner, dated July 17, 2023, regarding SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044; Letter from Peter Bouraphael, dated Aug. 13, 2023, regarding SR-CboeBZX-2023-028 ("Bouraphael Letter").  The Trust described in the Hashdex Amendment would purchase and sell spot bitcoin exclusively through Exchange for Physical ("EFP") transactions, which NYSE Arca describes as a "CME-regulated, bilaterally negotiated block trade" in which both parties engage in a composite transaction that involves both a CME bitcoin futures leg and a spot bitcoin leg.  See Hashdex Amendment at 6, 17.  Some commenters assert that such EFP transactions involve "enhanced regulatory standards."  See, e.g., Letter from Philippe Bekhazi, Chief Executive Officer, XBTO Global Ltd., dated Dec. 27, 2023, regarding SR-NYSEARCA-2023-58, at 2 ("The proposal's commitment to transparency is actively demonstrated through the reporting of EFPs to CME, subjecting prices to ongoing surveillance and review."); Letter from David Vizsolyi, CEO, DV Chain, LLC, dated Dec. 22, 2023, regarding SR-NYSEARCA-2023-58, at 2 (efforts to affect the price of the Trust's shares could involve a CME participant influencing the EFP prices, but "[p]resumably, such attempted manipulation would be strictly monitored, prevented, and if need be, sanctioned by CME").

[54]  See, e.g., Occupy Letter at 3 (stating that the Trusts would be "fertile ground for high-pressure brokers exploiting the hype and volatility to take advantage of unsophisticated investors"); Letter from Tally.xyz, dated Dec. 4, 2023, regarding SR-NASDAQ-2023-016 (stating that certain spot bitcoin ETP sponsors have "accumulated huge positions to dump on an excited retail market"); Letter from Daniel P.B. Smith, dated Aug. 12, 2023, regarding SR-CboeBZX-2023-028 ("Daniel Smith Letter") (stating that spot bitcoin ETP sponsors "just see money flowing from mark to con artist and figure if people are being conned anyway, they might as well divert a little bit of that flow to themselves."); Letter from Public Citizen, dated Dec. 28, 2023, regarding SR-NYSEARCA-2021-90, at 1 and 4 (stating that "[b]itcoin specifically, and cryptocurrencies generally, do not serve the public interest and are, in fact, a trap for vulnerable investors" and that "[s]ome cryptocurrency sponsors may be exploiting those who believe they've been shut out of the traditional financial system").  See also infra note 60 and accompanying text.

The Commission has considered these potential benefits and concerns in the broader context of whether the Proposals meet each of the applicable requirements of the Exchange Act,[55] including the requirement in Section 6(b)(5)[56] that the Exchanges' rules be designed to "prevent fraudulent and manipulative acts and practices."  For the reasons described above, the Commission has determined that the Proposals meet such requirement.  The Commission also finds that the Proposals are consistent with the Section 6(b)(5) requirement that the Exchanges' rules be designed to protect investors and the public interest because, in addition to the factors discussed in Section II.A and II.B above, existing rules and standards of conduct would apply to recommending and advising investments in the shares of the Trusts.  For example, when broker-dealers recommend ETPs to retail customers, Regulation Best Interest ("Reg BI") would apply.[57] Reg BI requires broker-dealers to, among other things, exercise reasonable diligence, care, and skill when making a recommendation to a retail customer to: (1) understand potential risks, rewards, and costs associated with the recommendation and have a reasonable basis to believe that the recommendation could be in the best interest of at least some retail customers; and (2) have a reasonable basis to believe the recommendation is in the best interest of a particular retail customer based on that retail customer's investment profile.[58]  In addition, investment advisers

---

[55]     See also Winklevoss Order at 37602.

[56]     15 U.S.C. 78f(b)(5).

[57]     Exchange Act rule 15*l*-1(a).

[58]     Exchange Act rules 15*l*-1(a)(2)(ii)(A) and (B).  Separately, under Reg BI's Conflict of Interest Obligation, broker-dealers must establish, maintain, and enforce written policies and procedures reasonably designed to, among other things, identify and disclose or eliminate all conflicts of interest associated with a recommendation and mitigate conflicts of interest at the associated person level.  See Exchange Act rules 15*l*-1(a)(2)(iii)(A) and (B).  To the extent that broker-dealers recommend ETPs to customers who are not retail customers covered by Reg BI, FINRA Rule 2111 requires, in part, that a member broker-dealer or associated person "have a reasonable basis to believe that a recommended transaction or investment strategy involving a security or securities is suitable for the customer, based on the information obtained through the reasonable diligence of the [broker-dealer] or associated person to ascertain the customer's investment profile."

have a fiduciary duty under the Investment Advisers Act of 1940 comprised of a duty of care and

a duty of loyalty.  These obligations require the adviser to act in the best interest of its client and

not subordinate its client's interest to its own.[59]

Some commenters contend that the Commission should disapprove the Proposals because

the bitcoin market has been, is being, and/or will likely continue to be, manipulated.[60]  The

---

[59]     See Commission Interpretation Regarding Standard of Conduct for Investment Advisers, Investment
Advisers Act Release No. 5248 (June 5, 2019), 84 FR 33669 (July 12, 2019), at 33671; Investment
Company Act Release No. 34084 (Nov. 2, 2020), 85 FR 83162 (Dec. 21, 2020), at 83217 (discussing the
best interest standard of conduct for broker-dealers and the fiduciary obligations of investment advisers in
the context of all ETPs).

[60]     See, e.g., Kling Letter (stating that the bitcoin futures price is beholden to the spot price, and the spot price
has always been, and continues to be, manipulated by bad actors); Better Markets Letter I at 2 and 4-9 and
Better Markets Letter II at 4-6 (stating that spot bitcoin ETPs are extremely vulnerable to manipulation by
bad actors because spot bitcoin markets (1) have a history of artificially inflated trading volumes due to
rampant manipulation and wash trading, (2) are highly concentrated, and (3) rely on a select group of
individuals and entities to maintain the bitcoin network); Letter from John Palmer, dated Aug. 11, 2023,
regarding SR-CboeBZX-2023-028 (stating that 75% of the bitcoin in circulation is controlled by a small
minority who use market makers to pump and dump); Daniel Smith Letter ("[t]he history of crypto is a
never-ending history of frauds and scams"); Letter from Billy Jensen, dated Sept. 5, 2023, regarding SR-
CboeBZX-2023-028 (stating that bitcoin is a digital Ponzi, and that approving a spot ETF "will bring
greater unsuspecting fools into the pyramid scheme"); Letter from The Registered Principal, dated Aug. 9,
2023, regarding SR-CboeBZX-2023-038, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, SR-
CboeBZX-2023-044, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, and SR-NYSEARCA-2023-44
("[t]here are no verifiable entities or persons as points of ultimate origin of [b]itcoin which makes it very
likely to be a major fraud operation"); Letter from Joseph, dated July 18, 2023, regarding SR-CboeBZX-
2023-044 ("[a] cartel of organized crime and money-launders [sic] actively manipulate the price of
[b]itcoin through the use of Tether and other crypto-ponzi schemes"); Letter from Avinash Shenoy, dated
Oct. 18, 2023, regarding SR-NASDAQ-2023-016 (stating that manipulation in the bitcoin marketplace has
not gone away); Letter from Winston Wood, dated Oct. 19, 2023, regarding SR-NASDAQ-2023-016
(stating that the bitcoin market is manipulated and has a history rife with scams and criminal activity);
Letter from Greg Steven, dated Oct. 19, 2023, regarding SR-NASDAQ-2023-016 ("Steven Letter") (stating
that bitcoin is wash traded on platforms outside of U.S. jurisdiction); Letter from Neil Fulton, dated Oct.
20, 2023, regarding SR-NASDAQ-2023-016 (recommending that spot bitcoin ETPs be disapproved until
bitcoin wash trading is minimized); Letters from Micah Warren, Associate Professor of Mathematics,
University of Oregon, dated Oct. 27, 2023, regarding SR-NASDAQ-2023-016, and dated Dec. 15, 2023,
regarding SR-CboeBZX-2023-072 ("Warren Letters") (explaining how the bitcoin ledger, which is
maintained by for-profit mining entities, could become significantly less diverse and less costly to
manipulate).  Some commenters also assert that the bitcoin asset *itself* is a manipulation or fraud.  One
commenter states that "the complete lack of knowledge of who the operators of the bitcoin network are
means that it is impossible to implement sufficient control measures to ensure a fair market that is free from
manipulation of both token trades, actions of the operators, or even the fundamental properties of the asset
itself."  See Letter from Brandon B., dated Oct. 25, 2023, regarding SR-NASDAQ-2023-016 ("Brandon
Letter"), at 4.  Another commenter asserts that the questions the Commission has been asking about fraud
and manipulation are misguided because "they are predicated on the idea that [b]itcoin is something
legitimate which could possibly serve the public interest."  This commenter claims that "[b]itcoin is, and
has always been, a form of investment fraud" that should be banned, not regulated.  See Letter from Sal

---

Commission acknowledges these concerns.  Pursuant to Section 19(b)(2) of the Exchange Act,

however, the Commission must approve a proposed rule change filed by a national securities

exchange if it finds that the proposed rule change is consistent with the applicable requirements

of the Exchange Act.[61]  For the reasons described above, the Commission finds that the

Proposals satisfy the requirements of the Exchange Act, including the requirement in Section

6(b)(5)[62] that the Exchanges' rules be designed to "prevent fraudulent and manipulative acts and

practices."

Commenters also raise concerns regarding the custody of spot bitcoin.  Some

commenters express concern that the Bitcoin blockchain is susceptible to hacking and that the

Trusts' bitcoin could be susceptible to "reverse hacking."[63]  Other commenters express concern

that a Trust could become "uncovered" if it issues shares that are not backed by adequate

amounts of bitcoin held on behalf of the Trust by its bitcoin custodian.  These commenters

recommend various verification methods, such as publicly sharing the relevant wallet

---

Bayat, dated Oct. 24, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044 ("Bayat Letter"), at 11-14.

[61]     See Exchange Act Section 19(b)(2)(C), 15 U.S.C. 78s(b)(2)(C).  The Commission does not apply a "cannot be manipulated" standard; rather, the Commission examines whether a proposal meets the requirements of the Exchange Act.  See, e.g., Winklevoss Order at 37582; VanEck Order II at 16059 n.43.  The Commission does not understand the Exchange Act to require that a particular product or market be immune from manipulation.  Rather, the inquiry into whether the rules of an exchange are designed to prevent fraudulent and manipulative acts and practices and, in general, to protect investors and the public interest, has long focused on the mechanisms in place for the detection and deterrence of fraud and manipulation.

[62]     15 U.S.C. 78f(b)(5).

[63]     See, e.g., Better Markets Letter at 2 ("[t]he concentrated nature of the spot bitcoin market and the heavy reliance on a select group of individuals and entities to maintain its network threatens a myriad of harms, such as hacking"); Letter from Nathaniel Parton, dated Nov. 14, 2023, regarding SR-NASDAQ-2023-016 (stating that hacking losses have occurred on bitcoin and ether decentralized platforms, centralized platforms, and when spot crypto is in transit; and that a Trust and its shareholders may have "huge unresolvable loss" from court-ordered "reverse hacking" if the bitcoin held by the Trust is itself the product of a prior alleged hack).

addresses.[64]  Another commenter states that a bitcoin custodian is not a "true custodian," but merely a "pass-through custodian" because it would only hold keys rather than directly possessing the underlying bitcoin balance.[65]  According to this commenter, the bitcoin "network of strangers" is the true custodian, undermining the safety and security investors have come to expect for exchange-traded securities.[66]

Conversely, some commenters consider the transparency of the Bitcoin blockchain to be an advantage over traditional asset classes, because it could enable the real-time tracking of the Trusts' bitcoin holdings.[67]  And as stated above,[68] some commenters consider custody by the Trusts' bitcoin custodians to be more secure than the self-custody of bitcoin.

The Commission acknowledges that the aggregation of bitcoin under the Trusts' control, and the fact that bitcoin custodians only hold keys to such bitcoin and not the bitcoin itself, could introduce risks.  As noted above, however, the Commission must approve a proposed rule change filed by a national securities exchange if it finds that the proposed rule change is consistent with the applicable requirements of the Exchange Act.[69]  The Commission has considered the risks raised by commenters, but for the reasons set forth in Section II.A and II.B above, it finds that the Proposals satisfy the requirements of the Exchange Act.  With respect to "uncovered" shares, the potential for a gap between issued shares and underlying holdings is a

---

[64]     See, e.g., Letter from Alexander Rohner, dated Nov. 30, 2023, regarding SR-CboeBZX-2023-072; Letter from Burak Aktas, dated Nov. 30, 2023, regarding SR-CboeBZX-2023-072; Letter from Michael Fuhrmann, dated Nov. 30, 2023, regarding SR-CboeBZX-2023-072; Letter from Marius, dated Nov. 30, 2023, regarding SR-CboeBZX-2023-072; Letter from Anonymous, dated Nov. 30, 2023, regarding SR-CboeBZX-2023-072.

[65]     See Brandon Letter at 1.

[66]     See id. at 4.

[67]     See, e.g., Schettler Letter.

[68]     See supra note 52.

[69]     See Exchange Act Section 19(b)(2)(C), 15 U.S.C. 78s(b)(2)(C).

risk pertinent to ETPs in general and is not unique to those that would hold bitcoin. Any such gap could constitute a potential violation of Exchange rules and grounds for suspension and the commencement of delisting proceedings.[70] More generally, a failure to maintain good ownership and control of sufficient bitcoin to cover issued ETP shares could, depending on the facts and circumstances, create potential violations of the Exchange Act, the Securities Act of 1933, and/or the Commodity Exchange Act.

Commenters also address, among other things: the nature, uses, merits, and drawbacks of bitcoin, other crypto assets, and blockchain technology;[71] the merits and drawbacks of an investment in bitcoin and/or bitcoin ETPs;[72] the nature of the bitcoin mining network and its environmental impacts;[73] the potential impact of Commission approval of spot bitcoin ETPs on the economy, jobs, U.S. innovation, and/or U.S. geopolitical position;[74] the potential impact of

---

[70]     See BZX Rule 14.11(e)(4)(E)(ii); Nasdaq Rule 5711(d)(vi)(B); NYSE Arca Rule 8.201-E(e)(2); NYSE Arca Rule 8.500-E(d)(2)(i).

[71]     See, e.g., Bouraphael Letter; Lester Letter; Bayat Letter; Letter from Shady Attia, dated July 20, 2023, regarding SR-NASDAQ-2023-016; Letter from Maria Fernanda, dated July 19, 2023, regarding SR-CboeBZX-2023-038 ("Fernanda Letter"); Letter from Joseph B. Dart, dated July 18, 2023, regarding SR-CboeBZX-2023-038, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044; Letter from Leeor Shapira, dated Sept. 28, 2023, regarding SR-CboeBZX-2023-028; Letter from Miller McGee, dated Sept. 8, 2023, regarding SR-CboeBZX-2023-028; Letter from The Due Diligence, dated July 31, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, SR-CboeBZX-2023-044, and SR-NYSEARCA-2023-44 ("TDD Letter"); Letter from Randy Donnelly, dated Oct. 24, 2023, regarding SR-CboeBZX-2023-028; Letter from N. Vittal, dated July 23, 2023, regarding SR-CboeBZX-2023-038; Letter from Adam R. Smith, dated Oct. 18, 2023, regarding SR-NASDAQ-2023-016; Letter from Jethro Davies, dated Oct. 19, 2023, regarding SR-NASDAQ-2023-016; Letter from Dylan Henderson, dated Nov. 28, 2023, regarding SR-CboeBZX-2023-072.

[72]     See, e.g., Spotto Letter; Lester Letter; Bayat Letter; Occupy Letter at 2; Letter from James Erbe, dated July 17, 2023, regarding SR-NASDAQ-2023-016; Letter from Keith Boyd, dated Oct. 24, 2023, regarding SR-CboeBZX-2023-028; Letter from Michael H., dated Nov. 29, 2023, regarding SR-CboeBZX-2023-028.

[73]     See, e.g., TDD Letter; Steven Letter; Bayat Letter; Schettler Letter; Warren Letters; Letter from Mandy DeRoche of Earthjustice, Scott Faber and Jessica Hernandez of the Environmental Working Group, and Josh Archer and Erik Kojola of Greenpeace, dated Aug. 30, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-CboeBZX-2023-042, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-NYSEARCA-2023-44; Letter from Marcus AE, dated Nov. 8, 2023, regarding SR-CboeBZX-2023-028.

[74]     See, e.g., Woods Letter; Fernanda Letter; John Smith Letter; Sapp Letter; Letter from David Alden, dated Aug. 14, 2023, regarding SR-CboeBZX-2023-028; Letter from Dennis Smith, dated Oct. 24, 2023,

Commission approval of spot bitcoin ETPs on the bitcoin market itself;[75] suggestions for improving regulation of crypto asset markets[76] and criticisms of the current regulatory approach;[77] suggestions for the Commission's allocation of its resources;[78] and specific concerns relating to a sponsor of one of the Trusts.[79]  Ultimately, however, the Commission has considered and, for the reasons discussed above, is approving the Proposals under the standards applicable to them; namely, the standards provided by Section 6(b)(5) and Section 11A(a)(1)(C)(iii) of the Exchange Act.[80]

## III.    ACCELERATED APPROVAL OF THE PROPOSALS

The Commission finds good cause to approve the Proposals prior to the 30th day after the date of publication of notice of the Exchanges' amended filings[81] in the Federal Register.  The

---

regarding SR-NASDAQ-2023-016; McGinley Letter; Letter from Berkshire, dated Aug. 7, 2023, regarding SR-CboeBZX-2023-038; Letter from Omar Ibrahim, dated July 15, 2023, regarding SR-CboeBZX-2023-040, SR-CboeBZX-2023-044, and SR-NASDAQ-2023-016; Letter from Paul Knight, dated July 18, 2023, regarding SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, and SR-CboeBZX-2023-044; Letter from Jeff Calhoun, dated Dec. 12, 2023, regarding SR-CboeBZX-2023-028.

[75]   See, e.g., Occupy Letter at 2; Brogan Letter.

[76]   See, e.g., Angel Letter at 3-6.

[77]   See, e.g., Letter from Naceur Hussein, dated July 18, 2023, regarding SR-CboeBZX-2023-044; Letter from Axel Hoogland, dated Aug. 15, 2023, regarding SR-CboeBZX-2023-028.  A commenter discusses the benefits of in-kind creation and redemption mechanisms for spot bitcoin ETPs, and the drawbacks to having only cash creation and redemption mechanisms for such ETPs.  See Letter from James J. Angel, Georgetown University, dated Dec. 12, 2023, regarding SR-NYSEARCA-2021-90, SR-NYSEARCA-2023-44, SR-NYSEARCA-2023-58, SR-NASDAQ-2023-016, SR-NASDAQ-2023-019, SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, SR-CboeBZX-2023-044, and SR-CboeBZX-2023-072.  The Proposals under consideration by the Commission in this order only contemplate cash creation and redemption by authorized participants.  Accordingly, in-kind creation and redemption processes by authorized participants, and their relative benefits or drawbacks, are outside the scope of this order.

[78]   See, e.g., Angel Letter at 3.

[79]   See, e.g., Letters from Marie-Lise Lipchik, dated Aug. 11, 2023, and Aug. 15, 2023, regarding SR-CboeBZX-2023-028; Letter from William C. Piontek, dated Aug. 12, 2023, regarding SR-CboeBZX-2023-028.

[80]   15 U.S.C. 78f(b)(5); 15 U.S.C. 78k-1(a)(1)(C)(iii).

[81]   See supra notes 3-13.

amended filings clarified the descriptions of the Trusts; further described the terms of the Trusts; and conformed various representations in the amended filings to the applicable Exchange's listing standards and to representations that the Exchanges have made for other spot commodity ETPs that the Commission has approved.[82]  These changes do not raise any novel regulatory issues.  Further, the changes assist the Commission in evaluating the Proposals and in determining that they are consistent with the Exchange Act and the rules and regulations thereunder applicable to a national securities exchange, as discussed above.  Accordingly, the Commission finds good cause, pursuant to Section 19(b)(2) of the Exchange Act,[83] to approve the Proposals on an accelerated basis.

## IV.    CONCLUSION

This approval order is based on all of the Exchanges' representations and descriptions in their respective amended filings, which the Commission has carefully evaluated as discussed above.[84]  For the reasons set forth above, including the Commission's correlation analysis, the Commission finds, pursuant to Section 19(b)(2) of the Exchange Act,[85] that the Proposals are consistent with the requirements of the Exchange Act and the rules and regulations thereunder

---

[82]     See also supra Section II.B.

[83]     15 U.S.C. 78s(b)(2).

[84]     See supra notes 3-13.  In addition, the shares of the Trusts in SR-NYSEARCA-2021-90 and NYSEARCA-2023-44 must comply with the requirements of NYSE Arca Rule 8.201-E (Commodity-Based Trust Shares) to be listed and traded on NYSE Arca on an initial and continuing basis; the shares of the Trust in SR-NYSEARCA-2023-58 must comply with the requirements of NYSE Arca Rule 8.500-E (Trust Units) to be listed and traded on NYSE Arca on an initial and continuing basis; the shares of the Trusts in SR-NASDAQ-2023-016 and SR-NASDAQ-2023-019 must comply with the requirements of Nasdaq Rule 5711(d) (Commodity-Based Trust Shares) to be listed and traded on Nasdaq on an initial and continuing basis; and the shares of the Trusts in SR-CboeBZX-2023-028, SR-CboeBZX-2023-038, SR-CboeBZX-2023-040, SR-CboeBZX-2023-042, SR-CboeBZX-2023-044, and SR-CboeBZX-2023-072 must comply with the requirements of BZX Rule 14.11(e)(4) (Commodity-Based Trust Shares) to be listed and traded on BZX on an initial and continuing basis.

[85]     15 U.S.C. 78f(b)(2).

applicable to a national securities exchange, and in particular, with Section 6(b)(5) and Section 11A(a)(1)(C)(iii) of the Exchange Act.[86]

IT IS THEREFORE ORDERED, pursuant to Section 19(b)(2) of the Exchange Act,[87] that the Proposals (SR-NYSEARCA-2021-90; SR-NYSEARCA-2023-44; SR-NYSEARCA-2023-58; SR-NASDAQ-2023-016; SR-NASDAQ-2023-019; SR-CboeBZX-2023-028; SR-CboeBZX-2023-038; SR-CboeBZX-2023-040; SR-CboeBZX-2023-042; SR-CboeBZX-2023-044; SR-CboeBZX-2023-072) be, and hereby are, approved on an accelerated basis.

By the Commission.

**Vanessa A. Countryman,**

*Secretary.*

---

[86]   15 U.S.C. 78f(b)(5); 15 U.S.C. 78k-1(a)(1)(C)(iii).

[87]   15 U.S.C. 78f(b)(2).